IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                              )
UNITED STATES OF AMERICA,      )
                              )
          Plaintiff,           )
                              )
vs.                            )   Case No.:  3:17-CR-82
                              )
RANDALL KEITH BEANE AND        )
HEATHER ANN TUCCI-JARRAF,       )
                              )
          Defendants.          )
_____)


**VOLUME I of VIII**

**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**January 23, 2018**
**9:16 a.m. to 5:00 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          CYNTHIA F. DAVIDSON, ESQUIRE
                               ANNE-MARIE SVOLTO, ESQUIRE
                               Assistant United States Attorney
                               United States Department of Justice
                               Office of the United States Attorney
                               800 Market Street
                               Suite 211
                               Knoxville, Tennessee 37902

**FOR THE DEFENDANT:**          RANDALL KEITH BEANE, PRO SE
**RANDALL BEANE**               Blount County Detention Center
                               920 East Lamar Alexander Parkway
                               Maryville, Tennessee 37904

**FOR THE DEFENDANT:**          STEPHEN G. McGRATH, ESQUIRE
(As Elbow Counsel)             9111 Cross Park Drive
                               Suite D-200
                               Knoxville, Tennessee 37923


**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **FOR THE DEFENDANT:** | HEATHER ANN TUCCI-JARRAF, PRO SE |
| **HEATHER ANN** | 105 Orchard Lane |
| **TUCCI-JARRAF** | Oak Ridge, Tennessee 37830 |

| | |
|---|---|
| **FOR THE DEFENDANT:** | FRANCIS LLOYD, ESQUIRE |
| (As Elbow Counsel) | 9111 Cross Park Drive |
| | Suite D-200 |
| | Knoxville, Tennessee 37923 |

**REPORTED BY:**

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**INDEX**

**GOVERNMENT'S WITNESSES**                                            **PAGE**

PARKER STILL
Direct Examination by Ms. Davidson                                    21
Cross-Examination by Ms. Tucci-Jarraf                                 39
Cross-Examination by Mr. Beane                                        78
Redirect Examination by Ms. Davidson                                  80
Recross-Examination by Ms. Tucci-Jarraf                               83
Recross-Examination by Mr. Beane                                      86

DAVID WALKER
Direct Examination by Ms. Svolto                                      89
Cross-Examination by Ms. Tucci-Jarraf                                 94

MONICA ALCALA
Direct Examination by Ms. Davidson                                    98

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**

**NO.**   **DESCRIPTION**                                             **PAGE**

1     RV Photos                                                       31

149   AT&T Internet 45.22.26.36 Randall Beane                        92

150   AT&T MAC Address Report                                        92

152   AT&T Wireless Subscriber Information                           92

151   AT&T Wireless Mobility Report                                  95

91    Screenshots Creation of CD                                     105

2     USAA CD Activity Spreadsheet                                   108

3     USAA Acct Ending 3062 Account Summary_2017-07-14               108

4     USAA Checking Acct On Line App_0206953062 May 19,              108
      2016

5     USAA Acct Ending 4026 Account Statement                        108
      Summary_2017-07-14

6     USAA Savings On Line Application for Randall Keith             108
      Beane Account 040540949 June 10, 2016

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP Document 162 Filed 04/20/18 Page 3 of 136 PageID #: 16264

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 7 | USAA CD Deposit App 3204111 Acct No 7004609 $500,000 | 108 |
| 8 | USAA CD Deposit App 3204127 Acct No 7004613 $500,000 | 108 |
| 9 | USAA CD Deposit App 3204139 Acct No 7004615 $999,000 | 108 |
| 10 | USAA CD Deposit App 3204143 Acct No 7004617 $999,000 | 108 |
| 11 | USAA CD Deposit App 3204165 Acct No 7004619 $999,000 | 108 |
| 12 | USAA CD Deposit App 3204173 Acct No 7004621 $999,000 | 108 |
| 13 | USAA CD Deposit App 3204177 Acct No 7004623 $999,000 | 108 |
| 14 | USAA CD Deposit App 3204181 Acct No 7004625 $999,999 | 108 |
| 15 | USAA CD Deposit App 3204189 Acct No 7004627 $999,999 | 108 |
| 16 | USAA CD Deposit App 3204191 Acct No 7004629 $999,999 | 108 |
| 17 | USAA CD Deposit App 3204201 Acct No 7004631 $999,999 | 108 |
| 18 | USAA CD Deposit App 3204209 Acct No 7004633 $999,999 | 108 |
| 19 | USAA CD Deposit App 3204215 Acct No 7004635 $999,999 | 108 |
| 20 | USAA CD Deposit App 3204225 Acct No 7004639 $999,999 | 108 |
| 21 | USAA CD Deposit App 3204229 Acct No 7004641 $999,999 | 108 |
| 22 | USAA CD Deposit App 3204231 Acct No 7004643 $999,999 | 108 |
| 23 | USAA CD Deposit App 3204235 Acct No 7004645 $999,999 | 108 |
| 24 | USAA CD Deposit App 3204237 Acct No 7004647 $999,999 | 108 |
| 25 | USAA CD Deposit App 3204243 Acct No 7004649 $999,999 | 108 |
| 26 | USAA CD Deposit App 3204251 Acct No 7004651 $999,999 | 108 |
| 27 | USAA CD Deposit App 3204255 Acct No 7004653 $999,999 | 108 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP Document 162 Filed 04/20/18 Page 4 of 136 PageID #: 16265

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 28 | USAA CD Deposit App 3204257 Acct No 7004655 $999,999 | 108 |
| 29 | USAA CD Deposit App 3204263 Acct No 7004657 $999,999 | 108 |
| 30 | USAA CD Deposit App 3204265 Acct No 7004659 $999,999 | 108 |
| 31 | USAA CD Deposit App 3204283 Acct No 7004661 $999,999 | 108 |
| 32 | USAA CD Deposit App 3204289 Acct No 7004663 $999,999 | 108 |
| 33 | USAA CD Deposit App 3204293 Acct No 7004665 $999,999 | 108 |
| 34 | USAA CD Deposit App 3204297 Acct No 7004667 $999,999 | 108 |
| 35 | USAA CD Deposit App 3204299 Acct No 7004669 $999,999 | 108 |
| 36 | USAA CD Deposit App 3204301 Acct No 7004671 $999,999 | 108 |
| 37 | USAA CD Deposit App 3204305 Acct No 7004673 $999,999 | 108 |
| 38 | USAA CD Deposit App 3204317 Acct No 7004675 $999,999 | 108 |
| 39 | USAA CD Deposit App 3204319 Acct No 7004677 $999,999 | 108 |
| 40 | USAA CD Deposit App 3204321 Acct No 7004679 $999,999 | 108 |
| 41 | USAA CD Deposit App 3204349 Acct No 7004683 $999,999 | 108 |
| 42 | USAA Debit Card Activity to include $10k to Buddy Motors | 108 |
| 43 | USAA Funds Transfers | 108 |
| 44 | USAA Payment History Credit Card Acct 6824 | 108 |
| 45 | USAA Payment History Credit Card Acct 9575 | 108 |
| 46 | USAA Payment History Loan xx3366 | 108 |
| 47 | USAA Payment History Loan xx6471 | 108 |
| 48 | USAA Payment History Loan xx7593 | 108 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP Document 162 Filed 04/20/18 Page 5 of 136 PageID #: 16266

1

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

2

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 49 | USAA Payment History Loan xx9002 | 108 |
| 50 | USAA Payment History P&C | 108 |
| 51 | USAA Wire Instructions - Buddy Gregg | 108 |
| 52 | USAA On Line Application for Checking and Savings Joint Account - Ricky E. Beane 06-25-16 | 108 |
| 53 | USAA On Line Application for Checking Randall Keith Beane 02-01-17 | 108 |
| 54 | USAA On Line Application for Checking Randall Keith Beane 02-01-17 | 108 |
| 55 | USAA Unsecured Credit Card Application for Randall Keith Beane 08-15-16 | 108 |
| 56 | USAA Secured Credit Card Application for Ricky Beane 06-12-16 | 108 |
| 57 | USAA Checking Account Statement for Randall Keith Beane 06-20-16 to 07-19-16 | 108 |
| 58 | USAA Checking Account Statement for Randall Keith Beane 07-19-16 to 08-18-16 | 108 |
| 59 | USAA Checking Account Statement for Randall Keith Beane 08-18-16 to 09-19-16 | 108 |
| 60 | USAA Secure Checking Account Statement for Randall Keith Beane 09-19-16 to 10-18-16 | 108 |
| 61 | USAA Checking Account Statement for Randall Keith Beane 10-18-16 to 11-17-16 | 108 |
| 62 | USAA Checking Account Statement for Randall Keith Beane 11-17-16 to 12-19-16 | 108 |
| 63 | USAA Checking Account Statement for Randall Keith Beane 12-19-16 to 01-18-17 | 108 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 64 | USAA Checking Account Statement for Randall Keith Beane 01-18-17 to 02-15-17 | 108 |
| 65 | USAA Checking Account Statement for Randall Keith Beane 02-15-17 to 03-17-17 | 108 |
| 66 | USAA Checking Account Statement for Randall Keith Beane 03-17-17 to 04-18-17 | 108 |
| 67 | USAA Checking Account Statement for Randall Keith Beane 04-18-17 to 05-18-17 | 108 |
| 68 | USAA Checking Account Statement for Randall Keith Beane 05-18-17 to 06-19-17 | 108 |
| 69 | USAA Checking Account Statement for Randall Keith Beane 06-19-17 to 07-18-17 | 108 |
| 70 | USAA Promissory Note Loan for Randall K. Beane $10,998.88 02-21-17 | 108 |
| 71 | USAA $10,998.88 Loan Payment History as of 07-19-17 | 108 |
| 72 | USAA Promissory Note Loan for Randall K. Beane $4,500.00 09-06-16 | 108 |
| 73 | USAA $4,500.00 Loan Payment History as of 09-19-17 | 108 |
| 74 | USAA Promissory Note Loan for Randall K. Beane $16,847.23 08-20-16 | 108 |
| 75 | USAA $16,847.23 Loan Payment History as of 07-19-17 | 108 |
| 76 | USAA Promissory Note Loan for Randall K. Beane $7,875.00 11-03-16 | 108 |
| 77 | USAA $7,875.00 Loan Payment History as of 07-19-17 | 108 |
| 81 | USAA Recording - request to defer loans 07-03-17 | 126 |
| 82 | USAA Recording - inquiry on cc overpayment 07-05-17 | 126 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, TN 37901

Case 3:17-cr-00082-TAV-DCP Document 162 Filed 04/20/18 Page 7 of 136  PageID #: 16268

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 83 | USAA Recording - Looking for titles 07-05-17 | 126 |
| 84 | USAA Recording - close 2nd CD 07-06-17 | 126 |
| 85 | USAA Recording - debit limit increase 07-06-17 | 126 |
| 86 | USAA Recording - inquiry on frozen accounts 07-07-17 | 126 |
| 87 | USAA Recording - request for credit card with large limit 07-07-17 | 126 |
| 88 | USAA Recording - Wire 07-07-17 | 126 |
| 89 | USAA Recording - Check bounced on notes #1 07-07-17 | 126 |
| 90 | USAA Recording - Check bounced on notes #2 07-07-17 | 126 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP Document 162 Filed 04/20/18 Page 8 of 136 PageID #: 16269

1      (Call to Order of the Court)

2           THE COURT:  Thank you.  Good morning, everyone.

3  Let's call up the case for trial, please.

4           THE COURTROOM DEPUTY:  Criminal Action 3:17-CR-82,

5  United States of America versus Randall Keith Beane, Heather

6  Ann Tucci-Jarraf.

7           THE COURT:  All right.  Thank you.  Looks like

8  everyone is present, counsel for the government and the

9  government representatives; the defendant, Ms. Tucci-Jarraf,

10  and her standby counsel, Mr. Lloyd; and the defendant,

11  Mr. Beane, and his standby counsel, Mr. McGrath.

12           Before we have jury selection in this case, I want to

13  address a few preliminary matters.

14           First is jury selection.  I want to briefly remind

15  the parties how jury selection will proceed in this case.  As I

16  informed you last week at the final pretrial conference, the

17  Court will conduct all of the voir dire in this case, that is

18  the questioning of prospective jurors as permitted by Federal

19  Rule of Criminal Procedure 24(a).

20           The Court also ordered the parties to submit any

21  proposed jury questions they wished the Court to ask by

22  Wednesday, January 17, and the Court later amended this

23  deadline to permit the parties to submit proposed questions by

24  Thursday, January 18, in light of requests made last week due

25  to the inclement weather.

UNITED STATES DISTRICT COURT

1          The Court did receive proposed jury questions from

2    the government and from the defendant, Mr. Beane.  However, the

3    Court then received a subsequent filing from Defendant Beane

4    that the Court interprets as a request to withdraw his proposed

5    voir dire questions or jury questions.  Those two documents by

6    Defendant Beane being chronologically Document 89 and

7    Document 99 in the record.

8          The Court has nonetheless carefully reviewed all of

9    these filings and will exercise its discretion under Rule

10   24(a)(2)(B) to determine which questions it considers proper to

11   ask the prospective jurors.  The Court will also ask -- as it

12   stated last week, will ask a number of its own questions.

13         The Court will not inform the jury panel whether a

14   particular question was suggested by the government,

15   defendants, or the Court itself, but will inform the jury panel

16   that the parties had the opportunity to submit proposed

17   questions and that the Court will be conducting the jury

18   questioning in its entirety.

19         After the conclusion of the questioning, as a

20   reminder, the parties will be permitted to exercise their

21   peremptory challenges in the manner we discussed at the final

22   pretrial conference.  That, again, being up to seven peremptory

23   challenges by the government and up to 11 peremptory challenges

24   combined by the defendants.  I also remind you that any

25   challenge for cause, other than those directly addressed by the

UNITED STATES DISTRICT COURT

```
 1   Court during the Court's questioning, should be made at the
 2   time any for-cause challenge is brought to the attention of any
 3   of the respective parties.
 4          So does anyone have any questions about the
 5   procedures for jury selection in this case?
 6          Ms. Davidson?
 7          MS. DAVIDSON:  Yes, Your Honor.  Rule 24 provides
 8   that follow-up questions could be submitted.  Is that -- are we
 9   allowed to submit follow-up questions to you if we have them?
10          THE COURT:  It provides it could.  Let's see at the
11   end.  I'll make that determination, see if anyone has any.
12          MS. DAVIDSON:  Okay.  Thank you, Your Honor.
13          THE COURT:  All right.  Ms. Tucci-Jarraf, any
14   questions about jury selection?
15          MS. TUCCI-JARRAF:  I don't have any questions about
16   jury selection, but I would like to address a preliminary
17   matter, which was just brought to my attention, and I still
18   need to -- I just received the document, and I need to be able
19   to go over it with Francis.
20          THE COURT:  All right.  We'll give you the
21   opportunity in just a moment.
22          But let me -- Mr. Beane, any questions about jury
23   selection?
24          MR. BEANE:  No.
25          THE COURT:  All right.  Then the next matter I want
```

UNITED STATES DISTRICT COURT

1    to take up, and I don't know if this is the document to which

2    you're referring, Ms. Tucci-Jarraf, but the government filed --

3    excuse me -- I believe it was yesterday, a motion to amend the

4    indictment to correct a clerical error, which is Document 97 in

5    the record.

6           The Court had reviewed that motion, but was going to

7    give the defendants, if there is anything further you want to

8    say regarding that particular document, Ms. Tucci-Jarraf, or if

9    you want to refer -- defer to Mr. Lloyd, either way, do you

10   have anything you want to say with respect to Document 97, the

11   government's motion to amend the indictment to correct a

12   clerical error?

13          MS. TUCCI-JARRAF:  I haven't reviewed or received --

14   apparently, Francis did that.  He sent it over with a number of

15   documents.  I received various documents over the last 48 hours

16   from the Department of Justice and as well as -- I believe

17   it's -- it's a division of Department of Justice.

18          And then also I just received notice of Mr. Beane's

19   filings, as well as Document 100, I believe it is, which was

20   entered in for yourself.  And I haven't had a chance to review

21   any of these.

22          So at this time, I'm going to reserve any kind of

23   response until I'm actually able to review it and to make an

24   informed response.

25          THE COURT:  All right.  Mr. Beane, do you have

UNITED STATES DISTRICT COURT

1  anything you'd like to say in response to the government's

2  motion to amend the indictment?

3          MR. BEANE:  Just that there's not been time to review

4  any of the documents that were just handed and make

5  appropriate --

6          THE COURT:  Well, as the Court reminded the

7  individual defendants at the final pretrial conference, while

8  certainly you have chosen, you have the right to represent

9  yourselves and use standby counsel as you see fit, nonetheless,

10 you are bound by the same rules of procedure and adherence to

11 the rules of evidence that an attorney would be in this case.

12         So the Court did receive the motion to amend and is

13 prepared to rule on it at this time.

14         In that regard, the Court notes that generally an

15 indictment in a criminal case may not be amended --

16         MS. TUCCI-JARRAF:  I was just -- you told me on the

17 12th to just stand and you would notice and then --

18         THE COURT:  But not while I'm giving an order, while

19 I'm announcing an order.  I'll give you the chance to address

20 any further matters you want to after the Court rules on the

21 government's motion to amend.

22         MS. TUCCI-JARRAF:  Is this the motion that was filed

23 today -- I mean, excuse me, yesterday?

24         THE COURT:  Yes.  Document 97.

25         MS. TUCCI-JARRAF:  That we haven't been able to

UNITED STATES DISTRICT COURT

1    review?

2            THE COURT:  Well, it was filed yesterday.

3            MS. TUCCI-JARRAF:  Yes, but we don't have access to

4    the electronic, so we are dependent upon counsel.  Mr. Beane,

5    from my understanding, is incarceration, doesn't have access to

6    that until he meets with his counsel, which was brought this

7    morning.  I didn't have an opportunity to go over it with

8    Francis either because I just was handed the actual document.

9            THE COURT:  Okay.  Thank you.

10           MS. TUCCI-JARRAF:  And this Court is going to make a

11   ruling in this moment?

12           THE COURT:  The Court is.  The Court has reviewed it

13   and does note that when an amendment -- proposed amendment to

14   an indictment concerns a matter of form rather than substance,

15   an amendment is proper unless there is resulting prejudice from

16   the amendment.

17           Furthermore, Federal Rule of Criminal Procedure

18   7(c)(2) provides that unless the defendant was misled and

19   thereby prejudiced, neither an error in a citation nor a

20   citation's omission is a ground to dismiss an indictment or

21   information or to reverse a conviction.

22           The Sixth Circuit has further held that the

23   recitation of specific facts contained within the indictment

24   alone is sufficient to adequately inform a defendant of the

25   nature of the charges.  The Court in that matter, paraphrasing

                    UNITED STATES DISTRICT COURT

1  or quoting from the Sixth Circuit 1976 decision, United States

2  v. Garner.  Thus, the Sixth Circuit has upheld amendments of

3  the indictment, even as of the time of trial to correct an

4  erroneous statutory citation, the Court reviewing, among other

5  cases, United States v. Fruchtman, F-r-u-c-h-t-m-a-n, a Sixth

6  Circuit 1970 case.

7       Here, after reviewing the government's proposed

8  amendment and doing its own independent research and review,

9  the Court finds that the requested amendment is one of form,

10  not substance.  Subparagraph 19(a) of the indictment includes

11  language referencing the statutory elements of a violation of

12  18 United States Code Section 1956(a)(1)(A)(i), thus, the

13  defendants were put on notice of the substantive charge against

14  them.  The fact that this subparagraph of the indictment then

15  erroneously references Section 1956(a)(1)(B)(i) is, under Rule

16  7(c)(2), not a basis for dismissing the indictment.

17       Furthermore, the Court finds that the defendants

18  would not be prejudiced or misled by this error or the

19  requested amendment.  Instead, the language of the indictment

20  was sufficient to inform the defendants of the substantive

21  offense which subparagraph 19(a) alleges they conspired to

22  commit.

23       Accordingly, the Court will grant the motion to

24  amend, and the Court orders that subparagraph 19(a) on Page 6

25  of the indictment is amended to reference, quote, Title 18

UNITED STATES DISTRICT COURT

1  United States Code Section 1956(a)(1)(A)(i), close quote,

2  rather than, quote, Title 18 United States Code

3  Section 1956(a)(1)(B)(i), closed quote.

4          That addresses the motion to amend.

5          Are there any other preliminary matters that the

6  parties want to address?

7          MS. DAVIDSON:  No, Your Honor.

8          THE COURT:  Ms. Tucci-Jarraf, you indicated there was

9  something you wanted to address?

10          MS. TUCCI-JARRAF:  Yes.  Thank you.

11          In regards to this particular motion, I'm sorry, what

12  is the document number, because it's not stated on here?

13          THE COURT:  This is the motion the Court --

14          MS. TUCCI-JARRAF:  Motion you just ruled on.

15          THE COURT:  Motion to amend was Document 97, I

16  believe, as filed by the government.

17          MS. TUCCI-JARRAF:  Okay.  So Document 97, along with

18  your order, later today, there will be -- or tomorrow morning,

19  there will be a written version entered into the record of my

20  oral due rejection at this moment of both Document 97 as well

21  as your order for lack of verification and validation of

22  authority, authorization, identity, and endorsement.  It is

23  duly rejected without dishonor for due cause.

24          This is accepted as proof of exactly the national

25  security threats that this case has been put in place to be

UNITED STATES DISTRICT COURT

1    able to ferret out so that things could be changed within the

2    judicial branch.  Legislative branches are held by other

3    universal cleanup crews.

4         This particular instance, which I'm going to make on

5    oral record, and then I will file the actual written one as an

6    example of when an indictment is duly canceled for due cause

7    without dishonor, that this is a particular method for DOJ, as

8    well as this Court, to go in and reactivate an indictment

9    unlawfully and illegally, what we call a fabrication of

10   charges.

11        And that particular indictment was canceled,

12   praeterea, preterea, ab initio, so I just wanted to make that

13   part of this record -- excuse me -- and I don't consent or give

14   authority, authorization for Cynthia Davidson to file such a

15   blatant deceptive act and practice to reinstate an indictment,

16   which had already been duly canceled, without my authorization

17   to reinstate it, and as well as putting you into a position

18   where you have to issue an order, which essentially legalizes

19   such deceptive acts and practices.

20        Thank you.

21        THE COURT:  All right.  Thank you.

22        Mr. Beane, anything further you need bring up on your

23   own behalf?

24        MR. BEANE:  No.

25        THE COURT:  All right.  Then the Court does duly

UNITED STATES DISTRICT COURT

1  consider the additional comments made by the defendant,

2  Ms. Tucci-Jarraf, and to the extent they're made to ask the

3  Court to reconsider its oral order granting the government's

4  motion to amend the indictment, the Court would deny that

5  motion for reconsideration.

6           All right.  Unless there are any other preliminary

7  matters, what we'll do next is we'll take about a ten-minute

8  recess.  I would ask the parties to stay seated, unless they

9  take a brief restroom break, but you can stay in here and talk

10  or discuss, if need be, and the jury will come and sit in this

11  middle section.  And as soon as they're all present, the Court

12  will come back in to -- we'll open court again, and we'll go

13  right into jury selection.

14           Thank you, everyone.

15           THE COURTROOM DEPUTY:  All rise.  This honorable

16  court shall stand in recess.

17      (Recess from 9:30 a.m. to 9:43 a.m.)

18           THE COURTROOM DEPUTY:  All rise.

19           THE COURT:  All right.  Ms. Tucci-Jarraf -- thank

20  you, everyone may be seated -- the Court understands you'd like

21  to make an objection or something for the record before the

22  jury comes in?

23           MS. TUCCI-JARRAF:  Thank you.  That's very kind.  I

24  was told that that wouldn't be possible till after.  Thank you

25  so much for initiating that.

                    UNITED STATES DISTRICT COURT

1          We're preparing right now a written one just in the

2     event that it was permitted.  I now give you notice to

3     principal, which is notice to agent, notice to agent is notice

4     to principal, that orally -- and I will file a written one

5     afterwards to what I say now -- is I'm making a standing notice

6     of filing with the standing due declaration and notice that is

7     duly made, that I, Heather Ann Tucci-Jarraf, do not consent to

8     the actions and proceedings against me to be held and conducted

9     by Thomas Varlan, Cynthia Davidson, including a trial and the

10    jury selection and any other proceeding.

11         Also, number two is that this alleged Court,

12    including yourself, Thomas Varlan, and Cynthia Davidson,

13    Department of Justice do not have the authority, nor my

14    authorization, to conduct and hold any proceedings against me.

15         Thank you.

16         THE COURT:  All right.  Thank you.  Anything further

17    from anybody else?

18         Ms. Davidson?

19         MS. DAVIDSON:  Your Honor, I just am reminded of the

20    fact that Ms. Tucci-Jarraf is on bond and by order of this

21    Court.  And if she does not consent to this Court's

22    jurisdiction, I am concerned that she is a flight risk.  And I

23    think the Court should consider detaining Ms. Tucci-Jarraf.

24         THE COURT:  All right.  Thank you.

25         Anything further, Mr. Beane?

                    UNITED STATES DISTRICT COURT

1          MR. BEANE:  No.

2          THE COURT:  All right.  Then let's go ahead and we're

3     going to go ahead and bring our jury in at this time -- your

4     proposed jurors in at this time.

5          (Prospective Jurors in at 9:45 a.m.)

6          (Whereupon, voir dire, preliminary instructions, and

7     Government's opening statement were had and reported but not

8     herein transcribed.)

9          THE COURT:  Thank you, Ms. Svolto.

10         And, again, remind the jury, the defendants

11    informed -- each individually informed the Court that they are

12    waiving opening statements at this time or deferring them until

13    a later time.

14         So with opening statements having been concluded, we

15    will ask the government to call its first witness and give our

16    courtroom deputy just a moment here to move the podium.

17         You can go ahead answer announce your witness.

18         MS. DAVIDSON:  Thank you, Your Honor.  The United

19    States calls Special Agent Parker Still.

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    WHEREUPON,

2                          **PARKER STILL,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                        **DIRECT EXAMINATION**

6                THE COURTROOM DEPUTY:  Have a seat, please.  If you

7    will scoot in as close as you can, state and spell your name

8    for the record.

9                THE WITNESS:  My name is Parker Still.  P-a-r-k-e-r,

10   S-t-i-l-l.

11               THE COURTROOM DEPUTY:  Thank you.

12   BY MS. DAVIDSON:

13        Q    Special Agent Still, what do you do?

14        A    I'm a special agent with the FBI, currently assigned

15   to the Knoxville division.

16        Q    Okay.  And how long have you been with the FBI?

17        A    I've been with the FBI approximately five and a half

18   years.

19        Q    And prior to the FBI, what did you do?

20        A    Yes, ma'am.  I was an attorney in private practice

21   for approximately seven and a half years, including time in

22   private practice and also with the military.

23        Q    Okay.  And so you mentioned a little bit about it.

24   What was your military experience?

25        A    So I've been -- I was with the National Guard,

                    UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

 1    currently at the rank of major.  I still am in, just in a drill

 2    status, you know, just generally one weekend a month.  I have

 3    gone on deployment, though, to Afghanistan.

 4        Q    Okay.  And so at the FBI as a special agent, do you

 5    typically work a particular type of case?

 6        A    Yes, ma'am, I have -- since I've been assigned with

 7    the FBI, again, approximately five and a half years, I have

 8    always been in white-collar work.

 9            So the FBI is divided up and generally into squads.

10    We may have a violent crime squad that does -- you know,

11    handles your bank robberies, your kidnappings, gang-related

12    stuff.  You have a cyber squad, who does a lot with your

13    computer-based crimes.  We have national security squads, the

14    Joint Terrorism Task Force, as well as white collar.

15            And in the world of white collar, the world I work

16    in, we work a lot of your typical bank fraud violations, your

17    wire fraud violations, your crimes that affect financial

18    institutions, corporate fraud type cases, kind of what you

19    think of the FBI's traditional, you know, white-collar

20    background.

21        Q    Okay.  And so are you -- did you work the case

22    against the defendants?

23        A    I was one of the co-case agents on there, yes, ma'am.

24        Q    Okay.  And how did this case become initiated with

25    the FBI?

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    A    Okay.  One of the ways the FBI gets cases is we rely

2    a lot on private citizens, complaints that come in.  Within

3    that private citizen realm, also financial institutions are a

4    big source of information for us and how we get cases.  And in

5    this case, USAA reached out through channels ultimately routed

6    to the FBI Knoxville division.

7    Q    Okay.  And when did that happen?

8    A    During the approximate time period of July 10th.  It

9    could be a day or two earlier than that, but during that

10   approximate time period of July 10th, 2017.

11   Q    Okay.  And when this case was initiated, what did you

12   learn?

13   A    Well, initially, so when we had some information that

14   came in, what we normally do, the FBI, we talk to people.

15   That's our -- kind of our bread and butter, is we go out and we

16   like to talk to people.  In this case, it was by phone.

17        But what we learned is that Mr. Beane, Mr. Randall

18   Beane had used a fraudulent account number in order to acquire

19   funds -- in order to purchase CDs.  Those CDs were subsequently

20   liquidated, at least one or more of the CDs was liquidated and

21   he had then used those funds to purchase an RV.

22   Q    Okay.  And where did he attempt -- or where did he

23   actually purchase the RV?

24   A    In Buddy Gregg, that's located in Knoxville,

25   Tennessee, off the -- I think that's Campbell Station exit out

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    there in Farragut.

2        Q    Okay.  Did someone from the FBI actually reach out to

3    Buddy Gregg?

4        A    Yes, ma'am.  It's my understanding that we did reach

5    out.  Someone from our office did reach out to Buddy Gregg.

6        Q    And what was your goal in reaching out to them?

7        A    So if I may back up just one step there,

8    Ms. Davidson.

9             So our goal in reaching out to them, at the time, we

10   had information that the motor home was there or going to be

11   there.  So in an effort to find out that additional

12   information, that's why they were reached out to, just to

13   determine where the motor home was at the time.

14       Q    Okay.  And were you seeking not only to find the

15   defendant, but also to protect the asset?

16       A    Oh, absolutely.  So, I mean, in this case, we had

17   half a mill -- half-a-million-dollar motor home.  And what our

18   goal is to, a lot of times in these victim cases is, we want to

19   recover the asset for the victim.  In this case, USAA is our

20   victim, and we have -- we know where the motor home is located.

21   Absolutely right.

22            We had multiple issues.  One is safety.  The -- if

23   Mr. Beane had gotten out on the open road, we had -- we don't

24   know.  I mean, at this time, we don't know.  We know he used

25   funds to purchase a -- used stolen funds to purchase an RV.  We

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    don't know anything else about, you know, what his ultimate

2    intent with that.  It's 45 feet.  You know, you can imagine

3    our -- what, you know -- the possibilities are unlimited.

4         And absolutely, we want to recover an asset for the

5    victim in any case.  That's always one of our -- we want to

6    prosecute the bad guys and we want to get the assets.

7    Absolutely right.  That's what the American public expects of

8    us.

9    Q    Okay.  And so did you learn from Buddy Gregg that the

10   defendant was coming to pick the RV up?

11   A    We did.  So our office is -- had information that

12   later in the day or at some time Mr. Beane would be out there

13   to purchase -- to pick that RV up.  And to the point where

14   my -- at this point, I'm drafting an affidavit to put together

15   so we can go try to seize the motor home.

16   Q    Okay.  And did you have to act quick and go to get

17   Mr. Beane?

18   A    Yeah.  We did.  We -- absolutely.  So we had

19   information that came -- it was relayed down to me.  So I'm at

20   the computer there working on this affidavit to go seize the

21   motor home.  I think I'm speaking with Ms. Svolto and I

22   primarily and as you, Ms. Davidson, so we're getting this

23   information in.

24        All of a sudden, we have information that Buddy Gregg

25   is going to turn it over or he is going to leave in this motor

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    home.  So, yeah, it was similar to a bank robbery.  I grabbed

2    Special Agent Jimmy Durand.  We literally run towards the door.

3           Because, I mean, you got to understand where we're at

4    on this.  We've got a motor home, an asset that is

5    potentially -- we don't know where it's going to be.  And you

6    say, well, it's a 45-foot motor home.  You may be able to find

7    it.  I don't know.  You just don't know.  You don't know if

8    these things could be stripped down.  A million different

9    things could happen.

10          So I literally jump up from the computer, I grab

11   Jimmy, and we start running towards the door to go out and stop

12   this transaction from taking place.

13          In the meantime, in the parking garage, we literally

14   go down our steps, I come across Special Agent Jason Pack,

15   Special Agent Joelle Vehec.  I say, "Come with us.  We've got

16   to get out to Buddy Gregg.  We've got -- the motor home is

17   leaving."  Task Force Officer Jaron Patterson is also involved,

18   and I think additional Knox County deputies were contacted all

19   in this time frame.

20          So we're out trying -- yes, we're flying down 40,

21   lights on, to get out there and stop this transaction.

22     Q    Okay.  And before you went out there, did you do a

23   records search to see whether or not there was an outstanding

24   warrant?

25     A    Yeah.  Our office did.  There was -- it was

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1  information that was provided down to me was, there was an

2  outstanding state court warrant on this individual, Mr. Beane.

3      Q    Okay.  So you went out there intending to arrest

4  Mr. Beane?

5      A    Right.  We went out there -- right.  We had a state

6  court warrant that we could arrest on.  So, yes, ma'am.

7      Q    Okay.  And when you arrived at Buddy Gregg, what was

8  going on?

9      A    Okay.  So the way it goes down is, Jimmy is driving.

10 I'm in his car.  So Jimmy pulls up to the Buddy Gregg out there

11 in Farragut, and we see Mr. Beane walking across the parking

12 lot.  At the time, it's Jimmy and I are there first, and we

13 wait on Jason and Joelle to get there.  So they come circling

14 behind.  At that time, we've got four agents.  And we make an

15 approach on the motor home that is in the Buddy Gregg parking

16 lot.

17     Q    How did you know that it was Defendant Beane?  Had

18 you researched what he looked like?

19     A    Yes, ma'am.  We had -- you know, I think at the time

20 maybe that was the DL photo we had.  But we knew.  I'm pretty

21 sure we had a photograph of him right there, yes, ma'am.

22     Q    Okay.  And so did he enter the motor home?

23     A    Yes.  Ultimately, by the time we get up to there --

24 so kind of the way it's set up, the motor home is on the hill,

25 Jimmy and I approach first.  Jason, and he's got Joelle with

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1  him in the vehicle, they pull in and kind of block the motor

2  home straightaways.  So you've got Jimmy and I on foot.  And

3  you've got Jason and Joelle blocking the motor home.  At this

4  time, the motor home is running.  And Jason pulls right in

5  front of it and we proceed to go into the motor home.

6      Q    Okay.  And so did you approach the door of the motor

7  home?

8      A    Yes, ma'am.  We did approach the door, and we've been

9  able to establish that at that time, the door was -- the door

10 was closed.  And also based on all the agents at the scene,

11 there were announcements that were made.  So now we've got --

12 Jason kind of comes around the back and Joelle is still towards

13 the front.  And, ultimately, the door is opened and the --

14     Q    After y'all are making demands for them to open the

15 door?

16     A    Right.  Exactly.  Based on all the agents there,

17 there's various things that are said.  And then the door is

18 opened and Jimmy and I enter into the motor home.

19     Q    Okay.  Do you -- are there more than just Mr. Beane,

20 the defendant, in the motor home?

21     A    Right.  So there are two other people there.  It's my

22 understanding, I believe that one, the gentleman, the male

23 stepped out of the motor home first and the female remained in

24 the motor home.  There's a total of three.  There's definitely

25 three.  There is Mr. Beane in the driver's seat with the motor

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    running of this motor home.  There's at this time an

2    unidentified female and unidentified male also.

3         Q    Was Mr. Beane requested to leave the motor home?

4         A    Yes.  Jimmy -- I mean, there was dialogue back and

5    forth.  Ultimately, Mr. Beane refused to leave the motor home.

6    So he's in the driver's seat.  You've got two agents here,

7    you've got an agent behind us.  You got kind of Joelle in the

8    perimeter, and then we've got a car blocking this motor home

9    that's running at the time, you know.

10             And so he refuses the commands to get up.  Makes a

11   movement towards -- kind of towards his waistband when we

12   approach.  We immediately grab Mr. Beane.  He is passed out,

13   because kind of -- excuse me, I did not mean passed out in the

14   literal sense.  He's passed kind of -- as a technique we

15   normally use, he's removed from his seat, kind of handed down

16   to Jason who's sitting, who's behind us.  It's not a -- it's a

17   fairly tight squeeze, you know, for a couple of folks.  He's

18   passed down behind us and ultimately taken outside the motor

19   home at that point.

20        Q    Is he resisting during this time?

21        A    He is resisting.  And I told him to stop resisting.

22   You know, I did make that command to him.  He's passed down and

23   then ultimately outside.  Once he's outside, Jason and Jimmy

24   are able to get him secured and put him in handcuffs.

25        Q    Okay.  When he's passed down, did he continue to

UNITED STATES DISTRICT COURT

1  resist?

2      A    He did.  He continued to resist.  Even while Jimmy

3  was putting the cuffs on him at the end, he was continuing --

4  you know, ultimately, he did stop resisting once Jimmy was able

5  to get his arms -- hands behind his back.

6      Q    Did you have to put him on the ground?

7      A    He did.  He was what we refer to as proned out.  You

8  know, I mean, he was out on the concrete right there on the

9  side there.

10     Q    Okay.  Were you -- after he was arrested, were you

11 asked to contact anyone by the defendant's friends?

12     A    Yes.  I was provided a piece of paper with the name

13 Heather on it.  And it contained a phone number.  And at this

14 time, it was represented at the scene to us that this was an

15 attorney or someone we should call, yes, ma'am.

16     Q    Okay.  And I'm going to show you what's marked as

17 Government's Exhibit 1.  If you look in front of you, there's

18 an exhibit folder.

19     A    Okay.

20     Q    And just turn to No. 1.

21     A    Okay.  I'm there.

22     Q    Do you recognize those pictures?

23     A    Yes.  That is the motor home that was -- that

24 Mr. Beane was on the day that was purchased with stolen money.

25     Q    Is that -- are those pictures an accurate

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    representation of the RV as it looked the day of the arrest?

2        A    Yes, ma'am.  It was a new RV.

3            MS. DAVIDSON:  Okay.  Your Honor, I'd like to admit

4    Government's Exhibit 1 into evidence at this time.

5            THE COURT:  So admitted.

6        (Government's Exhibit 1 admitted into evidence.)

7    BY MS. DAVIDSON:

8        Q    Okay.  If we could put up 1-1, and I just want you to

9    describe these pictures for me and the jury, 1-1.

10       A    So 1-1, I'm looking at -- that's the front of the

11   motor home, that would have been where -- of course, this is

12   not -- this is -- this is at the point -- this photo appears to

13   be at our office, not at the scene.  But that is where Jason

14   would have -- his vehicle would have been pointed right at

15   that.

16       Q    Okay.  And 1-2?

17       A    That's the side of the motor home.

18       Q    Okay.  And slides that are slid out, is that how that

19   works?

20       A    That's my understanding, yes, ma'am, that it's pretty

21   fancy.

22       Q    Okay.  And 1-3.

23       A    That's just a long shot of the motor home.

24       Q    Okay.  1-4?

25       A    That's the back of the motor home there.  You see

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    it's an Entegra Cornerstone.

2         Q    1-5?

3         A    Again, another shot of the back of the vehicle.  As

4    you'll note, it looks like there's still dealer tags on there.

5         Q    Okay.  1-6?

6         A    That's a side shot of the motor home.  It looks like

7    from this angle that the -- again, the -- those extensions are

8    there.

9         Q    1-7?

10        A    That's another shot of it from the front.

11        Q    1-8?

12        A    That is -- that's looking -- the front -- the door is

13   open there going into the -- to the motor home.

14        Q    1-9?

15        A    Yeah.  Another inside shot of the motor home.

16        Q    Okay.  1-10?

17        A    Yeah.  That's inside of it as well.

18        Q    1-11?

19        A    Yes, ma'am.  Inside shot.  I think you can see that

20   fireplace right there.

21        Q    Oh, there's a fireplace.

22        A    Pretty sure, yeah.

23        Q    Okay.  1-12?

24        A    Again, just another angle of the inside.

25        Q    And if you could focus on the driver's side chair.

UNITED STATES DISTRICT COURT

1  Is that -- is that the chair that the defendant refused to

2  leave?

3      A    Right.  He was in the driver's seat of the motor

4  home.

5      Q    Okay.  1-13?

6      A    Oh, yes, ma'am.  The -- again, another shot there.

7  You can see the two chairs up front.

8      Q    1-14?

9      A    Just the kitchen area of the motor home.

10      Q    1-15?

11      A    Yes, ma'am.  The kitchen area there.  I think that's

12  a microwave on top.

13      Q    1-16?

14      A    Again, another inside shot of the motor home.

15      Q    And are those marble or tile floors?

16      A    Not sure, but they're nice.

17      Q    1-17?

18      A    Yes, ma'am.  That's another shot.  I believe that's

19  in the bathroom there.

20      Q    1-18?

21      A    Yeah.  Again, another nice counter.

22      Q    1-19?

23      A    Yes, ma'am.  That's a good shot there, the nice

24  counter again.

25      Q    1-20?

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1     A     Yes, ma'am.  That's another inside shot.

2     Q     1-21?

3     A     Yes, ma'am.  That's another shot.  You see the fan

4  there.

5     Q     Is this the bedroom, you think?

6     A     I think so.  I'm trying -- I think that is the

7  bedroom there.

8     Q     Okay.  1-21?

9     A     Yes, ma'am.  Another -- just kind of angle of the

10 inside there.

11    Q     1-22?

12    A     Just shows the -- I don't know if that's crown

13 molding.  My wife, I would defer to her, but I think that's --

14 it's fancy, yeah.

15    Q     1-23, 1-24?

16    A     Inside, again, yes, ma'am.  Just shows how nice this

17 thing is.

18    Q     1-25?

19    A     Yes, ma'am.  I think that may be the inside of the

20 shower there.

21    Q     There's two bathrooms in this.  Is this a separate

22 bathroom?  1-20 -- what am I up to?  1-27?

23    A     Yes, ma'am.  That's going to be the -- as you can see

24 there, you can see a shower head.

25    Q     1-28?

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

1    A    That's a better shot there of the detached shower.

2    Q    1-29?

3    A    Again, I -- crown molding.

4    Q    1-30?

5    A    Yes, ma'am.  That's showing again some of that.

6    Q    1-31?

7    A    I think that's the -- so it opens up underneath.

8  That's where the storage compartments are, yes, ma'am.

9    Q    1-32?

10    A    Again, that's showing the -- just a lot of storage.

11    Q    1-33, is that a TV?

12    A    You know, it may be.  I'm not exactly sure on that,

13  yes, ma'am.

14    Q    Okay.  And 1-30 -- whatever the next one is, 1-35?

15    A    Yes, ma'am.  Kind of the control center there.

16    Q    1-36?

17    A    Again, that's more of the storage up underneath the

18  motor home.

19    Q    1-37 -- I'm sorry -- 6?

20    A    Yes.  That's mahogany.  It's nice.

21    Q    1-37?

22    A    Yes, ma'am.  It's a nice area for your drinks there.

23    Q    1-38?

24    A    That's going to be a glare.  I think that's the

25  bedspread there.

UNITED STATES DISTRICT COURT

1    Q    Uh-huh.  And then some clothes you see?

2    A    Yes, ma'am.

3    Q    1-39?

4    A    Right.  Just some miscellaneous items that were in

5  the motor home.

6    Q    1-40?

7    A    Refrigerator with appears to be some alcohol in there

8  or drinks.

9    Q    1-41?

10    A    Again, just another length-wise shot showing the

11  detail of that motor home.

12    Q    Is that it?  Or is there 1-42?  1-42?

13    A    Another outside shot, Ms. Davidson.

14    Q    Okay.  And in your investigation, did you learn that

15  the defendant also purchased another vehicle?

16    A    Yes, ma'am.  At the time, we didn't initially know

17  that, but we did later on learn that the defendant had bought a

18  truck approximately 80, $86,000 from Ted Russell.  It's my

19  understanding that the -- ultimately that truck was delivered

20  back to Ted Russell, but, yes, ma'am.

21    Q    And did you ever contact the defendant Heather Ann

22  Tucci-Jarraf?

23    A    Yes, ma'am.  We did.  You know, at the scene, we were

24  given a piece of paper and a phone number.  As I said, you

25  know, the FBI, what we do is we talk to folks.  So of course,

Parker Still - Direct Examination

1    I'm going to reach out to the name Heather and that number, who

2    we believed by that time to be Ms. Heather Ann Tucci-Jarraf.

3    And during that call, she specifically referenced that she was

4    planning military operations.

5        Q    And did she identify herself as an attorney?

6        A    During that time period, she -- it was being held out

7    as an attorney.

8        Q    And after you -- did she end the call after that,

9    telling you that she was planning military actions?

10       A    Yes, ma'am.  So Jason and I were on that call, and we

11   tried -- I remember it seemed like it was on a Friday night I

12   think we tried to call her back and didn't have any luck.

13       Q    Did you do any research to determine whether or not

14   the defendant, Ms. Heather Ann Tucci-Jarraf, is actually an

15   attorney?

16       A    Our office did some and determined she was not

17   licensed in the state of Tennessee or in the state of

18   Washington.

19       Q    And why did you look into Washington?

20       A    Because I think if I remember right, some of our

21   database checks that we would do normally, you know, on an

22   individual showed an address in Washington, yes, ma'am.

23           MS. DAVIDSON:  Okay.  May I have a minute, Your

24   Honor?

25           THE COURT:  Yes.

UNITED STATES DISTRICT COURT

Parker Still - Direct Examination

BY MS. DAVIDSON:

Q    Okay.  Did you appear at a -- another hearing in this case regarding the -- the identity of Heather Ann Tucci-Jarraf?

A    Yes, ma'am.  I appeared at multiple hearings in Washington, D.C., subsequent to the arrest of Ms. Heather Ann Tucci-Jarraf.  She was arrested in Washington, D.C. after -- after the FBI and our office received information from the United States Secret Service that she was trying to meet with President Trump.

Q    Okay.  And are you familiar with the appearance of Ms. Heather Ann Tucci-Jarraf?

A    I am.  Yes, ma'am.  I've seen her in the -- in court in Washington, D.C.

Q    Okay.  Can you identify Ms. Tucci-Jarraf?  Is she sitting in the courtroom?

A    Yes, ma'am.  To my right, to your left, I see Ms. Heather Ann Tucci-Jarraf in a black coat there sitting at defense counsel table.

Q    Okay.  And can you identify Mr. Randall Beane?

A    I can.  To my right, to your left, I see Mr. Randall Beane in a suit with a black tie and a white shirt.

MS. DAVIDSON:  Thank you, Your Honor.  That's all I have.

THE COURT:  All right.  Thank you.

Any cross-examination?  We'll begin with you

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1  Ms. Tucci-Jarraf.  Any cross-examination of this witness?

2          MS. TUCCI-JARRAF:  Thank you.  Without prejudice, I

3  will proceed.

4                    **CROSS-EXAMINATION**

5  BY MS. TUCCI-JARRAF:

6      Q    Hello, Mr. Parker.

7      A    Hey, Ms. Tucci-Jarraf.  How are you today, ma'am?

8      Q    I'm good.  I'm good.

9      A    Thank you.

10     Q    We both get our names right today.

11          Okay.  So, Mr. Still, you stated that you've been

12  with the FBI for five and a half years and that seven and a

13  half years with private attorney and military JAG?

14     A    That's correct, yes, ma'am.  All approximately, yes,

15  ma'am.

16     Q    Okay.  I just wanted to clarify in your statement

17  about being a private attorney and military JAG for seven and a

18  half years, how much of that seven and a half years was private

19  attorney and how much of it was military JAG?

20     A    Fair question.  Yes, ma'am.  So the great thing about

21  like where I was, the National Guard, you could do both.  I was

22  never on active duty except when I deployed to Afghanistan.

23  So, you know, unless I was going to training or to drill or

24  something, I remained -- I had my law business.

25          And so, you know, I did get called up for a time

                    UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1  period, like for Afghanistan. I'd go to training in
2  Charlottesville, Virginia where the Army JAG school is. So,
3  yeah, you know, so during that time period, there would be
4  intermittent, intermediate -- not real good with that word --
5  but times when I would be out of the office on military duty.
6          But even to get more specific, I'd say, I think
7  probably, I believe I practiced probably four years before I
8  actually went back and joined the military. So I think there
9  was a four-year period out of law school where I was just in
10  private practice before I joined the military.
11     Q    So out of that seven and a half years, about four
12  years, four and a half years was private, did you ever operate
13  as a JAG attorney inside of a military tribunal?
14     A    No, ma'am. No. I have never been -- I'm just -- let
15  me clarify, though, military tribunal there. Are you speaking
16  in an administrative action or an actual court-martial
17  proceeding?
18     Q    Either.
19     A    I don't think so. I mean, there is a -- I think I
20  was a legal -- I think I may have been a legal adviser in a
21  administrative separation action. That would be something like
22  maybe when we're throwing somebody out of the military for
23  doing drugs, something like that. You know, I very well may
24  have been legal adviser in some of those type proceedings.
25     Q    Okay. So you've never conducted a trial inside of --

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    for whether it was military administration action or a military

2    court-martial, you've never been the actual prosecuting JAG

3    attorney, you've just been a legal consultant?

4        A    I don't think so.  I mean, I hate -- you know, like I

5    said, now I've been in almost ten years.  I don't think I have.

6    I'm sorry, that's the best answer I can give you.  I don't

7    recall me being --

8        Q    You don't recall ever -- I mean, isn't that something

9    you would recall, whether you did a military tribunal, whether

10   it was administrative or --

11       A    Yes, ma'am.  No, I mean, and I'm saying I do remember

12   one where I sat in as a legal adviser.  I just -- I don't think

13   I ever conducted a military tribunal.  One thing is, the

14   National Guard and Reserves in general, we don't do a lot of

15   UCMJ, you know, formal big trials, as you would think, you

16   know, like we're here today on.

17       Q    Okay.

18       A    UCMJ is Uniform Code of Military Justice too.  I'm

19   sorry.

20       Q    Got you.  That's okay.  One of our big family friends

21   was actually the head of all of the U.S. National Guard.  So

22   I'm familiar with it.  Thank you.

23            Okay.  So you went on to discuss that you've been

24   with FBI for five and a half years.  In your experience, you

25   just made passing comments as far as working in the specific

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    unit of white collar crime.  Have you ever worked in any other

2    unit?

3         A    No, ma'am.  But I would like to clarify.  Just --

4    when you're talking about a small office like Knoxville, we

5    have -- so we have -- we don't have a huge office, like you

6    would maybe in New York or Washington field office or something

7    like that.  So, yeah, we all help out.  I mean, you better

8    believe if a child gets kidnapped today in Knoxville,

9    Tennessee, it doesn't matter what squad you're on, you're going

10   out there knocking on doors tonight.

11        Q    I can appreciate that.

12             Okay.  So in your white collar work for the FBI --

13        A    Yes, ma'am.

14        Q    -- you have certain protocols and procedures that you

15   need to follow in doing any kind of a case.  And you had stated

16   at one point that you were working on an affidavit to seize the

17   vehicle, which Ms. Davidson had showed a whole bunch of photos

18   for, and you had -- were in the middle of working on it and

19   then you jumped up and left?

20        A    That's correct.  Yes, ma'am.

21        Q    Okay.  So my question is this, when you are doing

22   cases, how thorough are you on the details, the actual

23   investigation part?  Do you -- are you thorough, are you

24   detailed, are you careful as far as reporting?

25        A    Uh-huh.  I feel like we very are, ma'am.  And if

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

 1    you're talking specifically about this case, though, don't get

 2    me wrong, though, that at the end of the day, we're going to

 3    react.

 4           And, I mean, if I'm in the middle of something, or --

 5    you know, our ultimate job is to protect the American public.

 6    And if it means react and I don't have time to get a piece of

 7    paperwork done or something like that, you better believe I'm

 8    going to react.

 9    Q    I can appreciate the comment that -- the actual quote

10    that you made, which was quote, prosecute the bad guys and get

11    the assets, end quote?

12    A    Sounds about right.

13    Q    You also stated -- you also stated that it is your

14    job, that you're there to protect property and the assets of

15    victims?

16    A    Right.  Yes, ma'am.  I mean, you know, if someone has

17    something stolen or if -- I mean, in the white-collar world, I

18    mean, we're dealing with victims who have lost something

19    generally in the white-collar world, be it property, be it

20    funds, be it whatever.  And part of our job is to try to make

21    as much recovery for them as we can.  I mean, we want to gather

22    up as many assets as we can to try to make them whole, yes,

23    ma'am.

24    Q    Okay.

25    A    Uh-huh.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    Q    So you do whatever you need to to protect a victim as

2    well as the assets, if possible?

3    A    Well, I don't know if I'd use the term whatever I

4    need to.  Within the boundary of the United States

5    Constitution, within the parameters of what the FBI does, yes,

6    ma'am.  I wouldn't say I do anything necessary -- I mean,

7    anything, you know -- just to say the word "anything," but

8    definitely, you know, within the parameters, you know, of the

9    Department of Justice and FBI's guidelines, uh-huh.

10    Q    So within the laws and the statutes and the codes and

11    the constitution and your own FBI policy standards.  Is that

12    correct?  That limits what kind of actions you can take?

13    A    No, ma'am.  I wouldn't limit.  I wouldn't say that

14    even limits us.  Because, I mean, in a state like Tennessee,

15    you know, where we have -- we have -- might even have -- in a

16    lot of states, we might have something called like a peace

17    officer status or something where we can even enforce the laws

18    of the State of Tennessee.  So, I mean, it's hard to limit when

19    you start, you know, saying, you know, this code or that code

20    or this or that.  So I can't agree to that statement.

21    Q    So you would do -- you're stating that you could do

22    any actions regardless if there's codes, statutes, actual laws

23    that you're supposed to follow?

24    A    No, ma'am.  I can't do any actions.  I am bound by,

25    you know, rules and regulations.  And you did -- you said a lot

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    of them that we are bound by, the United States Constitution,

2    the FBI internal rules, Department of Justice, big umbrella,

3    you know, that we fall under.  State of Tennessee, you know, I

4    mean, there's a lot of rules and regulations out there.

5        Q    Okay.  And what are the laws regarding an arrest, a

6    physical arrest and detainment?  What are the actual criminal

7    rules of procedure that you are required to follow, such as a

8    warrant to be able to take that, do you have to have a warrant

9    to be able to arrest someone?

10       A    No, ma'am.  I can arrest someone on probable cause

11   without a warrant.  I don't need a warrant to arrest someone.

12       Q    Okay.  But let's go into the probable cause.  That

13   day, do you believe that you had probable cause that day to

14   arrest Randy Keith Beane?

15       A    Without a doubt, ma'am.  He is sitting in a vehicle

16   purchased with stolen money with the vehicle running.  You

17   better believe I had probable cause.  I saw it with my own two

18   eyes.

19       Q    Okay.  And you stated that you -- that there are

20   basically two ways that you receive cases.  You stated, one,

21   that you receive complaints, you rely on private citizens

22   making complaints, and the second one was that -- the second

23   one was that banks and institutions are a big source of your

24   cases received.  Is that correct?

25       A    Yes, ma'am.  That's correct.  But we do receive cases

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    from other ways as well, you know.

2        Q    What are some of those ways?

3        A    Let's see, other ways, maybe another agency.  That's

4    very likely, you know, somebody -- another agency may get us

5    involved in the white-collar world, the IRS Criminal

6    Investigation Division, or, you know, maybe the Securities and

7    Exchange Commission.  Those are -- there's different avenues

8    that we get cases by, yes, ma'am.

9        Q    So in this particular instance, you had made a

10   statement that on July 10th, you found out about the existence

11   of Randall Keith Beane and the possibility that a crime might

12   be occurring.  Is that what you stated, July 10th?

13       A    No, ma'am.  I think I used the approximately given --

14   I think I even said, you know, give it a day or two on either

15   side -- or I think I said maybe even earlier.  I used the word

16   "approximately."

17       Q    And you stated that someone from your office reached

18   out to Buddy Gregg or was it that Whitney Bank or USAA Bank?

19   Who reached out to who first?  Did an institution call you or

20   an individual, or did you reach out?

21       A    I think in this case, just -- in the normal course,

22   we would have gotten the financial institution would have

23   reached out to us first, USAA.

24       Q    USAA?

25       A    Yes, ma'am.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    Q    Uh-huh.  And what day was that?

2    A    You know, I -- again, I'm going to have to be

3  approximately of July 10th.  I know I -- I know I believe based

4  on my 302s -- and a 302 is a memorandum.  That's something that

5  we write.  Just kind of, you know, if we do an interview or an

6  event takes place, we do a -- what we call a 302, which is

7  nothing more than a memorandum.  And I was looking -- I think

8  on those were July 11th.  I was actually talking with -- with a

9  representative from the USAA, but the information came in

10  before that, yes, ma'am.

11    Q    And do you have an FBI agent named True Brown?

12    A    It's my understanding that Mr. Brown is a retired FBI

13  agent who works for USAA.

14    Q    So --

15    A    That's just my understanding, ma'am.

16    Q    -- the Federal Bureau of Investigations does not

17  have -- on July 11th or July 10th or around that time did not

18  have an active Federal Bureau of Investigation agent named True

19  Brown?

20    A    I'd love to answer that question for you, ma'am, but

21  I don't -- the FBI, you know, has a lot of employees at a lot

22  of different places.  And I can't -- it's my understanding that

23  Mr. True Brown that you're referencing is a retired FBI agent

24  that works for USAA in their financial crimes division, which

25  would be what a lot of different FBI agents do at the end of

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      their career, is they go work for financial institutions.

2          Q    Uh-huh.  Okay.  So on July 11th, let's go to that

3      date --

4          A    Yes, ma'am.

5          Q    -- if you would.

6          A    Sure.

7          Q    Now, you stated you were working on an affidavit to

8      seize this vehicle.  You said it was 45 feet long.  You were

9      concerned about safety if this vehicle had gotten out, you

10     know, it's 45 feet long, it could hurt someone, it could -- you

11     never know.  And you wanted -- you're always there to protect?

12         A    You never know.  Looking to what just happened in New

13     York with somebody mowing people down, that stuff's going on

14     everywhere.  We don't know.  We know a vehicle is purchased

15     with stolen funds and we do not know what the intent of that

16     individual is to use with that vehicle.

17         Q    So what actual information, when you were writing

18     this affidavit, okay, for the seizure of the vehicle --

19         A    Right.

20         Q    -- what actual information had you received that

21     there was actually a possible crime committed by Mr. Beane to

22     believe that the RV wasn't his?

23         A    The information primarily from what I've stated from

24     USAA at the time.  That's what we were relying on, that

25     information from USAA that is telling us that their money has

UNITED STATES DISTRICT COURT

1   been stolen.

2        Q    Was there a complaint filed so it's in writing or was

3   this just a phone conversation?

4        A    No.  So we got some -- we had some written

5   information from USAA, and then we -- I believe I was

6   referencing back to my 302, again that -- the memorandum, where

7   I'm actually on the phone.  We're conducting an interview with

8   Mr. Brown, at this time who you're referencing, to get all that

9   information, yes, ma'am.

10       Q    Okay.  So you found out about the funds approximately

11  the 10th?

12       A    Uh-huh.

13       Q    And on the 11th, you didn't have any kind of written

14  report from USAA, just that someone had stolen their money.

15       A    We had just some -- some basic facts that were

16  provided to us by USAA in a document, yes, ma'am.

17       Q    In a document?

18       A    Yes, ma'am.

19       Q    And that document is what document?

20       A    I believe.

21       Q    On USAA letterhead or --

22       A    I think it was attached to an e-mail from USAA.

23  Again, and I followed up with an interview.

24       Q    Uh-huh.  And what was this attachment?

25       A    There was some notes I know, like I was describing,

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    and then I think there was some kind of maybe IP logs that

2    showed a -- where, you know -- just IP logs.

3        Q    And that is what you used to make a determination

4    that a -- when you were working on an affidavit for the

5    warrant, because you have to basically have an application of

6    affidavit, an affidavit application for a warrant in order for

7    a warrant to be issued.  Is that correct?

8        A    You have -- yeah, well you have an affidavit that we

9    swear to, you know, facts, and then, yeah, it's -- yes, ma'am.

10   You would then, I guess, you -- yeah, there is an application,

11   an affidavit, and then you ultimately get an order from the

12   court -- from the magistrate judge, yes, ma'am.

13           But I'm not just working on that.  I mean, we are

14   working on this from multiple angles.  We've got people looking

15   into the background.  We've got people -- like I said, I'm

16   working on the affidavit.  We're trying to get calls in to USAA

17   to understand more detail.

18           Like I said, we were working on the affidavit.  It is

19   not a finished product at this time.  We are working on it.  We

20   have credible, reliable information from one of the, you know,

21   a large financial -- United States financial institution that a

22   theft has occurred.  And we are conducting an investigation

23   accordingly and reacting accordingly.  Have no reason to doubt

24   USAA's information that they provided to us.

25       Q    So at that point, you had determined that USAA Bank

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    was the victim before looking at any other information?

2        A    I -- at that time, yes.  I mean, USAA has reached out

3    to us and provided me solid information about a theft that has

4    occurred and is -- and so, yes, we are focusing in on USAA to

5    get that information and to get that asset, yes, ma'am.

6        Q    So they send you some IP logs showing that the actual

7    accounts and that money had -- how can you determine from that

8    that the money didn't actually belong to Randall Beane?

9        A    You --

10       Q    I mean --

11       A    Sorry.

12       Q    Yes.

13       A    I didn't mean to interrupt.

14       Q    I apologize.

15       A    Go ahead.  No.  We were relying -- USAA -- we are

16   getting -- we were conducting an interview, you know, that

17   morning of, I believe it was with -- looking back on my 302, I

18   think it dates July 11th when, you know, we're interviewing

19   Mr. Brown and getting additional information.

20            This is what we do.  We rely -- we have to rely on

21   financial institutions.  When they're telling us that

22   they're -- when there's a theft that's occurred, we rely on

23   that information they've given us.  Have absolutely no reason

24   to doubt, as I said earlier, anything that Mr. Brown or USAA

25   was relaying to us.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      Q    So you put more weight on any kind of evidence or

2 statements that you get from a bank than you do from any other

3 individuals?

4      A    Absolutely not.  No, ma'am.  I'm just -- at the time,

5 I mean, I take my -- we -- you know, I have -- unless somebody

6 gives me a reason to doubt them, I'm not going to doubt them.

7 You know, no difference if somebody comes in the FBI office

8 today and tells me, "Hey, look, I've got half a million dollars

9 stolen and, you know, Bob Jones did it, and he went out and

10 bought a half million dollars motor home," if I had no reason

11 to doubt that, then, yeah, I'm taking them at face value for

12 it.  Just as if I had -- just as if we did USAA here.

13     Q    You stated in your direct with Ms. Davidson that you

14 didn't have hardly any information on Randall Beane except for

15 his driver's license photo or the scan of his driver's license.

16 Did you ever give Mr. Beane an opportunity to -- without

17 assaulting him or kidnapping, did you ever approach him,

18 because I believe -- in this country, it's innocent before

19 proven guilty, you have a banker's statement, and with all the

20 bank fraud committed by the banks themselves, did you ever once

21 think let me get the other side of the story?

22     A    Absolutely.

23     Q    And the first time that you ever made contact with

24 Randall, was that when you guys passed him out?

25     A    Let me -- let me -- I take --

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      Q    Please just answer the question --

2      A    No.  I'll --

3      Q    -- yes or no, was the first time that you met Randall

4  on July 11th when your teams passed him out of the vehicle?

5  Was that the first time?

6      A    The first time we ever met Mr. Beane was on

7  July 11th.

8      Q    When you pulled him out of the RV.  Is that correct?

9      A    When I -- when we -- when we removed him from an RV

10  purchased with stolen money that was running.

11      Q    Okay.  I asked you, is that correct?  And I can

12  appreciate --

13          THE COURT:  Was the first time you met Mr. Beane was

14  when you approached him and took him out of the RV on or around

15  July 11th?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  All right.  Go on to the next question.

18          MS. TUCCI-JARRAF:  Thank you.

19  BY MS. TUCCI-JARRAF:

20      Q    Okay.  I want to keep this very --

21      A    Oh, no, ma'am.  I'm just -- I'm here to answer your

22  questions.

23      Q    Okay.

24      A    I'm happy to do so, as long as you want to ask them.

25      Q    Okay.  So at no other time prior to that had you

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1  actually tried to figure out whether that money could possibly

2  be Mr. Beane's?

3      A    We had information from USAA, ma'am, that we --

4  credible, reliable information from their financial

5  investigators that this money was stolen.  That's what we were

6  working with at the time.

7      Q    Okay.

8      A    Uh-huh.

9      Q    So then I have a question for you, if your -- I get

10  your experience regarding investigating crimes.

11      A    Sure.

12      Q    Trying to locate them, I appreciate that.

13      A    Yes, ma'am.

14      Q    More than you could know.  My question is, is how

15  familiar are you with actual banking, as far as how banking

16  actually works, money transactions actually work, the inner

17  workings of banking?  Have you ever worked for a bank?

18      A    No, ma'am.  I have never worked for a bank.

19      Q    Okay.  Have you ever been an attorney in private

20  capacity, as far as a consultant or any other for a bank?

21      A    You know, I did work some for a -- I did some work

22  for a bank.  I don't know -- I wouldn't go as far as saying I

23  was in-house counsel or anything like that.  But I have done

24  work for a bank, yes, ma'am.

25      Q    Okay.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

```
 1        A      Generally, though, you know, involving, you know,
 2   maybe a collection or something.  Not -- not -- I think what
 3   you're getting, at inner workings, not so much.
 4        Q      Inner workings would be similar to this -- the ACT
 5   and the actual transfer systems.
 6        A      I'm not familiar with ACT.
 7        Q      So are you --
 8        A      You're speaking of ACH?
 9        Q      -- familiar with the actual transfer system which was
10   used for the transfer from the Federal Reserve to USAA or even
11   the wire transferring system from USAA to Whitney Bank?  Are
12   you familiar with those systems and how they work?
13        A      I have a general understanding of those, yes, ma'am.
14        Q      Okay.  General understanding, can you give me an
15   example of that?  Because when someone says "general
16   understanding," these are complicated systems and yet they are
17   super simple.  So I just need to know what your -- it can be
18   complex as far as technicality, technical, however, with APIs,
19   are you familiar with an API?
20        A      No, ma'am.  I'm not familiar with an API.  Could you
21   give me a full definition of what an API is?
22        Q      APIs are what are used for any kind of system -- when
23   there's a transfer, the API makes sure the data on this side
24   actually is what it is.  And this side -- so if this side sends
25   over data for account number whatever it is, if it can't find
```

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1  that account number, it doesn't exist, no transaction actually

2  occurs.

3         That's why I'm asking, are you familiar with an API

4  or with an actual money transfer systems here in the Federal

5  Reserve System or in its member systems, which is still the

6  Federal Reserve System?

7     A    I understand ACH transfers, automated clearinghouse

8  transfers.  I understand a Fedwire.  Yes, ma'am, I understand

9  those -- those type of transactions.  I do have a -- you know,

10 a general understanding of how that works in the banking world.

11    Q    And what's your understanding?  You've just stated

12 earlier that based on the information that you received from

13 just USAA Bank at that point, and they made a statement and

14 gave you some IP screenshots or data information that you

15 determined that they were a victim, that someone had stolen

16 their money.  So I need to know, we all need to know what is

17 your general understanding of the ACH financial transfer system

18 from money to any bank, including Federal Reserve, to any of

19 its member banks.  What's your general understanding?

20         MS. DAVIDSON:  Your Honor, I'm going to object to

21 this.  I think it's outside the scope of direct.  I'm not sure

22 that his banking understanding goes into the arrest in this

23 case.

24         THE COURT:  Your response?

25         MS. TUCCI-JARRAF:  Without prejudice, he stated that

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1   they literally went in, took this man out because he believed

2   that USAA Bank was a victim based off of the information.

3   We're trying to determine what information they had in order to

4   arrest Randall Beane without any kind of warrant at that point.

5           THE COURT:  All right.  I'll overrule the objection,

6   since we've gone down this line.  Maybe we can finish it up.

7   But go ahead.

8           MS. TUCCI-JARRAF:  Thank you.

9           THE COURT:  Answer the question to the extent you

10  can.

11          THE WITNESS:  Yes, Your Honor.

12          Ma'am, the general understanding of the ACH transfer

13  system and a Fedwire, is that your question?

14  BY MS. TUCCI-JARRAF:

15      Q    My question is, just what is your general

16  understanding -- because were you the one that made the call to

17  go and arrest -- well, to arrest, we'll just say at this point,

18  to arrest Randall Beane and seize the vehicle?  Were you the

19  one that made that call?

20      A    You know, I think we -- I spoke to the U.S.

21  Attorney's Office to let them know what we were on the way to

22  do, yes, ma'am.  I -- so I guess, yeah, I did.  I was letting

23  know the U.S. Attorney's Office.

24          I think we're getting a little off track here.  I

25  mean, you know, when an FBI gets a call that a bank is getting

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1   robbed, we don't sit there and say, "Hey, do you know" -- I

2   mean, we don't ask a million questions. We go. That's what we

3   did today or did then.

4   Q    When a bank gets robbed, do you usually have a bank

5   robber and a banker and a gun or some kind of weapon and cash?

6   You're talking about, per Ms. Svolto's opening statement, that

7   he was robbing a bank? I'm asking you, because it appears from

8   what you have said that you believed that he had stolen money

9   using a transfer system that unless you are inside the Federal

10  Reserve Banking System and the IT source code dealing with the

11  source code and all that, most people don't know what it is.

12  A    Yes, ma'am.

13  Q    I'm asking you, because you are the one that

14  supposedly made the call, except for what inference you just

15  tried to make that U.S. attorneys might have some

16  responsibility as --

17  A    No.

18  Q    -- to the events that day, but that you made the call

19  to go in and arrest what you believed was the criminal to

20  protect what you believed at the time was the victim.

21       You stated that because of documents you had

22  received, which were IP coding and their e-mail, which we don't

23  know what was in it, but that they had been robbed, something

24  to that effect, that you believed that Randall Beane was

25  already a criminal and that the money could not have been his,

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    just based on that.

2            So I'm asking, what is your general statement to make

3    a call that someone may be a victim and a criminal when there's

4    still a possibility without all the data or even just that

5    splice of evidence you may have had that perhaps Randall Beane

6    was the victim that day and USAA Bank was the criminal?

7            So I'm asking, do you -- what is your general

8    knowledge, because you said you have a general knowledge of

9    it --

10   A    Yes, ma'am.

11   Q    -- or general understanding.  What is your general

12   understanding of the ACH transfer system?

13   A    Of the -- my general understanding of the ACH, the

14   automated clearinghouse, is the system is commonly what they

15   call like a batch system where the -- the way it would work,

16   it's not immediate.

17           It's not like a Fedwire, which a wire transfer goes

18   immediately.  Like when Mr. Beane sent -- or when -- caused the

19   transaction to be sent to Whitney Bank to be -- for the funds

20   with the stolen money to purchase the motor home.  That was a

21   Fedwire, immediate transfer versus ACH sometimes takes a little

22   bit of time to do a reconciliation.

23   Q    Okay.

24   A    It's my general understanding.

25   Q    Right.  And you had stated that the IP showed the

                        UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    transactions that were done how many days prior to the -- what

2    was the actual date on the purchase -- sale of purchase?

3         A    Of the RV?

4         Q    Yeah.

5         A    It's in that July 8th, 9th, 10th time frame, in that

6    approximate time frame.

7         Q    Do you believe it was July 7th?

8         A    Okay.

9         Q    July 7th, which means that ACH transfers happen

10   sometimes before July 7th?

11        A    Again, I'm not looking at bank -- I'm not trying to

12   dodge your questions by any means, ma'am.  I don't -- I'm not

13   looking at any bank records here in front of me or anything

14   like that.

15        Q    No, I understand that.  I'm just asking, you had

16   stated that ACH takes longer to process, in your general

17   understanding and whereas Fedwires are --

18        A    Fedwire, yes, ma'am.  I understand -- as of today, I

19   understand Fedwire is immediate versus ACH takes -- is

20   sometimes -- I don't know if it's a day or two to do a

21   reconciliation.

22        Q    No.  I appreciate you taking the time --

23        A    Yes, ma'am.

24        Q    -- and for everyone taking the time to explain what

25   your general understanding is, so we know what information that

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    you relied on for your actions --

2        A    No.

3        Q    -- taken that day.

4        A    That day, I just want to be clear, I was not relying

5    on information about ACH or Fedwire.  I was relying on

6    information that I had from USAA.

7        Q    I understand that.

8        A    May I finish, ma'am?

9        Q    Uh-huh.

10       A    Okay.  That I was relying on information from USAA

11   that they -- that money was -- that a scheme was orchestrated

12   by Mr. Beane that I've described earlier and which resulted in

13   a loss to the bank, and that that money had then been used to

14   purchase a motor home, and he was about to leave in it, and I

15   had no idea what he was going to do with it.

16       Q    And that was -- that information that he was about to

17   leave in it was from USAA?

18       A    No, ma'am.  The general information -- and I say

19   information, taking from all of what we're doing that day.

20       Q    Okay.  Then let's address that, because you had

21   stated when you were working on the affidavit, you just got up

22   and ran and grabbed -- I'm sorry I don't remember your

23   partner's name, but another colleague?

24       A    Yes, ma'am.  Correct.

25       Q    Where did that information come from that would have

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

```
 1    you stop the lawful process, the criminal procedures you're
 2    supposed to follow in order to have a warrant to be able to
 3    arrest someone?  What -- who called you with that information
 4    that had you abandon protocols and process?
 5         A    I never --
 6         Q    For what you had stated was to protect victim and
 7    asset?
 8         A    The argument that I abandoned protocols and process,
 9    I strongly disagree with.  I did not abandon anything.  We
10    have -- we can make a probable cause arrest based on
11    information.
12              Just like tonight if I see a shoplifter running down
13    the aisle at Walmart, I can tackle them.  You know, I can make
14    a probable cause arrest in Tennessee.
15              So let's -- I didn't abandon any type of protocols or
16    anything.  Our job is to stop criminal activity.  So I strongly
17    disagree with that assumption that we abandoned anything.
18              I was working on a seizure warrant.  That is correct.
19    At the time I was working on a seizure warrant in coordination
20    with the U.S. Attorney's Office.  Once the facts changed, and
21    Mr. Beane starts -- is -- plans to leave in that motor home or
22    it's going to be -- the keys are going to be turned over to him
23    at Buddy Gregg, we had to react.  There was not time for me to
24    get in front of the magistrate judge.  There was not time for
25    me to finish an affidavit.  We had to react at the time.
```

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    Q    Okay.  But what -- who called you to -- so that you

2    could make that call?

3    A    Yeah.

4    Q    Who called you with that information, was that USAA

5    Bank or was it Buddy Gregg?  Who was it?

6    A    It's my understanding that information was provided

7    to another task force officer in our office who then relayed

8    the information to me.

9    Q    And was there a report done on that?

10   A    A report?  Not by me.  I don't recall.  I mean, we

11   did an arrest, 302 -- again, that's our -- I keep calling them

12   302.  That's our memorandum.  There's an arrest 302 that lays

13   out the events that took place that day.

14   Q    Okay.  So you're not sure who -- where that

15   information came from?  It could come from anyone saying he was

16   going to leave -- I'm just stating, from your comments, you

17   don't know what that information came from, other than a

18   colleague receiving it from somewhere?

19   A    No, ma'am.  I -- I did not say a colleague receiving

20   it from somewhere.  Buddy Gregg, it's my understanding as a --

21   that Buddy Gregg provided that information to one of our task

22   force officers who relayed that information to me that he was

23   leaving in the motor home.  And you know what?  When we got

24   there, he was leaving in the motor home.  Pretty good

25   information.  Stolen motor home.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    Q    Did you also retrieve or seize at that time Randall

2    Beane's cash that he had already paid to Buddy Gregg three

3    days -- excuse me, four days prior to you taking him on the

4    11th?

5    A    Did we seize the cash?  No, ma'am.  We ultimately

6    seized the motor home, not any cash that I'm aware of.

7    Q    Okay.  So on the 11th, you seized a motor home which

8    he had bought four days prior and paid cash for, but didn't

9    grab the cash as well as part of the evidence of a crime?

10    A    No, ma'am.  The -- you know, you're getting into some

11    legal stuff, you know, whether you've got good faith purchasers

12    and that kind of stuff.  We seized the asset that was purchased

13    with the stolen money.  The victim bank, you know -- or USAA,

14    and I think this is Whitney Bank who is the correspondent bank,

15    who actually received the money, you know, that's -- I mean, I

16    don't think that money has been seized.  I know it hasn't.

17    That money has never been seized.

18    Q    The money has never been seized or secured to

19    preserve the evidence of a possible crime or an alleged crime?

20    A    Well, yeah, the evidence is seized right here in

21    those photographs you saw of the motor home.

22    Q    I'm talking about the actual money, which Mr. Beane

23    had paid from his own property?

24    A    No.  The -- the money has not been seized --

25    Q    Okay.  Thank you.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      A     -- from the bank.  Yes, ma'am.

2      Q     I appreciate that.  I just wanted to know whether

3   you've gone in to seize all the evidence within the crime

4   scene --

5      A     To the extent --

6      Q     -- or involved in the crime?

7            THE COURT:  Let's wait for the next question.

8            THE WITNESS:  Sorry, sir.

9            MS. TUCCI-JARRAF:  Thank you.

10  BY MS. TUCCI-JARRAF:

11     Q     Okay.  You mentioned that your office had information

12  on an outstanding warrant on the day that -- on July 11th.

13  What warrant are you referring to?

14     A     It's -- there was a state court warrant.

15     Q     Okay.  And you just had information on it, you didn't

16  actually have it?

17     A     I did -- I personally did not have it in hand, no,

18  ma'am.

19     Q     Okay.  Who in the office -- you said it was a small

20  office.  How many people are in your office, just so I can get

21  a scope here, because you say that there was an outstanding

22  warrant, but you didn't see the warrant, you know -- didn't

23  have a copy of the warrant.

24            How many people are in your office, so we can get an

25  idea of how many people -- you said a lot of people working on

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1   this case from your office, and yet earlier you said your

2   office is really small.

3          So how many people are in your office?

4   A    You know, total office of Knoxville division, I don't

5   know, maybe, there's -- maybe -- again, I'm -- maybe there's 75

6   employees total from staff agents, forensic accountants,

7   computer analysts, everything.

8   Q    Okay.

9   A    Maybe.

10  Q    That gives us a better idea of how many bodies could

11  have possibly received information on this outstanding state

12  warrant.  Do you remember what state at least this was to be

13  from?

14  A    Yes, ma'am.  Today -- I believe that today, I could

15  tell you, it is -- I think it was out of South Carolina.

16  Q    Uh-huh.  Today?

17  A    Uh-huh.

18  Q    But on July 11th, you had never seen it, you just had

19  information that your office had information that an

20  outstanding warrant existed.

21         Did you confirm at least with a database, NCIC or

22  anything else that there was actually an outstanding state

23  warrant?

24  A    So me personally, I did not -- I was relying on

25  information that was provided to me.  You know, it's -- we work

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    as a team.  I mean, it's -- you know, there's moving parts.

2    I'm doing the affidavit.  Somebody else would be looking to see

3    about the warrant, you know, providing that information to us.

4         I mean, it is a team effort.  Not one person can sit

5    here and do all the different jobs.  So I'm not the person who

6    made any confirmation of that warrant.

7         But I would say this too.  It's my understanding that

8    at the scene also, the warrant was also confirmed by Knox -- I

9    believe it was the Knox County Sheriff's Department.

10    Q    I'm just asking, because in the plethora of discovery

11    that was provided to us, not once was there any report by you,

12    a 302, or by any other member supposedly working on this case

13    regarding -- excuse me, with an actual copy of the South

14    Carolina -- the alleged South Carolina outstanding warrant, no

15    NCIC, no actual NCIC from that date or anything else showing

16    there was an outstanding South Carolina warrant.  You stated

17    you had not even confirmed --

18         MS. DAVIDSON:  Objection, Your Honor.  That is

19    inaccurate.

20         MS. TUCCI-JARRAF:  I'm just stating --

21         MS. DAVIDSON:  Mr. Beane's --

22         THE COURT:  Well, let's --

23         MS. DAVIDSON:  Okay.

24         THE COURT:  Let's go ahead and ask the question.

25         MS. TUCCI-JARRAF:  Thank you.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

```
 1           THE COURT:  I'll remind -- you heard me say both
 2   questions by the attorneys, or in this case, the party
 3   represents herself, and the objections, statements by the
 4   attorneys or parties in that role are not evidence.  So just --
 5   Jury, keep that in mind.  The evidence comes from the witness
 6   stand.  So let's try to focus on the question and answer the
 7   question asked.  Go ahead and ask your question.
 8           MS. DAVIDSON:  Your Honor, may I address the NCIC
 9   issue?
10           THE COURT:  Let's just go on.
11           MS. TUCCI-JARRAF:  Thank you.
12           THE COURT:  Go ahead.
13           MS. TUCCI-JARRAF:  Okay.  I'll just restate my
14   question clear then.
15           THE WITNESS:  Sure, absolutely, yes, ma'am.
16   BY MS. TUCCI-JARRAF:
17      Q    Okay.  Because it is important to know that you have
18   the tools you need to do your job.
19           Okay.  Did you personally confirm the existence of an
20   outstanding state warrant that you now know to be from South
21   Carolina?
22      A    No, ma'am.  I did not.  I have seen it, though, since
23   that date.  I have seen a copy of that warrant, yes, ma'am.
24   And it was exactly right.  I mean, he was -- Knox County
25   confirmed it at the scene.  It's my understanding he was taken
```

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1  to jail.

2      Q    Did you ever provide a copy of that alleged South

3  Carolina outstanding warrant to Ms. Davidson or anyone on

4  the -- at the DOJ?

5      A    You know, I would have to look back on it.  What we

6  normally do is we turn our file -- our discovery file over to

7  the prosecutors.

8      Q    Okay.  On July 11th, prior to or at any moment, did

9  you ever present a warrant to Mr. Beane or the other

10  unidentified male and unidentified female that you found in

11  that vehicle?  Did you ever present an actual paper warrant or

12  electronic warrant to any of those three?

13      A    No, ma'am.  And I -- I don't -- I mean, that's -- I

14  think that's some of TV stuff where we serve people, put a

15  warrant in their hands.  You know, that's -- I don't -- that's

16  just not general practice where you would, you know, serve

17  someone -- hand someone a warrant, generally.

18      Q    Okay.

19      A    I'm not saying it doesn't happen.  I'm just saying,

20  you know, the fact that we -- you know, we've made -- you know,

21  we have -- it's a team effort.  We rely on information that is

22  provided to us, and we go out and we do our jobs.  And on that

23  day --

24      Q    Sorry.

25      A    Oh, go ahead.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      Q      Someone who's been an attorney for so long, as well
2   as the FBI for five and a half years who's familiar, presumed
3   to be familiar and presented to be familiar with the laws of
4   criminal procedure and process, making kinds of statements like
5   that regarding warrants not being necessary.  I do understand
6   probable cause --
7            THE COURT:  Let's not comment on the evidence.  Let's
8   go ahead and ask the next question.
9            THE WITNESS:  May I clarify?
10           MS. TUCCI-JARRAF:  Okay.  The actual --
11           THE COURT:  Let's go on to the next --
12  BY MS. TUCCI-JARRAF:
13     Q      The actual warrants, there were two other warrants,
14  on the 12th and 13th, were those issued by -- was that
15  application for an affidavit or the affidavit for an
16  applicational warrant on July 12th and July 13th, were you
17  involved in -- was that your affidavit?  There were two of
18  them.
19     A      Are you -- yes, ma'am.  Are you speaking about the
20  affidavit to seize the motor home?  Is that what you're
21  speaking about?
22     Q      No.  In fact, if I can recall, the affidavit to do
23  the motor home was actually provided by your partner.  And I'm
24  sorry, I don't remember his name.
25           I believe it was him, Mr. Durand.  Is that correct?

UNITED STATES DISTRICT COURT

1    Is his name Mr. Durand?

2        A    You're asking me this gentleman here?  That's --

3        Q    Yeah.

4        A    -- Special Agent Jimmy Durand.

5        Q    Durand.  Excuse me.

6        A    Yes, ma'am.

7        Q    So that was actually Agent Durand, so I don't believe

8    we're talking about that warrant, because I know you didn't

9    issue it.  I'm talking about the actual warrant that you say

10   you didn't have and didn't produce on July 11th when you took

11   Mr. Beane.  There were still two affidavits, one on the 12th

12   and one on the 11th -- or excuse me, one on the 12th of July

13   and one on the 13th of July.

14            Did you make those affidavits for those warrants?

15       A    I am not following what warrants or what affidavits

16   your speaking of Ms. Jarraf.

17       Q    No.  That's great.  I just wanted to make -- to ask

18   you if those were the warrants you relied on.

19       A    I'm not sure what warrants.  So there's a state court

20   warrant --

21       Q    Right.

22       A    -- and there's federal warrants out there that were

23   on you and Mr. Beane, ultimately when a federal grand jury

24   indicted both of you.  That's the warrants I'm aware of.

25       Q    Okay.  And the grand jury, the indictment that you

                    UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1   spoke of --

2       A    Yes, ma'am.

3       Q    -- you testified you helped secure that indictment.

4   Is that correct?

5       A    It -- I testified, yes, ma'am.

6       Q    In order to have those warrants issued, it was

7   required to have a grand jury indictment.  Is that your

8   understanding?

9       A    No, ma'am.  I -- you don't have to have a grand jury

10  indictment.  As I said earlier, we can pick someone up on a

11  probable cause complaint.

12      Q    Okay.

13      A    Yes, ma'am.

14      Q    So which one came first, the indictment, your

15  testimony, or the indictment that you testified for, did that

16  come on that date, before the actual warrant that you had

17  issued for Mr. Beane and myself that you referred to, or were

18  the warrants first, then the indictment -- then the indictment?

19      A    No, ma'am.  The -- in this case, we used a federal

20  grand jury and obtained indictments.  And then based on that,

21  warrants are issued, arrest warrants.

22      Q    Okay.  And was your testimony to the grand jury, was

23  it true, accurate, and complete or truth?

24      A    Yes, ma'am.

25      Q    The whole truth, nothing but the truth?

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      A      Absolutely.

2      Q      Okay.  You stated that Mr. Beane -- I just have a few

3  more questions here.  Let's go back to the physical removal,

4  since we already have data on the warrant or no warrant.

5          Resisting and eventually stopped resisting, you had

6  stated Ms. Cynthia Davidson had asked you did he resist.  You

7  said he did.  Is that correct?

8      A      That's correct, yes, ma'am.

9      Q      And then she later said, did he stop resisting, and

10  you said eventually he stopped resisting.  Is that correct?

11     A      Eventually, once he was secured.

12     Q      Okay.  So my question is, you had stated that once he

13  had his hands around his back, what methods did you use -- did

14  he stop resisting arrest after he had been elbow punched in the

15  back of the head a number of times with his face in the ground,

16  or did he stop resisting arrest after he had already been

17  passed out from a head injury?

18     A      I disagree, ma'am, with your recitation of the facts

19  there.  But I will answer your question to the extent I can,

20  that the amount of force used was only the amount necessary to

21  effectuate the arrest, to make the arrest that day.

22          We had a motor home that was running.

23     Q      Uh-huh.

24     A      I mean, all he had to do was put it in drive and, you

25  know, lives would have been lost potentially.  And also, we did

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    not know who all -- you know, we don't -- it's -- we're

2    reacting to a situation.  We do not know what -- you know, if

3    there's other people involved.  We just don't know.  We have to

4    make that arrest, get him cuffed up.

5         He was -- he did, as you said, he obtained a cut on

6    his head.  We had an EMT, Jason, who was at the scene, is an

7    agent who's also an EMT and he treated him immediately.  Also,

8    we called an ambulance just to be on the safe side, and

9    Mr. Beane refused treatment.

10   Q    When -- after he received the head injury, he refused

11   treatment?

12   A    I disagree with that -- I don't know -- I mean, an

13   injury, he got a cut on his head.

14   Q    302 that he had a head injury.  The actual -- okay.

15   Let's step aside from that.  When you approached the vehicle,

16   were weapons drawn?

17   A    I don't recall a weapon being drawn, no, ma'am.  I

18   don't --

19   Q    How many officers were there?

20   A    At the time, there were initially four total FBI

21   agents that were there at the scene.

22   Q    And supporting officers, how many?

23   A    Got there a little bit later.  There were some Knox

24   County deputies that arrived and some of our task force

25   officers.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    Q    So approximately how many officers total?

2    A    Maybe by the time -- maybe -- maybe eight in that --

3    eight, nine, something like that.  Again, that's approximately.

4    Q    I appreciate that.  Thank you.

5         So approximately eight or nine armed individuals

6    approached a vehicle?

7    A    I would -- no, ma'am.  No, ma'am.  That's not how it

8    went down.  No, ma'am.  There were only four of us who arrived

9    initially at the scene.  The others came after the fact.  I

10   mean, once -- they literally get to the scene about the time

11   that Mr. Beane is being put into handcuffs.

12   Q    Okay.

13   A    So, I mean, it's after the fact.  And you -- I mean,

14   to the extent you're trying to insinuate -- insinuating that

15   that's a number -- a larger number, it's really not.  Because

16   we don't know what's going on with other individuals

17   potentially in the area or, you know, we just don't know.

18   Q    That -- thank you.  Thank you for stating that.

19   Because just as you don't know, is there a possibility that

20   Mr. Beane didn't know what your intentions are?

21   A    No, I don't think so.

22   Q    So if he believed that he's made a lawful purchase,

23   he's actually taking his property away four days after he had

24   purchased it from the actual RV place, that armed individuals

25   coming into -- is it possible that the whole thing wasn't

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1   handled properly as far as trying to figure out that's why it

2   got so violent?

3       A    No, it did not.  First of all, I disagree with the

4   fact that he didn't know, and I disagree with the fact it got

5   violent.  It was not violent.  It was a properly executed

6   arrest for an individual who was resisting.

7       Q    Excuse me just one second --

8       A    Absolutely.

9       Q    -- so that I can check my notes so that we're -- I'm

10  finished here.

11          I just have one last question regarding something you

12  stated about --

13      A    Yes, ma'am.

14      Q    -- your 302s.

15          Do you write a 302 for every action that you've taken

16  or for every action that you're going to take, just so that

17  we're clear as far as how detailed are you recording the actual

18  investigation?

19      A    No.  For every action we're going to take, there's

20  not a 302, no, ma'am.  And, generally, we do one for actions

21  that are taken, but not always.  I mean, there could be a

22  circumstance out there for whatever reason where a 302 is not

23  generated.

24      Q    Did you keep a notebook on you that you write notes

25  in when you're in the field or anything like that?

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1      A     We -- I generally keep, you know, if I'm going for an

2  interview, absolutely, we keep notes and stuff of interviews,

3  sure.

4      Q     Okay.

5      A     Now, I have one thing to add.  Not always.  There

6  could be an arrest-type situation where, I mean, I'm not taking

7  notes while we're putting handcuffs on somebody, so...

8      Q     Okay.  Were you asked to -- because since there's a

9  possibility we don't -- I've never seen in your reports

10  anywhere that you presented the warrant, which is why I'm

11  asking, but you were asked for that warrant by the unidentified

12  male and unidentified female as well as Mr. Beane or just the

13  unidentified male and female?

14      A     I remember the un -- at the time unidentified male

15  and female asking for a copy of a warrant.  Which would not be

16  something we would give to somebody out -- you know, who is at

17  a scene.  We would not give a warrant to that individual.

18      Q     They were in the vehicle, though, and you actually

19  gave them orders to get out of the vehicle?

20      A     There's officer safety issues there.  If you have

21  individuals in a vehicle doesn't mean we would give them a copy

22  of paperwork or anything.

23      Q     Did they ask you for that warrant while still in the

24  vehicle before you ordered them out or --

25      A     I don't recall specifically.  I do -- I know they

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1    asked for a warrant.  I think they were out in the parking area

2    when they were asking for that.  They could have been inside.

3    I don't know.  I don't know the answer to that.

4         Q    Okay.

5         A    Very well may have been inside, you know, asking for

6    warrants.  I don't know.

7              MS. TUCCI-JARRAF:  Okay.  I don't have anymore

8    questions.  Thank you.

9              THE COURT:  Thank you.

10             Mr. Beane, cross-examination?

11             MR. BEANE:  Yes.

12             MS. TUCCI-JARRAF:  Thank you, Mr. Still.

13             THE WITNESS:  Thank you, ma'am.  Thank you.

14                         **CROSS-EXAMINATION**

15   BY MR. BEANE:

16        Q    Hello, Mr. Still.

17        A    Good afternoon, sir.

18        Q    On the day of July the 11th, do you remember the

19   temperature that day, Mr. Still?

20        A    It was hot that day, sir.

21        Q    Yes, sir.  It was very hot.

22             Do you remember if the air conditioners were running

23   on the RV, Mr. Still?

24        A    It seems like they were running.

25        Q    Yes, sir, they were.

UNITED STATES DISTRICT COURT

Parker Still - Cross-Examination

1          Also on that day, when you arrested me, you told me

2     that I had a warrant out of Jasper, Colorado.  Do you remember

3     telling me that, Mr. Still?

4     A     There very well may have been -- I may have

5     inaccurately said where the warrant was from, Mr. Beane.

6     Q     That's the only warrant you told me about.  Isn't it

7     correct, Mr. Still?

8     A     I think there was talk about that it was out of North

9     Carolina.  Again, I was not the one who I just previously said

10    to --

11    Q     Mr. Still, I tried to ask you --

12          THE COURT:  Let him finish.  Let him --

13    Q     -- to please discuss with me --

14          THE COURT:  Excuse me.  I think he was in the middle

15    of an answer, so let him finish it.  Go ahead.

16          THE WITNESS:  Yes, sir, Mr. Beane, I was not the one

17    who -- who was -- you know, I just knew there was an active

18    warrant, yes, sir.

19    BY MR. BEANE:

20    Q     And I also asked you to please discuss with me the

21    fact that I had never been to Colorado and there's possibly no

22    way there could have been a warrant for my arrest?

23    A     I believe we tried to interview you at the scene, and

24    you said you wanted to speak with an attorney and didn't want

25    to talk to us.

UNITED STATES DISTRICT COURT

Parker Still - Redirect Examination

1    Q    No, sir.  That's not correct.

2    A    Okay.  That's not the way I remember it, sir.

3  Respectfully disagree with you.

4         MR. BEANE:  All right.  No further questions.

5         THE COURT:  Thank you.  Any redirect?

6         MS. DAVIDSON:  Yes, Your Honor.

7                   **REDIRECT EXAMINATION**

8  BY MS. DAVIDSON:

9    Q    Okay.  So you were talking about you were preparing

10  an affidavit for a warrant.

11        What kind of warrant were you working on on the 11th?

12   A    That was a seizure warrant, an affidavit of seizure

13  warrant, probable cause warrant to seize the motor home.

14   Q    So you weren't working on an arrest warrant or

15  complaint or any other sort of arrest process for Mr. Beane at

16  that time?

17   A    No, ma'am.  At the time, we were working, the way I

18  recall it, was on an actual seizure warrant.  Because that's

19  why I had been speaking with Ms. Svolto who is the -- generally

20  does the forfeiture work with the U.S. Attorney's Office.

21  That's the way I recall it.

22   Q    Okay.  Did you -- actually, after this arrest, did

23  you get a seizure warrant signed by a United States magistrate?

24   A    Yes.  Special Agent -- Jimmy, he swore it out, yes,

25  ma'am.

UNITED STATES DISTRICT COURT

Parker Still - Redirect Examination

1    Q    So -- and was there an arrest warrant by the State of

2  South Carolina for Mr. Beane?

3    A    Yes, ma'am.  I mean, at the scene -- that's what I

4  was saying.  Knox County, it's my understanding, when they took

5  him -- he did not go into federal custody at the time.  He went

6  into state custody, that Knox County does those verifications

7  is my understanding.

8    Q    Then he was indicted by a federal grand jury?

9    A    That's correct, both he and Ms. Heather were.

10  Correct.

11    Q    And you testified at that federal grand jury?

12    A    I did, yes, ma'am.

13    Q    And before you testified, did you do your own

14  investigation into this case?

15    A    As we do with all.  I mean, we do our investigation.

16  We get the records in.  And we -- you know, we do our

17  investigation.  As I said earlier, what the FBI does is we talk

18  to people.  And that's what we do, yes, ma'am.

19    Q    Okay.  So was the money that Mr. Beane bought that RV

20  with, was that his own money?

21    A    That was not his money.

22    Q    Whose money was it?

23    A    That was United -- it was USAA's money.

24    Q    Okay.  The United States did not seize the money that

25  Buddy Gregg got from the wire transfer.  Is that --

UNITED STATES DISTRICT COURT

1    A    Correct.

2    Q    Is that your understanding?  And Ms. Tucci-Jarraf

3  asked you about NCIC reports.  It's not the practice of the FBI

4  to give codefendants each other's NCI reports.  Is it?

5    A    I could not imagine why we would give NCI reports

6  because of the personal identifiers on those reports.

7    Q    So Ms. Tucci-Jarraf doesn't have Mr. Beane's NCIC

8  doesn't mean that there's not a warrant on his NCIC, does it?

9    A    Right.  No, ma'am.  That would not mean that.

10    Q    Okay.  And you mentioned you -- just out of an

11  abundance of caution, Mr. Beane had a scratch on his head.  Is

12  that right?

13    A    That's correct, yes, ma'am.  And Jason, the agent at

14  the scene, is a EMT, paramedic.  He immediately put a bandage

15  on Mr. Beane, and I believe it was Jason, too, who called the

16  paramedics.  The actual ambulance showed up, and we, you

17  know -- to make -- I mean, it just -- we -- we want to do

18  right, want to treat everybody fairly, want to -- you know, if

19  there was any injury, we wanted to make sure he got the medical

20  attention, and he refused.

21    Q    So he could have gone to the hospital, but he refused

22  treatment?

23    A    We called -- the ambulance was called.

24    Q    And you saw his injuries.  Were these life

25  threatening head injuries?

1    A    No, ma'am.  They were not.  Like I said, we had an

2  EMT agent at the scene.

3    Q    And did you give the defendant, Mr. Beane, plenty of

4  opportunity to come out of the RV and talk to you?

5    A    Right.  There was ample opportunity.  You know, you

6  never want to put hands on with anybody.  That's always the

7  last resort, yes, ma'am.

8    Q    And you identified yourself as the FBI, but he

9  refused --

10   A    He refused --

11   Q    To come out of the RV?

12   A    He refused to come out.

13        MS. DAVIDSON:  That's all I have.

14        THE COURT:  All right.  Thank you.  Any recross based

15  on the redirect?

16        MS. TUCCI-JARRAF:  I just have one question.

17        THE COURT:  Go ahead.

18        THE WITNESS:  Yes, ma'am.

19                    **RECROSS-EXAMINATION**

20  BY MS. TUCCI-JARRAF:

21   Q    Okay.  You've just blown my mind with a statement

22  that you made that this is in regards to Ms. Davidson's

23  question regarding whose money was it that he stole, and you

24  said it was USA's money?

25   A    That's my understanding that they're -- USAA is the

                    UNITED STATES DISTRICT COURT

1    one who's out.  I mean --

2         Q    No.  My question is, there was supposedly 30-plus

3    transactions from the Federal Reserve to USAA.  Are you -- are

4    you telling us now that you can actually go into a bank online

5    and just set up a bank account with USAA and put some money in

6    there just putting any numbers in or -- because it was my

7    understanding that this was the Federal Reserve, your position

8    was that it was the Federal Reserve's money which had

9    unlawfully been transferred over to USAA?

10        A    Yes, ma'am.  I think the way I understand it is, the

11   Federal Reserve put money in USAA, then it was recalled by the

12   Federal Reserve, and now USAA eats the loss.

13        Q    Okay.  So then the money itself at the time of the

14   July 11th that you say was stolen was actually supposedly

15   stolen from the Federal Reserve Bank of New York.  Is that

16   correct?

17        A    No.  I think we're --

18        Q    How could it be USAA's money?

19        A    USAA is the one who -- to me this scheme works like a

20   bad check in a sense, you know, where the money -- the money

21   was in the account and it was fraudulently put into the

22   account, and the money -- then Mr. Beane used that money to

23   purchase this RV.  And that was USAA's funds that were the

24   ultimate source of -- USAA is the one who's out the money in

25   this case.

1    Q    Yes.  I'm aware of the theft scheme that the Federal

2  Reserve and its member banks concocted by using unknowing and

3  unsuspecting American citizens.  That's why I got involved.

4         MS. DAVIDSON:  Objection, Your Honor.

5         MS. TUCCI-JARRAF:  I'll move on with my question, so

6  the point --

7         THE COURT:  I'll sustain the objection to the extent

8  that was not a question.

9         Go ahead.

10 BY MS. TUCCI-JARRAF:

11   Q    Are you aware of a scheme that was done by the

12 Federal Reserve Banks System, the banks within the Federal

13 Reserve Bank System, and its member banks, including USAA Bank

14 that is a member of the Federal Reserve System, are you

15 familiar or aware of a bank scheme to use unsuspecting and

16 unknowing American citizens in order to cause a theft of funds

17 so that they could later make insurance claims or write-offs,

18 which in this case USAA Bank would be doing?

19   A    No, ma'am.  I'm not aware of any scheme like that.

20 The only scheme I'm aware of is the one orchestrated by you and

21 Mr. Beane.

22   Q    Okay.  If you were aware of such a scheme at the

23 institutional level, would you give it any type of attention

24 whatsoever in an investigation?

25   A    If I'm aware of a scheme anywhere that falls within

UNITED STATES DISTRICT COURT

1    what I'm -- you know, in the Eastern District of Tennessee that

2    affects it, absolutely, I would give -- you know, if someone,

3    just as if USAA or if someone off the street today comes in and

4    complains, we give every complaint its due consideration, yes,

5    ma'am.  If there's any scheme anywhere involving political

6    figures or whatever you have it, we -- absolutely, we give

7    that -- we'll look into that.

8           MS. TUCCI-JARRAF:  I hope that to be true.  Thank

9    you.

10          THE WITNESS:  It is true.  You can count on it.

11          THE COURT:  Thank you.

12          MS. TUCCI-JARRAF:  Thank you.

13          THE COURT:  Any recross based upon the redirect,

14   Mr. Beane?

15          MR. BEANE:  Yes, sir.

16                       **RECROSS-EXAMINATION**

17   BY MR. BEANE:

18      Q    Mr. Still, you said that on the day of the 11th that

19   the Knox County Sheriff's Department verified a warrant?

20      A    That's my understanding, Mr. Beane, in the vehicle.

21   There was at the scene there the Knox County -- you were put

22   into a Knox County cruiser.  It's my understanding that a

23   warrant confirmation was done or something to that effect or

24   later in the day it was, you know, confirmed.  But, yeah, they

25   do a process there.  That's my understanding.

                    UNITED STATES DISTRICT COURT

Parker Still - Recross-Examination

1      Q    Are you aware that once I arrived in Knox County Jail

2  that I had to stay in the patrol car for three hours because

3  they didn't have anything on me, Mr. Still?

4      A    You know, we may have learned that information later

5  from a jail call or something like that.  Again, that wouldn't

6  be --

7      Q    And -- sorry to interrupt you.

8      A    No, no.  I mean, that's -- you know, you were

9  lawfully arrested, Mr. Beane.

10     Q    How come Knox County Jail refused to take me into

11  custody because I didn't have anything on me?

12     A    I'm sure it takes a little bit of time for them to do

13  a -- to confirm a warrant.

14     Q    Mr. Still, you just said Knox County confirmed that

15  warrant at the scene.

16     A    I said that's my understanding.  Maybe it takes --

17  maybe it -- I think -- maybe it was later in the day, you know,

18  I just -- that's -- I wasn't privy to that.  I guess that's --

19  so I'm speculating.

20     Q    So you arrested me without a warrant thinking that

21  there was a warrant?

22     A    No, sir.  There was a warrant.

23     Q    Really?

24     A    Yes, sir.  You're still in custody or have been is my

25  understanding.

UNITED STATES DISTRICT COURT

Parker Still - Recross-Examination

1    Q    I have another question for you, Mr. Still.

2         In your professional actions, as I was in the back of

3    the parole car passing you and one of the other agents in the

4    courtroom, back there with the pink tie on, do you remember

5    laughing at me and poking at me as I drove by, Mr. Still?

6    A    I remember you driving by, and it was -- it was a

7    stressful situation.  I do remember kind of like, laughing,

8    yeah, there he goes, he's in the back of the police car.  This

9    was one for the good guys.  Yeah.

10        MR. BEANE:  Thank you.

11        THE COURT:  Thank you.  We'll take our afternoon

12   break at this time.  The jury may be excused.

13        THE COURTROOM DEPUTY:  All rise.

14   (Jury out at 3:29 p.m.)

15        THE COURTROOM DEPUTY:  This honorable court shall

16   stand in recess until 3:45.

17   (Recess from 3:29 p.m. to 3:47 p.m.)

18        THE COURTROOM DEPUTY:  Please come to order and be

19   seated.

20        THE COURT:  I think our jury is ready.  And the

21   government looks like it's ready with its next witness.  We'll

22   bring the jury in.

23   (Jury in at 3:48 p.m.)

24        THE COURT:  Thank you.  Everyone may be seated.  And

25   the courtroom deputy will swear in the next witness.

UNITED STATES DISTRICT COURT

David Walker - Direct Examination

1    WHEREUPON,

2                         **DAVID WALKER,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                      **DIRECT EXAMINATION**

6              THE COURTROOM DEPUTY:  Have a seat, please.  Will you

7    please state and spell your name for the record.

8              THE WITNESS:  David Walker.  D-a-v-i-d, W-a-l-k-e-r.

9    BY MS. SVOLTO:

10        Q    Good afternoon.

11        A    Good afternoon.

12        Q    Could you please tell me what's your name.

13        A    David Walker.

14        Q    And where do you work?

15        A    AT&T.

16        Q    And how long have you worked there?

17        A    Nine years.

18        Q    And what do you do for AT&T?

19        A    Currently, I'm a custodian of record.

20        Q    What are some of your primary job responsibilities as

21   the custodian of records?

22        A    The authentication of records produced by AT&T.

23        Q    All right.  Do you recognize Government's

24   Exhibit 149?  Can you see that there?

25        A    Oh, okay.  Yes.

                    UNITED STATES DISTRICT COURT

David Walker - Direct Examination

1    Q    All right.  And now, I'm going to -- so you recognize

2  that document?

3    A    Yes, I do.

4    Q    And do you recognize Government's Exhibit previously

5  marked as Exhibit 150?

6    A    Yes.

7    Q    And do you recognize that document?

8    A    Yes.

9    Q    All right.  And now Government's Exhibit 152, do you

10 recognize that document?

11   A    Yes.

12   Q    All right.  And I'll ask to use the Elmo briefly.

13        Do you recognize this that I'm showing up there?

14   A    Yes, I do.

15   Q    And so I'll ask to see Government Exhibit 152 -- I'm

16 sorry, 151 now.

17   A    Okay.

18   Q    And so you recognize that document?

19   A    Yes.

20   Q    Now, I previously showed you a disc that you just

21 identified?

22   A    Yeah.

23   Q    And could I ask for the Elmo again.

24        And is that your signature?

25   A    It is.

David Walker - Direct Examination

Q    And what is this disc?

A    So this disc contains the subscriber information for voice, text, and data of records for the subscriber requested.

Q    And did you review the documents on that disc?

A    I did.

Q    And did you determine they were the same documents that were in the Government's Exhibit 151?

A    That's correct.

Q    Thank you.  Are you familiar with the records that are kept in the course of regularly conducted business activity of AT&T?

A    Yes.

Q    And were these documents kept in the course of the regularly conducted business activity of AT&T?

A    Yes.

Q    And, specifically, the documents that were previously marked as Government's Exhibit 149, 150, 151, and 152?

A    Yes.

Q    And were these documents prepared by, at, or near the time of the events recorded?

A    Yes.

Q    And were they made by a person with knowledge of the events or from information transmitted by a person with knowledge?

A    Yes.

UNITED STATES DISTRICT COURT

David Walker - Direct Examination

1   Q   Is it the regular practice of AT&T to make these
2   records?
3   A   Yes.
4       MS. SVOLTO:  All right.  I'd like to at this time
5   move to admit Government's Exhibit 149, 150, and 152.
6       THE COURT:  149, 150, 152, seeing no objection, the
7   court will admit those documents.
8       (Government's Exhibits 149, 150, 152 admitted into
9   evidence.)
10  BY MS. SVOLTO:
11  Q   If I could have Government Exhibit 149 that has now
12  just been admitted into evidence.
13      Could you tell us what this document is?
14  A   So this particular document is "U-verse Customer
15  Account Details," which is stated on there on the page.  So it
16  contains information for a subscriber that would have had a
17  particular account with U-verse services from AT&T.
18  Q   Okay.  Thank you.  Looking to Government's
19  Exhibit 150.
20      And what does this document tell us?
21  A   So this is the MAC address report.  MAC stands for
22  media access control.  And this is the IP address and the phone
23  number associated with the device that the MAC address defines.
24  Q   Thank you.  And Government's Exhibit 151.
25      And what is this document again?

UNITED STATES DISTRICT COURT

David Walker - Direct Examination

1    A    So this is a billing report for voice usage.  If you

2  look at the top left corner, you'll see a routing number.  But

3  below that, you'll see a run date, run time, and then the words

4  "Voice Usage For."

5          So this particular page and the one that follow are

6  recorded events of voice calls by the subscriber who received

7  calls and also made calls from that telephone number.  The

8  document also contains SMS text message information as well as

9  data session usage for this telephone number.

10   Q    All right.  And Government Exhibit 152.

11        And what does this document tell us?

12   A    This is the subscriber information page for this

13 wireless subscriber.  It contains information related to the

14 financial liable party, the billing party, as well as user

15 information in those three sections that you see represented

16 here.

17   Q    And so the financially liable party section, does it

18 give a name there?

19   A    It does.

20   Q    And what's that name?

21   A    Randall Beane.

22   Q    And also an address?

23   A    300 State Street, Apartment 365, Knoxville, Tennessee

24 37902.

25   Q    All right.  It also gives an e-mail address as well?

UNITED STATES DISTRICT COURT

1    A    It does.  Want me to read that?

2    Q    No.  That's fine.

3    A    Okay.

4    Q    Are you also familiar with the location of AT&T

5    servers?

6    A    Yes.  There are several of them around the United

7    States.

8    Q    Are there any AT&T servers located in Tennessee?

9    A    No.

10    Q    And in your view of the records, do these records all

11    relate to a Randall Beane?

12    A    They do.

13         MS. SVOLTO:  I have no other questions.

14         THE COURT:  Thank you.

15         Cross-examination, start with you Ms. Tucci-Jarraf,

16    if any.

17                    **CROSS-EXAMINATION**

18    BY MS. TUCCI-JARRAF:

19    Q    Without prejudice, I'm going to have a few questions

20    for you.  Good afternoon, Mr. Walker.

21    A    Good afternoon.

22         MS. TUCCI-JARRAF:  If I could have the state's

23    exhibits brought back up.  Just the ones that you just --

24         MS. DAVIDSON:  I know.  I'm looking for it.

25         THE COURT:  Did you move 151 as well, Ms. Svolto?

UNITED STATES DISTRICT COURT

David Walker - Cross-Examination

1        MS. SVOLTO:  Yes, Your Honor.

2        THE COURT:  The court overlooked that one.  So we'll

3   admit 151 as well.

4        MS. SVOLTO:  Thank you.

5      (Government's Exhibit 151 admitted into evidence.)

6        MS. TUCCI-JARRAF:  Thank you.

7   BY MS. TUCCI-JARRAF:

8        Q    Mr. Walker, I just had a few questions to sort of

9   decipher.  I have no idea what these are.  This particular

10  document, and I'm referring to Document 149.

11       A    Okay.

12       Q    This is just account detail information.  Is that

13  correct?  Like what does this document show us?  What

14  information does it tell you for a layperson?

15       A    So users for AT&T subscribers, customers, whatever

16  you want to use for the name, subscribe to different kinds of

17  services that AT&T offers.

18            In this particular case on this page, this is for

19  U-verse service, which is typically media based kinds of

20  services offered by AT&T.  What this contains is the

21  information in the first BAN number is billing account number.

22  So this is the information related to how we track and identify

23  customers in our billing system.  So all the codes and the

24  names and information you see here is related to that tracking

25  of that individual by AT&T for the U-verse service.

UNITED STATES DISTRICT COURT

1    Q    Okay.  So you can see everything if you just know

2  that BAN number, you can find anything that that particular --

3    A    Yeah, that --

4    Q    Is that BAN number also associated with every

5  activity?

6    A    It is for this -- it is for this account.  That's all

7  I can testify to.

8    Q    Okay.  And you'd be able to see every single thing

9  that that customer does that has that particular BAN number?

10    A    We did not provide that information, so I can't say

11  that you see everything.

12    Q    Okay.  And what does "TXID" mean?  Could you please

13  tell us that?

14    A    Where are you looking?

15    Q    I apologize.  It says "historical IP provising."

16  It's on the left-hand side.  What does "TXID" mean?

17    A    Well, the answer is I do not know what TXID stands

18  for.  It may be a tax ID indicator, but I don't know what the

19  acronym stands for.  I'm sorry.

20    Q    That's okay.  You said you were custodian of records.

21         Did you create any of these records?

22    A    No, ma'am.

23    Q    They were just delivered into your care?

24    A    Yes, ma'am.

25    Q    I apologize if I'm asking you any question.  I just

UNITED STATES DISTRICT COURT

David Walker - Cross-Examination

1    am not familiar with these kinds of documents.

2        A    Oh, you're fine.

3        Q    If you know them, could you let us know.  If you

4    don't, that's fine too.

5        A    Sure.

6        Q    Document, the next document, that's just subscriber.

7    That's --

8            MS. DAVIDSON:  If you can tell David what the number

9    is, he can pull it up for you.  There's an exhibit sticker on

10   it.

11           MS. TUCCI-JARRAF:  This is still 149.  Oh, I see, I'm

12   sorry.  Thank you for your help.  It would be the third

13   document.

14           THE COURT:  Is that the one?  And if you look on the

15   screen, that's -- what's on your screen is what the witness is

16   currently looking at.

17   BY MS. TUCCI-JARRAF:

18       Q    Okay.  No.  It was just that one document I had

19   questions about, because there was a lot of codes on there I

20   don't understand.  But it's basically for tracking purposes of

21   the activities for that?

22       A    It identifies information that engineers for

23   switching IDs, circuit ID.  A lot of that information contained

24   is not user friendly to the customer.  It's more user friendly

25   to the engineers and the technicians that manage the network.

UNITED STATES DISTRICT COURT

1          MS. TUCCI-JARRAF:  Okay.  Thank you.  I don't have

2    any further questions.

3          THE COURT:  Thank you.

4          MS. TUCCI-JARRAF:  And, Ms. Davidson, thank you very

5    much for letting me borrow this and thank your associate.

6          THE COURT:  Mr. Beane, cross-examination?

7          MR. BEANE:  No.

8          THE COURT:  Any redirect?

9          MS. SVOLTO:  No, thank you, Your Honor.

10          THE COURT:  All right.  Then this witness may be

11    excused.  Thank you.

12          THE WITNESS:  Thank you, Your Honor.

13          THE COURT:  The government may call its next witness.

14    We call Monica Alcala -- Alcala.

15    WHEREUPON,

16                         **MONICA ALCALA,**

17    was called as a witness and, after having been first duly

18    sworn, testified as follows:

19                      **DIRECT EXAMINATION**

20          THE COURTROOM DEPUTY:  Have a seat.  Scoot as close

21    as you can, please.  Will you state and spell your name for the

22    record.

23          THE WITNESS:  My name is Monica Alcala.  M-o-n-i-c-a,

24    A-l-c-a-l-a.

25          THE COURTROOM DEPUTY:  Thank you.

                    UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

BY MS. DAVIDSON:

1  Q    Morning.

2  A    Good morning.

3  Q    What do you do?

4  A    I am a --

5  Q    It's afternoon, actually.  I'm sorry.

6  A    I am a financial crimes investigator with USAA.

7  Q    Okay.  And what is USAA?

8  A    USAA is banking and insurance primarily for
servicemen, former military, and their families.

9  Q    Okay.  And so what does USAA stand for?

10 A    USAA is United Services Automobile Association.

11 Q    Okay.  And how long have you worked for USAA?

12 A    I have worked for USAA for 14 and a half years.

13 Q    And where are your primary responsibilities at USAA?

14 A    I am a fraud investigator.  We do research,
investigate, detect fraud, whether it is account takeover,
member fraud, or members taking advantage of their accounts.

15 Q    Okay.  And so do you know a little bit about the USAA
history?

16 A    I do.

17 Q    And why do you know about the history?  Is that
something that is important to the corporation itself?

18 A    Yes.  USAA takes pride in showing our support to
military members.  That's actually one of the first things that

UNITED STATES DISTRICT COURT

1   we learn is how to be more member-centric in understanding the

2   needs of our military members, especially since they're a lot

3   of times traveling or spouses are trying to take care of

4   business while the spouse is deployed.

5       Q    Okay.  And so when was USAA formed?

6       A    USAA was formed in 1922 by select military officers

7   who wanted to insure -- they wanted to insure each other.  So

8   they wanted to make sure that, again, the military was taking

9   care of their own.

10      Q    Okay.  And so it started as an insurance.  And did

11  the products that they provide to military families, did that

12  grow as the company growed -- grew?

13      A    Yes.  In 1983, USAA opened their doors for banking,

14  and started off with credit cards.  And now we offer full

15  services, such as checking accounts, CDs, loans, and even

16  investment accounts.

17      Q    And does USAA have a mission?

18      A    Yes.

19      Q    What is it?

20      A    It's to protect our military members financially to

21  be able to support them again through their times why they are

22  taking care of us.

23      Q    Okay.  And so was USAA formed to support a certain

24  sector of the United States population?

25      A    Yes.  So it is military specific for officers, again,

UNITED STATES DISTRICT COURT

1    their families and their children.  So it's really to take care

2    of the military and their family, whether it was past or

3    current.

4         Q    Okay.  And was that its mission when it was formed in

5    1922?

6         A    In 1922, it started as officers.  And throughout the

7    years, we have opened the doors to NCOs and then to enlisted.

8    So they've expanded the eligibility.  It used to be you had to

9    have been recently separated from the military and currently

10   it's offered to anybody who has served in the past and has been

11   honorably discharged.

12        Q    Okay.  And so is USAA selective about who it lets

13   bank at its -- at its banks?

14        A    Yes.

15        Q    And does it require someone to become a member?

16        A    Yes.  So when you enter -- when you attempt to become

17   a member, we do validate that you were in the military during

18   the time that you said.

19        Q    Okay.  And which location of USAA do you work?

20        A    I work in the banking -- I work under the banking, so

21   the fraud is directly covering bank fraud.

22        Q    Okay.  And what location is the building that you

23   work in?

24        A    I work in the San Antonio home office.

25        Q    And you've been in that bank.  Is it everywhere in

UNITED STATES DISTRICT COURT

1    your location about what your mission is?

2        A    Repeat the question.

3        Q    I'm saying the decorations, the entire -- does it

4    have flags?  Do you know who you are serving when you work

5    there?

6        A    Yes.  We take pride in that, even in something as

7    Veteran's Day, we -- we go all out for every branch of

8    services' birthday.  It's really ingrained that we take care of

9    our members, especially because they take care of us.

10       Q    Okay.  And when you walk into the lobby of the San

11   Antonio office, is it a huge -- I mean, there's a lot of

12   buildings there?

13       A    Yes.  We like to joke that square-footage-wise, maybe

14   it's bigger than the Pentagon.  From one side to the other, you

15   can get a good work out.  So it's very big.  And that's just

16   one location.

17       Q    And so is there a big marble thing that says, "A

18   foundation of service to service"?

19       A    Yes.

20       Q    Why does USAA Bank only allow members to bank with

21   it?

22       A    It goes back to we are wanting to take care of those

23   who serve.  So we are selective.  We feel the people in the

24   military have honor, they have morals, they have standards, and

25   that's -- since that's what the company was based on, we want

UNITED STATES DISTRICT COURT

1    to continue that tradition and to ensure that we are focusing

2    on their needs because we know what it's like to be a military

3    member.

4          We are given training classes to know what it's like

5    for a member to deploy last minute or how the spouse feels when

6    she's home taking care of all the bills, what it's like to come

7    home and have to start back up.

8          So they really take -- USAA takes pride in teaching

9    us, if we were never prior military, at least to teach us and

10   have us understand who we're serving, so they want to keep it

11   very member-centric.

12   Q    Okay.  When someone applies to become a member, do

13   you confirm that they were actually -- are or were a member of

14   the United States armed service?

15   A    Yes.

16   Q    Okay.  And once -- have you worked in the banking

17   industry other than USAA Bank?

18   A    Yes.  Prior to USAA, I worked at Chase -- at JP

19   Morgan Chase.

20   Q    And is it your experience that once someone becomes a

21   member at USAA, they are trusted higher than the average bank

22   customer?

23   A    Yes.

24   Q    And why is that?

25   A    Again, it goes back to our military.  They are chosen

UNITED STATES DISTRICT COURT

1    to protect us, and there's a lot that they do, and they're held

2    at a higher standard in our eyes, so we feel that we trust them

3    just as much.

4         Q    Okay.  What is the primary way that the vast majority

5    of your customers do their banking?

6         A    We are considered an online bank.  So you would go

7    through our online mobile app or through the regular USAA.com.

8         Q    Okay.  Do you have any brick and mortar banks?

9         A    We have the San Antonio office.  We used to have

10   financial centers, but those have been closed.  So right now

11   the only brick and mortar would be the San Antonio location.

12        Q    Okay.  So almost all your members do the online

13   banking?

14        A    Yes.

15        Q    Okay.  I'm going to show you what's marked as

16   Government's Exhibit 91, just for the -- you can flip to it.

17             Do you recognize Government's Exhibit 91?

18        A    Yes.  This is the home page for our website.

19        Q    Okay.  And if you could -- just you flip through

20   those pages independently and let me know if you recognize

21   these pages that represent Exhibit 91.

22        A    Yes.

23        Q    And are -- is this an actual copy of the screenshots

24   taken from USAA website?

25        A    Yes.

UNITED STATES DISTRICT COURT

1      Q    Is this an accurate screenshot or basically a

2  photograph of the way the website looks?

3      A    Yes.  It's exactly how it looks.

4           MS. DAVIDSON:  Your Honor, at this time I'd like to

5  admit Government's Exhibit 91.

6           THE COURT:  So admitted.

7       (Government's Exhibit 91 admitted into evidence.)

8  BY MS. DAVIDSON:

9      Q    Okay.  If you could publish it to the jury.  Could

10  you blow up the photograph, please, David?

11          And, again, it talks about what you were just

12  testifying to, that you serve military members and their

13  families.

14          And then if you click "Who We Serve," could you go to

15  Page 1-2.  Could you expand that please.

16          And is that an accurate representation of who

17  membership is open to?

18     A    Yes.  That is the current way that you become a

19  member.

20     Q    Okay.  And where are the headquarters of USAA Bank?

21     A    The headquarters is San Antonio, Texas.

22     Q    Do you happen to know where the computer servers are

23  located that serve USAA Bank?

24     A    They're in Texas.  Dallas, Plano area is the primary.

25     Q    Okay.  So you mention that you were a financial fraud

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    investigator.

2              Did you get involved in the case that's before the

3    court against Mr. Randall Beane?

4        A    Yes, I did.

5        Q    And did the defendant Randall Keith Beane have an

6    account at USAA?

7        A    Yes, he did.

8        Q    And do you know when he opened it?

9        A    The account, I believe, was opened 2015 -- 2016 is

10   when the account was opened.

11       Q    Okay.  I'm going to point you to the attention of

12   Government's Exhibit 2 through 77 in that.  And we went over

13   all these documents together last night.

14             Do you recognize those?

15       A    Yes, I do.

16       Q    Okay.  Are the documents -- are you familiar with

17   whether or not the documents in Government's Exhibit 2 through

18   77 are records that are kept in the course of regularly

19   conducted business activities of USAA?

20       A    Yes, they are.

21       Q    And was the -- was it prepared by, at, or near the

22   time of the event recorded?

23       A    Yes.

24       Q    Was it made by a person with knowledge of the event

25   or from information transmitted by a person with knowledge?

UNITED STATES DISTRICT COURT

1    A    Yes.

2    Q    Is it the regular practice of USAA to make such

3  records?

4    A    Yes.

5         MS. DAVIDSON:  Your Honor, at this time, I'd like to

6  move to admit Government's Exhibit 2 through 77.  And they're

7  in order with no gaps.

8         MS. TUCCI-JARRAF:  I'm sorry.  I don't even know what

9  documents she's referring to.  As far as the order, I'm not

10  sure which ones.  Can I just briefly review which ones she's

11  trying to submit?

12         MS. DAVIDSON:  Sure.  These were all provided in

13  discovery.

14         MS. TUCCI-JARRAF:  I'm sure they were.  There was

15  just so much.  I just want to be able to know what she's

16  referring to.

17         MS. DAVIDSON:  2 through 77.

18         MS. TUCCI-JARRAF:  I just have a question.  If she's

19  going to be going through each of these so we can see them --

20         MS. DAVIDSON:  I am.  I'm admitting them first so

21  that we don't have to keep going back and forth between do

22  you -- the computer versus -- so I admitted them all at once

23  and I'm going to go through each and every one of them.

24         MR. BEANE:  I'd like to see them as well.

25         MS. TUCCI-JARRAF:  Okay.  I'm good with them.

UNITED STATES DISTRICT COURT

1    THE COURT:  Ms. Davidson, would you mind bringing

2  them over to Mr. Beane?  Thank you.

3    MR. BEANE:  There's some pages I didn't get in my

4  discovery.

5    MS. DAVIDSON:  Your Honor, we provided them all in

6  discovery.

7    THE COURT:  Other than that, any objection to the

8  documents themselves?

9    MR. BEANE:  Not at this point.

10    THE COURT:  Then we'll admit Government's Exhibits 2

11  through 77.

12    MS. DAVIDSON:  All of these documents were provided

13  in the very first discovery.

14    THE COURT:  Go ahead.

15    (Government's Exhibits 2 through 77 admitted into

16  evidence.)

17  BY MS. DAVIDSON:

18    Q    Okay.  Let's pull up Government's Exhibit 4.  You can

19  look at it on the computer or either in the book, whichever is

20  easier for you.  But we'll pull it up on the computer for the

21  jury.

22    And what is Government's Exhibit 4?

23    A    This is an online application for a checking account

24  for Randall Keith Beane.

25    Q    Okay.  And if you can -- is this the first

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1  application that was submitted by Mr. Beane to USAA Bank?

2      A    Yes.  This was the first account that was created and

3  opened.

4      Q    Okay.  If you could put the date received.  Okay.  So

5  that's May 19th, 2016?

6      A    Yes.

7      Q    And what's the e-mail address on that?

8      A    It's ENALRR67@Gmail.com.

9      Q    Okay.  And I see there's a member number there.  Is

10  that a unique identifier?

11      A    Yes.  When you submit your information to USAA,

12  you're given a membership number.  It's a unique membership

13  number that never changes.  You can't ask for a new one.  But

14  this establishes you based off of your name, date of birth,

15  social that you provide to us.  So that's your unique

16  identifier.

17      Q    So is this unique identifier on every line of

18  business that you have with USAA Bank?

19      A    Yes, it is.

20      Q    So you can open ten different checking accounts,

21  savings accounts, auto loans, it all goes back to the same

22  member number?

23      A    Correct.  We tend to reference that instead of a

24  Social Security number for protection.

25      Q    Okay.  And if you could go to another section of the

UNITED STATES DISTRICT COURT

1    form, specifically where the address and Social Security are.

2            And so who is the primary applicant's name on this?

3    A    Randall Keith Beane.

4    Q    And what is the Social Security number?

5    A    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.

6    Q    And the date of birth?

7    A    It's 9/29/67.

8    Q    Okay.  And let's -- does this open a checking

9    account?

10           If you could make it bigger.

11           Is this for a checking account?

12   A    Yes.

13   Q    And what is the checking account number that's

14   assigned to this account?

15   A    It's 206953062.

16   Q    And so often when there are phone calls with

17   customers, do you refer -- do people that work for USAA refer

18   to the account by the last couple of numbers?

19   A    Yes.  It's usually the last four numbers.

20   Q    Last four numbers.  Okay.

21           And let's go to funding method.  And what is that?

22   A    An eCheck is an ACH transaction where the member will

23   provide their routing number and account number that they want

24   us to draw the money from to open the account.

25   Q    Okay.  And if you can, David, go to the routing

UNITED STATES DISTRICT COURT

1   number and the funding account number.  Okay.

2          And so show me the funding account number.  What is

3   that?  Is that an account number?

4      A    Right.  That's the account number that's provided to

5   us and that's 48611633.

6      Q    Okay.  And funding routing number, what is a routing

7   number?

8      A    That one designates the bank.  103112675 is actually

9   for Fort Sill.

10     Q    Okay.  And so how were the numbers entered into this

11  screen?

12     A    That would have been entered by the member, Randall

13  Beane.

14     Q    Okay.  So because it -- is this all done on a

15  computer?

16     A    This one is.  It specifies that it was -- the

17  application was done online.

18     Q    Okay.  So the member, in this case, Randall Beane,

19  had to actually type the routing number?

20     A    Correct.

21     Q    And had to type the account number?

22     A    Correct.

23     Q    Okay.  And what is the total funding amount that

24  opens this account?

25     A    It was $25 that was requested to open the account.

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    Q    Okay.  If you could go back to the normal size,

2  please.

3         And was this online account opened?  Was it approved?

4    A    Yes.

5    Q    And in order for it to be approved, was Mr. Beane,

6  the defendant's service record checked?

7    A    Yes.

8    Q    And is he a former service member in the United

9  States Air Force?

10   A    Yes.

11   Q    Okay.  Let's go to Government's Exhibit 6.

12        Okay.  If you could -- what is this?  Can you tell

13  from looking at it?

14   A    This is an online application for a savings account

15  for Randall Keith Beane.

16   Q    Okay.  And what is the date that this savings account

17  is opened?

18   A    It was June 10th, 2016.

19   Q    Okay.  And, again, the member number, is this the

20  same member number that you just -- that's always with Randall

21  Keith Beane?

22   A    Yes.

23   Q    And e-mail address?

24   A    It's EAN -- ENALRR67@Gmail.com.

25   Q    Okay.  And if we could look at the Social Security

UNITED STATES DISTRICT COURT

1    number on this.

2        A    The social is 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.

3        Q    Same social as the last -- Government's Exhibit --

4    what was it -- 4.  Right?

5        A    That's correct.

6        Q    Okay.  Let's go to Government's Exhibit 52.

7             Can you tell what Government's Exhibit 52 is?

8        A    This is an application for a checking and a savings

9    account with -- it actually has Ricky E. Beane and Randall

10   Keith Beane as coapplicants.

11       Q    Okay.  And it was opened on what date?

12       A    June 25th, 2016.

13       Q    Okay.  And so this is another checking and savings

14   account that Randall Beane had?

15       A    Correct.

16       Q    If we could go to the member number, is it the same

17   member number?

18       A    That is actually the membership number for Ricky

19   Beane, because he was considered primary on the account.

20       Q    Okay.  And so how is Randall Beane related to this

21   account?

22       A    He's the secondary, and his membership number would

23   appear at the bottom at the next part of the application.

24       Q    Okay.  And is that a Randall Keith Beane number?

25       A    Yes.  That's his membership number.

UNITED STATES DISTRICT COURT

1      Q    Okay.  Let's go to Government's Exhibit 56.

2           And what is Government's Exhibit 56?

3      A    This is a credit card application with Randall Keith

4  Beane as the primary, adding an authorized user of Ricky Beane,

5  Ricky E. Beane.

6      Q    Okay.  And when was this application taken?

7      A    The application was done June 12th of 2016.

8      Q    Okay.  Let's look at the member number.  And same

9  member number?

10     A    Yes.

11     Q    Same Social Security number?

12     A    Yes.

13     Q    Same e-mail address?

14     A    Yes.

15     Q    Okay.  If you could go over to the service part of

16  the form, please.

17          And it says, "Branch of service, U.S. Air Force"?

18     A    Correct.

19     Q    "Randall K. Beane."

20          Okay.  Can you go to the income of this credit card

21  application, $90,000?

22     A    Yeah.

23     Q    And what -- who provided that information?

24     A    That would have been provided by Randall Beane during

25  the time of the application.

1    Q    And what is a secured credit card?

2    A    A secured credit card is usually offered to people

3    who have not established credit yet or maybe have bad credit

4    and we're trying to help them reestablish.  In order to have a

5    secured credit card, you must have a secured CD before you can

6    get the credit card.

7         So a CD, a certificate of deposit, means that there's

8    guaranteed funds in an account, and it sits there as long as

9    you have the credit card.  So if you wanted a $500 credit card

10   to help build your credit and help make it better, you want to

11   make sure you have a $500 CD with USAA in order to be able to

12   back it.  In the event that you defaulted, we could use the

13   money to pay it off.

14   Q    With this secured credit card, did Randall Keith

15   Beane purchase a CD from USAA in order to fund that secured

16   credit card?

17   A    Yes.

18   Q    And so let's move onto Government's Exhibit 53.  I'm

19   sorry, 55.  Let's focus on the next credit card application.

20        Okay.  And what is Government's Exhibit 55?

21   A    55 is a credit card application in Randall Beane's

22   name only.

23   Q    Okay.  This is August 15th, 2016?

24   A    Correct.

25   Q    And you can focus on the bottom, David, the submit

UNITED STATES DISTRICT COURT

1    date.

2         Okay.  So this is what, roughly, couple months after

3    the last credit card application?

4    A    Yes.

5    Q    Okay.  And let's go to member number, e-mail address,

6    and Social Security.  So its member number, is that Randall

7    Keith Beane's number?

8    A    Yes.

9    Q    Social Security number?

10   A    Correct.

11   Q    E-mail address?

12   A    Yes.

13   Q    Okay.  And if we could look at Government's

14   Exhibit 55.  Could you move to the income that was reported in

15   this?

16   A    It's 144,264 annually.

17   Q    And where did that figure come from?

18   A    Mr. Beane would have provided that.

19   Q    Okay.  Let's move to Government's Exhibit 53.

20        What is this?

21   A    This is a checking account for Randall Keith Beane.

22   Q    And when was this opened?

23   A    February 1st, 2017.

24   Q    Okay.  And it's another checking account?

25   A    That is correct.

1    Q    Okay.  And let's move on to Government's Exhibit --

2    was this one opened?

3    A    Yes.

4    Q    Okay.  And that's on February --

5    A    The 1st.

6    Q    -- 1st, 2017?

7    A    Correct.

8    Q    Okay.  Let's move to Government's Exhibit 54.

9         And what is this?

10   A    This is another checking account submitted for

11   Randall Beane on February 1st, 2017.

12   Q    Okay.  And what -- on the February 1st, 2017, does

13   the address, is it different?

14   A    Yes, it's different than the prior applications.

15   Q    And what is the address on these applications?

16   A    These, it's 300 State Street, Apartment 365.

17   Q    Okay.  So on February 1st, 2017, he opened two more

18   checking accounts?

19   A    Yes.

20   Q    Okay.  And let's go to Government's Exhibit 57.

21        What is Government's Exhibit 57?

22   A    This is a bank account statement for Randall Beane's

23   account number ending in 3062 from June 20th of 2016 to

24   July 19th, 2016.

25   Q    Okay.  And is this for the -- what we call his

                    UNITED STATES DISTRICT COURT

1    primary account number, the first one he opened, 3062?

2         A    Yes.  That was the first one that was opened.

3         Q    And in your investigation, is this the checking

4    account that Mr. Beane primarily used?

5         A    Yes.

6         Q    Okay.  And so this is for the time period June 20th,

7    2016 to July 19th, 2016?

8         A    Correct.

9         Q    Okay.  Let's look at the deposits.  This is for a

10   month.  Right?

11        A    Yes.

12        Q    Okay.  And let's go down and look at some of the

13   actual deposits in here.  Okay.  And if you could identify some

14   of those deposits?

15        A    We've got a couple of payroll deposits from Advantage

16   Innovation on July 6 for $2,783.62 and then again July 13 for

17   $2,235.29.

18        Q    Okay.  And on this -- on this statement, there is a

19   CD purchase.  Is this the purchase that he made to secure that

20   secured credit card we just reviewed?

21        A    That is correct.

22        Q    And so did you research to see how he purchased this

23   CD?

24        A    Yes.

25        Q    And how did he do it?

UNITED STATES DISTRICT COURT

1    A    It was online and it was the request to draw funds

2   from his -- on that one, I believe it was from his external

3   account, $250.

4    Q    Okay.  So he created this CD himself online?

5    A    Yes.

6    Q    And that was for $250 initially?

7    A    Correct.

8    Q    Okay.  Let's go to Government's Exhibit 58.

9         And what is this?

10   A    This is a checking account statement for the account

11  ending in 3062 from July 19th, 2016 to August 18th, 2016.

12   Q    Okay.  And let's scroll down and look at the

13  deposits.  And total deposits over 15,000?

14   A    Correct.

15   Q    And if you could scroll down to look at -- okay.

16        So what is a NSF fee?

17   A    NSF is insufficient funds.  It means you attempted to

18  have a payment to come through and there was not enough funds.

19  So bounced check, bounced payment, something where you

20  attempted to pay another person and there was not enough money

21  to cover it.

22   Q    Okay.  So on his checking account statement from

23  July 19th, 2016 to August 18th, 2016, he's got a bounced check,

24  even though he has $15,000 in deposits?

25   A    That's correct.

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    Q    Okay.  And does this statement also reflect that he's

2    had multiple bounced checks throughout this year?

3    A    Yes.  So we give you how many -- the information is

4    how many you've had for the month and how many you've had for

5    the year to date.

6    Q    Okay.  Let's go to Government's Exhibit 59.

7         And when is this for?

8    A    This is the account ending the 3062 for Randall Beane

9    from August 18th, 2016 to September 19th, 2016.

10   Q    Okay.  And if you could scroll down and look at the

11   next part of the statement.

12        What are the total amount of deposits?

13   A    It's $16,697.14.

14   Q    Okay.  Continue to scroll down, please.

15        And this month of August 18th to September 19th,

16   another insufficient funds charge?

17   A    Correct.

18   Q    Okay.  Let's go to Government's Exhibit 61.

19        What is Government's Exhibit 61?

20   A    A statement for the account ending in 3062 for

21   Randall Beane from October 18th, 2016 to November 17, 2016.

22   Q    Okay.  If you could look at the deposits.

23        More than $13,000 worth of deposits?

24   A    Correct.

25   Q    Okay.  Let's go to Government's Exhibit 62.  The

UNITED STATES DISTRICT COURT

1  same -- this is for November to December of 2016?

2      A    That's correct.

3      Q    Same account number?

4      A    Yes.

5      Q    Let's look at the deposits again, 12,000.  And if you

6  could continue down on the insufficient funds statement.

7           So there's another bounced check this month?

8      A    Yes.

9      Q    So total for the year $116?

10     A    Correct.

11     Q    Okay.  Let's go to Government's Exhibit 63.

12          What is Government's Exhibit 63?

13     A    It's for the next month.  It's account ending in 3062

14 for December 19th, 2016 to January 18th, 2017.

15     Q    Okay.  And I notice on this one that he has a new

16 address.  What's the address on this statement?

17     A    300 State Street, Apartment 365.

18     Q    Okay.  And let's scroll down just to look at his

19 deposits.

20          $12,000 in deposits?

21     A    Yes.

22     Q    Okay.  Let's go to 65.

23          Okay.  This is February to March 2017?

24     A    Correct.

25     Q    Okay.  If we could scroll down to the -- what's the

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1   total number of deposits?

2       A    $21,965.25.

3       Q    Okay.  And scroll down, please.  Another bounced

4   check?

5       A    One bounced check, yes.

6       Q    Let's go to Government's Exhibit 66.

7            What statement is this?

8       A    This is March 17th, 2017 to April 18, 2017.

9       Q    Let's just go straight to the insufficient funds.  So

10  he has two more this month?

11      A    Yes.

12      Q    Okay.  Government's Exhibit 67.

13           And April to May, 2017?

14      A    Correct.

15      Q    Okay.  Go straight to the insufficient funds.  Two

16  more?

17      A    Yes.

18      Q    Government's Exhibit 68.

19           Okay.  What's the time period of this?

20      A    May 18th, 2017 to June 19th, 2017.

21      Q    And total deposits over $13,000?

22      A    Correct.

23      Q    And three more bounced checks?

24      A    Correct.

25      Q    So the total for this year as of June 19th, 2017 is

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    $232?

2    A    Yes.

3    Q    Let's go to Government's Exhibit 69.

4         And what's the time period of this?

5    A    June 19th, 2017 to July 18th, 2017.

6    Q    Okay.  And what's the total amount of deposits?

7    A    $2,553,137.69.

8    Q    What's the balance at the close of this statement?

9    A    The account is overdrawn at $513,186.27.

10   Q    Okay.  So we'll come back to this.

11        Okay.  So besides credit cards and checking accounts

12   and savings accounts, multiple checking accounts, did Randall

13   Beane have any other loans with USAA Bank?

14   A    He had four consumer loans with us.

15   Q    Okay.  Let's go to Government's Exhibit 70.

16        What is Government's Exhibit 70?

17   A    70 is an application for a consumer loan for Randall

18   Beane.

19   Q    Okay.  If you could focus on the borrower, please.

20        Randall Beane, State Street, Knoxville, Tennessee?

21   A    Yes.

22   Q    Okay.  And what's the amount of this loan?

23   A    This loan amount was $10,998.88.

24   Q    What is it for?

25   A    This was for a 2002 Ford Excursion was the

UNITED STATES DISTRICT COURT

1 collateral.

2     Q    Okay.  Government's Exhibit 72.

3         And Randall Beane?

4     A    Correct.

5     Q    And what was the amount?

6     A    4,500.

7     Q    Okay.  And what was it for?

8     A    The collateral was a 1998 Ford F150.

9     Q    Okay.  Government's Exhibit 74.

10         Randall Keith Beane?

11     A    Yes.

12     Q    What's the amount?

13     A    $16,847.23.

14     Q    Okay.  And what's it for?

15     A    This was for the purchase of a 2010 Lincoln

16 Navigator.

17     Q    Okay.  Government's Exhibit 76.

18         Randall Keith Beane?

19     A    Yes.

20     Q    What's the amount of the loan?

21     A    $7,875.

22     Q    And what's this one for?

23     A    The collateral is a 2007 Lincoln.

24     Q    Okay.  I'm going to direct your attention to

25 July 3rd, 2017.  And we recently looked at his checking account

1    statement of that relevant time period.

2             Can a member call USAA Bank?

3    A    Yes.

4    Q    And how does that work?

5    A    If they have questions, concerns, problems, they just

6    want to ask about different things, they can just call up the

7    1-800 number and ask for a specific department.

8    Q    Okay.  Does USAA make recordings of these calls?

9    A    They do.

10   Q    Do they make recordings of all calls?

11   A    No, not all calls are recorded.

12   Q    Is it kind of random?

13   A    It's randomly designated.

14   Q    Are the calls made at the time the call was made --

15   let me restate that.

16            Was the recording made at the time the calls were

17   made?

18   A    Yes.

19   Q    Okay.  And how are they stored?

20   A    They're stored in a database that is used for the

21   normal course of business.

22   Q    Okay.  And did you search that database and pull all

23   calls by a member Randall Keith Beane between July 3rd, 2017

24   and July 10th, 2017?

25   A    Yes, I did.

UNITED STATES DISTRICT COURT

1    Q    And are those recordings kept in the ordinary course

2    of USAA's business?

3    A    Yes, they are.

4    Q    And did you review those conversations?

5    A    I did.

6    Q    And we listened to each of those exhibits, 81, 82,

7    83, 84, 85, 86, 87, 88, 89, and 90 last night in my office?

8    A    Correct.

9    Q    And these are your initials on this CD?

10   A    Yes.

11   Q    And so are these exhibits accurate of the recordings

12   that were kept on USAA database?

13   A    Yes.

14         MS. DAVIDSON:  Your Honor, at this time, I'd like to

15   admit Government's Exhibit 81, 82, 83, 84, 85, 86, 87, 88, 89,

16   and 90.

17         THE COURT:  So admitted.

18     (Government's Exhibits 81 through 90 admitted into

19   evidence.)

20   BY MS. DAVIDSON:

21   Q    Okay.  I'm going to show you what's marked as

22   Government's Exhibit 3.

23         What is Government's Exhibit 3, if you could explain

24   it to the jury?

25   A    Those are transactions that were done on account

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1  ending in 3062.

2      Q    Okay.  And is this the online statement of a checking

3  account that was ending -- his primary checking account?

4      A    This was the information that you'd be able to see

5  online, yes.

6      Q    Okay.  And so this is the 3062 account number?

7      A    Yes.

8      Q    And this is just like the checking account

9  information that we just saw, what was it, Government's

10  Exhibit -- Government's Exhibit 69?

11      A    Yes.

12      Q    So 3 is basically the online statement of

13  Government's Exhibit 69, that checking account statement that I

14  just showed you?

15      A    Correct.

16      Q    Okay.  So let's play at this time for the jury

17  Government's Exhibit 81.

18           And this is a recording made on July 3rd, 2017.  Is

19  that correct?

20      A    Yes.

21      (Audio played in open court; not reported.)

22  BY MS. DAVIDSON:

23      Q    Okay.  And so let's go back to Government's

24  Exhibit 3.  And so if you could scroll down to 7/3/2019 on

25  this -- I mean, '17.  7/3/2017.  I'm sorry.  You went too far.

UNITED STATES DISTRICT COURT

1    Okay. So on -- what can you see that happened on

2  7/3?

3    A    These are loan payments that were made.

4    Q    No. Just -- you stopped where I wanted you to. Go

5  back down, the loan payments. Yeah.

6    Okay. So these loan payments that he references in

7  the phone call are -- he does actually make payments, you can

8  tell that by this online statement?

9    A    Right. So those were the payments that were made to

10  catch up the loans.

11    Q    Okay. And he does that with his actual money that's

12  in that account?

13    A    Correct.

14    Q    Okay. Tell me what -- tell me about adding a funding

15  account. What does that mean?

16    A    So if you are wanting to add an external bank account

17  to pay your bills, transfer money, you would do that on the

18  funds transfer.

19    So for instance, if I have a Bank of America account

20  as well as USAA, and I want to be able to transfer back and

21  forth or to use it to pay my bills, I would log on, add the

22  routing number and the account number to the USAA app to have

23  it for future use.

24    Q    Okay. And on July 3rd, 2017, did Randall Beane add a

25  funding account to the USAA website?

Case 3:17-cr-00082-TAV-DCP   Document 162   Filed 04/20/18   Page 128 of 136   PageID #: 16389

1    A    Yes.

2    Q    And what did he call this funding account?

3    A    It was listed as trust.

4    Q    Okay.  And what was the routing number of that

5    funding account?

6    A    I don't have the exact number, but it was for the

7    Federal Reserve Bank.

8    Q    And what was the account number?

9    A    The account number was Randall Beane's Social

10   Security number.

11   Q    So his actual -- his actual Social Security number?

12   A    Yes.

13   Q    So Federal Reserve routing number and then his actual

14   Social Security number on July 3rd?

15   A    Correct.

16   Q    Okay.  And so once he added that funding account,

17   what did he do?

18   A    He used that account to pay -- to completely pay off

19   the four loans, to pay off his credit card, and to pay his auto

20   insurance in full.

21   Q    Okay.  And so he added this account, and then made

22   all these payments.  Is that an instantaneous process?  Does --

23   when he adds this account, is the money immediately sucked out

24   of whatever he put on the website?

25   A    The account is added.  And to pay your bills, it

Case 3:17-cr-00082-TAV-DCP   Document 162   Filed 04/20/18   Page 129 of 136   PageID #: 16390

Monica Alcala - Direct Examination

1      automatically credits all of the different bills.  So

2      automatically it assumed that the loan was paid off, that the

3      credit cards were good, and that the insurance was paid in

4      full.

5          Q    Okay.  But it doesn't immediately withdraw money from

6      the Federal Reserve?

7          A    No.  No.

8          Q    Okay.

9          A    If we're pulling money from an external bank, it can

10     take a couple of days.

11         Q    Okay.  And that's -- what kind of transaction is

12     that?

13         A    That's called an ACH.

14         Q    An ACH transaction.  And what -- how many -- what's

15     the closing time of most ACH transactions?

16         A    We submit the requests at the end of the business

17     day.  So 8:00 p.m. is when we batch everything.  So it can take

18     anywhere from two to ten days for the other bank to receive it

19     and give us the money that we're requesting.

20         Q    Okay.  But with USAA members, you immediately credit

21     their payment?

22         A    Yes.

23         Q    Even before you have the money?

24         A    Yes.  It goes back to we try to take care of our

25     members who are active military, so we try to take care of them

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    as fast as possible.

2         Q    Okay.  So let's go to Government's Exhibit 44.

3              THE COURT:  Let's do this.  I don't know what the --

4    a really good stopping point is.  I know this --

5              MS. DAVIDSON:  This is as good as any.

6              THE COURT:  Let's go ahead and stop for the

7    afternoon.  I have a couple matters to take up outside the

8    presence of the jury.  We'll excuse the members of the jury and

9    we'll plan to pick back up with this witness tomorrow, which is

10   Wednesday, January 24 at 9:00 a.m.

11             Just a couple reminders with respect to any -- if you

12   are using your notepad and taking notes, leave them in the jury

13   room at your seat and they'll be secured for the evening.

14             Just a reminder as you heard me state earlier today,

15   don't talk about the case among yourselves or with anyone else,

16   and continue to keep an open mind about the case as you hear

17   all the evidence in this case over the next several days.  To

18   the extent that there is any news reporting of this case,

19   refrain from reading anything or listening to anything that may

20   be said in the media about this case to the extent it might be.

21             So with those instructions in mind, I wish everyone a

22   pleasant evening, and we'll see you back here tomorrow.

23             The jury is excused.

24        (Jury out at 4:55 p.m.)

25             THE COURT:  Thank you.  The witness may be excused

UNITED STATES DISTRICT COURT

1    for the day.  Be back here tomorrow morning.  Everyone can sit

2    down a moment.

3         Just a couple of quick things.  One, I may or may not

4    have discussed that last week, but if you notice when one side

5    or the other, in this case, the government asks to introduce a

6    document, my normal course of action is to pause and look at --

7    in this case, the defendants and to give you the chance to

8    object, and if I don't hear anything or see anything, then I'll

9    admit the document.  I would do the same thing with any

10   documents that the defendants seek to introduce with respect to

11   their case.

12         The other thing I was going to bring up real quickly,

13   Ms. Tucci-Jarraf, I know you -- I understand you were a little

14   late getting here, pushed for time getting here because of one

15   of your conditions of release, which I guess restricts you to

16   your residence until 8:00 a.m. in the morning.  Is that

17   correct?

18         MS. TUCCI-JARRAF:  Yes.  I've actually addressed that

19   a number of times with Shirley, with -- even mentioned -- I'm

20   not sure if I mentioned it on the 12th, but every other time

21   I've mentioned that in court for the court hearings to try to

22   get a -- how do you say -- to be able to leave early, get

23   permission early to leave.

24         THE COURT:  Well, now that --

25         MS. TUCCI-JARRAF:  It's really hard for me to leave

UNITED STATES DISTRICT COURT

1  from Oakland -- or Oak Ridge to get here from eight at

2  rush-hour traffic.

3              THE COURT:  What time would you -- what time would be

4  best, 7:00 a.m., 7:30?

5              MS. TUCCI-JARRAF:  I would prefer 7:00 a.m.

6              THE COURT:  All right.  We'll --

7              MS. TUCCI-JARRAF:  That way I can be here.

8              THE COURT:  We'll do this --

9              MS. TUCCI-JARRAF:  Thank you.

10             THE COURT:  -- in fact, Ms. Norwood has drafted

11  something -- since we changed the one condition release related

12  to avoiding contact, except that the defendants may meet for

13  purposes of trial preparation in the presence of elbow counsel

14  and coordinate with the U.S. Marshals Service, so we've got

15  that in writing.  And the second one we'll modify bond

16  condition to 7P to the curfew being -- instead of 8:00 p.m. to

17  8:00 a.m., from 8:00 p.m. to 7:00 a.m. and during -- during the

18  course of the trial.  And then we can assess it, if we need to,

19  after that.

20             All right.  So if, Ms. Norwood, you can make that --

21  add that additional language.  And then you can look at that,

22  get it signed.  But the Court is orally changing your condition

23  of release during the course of the trial from 8:00 a.m.,

24  backing it up to 7:00 a.m.  And then if you-all want to wait

25  around to maybe sign it and can get the probation officer to

UNITED STATES DISTRICT COURT

```
 1    sign it.  But if for some reason it doesn't get signed today,

 2    that starts tomorrow at 7:00 a.m. during the course of the

 3    trial.

 4           All right.  Unless there's anything else, we'll see

 5    everybody back here at 9:00 a.m.

 6           Mr. Lloyd?

 7           MR. LLOYD:  Your Honor, two things.  One, a

 8    housekeeping matter.  May we leave some of this material here

 9    overnight?

10           THE COURT:  Yes.  We don't have anything else

11    scheduled tomorrow.

12           MR. LLOYD:  The other thing is, I noticed that the

13    exhibits that have gone in most recently do have identifying

14    information on them, such as Social Security numbers.  I wanted

15    to ask the Court how the Court anticipates handling compliance

16    with the redaction policy of the district.

17           THE COURT:  Government have any thoughts in that

18    regard?

19           MS. DAVIDSON:  Your Honor, in this case, the Social

20    Security number is very important, which is why we did not

21    redact them prior to trial.  I am aware of the policy of the

22    Court, and we are planning to redact the transcript before it

23    is written up.  But, unfortunately, I believe that his Social

24    Security number is very important for our exhibits and needs to

25    be unredacted.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  So why don't -- let me think about that.

2     I mean, I understand the government's position and I hear their

3     response.  So why don't y'all think about that response and we

4     can talk about it tomorrow if we need to.

5          MR. LLOYD:  Yes, Your Honor.

6          THE COURT:  Thank y'all.  Everyone have a pleasant

7     evening.

8          THE COURTROOM DEPUTY:  All rise.  This honorable

9     court stands in recess until Wednesday, the 24th, at 9:00 a.m.

10        (Proceedings recessed at 5:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    **CERTIFICATE OF REPORTER**

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4              I, Rebekah M. Lockwood, RPR, CRR, do hereby certify

5    that I was authorized to and did stenographically report the

6    foregoing proceedings; and that the foregoing pages constitute

7    a true and complete computer-aided transcription of my original

8    stenographic notes to the best of my knowledge, skill, and

9    ability.

10        I further certify that I am not a relative, employee,

11   attorney, or counsel of any of the parties, nor am I a relative

12   or employee of any of the parties' attorneys or counsel

13   connected with the action, nor am I financially interested in

14   the action.

15        IN WITNESS WHEREOF, I have hereunto set my hand at

16   Knoxville, Knox County, Tennessee this 22nd day of April, 2018.

17

18

19

20   _____
     REBEKAH M. LOCKWOOD, RPR, CRR
21   Official Court Reporter
     United States District Court
22   Eastern District of Tennessee

23

24

25