IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
        Plaintiff,               )
                                )
vs.                              )   Case No.:  3:17-CR-82
                                )
RANDALL KEITH BEANE AND          )
HEATHER ANN TUCCI-JARRAF,        )
                                )
        Defendants.              )
_____)

**VOLUME II of VIII**

**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**January 24, 2018**
**9:09 a.m. to 5:16 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          CYNTHIA F. DAVIDSON, ESQUIRE
                                ANNE-MARIE SVOLTO, ESQUIRE
                                Assistant United States Attorney
                                United States Department of Justice
                                Office of the United States Attorney
                                800 Market Street
                                Suite 211
                                Knoxville, Tennessee 37902

**FOR THE DEFENDANT:**          RANDALL KEITH BEANE, PRO SE
**RANDALL BEANE**               Blount County Detention Center
                                920 East Lamar Alexander Parkway
                                Maryville, Tennessee 37904

**FOR THE DEFENDANT:**          STEPHEN G. McGRATH, ESQUIRE
(As Elbow Counsel)              9111 Cross Park Drive
                                Suite D-200
                                Knoxville, Tennessee 37923

**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**APPEARANCES (CONTINUED):**

**FOR THE DEFENDANT:**      HEATHER ANN TUCCI-JARRAF, PRO SE
**HEATHER ANN**                 105 Orchard Lane
**TUCCI-JARRAF**              Oak Ridge, Tennessee 37830

**FOR THE DEFENDANT:**      FRANCIS LLOYD, ESQUIRE
(As Elbow Counsel)       9111 Cross Park Drive
                          Suite D-200
                          Knoxville, Tennessee 37923

**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

1                              **INDEX**

2   **GOVERNMENT'S WITNESSES**                                **PAGE**

3   MONICA ALCALA
    Direct Examination by Ms. Davidson                           7
4   Cross-Examination by Ms. Tucci-Jarraf                       40
    Cross-Examination by Mr. Beane                              73
5   Redirect Examination by Ms. Davidson                       74
    Recross-Examination by Ms. Tucci-Jarraf                    78
6
    RICHARD DAVEY
7   Direct Examination by Ms. Davidson                         83
    Cross-Examination by Ms. Tucci-Jarraf                      90
8
    ARTHUR LEE HANCOCK
9   Direct Examination by Ms. Svolto                           92
    Cross-Examination by Ms. Tucci-Jarraf                     101
10  Redirect Examination by Ms. Svolto                        102

11  JARON PATTERSON
    Direct Examination by Ms. Davidson                        103
12  Cross-Examination by Ms. Tucci-Jarraf                     127
    Redirect Examination by Ms. Davidson                      143
13  Recross-Examination by Ms. Tucci-Jarraf                   143

14  JERALD BYRNE
    Direct Examination by Ms. Svolto                          145
15
          **GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
16
17  **NO.   DESCRIPTION**                                    **PAGE**

    80   USAA Indemnification Letter to Whitney Bank,          37
18       07/10/2017

19  79   USAA Authentication Log                               85

20  161  Marble Alley Lofts fob log                            94

21  131  Marble Alley Lofts security camera still photo        99

22  78   USAA Authentication Log IP Assignments               108

23  92   Google Randall Keith Beane Conference Call with      113
         Heather Ann Tucci-Jarraf
24
    93   Google HATJ Call to Randall Keith Beane at RV Dealer 115
25

                    Rebekah M. Lockwood, RPR, CRR
                       Official Court Reporter
                          (865) 210-6698
                          P.O. Box 1823
Case 3:17-cr-00082-TAV-DCP Knoxville, Tennessee 37901 Page 3 of 199   PageID #:
                                16400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 94 | Google Conference Call recording between HATJ, Beane, Buddy Gregg, and Whitney Bank (Combined with video of HATJ on other end) | 116 |
| 139 | Facebook Beane - Just paid off all debts - 1st page of comments | 117 |
| 140 | Facebook Bean - Just Paid off all debts - 2nd page of comments | 118 |
| 141 | Facebook HATJ - Pay bills now using your secret account 07-03-2017 | 121 |
| 142 | Facebook Beane - Trust! Sharing HATJ post - Pay bills now using your secret account, 07-04-2017 | 122 |
| 144 | Facebook Beane - Let's get ready to travel 07-09-2017 | 126 |
| 145 | Facebook Beane - The brains of the operation 07-09-2017 | 126 |
| 95 | Buddy Gregg Odometer Disclosure Statement | 153 |
| 96 | Incoming Wire (Whitney - Buddy Gregg) | 153 |
| 99 | Buddy Gregg Finance Deal Check Sheet 07-07-2017 | 153 |
| 100 | Buddy Gregg Purchase Sales Agreement (Randall Keith Beane Factualized Trust) | 153 |
| 101 | Buddy Gregg Copy Randall Keith Beane Driver's License | 153 |
| 102 | Buddy Gregg Sales Receipt $10,000.00 (07-06-17) | 153 |
| 103 | Buddy Gregg Wire (Buddy Gregg Documentation $493,110 Wire) | 153 |
| 104 | Buddy Gregg account report 7-7-17 | 153 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP Document 163 Filed 04/20/18 Page 4 of 199 PageID #: 16401

1          **GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
                            **(CONTINUED)**
2

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 105 | Buddy Gregg  Factualized Trust provided to Buddy Gregg | 153 |
| 106 | Buddy Gregg Requested Repair Sheet for motor home | 153 |
| 108 | Buddy Gregg Wire $10,294.39 Extended Warranty with copy of check | 153 |
| 109 | Buddy Gregg Extended Warranty Breakdown | 153 |
| 110 | Buddy Gregg RV Service Contract Registration (Randy Beane) | 153 |
| 111 | Buddy Gregg RV Vehicle Tire and Wheel Guarantee (Randy Beane) | 153 |
| 112 | Buddy Gregg RV Paint and Fabric Warranty $2,660.00 (Randall K. Beane) | 153 |
| 113 | Buddy Gregg Delivery Receipt and Storage Agreement (Randy Beane) | 153 |
| 114 | Buddy Gregg Errors and Omissions Compliance Agreement (Randy Beane) | 153 |
| 115 | Buddy Gregg Privacy Statement (Randy K. Beane) | 153 |
| 116 | Buddy Gregg Preliminary Work Sheet (Randy Beane) (07-05-17) | 153 |
| 117 | Buddy Gregg RV Certificate of Origin | 153 |
| 118 | Buddy Gregg Certificate of Origin for a Vehicle | 153 |
| 119 | Buddy Gregg Signature Page Certificate of Origin for a Vehicle (Beane Factualized) | 153 |
| 120 | Buddy Gregg RV TN Dept. of Revenue Odometer Disclosure Statement (Beane Factualized) | 153 |
| 121 | Buddy Gregg TN Dept of Rev Form App "Randall Keith Duly" (7-7-17) | 153 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP   Document 163   Filed 04/20/18   Page 5 of 199   PageID #: 16402

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 122 | Buddy Gregg Power of Attorney "Randall Keith Beane Duly" (7-7-17) | 153 |
| 123 | Buddy Gregg Purchase Sales Agreement (Randy Beane) with Trust note | 153 |
| 124 | Buddy Gregg Purchase Sales Agreement (Randy Beane) | 153 |
| 125 | Buddy Gregg TN Dept of Rev Form App "Randy Beane" (7-7-17) | 153 |
| 126 | Buddy Gregg TN Dept of Rev Form App "Randy Beane" (7-7-17) | 153 |
| 127 | Buddy Gregg RV TN Dept. of Revenue Odometer Disclosure Statement_Randy Beane | 153 |
| 128 | Buddy Gregg Customer Delivery Form (Randy Beane signed Randall Beane) | 153 |
| 129 | Buddy Gregg Warranty Registration unsigned | 153 |
| 130 | Buddy Gregg Limited Warranty Registration (Randy Beane 7-7-17) | 153 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Monica Alcala - Continued Direct Examination

1      (Call to Order of the Court)

2          THE COURT:  Morning, everyone.  We're ready to

3   continue with this witness and bring our jury in.

4      (Jury in at 9:10 a.m.)

5          THE COURT:  Thank you.  Everyone may be seated.

6          Good morning to our members of the jury.  We're ready

7   to continue with the witness from yesterday afternoon.

8          Ms. Davidson, you may continue.

9          MS. DAVIDSON:  Thank you, Your Honor.

10  WHEREUPON,

11                         **MONICA ALCALA,**

12  was called as a witness and, after having been previously duly

13  sworn, testified as follows:

14                 **CONTINUED DIRECT EXAMINATION**

15  BY MS. DAVIDSON:

16     Q    Okay.  So we were talking about the events of

17  July 3rd, 2017.  Do you remember?

18     A    Yes.

19     Q    And we played the video -- or the audio of the

20  defendant Randall Beane calling in?

21     A    Yes.

22     Q    Okay.  And I asked you just to refresh everybody's

23  memory about adding an external account into the USAA system.

24  And did the defendant do that on July 3rd, 2017?

25     A    Yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    Q    And what number did he add to the external system?

2    A    The routing number was a Federal Reserve routing

3   number and the account number was his Social Security number.

4    Q    Okay.  And once he added that account, what did he

5   do?

6    A    He paid off the four consumer loans, the two credit

7   cards, and his auto insurance, he paid that one in full.

8    Q    So did he actually make double payments on his -- did

9   he overpay his credit cards?

10   A    The credit cards actually had two payments each for

11  the full amount, so it was overpaid.

12   Q    Okay.  So I'm going to pull up Government's

13  Exhibit 44.  And so what is Government's Exhibit 44?

14   A    This is to show what payments were made on what days,

15  the dollar amounts, and the accounts that the money was drawn

16  off of.

17   Q    Okay.  And if we could highlight on the transaction

18  on the 3rd.

19        Okay.  And that was a payment?

20   A    Yes.  That's one payment to the credit card ending in

21  6824.

22   Q    Okay.  And then the next -- what -- could you do the

23  whole third.

24        Okay.  And did -- were both of those payments made on

25  July 3rd?

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    A    Yes.  Those are the payments that were made July 3rd

2  from the trust account.

3    Q    Okay.  And so if you could go back to the full size

4  view of 44, please.  If you look at this, could you blow up the

5  entire -- the entire thing here, around here.  I didn't mean

6  for it to mark.  I was just showing you.  There you go.

7         So if you look at the account number, what is that --

8  the account method, what is that?

9    A    That just -- if you have multiple accounts on your

10  funds transfer list, that tells you which account you want the

11  money drawn off of.

12    Q    Okay.  And so if you look at the payment that's made

13  on the second, what was that made from?

14    A    That's the USAA account ending in 3062.

15    Q    Okay.  3062, that's that checking account that we've

16  looked at at length yesterday?

17    A    That's correct.

18    Q    Okay.  And then on the third, he -- this is the

19  trust?

20    A    Right.  That's the trust account with the Social

21  Security number as the account number.

22    Q    Okay.  And so did he -- what happened on the --

23  what's the date of this -- the 7th?

24    A    On the 7th, he made another payment for the balance

25  from the primary USAA account ending in 3062.

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    Q    Okay.  So he basically paid this account twice on

2  the -- well, once on the second, twice with the trust account

3  on the third, and then he paid it again on the 7th with -- from

4  the 62 account?

5    A    Right.

6    Q    Okay.  Can we go to Government's Exhibit 45.

7         Okay.  And what is Government's Exhibit 45?

8    A    This is the payment for the secured credit card from

9  the 3rd through the 6th.  These are all payments in a 30-day

10  period.

11    Q    Okay.  Could you, David, blow up the payee so they

12  see how she knows it's the secured payee.  Right here, payee.

13         Okay.  So that's how you know that this is the

14  payment history for the secured Visa ending in 9575?

15    A    That's one way, yes.

16    Q    Was there another one?

17    A    On the line?

18    Q    Uh-huh.

19    A    To the -- where it says bills on the left-hand side,

20  it also says, "USAA Secured Platinum Visa," first two and the

21  last four.

22    Q    Okay.  Awesome.

23         So if, David, you could blow up the entire payment

24  history, please.

25         Okay.  What does this show?

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    A    This is the -- showing that the credit card, that

2    credit card was paid twice on the 3rd and then again on the

3    6th.  It shows the different types of accounts that were used

4    to try to pay the credit card off.

5    Q    Okay.  And so the account method, it says, "Trust,"

6    and who put the word "Trust" in there?

7    A    That would be Randall Beane.

8    Q    And who put the account number in there?

9    A    That would be Randall Beane.

10   Q    Okay.  And who labeled the second account that was

11   used on the 6th as Trust 2?

12   A    Randall Beane.

13   Q    Okay.  And so on this amount of time period, this

14   account was paid in full basically three times?

15   A    Correct.

16   Q    By these trust accounts?

17   A    Yes.

18   Q    Okay.  Let's go on to Government's Exhibit 46.

19        And what is Government's Exhibit 46?

20   A    This shows payments to one of the loans ending in

21   3366 for the past 30 days.

22   Q    Okay.  And, David, if you could blow up the entire

23   payment history.

24        Okay.  And what does this show?

25   A    On the 3rd, the payment was made from the trust

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    account ending in 1135.  And on the 7th, the payment was made

2    from the direct deposit account ending in 3062.

3         Q    Okay.  Could you expand that?

4              Just to point out, all of these documents show --

5    could you highlight his member number, Randall Beane, member

6    number?

7              All of these documents which we're looking at now

8    shows his same member number 40540949?

9         A    That's correct.

10        Q    Okay.  Let's go to Government's Exhibit 47.

11             And what is this?

12        A    This is another one of the consumer loans, the

13   payment history.

14        Q    And it says that it's for the Navigator?

15        A    Yes.

16        Q    Lincoln Navigator.

17             If you could blow up the whole payment history.

18             Okay.  And looks like he makes a payment from his

19   account ending in 3062 on the 1st.  And then what happens on

20   the 3rd?

21        A    On the 3rd, he pays the loan off in full, using

22   account 1135.

23        Q    Okay.  And then does -- what does he use?

24        A    That's the trust account ending in 1135.

25        Q    Okay.  And then what's he do on the 4th?

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    A    He attempts to make another payment.  That one

2  actually fails, but he tried using the funds off of the trust

3  account ending in 1135.

4    Q    Okay.  And then what happens on the 7th?

5    A    He makes another payment and that one is from the

6  USAA account ending in 3062.

7    Q    Okay.  Let's go to 48.  What is the payment history

8  for?

9    A    This is another secured loan.

10    Q    Okay.  If you could expand the payment history.

11         Okay.  And so what does he do on the 1st?

12    A    On the 1st, there's that payment for 210.56 from his

13  USAA account ending in 3062.

14    Q    Okay.  And then what happened on the 3rd?

15    A    He goes to pay off the loan in full, using the trust

16  account ending in 1135.

17    Q    Okay.  And then what's he do on the 7th?

18    A    Again, makes another payment on the consumer loan

19  using the USAA account ending in 3062.

20    Q    Okay.  Let's go to Government's Exhibit 49.

21         And this is another loan?

22    A    Yes.

23    Q    Okay.  David, could you blow up the payment history.

24         Okay.  Tell me about this -- what does he do on the

25  1st?

UNITED STATES DISTRICT COURT

1    A    On the 1st, he's attempting to make a payment on the

2  loan, using the USAA account ending in 3062.

3    Q    Okay.  And then on the 3rd?

4    A    He pays off the loan, using the trust account ending

5  in 1135.

6    Q    Okay.  What's he do on the 7th?

7    A    On the 7th, he pays off the loan again using the USAA

8  account ending in 3062.

9    Q    Okay.  Let's go to Government's Exhibit 50.  What is

10  this?

11    A    This is the bill for the auto and property, so that's

12  the -- any insurance coverage that he has, rental, home, or

13  car.

14    Q    And I think you testified yesterday that that is

15  another product line of USAA?

16    A    That's correct.

17    Q    And he had insurance through USAA?

18    A    Yes.

19    Q    Okay.  And let's look at the payment history.  Okay.

20  So what's he do?

21    A    On the 3rd, he pays the policy in full using the

22  trust account ending in 1135.

23    Q    Okay.  And what's he do on the 7th?

24    A    On the 7th, he then pays off the policy with the

25  savings account ending in 4026 and the direct deposit account

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    ending in 3062.

2         Q    Okay.  And let's go back to the credit card account

3    that we just saw.  When he overpaid that account, what happened

4    to the money, the credit card?

5         A    So once the payments are listed to the account and

6    there's an overage, you can call in to request that they move

7    those extra funds back into your checking account.

8         Q    And so in this case, did they move the funds into

9    Mr. Beane's checking account?

10        A    Yes.

11        Q    Okay.  Let's play Government's Exhibit 81.  And this

12   is the phone call recorded on July 3rd -- I'm sorry, 82.  And

13   this is a phone call on July 5th.

14        (Audio played in open court; not reported.)

15   BY MS. DAVIDSON:

16        Q    Okay.  And let's play Government's Exhibit 83.

17   That's another call on July 5th, 2017.

18        (Audio played in open court; not reported.)

19   BY MS. DAVIDSON:

20        Q    What is he looking for there?  Mr. Beane, the

21   defendant?

22        A    To make sure that everything, the payments had shown

23   cleared and that either he could use the money immediately --

24        Q    I'm talking about the title issue.

25        A    On the title, to make sure that the titles were

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    released.

2         Q    Okay.  What does getting the title back mean to

3    someone?

4         A    That USAA doesn't have an interest in that.  So,

5    typically, if we have a lien on a vehicle and it goes into

6    default, then USAA does have the right to repossess it if it's

7    not being paid on.

8         Q    Can someone sell a vehicle if USAA has the title?

9         A    Not until the title has been paid or the amount has

10   been paid to USAA and we'll release the lien.

11        Q    Once a title is returned to a customer, does USAA

12   have any recourse against that customer?

13        A    No, we don't.

14        Q    So, basically, once you have a title, you own the

15   vehicle free and clear?

16        A    That's correct.

17        Q    Okay.  Later, on July 5th, does -- and we've talked

18   about adding a payment account onto the USAA website.  On

19   July 5th, does the defendant, Mr. Beane, add another payment

20   account?

21        A    Yes.

22        Q    And what does he call this second payment account?

23        A    That's called Trust 2.

24        Q    And he put Trust 2 in there?

25        A    Yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    Q    And is it the same routing number to the Federal

2  Reserve?

3    A    Yes, it is.

4    Q    Is it the same account number based on his Social

5  Security number?

6    A    It's off by one digit.

7    Q    Okay.  So on July 5th, what does the defendant do --

8  start doing --

9    A    On July 5th --

10   Q    -- with this new Trust 2 account?

11   A    CDs are -- CD applications are submitted online using

12  the Trust 2 account.

13   Q    What exactly is a CD?

14   A    A certificate of deposit.

15   Q    Okay.  And is that a product line that USAA bank

16  offers?

17   A    Yes.  That's another one of our services.

18   Q    We keep talking about purchasing a CD.  What exactly

19  does that mean?

20   A    Well, you have to fund it with money.  And so we hold

21  that and let you earn interest on that certificate of deposit.

22  So when you purchase it, you're actually telling us this is how

23  much money I want to put in and lock it at this rate for this

24  amount of time.

25   Q    Okay.  And you said it -- this amount of time.  Are

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    CDs for a specific period of time?

2         A    Yes.  You can choose the length of time that you'd

3    like this CD to be open.

4         Q    And you can do all of this online?

5         A    Yes.

6         Q    Let's go back to Government's Exhibit 91, which is

7    the screenshots of the USAA website.

8              Is that what this is, you recognize that to be?

9         A    Yes.

10        Q    Okay.  So let's go through this in order.  So the

11   first page of 91 is the opening page?

12        A    Yes.

13        Q    Okay.  And then go to the third page of this exhibit.

14   Okay.  So if you could expand that as much as you can, David,

15   that would be great.

16             Okay.  So is this what a customer sees?

17        A    Yes.  It just basically helps you to be ready, make

18   sure you have all your documents and information that you need

19   to open an account with us.

20        Q    Okay.  And let's see, what does it say?

21             Okay.  To make an opening deposit from another bank,

22   you will need the account number and routing number.  It tells

23   you that right at the very beginning?

24        A    Yes.

25        Q    Okay.  David, will you go to the next page?  Okay.

UNITED STATES DISTRICT COURT

1    And expand that as much as you can.

2           And so what is this?  Is this is the next page that

3    you see if you click on the button that you're supposed to

4    click on?

5    A    Yes.  So this is just basically the beginning of the

6    application for opening.  It tells you the type of account that

7    you're trying to open, a certificate of deposit.  Tells you the

8    minimum requirements.  And then it asks if you want it to be --

9    if you have any other family members or friends that you're

10   wanting to add on the certificate deposit, it asks you, you can

11   choose it then.

12   Q    Okay.  If you would unexpand it.  Okay.  If you could

13   go to the next page.  Okay.  If you could just kind of blow up

14   what the person -- go all the way to the next, please.  There

15   you go.

16          Okay.  So what information does this page show?

17   A    So this just verifies your personal information, your

18   name --

19   Q    Uh-huh.

20   A    -- your address, mailing and physical, and your

21   e-mail address.  So if anything has changed since the last time

22   you opened any type of product or realized that -- we want to

23   make sure everything is correct as of today's date.

24   Q    Okay.  And could you go to the next page.  And when

25   you do all -- when you -- do you type this all in or is this

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1   already populated?

2       A    This part is already populated.  But if you have

3   moved and didn't tell us, then that's when you'd hit the edit

4   buttons and you can change it to be whatever it is that's

5   correct for -- at that point in time.

6       Q    Okay.  So then you would hit next.  And David, if you

7   could go to the next page.  And just expand -- go up a little

8   higher to the open account.  Yeah.  There we go.  Thanks.

9            Okay.  And so explain this page.

10      A    Okay.  So on a CD, you have multiple options.  You

11  can -- it can be a fixed, adjustable, variable, so depending on

12  what your risk or what you're wanting, how much interest you're

13  wanting to earn, then it asks you, okay, once you've earned the

14  interest, what do you want us to do with that money?  Do you

15  want us to just put it back in the CD, or do you want to

16  deposit it into a different account?  So you can have it

17  redeposit into your checking account as extra income.

18      Q    Okay.

19      A    Then after that --

20      Q    After you click on these little dots, you hit the

21  button "Next"?

22      A    Right.

23      Q    David, could you go on to the next page, please.

24           Okay.  So what is this?

25           If you could go all the way down to where the little

UNITED STATES DISTRICT COURT

1  dots, red, blue, yes, stop there.

2        Okay.  Explain all this.

3      A    When you typed in on the previous page, it just shows

4  you what it would expand to.  So if you clicked on that you

5  wanted a fixed-rate CD, then it asks you, okay, how much money

6  do you have to put in to start the CD.  And then we tell you if

7  you're putting in this amount, this is what it's considered,

8  what type of CD it is.  And then we ask you what term you want,

9  how long do you want the CD to be open and earning interest,

10 and we give you a breakdown of how much interest you would earn

11 on each term.

12     Q    Okay.  And then, David, if you could go to the next

13 page.

14        And then this pops up.  It says, "Make Your Initial

15 Deposit."

16     A    Yes.  So we ask you, okay, now that you've told us

17 what type of CD -- that you verified your information, you told

18 us what type of CD and the terms, we need to know how much you

19 plan to use and where are we supposed to get that money from.

20     Q    Okay.  Is this where you were talking about use

21 another account?

22        David, highlight that for me, please, "Use Another

23 Account."

24     A    So if you have funds -- an account on the funds

25 transfer list already that you typically use to move money back

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    and forth or it's a USAA account, that's going to be found on

2    the drop-down.

3         Q    Okay.

4         A    If it's one that you haven't already validated as

5    your own, that it belongs to you or that we can validate as

6    yours and you want to add a new account that we're not aware

7    of, you'd click on that, and that's when you would add the

8    routing number and account number information.

9         Q    Okay.  And is that what the defendant did to use

10   Trust 2?

11        A    That's correct.

12        Q    Okay.  And then it's got "Initial Deposit."  So in

13   this, it's clear that you need to make a deposit to buy a CD?

14        A    Yes.

15        Q    Okay.  And then you hit "Next," and what pops up?

16             David, if you could go to the next page.

17        A    The next page is just going to ask that you verify

18   all the information that you put in to make sure that

19   everything is to your standards and what you were asking for.

20        Q    Okay.  And so it's got the defendant's name and it

21   says "Type, Super Fixed CD," for one month.

22             Okay.  And go down lower, if you could scroll lower,

23   yes.  And even lower.  Sorry.  There we go.

24             So in this, it says the "Initial Deposit," and what

25   does this say?

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1      A      This is just confirmation that you're wanting to open

2  up a certificate of deposit for that dollar amount.

3      Q      999,000 in this case?

4      A      Yes.  And that the money is coming from a non USAA

5  account, and it's confirming the routing number and the account

6  number that you're wanting us to pull from.  It's one last look

7  at everything before we finalize it.

8      Q      Okay.  And the account number in this case, and I

9  didn't put it in front of you, so you weren't a hundred percent

10 sure, but is it 244391135?

11     A      Yes.

12     Q      And that's Randall Beane's Social Security number,

13 only his Social Security is 243?

14     A      Yes.

15     Q      Right?

16     A      Correct.

17     Q      243 instead of 244?

18     A      Correct.

19     Q      Okay.  And let's go to the next page.  That's the

20 last page.

21            Okay.  So that's how you do it online?

22     A      Yes.

23     Q      Okay.  And what -- from the information that is

24 placed in -- online, is an application for a CD prepared?

25     A      Yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    Q    Okay.  And let's pull up Government's Exhibit 8,

2    which is a CD application.

3         Okay.  This is prepared by USAA based on the

4    information that is put in by a customer?

5    A    That's correct.

6    Q    Okay.  And so let's look at the time of this.  Is --

7    Government's Exhibit 8 is one of the defendant's applications?

8    A    Yes.

9    Q    Okay.  And let's look at -- explain to me what's in

10   the "Account Details" box.

11   A    So it tells you the status, if the application was

12   completed correctly and approved.  It confirms that it's a CD,

13   that it was done online and the time and date of the submittal.

14   Q    Okay.  And -- and this "21:32:54," is that military

15   time?

16   A    It is.

17   Q    And is it Central Standard Time?

18   A    Yes.  All our documents are Central Standard Time.

19   Q    Okay.  And if you could go to the information of the

20   applicant.

21        Okay.  And who's the applicant?

22   A    Randall Keith Beane.

23   Q    And what's his address?

24   A    300 State Street, Apartment 365.

25   Q    And e-mail address?

UNITED STATES DISTRICT COURT

1    A    ENALRR67@Gmail.com.

2    Q    Okay.  And member number?

3    A    40540949.

4    Q    Social Security number?

5    A    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.

6    Q    Okay.  And let's go to the -- David, if you can, to

7    the information regarding -- no, not that.  I'm sorry.  If you

8    could go to the information regarding -- okay.  Go to the

9    second page of this exhibit, please.

10        Okay.  And tell me what is the initial deposit.

11    A    500,000.

12    Q    Okay.  And what is the routing number?

13    A    That's the Federal Reserve routing number.

14    Q    And what is the funding number -- I mean, I'm sorry,

15    the funding account number?

16    A    It's 244391135.

17    Q    Okay.  So did you do a spreadsheet of all the CDs

18    that the defendant attempted to purchase in this way on -- or

19    did purchase in this way from July 5th through July 7th?

20    A    I did.

21    Q    Would this spreadsheet assist you in your testimony?

22    A    Yes, it will.

23    Q    Okay.  If you could pull up Government's Exhibit 2.

24        Okay.  Explain to the jury what's contained -- first

25    of all, is this for Randall Beane's account?

1    A    Yes, it is.

2    Q    Let's -- tell me what the actual -- what the headings

3 are.

4    A    So I was attempting to just gather the information.

5 I listed the CD account number that was established or

6 attempted to be established, the term, which is how long he

7 wanted to have the CD for, the date of the application, the

8 exact time of the application submitted, the amount that was

9 entered in for the CD, whether it was opened successfully or

10 just attempted, the status of the application, whether it was

11 approved or not, the external account number, and the routing

12 number.

13    Q    Okay.  And so it's the same external number and

14 funding number for all of these?

15    A    That's correct.

16    Q    Okay.  If you could go back out, zoom out, okay, I

17 notice that the very first one says "discontinued/system

18 error."

19         And what does that mean?

20    A    It could be a number of things.  May have hit the

21 back button and the application -- USAA application isn't

22 presently with the back button.  It could mean that -- tried to

23 go back to a different page.  A lot of times it just means the

24 application wasn't completed.

25    Q    Okay.  It doesn't mean that USAA has checked to see

UNITED STATES DISTRICT COURT

1    if the money was there?

2         A    No.

3         Q    Okay.  So let's look at, if you can, David, look --

4    see how much you can explain -- expand it to show how many CDs

5    he buys on the 5th.  So all of these are being done on --

6    excuse me -- it starts at 21:26 and goes through 23:39?

7         A    Yes.

8         Q    Do you know how many CDs he buys on the 5th?

9         A    Successfully, 32 CDs were purchased.

10        Q    Is that during the entire time period?

11        A    That's just on the 5th.

12        Q    32 were purchased on the 5th.

13        A    Right.

14        Q    For -- the first one is 500,000, and then 999,000.

15   Then he starts doing $999,999.

16             So in each one of those CDs, he has to go through the

17   same application through the screen that we just saw?

18        A    Yes.  You have to click through each one of the

19   buttons each time.

20        Q    Okay.  So when -- when a CD is purchased on the USAA

21   system, is that CD immediately funded?

22        A    Yes.

23        Q    Okay.  And is there any hold that is placed on these

24   CDs to make sure the money is there?

25        A    Yes.  There's supposed to be a ten-day hold to ensure

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    that we -- because we want you to start earning the interest

2    right away, but we haven't officially collected it from the

3    other bank, we put a ten-day hold to ensure that the funds are

4    good.

5        Q    Okay.  And when do you put the hold on it?

6        A    The CDs are actually batched, so at 8:00 p.m. Central

7    Time is when we batch everything, meaning we run it through the

8    books, make it official, and that's when the holds are placed.

9        Q    Okay.  And so after this crime, did USAA discover a

10   hole in their system?

11       A    Yes.  We realized that anybody who opens a CD after

12   8:00 p.m. Central Standard Time, it doesn't catch that at batch

13   until the following day.  So there's a vulnerability of almost

14   24 hours where a CD doesn't have a hold.

15       Q    And so all these CDs were purchased in the middle of

16   the night, Eastern Standard Time?

17       A    It was 9:30 Central -- 9:26 Central Standard Time.

18       Q    When he started?

19       A    When he started.

20       Q    And then it goes onto what, 23:19?

21       A    11:19 Central Standard Time.

22       Q    So 12:19 Eastern Standard Time?

23       A    Correct.

24       Q    Okay.  And so let's play on the morning of the 6th --

25   what does the defendant do early in the morning on the 6th?

UNITED STATES DISTRICT COURT

1      A    Mr. Beane calls in and requests to liquidate one of

2  the CDs.

3      Q    Did he call to liquidate a second CD also on that

4  same morning?

5      A    Later on in the day, yeah.

6      Q    So we don't have both of those calls, but we do have

7  one.  Is that right?

8      A    That's correct.

9           MS. DAVIDSON:  Let's play Government's Exhibit 84.

10          (Audio played in open court; not reported.)

11  BY MS. DAVIDSON:

12     Q    Okay.  Can you pull back up Government's Exhibit 3.

13  Okay.  And let's -- let's see.  Could you scroll down, David,

14  to that following page of this exhibit.  Okay.  If you could

15  highlight the 6th, right here.

16          And, again, Government's Exhibit 3 is a computer

17  summary of the defendant's account ending in 3062.  Is that

18  right?

19     A    Correct.

20     Q    Okay.  So on 7/6/2017, you see those two transfers

21  enter into his checking account?

22     A    Yes.

23          MS. DAVIDSON:  Okay.  And then let's play

24  Government's Exhibit -- and this is a recording taken on

25  July 6th, 2017.  Let's play Government's Exhibit 85, please.

Monica Alcala - Continued Direct Examination

1          (Audio played in open court; not reported.)

2    BY MS. DAVIDSON:

3        Q    Okay.  So there's some communication back and forth

4    between the USAA employees.  What exactly is going on in this

5    case?

6        A    Mr. Beane asked for a debit limit increase, and it

7    was above the first person's authorization, so she had to ask

8    somebody higher than her to authorize that amount.

9        Q    Okay.  And was that ever authorized?

10       A    Yes.

11       Q    Okay.  And let's go to Government's Exhibit 3, which

12   is the statement of the checking account 3062.  And if you can

13   go to the second page.

14            Okay.  And I showed you where -- so this transaction

15   that's made after the CD is put in, what is that?

16       A    Those are transfers done out of the account ending in

17   3062 to his other USAA account.

18       Q    Okay.  And let's go to Government's Exhibit 5.

19            Okay.  What is Government's Exhibit 5?  I don't think

20   we've highlighted this before the jury yet.

21       A    This is the transactions, the online transactions for

22   account number ending in 4026 held by Randall Beane.

23       Q    Okay.  And so if you could go on what he does on the

24   6th, please.

25            Are those the two transfers that he made from his

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1 account, 3062, to seven -- I mean, sorry, 4026?

2 A    Yes.

3 Q    Okay.  So on July 7th, Randall Beane calls in again.

4         MS. DAVIDSON:  And let's play Government's

5 Exhibit 88.

6     (Audio played in open court; not reported.)

7 BY MS. DAVIDSON:

8 Q    Okay.  Can you pull up Government's Exhibit 51.

9         Okay.  What is Government's Exhibit 51?

10 A    That is our wire page that just shows the dollar

11 amounts, where the money came from, where the money is going,

12 the dates.

13 Q    Okay.  David, if you could click on the amount, on

14 the amount.  Okay.  So that's the base amount.  Okay.  Would

15 you go to the bank and the beneficiary party, down in the lower

16 right corner.

17         And who is that?

18 A    That's the Buddy Gregg Motor Home and their routing

19 number and account number, as given to us by Randall Beane.

20 Q    Is that a valid routing number and account number for

21 Whitney Bank and Buddy Gregg?

22 A    That's where we would send it to, yes.

23 Q    Okay.  And could you expand it again, I'm sorry.  And

24 could you go over to the customer information, David.

25         And who is the ordering customer?

UNITED STATES DISTRICT COURT

1    A    That's Randall Keith Beane.

2    Q    Okay.  And, David, if you could pull up Government's

3  Exhibit 5.

4         Okay.  Again, this is the account ending 4062 [sic]?

5    A    Correct.

6    Q    And just to remind the jury, this is Randall Keith

7  Beane's account.

8         And if you could go to the 7/7 transactions that says

9  "Wire Out" and highlight that.

10         Okay.  Let's move to Government's Exhibit 87.  The

11  defendant calls again on -- this is a phone call that was

12  received on July 7th, 2017.

13     (Audio played in open court; not reported.)

14         MS. DAVIDSON:  Can you pause it, David.

15     (Audio paused in open court.)

16         MS. DAVIDSON:  I'm sorry, I just want to make sure

17  y'all can hear it.  If we could start it from the beginning

18  after the ambulance goes.  The defense, Ms. Jarraf asked for us

19  to start it at the beginning.  Okay.

20     (Audio played in open court; not reported.)

21  BY MS. DAVIDSON:

22    Q    Okay.  It seems we're having a little technical

23  difficulty with that.

24         So on July 7th, 2017, did USAA start figuring out

25  that something was wrong after the wire transfer went out?

Monica Alcala - Continued Direct Examination

1    A    It was after the wire transfer, yes.

2         MS. DAVIDSON:  Okay.  Let's go and play Government's

3    Exhibit 86.

4         (Audio played in open court; not reported.)

5    BY MS. DAVIDSON:

6    Q    Okay.  So what's -- oh, I'm sorry.

7         (Audio played in open court; not reported.)

8    BY MS. DAVIDSON:

9    Q    Okay.  Let's just start with the way this call was

10   recorded.  Did -- tell me about how you actually made this

11   recording.

12   A    I pulled up the system that holds the recordings, and

13   we use an application called Snagit to record the recording.

14   Q    And does -- at the end of it, does it actually also

15   record you talking to a colleague?

16   A    Yes.  Because it recorded my mic as well as the

17   recordings on the screen.

18   Q    Okay.  But you didn't alter or change any of the

19   recording that we heard between the help desk and Mr. Beane?

20   A    No.

21   Q    Okay.  So let's go with -- what's going on here?

22   What has happened to Mr. Beane to make him call in?

23   A    He was online, and he was not able to see his

24   balance, so it showed it was unavailable, so he was calling in

25   to try to find out what was causing the problem.

UNITED STATES DISTRICT COURT

1    Q    Okay.  So later in the day, I think they talked about

2  it being after 6:00 p.m. Central Time, his accounts were

3  frozen?

4    A    Yes.

5    Q    So he's calling to talk about that?

6    A    Right.

7         MS. DAVIDSON:  Okay.  And let's play Government's

8  Exhibit 89.

9         (Audio played in open court; not reported.)

10         MS. DAVIDSON:  Okay.  And, again, another phone call

11  on July 7th, 2017, Government's Exhibit 90.

12         (Audio played in open court; not reported.)

13  BY MS. DAVIDSON:

14    Q    Okay.  On July 7th, once USAA, the system -- I mean,

15  there's so many different parts involved, but once they start

16  figuring things out, what happens?

17    A    Well, the loan department, the title area makes a

18  courtesy call to advise them that the payments hadn't been

19  made, to make sure they could make payments.  The loans are --

20  it's not based off of the person itself, it's based off each

21  individual loan.  So that's why there's multiple people calling

22  out, because each one would have identified it individually.

23         And the ACH department, where the funds transfer

24  processes, when that returned, they started shutting everything

25  down and making notations and shutting down the accounts to

UNITED STATES DISTRICT COURT

1    avoid any more losses.

2         Q    When did you get involved in the case?

3         A    January 10th.

4         Q    January or July?

5         A    I'm sorry, July 10th.

6         Q    July 10th.  So as a fraud investigator, USAA got you

7    involved on July 10th?

8         A    Yes.  We were notified early morning.  That was a

9    Monday, I believe, and one of our AVPs, the assistant vice

10   president of the fraud area, came down to our director and

11   notified him that a wire had gone out and about all the CDs

12   that had returned.

13        Q    Okay.  And so why were you especially concerned about

14   a wire going out?

15        A    Because of -- because it was the true member and it

16   was for the purchase of an RV, so those were funds that were

17   used from the fraudulent CDs that were established.

18        Q    Okay.  And is a Fedwire, is that basically like your

19   USAA number, is that like sending out cash?

20        A    Yes.  That's why the gentleman explained to Mr. Beane

21   on that one call beforehand, because sometimes our members fall

22   victim to scams, and they send out a wire not knowing, and we

23   have to let them know we can't get that back if you're sending

24   it out.  As soon as it goes, it hits.  It's immediate cash in

25   the other account.

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    Q    Okay.  So what did you do on -- what did USAA do on

2    the 10th.  Did they try to get the wire back?

3    A    Right.  So there was multiple people trying to figure

4    out where the money went, the processes, reaching out to the RV

5    company to see if we could -- if the vehicle was still there,

6    if we could, you know, identify that this was fraudulent money

7    so that we could try to get that back.

8    Q    Okay.  And did anyone contact Whitney Bank, the

9    receiver of the wire?

10   A    I believe so, yes.

11   Q    Okay.  I'm going to show you what's marked as

12   Government's Exhibit 80.

13        Just for the witness now.  I don't think I've

14   admitted this one yet.

15        And is Government's Exhibit 80 something that was

16   kept in the ordinary course of USAA?

17   A    Yes.

18   Q    Ordinary course of business?

19   A    Yes.

20        MS. DAVIDSON:  Your Honor, based on that -- can you

21   see it?

22        MS. TUCCI-JARRAF:  Can you make it bigger?

23        MS. DAVIDSON:  Can you make it bigger for the

24   defense -- the defendants?

25        Okay.  Your Honor, at this time, I'd like to admit

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    Government's Exhibit 80.

2            THE COURT:  So admitted.

3        (Government's Exhibit 80 admitted into evidence.)

4    BY MS. DAVIDSON:

5        Q    And what is Government's Exhibit 80?

6        A    This is a hold harmless agreement where USAA is

7    asking to recover the funds from Whitney Bank.  We give the

8    date, the dollar amount, asking -- saying that it's fraudulent

9    and we would not -- we're not going to hold the other bank

10   liable, we'd just like to recover as much of the funds as

11   possible.

12       Q    Okay.  And did Whitney Bank reverse the transaction?

13       A    No.

14       Q    After you sent -- or after USAA sent the hold

15   harmless agreement, did -- was the FBI contacted by USAA?

16       A    Yes.  Our area also contacted FBI, again, to involve

17   them in the -- especially because of the dollar amount and

18   everything that happened trying to get the money.

19       Q    Okay.  So are you -- during your investigation of

20   this case, did you become aware of anything on YouTube that was

21   published?

22       A    Yes.  So part of our investigation is to try to

23   identify trends or what would cause something like this to

24   happen.  And there was actually -- Harvey Dent has a YouTube

25   video out there about trust accounts, TreasuryDirect accounts

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1  and how people can use the Treasury -- the routing number, the

2  Federal Reserve routing number and your social to pay your

3  bills.

4      Q    Okay.  During the theft from the defendant, Randall

5  Keith Beane, roughly July 30 -- I'm sorry, July 3rd, 2017

6  through July 10th, 2017, was USAA Bank FDIC insured?

7      A    Yes.

8      Q    Okay.  Total amount of CDs purchased by Randall Beane

9  using the routing number of the Federal Reserve Bank and the

10  bad account number?

11      A    There were 32 successfully opened CDs.

12      Q    And what was the amount of the -- that were funded?

13      A    It was over $31 million.

14      Q    So if I told you the number was $31,000,494.974

15  [sic], would that sound right?

16      A    That sounds right.

17      Q    Okay.  You talked a little bit about USAA trying to

18  claw the money back?

19      A    Yes.

20      Q    What's the total loss to USAA Bank based on this

21  fraud scheme?

22      A    Right now the consumer loans are in default about

23  $25,000, the credit cards are in default about another 25,000,

24  and then the checking amount, over 500,000, so over $550,000.

25          MS. DAVIDSON:  May I have a moment, Your Honor.

UNITED STATES DISTRICT COURT

Monica Alcala - Continued Direct Examination

1    THE COURT:  Yes.

2    MS. DAVIDSON:  That's all I have, Your Honor.

3    THE COURT:  All right.  Thank you.  This might be a

4 good time for our morning break, so we'll excuse the jury.

5    (Jury out at 10:52 a.m.)

6    THE COURT:  Do the defendants have a preference who I

7 should call upon first for cross-examination?

8    MS. TUCCI-JARRAF:  That's what we need to discuss.

9 We need to discuss that over the break.

10    THE COURT:  Let me know when we come back in.

11    THE COURTROOM DEPUTY:  This honorable court shall

12 stand in recess until 11:10.

13    (Recess from 10:53 a.m. to 11:10 a.m.)

14    THE COURTROOM DEPUTY:  This honorable court is again

15 in session.

16    THE COURT:  Are we ready?

17    Whose's going to conduct initial cross-examination?

18    MS. TUCCI-JARRAF:  Without prejudice, I'll go first.

19    THE COURT:  All right.  Bring the jury in.

20    (Jury in at 11:11 a.m.)

21    THE COURT:  All right.  Thank you.  Everyone may be

22 seated.

23    Ms. Tucci-Jarraf, you may proceed with

24 cross-examination.

25

UNITED STATES DISTRICT COURT

1                        **CROSS-EXAMINATION**

2    BY MS. TUCCI-JARRAF:

3        Q    Thank you.  Good morning, Ms. Alcala.  Am I

4    pronouncing it properly?

5        A    Alcala.

6        Q    Alcala.  Thank you.  So, Ms. Alcala, you stated that

7    you've been working with USAA for 14 and a half years.  That's

8    correct?

9        A    Yes.

10       Q    Okay.  And how long have you been -- what official

11   department -- thank you.  What official department are you in

12   again?

13       A    I'm currently in financial crimes investigations,

14   which is under the Enterprise Security Group.

15       Q    The what?

16       A    Enterprise Security Group.

17       Q    Okay.  Enterprise Security Group, is that a separate

18   entity from USAA?

19       A    No.  No.  It's part of USAA.  So within USAA you have

20   different areas that have different specialties.  The

21   Enterprise Security Group is -- encompasses everything, whether

22   it's physical security, banking security, it encompasses

23   internal fraud monitoring.  So Enterprise Security Group is the

24   overall umbrella for the security at USAA.

25       Q    Okay.  There's a vice president over that particular

                    UNITED STATES DISTRICT COURT

1    group.  Is that correct?

2        A    Right.

3        Q    Which -- do you know who that vice president was at

4    that time?

5        A    Tom Shaw.

6        Q    Tom Shaw.  And to the best of your knowledge, did you

7    communicate with Tom Shaw during the investigation in this case

8    or your involvement in this case?

9        A    I do not believe so.  We worked directly with Jim

10   Hickman, which was the -- is the assistant vice president.

11       Q    With Jim Hickman.  You stated that you became

12   involved in this on July 10th.  So your communications with Jim

13   Hickman regarding this particular case began on July 10th or

14   sometime after that?

15       A    That's correct.

16       Q    Okay.  Is he in the same office?  You stated that

17   USAA was -- headquarters in San Antonio was pretty big.  Are

18   you guys all in the same office area where you have --

19       A    Yes, we're actually in a secured area.  You have to

20   have special permissions to get in because of the security of

21   the information that we research and do, and he is in that

22   secured office with us.  So it's a two building, couple hundred

23   people in there, but yes.

24       Q    Is Tom Shaw in that -- was he in that office as well?

25       A    Yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    Q    I'm sorry.  Okay.  I'm going to go a little bit

2   into -- just so that we can get some clarity questions.  And

3   I'm kind of going to follow the order that Ms. Davidson sort of

4   took you through your direct.  Okay?

5    A    Okay.

6    Q    Ms. Davidson spent a significant amount of time

7   talking about -- having you talk about the culture of USAA, and

8   your client base, and sort of indicated -- you indicated that

9   there were programs set up for you to not only know your client

10  base better, but also to anticipate, it sounded like, their

11  needs.  So were you military?

12   A    No, I was not.

13   Q    Okay.  So you attended those particular classes that

14  you had mentioned in direct?

15   A    Yes.

16   Q    Okay.  How many classes did you attend?

17   A    I -- over the years, we have at least one a year that

18  we have to do, and when I was a service representative, that

19  was initial, so I'd say at least 14 throughout my career.

20   Q    And can you give us a little bit more detail just

21  on -- how long is a class?  You said there were about 14.  Are

22  they pretty much all standard, all the 14 you took, as far as

23  length, place?

24   A    Yeah.  About an hour, just a classroom setting.

25  Sometimes, you know, in some years, we'd listen to phone calls

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    of members calling in from being deployed.  Sometimes it's the

2    spouses.  So it varies depending on what group you get and what

3    they're asking you to focus on.

4         Q    And are these classes mainly just to show you what

5    they go through in the military, or is this also -- because you

6    had made a statement earlier on that you were there to protect

7    your client, the military client financially.

8         A    Right.

9         Q    Correct?  So are you, during those classes, only

10   given some kind of teaching on what they go through in the

11   military or what they are going through as military officers

12   just in life regarding their financial?

13        A    No.  We are given assistance to help them understand

14   when they are military, when they're actively in the military

15   or getting ready for separation or retirement, so because we

16   are a military based company, we want to know more of what we

17   probably don't know, especially like myself not being in the

18   military, to understand the trials and tribulations that they

19   go through during active duty, right before they're going into

20   basic training, retirement, because now they've got to be out

21   in the local workforce and get a job.  So it's kind of get to

22   know your military members at any stage they might be in.

23        Q    So maybe it would be for them to interact or reengage

24   into society then?

25        A    Some of the -- not high level on that, but just to

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    say, hey, this could happen and this is the area you want to

2    get them to, because then you have specialized groups that

3    would talk to them, let's say they just got separated from the

4    military, they retired, and now they're going to, you know --

5    so we want to get them over to investments or we want to get

6    them over to a different department to help them with their

7    finances.

8            So it depends on -- that's why I said some of the

9    classes are very high level just to get an understanding of

10   what they go through.  And based off their needs, they're going

11   to go to a specialized department who has more training in

12   that.  I'm in the fraud department, so my training is going to

13   focus more on fraud that's occurring within USAA.

14       Q    Does that training in fraud that's occurring, does

15   that -- does that training include fraud that's possibly done

16   against your client and possibly fraud your clients may en --

17   or may do themselves.  What kind of fraud training?

18       A    I'm a certified fraud examiner since 2008.  That

19   certification does require that I get 30 continuing credit

20   hours per year.  So constantly we are reviewing, we're taking

21   classes, we're going to seminars to learn about fraud, internal

22   fraud.  We learn about member fraud, so members who are

23   deliberately taking advantage of the banks.  We also -- I got

24   experience with people who have been taken advantage of, as

25   well as account takeovers where you have no idea who's taking

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    your money.

2        Q    So -- that's what I was looking for, was you said

3    internal -- internal fraud, member fraud, and then how would

4    you classify that last one where someone --

5        A    Account takeover is somebody hacks into your USAA

6    account.  They add an external bank account and transfer the

7    money.  Or they call in and say, "I'm Monica Alcala, here's all

8    my personal information, send it to a bank overseas."  So

9    that's account takeover where they are taking over your USAA

10   account without your knowledge or authorization.

11       Q    Okay.  Thank you.  And just to clarify, when you said

12   "internal fraud," what kind of fraud is that?  Can you give --

13       A    Yeah.  Employee fraud, so we look at if employees

14   are -- we monitor our employees, their actions, their

15   movements, if they tend to be in an account or too many

16   accounts for unnecessary reasons.  So we do monitor our

17   employees to ensure that they are not committing fraud within

18   the company.

19       Q    Does that also include reviewing any kind of bank

20   practices that your employees, obviously at the higher levels,

21   might institute, or is this just basically looking to see if

22   they're going into people's accounts?

23       A    Yeah.  Just to see if they're going into people's

24   accounts.  If it goes any further, then there's an internal --

25   a group that will, again, specialize -- so USAA is very

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

specialized, so they want to make sure that you know your job
backwards and forwards.  So if it's something I don't have the
experience or because of the privacy, if it's internal fraud,
then it goes to somebody else, and that's our internal
investigators.

    Q    Okay.  And all the investigators that would
investigate internal fraud or member fraud or account take
over, that's all in that secured facility that you were
discussing --

    A    Yes.

    Q    -- where you guys all are?

    A    Yes.

    Q    Okay.  And you stated that Tom Shaw was the vice
president of -- at that time of the enterprise financial crimes
management.  Do you know, is he still employed there?

    A    I was just going say, I don't remember exactly when
he left, but he's no longer the vice president at USAA for
fraud.

    Q    Okay.  Does July 2017 sound appropriate for when he
left?

    A    I don't know.

    Q    Okay.  When you stated that you had become involved
in this matter on the 10th of July, at what point --
Ms. Davidson had pulled up a whole bunch of statements and
documents that belong to -- that you identified that belonged

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    to Randall Keith Beane.

2         And on those deposits, specifically, it showed -- and

3    I can't remember which particular statement and exhibits they

4    were, but on the statements, it showed an NSF.

5         And I do have -- perhaps, David, you might help me

6    pull up Exhibit 69.

7         This is just one example of the statement.  And if

8    you could -- thank you.  I'm getting anticipated here.

9         All right.  If you look where it's "Total

10   Nonsufficient Funds (NSF) Fees, 29, 261," okay, on a number of

11   the statements that Ms. Davidson had you go over yesterday, on

12   a few of those statements, it showed NSF and it would show one

13   transaction.  I believe only on one of the statements that she

14   went over yesterday that showed two NSFs for that month.  Do

15   you recall that?

16   A    Yes.

17   Q    David, if you could unhighlight that and highlight

18   the total deposits, total debits, please.  Thank you.

19        Okay.  Now, on the statements from yesterday, it

20   showed significantly different amounts.  Okay.  If I recall

21   correctly, and I'm just going to summarize it, it was deposits

22   of like 15 -- showing total amount of deposits made was around

23   15,000, 12,000.  Does that sound correct?

24   A    Yes.

25   Q    Okay.  And then on total amounts of debits paid from

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    the statements that were reviewed yesterday with Ms. Davidson,

2    it would show 18,000, 17,000, somewhere around in those

3    amounts.  Is that correct?

4       A    I could go back.  I wasn't focusing on those

5    yesterday, but that sounds right.

6       Q    Okay.  She just highlighted those parts when you guys

7    went over them.  So, typically, on this -- let's use this as an

8    example.  Okay.  So on this one, you have a number of deposits

9    for this particular month was 13.  Correct?

10      A    Yes.

11      Q    And number amount of debits paid is 61.  Is that

12   correct?

13      A    Yes.

14      Q    So total amount of activity on this particular

15   account for that month would be 61 plus 13.  Is that right?

16      A    Yes.

17      Q    Okay.  So out of the total of that -- let's see -- so

18   74 transactions were done that month.  Is that correct?

19      A    Yes.

20      Q    Okay.  And out of those 74 transactions, there was

21   one nonsufficient funds charge fee.  Is that correct?

22      A    Correct.

23      Q    Okay.  So on the other statements, there was a

24   similar scenario, the numbers obviously are different.  Can you

25   please explain to me your debiting and accounting processes on

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    how each day -- you processed transactions on batches --

2        A    Yes.

3        Q    -- you stated?  Does that include any debit or credit

4    payments each day you do the batch processing for those, the

5    accounting applications?

6        A    The only one that's not included in batch is going to

7    be your debit card point of sale.  So if you enter your debit

8    card with your PIN number, that's the only one.  But everything

9    else is done in batch.

10            At the end of the night, credits are done before

11   debits to ensure that if you've got last minute bills coming

12   in, we want to give our members the benefit of the doubt.  So

13   we're going to make sure all credits are applied before any

14   debits to try to make sure there's no insufficient funds.

15       Q    That wasn't always the practice of all banks,

16   including USAA.  If I remember correctly, you've been there for

17   14 and a half years.

18       A    I started in the bank as a bank servicing

19   representative, and since I've been there, it has been.  It's

20   always when I was on the phone as a representative, it was

21   credits before debits.

22       Q    And before that, you stated that you were with JP

23   Morgan.  Is that correct?

24       A    Yes.

25       Q    And how long were you with JP Morgan?

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1      A      A year.

2      Q      One year.  So approximately you started in banking

3  around 2002?

4      A      This will be year 15, yes, that sounds about right.

5      Q      So 2002.  So you're not aware of the bank fee

6  overdrafting lawsuits that actually resulted in the banking

7  system having to do a complete overhaul on the accounting

8  procedures because it wasn't always where you did credits --

9  not you.  I'm using the universal you here in banking.  That

10  they did credits first and then debits, they were doing debits,

11  then credits.

12      A      Right.

13      Q      And it was resulting in military personnel who were

14  in Afghanistan at that time.  Is that correct?

15      A      I don't know all the specifics.  When I was younger,

16  I do remember, prior to USAA when I had another bank account,

17  that that was always another concern for me is when the debits

18  were coming in before credits.  But I was much younger.  It was

19  before I even became somebody in banking.

20      Q      Do you guys constantly watch for that, for any of

21  your military clients that are deployed overseas, that their

22  credits are done beforehand, before their debits so that they

23  don't get those overdraft charges?

24      A      It's an automatic.  It's not something that we

25  monitor, because our system will automatically do credits

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    before debits.

2           If there were ever to be a complaint, then we would

3    research it.  But we don't have anything that's ever said that

4    there's been an issue where the debits were applied before the

5    credits on the same day.

6        Q    And who's in charge of the automated system?

7        A    I don't know the main person in charge of that.

8        Q    In your fraud department, you don't know who would

9    get the over -- any kind of complaint for an overdraft charge?

10       A    We don't get -- in the fraud department, that's not

11   considered a fraud issue.  That's money management.  So if

12   they're getting charged for insufficient funds, that goes to

13   the bank.  That's not considered a fraud event.

14       Q    So NSFs are not considered a fraud event?

15       A    The only time it could come to us is if a member is

16   kiting, floating funds between accounts with money that's not

17   necessarily there, or when our member is committing fraud.

18   That's when something with NSFs will come to us.  But for a

19   mere question if the debits were posted before credits, that's

20   not a fraud issue.

21       Q    And are your members trained on what kiting is?

22       A    We have our anti-money laundering team that do have

23   roles to watch for kiting, yes.

24       Q    But do you educate your clients, your military

25   members?

UNITED STATES DISTRICT COURT

1    A    Yes.  If I get a case, for instance, that has to do

2   with kiting, we give them the -- we talk to them, let them

3   know, hey, this is something USAA does not allow, this is what

4   kiting is, and we talk to them about that and give them the

5   opportunity to stop it before we cease business.

6    Q    Do your member clients know how the actual transfer

7   system works regarding ACH, that there's a time period in

8   between a deposit made and it actually clearing, or do you

9   educate your members on that?

10   A    Yeah.  Some do and some don't.  You know, it just

11  depends on the level.  Everybody's got a different knowledge of

12  banking.  Some are very aware that things will clear within one

13  to two days, and others don't understand why it took four to

14  five days for a return to happen.  So it's varied.  Everybody

15  is different in their knowledge in banking.

16   Q    So you had mentioned earlier that they put -- that

17  they put a ten-day hold usually, and specifically you made this

18  reference when you were going over with Ms. Davidson about CD,

19  the CD statements, the purchasing of the CDs, you had stated

20  that there was -- let me double-check this, so that we can make

21  sure it's accurate.

22        Okay.  That you do a ten-day hold on those CD

23  accounts.  Is that also automatic for any holds that you would

24  put for the funds to actually clear?

25   A    For CDs, yes, that was a change that was implemented

Monica Alcala - Cross-Examination

1   probably within the past 11, 12 years, where -- two minimize

2   the risk that USAA had on CDs.  It was implemented that at

3   batch, after a CD has been opened, at batch, there's an

4   automatic ten-day hold.

5       Q    And is that -- is that done through programming,

6   source coding so that it automatically is done in the system,

7   or does that have to be a manual activation to have it be held

8   for ten days?

9       A    I don't work in that area, so I don't know.

10      Q    Okay.  So during this investigation regarding Randall

11  Keith Beane, did you ever talk to anyone in that department, as

12  far as the hold and why it wasn't done in this particular case?

13      A    Right.  So that's when we learned that the holds were

14  placed.  Before that, I thought the holds were placed as soon

15  as the account was opened.  And I learned that the CDs were

16  placed on hold at batch.

17          And that's how we realized that when he called in the

18  morning, that there wasn't a hold identified because our member

19  service representatives, the first line that answers the basic

20  calls, if they don't see a hold, they assume that it's good,

21  and it's already been taken care of, so they don't pay

22  attention to the date and time.

23          So if there's no holds that were placed by the

24  system, they assume that that was already past the ten days.

25  But because it was done after 8:00 p.m. the day before, it

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    hadn't batched to place that hold.  And that's when I learned

2    about the weakness, the vulnerability that we had.

3        Q    What date was that?

4        A    It would have been after the 10th, probably within a

5    couple of days of figuring this out, because it's part of the

6    investigation, so ...

7        Q    Can you give me an approximate date just so -- like

8    two, three days, or -- so that would have been 7/10, you

9    started -- you found the vulnerability in the system, so that

10   was what, maybe the 12th?

11       A    I don't have the exact date.  There was so many

12   parties involved to stop it and to identify any fraud and to

13   figure out what happened, so it was after the 10th.  It

14   wouldn't have been within the first day or two, but within that

15   week, so the 12th through 15th maybe.

16       Q    Give me a moment.  I just want to make sure

17   everything --

18       A    Uh-huh.

19       Q    Okay.  So you explained the system automatically puts

20   a hold on it.  In this particular instance, you found that

21   there was no hold, and it sounds like there's a vulnerability

22   in the system itself where that might happen.  Is that a

23   correct summation of what you just said?

24       A    That's correct.

25       Q    Okay.  So you discovered that there wasn't a hold in

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    this particular case, or somebody did, and then a manual hold

2    went in.  Is that correct?

3         A    No.  By the time we received it on the 10th, all the

4    CDs had already -- the funding had already returned.  So by the

5    time we got it on the 10th, all of the opening deposits had

6    returned.  So there wasn't a hold to place on the CDs, because

7    all of the money was gone, it was reversed.

8         Q    So would that be a system return then, if you have a

9    system -- meaning automated?

10        A    Yes.

11        Q    That there's not a live person watching this, it's

12   all programmed in through the source coding and IT?

13        A    Right.

14        Q    Okay.  So the system that you have to do the holds,

15   do the returns, is this the same system that is communicating

16   and doing the transfers with other institutions?

17        A    Repeat.  I'm not sure I understand the question.

18        Q    Okay.  This is a system hold?

19        A    Yes.

20        Q    And a system return?

21        A    Yes.

22        Q    Okay.  You have the ACH, which is the transfer

23   system, which USAA would communicate with with any other

24   institution, such as the opening of accounts that you walked

25   all of us through on opening a new account and you have to do

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1   this application, so you have a transfer system that you

2   obviously use that tells you whether things are to be returned,

3   aren't paid, is that all a part of the same system?

4       A    Yes.  So we receive -- so the money goes through the

5   Federal Reserve to say, okay, now we need this money from this

6   bank.  If it comes back, it comes back through them.  They say,

7   hey, the other bank gave this reason.  It's unable to locate or

8   there's insufficient funds.  So that's all automated.  We just

9   get the reports for the reasons that anything doesn't get paid.

10      Q    Okay.  So in all this discovery, you didn't go over

11  yesterday any specific reports for why moneys were returned or

12  they weren't presented.  She didn't have you go over those

13  actual reports yesterday.

14      A    No.

15      Q    Do you have those actual reports?

16      A    No.  We don't -- we don't work the reports.  That's

17  the ACH department.  We are given the notice that they were --

18  the accounts were returned as unable to locate.  I don't -- I

19  don't work those reports.

20      Q    Well, I'm just asking, because this is an

21  investigation fraud that you're working on.

22      A    Right.

23      Q    Correct?

24      A    Right.

25      Q    So you don't actually review those particular reports

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    to see why they were returned, if this is a fraud and what

2    you're describing is essentially kiting, right, electronic

3    kiting?

4        A    No.  Kiting is floating money between two accounts,

5    two valid accounts.  So if this external account was a valid

6    account, let's say at Bank of America -- I call it robbing

7    Peter to pay Paul.  So you're moving money between Bank of

8    America and USAA.  You're maybe doing an ACH in one, taking the

9    cash out, putting into Bank of America to cover that ACH, so

10   you're moving money back and forth between the two.

11            This one, there was no kiting.  There wasn't money

12   moved between the two accounts back and forth to pay each other

13   to cover the transaction.

14       Q    That's where this becomes vital as far as like me

15   asking you, did you review any of the reports from the ACH

16   department that actually stated the account did not exist?

17       A    No.  Because if I were to review it, I wouldn't know

18   what I'm looking at because that is not my specialty.  I am not

19   in the ACH department.  So I wouldn't -- if they gave me a

20   report that says X, Y, Z, I wouldn't know how to read that.  I

21   have to trust that expert to tell me this says unable to

22   locate, and I go based off of that information.

23       Q    Okay.  So you went based off of another department's

24   information, just a verbal, that the account doesn't exist?

25       A    Yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1      Q    Okay.  Could you please, David, if you would, could

2  you please highlight the date of this statement, the statement

3  period, please.  Okay.  This particular statement says that --

4  we went over, it's Exhibit 69, again, it says that this was

5  July 19th, 2017, to July -- excuse me, June 19th, 2017 to

6  July 18th, 2017.

7      A    Yes.

8      Q    Okay.  Is this the only statement that was issued in

9  this particular month for this account?

10     A    Sometimes once the account is overdrawn, we send out

11  another statement that will tell you that the account is

12  overdrawn.  So this is the one for the 30-day.  Then after

13  that, if there's any overdrawn amount, that will be sent to you

14  as well.

15     Q    Okay.  So there's a possibility that there might be

16  another account statement for this particular month, because

17  you're saying there were some --

18     A    That's correct.

19     Q    Okay.  And, David, excuse me for a minute, I'm just

20  going to pull up some of the exhibits quickly so we can use the

21  numbers.

22          MS. DAVIDSON:  You can use the document camera.

23  BY MS. TUCCI-JARRAF:

24     Q    You went over with Ms. Davidson regarding the

25  statements where it showed two transactions, one on July 3rd

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    and then another one on July 7th.  So basically she had asked

2    you regarding -- where you were talking about overpayments.

3            Okay.  So Exhibit 46.  Thank you.  This would be

4    fine, Document 46 -- or excuse me, Exhibit 46 and through a

5    number of the exhibits, you had gone in and said that on

6    July 3rd, payments were made on the account, and then on

7    July 7th, another payment was made.  So you said that he had

8    made multiple overpayments.  Do you recall that?

9       A    Yeah.  On the credit card, yes, he made overpayments.

10   He made two payments on the same date.  That's the

11   overpayments.  That's the only time he made overpayments was on

12   the credit cards.

13      Q    Okay.

14           MS. DAVIDSON:  You have to ask Julie to do it.

15           MS. TUCCI-JARRAF:  Thank you.  Is that right?

16           THE COURTROOM DEPUTY:  The roll bar on the top will

17   zoom in and out.

18           MS. TUCCI-JARRAF:  I should have taken the tutorial.

19   Bear with me, everybody.  I've never done this.

20   BY MS. TUCCI-JARRAF:

21      Q    Okay.  Down here, you'll see a "USAA Fixed Rate Loan

22   3366."  Under the account method, it shows "Direct Deposit

23   Account 3062."

24      A    Yes.

25      Q    Okay.  And then there's another one right below it,

UNITED STATES DISTRICT COURT

1    it says, "Trust star 1135."

2        A    Correct.

3        Q    Okay.  Those are two different accounts?

4        A    Yes.

5        Q    Okay.  And then you had stated earlier that there was

6    also a third account then labeled Trust2?

7        A    Yes.

8        Q    So three total accounts.  Is that correct?

9        A    That he used.  Yes.

10       Q    Okay.  And those particular accounts, when we're

11   talking about accounts, just to make it clear, you walked

12   through with Ms. Davidson on how to open, add an account to

13   make payments from directly to USAA.  Correct?

14       A    Correct.

15       Q    Okay.  So when opening an account, it's not as if

16   they're actually opening an account at USAA, they're just

17   giving you the information to be able to pull directly from an

18   external account to USAA.  Is that correct?

19       A    You can also use it to open an account.  So not just

20   to pull money, but you can use that to open up your account.

21       Q    So it's basically an add payment method?

22       A    Uh-huh.  Or add it to transfer money.

23       Q    Okay.  And when was direct deposit account 3062 open?

24       A    Oh, that was the one in 2016.  That was the first

25   account that he established with USAA.

1    Q    The main account.  Okay.  And Trust 1135?

2    A    Was July 3rd is when that was added, of 2017.

3    Q    On July 3rd?

4    A    Uh-huh.

5    Q    And Trust2?

6    A    July 6, 2017.

7    Q    July 6?

8    A    Or the 5th.  That was the 5th because Trust1 was

9    restricted on July 6.  So July 5 is when the Trust2 account was

10   entered.

11   Q    July 3rd and July 5th.  So the legal department, you

12   have heard Exhibit 83, an audio with someone from the legal

13   department who identified herself on audio as Jeannie,

14   regarding finals for the vehicle in the title department?

15   A    Oh, she's from the title department, yes.

16   Q    Right.  And she said that it had released and titles

17   were being mailed from Pennsylvania.  This is part of -- part

18   of USAA's department -- is that in the secure department where

19   you guys are, or is that in the other section?

20   A    No.  That's a different department.  The title

21   department is a different area.  That's not considered the

22   fraud area.

23   Q    Okay.  And did you ever connect with Jeannie about

24   the titles and gather the information from their records?

25   A    Yes.  I spoke to a couple of different people, not

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1  Jeannie directly.  I spoke to managers trying to find out what

2  the normal process is.  For instance, we released the title,

3  even though we didn't verify the funds were good, and how we

4  could get that stopped.

5      Q    All right.  Would you say that was another

6  vulnerability that you were able to discover during this

7  investigation in the bank?

8      A    Yes.  That's also another vulnerability.

9      Q    Okay.  Do you know how many departments USAA has,

10 then, for bank products?

11     A    No.  We have quite a bit, because everyone

12 specializes in something else.

13     Q    Okay.  Were you able to discover any other

14 vulnerabilities within your system due to this investigation?

15     A    Those were the two main ones that I can think of

16 right now.

17     Q    You had stated that you -- on the 10th, you became

18 involved and that that was the date that you contacted the FBI.

19 Is that correct?

20     A    Right.  My director contacted the FBI, and I worked

21 with him to gather the information on what was going on with

22 the account.

23     Q    Who was your director?

24     A    True Brown.

25     Q    So is it you that notified True Brown about this

UNITED STATES DISTRICT COURT

1   issue, or was True Brown the one that notified you, assigned

2   you to this issue?

3       A    He assigned the case to me.

4       Q    He assigned the case.  Did you ever contact Whitney

5   Bank directly?

6       A    No, I did not.

7       Q    Okay.  Are you aware of whether True Brown contacted

8   Whitney Bank?

9       A    I don't know.

10      Q    Do you know how many people were assigned to this

11  particular investigation?

12      A    Well, I was the investigator assigned to this case.

13  You had other areas, like our recovery team is in charge of

14  contacting Whitney Bank to do the hold harmless.  We had

15  different areas to try to correct the vulnerability.  So,

16  again, as the investigation, this was my case, and reaching out

17  to different departments to get answers to stuff that I don't

18  have the knowledge on.

19      Q    So you were the lead investigator, is that fair to

20  say?

21      A    Yes.

22      Q    And you coordinated between every other department?

23      A    Right.

24      Q    Did you ever speak with the FBI?

25      A    Yes.  I've been in contact with them, yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    Q    And what -- you stated you have found a video by a

2    Mr. Harvey Dent?

3    A    Yes.

4    Q    Okay.  What date was that?

5    A    Again, I don't know dates.  We -- I mean, when we get

6    a case, we work on it as bits and pieces come up.  After this

7    happened, I can tell you there was a lot of research into the

8    documents received, the video.  If I had to, I could go back

9    and pull up e-mails that were communicated, but I don't know

10   the exact dates.

11   Q    So sometime after July 10th --

12   A    Uh-huh.

13   Q    -- huge amounts of your USAA resources were put to

14   figure out regarding Harvey Dent's process that was in there?

15   A    What we were looking for is what caused somebody to

16   use a Federal Reserve routing number and their Social Security

17   number to open up accounts.

18        So in a fraud event, we tried to find out what would

19   make somebody open up 31 CDs using money from an invalid

20   account number.  So we're trying to find out where it's at in

21   the Internet to see, you know, what's starting it and how it's

22   going to affect us as well as other banks.

23   Q    Okay.  Did you ever speak with Mr. Harvey Dent?

24   A    No.

25   Q    Okay.  And I don't believe that's his correct name.

UNITED STATES DISTRICT COURT

1       A       No.

2       Q       It's just an alias?

3       A       It's his YouTube name, I guess.

4       Q       YouTube name.  Okay.  So you did speak with him?

5       A       No.

6       Q       Oh, you didn't speak with him?

7       A       No, I did not speak with him.

8       Q       Okay.  It was just part of the research that you

9  found?

10      A       Yes.

11      Q       Okay.  And did you hand that -- all the research that

12 you've found during this investigation over to the FBI?

13      A       No, I didn't.  All the blogs and stuff, I did not

14 personally hand them over to them.

15      Q       Who did you hand all that research over to?

16      A       Those were just us researching it online.  I didn't

17 hand that over to anybody.

18      Q       So not even to your -- you didn't even hand it over

19 to your supervisor?

20      A       We talked about it, and that was communicated, but I

21 didn't record every YouTube video or every blog that was posted

22 or every conversation that was online to save that and to

23 forward it to anybody, no.

24      Q       Did you write a summary report of --

25      A       Yes.

1    Q    -- with -- can you describe what kind of report that

2  is?

3    A    Yeah.  So we have to present it to our upper

4  executives on the type of fraud that happened and what we're

5  doing to mitigate the losses.  And we didn't specify any names,

6  but we advised them that out on the Internet, there are blogs

7  and there are videos telling people how to use these secret

8  trade accounts to pay their bills.

9         So by depending on your Social Security number, there

10  are specific ways to determine which Federal Reserve routing

11  number to use and input your Social Security number as the

12  account number and magically all your bills will get paid with

13  these accounts.

14         So there was a lot of research done and it was just

15  given at a higher level to explain where this would have been

16  derived from.

17    Q    And did you give any kind of opinion on -- or

18  suggestive action regarding that?

19    A    To any --

20    Q    Of your --

21    A    Well, as a group, we collaborated and said anybody

22  using the Federal Reserve routing number was to be reviewed to

23  see, and then if it was the routing number with their Social

24  Security numbers, then we were to put an automatic hold to

25  ensure that those funds had been validated.

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    Q    So due to this particular event, you were able to

2  identify a few key vulnerabilities and then make some

3  suggestions to adjust your system so that there may -- it

4  didn't run a risk, you guys, USAA Bank didn't run a risk of

5  similar events?

6    A    Correct.

7    Q    Okay.  Were you able to implement those --

8    A    Yes.

9    Q    -- quickly?

10    A    Yes.  The one with the -- the automatic holds on the

11  CDs has been implemented, and the one with the holds on paying

12  off loans is currently in process.

13    Q    Okay.  In regards to specifically, Mr. Beane, or

14  member -- client-member wide?

15    A    Members in general.  Because we -- you know, again,

16  we're very member-centric.  We're all about our members.

17  Typically, when they're paying off a loan in a large amount,

18  it's paid off.  So the different areas have to assess the risks

19  and how it's going to affect true members that have valid money

20  and want to pay off their loans and get their titles right away

21  because they have to sell it.

22         We have to outweigh what, you know -- so that's a

23  little bit longer process.  It's not the snap of a button,

24  because we're affecting people who truly pay off their loan

25  with valid money and need to sell their car.

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    Q    You did implement the procedure, risk eliminating

2  procedure to make sure holds were put on there so you can

3  identify and assist your client members and figure out what

4  happened before the bank actually lost anything?

5    A    Correct.

6    Q    Okay.  And it sounds, from what you have stated in

7  the direct, that USAA has indeed experienced a loss --

8    A    Yes.

9    Q    -- on your own books due to this case as well as

10  possibly many others?

11   A    This was the only case that had a loss.  That's

12  correct.

13   Q    Okay.  So were you able to recover the 400,000-plus

14  from Whitney Bank --

15   A    No, we haven't.

16   Q    -- today?

17   A    No.

18   Q    And why is that?

19   A    That, I'd have to check with our recovery team.  I

20  think because of the process of selling it, it going to

21  purchase the RV, so the funds are actually -- were used to pay

22  for an RV.

23   Q    Right.  You had gone over Exhibit -- an indemnity

24  agreement, and I believe that is Exhibit 80.  I'm going to have

25  you look at Exhibit 80.  Here's Page 1.

UNITED STATES DISTRICT COURT

1        So this was on July 10th that this was sent over to

2   Whitney Bank.  Is that correct?

3        A    Yes.

4        Q    Okay.  And as you described it, this basically

5   promises Whitney Bank you'll hold them harmless for this amount

6   so they don't have to write it off or anything like that, as

7   long as they return the money, you won't proceed any further

8   action against Whitney Bank.  Is that correct?

9        A    Correct.

10       Q    So, in essence, you won't claim they've participated

11  in any way if they hand the money back over?

12       A    Correct.

13       Q    And this shows that it was from your USAA fraud

14  investigations --

15       A    Yes.

16       Q    -- unit?  And by who, Shelsea Anderson?

17       A    Yes.

18       Q    Is she part of your -- is she reporting to you or is

19  she --

20       A    She's under True Brown, so he has a recovery team

21  that goes and attempts to recover fraudulent funds that have

22  left USAA.

23       Q    Okay.  So this is the actual agreement here, uniform

24  indemnification agreement to hold harmless.  And that is True

25  Brown, director of financial kinds of investigations you've

UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1   been speaking of?

2      A    Yes.

3      Q    And it hasn't been signed by Whitney Bank?

4      A    No.  This is the one that we fax over to them.  This

5   is the original one that we fax over to them.

6      Q    Uh-huh.

7      A    And so then they would have to sign it and then send

8   it back.

9      Q    Okay.  But they -- you stated that they refused or

10  they didn't?

11     A    I don't know what the reasons were, but I know that

12  we did not receive any funds, because the account is still

13  overdrawn.

14     Q    Okay.  Is this part of -- excuse me.  Are you aware

15  of whether USAA Federal Savings actually indicated in writing

16  whether they would not sign the indemnification agreement on

17  the 10th?

18     A    I don't know.

19     Q    And are you aware of whether they signed an

20  indemnification agreement as of to date with USAA Bank?

21     A    I don't know.

22     Q    Okay.  And just to be clear, your specialty is

23  specifically on fraud and not the actual transactions and ACH

24  system?

25     A    Not the ACH system, but on transactions related to

UNITED STATES DISTRICT COURT

1    fraud.

2         Q    Okay.  Thank you.  Let me just check and see if I

3    have any more questions here.

4              Oh, I do have one last question.

5              In the vulnerabilities that we talked about where

6    there's the ten-day -- you have to hold it for ten days because

7    it takes you guys so long to get the money from a secondary or

8    external institution within the Federal Reserve System, has

9    that been resolved?

10        A    Yes.

11        Q    Okay.  And, in fact, as of September 15th, all ACH

12   payments are same day instead of a two- to ten-day receipt?

13        A    You mean the hold, the hold?

14        Q    No.

15        A    What's same date?  The transaction doesn't process

16   same day.  You still -- that's still Federal Reserve.  ACH

17   transactions can go anywhere from one day to ten days.  What we

18   resolved is that we're putting holds on CDs before eight

19   o'clock the following day.  We're not waiting till batch to do

20   that.

21        Q    So your ACH payment, when you send out your batches,

22   it's not same day settlement?

23        A    That, I don't know.  But the settlement is what -- I

24   think what you're asking is different than what -- we don't get

25   the money right away.  We still batch it out.

Monica Alcala - Cross-Examination

1          What was resolved was the holds placed on CDs when

2    they're first opened.  So the resolution is that.  There's

3    still a timing system.  We still have to follow NACHA Rules.

4    We have to follow all the rules for banking on how to process

5    them.

6          What we have resolved is putting a hold on our side

7    for our accounts to ensure that we're holding it until

8    everything goes through its process and lets us know whether

9    the funds are good or not.

10   Q    Okay.  So you're not aware of any system changes,

11   banking wide as far as settlements for any kind of transfers?

12   A    No.  We follow the rules that are set for banks.

13   Q    Okay.  And you are aware of the anti-money laundering

14   laws as part of your education and training?

15   A    Yes.

16   Q    Okay.  Have you ever seen an origin of funds

17   documentation?

18   A    Not the official document, no.

19   Q    Have you ever seen a history of funds documentation?

20   A    Yes.

21   Q    Okay.  Have you ever seen a title?

22   A    A vehicle title?

23   Q    No.  This would be a title for funds.

24   A    No.  I haven't seen that.

25          MS. TUCCI-JARRAF:  Okay.  Thank you.  I have no

UNITED STATES DISTRICT COURT

 1   further questions.

 2              THE COURT:  Thank you.

 3              Cross-examination, Mr. Beane?

 4                         **CROSS-EXAMINATION**

 5   BY MR. BEANE:

 6       Q    I'm sorry.  I didn't catch your name when you

 7   first --

 8       A    Monica.

 9       Q    Monica?

10       A    Uh-huh.

11       Q    Okay.  Monica, for a USAA member like myself who

12   travels quite frequently, I found the security protocols to be

13   very high, and I bragged about USAA quite often to my friends

14   and family about how proud I was to bank with USAA, because

15   currently being on the road, I would get frequent phone calls

16   about my credit card being charged against something that I

17   was -- or in another state.

18              Is that in your department?

19       A    No.  Not my department.  Again, I work the

20   investigative part, but we do have a specialty group that

21   monitors that and says anything out of your normal behavior or

22   location, that it will go through and trigger a call to you,

23   but --

24       Q    So I'm correct in assuming the security protocol is

25   very high for USAA?

UNITED STATES DISTRICT COURT

1   A    Yes, it is.

2   Q    So my trust in thinking that a transaction being

3   taken care of would be under that same protocol?

4   A    Yes.

5        MR. BEANE:  Okay.  No further questions.

6        THE COURT:  Thank you.

7        Redirect?

8        MS. DAVIDSON:  Yes, Your Honor.

9                    **REDIRECT EXAMINATION**

10  BY MS. DAVIDSON:

11  Q    Okay.  If we could go back to Government's Exhibit 3.

12  And Ms. Tucci-Jarraf asked you, I think she showed you an

13  exhibit that had been paid by the trust account, and then a

14  couple of days later on the 7th also paid from this account

15  ending in 3062.

16       Okay.  So I thought it would be useful for us to just

17  go through this statement.

18       David, if you could pull it up and, one, two, three,

19  four.  Okay.  Start on the fourth page.  I'm sorry.  That's

20  six.  If you could start on the 3rd page.

21       Okay.  Let's just go through this statement.  And so

22  I highlighted for you the three loan payments during your

23  direct on 7/3.

24       If you could blow those up, David, down on 7/3, the

25  three USAA payments.  I'm sorry.  Loan payments.

                    UNITED STATES DISTRICT COURT

Monica Alcala - Redirect Examination

1    So we talked about that earlier.  Okay.  So 7/3 is

2    before he started purchasing all the CDs.  Right?

3        A    Correct.

4        Q    So let's scroll up.  Now, to Page 2 of the account.

5            And then if you look at everything that happens on

6    6/7.  She was talking about deposits first.  Right so what --

7    I'm sorry, not 6/7.  7/6, July 6th.

8            Okay.  So enters these transfers from CDs.  So 7/6,

9    do you see -- what are the first two credits, if you could look

10   at the screen, I think David has highlighted it for you?

11       A    Yes.  On 7/6, the two transfers from the CDs.

12       Q    Uh-huh.

13       A    That's $499,909.59.  Then the $998,818.36 [sic].

14       Q    Okay.  On 7/6, this checking account balance is over

15   $1.5 million.  Right?

16       A    That's correct.

17       Q    Based on the money that was transferred in from the

18   fraudulent CDs?

19       A    Yes.

20       Q    And then I showed you -- I showed you the other

21   account where he transfers it out, but later on 7/6, do you see

22   the inter fund transfers?

23           David, if you could highlight those, the 50,000, and

24   then the 450,000.

25           Okay.  And so after those accounts, his checking

UNITED STATES DISTRICT COURT

1    account balance, still on 7/6 is over a million dollars?

2        A    That's correct.

3        Q    Okay.  David, let's go over to Exhibit 5.  This is

4    the account number ending in 4062 [sic].

5            I think I highlighted in your direct, the transfers

6    in and transfers out, but also on 7/6 -- I mean, 7/7, what is

7    that transaction on 7/7?

8        A    That's one of the insurance payments to pay the bill

9    in full.

10       Q    Okay.  And, David, if you could span out, can you

11   highlight the entire -- all the transactions from the statement

12   summary if you can.  Bigger please, yeah.

13           Okay.  So let's look, his -- his balance on

14   5/22/2017, what is it?

15       A    $1.02.

16       Q    Okay.  And then we talked about those transfers in

17   from the other account that cashed the CD, the bad money, it's

18   transferred over to this account.  Right?

19       A    Correct.

20       Q    And then he wires out money 493,000, which you

21   testified to?

22       A    Yes.

23       Q    And then he paid this insurance payment.  Ultimately,

24   where would that -- did that insurance payment come from?

25       A    From the bad funds that were used to fund the CD.

UNITED STATES DISTRICT COURT

Monica Alcala - Redirect Examination

1    Q    Okay.  So let's go back to Government's Exhibit 3.

2  Okay.  And if you could go -- starting on -- and this is the

3  second page, David, start, if you could highlight all the

4  transactions on the 7th, if you can.

5         Okay.  So we -- I highlighted for you a minute ago,

6  they transferred the money from the CD, and so his balance

7  became $1.5 million.  He transfers a couple out, so he's still

8  in the millions -- oh, I guess it's just under a million.  It's

9  $945,250.  Right?

10   A    Correct.

11   Q    And so then he -- even though he's already -- we

12 talked -- we saw how he was paying these off on the 3rd, so --

13 and she showed you that he made more loan payments on the 7th.

14 And can you -- if you look, starting here, these payments, does

15 he pay those out of that checking account?

16   A    Yes.  Because the other payments he had made from the

17 trust account had returned, so he had to pay it from somewhere,

18 and this would take it out automatically to guarantee payment.

19   Q    Okay.  And so his balance is close to a million at

20 this point.  Ultimately, where did this money come from?

21   A    The fraudulently established CDs.

22   Q    Okay.  And she asked you some -- about titles and

23 stuff.  Did Beane get all of the titles for those four loans

24 that he paid off with fraudulent money?

25   A    Those were sent out automatically through the title

UNITED STATES DISTRICT COURT

 1   company, so, yes.

 2        Q    Okay.  And so USAA Bank has no recourse to those

 3   loans?

 4        A    Correct.

 5        Q    And so the vulnerability you learned of was that you

 6   sent them out immediately when you got the payment?

 7        A    Correct.

 8        Q    Okay.  And let's go back to Government's Exhibit 80,

 9   please.  So this is a home -- hold harmless agreement.  Right?

10   And so the document, does it not only hold harmless Whitney

11   Bank from USAA, but it offers to hold them harmless against

12   their customers or anybody else that sues them because they

13   returned the money, doesn't it?

14        A    That's correct.

15             MS. DAVIDSON:  Can I have a moment, Your Honor.

16             THE COURT:  Yes.

17             MS. DAVIDSON:  That's all I have.  Thank you.

18             THE COURT:  Thank you.  Any recross-examination?

19             MS. TUCCI-JARRAF:  Just a short one.  Thank you.

20                      **RECROSS-EXAMINATION**

21   BY MS. TUCCI-JARRAF:

22        Q    Without prejudice, moving forward, Ms. Alcala, in

23   regards to -- you had said that when Ms. Davidson just asked

24   you where the funding came for those loan payments and whatnot,

25   you had stated the bad funds had come from the CDs?

1       A       Yeah.

2       Q       Is that correct?

3       A       Correct.

4       Q       And the -- your determination and even classification

5  today as bad funds was not because you actually received

6  anything from the funding institution saying it didn't exist,

7  but because of someone from your other department orally

8  telling you that they were bad and the account didn't exist.

9  Is that correct?

10      A       Because they received the notification from the other

11 bank that it didn't exist.

12      Q       They did receive a notification.  That's what I've

13 been asking you for.

14      A       You said if I saw the documents.  I have not seen

15 them.  I was told from that department that they had received

16 the notification.  So they didn't just make it up.  They

17 receive it from all banks.

18      Q       Okay.  So there are documents -- there are

19 documents --

20      A       Oh, yes.

21      Q       -- from the funding bank or the alleged funding

22 bank --

23      A       That says --

24      Q       -- in writing stating that that account does not

25 exist?

UNITED STATES DISTRICT COURT

Monica Alcala - Recross-Examination

1    A    That is correct.

2    Q    But you have not seen them?

3    A    I have not physically seen them.

4    Q    And they haven't been from your department sent to

5  the Federal Bureau of Investigations or Ms. Cynthia Davidson?

6    A    I did not send them, no.

7    Q    Okay.

8         Could you -- David, could you -- so those reports

9  from other departments communicating with another bank that

10 you've just discussed --

11   A    Yes.

12   Q    -- this would be an example of Exhibit 51, this is

13 from your wire room department, would that be an example?

14   A    We also get notification on here for wires that are

15 sent out, and when they return, or if the wire doesn't go out,

16 this is a system for wires, only for wires, so it's not the

17 same for ACH.

18   Q    Okay.  So the department that would have received the

19 communication would have some kind of documentation for their

20 department, only that would be similar to this, how your wire

21 room gets a department notification in writing?

22   A    Yes.

23        MS. TUCCI-JARRAF:  Okay.  Thank you.  I have no

24 further questions.

25        THE COURT:  Thank you.  Mr. Beane, any recross?

UNITED STATES DISTRICT COURT

Monica Alcala - Recross-Examination

1          MR. BEANE:  No.  No, sir.

2          THE COURT:  Okay.  Why don't we go -- this witness

3    will be excused simultaneous with our lunch break.  Thank you.

4    We'll take our lunch break until 1:30.

5          (Jury out at 12:16 p.m.)

6          THE COURTROOM DEPUTY:  This honorable court shall

7    stand in recess.

8          MS. DAVIDSON:  Your Honor, may I bring something up?

9    It's just briefly, Ms. Alcala would like to be released from

10   her subpoena so she can watch the rest of the trial.  Can she

11   be released and so she can stay in the audience?

12         THE COURT:  That would typically be done.  Any

13   objections from either of the defendants to that?  In other

14   words, she's released, she's no longer subject to testimony

15   because her testimony is done, which would allow her to remain

16   in the courtroom.

17         MS. TUCCI-JARRAF:  I'm -- I at lunchtime am hopefully

18   receiving some of the other bank statements, so it may be

19   necessary to recall her for the -- since she was the one that

20   introduced, as far as rebuttal, I don't know, I haven't seen

21   those statements, they're actually, hopefully going to be

22   obtained at lunchtime.  So I don't know if I'm going to have

23   further need of this witness.

24         THE COURT:  Why don't you look at the documents and

25   perhaps we allow that -- you to ask those questions right after

UNITED STATES DISTRICT COURT

1  lunch.

2          MS. TUCCI-JARRAF:  I personally don't care if she's

3  released.  If she's staying, she can hear the rest.  I'd rather

4  have every witness in here listening to everything.

5          THE COURT:  I don't know if we can do it witness by

6  witness.

7          What's your response to that, Ms. Davidson?

8          MS. DAVIDSON:  Your Honor, I have no opposition to

9  her hearing or -- you know, we don't really care -- we didn't

10  invoke the rule, and I --

11          THE COURT:  Well, let me just -- actually, put it

12  that way.  Is there objection to this witness not being subject

13  to the rule of sequestration, in other words, being able to

14  stay in the courtroom, although you've indicated there's a

15  possibility you might want to recall her to talk about some

16  documents?

17          MS. TUCCI-JARRAF:  I'm fine with her being released.

18          THE COURT:  Okay.  Mr. Beane, do you have any

19  objection?

20          MR. BEANE:  No, I'm fine with her being released.

21          THE COURT:  Okay.  That will be allowed.

22          Thank you.

23          THE COURTROOM DEPUTY:  This honorable court shall

24  stand in recess until 1:30.

25      (Recess from 12:22 p.m. to 1:36 p.m.)

UNITED STATES DISTRICT COURT

Richard Davey - Direct Examination

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Ready with our jury in just a moment.

3      (Jury in at 1:37 p.m.)

4          THE COURT:  Thank you.  Everyone may be seated.  Ask

5  the courtroom deputy to swear in the next witness.

6          THE COURTROOM DEPUTY:  Sir, if you'll raise your

7  right hand.

8  WHEREUPON,

9                          **RICHARD DAVEY,**

10  was called as a witness and, after having been first duly

11  sworn, testified as follows:

12                      **DIRECT EXAMINATION**

13          THE COURTROOM DEPUTY:  Have a seat, please.  Please

14  state and spell your name for the record.

15          THE WITNESS:  Richard Davey.  R-i-c-h-a-r-d,

16  D-a-v-e-y.

17          THE COURTROOM DEPUTY:  Thank you, sir.

18  BY MS. DAVIDSON:

19      Q    Mr. Davey, if you could speak up a little bit.

20          So what do you do?

21      A    I am a lead for a team of security advisers that

22  oversee the authentication capabilities for USAA.

23      Q    Okay.  So you work for USAA?

24      A    That is correct.

25      Q    And which part of USAA?

UNITED STATES DISTRICT COURT

1    A    We are a security organization within the fraud

2  group.

3    Q    Okay.  And how long have you worked for USAA?

4    A    Total of 17 years.

5    Q    And what are your responsibilities in your role?

6    A    The team is responsible for authentication for all

7  members on all channels for every interaction.

8    Q    Okay.  And just tell me in layperson term what

9  authentication is.

10   A    It's using previously shared attributes, for example,

11 a password to validate a previously known identity.

12   Q    Okay.  And does USAA keep a record of the

13 authentications of its members in the system?

14   A    We do.

15   Q    And how is that record maintained?

16   A    It's maintained in a database we refer to as the

17 authentication log or auth log for short.  And that is the

18 repository that stores those authentication events.

19   Q    Okay.  And is this authentication log maintained in

20 the ordinary course of business by USAA Bank?

21   A    Yes.

22   Q    Did you download -- or let me ask you this.  Can you

23 search that log to determine that authentication of particular

24 members?

25   A    We can, yes.

Richard Davey - Direct Examination

1    Q    And did you do that for Mr. Randall Beane, member at

2  USAA?

3    A    Yes.

4    Q    Okay.  And did you provide a copy of that

5  authentication log to the United States?

6    A    I believe that was provided, yes.

7    Q    Okay.  And I'm going to show you what's marked as

8  Government's Exhibit 79.  And this is not the entire

9  authentication log, is it?

10   A    No.  This is a edited section.

11   Q    Okay.  And so it's -- it ends at 7/10/2017 and it

12  starts on the very last page.  It goes from May 11th, 2017.  Is

13  that correct?

14   A    Yes.

15        MS. DAVIDSON:  Your Honor, at this time, I'd like to

16  admit Government's Exhibit 79.

17        THE COURT:  So admitted.

18    (Government's Exhibit 79 admitted into evidence.)

19  BY MS. DAVIDSON:

20   Q    Okay.  So let's take the first page of this

21  authentication log on the screen.

22        Can you tell me what this log tells you?  And if you

23  could tell the diagrams going left to right -- I mean, the

24  columns going left to right.

25   A    Absolutely.  So what we're seeing here is the event

UNITED STATES DISTRICT COURT

Richard Davey - Direct Examination

1   date and time, the contact channel, be it telephone or

2   Internet, the source, in this case, it's the USAA mobile

3   application, the IP address, which is related to that Internet

4   connection, and then the authentication event types.

5       Q    Okay.  And so if you go to the last column, is --

6   what's the USAA number?

7       A    That is the -- the USAA customer number associated

8   with a given member.

9       Q    Okay.  And so is that number the same for every page

10  in this log?

11      A    Yes.

12      Q    Okay.  So what -- let's go down on this page to --

13  let's look on -- on the second page lower, let's start on the

14  7th, July 7th, 2000 -- and I think it's the bottom, towards the

15  end, if you could just highlight the entire row of the 7th.

16          Okay.  So what is this telling you when you look at

17  these columns?  Tell the jury what this is telling you.

18      A    So to walk through an entire authentication event, if

19  we look at the event that begins at 9:23 on 7/7.

20      Q    Okay.  I'm going to point to it with my finger, so we

21  know which one you're -- that one?

22      A    Yes.

23      Q    Okay.

24      A    So you see the mobile application, contacting USAA

25  using the Internet from the IP address 45.22.26.36, and the

UNITED STATES DISTRICT COURT

Richard Davey - Direct Examination

 1    mobile application is making the identity claim, and it's using

 2    the Quick Logon mechanism, which is built into the USAA mobile

 3    application, and the user is using a biometric fingerprint in

 4    that iPhone to complete that authentication.

 5        Q    Okay.  So can you walk me through this.  First of

 6    all, what's the -- I mean, I know what the Internet is, but

 7    explain to the jury, are there different ways of communicating

 8    with USAA?

 9        A    Absolutely.  You can use a web browser on a mobile

10    device or on a personal computer to connect to the USAA

11    website.  You can download and use the USAA mobile application

12    on a device, iPhone, Android, or iPad device.  You can call and

13    use the USAA automated voice system or you can speak with one

14    of our member representatives.

15        Q    So the Internet section, does the authentication log

16    also log the telephone calls that the customer makes?

17        A    It logs the authentication events for those channels,

18    yes.

19        Q    Okay.  So when you make a phone call, you also have

20    to go through an authentication process?

21        A    Correct.

22        Q    Okay.  And so this says that he used the Internet and

23    then what's the next, it says "Source iPhone App"?

24        A    Correct.  That's the USAA mobile application running

25    on an IOS device, an iPhone in this case.

UNITED STATES DISTRICT COURT

Richard Davey - Direct Examination

1   Q    Okay.  So that is -- this tells you that it's located

2   on a mobile device?

3   A    Correct.

4   Q    Okay.  And then the next section, "Contacting

5   Source," I don't know if the jury can see it, but this -- these

6   numbers, what is that?

7   A    That's an IP address.  It's the equivalent of a

8   unique identifier to a client that is on the Internet.  It's

9   usually assigned to modems or mobile devices, and it's just a

10  unique identifier for the client connecting to USAA at that

11  point in time.

12  Q    Okay.  And I notice that on all of the ones that

13  we're focusing on now, it's the same IP address?

14  A    Correct.

15  Q    And so is a IP address kind of like a phone number or

16  is it something -- how -- tell -- explain IP address to me.

17  A     It's an indication of the Internet connection.  So,

18  for example, if you had a home wireless network, it's possible

19  that all the devices on that network would present externally

20  the same IP address.

21  Q    Okay.

22  A    If you were using a cellular data plan, then your

23  cell phone carrier would present that IP address for that

24  device.  So IP address can vary, but it's unique at the point

25  in time that that authentication event occurred.

UNITED STATES DISTRICT COURT

Richard Davey - Direct Examination

1    Q    Okay.  And so -- and then it says a biometric

2   fingerprint.  What is that?

3    A    The biometric fingerprint in this instance on an

4   iPhone device is stored within the device.  It's validated

5   using Apple's proprietary mechanisms.  And as part of the USAA

6   application, we receive an attestation from the device that

7   says the fingerprint matched one previously registered on the

8   device.

9    Q    Okay.  And does a USAA member, you talk about

10  authentication, the way you go through it, did they create

11  passwords and things in order to be authenticated by USAA Bank?

12   A    Correct.  Initially when registering to do business

13  with us on our digital channels, that is the Internet or using

14  the mobile application, you will establish an online ID, a

15  password and a PIN for your initial authentication.  And then

16  the Quick Logon that's referenced in this log is something

17  that's built in to the USAA mobile application, and you can

18  enable that specific to that application.

19   Q    Okay.  And so if we can look -- if you could go to

20  the 5th.  Okay.  Roughly around here.

21        So what do all of these transactions tell you about

22  the transactions made on the 5th?

23   A    What we see here is a number of connections from the

24  same device using the same Internet connection coming back over

25  a period of time and successfully authenticated.

UNITED STATES DISTRICT COURT

Richard Davey - Cross-Examination

1    Q   Can you continue on that same row, David, with the

2   zoom.  I'm trying to get the whole row, all the way down to the

3   USAA number.

4        And so all of these log ins were done with this IP

5   address, this iPhone app being authenticated by USAA with the

6   member number that belongs to Randall Beane?

7    A   Yes.

8    Q   So were there any log ins to Randall Beane's account

9   during this time period by any other person that was not -- was

10  it all done by the member number 40540949?

11   A   That's what is indicated in the authentication log,

12  yes.

13   Q   Okay.  Do you know where the servers are for USAA

14  Bank?

15   A   They are in the state of Texas.

16       MS. DAVIDSON:  That's all I have.

17       THE COURT:  Thank you.

18       Cross-examination?

19       MS. TUCCI-JARRAF:  Yes.

20                    **CROSS-EXAMINATION**

21  BY MS. TUCCI-JARRAF:

22   Q   Without prejudice, I have some questions.

23       Hello, Mr. Davey.  I just wanted to ask you a

24  question to clarify, when you say "biometric fingerprint,"

25  that's data that you're receiving from Apple.  Is that correct?

UNITED STATES DISTRICT COURT

Richard Davey - Cross-Examination

1      A     We do not receive the fingerprint.  We receive an

2   indication from Apple's system running on the device that the

3   fingerprint matched one that had been previously registered on

4   that device.

5      Q     There's an actual physical fingerprint that is used?

6      A     Registered on the device, yes.

7      Q     Registered on the device.  Okay.  Again, you don't

8   see the fingerprint, you just get a confirmation that it's

9   successful and good to go?

10     A     Correct.

11     Q     Okay.

12            MS. TUCCI-JARRAF:  I don't have any further

13   questions.  Thank you.

14            THE COURT:  Thank you.

15            Mr. Beane, any cross-examination?

16            MR. BEANE:  No, thank you.

17            THE COURT:  Any redirect?

18            MS. DAVIDSON:  No, Your Honor.

19            THE COURT:  Thank you.  This witness may be excused.

20            MS. DAVIDSON:  Your Honor, may this witness be

21   released?

22            THE COURT:  Without objection, yes.

23            MS. DAVIDSON:  Your Honor, at this time, we call a

24   Mr. Lee Hancock.

25            THE COURTROOM DEPUTY:  Raise your right hand.

UNITED STATES DISTRICT COURT

1    WHEREUPON,

2                        **LEE HANCOCK,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                    **DIRECT EXAMINATION**

6              THE COURTROOM DEPUTY:  Have a seat.  If you'll scoot

7    as close as you can.  Please state and spell your name for the

8    record.

9              THE WITNESS:  Arthur Lee Hancock.  A-r-t-h-u-r,

10   L-e-e, H-a-n-c-o-c-k.

11   BY MS. SVOLTO:

12        Q    Mr. Hancock, would you tell us where you work?

13        A    Currently, I work at The Cove at Creekwood Park,

14   Lenoir City, Tennessee.

15        Q    What do you do there?

16        A    I'm a maintenance supervisor.

17        Q    How long have you have been there?

18        A    I've been there approximately six months.

19        Q    Okay.  Prior to that, July 2017, where were you

20   working?

21        A    I was at Marble Alley Lofts, Knoxville, Tennessee.

22        Q    And what did you do there?

23        A    Maintenance supervisor.

24        Q    And how long ago were you the maintenance supervisor

25   at Marble Alley Lofts?

                    UNITED STATES DISTRICT COURT

Lee Hancock - Direct Examination

1      A    They sold the property to a different owner.  They

2  had their own crew, so at that point, is when I transferred to

3  The Cove at Creekwood Park, so six months.

4      Q    And were you familiar with the recordkeeping

5  practices at Marble Alley Lofts?

6      A    I am.

7      Q    And I'm going to show you, actually, if you flip in

8  that binder right there to Exhibit 161.

9      A    Okay.

10      Q    Do you recognize that document?

11      A    Yes.

12      Q    All right.  Is that a document that's been kept by

13  Marble Alley Lofts?

14      A    It is.

15      Q    And that's kept as part of its ordinary course of

16  business?

17      A    It is.

18      Q    All right.  And was that document prepared by, at, or

19  near the time of the events that were recorded?

20      A    It was.

21      Q    And was it prepared by a person who would have

22  knowledge of the events?

23      A    It was.

24      Q    All right.  And is it the regular practice of -- is

25  it Marble Alley Lofts or did you work for a management company?

UNITED STATES DISTRICT COURT

Lee Hancock - Direct Examination

1    A    I worked for RAM Partners, LLC out of Atlanta,

2  Georgia.

3    Q    RAM Partners, what work do they do?

4    A    We actually manage the property for the owners.

5    Q    So was this record kept by RAM?

6    A    It's kept internally at each property that would have

7  the Doorking system in operation.

8    Q    You're familiar with that system?

9    A    Yes.

10   Q    Okay.  And is the regular practice to keep that

11 record?

12   A    Yes.

13   Q    Okay.

14        MR. LLOYD:  Your Honor, I can't see the --

15        MS. SVOLTO:  Can we show it to the defendant?

16        MR. LLOYD:  Thank you.

17        MS. SVOLTO:  I'd like to move to admit Government's

18 Exhibit 161.

19        THE COURT:  So admitted.

20     (Government's Exhibit 161 admitted into evidence.)

21 BY MS. SVOLTO:

22   Q    All right can you tell us what that document is?

23   A    This document is a report that shows activity for two

24 specific fobs, and they're used to enter any controlled access

25 point at the property.

UNITED STATES DISTRICT COURT

Lee Hancock - Direct Examination

1   Q    So this is a log of the fobs that were used to access

2   entry to the property?

3   A    Yes.

4   Q    And what is a fob?

5   A    A key fob is simply a unique ID tag that when you

6   walk up to the control access point, you would place it on a

7   reader, it would scan it, it would either admit or deny entry

8   into the building at specific points.

9   Q    So when the key fob is used, is there a record of the

10  time and the date?

11  A    Yes, ma'am.

12  Q    And that time and date is recorded?

13  A    It is.

14  Q    By the system kept by Doorking?

15  A    Yes.

16  Q    So when that fob is used, does it also say where it

17  is used?

18  A    It does.

19  Q    And that's where on the property?

20  A    Yes.  It's a specific relay or entry point.  It may

21  be the main entrance, a specific side door, lower door, or even

22  the control access gates that you would drive through.

23  Q    Okay.  Can you describe for us a little bit the

24  Marble Alley Lofts property, what it encompasses?

25  A    It is a downtown property, a mid-rise of five floors.

UNITED STATES DISTRICT COURT

Lee Hancock - Direct Examination

1  We have two control access gates to enter with vehicles.  And

2  probably about eight or nine different gate relay points,

3  access points.

4       Q    And each gate, when you access each gate, a record is

5  made of that access?

6       A    Yes.

7       Q    Okay.  And this record here, is this a record of all

8  the key fobs at Marble Alley Lofts?

9       A    No, ma'am.  This is specific to Apartment 365, and

10 there are two key fobs associated with 365.

11      Q    Okay.  And do you know whose Apartment 365 is?

12      A    Randall Beane's.

13      Q    Okay.  All right.  Can we look at, maybe you could

14 scroll down a little, yeah, go ahead.

15           So in the left-hand side of the column there, which

16 column is that?

17      A    On the left-hand side?

18      Q    Yeah.  Let me -- right over here.

19      A    Okay.  That would be the date.

20      Q    That's the date.  And that's the date that the fob

21 was used?

22      A    Correct.

23      Q    All right.  And the next column there?

24      A    Next column would be the time.

25      Q    All right.  Also the time the card is used?

UNITED STATES DISTRICT COURT

1    A    Yes, ma'am.

2    Q    And the "Event," what does that column indicate?

3    A    The "Event" would be whether they used a card or a

4  fob to enter.  The place where it says "Directory" would be if

5  somebody scrolled the directory and actually called a resident

6  from one of the call boxes.

7    Q    Okay.  And what about the number there that's next to

8  the event column?

9    A    The number is the specific key fob ID associated with

10  the fob itself.

11    Q    So each key fob has its own ID?

12    A    Correct.

13    Q    All right.  Even with -- if there are multiple key

14  fobs for an apartment?

15    A    Correct.

16    Q    Okay.  And then what's the "Name" column?

17    A    The "Name" column is -- we associated the apartment

18  number to the "Name" column.  So 365 would be the first fob

19  associated with that apartment.  365-2 would be the second key

20  fob assigned to Apartment 365.

21    Q    All right.  And moving over, the "Access," does that

22  indicate whether they were admitted or not?

23    A    Yes.

24    Q    And then "Relay," what does that mean?

25    A    "Relay" is the location.

Lee Hancock - Direct Examination

1    Q    Okay.  And so if we could go to maybe, you know,

2   Row 68 up?

3    A    Okay.

4    Q    There.  Can you read that?

5    A    Yes.

6    Q    All right.  We'll try to maximize it for you.  All

7   right.  So on those dates there, so there's a number of dates

8   indicated, Row 69, does that indicate July 1st?

9    A    It does.

10   Q    And card access was used?

11   A    Yes.

12   Q    All right.  And going up all the way to the 5th,

13  these are the dates and times that key fobs for 365 were used

14  to access the property?

15   A    Correct.

16   Q    All right.  If you could go up a little further, and

17  the same with all of these?

18   A    Yes.

19   Q    And so all of these dates and times are times one of

20  the key fobs was used to access the property?

21   A    Correct.

22   Q    All right.  Thank you.

23       All right.  If you could go in your book now to

24  Exhibit 131.  It's been previously marked as Exhibit 131.

25   A    Okay.

UNITED STATES DISTRICT COURT

Lee Hancock - Direct Examination

1       Q    All right.  While you're looking at it, do you

2   recognize that document?

3       A    I do.

4       Q    Is that a document that is regularly recorded by RAM?

5       A    Yes.

6       Q    All right.  And is that kept in the ordinary course

7   of business?

8       A    It is.

9       Q    And is that record kept close in time to the event

10  recorded?

11      A    Yes.

12      Q    And by someone who would have knowledge of the

13  events?

14      A    Yes.

15      Q    All right.  I'd like to move to admit Exhibit 131.

16           THE COURT:  So admitted.

17      (Government's Exhibit 131 admitted into evidence.)

18  BY MS. SVOLTO:

19      Q    So what is this document?

20      A    This is a still frame photo from our closed circuit

21  surveillance system.

22      Q    How does your closed circuit surveillance system work

23  at Marble Alley at this time?

24      A    At this time, there are approximately 50 or 60

25  cameras that are all networked together and report back to a

UNITED STATES DISTRICT COURT

Lee Hancock - Direct Examination

1    central location.  Everything is kept on a DVR that is looped

2    to record, typically five seconds prior to motion and five

3    seconds after motion.

4        Q    All right.  So is this an access point at the

5    apartment complex?

6        A    This is.

7        Q    And so if you go to the right hand, there's some

8    letters there?

9        A    Yes.

10       Q    Is that "Commerce Entrance"?

11       A    Yes.  Commerce Street entrance.

12       Q    Oh, so is that an entrance, an access to the Loft?

13       A    It is.

14       Q    Or the apartments.  Okay.  Great.

15            Looking over there, is there a date indicated?

16       A    There is.

17       Q    Is that the date the photograph was taken?

18       A    Yes.

19       Q    And how about the time?

20       A    Yes.

21       Q    All right.  Have you cross referenced the photograph

22   with the key fob entry?

23       A    Yes, I have.

24       Q    And did this match a date and time that the -- a key

25   fob was used for Apartment 365?

UNITED STATES DISTRICT COURT

Lee Hancock - Cross-Examination

1      A     Yes.

2            MS. SVOLTO:  That's all I have.  Thanks.

3            THE COURT:  Thank you.  Cross-examination.

4            MS. TUCCI-JARRAF:  Just a quick question, thank you.

5                        **CROSS-EXAMINATION**

6   BY MS. TUCCI-JARRAF:

7      Q     Without prejudice, Mr. Hancock, hi, good afternoon.

8      A     Yes.

9      Q     Can I see exhibit -- oh, sorry, 131.  I apologize.

10           Mr. Hancock?

11     A     Yes.

12     Q     Just to make sure we have all the information here,

13  I'm not sure what this event -- you mentioned an event, but as

14  far as the gentlemen in this picture, are you familiar with who

15  they are?

16     A     The gentleman on the right, standing at the corner,

17  yes.

18     Q     Okay.  And do you know who the identity is of the one

19  on the left?

20     A     I do not.

21     Q     Unidentified.  Okay.  Thank you.  I appreciate it.

22           THE COURT:  Thank you.

23           Mr. Beane, cross-examination?

24           MR. BEANE:  No, thank you.

25           THE COURT:  All right.  Redirect?

UNITED STATES DISTRICT COURT

1          **REDIRECT EXAMINATION**

2    BY MS. SVOLTO:

3         Q    So you said -- we'll keep Government Exhibit 130 --

4    131.  Thank you.

5              The individual on the photograph that's on the right

6    on the corner?

7         A    Yes.

8         Q    Do you recognize that person?

9         A    I do.

10        Q    Who is that?

11        A    Randall Beane.

12        Q    Thank you.

13             THE COURT:  Any recross?

14             MS. TUCCI-JARRAF:  No.  Thank you.

15             THE COURT:  Any recross, Mr. Beane?

16             MR. BEANE:  No, thank you.

17             THE COURT:  All right.  Thank you.

18             Without objection, this witness may be excused.

19             MS. DAVIDSON:  United States calls Jaron Patterson.

20             THE COURTROOM DEPUTY:  Raise your right hand.

21

22

23

24

25

UNITED STATES DISTRICT COURT

1    WHEREUPON,

2                          **JARON PATTERSON,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                          **DIRECT EXAMINATION**

6              THE COURTROOM DEPUTY:  Have a seat, please.

7              THE WITNESS:  Thank you.

8              THE COURTROOM DEPUTY:  Scoot as close as you can.

9    State and spell your name for the record.

10             THE WITNESS:  Jaron, J-a-r-o-n, Patterson.

11             THE COURTROOM DEPUTY:  Thank you.

12   BY MS. DAVIDSON:

13        Q    Task Force Officer Patterson, what do you do?

14        A    I am assigned to the FBI Cyber -- Knoxville Cyber

15   Task Force.  I investigate cyber matters, such as online frauds

16   and --

17        Q    Okay.  I guess where I was starting was what -- who

18   employs you directly?

19        A    I'm directly employed by the University of Tennessee

20   Police Department.  I'm deputized by the United States Marshal

21   Service as a Special Deputy U.S. Marshal, and I'm assigned to

22   the FBI.

23        Q    Okay.  And so you -- tell me about this FBI task

24   force.  Who comprises the FBI task force?

25        A    It's comprised of special agents with the FBI,

                   UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    investigators with Tennessee Highway Patrol, investigators with

2    the Knoxville Police Department, University of Tennessee Police

3    Department, and the Knox County Sheriff's Office.

4        Q    Okay.  The University of Tennessee Police Department.

5    You aren't a UT student?

6        A    No.

7        Q    Okay.  Tell me how that works.  Are you like a --

8    tell me about the UT police.

9        A    It's a state law enforcement agency.  We employ

10   roughly 54 officers.  Of that, including myself, six criminal

11   investigators about.

12       Q    Okay.  And did you go to college prior to getting

13   that job?

14       A    I did.  I attended the University of Tennessee where

15   I obtained a bachelor of arts degree with honors in psychology

16   and political science.

17       Q    Okay.  And then you went into law enforcement?

18       A    I did.

19       Q    And what kind of training have you had to be a UT

20   police officer?

21       A    I had an initial, basic police training.  And since

22   then, I've had numerous specialized trainings and criminal

23   investigations, drug recognition.  I've had training for basic

24   networking.  I've had numerous courses through the FBI for

25   cyber specific matters.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1          We partner a lot with private industry, courses such

2   as SANS, which they deal with cyber security, and I have

3   certifications through GIAC, which is Global Information

4   Assurance Certification in both -- trying to think --

5   Information Security Fundamentals and Security Essentials.

6   I've also had training from Mandiant in network traffic

7   analysis, Windows investigations, and Unix investigations,

8   which Unix would be like the operating system that Apple is

9   based on.

10          Q     Okay.  And so how long ago were you assigned to that

11  FBI?

12          A     Over two years ago.

13          Q     And what type of cases do you work at the FBI?

14          A     We deal with computer intrusions, network intrusions,

15  such as hacking.  We deal with e-mail compromises where someone

16  might access another person's e-mail account and send

17  fraudulent e-mails.  We deal with ransomware, different types

18  of viruses that -- malicious code that sends to other computer

19  networks.

20          Q     So primarily computer crimes?

21          A     Exclusively, yes.

22          Q     Exclusively.  You exclusively work computer crimes?

23          A     Yes.  There has to be some sort of cyber computer

24  nexus.

25          Q     You use the word "cyber."  What is that -- is that a

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    shortcut for something?

2        A    It would include more than just a typical e-mail or

3    type -- something is typically going to be more complex than

4    just using a computer to commit a fraud.

5        Q    So cyber is computer?

6        A    Yes.

7        Q    Okay.  And so did you get assigned to work on the

8    case against Randall Beane?

9        A    I did.

10       Q    And when did you get assigned to this case?

11       A    It was brought to our attention July 10th, 2017 -- or

12   my attention, rather.  I believe some other field office was

13   notified prior to Knoxville receiving the --

14       Q    Okay.  But you got involved.  And what primarily was

15   your work with regard to this case?

16       A    My assignment was the -- the Internet aspect of the

17   case, dealing with YouTube videos that were posted, Facebook

18   posts, and also looked at IP addresses that accessed USAA's

19   system.

20       Q    Okay.  And so did you request documents from AT&T?

21       A    I did.

22       Q    And why did you request documents from AT&T?

23       A    I was provided authentication logs from USAA that

24   showed a series of IP addresses, access Mr. Beane's USAA

25   account.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Uh-huh.

2    A    So IP addresses are public record, so we identified

3    one IP address as being associated with AT&T, and AT&T provided

4    the subscriber as being Mr. Randall Beane, at 300 State Street.

5    Q    Okay.  And I'm going to show you what's been marked

6    as -- already admitted -- Government's Exhibit 79.

7         And you referenced a authentication log from USAA.

8    Is that the document that you received?

9    A    It is.

10    Q    And on this document, does it tell you what IP

11    address accessed USAA's computer?

12    A    It does.  It's the column that says "Contacting

13    Source."

14    Q    Okay.  Did you take that document, Government's

15    Exhibit 79, and the information that you received from AT&T,

16    which has previously been admitted, and create your own

17    spreadsheet based on that information?

18    A    I did.  I added two columns to identify the service

19    provider, the Internet service provider, and the individual

20    subscriber of that service provider.

21    Q    And reviewing the spreadsheet, which you prepared,

22    which included those two admitted pieces of evidence, would

23    looking at that spreadsheet help you in your testimony?

24    A    It would.

25         MS. DAVIDSON:  Your Honor, at this time, I would like

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    to admit Government's Exhibit 78.

2            THE COURT:  So admitted.

3        (Government's Exhibit 78 admitted into evidence.)

4    BY MS. DAVIDSON:

5        Q    Okay.  If we could put it on the screen.  Now, I know

6    this is hard to look at, so bear with us.

7            Point out to me what two columns that you added.

8        A    The two columns at the right where it says

9    "Provider/Carrier" and "Subscriber."

10       Q    Okay.  "Provider/Carrier" and "Subscriber."

11           Okay.  And could you -- did you do that for every

12   single IP address that you could identify?

13       A    Yes.

14       Q    Okay.  If you could just scroll down this first

15   sheet, David, the first page.  I like it the way -- you

16   couldn't do it that way.  I'm sorry.  Just -- and then scroll

17   down.

18           Okay.  And so by using that routing number, did you

19   discover where that routing number was coming from?

20       A    Yes.  Particularly the 45 -- the IP address that

21   starts with 45.

22       Q    Okay.  If you can look -- go over -- yeah.

23       A    IP address 45.22.26.36 was identified as Randall

24   Beane at 300 State Street.  I didn't list the apartment number,

25   but AT&T records showed Apartment 365.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Okay.  And so tell me in real-world terms what this

2  means.

3    A    An IP address is basically an address for the

4  Internet.  It would be similar to if a phone is connected to a

5  phone grid, you have a phone number, your source phone number,

6  which would be your phone number and whomever you call would be

7  your destination phone number.

8         So IP address will have a source, which this is a

9  source IP address, it's where it's coming from and would have a

10 destination or contacting IP address, which would be USAA's IP

11 address.  So this is -- this is the person -- or the account

12 that's contacting USAA.

13   Q    And so in this case, does this IP address stay with

14 300 State Street?

15   A    This IP address does, according to AT&T's records.

16   Q    And so you see that IP address throughout these

17 records?

18   A    Yes.

19   Q    And so does it mean that the computer -- the Internet

20 was accessed at USAA from 300 State Street?

21   A    With this IP address, it does.

22   Q    Okay.  And so tell me what a router is.

23   A    A router is a piece of equipment that connects your

24 electronics to the Internet.  That would be the Internet facing

25 device.  So in your home, if you have a smart TV, a laptop, and

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    like a PlayStation or an iPhone, it would connect to the

2    router, if it's connected or Wi-Fi or wireless fidelity, and

3    that router is what would source -- would take your IP address

4    and send those packets to the destination.

5         Q    Okay.  And so is -- where is the router for 300 State

6    Street?

7         A    I don't know.  We didn't physically go inside his

8    residence, but it would be at that residence.  It would have to

9    be there.

10        Q    Okay.  So the router has to be somewhere at 300 State

11   Street?

12        A    Yes.

13        Q    And so is the Internet a wire communication?

14        A    It is.

15        Q    Okay.  And so the wire in this case started in

16   Knoxville at 300 State Street?

17        A    Yes.

18        Q    And then where does it go?

19        A    It would go to USAA in San Antonio.

20        Q    Okay.  And so through the server at USAA in San

21   Antonio, is that how it works?

22        A    It is.

23        Q    Okay.  So it goes from a router to a server?

24        A    It would go to USAA's router, which would be in San

25   Antonio on their -- I don't know how their network topography

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    looks, and then it would send it to their server from there.

2         Q    Okay.  So bottom line, it started in Tennessee and

3    went to Texas?

4         A    That's correct.

5         Q    Did you do any online investigations for this case?

6         A    I did.  We did some research into social media.

7    There was a website we found that was associated, or at least

8    mentioned Heather Ann Tucci-Jarraf and Randall Beane, IUV.com

9    that had YouTube videos posted on that website.  We

10   investigators viewed those videos and we took screenshots from

11   Facebook as well.

12        Q    Okay.  So did you download any videos?

13        A    I did.  We down -- we saved videos from YouTube to

14   discs.

15        Q    Okay.  And I'm going to show you what's -- the disc,

16   which is Government's Exhibit 92.

17             Okay.  Do you recognize Government's Exhibit 92?

18        A    I do.

19        Q    Is this an exact copy of the video that -- this says

20   "no video."  What is Government's Exhibit 92?

21        A    This is a recording that we believe to be from inside

22   Buddy Gregg Motor Home.

23        Q    When I say, what is it, is there any pictures?

24        A    There's no video.  It's a blank screen, but there is

25   audio that's clear.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Is it a phone call?

2    A    Yes.

3    Q    And are all the parties identified on that phone

4  call?

5    A    We identified Randall Beane, Heather Ann

6  Tucci-Jarraf.  She actually references her name and spells it

7  and refers to Randall Beane in this -- as Randall Keith Beane

8  at one point.  The parties Mr. Forbes and Mr. Nelson are both

9  mentioned who are with Buddy Gregg Motor Home, and they are on

10 a conference call with Lauren with Whitney Bank.

11   Q    Okay.  And so you -- you reviewed this disc and

12 initialed it.  Is it an exact copy of what you downloaded from

13 YouTube?

14   A    It is.

15   Q    When did you download it?

16   A    I don't recall exactly.  I know the video was

17 uploaded to YouTube July 16th, so it would have been sometime

18 after that when it was downloaded.

19   Q    Okay.  And have you recently checked to see whether

20 this file is still on YouTube?

21   A    I did.  I viewed it as recently as Monday night.  It

22 still -- was still up at that time.

23   Q    Okay.  Is this conference call Government's

24 Exhibit 8 -- 92 publicly available?

25   A    It is.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    What does the file claim to be on the YouTube

2  website?

3    A    It claims to be a conference call with Randy --

4  Randall Beane.

5    Q    And Buddy Gregg?

6    A    Yes.

7    Q    Okay.  Have you listened to that?

8    A    I have.

9    Q    And does it appear to your ear that it is in fact

10  that conference call?

11   A    It does.

12   Q    Your Honor, at this time, I'd like to admit

13  Government's Exhibit 92.

14        THE COURT:  So admitted.

15      (Government's Exhibit 92 admitted into evidence.)

16  BY MS. DAVIDSON:

17   Q    Okay.  I'm going to show you what's marked as

18  Government's Exhibit 93.  Okay.  Government's Exhibit 93,

19  another YouTube video.

20        And, again, does Government's Exhibit 93 actually got

21  video on it?

22   A    This does.  It has video and audio.

23   Q    Okay.  And can you tell me where you got this?

24   A    This was also posted to YouTube.  I downloaded it

25  from YouTube.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Okay.  And was it publicly available when you

2  downloaded it?

3    A    It was and it is still publicly available as of

4  Monday night.

5    Q    Okay.  Do you remember when you downloaded it?

6    A    No, I don't.  This was also posted either on or about

7  July 16th, and it would have been sometime after that.

8    Q    When you say "July 16th," you mean 2017?

9    A    Yes, ma'am.  That's correct.

10   Q    Okay.  And did you review the video?

11   A    I did.

12   Q    And can you identify anyone in the courtroom in that

13 video?

14   A    I can.  It was Ms. Heather Ann Tucci-Jarraf.

15   Q    Okay.  And she appears on the video.  Have you

16 reviewed that video?

17   A    I have.

18   Q    Does it in fact appear to be a conference call with

19 Buddy Gregg?

20   A    It does.  The same audio can be heard on the other

21 disc as well.

22   Q    Okay.

23   A    It's not as -- not as loud.

24        MS. DAVIDSON:  Okay.  Your Honor, at this time, I'd

25 like to admit Government's Exhibit 93.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1          THE COURT:  So admitted.

2      (Government's Exhibit 93 admitted into evidence.)

3   BY MS. DAVIDSON:

4      Q    Okay.  I'm going to show you what's marked as

5   Government's Exhibit 94.

6          And Government's Exhibit 94, what is it?

7      A    This is a merger of the two previous exhibits.  We

8   took the video file with the video and audio and we took the --

9   and by "we," I mean the FBI and United States Attorney's

10  Office, and we took the audio file from the other YouTube

11  video, you can actually piece those together and overlap the

12  audio so that the audio plays at the same time in sync with the

13  video.  So it makes it a more concise recording so you can hear

14  exactly what's going on with the conference call and view the

15  video of Ms. Jarraf on the porch.

16     Q    Okay.  And did you add or take anything away on

17  Government's Exhibit 94?

18     A    No.

19     Q    So it is the entirety of both 92 and 93 merged

20  together?

21     A    It is.  And, actually, I viewed the entirety of this

22  disc and the entirety of the other two discs to verify.

23     Q    Is that what your initials signify on this disc?

24     A    It is.

25     Q    Is there a large gap in the video?

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1      A      There is somewhat of a gap in the middle of the

2   video, yes.

3      Q      Did you do that or did anyone associated with the

4   video do that?

5      A      No.  That was present and it's still present as of

6   Monday night, the screen goes blank for a few moments, couple

7   minutes and then it comes back.

8      Q      On the YouTube video that was uploaded by someone

9   with public access?

10     A      Correct.

11     Q      So we didn't change anything?

12     A      No.  We did not.

13            MS. DAVIDSON:  Your Honor, at this time I'd like to

14   admit Government's Exhibit 94.

15            THE COURT:  So admitted.

16         (Government's Exhibit 94 admitted into evidence.)

17   BY MS. DAVIDSON:

18     Q      Okay.  So did you mention that you did some Facebook

19   research?

20     A      Yes, I did.

21     Q      Okay.  Just for the witness, can you pull up what's

22   marked as Government's Exhibit 139.

23            And what is Government's Exhibit 139?

24     A      This is a Facebook page in the name of Randy Beane

25   with Randall Beane's photograph and likeness, and he mentions

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1   that he -- on July 3rd, he says, "I just paid off all my debts

2   with my trust account.  Ask me."

3        Q    Okay.  And so did you subpoena records from Facebook

4   to determine whether in fact this was Randy Beane's account?

5        A    I did.

6        Q    And is it?

7        A    I believe so.  It has the same Internet protocol

8   address that was found in the authentication logs with USAA,

9   and then AT&T identified that IP address as belonging to

10  Randall Keith Beane at 300 State Street.

11            MS. DAVIDSON:  Your Honor, at this time, I'd like to

12  admit Government's Exhibit 139.

13            THE COURT:  So admitted.

14       (Government's Exhibit 139 admitted into evidence.)

15  BY MS. DAVIDSON:

16       Q    Okay.  If you could publish it to the jury.  Okay.

17  So 139, can you see Randy Beane's picture on this, Randall

18  Beane?

19       A    Yes, ma'am.

20       Q    And what does he say on July 3rd?

21       A    He says, "I just paid off all debts with my trust

22  account.  Ask me."

23       Q    Okay.  If you could pull up -- just look in your

24  notebook what 140 is.  Is that a continuation of the same page?

25       A    I see a 135 and 142.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    You don't have a 140?  I think it's upside down.

2  Somebody said it was upside down.  You can switch it around.

3    A    That would be part of the problem.  Okay.

4         MS. DAVIDSON:  Okay.  So at this time, I'd like to

5  admit Government's Exhibit 140, Your Honor.

6         THE COURT:  So admitted.

7    (Government's Exhibit 140 admitted into evidence.)

8  BY MS. DAVIDSON:

9    Q    Okay.  And --

10        MR. LLOYD:  Your Honor, we've not seen 140.

11        THE COURT:  Wait just a minute then.  Show it to

12 them.

13        Any objection?

14        MR. BEANE:  No.

15        THE COURT:  Thank you.  So admitted.

16 BY MS. DAVIDSON:

17   Q    If you could -- okay.  This is -- tell me how you

18 made these.

19   A    I took a screenshot, which is just like taking a

20 picture of what's on the screen at the time.

21   Q    Okay.  So when you were doing your Internet research,

22 you took a screenshot, you can do that with a computer, too?

23   A    You can.

24   Q    Is that what you did here?

25   A    I did.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Okay.  And so this is the continuation of 139?

2    A    Yes.

3    Q    And so explain how Facebook works.  You -- if you

4  could go back to 139.  Okay.

5         So can you post stuff on Facebook?  Tell me how

6  Facebook works.

7    A    Facebook is a social media platform.  You can post

8  pictures, text, video, and you can interact with other people

9  with whom you want to communicate.  You can have privacy

10 settings.  And in this case, there were no privacy settings

11 prohibiting anyone from -- with a Facebook account from going

12 to this page and viewing it.

13   Q    Okay.  So there were no privacy settings.

14 Presumably, Mr. Beane doesn't care who looks at it?

15   A    He doesn't care who sees this.  He may have something

16 that's more private, but this was open to the public.

17   Q    Okay.  So the first post we saw, which you read, if

18 you could blow that up.

19        Okay.  So "I just paid off my debts with my trust

20 account."

21        What is that called?  Can you, like, post something

22 or what does it -- how does it work?

23   A    This would just be a wall post, Facebook post.

24   Q    Okay.  What's a wall post?

25   A    What you see all these comments are essentially a

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    virtual wall.  They're just postings on a Facebook wall, just a

2    posting to the web page.

3        Q    So people can -- can others comment on the posting to

4    your wall?

5        A    Yes.

6        Q    Okay.  And if you could expand it, please.  Go back

7    to the regular.  And so if you could highlight on the comments.

8    And so this is other people commenting on his wall?

9        A    Yes.

10       Q    Is that how it works?  Okay.  If we could go to 140.

11   Okay.  If you go to the bottom of this page, please, and if you

12   could expand it.

13            And what does this say?

14       A    Steve Heather says, "Is this related to what HATJ

15   posted?"  And Mr. Beane replied, "Yes."

16            HATJ are initials for Heather Ann Tucci-Jarraf as the

17   FBI experienced on Internet postings and videos.

18       Q    Okay.  And when you researched the web, HATJ, is that

19   fairly common?

20       A    It is.

21       Q    And she refers to herself on the -- or --

22       A    In writing.

23       Q    People in the Internet refer -- use this abbreviation

24   for Ms. Heather Ann Tucci-Jarraf?

25       A    In writing, yes, we've seen that.

                    UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Okay.  Next, for your attention for the -- just the

2    witness, it is witness and defendants, 141.

3         And what is 141?

4    A    This is a screenshot from Heather Ann Tucci-Jarraf's

5    Facebook page.

6    Q    Okay.  And how do you know that this is Heather Ann

7    Tucci-Jarraf's page?

8    A    We found it pretty readily with the unique name.  I

9    issued a subpoena to Facebook, and it's listed to Heather Ann

10   Tucci-Jarraf and also her -- a phone number appears as the --

11   in the records, and that matches the phone number that we've

12   seen on an e-mail to Whitney Bank from Ms. Tucci-Jarraf where

13   she includes that in her signature line.  And also that phone

14   number is also provided in the previous exhibit on the disc

15   where -- in the video where she's on the conference -- or she's

16   on the porch speaking during the conference call, she gives

17   that phone number out as well.

18        MS. DAVIDSON:  Okay.  Your Honor, at this time, I'd

19   like to move Government's Exhibit 141.

20        THE COURT:  So admitted.

21   (Government's Exhibit 141 admitted into evidence.)

22   BY MS. DAVIDSON:

23   Q    Okay.  If you could go back outside so the -- okay.

24   So this -- what is 141?

25   A    This is a screenshot of Heather Ann Tucci-Jarraf's

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Facebook page.

2         Q    Okay.  And if we could concentrate on the post from

3    July 4th, 2017.  What does this say?

4         A    Heather Ann Tucci-Jarraf posted, "All on.  You are

5    all going faster than my fingers can type, and I love it."

6              It's a link to a YouTube video on paying bills with a

7    secret government account.

8         Q    Okay.  Let's move to Government's Exhibit 142, only

9    for the defendant and the witness, please.

10             And what is Government's Exhibit 142?

11        A    This is a screenshot of Randall Beane's Facebook page

12   where he shares the previous comment from Ms. Tucci-Jarraf, so

13   he added that post onto his page and it's a repeat.  It says,

14   "Heather Ann Tucci-Jarraf, all on."

15             MS. DAVIDSON:  Hold on a second.  Let me go ahead

16   and -- Your Honor, at this time I'd like to admit Government's

17   Exhibit 142?

18             THE COURT:  So admitted.

19        (Government's Exhibit 142 admitted into evidence.)

20   BY MS. DAVIDSON:

21        Q    So to be published to the jury, please.

22             Okay.  So this is a post by Randy Beane on the 4th,

23   2017?

24        A    It is.  He made the comment, "Trust," and then

25   posted, in addition, her earlier post from the prior exhibit.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1    Q    Okay.  And tell me how this works.  Explain to a

2  non-Facebook user how this works.

3    A    A Facebook share is taking someone else's post and

4  linking it to your page.  So it appears on your page, although

5  you didn't physically publish it.  It's --

6    Q    Is there --

7    A    -- someone else published it.

8    Q    -- an option in Facebook that says share and then --

9    A    Yes.  You can just click it.  Actually, if you back

10 out, you will see the button that says "Share."

11   Q    Can you back out, please, David?

12   A    It's right below the video.  You'll see like and

13 share.  So you -- once you click "Share," it publishes to your

14 page.

15   Q    Okay.  So explain to me, you're looking at somebody

16 else's Facebook page, and you can make it happen on your

17 Facebook page?

18   A    Yes.

19   Q    Okay.  So where did this share come from?

20   A    It came from the prior exhibit on Ms. Tucci-Jarraf's

21 page where she made that posting and embedded the picture --

22 I'm sorry, the video.

23   Q    Okay.  Could you go back out again.  And so if you

24 could expand on the total post, please, or highlight the total

25 post, make it bigger.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1          So what do we know from this?  Do we know that he

2   went on her page?

3       A    Yes.

4       Q    And how can you tell?

5       A    He would have had to go to her page to share it.

6       Q    Okay.  And so who wrote the word "Trust"?

7       A    Mr. Beane.

8       Q    And then who wrote what's under Heather Ann

9   Tucci-Jarraf's post?

10      A    Ms. Tucci-Jarraf.

11      Q    Okay.  So when you hit the "Share" button, it shares

12  identically what the prior person posted?

13      A    It does.

14      Q    Okay.  Let's move on to -- just for the witness and

15  the defendants, can you look at Government's Exhibit 143.

16          Is this another post from Ms. Heather Ann

17  Tucci-Jarraf's Facebook page?

18      A    Yes.  Yes.

19      Q    And this one is from July 4th?

20      A    Yes.

21      Q    Your Honor, at this time, I'd like to move to admit

22  143.

23      A    So admitted.

24      Q    If we could publish it to the jury.  And if you can

25  expand on the top so we see what she posted at 4:48 p.m.

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1           What does it say?

2      A    It says, "For all wondering where the Fed Res routing

3  number '021050466,' in red, on photo's right hand side of

4  Harvey's video came from:  FED RES NY assisted a servicer, a

5  payment processer, essentially, identified as Disbursing

6  Division-New York."

7      Q    And then there's a link.

8           Okay.  And then if you could unexpand it, please.

9           And then what is below that?

10     A    Below that is also a --

11     Q    Series of routing numbers?

12     A    Yes.

13     Q    Or links?

14     A    Links.

15     Q    A series of links?

16     A    They are links to what appear to be routing numbers.

17     Q    Okay.  If I could show just for the witness and the

18  defendant's view, 144.

19          And what is 144?

20     A    This is a screenshot from Randall Beane's Facebook

21  page with a photograph of an RV or a motor home.

22          MS. DAVIDSON:  Your Honor, at this time, I'd like to

23  admit 144?

24          THE COURT:  So admitted.

25

UNITED STATES DISTRICT COURT

Jaron Patterson - Direct Examination

1              (Government's Exhibit 144 admitted into evidence.)

2     BY MS. DAVIDSON:

3          Q     Okay.  When is this a post from?

4          A     This is from July 9th.

5          Q     If you could expand the post.  Okay.  Go to 145.

6                What is 145?

7          A     This is a screenshot from Randall Beane's Facebook

8     page.  It shows Randall Beane inside the motor home.  I do

9     recognize the inside of that motor home, as I was inside it

10    when we -- after it was seized.

11               MS. DAVIDSON:  Okay.  Your Honor, at this time, I'd

12    like to admit Government's Exhibit 145.

13               THE COURT:  So admitted.

14          (Government's Exhibit 145 admitted into evidence.)

15    BY MS. DAVIDSON:

16         Q     Okay.  If it could be published to the jury.

17               And so what does the post say?

18         A     It says, "The brains of the operation."

19         Q     Okay.  And if you could unexpand that, please.  And

20    then go to a post -- the first post on July 10th.

21               And what does that say?

22         A     Individual said, "Did you take possession of it yet?

23    Looks sweet!"  Mr. Beane replies, "Yes."

24               MS. DAVIDSON:  If I may have a minute.  That's all I

25    have of this witness.  Thank you.

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1        THE COURT:  Thank you.

2        Cross-examination?

3                    **CROSS-EXAMINATION**

4   BY MS. TUCCI-JARRAF:

5        Q    Without prejudice, I'll go ahead and start.

6            Mr. Patterson, okay.  If you could help us clear up a

7   little bit about your work situation here.  Might be a little

8   confusing for those who don't understand the joint task forces

9   and everything that got kind of consolidated with the --

10  starting with the Patriot Act.  So if you can kind of help us

11  here.

12           Do you currently and have always started at

13  University of Tennessee Police Department with your law

14  enforcement career?

15       A    My initial assignment was as a probation officer, but

16  as -- not relative to the FBI assignment, no.

17       Q    Okay.  As a probation officer, was it at the state

18  level or fed level?

19       A    It was county level.

20       Q    County level.  Okay.  So your first job as a law

21  enforcement besides at probation was University of Tennessee

22  Police Department?

23       A    That's correct.

24       Q    Okay.  And you had stated only that you had been with

25  the FBI for two years.  I missed what you had said as far as

                    UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1  when you started with -- how long you'd been in law

2  enforcement?

3       A    Law enforcement since 2010.

4       Q    2010.  Not including probation?

5       A    Correct.

6       Q    Okay.  2010.  So approximately seven years by the

7  time this case came on your desk?

8       A    That's correct.

9       Q    Okay.  And how long had you been with the University

10  of Tennessee?

11       A    Since 2010.

12       Q    Since 2010.  Then you stated something about U.S.

13  Marshals?

14       A    I'm deputized by the Marshals Service.

15       Q    So you are a U.S. marshal or you're just deputized by

16  U.S. Marshals so you can work with them, or how does that work?

17       A    Right.  I'm not a deputy U.S. marshal.  I'm specially

18  appointed to investigate federal crimes.

19       Q    Since when?

20       A    2016.

21       Q    2016.  Okay.  It was the -- who assigned you to the

22  FBI?  When you said you were assigned to the FBI, who assigned

23  you?

24       A    Jointly my department and the FBI.  So the University

25  of Tennessee Police Department and the FBI.

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1    Q    So they have some kind of agreement with the FBI for

2 members of the University of Tennessee Police Department to

3 work on cases with them?

4    A    Yes.

5    Q    Okay.  Are you deputized by that as well?

6    A    The FBI, to my knowledge, doesn't do deputations.

7 The U.S. Marshals Service does deputations for members of these

8 joint task forces.

9    Q    Okay.  And this joint task force that you're on with

10 the FBI, U.S. Marshals are a part of that as well?

11    A    No.

12    Q    Totally different programs?

13    A    Not on our task force.

14    Q    Okay.  And the official name of your task force

15 again?

16    A    Knoxville Cyber Task Force.

17    Q    So does the Knoxville Cyber Task Force, do you

18 actually have like an FBI or a federal agency that actually has

19 a person there at all times or --

20    A    I don't know if I understand your question exactly.

21 24/7 or --

22    Q    I'm not understanding exactly how this works.

23    A    Sure.

24    Q    You said there were about six criminal investigators

25 on your task force?

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1        A    No.  At the University of Tennessee Police

2   Department.  On -- the task force is comprised of special

3   agents with the FBI, investigators with the University of

4   Tennessee Police Department, being me, and investigator with

5   Knox County Sheriff's Office, investigator with Tennessee

6   Highway Patrol, and an investigator with Knoxville Police

7   Department.  We also have intelligence analyst, special

8   operations specialist with the FBI on the task force as well.

9        Q    Is this task force all located in one physical office

10   building or is everyone just sort of working in their -- like

11   would you have been working at University of Tennessee Police

12   Department on campus --

13        A    No.

14        Q    -- or --

15        A    Our office is all located at the FBI building in

16   Knoxville.

17        Q    Okay.  So the entire cyber task force -- Knoxville

18   Cyber Task Force that you work for is located in the same FBI

19   building?

20        A    That's correct.

21        Q    Okay.  Approximately how many are on the task force?

22   Just approximately.

23        A    Approximately maybe ten.

24        Q    Ten.  Does that include FBI Special Agent Parker

25   Still?

UNITED STATES DISTRICT COURT

1    A    No.

2    Q    How many FBI are in that cyber task force?

3    A    Special agents are probably four or five.

4    Q    So out of the ten people on the Knoxville Cyber Task

5  Force, there's four or five FBI special agents?

6    A    Correct.

7    Q    Okay.  Do you know their names?

8    A    I do.

9    Q    May we have them?

10   A    Let's see, be Robert Gladwin, Richard Lara, Jeremy

11  Allman, Daniel Damron.  He's a supervisor.

12   Q    Daniel Damron?

13   A    Yes.

14   Q    He's the supervisor?

15   A    Yes.

16   Q    Thank you.  The agents you just named, were they

17  there during the July 2017 time period?

18   A    Yes.

19   Q    So do you receive a paycheck from University of

20  Tennessee Police Department?

21   A    I do.

22   Q    Do you receive a paycheck from the U.S. Marshals at

23  all?

24   A    No.

25   Q    Do you receive a paycheck from the FBI at all?

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1     A     No.

2     Q     Okay.  You stated you were assigned to the -- excuse

3  me, to the Randall Keith Beane matter on July 10th.  You stated

4  others knew about it prior to July 10th was your comment?

5     A     May have.  It was referred from another field office.

6     Q     Do you know what field office it was referred to or

7  referred from?

8     A     I want to say New York, but I'm not entirely

9  positive.

10    Q     So from the FBI New York field office.  When you have

11 referrals come in from another field office, especially one

12 from another state, is there a written report or -- that you

13 get from that field office?

14    A     Not necessarily.

15    Q     Or just a phone call, how does that work?

16    A     It just depends.  I think this scenario, there was no

17 written report.

18    Q     So this particular instance related to Mr. Beane, how

19 did it actually work for your field office?

20    A     It was referred to an acting supervisor at the time.

21 He just made us aware of it verbally.

22    Q     Who was the acting supervisor that you're referring

23 to?

24    A     Clay Anderson.

25    Q     Clay Anderson?

UNITED STATES DISTRICT COURT

1      A      Yes.

2      Q      Thank you.  Is that with a C?

3      A      Yes.

4      Q      Is that a s-o-n?

5      A      Yeah.

6      Q      Is he still currently at your -- at the Knoxville

7 cyber unit?

8      A      He's not.

9      Q      He's not.  So acting supervisor FBI Clay Anderson,

10 where is he located?

11     A      He's at the FBI cyber headquarters now.

12     Q      And where is that?

13     A      It's a satellite office outside Washington.  I don't

14 know exactly where the building is located.

15     Q      Washington, D.C.?

16     A      Yes.

17     Q      So he's actually never been in Knoxville, when you

18 say it was referred to him, it was referred to the headquarters

19 in D.C.?

20     A      No.  He was in Knoxville.  He's just no longer in

21 Knoxville.

22     Q      Okay.  And when did he go to D.C.?

23     A      Approximately two or three months ago.  I don't

24 recall.

25     Q      Two or three months ago.  So like October?

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1      A    Perhaps.

2      Q    And do you know how long he had been with -- in the

3 Knoxville location?

4      A    I don't.

5      Q    Okay.  But he was acting supervisor when you came

6 onto the task force two years ago?

7      A    No.  He was that day.

8      Q    He was that day.  Okay.  Thank you for that

9 clarification.

10          You said that you partner -- that you made the

11 statement, we partner with private institutions?

12     A    For training.

13     Q    For training.  For any other matters?

14     A    I was speaking relative to the training that I've

15 received that wasn't law enforcement specific, but I don't know

16 about our partnership with the private sector.  I know we have

17 individuals that fill that role, but that's beyond my scope.

18     Q    Uh-huh.  These private institutions, are they

19 multinational corporations, are they banking institutions?

20 What kind of institutes -- private institutions are you

21 referring to?

22     A    I don't know.

23     Q    Okay.  Have you ever done any of the training that

24 you say that you guys get, have you done any of it?

25     A    Have I partaken training?  Yes.

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1      Q    Yeah.  Partner with private institutions, you just
2  clarified it was for training --
3      A    For training.
4      Q    -- and you don't know who does those, so I'm asking,
5  have you taken any of that training?
6      A    No.  I thought you were asking two separate
7  questions.  The training I've received was from private non-law
8  enforcement training, but separately, the FBI has people who
9  partner with the private sector, so I thought that's where you
10  were going.  I'm sorry.
11      Q    It's okay.
12      A    But, yes, I have taken --
13      Q    We'll work it out.
14      A    Okay.
15      Q    Okay.  So you've done the non-law enforcement
16  training?
17      A    Correct.
18      Q    Okay.  And when you say non-law enforcement, what do
19  you mean?  Can you give us an example?
20      A    It's not specifically geared for criminal cases.
21  It's just general networking training and ...
22      Q    Networking training, I'm -- I just want to make sure
23  we're on the right page here.  When you say networking
24  training --
25      A    Like computer networks.

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1     Q     Okay.  So cyber related?

2     A     Correct.

3     Q     Things that would enhance your abilities in your

4  cyber unit?

5     A     Correct.

6     Q     Okay.  So that would be like Facebook and when you're

7  talking about networking?

8     A     Sure.  IP addresses.

9     Q     So with a non-law enforcement training that would be

10  able to teach you IP addresses, would that be an official from

11  Apple or an official from Microsoft, is that the kind of thing

12  that --

13     A     Similar, but not necessarily Apple or Microsoft.

14     Q     I just threw out some examples --

15     A     Sure.

16     Q     -- but something similar to that, someone that

17  actually operates --

18     A     Correct.

19     Q     -- some kind of social platform type of thing?

20     A     Not necessarily social platform.  The training, yes.

21     Q     Okay.

22     A     I've never had training directly from Facebook or

23  directly from Microsoft.

24     Q     Okay.  So everything that you went over with

25  Mrs. Davidson regarding the Facebook posting, that's just based

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1    on your own experience with Facebook?

2         A    No.  I just haven't had training from Facebook.  I

3    have had training regarding Facebook, but it hasn't been from

4    Facebook.

5         Q    Who has it been from?

6         A    I had a training, was it from -- it's PATC.  It's --

7    I don't recall the -- it was some time ago.

8         Q    That's okay.  At least we have some clarification on

9    that.  Thank you.

10        A    Sure.

11        Q    I just have one quick clarification question

12   regarding the USAA authorization log that you reviewed.  Do you

13   know when you received that?

14        A    Probably July 10th or right around July 10th.

15        Q    When you say "right around," I just want to clarify,

16   could it have been possible before July 10th or are you --

17        A    No.  It --

18        Q    -- when you say right around, it could be after?

19        A    -- could have been after July 10th.

20        Q    Thank you.  Okay.  And then Exhibit 78 that she -- I

21   don't need it brought up, but Exhibit 78 had been your own

22   spreadsheet that you had done when you had added the two extra

23   columns?

24        A    That's correct.

25        Q    Okay.  When did you actually produce that?

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1    A    I don't recall.

2    Q    It would have been after, obviously, you had gotten

3    the authorization log?

4    A    It would have.

5    Q    Okay.  Do you have a report made out at all, like a

6    302 or anything like that?

7    A    I don't think I made a specific 302 for that

8    spreadsheet, but I've authored 302s in the case.

9    Q    Right.  Okay.  But none done specifically by you?

10   A    What's that?

11   Q    But you did not do any 302s --

12   A    No, actually --

13   Q    -- FBI reports for this?

14   A    Not for that spreadsheet specifically to document

15   that, but I did do 302s in the case.

16   Q    Okay.  Just going to check real quick to make sure if

17   I have any more questions.

18         On Exhibit 141, which was a -- yeah, I'll let you go

19   ahead and get it for me, thanks.  Thank you.  Okay.

20         Do you have it?

21   A    I do.

22   Q    Okay.  It says under here, "See more."  I'm confused

23   with it.  Do you have the full screenshot of it anywhere in

24   your records?

25   A    I do not.  I don't believe so, no.

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1      Q    Is there a reason why you didn't take a record of a

2  screenshot of the entire post?

3      A    I don't recall why, no.

4      Q    Okay.  Were you at the event at Buddy Gregg's on

5  July 11th, 2017?

6      A    I was.

7      Q    Okay.  You were one of the arresting officers?

8      A    No.  I wasn't an arresting officer, but I was there.

9      Q    You were on the scene.  Okay.  Do you know if there

10  was a warrant on the premises?

11      A    On the premises?

12      Q    Did you -- did the task force that went to Buddy

13  Gregg that day?

14      A    The FBI personnel who went to the scene did -- were

15  all aware there was an active arrest warrant for Randall Beane,

16  but there were no -- I don't know what you mean by "on the

17  premises."  Did we have a warrant for the premises?

18      Q    No.  Did you have a warrant for Mr. Beane with you?

19      A    I didn't have one with me, but we had knowledge there

20  was an active arrest warrant.

21      Q    And per your knowledge, what was -- who issued that

22  active arrest warrant?

23      A    I don't recall.

24      Q    And what steps, if any, did you take to confirm there

25  was an -- personally, what steps did you take to confirm that

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1   there was an active outstanding warrant?

2      A    Law enforcement personnel confirmed it, acting on

3   good faith with other law enforcement officers.

4      Q    And you said law enforcement, someone in the law

5   enforcement, who -- which -- because you work for many, or you

6   work with many that you had stated here, FBI, U.S. Marshals?

7      A    It would have been FBI.

8      Q    Do you know which law enforcement?

9      A    It would have been FBI that confirmed.

10     Q    So FBI was the one that informed you that there was

11  an outstanding warrant?

12     A    Yes.

13     Q    Do you remember specifically which FBI agent?

14     A    No.  I don't.

15     Q    And did you receive that information prior to

16  arriving to Buddy Gregg --

17     A    Yes.

18     Q    -- site?  Were you en route or were you in the office

19  when you got that?

20     A    We were in the office.

21     Q    Is there any reason why you guys didn't pull a copy

22  of that alleged active outstanding warrant?

23     A    That's not very common to take a copy.

24     Q    So it's not common to take a copy or to have a

25  warrant to show someone that you were arresting?

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1    A    The original copy would have been with the issuing

2    agency, so it was an out-of-state warrant.  The original copy

3    would have been in another state.

4    Q    In another state.  If there was an outstanding

5    warrant, do you know what kind of outstanding warrant it was?

6    A    I don't recall specifically.  It was either a failure

7    to appear or -- I don't recall specifically.

8    Q    Do you recall it was a felony warrant or --

9    A    I don't.

10   Q    -- misdemeanor?

11   A    I don't recall, no.

12   Q    Are there ways to actually check to see if there's

13   a -- any outstanding warrants, like what's your procedure?

14   A    Can either check with the operations center or

15   whoever has access to an NCIC terminal, or you can also

16   physically call the agency who issued it.

17   Q    Did you actually call the physical agency?

18   A    I did not.

19   Q    And did you check with the operations unit to see if

20   they checked the NCIC?

21   A    I don't recall if I actually talked to the operations

22   center or if another officer did.

23   Q    Are you aware of whether anybody that day that was on

24   the premises at Buddy Gregg had actually contacted the

25   operations center?

UNITED STATES DISTRICT COURT

Jaron Patterson - Cross-Examination

1    A    I don't recall who did, no.

2    Q    Okay.  And are you aware of anyone that was at the

3  Buddy Gregg in law enforcement or that was law enforcement at

4  the Buddy Gregg incident on July 7th -- excuse me, July 11th,

5  had actually requested a copy of the physical warrant from the

6  physical agency that issued it?

7    A    No, I don't recall that.

8    Q    So you're not sure if it was ever -- truly existed?

9    A    No.

10    Q    Other than relying on the statement of a fellow FBI

11  agent?

12    A    Correct.

13    Q    Couple final questions.

14        Regarding Facebook, when you went to go get those

15  snapshots, did you have to befriend myself or Mr. Randall to be

16  able to view those or it's just open?

17    A    It was just open.

18    Q    So anybody anywhere on this planet would be able to

19  see them?

20    A    Sure.  As long as they had a Facebook account.

21        MS. TUCCI-JARRAF:  Thank you.

22        THE WITNESS:  You're welcome.

23        THE COURT:  Thank you.

24        Cross-examination, Mr. Beane?

25        MR. BEANE:  No, thank you.

UNITED STATES DISTRICT COURT

Jaron Patterson - Recross-Examination

1    THE COURT:  Any redirect?

2    MS. DAVIDSON:  Just briefly.

3                    **REDIRECT EXAMINATION**

4  BY MS. DAVIDSON:

5    Q    Was there a warrant to arrest the defendant Randall

6  Beane?

7    A    Yes.

8    THE COURT:  Thank you.

9    Any recross on the redirect?

10    MS. TUCCI-JARRAF:  Yeah.

11                    **RECROSS-EXAMINATION**

12  BY MS. TUCCI-JARRAF:

13    Q    You just stated that there was a warrant.

14    A    Yes.

15    Q    Okay.  And that sole -- that statement that you've

16  just made is that still solely based on the fact that you were

17  only told by an FBI agent that it existed?

18    A    Correct.

19    Q    And you don't know who that FBI agent is that told

20  you that?

21    A    Not since then, no.

22    MS. TUCCI-JARRAF:  Thank you.  No further questions.

23    THE COURT:  Any recross, Mr. Beane?

24    MR. BEANE:  No, thank you.

25    THE COURT:  All right.  Thank you.  This witness may

UNITED STATES DISTRICT COURT

Jaron Patterson - Recross-Examination

1    be excused.

2              THE WITNESS:  Thank you.

3              MS. DAVIDSON:  Mr. Jerald Byrne.

4              THE COURT:  All right.  We're going to take a short

5    break.

6              MS. DAVIDSON:  Okay.

7              THE COURT:  Let him take a seat.  A break has been

8    requested, so we'll go ahead and take our break.

9         (Jury out at 3:00 p.m.)

10             THE COURTROOM DEPUTY:  This honorable court shall

11   stand in recess until 3:15.

12        (Recess from 3:01 p.m. to 3:19 p.m.)

13             THE COURTROOM DEPUTY:  Please come to order.

14             THE COURT:  All right.  Bring in our jury and the

15   next witness.

16        (Jury in at 3:20 p.m.)

17             THE COURT:  Thank you.  Everyone may be seated.

18             Swear in the next witness.

19             THE COURTROOM DEPUTY:  Sir, if you'll raise your

20   right hand.

21

22

23

24

25

UNITED STATES DISTRICT COURT

1  WHEREUPON,

2  **JERALD BYRNE,**

3  was called as a witness and, after having been first duly

4  sworn, testified as follows:

5  **DIRECT EXAMINATION**

6  THE COURTROOM DEPUTY:  Have a seat, scoot as close as

7  you can.  Please state and spell your name for the record.

8  THE WITNESS:  My name is Jerald Byrne.  J-e-r-a-l-d,

9  B-y-r-n-e.

10  BY MS. SVOLTO:

11  Q   Hi, Mr. Byrne.

12  Can you tell us where you work?

13  A   I work at Buddy Gregg RV.

14  Q   What do you do there?

15  A   I'm the general sales manager.

16  Q   What does a general sales manager do at Buddy Gregg?

17  A   Quite a bit.  We work all the sales from beginning to

18  end with the customers and the sales people.

19  Q   Can you speak up just a little bit?

20  A   Sure.  We -- we work all the deals from beginning to

21  end with the customer and the sales people.

22  Q   And what do you sell at Buddy Gregg?

23  A   Motor homes.

24  Q   And how long have you worked there?

25  A   A little over two years.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    And where did you work before that?

2    A    A place called Boat-N-RV Warehouse.

3    Q    Were you in sales there too?

4    A    I was.

5    Q    How long have you been in sales?

6    A    Almost 31 years.

7    Q    And where is Buddy Gregg located?

8    A    It's off Snyder Road in Farragut, Tennessee.

9    Q    And were you working at Buddy Gregg in July 2017?

10   A    Yes, ma'am.

11   Q    And in what capacity did you work there?

12   A    I was the general sales manager.

13   Q    That was your title then as well?

14   A    Yes, ma'am.

15   Q    Sir, are you familiar with people who come in to

16   purchase motor homes?

17   A    Very.

18   Q    And what kind of motor homes do you sell there?

19   A    Anything from travel trailers to $800,000 motor

20   homes.

21   Q    Are you familiar with someone by the name of Randall

22   Beane?

23   A    I am.

24   Q    And how did you become familiar with him?

25   A    He was a client that came in to purchase a motor

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    home.

2        Q    And do you remember when about he came in to look at

3    motor homes?

4        A    Originally, I believe it was the 6th of July when he

5    came in.

6        Q    And he came in -- he came around the 6th and that was

7    the first time he came to look at motor homes or roughly?

8        A    Yes.

9        Q    All right.  And did Beane purchase any motor homes?

10       A    He did.

11       Q    Okay.  And what kind of motor home did he purchase?

12       A    Entegra Cornerstone.

13       Q    And how did he purchase the motor home?

14       A    He purchased it with wiring -- wired cash.

15       Q    Did he finance the motor home?

16       A    No, ma'am.

17       Q    All right.  I'm going to look at documents that are

18   going to be on your screen.  I'm going to ask you to take a

19   look at those documents.  They have been marked for

20   identification purposes.  Starting with Exhibit No. 95.

21       A    That's an odometer disclosure.

22       Q    Do you recognize document, 96?

23       A    Yes.  That's a transfer to Whitney Bank.

24       Q    All right.  98 -- or I'm sorry, not 98.  99?

25       A    That's a checklist when we -- whether we finance a

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    deal or whether it's a cash deal, and we use it as a checklist

2    to go over it to see what the customer's requests are.

3         Q    You just have to look at these and tell me if you

4    recognize them.

5         A    Yes, I do.

6         Q    And Government's Exhibit 100?

7         A    Yes.

8         Q    You recognize that document?

9         A    I do.

10        Q    And Government's Exhibit 101?

11        A    I do.

12        Q    And Government Exhibit 102?

13        A    I do.

14        Q    Government's Exhibit 103?  And these are all

15   previously marked.

16        A    I do.

17        Q    Previously marked Exhibit 104?

18        A    I do.

19        Q    105?

20        A    I do.

21        Q    106?

22        A    I do.

23        Q    108, 109?

24        A    I do.  I do.

25        Q    And 110?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    A    I do.

2    Q    111?

3    A    Yes, ma'am.

4    Q    112?

5    A    I do.

6    Q    113?

7    A    I do.

8    Q    114?

9    A    I do.

10   Q    115?

11   A    I do.

12   Q    116?

13   A    I do.

14   Q    117?

15   A    I do.

16   Q    118?

17   A    I do.

18   Q    119?

19   A    I do.

20   Q    120?

21   A    I do.

22   Q    121?

23   A    I do.

24   Q    122?

25   A    I do.

UNITED STATES DISTRICT COURT

1    Q    123?

2    A    I do.

3    Q    124?

4    A    I do.

5    Q    125?

6    A    I do.

7    Q    126?

8    A    I do.

9    Q    127?

10   A    I do.

11   Q    128?

12   A    I do.

13   Q    129?

14   A    I do.

15   Q    And 130?

16   A    I do.

17   Q    And are those documents kept by Buddy Gregg?

18   A    They are.

19   Q    Are you familiar with the recordkeeping practices of

20   Buddy Gregg?

21   A    I am.

22   Q    And are these documents kept in the ordinary course

23   of Buddy Gregg's business?

24   A    They are.

25   Q    And are you familiar with whether the recordkeeper

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    had knowledge of the events at the time that this record was

2    created?

3         A    Yes, ma'am.

4         Q    And were these records created at the time the events

5    occurred?

6         A    They were.

7         Q    Okay.  Thank you.  We'd ask to admit exhibits --

8    Government Exhibits 96, 98, 100, 101, 102, 103, 104, 105, 106,

9    108, 109.

10             THE COURT:  109 through 130 after that?

11             MS. SVOLTO:  Yes, I believe that's correct.

12             THE COURT:  You didn't say -- I want to make sure,

13   you started out, I think you showed the witness 95, 96, 97, 99.

14             MS. SVOLTO:  Yes, yes, Your Honor.

15             THE COURT:  Let me back up a little bit.  I wrote

16   down 95 through 130 except for 107.

17             MS. SVOLTO:  Yes and 98, Government Exhibit 98.

18             THE COURT:  Is that -- make sure we're all on the

19   same page.  Is it 95 -- all of 95 through 130 except for 107,

20   or did I miss it?

21             MS. SVOLTO:  Yes, there's not -- we are not admitting

22   Government Exhibit -- marked Exhibit 98.

23             THE COURT:  95 through 130 with -- except for 98 and

24   107.  Is that correct?

25             MS. SVOLTO:  Correct, Your Honor.  That's correct.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1          THE COURT:  Any objections?

2          MS. TUCCI-JARRAF:  There was not shown 97.  I have no

3    97, no 98, no 107, no 105.

4          MS. SVOLTO:  95, 96.  Could you show 96 just to the

5    witness?  95 -- you saw 95.

6          MS. TUCCI-JARRAF:  I got -- I wrote them down as you

7    went through them.  I got 95, 96, 99, 100, 101, 102, 103, 104,

8    then it jumps to 108, 109, 110, and then from there, it goes

9    all the way to 130.

10          THE COURT:  Why don't you --

11          MS. SVOLTO:  I'll say them out if that --

12          THE COURT:  These all seem to be related to this same

13   transaction, and the witness has testified they are business

14   records of the company, so just want to make clear for the

15   record we have the right numbers.  Am I correct that it's 95

16   through 130 except for 98 and 107?

17          MS. SVOLTO:  There is not -- there is no 97.

18          THE COURT:  Is there a 98?

19          MS. SVOLTO:  No.

20          THE COURT:  There's not a 97, there's not a 98, and

21   there's not a 107.

22          MS. SVOLTO:  That is right.

23          MS. TUCCI-JARRAF:  So there is a 105 and a 106?

24          MS. SVOLTO:  There is a 105 and 106.  Correct.

25          THE COURT:  All right.  So the Court will admit

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Documents 95 through 130 with the exception of the following

2    numbers, 97, 98, and 107. If we need to double-check that at

3    the conclusion of the day's proceedings, we can do that.

4            Go ahead Ms. Svolto.

5        (Government's Exhibit 95, 96, 99 through 106, and 108

6    through 130 admitted into evidence.)

7    BY MS. SVOLTO:

8        Q    So, Mr. Byrne, are these records, which I've now

9    moved into evidence, are these records, records that pertain to

10   the purchase of the motor home that Randy Beane, the Defendant

11   Beane purchased?

12       A    Yes, ma'am.

13       Q    Okay. So let's talk about some of these documents.

14            If we could have Exhibit 95.

15       A    Okay.

16       Q    All right. What is this exhibit?

17       A    That's an odometer disclosure.

18       Q    Okay. And Exhibit 96?

19       A    That is a wire transfer to Whitney Bank.

20       Q    All right. And so you mentioned earlier that

21   Mr. Beane purchased the motor home with a wire transfer?

22       A    Yes, ma'am.

23       Q    And so -- but this document, though, if you take a

24   look at the account information, name and address on the

25   right-hand side?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1      A     Yes, ma'am.

2      Q     All right.  And so does this document identify the

3  account holder here?

4      A     It does.

5      Q     And that's Buddy Gregg.  Right?

6      A     Yes, ma'am.

7      Q     Okay.  It has a Lafayette, Louisiana address?

8      A     Yes, ma'am.  That's where the corporate location is.

9      Q     Does this document signify that Buddy Gregg has an

10 account at Whitney Bank?

11     A     Yes, ma'am.

12     Q     All right.  Let's move to Exhibit 99.

13           What is this document?

14     A     This here is what we use to kind of complete the flow

15 of the transaction with the customer.  It identifies whether or

16 not he's financing or paying cash, what has been received, and

17 it will tell at the bottom, you know, where to -- where to put

18 the title in, is it going into, you know, his name or a trust

19 name or someone else's.

20     Q     Okay.  So is this document filled out at the time the

21 seller comes in -- or the buyer comes in to purchase?

22     A     Yes, it is.

23     Q     So this is filled out at the time of purchase?

24     A     It is.

25     Q     Okay.  Could we look at the date?

UNITED STATES DISTRICT COURT

1     A     7/7.

2     Q     Okay.  So is that the date that Beane came in and

3 purchased the motor home?

4     A     Correct.

5     Q     You said he first game in on the 6th.  Correct?

6     A     That's right.

7     Q     All right.  Can we go to Exhibit 102, please.

8           Okay.  What is this document?

9     A     This here is a copy of the credit card receipt for

10 the deposit on the -- on the Cornerstone.

11     Q     So the Cornerstone is the motor home.  Right?

12     A     Yes, ma'am.

13     Q     So Beane put down a deposit on the motor home.  What

14 date was that?

15     A     Trying to see the date on here.

16     Q     It should be on the left-hand side with the receipt.

17     A     Yeah.  My eyes aren't that good.  7/6.

18     Q     That's 2017.  Correct?

19     A     Yes, ma'am.

20     Q     So how did he put down the deposit?

21     A     Would have been a credit card.

22     Q     Okay.  All right.  If we could go to Exhibit 100.

23           All right.  What is this document?

24     A     That's a purchase order.  It's a purchase order with

25 the -- with Randall and what the trust name is on it.

Jerald Byrne - Direct Examination

1    Q    And so in this, what's the buyer's name?

2    A    It's Randall Keith Beane Duly Factualized.

3    Q    Who provides this information on this form?

4    A    That would be the customer, Randall Beane.

5    Q    And this is on which date?

6    A    This is on, forgive me, I can't -- oh, there it is,

7    7/7.

8    Q    Okay.  So he filled out this form on July 7th and it

9    has the names "Duly Factualized"?

10   A    Correct.

11   Q    Can we go back to exhibit -- the previous exhibit, it

12   was 102.  All right.  And then, I'm sorry, 100, please.

13        All right.  On this document, is there a signature on

14   this?

15   A    It is.

16   Q    And what's the signature on the bottom there?

17   A    That's the signature of the manager.

18   Q    Okay.  And so what was the retail price of the motor

19   home?

20   A    The MSRP was 675,456, a discount of 206,333, selling

21   price of 469,123.  Correct.

22   Q    All right.  So it says a total down payment of

23   $20,294.39?

24   A    I'm sorry?

25   Q    If you go to the "Down Payment" right above the "Sub

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Total" on the -- all the way down.  Yeah.  It's okay.

2          Got a down payment, so those were -- were there

3    additional down payments in addition to the 10,000?

4    A    No, ma'am.  Well, there was a check wrote for a

5    extended service contract with the taxes --

6    Q    Okay.

7    A    -- which -- yes.

8    Q    If we could go to -- back to Exhibit 99.  And so this

9    is the finance sheet that indicated that he didn't take any

10   financing options?

11   A    Correct.

12   Q    But you made a notation at the bottom.  Was that a

13   notation from a Buddy Gregg employee?

14   A    That was a notation by the -- yes, Buddy Gregg

15   employee.

16   Q    Based on what information?

17   A    It would have been issued to Randall.

18   Q    And this was filled out again on the 7th.  Correct?

19   A    Correct.

20   Q    All right.  Let's just move forward to Exhibit 101.

21        And what's this document?

22   A    That's Randall's driver's license.

23   Q    And do you have all of the buyers provide their

24   driver's licenses at the time of sale?

25   A    Yes, ma'am.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    Does it indicate an address on his driver's license?

2    A    Forgive me.  I'm sorry.

3    Q    I'm sorry.  Does it indicate the address on the

4    driver's license?

5    A    Yes, ma'am.  Yes, ma'am.

6    Q    All right.  That's the 300 State Street, Apartment

7    365?

8    A    Yes, ma'am.

9    Q    And Beane provided you with his driver's license?

10   A    He did.

11   Q    Now, did you deal with Mr. Beane directly during the

12   sale process?

13   A    I did.

14   Q    And what did you -- what did you learn from your

15   discussions with Mr. Beane about the purchase of this motor

16   home?

17   A    That -- I'm -- forgive me, I'm not quite sure.

18   Q    Well, when Mr. Beane came looking for a motor home,

19   did he tell you what the purpose was or anything like that?

20   A    Yeah.  That he was going to do some traveling

21   throughout the country, and, you know, that he's done things,

22   you know, throughout the west coast of the country.

23   Q    All right.  Let's go through some more documents.

24   Let's go to Document 108.

25        So what's this document?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1      A      That document would have been the remaining balance

2  after the wire transfer and the $10,000 down.  This would have

3  been payment for the extended service contract.

4      Q      Okay.  So the service contract included in that

5  amount on the purchase agreement, it was a deposit of 10,000

6  that came from the credit card.  Is that correct?

7      A      Correct.

8      Q      And then there's this check for the rest of the

9  warranty?

10     A      Correct.

11     Q      Okay.  And when was this check written?  Can you read

12  the date on there?

13     A      Seven -- July 7, 2017.

14     Q      Okay.  If we could focus on the name of the check

15  there?

16     A      It's Randall Keith Beane.

17     Q      All right.  And there's a signature and a reference

18  line?

19     A      Yes, ma'am.

20     Q      Okay.  Great.  So did Buddy Gregg cash this check?

21     A      They put the check through, yes, ma'am.

22     Q      Okay.  But was the check ultimately deposited?

23     A      It was rejected.

24     Q      Okay.  And were you -- you had --

25     A      Forgive me.  This check was not deposited.

UNITED STATES DISTRICT COURT

1    Q    Okay.  Why wasn't it deposited?

2    A    That the -- looks like the -- to hold the check until

3  the 10th and he would let us know when we could run it.

4    Q    Okay.  And did you guys ever run that check?

5    A    You -- would you by any chance have a calendar?

6    Q    I do.

7    A    May I?

8    Q    Would this be to refresh your recollection?

9    A    Yes, it would.

10        MS. SVOLTO:  May I approach -- put it on the Elmo.

11        THE COURT:  We'll put it on the screen.  Thank you.

12  BY MS. SVOLTO:

13    Q    It will come up on your screen.

14    A    We would not have -- we would not have deposited

15  that.

16    Q    All right.  If we could look at Government's

17  Exhibit 109.  And what is this document?

18    A    That is -- that's something that we present to a

19  customer with the options of the extended service contract.

20    Q    Did Randall Beane choose any of these options?

21    A    He chose the platinum coverage.

22    Q    Okay.  Is that the more expensive of those coverages?

23    A    Yes, ma'am.

24    Q    How much is that?

25    A    $10,480.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    And did the customer sign that as well?

2    A    He did.

3    Q    All right.  If we could look at the signature line?

4    A    Yes, he did.

5    Q    And this was on July 7, 2017?

6    A    Yes, ma'am.

7    Q    All right.  Looking at Government's Exhibit 110.

8    A    Okay.

9    Q    All right.  What's this document?

10   A    That is the contract for the extended service

11   contract.  It was wrote through Cornerstone RV.

12   Q    It's in Randy Beane's name?

13   A    Yes, ma'am, it is.

14   Q    And there's a signature as well?

15   A    There is.

16   Q    And was this also filled out on July 7th, 2017?

17   A    It was.

18   Q    It was?

19        Okay.  Exhibit 111.

20        And what is this document?

21   A    That's -- it's wrote through Safe Harbor, it's for

22   wheel and tire coverage.

23   Q    The information on here was also provided by the

24   customer?

25   A    Yes, ma'am.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    That has Randy Beane on there?

2    A    It did.

3    Q    There's also a signature on the bottom?

4    A    There is.

5    Q    Government's Exhibit 112.

6    A    Okay.  That's for paint and fabric, kind of like rust

7    and dust, take care of the --

8    Q    Are these standard options for folks buying motor

9    homes?

10   A    They are.

11   Q    This was filled out on or about July 7, 2017 as well?

12   A    Yes, ma'am.  They would have all -- yes.

13   Q    Okay.  Government Exhibit 113.

14        What's this document?

15   A    Delivery -- it's basically consent for storage,

16   saying that the customer took delivery of the unit, and that is

17   being stored on the premises until they took final.

18   Q    All right.  Also indicates an agreement between Randy

19   Beane and Buddy Gregg.  Correct?

20   A    Correct, yes, ma'am.

21   Q    And signed by Randall Beane?

22   A    It is.  Yes, ma'am.

23   Q    And Government Exhibit 114.  And what is this

24   document?

25   A    It's errors and omission.  In other words, if we

UNITED STATES DISTRICT COURT

1    needed any additional signatures from the customer, that they

2    agreed to come in and sign any additional information.

3        Q    Okay.  And then what is Government's Exhibit 116?

4        A    That's what we consider a worksheet.  It's what we

5    call a four square.  It's what you work any information for the

6    customer.  So we have it when we go to -- when we go to build

7    the deal.

8        Q    All right.  So is this a worksheet that's filled out

9    at the time a customer first comes in?

10       A    Yeah.  It's filled out by a salesperson.

11       Q    And with information provided by the customer?  At

12   least --

13       A    Yes, the customer give them all the information.

14       Q    All right.  If we could look at the date and name

15   again?

16       A    The date is 7/5.  That isn't what we have on records,

17   which means the salesman just unfortunately didn't know what

18   day it was.

19       Q    Okay.  So your recollection is that he first came in

20   on the 6th?

21       A    Yeah.  Everything is time stamped in the computer.

22   It showed 7/6.

23       Q    All right.  And if we could look on some of the notes

24   down -- the note section.

25       A    Okay.

UNITED STATES DISTRICT COURT

1    Q    All right.  So were these notes filled out by the

2 salesman?

3    A    It would have been.  It would have been information

4 they got from Randall in order to get, you know, to start

5 qualifying the customer for what they wanted.

6    Q    So there's an indication, if you could highlight

7 "Cash Deal."

8    A    "Cash Deal Trust Fund."

9    Q    Right.  And so what was the understanding of that

10 notation?

11   A    That he wasn't sure whether it was going to be in the

12 trust or whether it was going to be just put in Randall's name,

13 that he was going to discuss that, and --

14   Q    And so the salesman was going to discuss that?

15   A    No.  Randall was going to discuss that with --

16 with -- I would -- I can only assume that he would have

17 discussed it with, you know, whether it be an accountant or

18 attorney or --

19   Q    So he indicated a cash deal would be in a trust

20 fund -- possibly in a trust fund?

21   A    Possibly in a trust fund, yeah.

22   Q    And then there's a sticky note, it appears, on the --

23   A    Yeah, that's an e-mail address for Randall.

24   Q    Okay.  That's his e-mail address he provided?

25   A    Correct.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    Okay.  Government's Exhibit 117.

2    A    That's a title from the manufacturer, certificate of

3    origin and bill of sale.

4    Q    Those are provided to you by the manufacturer?

5    A    Correct.

6    Q    118?

7    A    That's a -- it's for the chassis of the vehicle.

8    Q    So there's a separate --

9    A    There is.

10    Q    -- one for the chassis and one for the motor home?

11    A    Yes, ma'am.  There's two VINs, one for the cabin and

12    one for the chassis.

13    Q    Now, if someone purchases a vehicle, do they get --

14    do they obtain the certificate of origin?

15    A    They do.

16    Q    And it's provided to them as soon as payment is

17    complete?

18    A    Yes.  As soon as everything is cleared.

19    Q    And so -- as soon as everything is cleared, meaning

20    all the funds are --

21    A    The titling and such like that.

22    Q    Okay.  Okay.  Could we go to Exhibit 119.

23    And what is this exhibit?

24    A    That there looks like the back of a title.

25    Q    Is that the back of the title to the motor home?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    A    Yes, ma'am.

2    Q    That is filled out with information or --

3    A    Provided by Randall.

4    Q    Okay.  Could we highlight the name of the purchaser,

5    please, in the middle of the page.

6         Okay.  And who is the purchaser -- what's the name of

7    the purchaser line there?

8    A    It's "Randall Keith Beane Duly Factualized."

9    Q    And he gave you that information?

10   A    He did.

11   Q    When did he give you that information?

12   A    That would have -- if I could go back to the

13   calendar.

14   Q    Oh, sure.

15   A    We would have had to have a copy of it on the 7th, so

16   it would have been -- our first copy would have been on the

17   7th, on Friday.

18   Q    Friday, the 7th?

19   A    Yes, ma'am.

20   Q    Could we go to Government Exhibit 121?

21        All right.  And what is this document?

22   A    Can I have it enlarged?

23   Q    Can you enlarge the top?

24   A    Oh, it's for sales tax.

25   Q    All right.

UNITED STATES DISTRICT COURT

1    A    The State of Tennessee.

2    Q    So it's a sales tax form?

3    A    Correct.

4    Q    And what's the -- could we focus on the name portion

5    of that document?

6    A    Okay.  It's -- it's "Randall Keith" -- it's only

7    allowing a certain number of characters for the State of

8    Tennessee, so it would have gotten -- "Duly" would have --

9    would have been for the -- for the trust.

10    Q    And so did you talk to Mr. Beane about the trust and

11    what he wanted with that?

12    A    Yes.  That he wanted to -- he wanted to title the

13    coach in the name of the trust.

14    Q    All right.  So is this the -- this revenue form,

15    it's -- this one is for the motor home?

16    A    It is.

17    Q    Okay.  And there's a separate one for the -- is there

18    a separate one for the chassis or --

19    A    No, ma'am, no.

20    Q    So in this one, the Randall Keith Duly was how he

21    wanted it titled?

22    A    It would have been "Duly Factualized."  We present

23    the back of the title to help do that.  This is all they can

24    provide, the number of characters to the motor vehicle for --

25    for the -- it shows for registration and title.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    All right.  Document 122.

2    A    That's a power of attorney.

3    Q    And why do the customers fill these out?

4    A    They use it so in the event there's any mistakes made

5    with the titling of the registration of the vehicle, that we

6    have the ability to change it for the customer.

7    Q    Okay.  And let's look at the date and name, please.

8    A    That's on 7/7/2017.

9    Q    And the name used was "Randall Keith Beane Duly."

10   A    "Duly."  Correct.

11   Q    Is that field also limited by number of characters?

12   A    It is.

13   Q    So did you understand whether he wanted it "Duly

14   Factualized"?

15   A    It would have been "Duly Factualized."  It would have

16   been the same as what was on the back of the title.

17   Q    Okay.  Now, I'd like to go to Government's

18   Exhibit 123.

19        All right.  What is this document?

20   A    That is the original -- that would have been the

21   original purchase order prior to -- prior to changing it to

22   the -- in the name of the trust.

23   Q    All right.  So the buyer on this is indicated in --

24   A    Is Randy Beane.

25   Q    Randy Beane.  All right.  That's on the 7th also?

UNITED STATES DISTRICT COURT

1     A    Correct.

2     Q    Okay.  And so the -- the sticky note there in the

3  middle or what appears to be a copy of a sticky note, was

4  that --

5     A    Just a note that he wanted to put it in the trust's

6  name.

7     Q    That's Buddy Gregg's note, and it's based on what

8  Mr. Beane had indicated?

9     A    Correct.

10    Q    All right.  So this was the first purchase agreement

11 that was filled out?

12    A    That would have been the first purchase agreement.

13    Q    And then did Buddy Gregg change the name on there per

14 Mr. Beane's instruction?

15    A    Correct.

16    Q    All right.  Did he come back later on the 7th and ask

17 for that?

18    A    Yes.  They were -- there's a discussion with Randall,

19 and I -- I'm not sure what the last -- it was Heather who was

20 one of the -- I guess one of his attorneys or contacts for

21 that.  They discussed whether or not to put it in the trust's

22 name.  Then they went and retrieved the trust and brought it in

23 for -- you know, for us to change the documents.

24    Q    Okay.  And so was this the conversation that took

25 place in your office?

Jerald Byrne - Direct Examination

1      A    It did.

2      Q    And you were present during that conversation?

3      A    Yes, ma'am.

4      Q    And you understood that Mr. Beane was talking to an

5   attorney?  Was that your understanding?

6      A    Yeah.  One of his contacts to say how to -- that

7   happens frequently where they use either an accountant or an

8   attorney or someone with the -- you know, with some good

9   guidance.

10     Q    Okay.  So you said that -- so was it later that day

11  that they -- a trust was provided to you?

12     A    It was.

13     Q    And Beane provided you that trust?

14     A    Yes, ma'am.

15     Q    Okay.  If we could go to Exhibit 105.  And is this

16  what was provided to you?

17     A    Yes, ma'am.

18     Q    All right.  If we could take a look at Paragraph 1 of

19  this document.

20          And so when he provided the trust, did you review it?

21     A    Yes.  We looked it over.

22     Q    All right.  And if we could go down to the first

23  numbered paragraph there.

24     A    Okay.  That's the -- that's the unit he purchased.

25     Q    All right.  And if you just want to scroll down.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1        Was this trust provided after payment was made to

2   Buddy Gregg?

3        A    Yes, ma'am.

4        Q    Okay.  And so it indicates some payment information

5   in there and so forth?

6        A    Correct.

7        Q    All right.  And what was your take of what this is

8   there on the bottom that's highlighted?

9        A    The fingerprint?

10       Q    Yes.

11       A    It indicates that he is the -- he's the only one that

12  can make decisions for the trust.

13       Q    Okay.  And so are there fingerprints on every page of

14  this document?

15       A    You know, I believe there is, yes, ma'am.

16       Q    Okay.  Can you go to Page 2 of that document.

17       A    Yes, ma'am.

18       Q    Okay.  So once this document was provided --

19       A    It allowed us, gave us permission to change it into a

20  trust's name.

21       Q    Okay.  And so then after the trust documents were

22  provided, you then wanted -- okay.  So after the trust

23  documents were provided, that's when you initially were going

24  to put the title in the factualized trust name?

25       A    The trust's name.  Correct.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    So let's look at the signature line here.

2    A    Okay.

3    Q    Okay.  If we could -- right.  So can we scroll out

4   just a little on that to widen it so we can get to the end of

5   that page?

6    A    This is the second -- this is the second copy of the

7   trust.

8    Q    Okay.  So you got two copies of the trust?

9    A    We did.  And this here is a copy, if I remember

10  correctly, it had red dye, red dye on the thumbprint.  It was

11  on the 11th, which would have been, I believe, if I may see the

12  calendar again, would have been on a Tuesday.  Yes.  That's

13  right.

14   Q    Okay.  So this trust was provided to you on Tuesday,

15  July 11th?

16   A    Correct.  With the red dye on the thumbprint.

17   Q    Okay.  And so underneath the signature line there

18  right near the thumb print, it does indicate a lawyer, Heather

19  Ann Tucci-Jarraf?

20   A    Heather Ann, yeah.

21   Q    Was that the lawyer you understood to be representing

22  Randall Beane at this time?

23   A    Yes.  We spoke to her on, I believe, Monday and

24  Tuesday.

25   Q    Okay.  And so in a different factualized trust, was

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    it identical to this factualized trust?

2         A    Yes.

3         Q    Except for the color of the thumbprint?

4         A    Yeah.  There was a black print on one and a red print

5    on the other.

6         Q    Okay.  So after getting the original factualized

7    trust the first time, that was on the July 7th?

8         A    Yes, ma'am.

9         Q    Is that when you changed the name on the purchase

10   agreement?

11        A    That's what we did, yes.

12        Q    So the purchase agreement name was changed on

13   July 7th?

14        A    Correct.

15        Q    Could we go quickly to Government Exhibit 100.

16   Highlight the buyer.

17             So is this the second purchase agreement that --

18        A    That's the second purchase agreement.

19        Q    And that Buddy Gregg produced?

20        A    Correct.

21        Q    This was after getting a factualized trust from the

22   defendant?

23        A    Correct.

24        Q    And the defendant later also provided a second copy

25   of the factualized trust?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    A    Correct.

2    Q    With a red thumbprint as you understood?

3    A    With a red thumbprint.

4    Q    Could you go to Government Exhibit 124.

5         This says, "Randy Beane."  This looks like another

6    purchase agreement.  Is this the same purchase agreement?

7    A    That's the first purchase agreement before we had any

8    documentation of the trust.

9    Q    Is that for the motor home or is that a purchase

10   agreement for --

11   A    This is for an extended -- excuse me, I'm sorry.

12   This is a third agreement.  This is strictly for the -- for the

13   extended service contract.

14   Q    This is a -- the extended service contract purchase

15   agreement for -- and that was for $10,294?

16   A    And 35 cents, yes, ma'am.

17   Q    Okay.

18   A    Or 39 cents.

19   Q    That sounds --

20   A    39, yeah.

21   Q    All right.  And that's not in a trust name there?

22   A    No.  You can't put an extended service contract in a

23   trust name.

24   Q    Okay.  That has to be in an individual's name?

25   A    It does.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1      Q     Is that why that document doesn't have a trust

2   indicated on it or duly or anything?

3      A     Correct.

4      Q     Okay.  Do you know about what time of the day

5   Mr. Beane came back with the factualized trust on July 7th?

6      A     On July 7th, it would have been -- it would have been

7   in the afternoon, guesstimate probably three, three, 3:30,

8   somewhere in that area.

9      Q     Okay.  If we could go to the -- just a second.  If we

10  could go to Government Exhibit -- Government's Exhibit 103.

11     A     Okay.

12     Q     Okay.  What's this document?

13     A     That document is -- it would have been the wire

14  transfer for the $493,110.68.

15     Q     So was it determined by Buddy Gregg that the payment

16  would be by wire?

17     A     No.  Randy -- Randy said that he'd be wiring the

18  money.

19     Q     Okay.  You provided the wire information to --

20     A     We did.

21     Q     -- the defendant?  Is this pretty typical, a wire

22  transfer for this type of transaction?

23     A     Of that caliber, yes.

24     Q     All right.  Could we go to the name at the top,

25  right -- yeah.

UNITED STATES DISTRICT COURT

1      A     It's "Randall Beane Duly."

2      Q     Okay.  And that's who sent the wire?

3      A     Correct.

4      Q     All right.  Could we go to the -- to the right of

5  that where it says employee name and "Cashed Out Date"?

6      A     That's Nelson Forbes.  Whitney would contact Nelson

7  when the wire -- when the wire clears their bank.

8      Q     And so with the wire transfer, so is the cashed out

9  date when the wire cleared or how did that --

10      A     The -- yeah.  Once we -- once we got the full -- the

11  full amount, it would have been -- it would have been receipted

12  at -- looks like 12:10, so --

13      Q     That --

14      A     -- it would have -- that would have been their time,

15  so it would have been 1:10 our time.

16      Q     Okay.  Could we go a little lower.  And, I'm sorry,

17  zoom back out.  All right.  Can we go to the -- all right.

18            So the deposit amount is the amount that was wired?

19      A     Correct.

20      Q     And it was wired to Buddy Gregg?

21      A     To Whitney Bank.

22      Q     And that is where Buddy Gregg banks?

23      A     Correct.

24      Q     All right.  So when Mr. Beane provided the documents

25  or, excuse me, when he sent over the wire, and those were --

UNITED STATES DISTRICT COURT

 1    that was -- was the wire sent on July 7th?

 2         A    The wire was -- well, it would have initially been

 3    sent on July 7th, but it would have been received on the 8th.

 4         Q    All right.  So when Mr. Beane was purchasing the

 5    home, did you have any conversations with the defendant's

 6    attorney?

 7         A    Yeah.  We -- I -- I spoke three times, one on the --

 8    if I could see the calendar again.  It would have -- would have

 9    been on the 8th and -- I'm sorry -- 8th, 10th, and the day that

10    we -- that we got the second -- the second trust, which would

11    have been the 11th.

12         Q    And so what was the substance of your conversation

13    with --

14         A    We had had a couple phone calls, well, the -- the

15    original conversation was about doing the motor home in the

16    trust's name.  The other two were -- there were some problems

17    that had occurred with a call from USAA and from the FBI.  So

18    we -- she was just securing us that --

19         Q    So who were you talking to about this?

20         A    I'm sorry?

21         Q    You said original conversation was on the 8th where

22    you talked about the trust?

23         A    That would have been with Heather and Randall.

24         Q    Okay.  And how do you know you were talking to

25    Heather?

                        UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1       A    Well, because she identified herself as Heather.

2       Q    Who made the call?

3       A    Randall.

4       Q    So was it a conference call between you and Randall

5  and Heather Tucci-Jarraf?

6       A    Yes.  Correct.

7       Q    And that was on the 8th?

8       A    Yes, ma'am.

9       Q    And you discuss putting the RV in a trust name?

10      A    Correct.

11      Q    And then that was -- that was your discussions on the

12 8th?

13      A    Correct.

14      Q    Did you discuss anything else with them on the 8th?

15      A    I mean, just you know about the purchase and the

16 transaction, that everything had cleared, and that, you know,

17 we can put the motor home in the trust's name.

18      Q    Okay.  And then you said you also spoke with her on

19 the -- you know, subsequent to that, the 10th and the 11th?

20      A    Correct.  We had a call from a gentleman by the name

21 of True Brown that indicated that there was a problem with the

22 money, and Heather said everything was done, you know, through

23 the trust and that Randall was the only one that could stop the

24 transaction from happening.

25      Q    And that call from True Brown, was that the first

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1  time you heard that there might be anything wrong with the

2  transaction?

3      A    Yes, ma'am.

4      Q    Okay.  And so after you talked to True Brown, you

5  then talked to Tucci-Jarraf?

6      A    Yes.

7      Q    And she assured you everything was okay?

8      A    Yes, ma'am.

9      Q    And so do you remember that conversation?

10     A    Pretty well, yeah.

11     Q    Were there other folks on that phone call as well?

12     A    There was.  There was Nelson Forbes, myself, Heather,

13  Randall, and there was another gal that was in the office.  I

14  don't remember her name, but she was in there with us.

15     Q    And so was Randall in your office too?

16     A    Randall was, yes.

17     Q    Okay.  So he was in your office along with all those

18  folks you just mentioned?

19     A    Correct.

20     Q    Okay.  I'm going to show you -- I'm sorry I need the

21  Elmo again.

22          Previously been admitted as Exhibit 94?

23     A    Yes.

24     Q    And so do you recognize that?

25     A    I do.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    Can you tell us what it is?

2    A    This is a YouTube video of the phone conversation

3   from -- from the 11th.

4    Q    Okay.

5    A    Or, excuse me, the 10th.

6    Q    This is a conference call from the 10th?

7    A    Correct.

8    Q    And did you review this video?

9    A    I did.

10   Q    And did you remember that phone call?

11   A    I did.

12   Q    And to the best of your recollection, is that

13  recording an accurate representation of that phone call?

14   A    It is.

15   Q    Okay.  And is that your signature or your initials

16  there?

17   A    Yes, it is.

18   Q    Okay.

19        MS. SVOLTO:  I'd like to play Exhibit 94.

20       (Video played in open court; not reported.)

21       (Video paused in open court.)

22  BY MS. SVOLTO:

23   Q    Mr. Byrne, are you speaking during this time?

24   A    Myself and Nelson Forbes.

25   Q    And that's not part of this -- you can't hear your

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    voice on this part of the --

2        A    No, ma'am.

3        Q    -- during this part of the conversation?

4        A    No, I don't.

5        (Video played in open court; not reported.)

6        (Video paused in open court.)

7            MS. SVOLTO:  Pause it for just a second.

8    BY MS. SVOLTO:

9        Q    And who is the president?

10       A    It's Brad Cohen.

11       (Video played in open court; not reported.)

12       (Video paused in open court.)

13   BY MS. SVOLTO:

14       Q    Can you identify who's talking right there?

15       A    That's Nelson Forbes.

16       Q    And this is -- and Nelson Forbes works in your

17   office?

18       A    He does.

19       Q    He was present during this call?

20       A    Correct.

21       Q    Is this where the video and the audio merge together?

22       A    Yes.

23       Q    So now we're hearing the conversation from Buddy

24   Gregg's side as well?

25       A    Correct.

UNITED STATES DISTRICT COURT

1    Q    And is Randall Beane in the same room with you?

2    A    He is.

3    Q    Okay.  And also in the room with you is an

4  unidentified female and Mr. Forbes?

5    A    Correct.

6    Q    And Mr. Nelson -- or, I'm sorry, Mr. Forbes?

7    A    Nelson is Mr. Forbes.

8    Q    It's Nelson, you, Beane, and a female?

9    A    Yes, ma'am.

10    Q    Okay.  Thank you.

11    (Video played in open court; not reported.)

12    (Video paused in open court.)

13  BY MS. SVOLTO:

14    Q    Who was speaking there, do you remember?

15    A    That was Randall.

16    (Video played in open court; not reported.)

17    (Video paused in open court.)

18  BY MS. SVOLTO:

19    Q    So who's speaking there?

20    A    That was Randall.

21    (Video played in open court; not reported.)

22    (Video paused in open court.)

23         THE WITNESS:  That's me.

24  BY MS. SVOLTO:

25    Q    So that's you?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1   A    That's me in the background.

2   (Video played in open court; not reported.)

3   (Video paused in open court.)

4   BY MS. SVOLTO:

5   Q    So who's suggesting that phone call?

6   A    That would be me.

7   Q    That was you.  Okay.

8   (Video played in open court; not reported.)

9        THE WITNESS:  That's Randy.

10  (Video paused in open court.)

11  BY MS. SVOLTO:

12  Q    And so is that -- is that you making an attempt to

13  call USAA?

14  A    Correct.

15  Q    Okay.  And what was the purpose of contacting USAA?

16  A    To -- to see what the claim was to the funds.

17  (Video played in open court; not reported.)

18  (Video paused in open court.)

19  BY MS. SVOLTO:

20  Q    Okay.  So who just came back in there?

21  A    Randall came back from the restroom.

22  (Video played in open court; not reported.)

23  (Video paused in open court.)

24  BY MS. SVOLTO:

25  Q    And so who were you trying to speak to specifically?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    A    We were trying to get ahold of the gentleman by the
2  name of David Parker.

3    Q    Okay.

4    A    And it was ringing through, but then we were told to
5  hang up, so --

6    Q    Okay.

7    (Video played in open court; not reported.)

8    (Video paused in open court.)

9  BY MS. SVOLTO:

10    Q    Did you hang up then?

11    A    We did.

12    (Video played in open court; not reported.)

13    (Video paused in open court.)

14  BY MS. SVOLTO:

15    Q    Do you recognize that voice?

16    A    That was Randall.

17    (Video played in open court; not reported.)

18    (Video paused in open court.)

19  BY MS. SVOLTO:

20    Q    So at this point, Tucci-Jarraf has left the call?

21    A    Correct.

22    Q    But you're still on the call?

23    A    No.  Well, I'm on a separate call in the background,
24  and Don -- well, Nelson Forbes is on with Brad Cohen.

25    Q    Do you know who recorded this?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    A    Who recorded this --

2    Q    What we're listening to right now?

3    A    I didn't even know we were being recorded, so --

4    Q    Thank you.

5    (Video played in open court; not reported.)

6    (Video paused in open court.)

7  BY MS. SVOLTO:

8    Q    Who's talking right there?

9    A    Brad Cohen, sounds like Heather.  I had left the room

10  for another phone call that we had gotten.

11    (Video played in open court; not reported.)

12    (Video paused in open court.)

13  BY MS. SVOLTO:

14    Q    Do you know who's phone that is?

15    A    That's Randy's phone.

16    (Video played in open court; not reported.)

17    (Video paused in open court.)

18  BY MS. SVOLTO:

19    Q    So earlier in the call, you gave the fax number to

20  Buddy Gregg?

21    A    That was Nelson.

22    Q    Nelson gave the fax number to Tucci-Jarraf?

23    A    Correct.

24    Q    And to have her fax you documents?

25    A    That is right.

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    Did she ever fax you documents?

2    A    I didn't receive any.

3    Q    Thank you.

4    (Video played in open court; not reported.)

5    (Video stopped in open court.)

6  BY MS. SVOLTO:

7    Q    Okay.  That's where the recording ends?

8    A    Correct.

9    Q    Was there anything else after the recording stopped

10 on this call?

11   A    No.  I had just gotten off with True Brown.  I had

12 left the room.

13   Q    So you left the room at that point and to speak with

14 True Brown?

15   A    Correct.

16   Q    So after this call, what happened?

17   A    Randall had left.  The motor home was being -- having

18 some service work done on it.

19   Q    Where was that service work being done?

20   A    At our shop up at Buddy Gregg's.

21   Q    Okay.  So -- and Randall left, and when was the next

22 time he came back?

23   A    Randall had came back the day after, which would have

24 been the 11th, I believe.

25   Q    Do you need the calendar again?

UNITED STATES DISTRICT COURT

1    A    I do.  I'm sorry.  That would have been on Tuesday,

2  the 11th.

3    Q    Okay.  And on the 11th, is that when he -- did he

4  provide another trust document to you?

5    A    There was a trust document on the 11th.

6    Q    Is that Exhibit 105?  Can you go to the last page of

7  that document?

8    A    Yes, ma'am.

9    Q    Okay.  And did Randall Beane have title to the motor

10  home?

11    A    He did.

12    Q    He did.  And was that the --

13    A    We didn't hand him the title as of yet because

14  Randall would get the title for the motor vehicle.

15    Q    Okay.

16         So if we could pull up just quickly Government

17  Exhibit 117.

18         And now this is the certificate of origin of the

19  vehicle?

20    A    It is.

21    Q    And so the title or the registration for the vehicle,

22  was that in Randall Beane's name?

23    A    The registration, you'd have to get to the document.

24  I believe it was -- it was Randall -- it was Randall Keith Duly

25  for registration.  On the back of the -- on the back of the

UNITED STATES DISTRICT COURT

 1    certificate of origin is what we turned in with the

 2    registration information and the tax information to create the

 3    title for Randall.

 4         Q    Okay.  And go to Exhibit 110.

 5         A    No.  That's the warranty.

 6         Q    I'm sorry.  Could you describe, though, how the

 7    registration came to be titled to Randall Keith Duly?

 8         A    That would have been through his discussion with

 9    Heather and himself.

10         Q    Okay.  And so after this phone call, what was your

11    interpretation of what had happened?

12         A    More confused than really knowing what was going on,

13    but at that point, it was between, you know, between Randall

14    and the bank.

15         Q    At this point, had the wire gone through?

16         A    Oh, yeah.  Yeah.

17         Q    And the credit had gone into --

18         A    Whitney Bank.

19         Q    -- Whitney Bank?  And you had verified that?

20         A    Correct.

21         Q    That it had gone through?

22         A    That was on the 8th the credit went through.

23         Q    Did you have any other conversations with the

24    defendant after this phone call?

25         A    With Randall?

1      Q    Yes.  With Randall.

2      A    Yes.  He came in to -- he came in to take the

3  delivery of the unit, to go up and pick up the unit.  We spoke

4  for a short period, myself, Randall, there were two folks with

5  him that was out in our lobby.  One was the same -- the same

6  woman that was with him the original day and then there was a

7  gentleman that was out in the lobby.  They -- they -- Don

8  Forbes was in the office, and then Randall went up to take

9  delivery of the motor home.

10     Q    And so he had the keys?

11     A    He had everything, yeah.  He had the keys prior to --

12  we had one set, he had the other, so he could move the unit

13  around.

14     Q    And so he had the motor coach running, do you recall?

15     A    I wouldn't have known that.  That was up at the shop.

16     Q    Okay.

17     A    But it would have been running.

18     Q    And so at this point, Randall Beane owned the

19  vehicle, the motor home?

20     A    Randall Beane owned the motor home the second we got

21  the wire transfer on the 8th.

22     Q    All right.  And I'd like to show you Government's

23  Exhibit 1.  Do you recognize this?

24     A    Yes.  That's the -- that's the Cornerstone.

25     Q    All right.  And then is that the one that Buddy Gregg

Jerald Byrne - Direct Examination

1   sold to Mr. Beane?

2       A    Appears to be, yes.

3       Q    Could you just go to 2?

4       A    That is.

5       Q    So you said the motor home was at Buddy Gregg on the

6   11th when he came to get it?

7       A    Correct.

8       Q    But when did Randall Beane take possession of the

9   motor home?

10      A    That would have been taken -- I believe the walk was

11  done on the 8th.

12      Q    Okay.  And so that's the day he took possession?

13      A    The moment the wire transfer cleared.

14      Q    Okay.  Did he leave the premises with the motor home?

15      A    He did.

16      Q    He did.  And then he brought it back?

17      A    Yes.  He would have brought it back.

18      Q    And do you know when he brought it back?

19      A    I wasn't -- I wasn't -- the area where he would have

20  brought it back to was in the campground area over by the

21  service department.  I work on the other side of the property.

22      Q    Okay.  And so is that common for people to leave with

23  the motor home and come back?

24      A    All the time.

25      Q    Okay.  And why is -- why is that?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

```
 1       A    Well, a lot of times they'll go find something wrong
 2  that needs servicing, they'll bring it back, put it in the
 3  campground.  Other times, they may want to get themselves
 4  acquainted with the motor home.  He was leaving for a -- from
 5  what I recall, he was leaving for a trip to go out west and
 6  wanted to -- before he went out west, he wanted to familiarize
 7  himself with the motor home.
 8       Q    And so do you know when he brought the motor home
 9  back?
10       A    It would have been sometime on Saturday, because we
11  got the key.
12       Q    Okay.  So Saturday, was that July 8th?
13       A    I'd have to look at that.  I believe it was, yes.
14  Yeah.  Actually, it was, July 8th.  And it would have been --
15  he would have left, the day that the wire came through is the
16  day that the motor home was taken possession of.
17       Q    So then after Mr. Beane came in and after he brought
18  the motor coach home, did you guys do any warranty work?
19       A    It wasn't -- it was never brought home.  It left the
20  premises and came directly back.
21       Q    Okay.
22       A    So I -- it would have never been brought to his --
23  well, I mean, it may have stopped by, but it never spent the
24  night.  It went back to us the same time -- the same day it
25  left.
```

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    Q    Did you-all perform warranty work on the motor --

2    A    We did.

3    Q    What kind of work was that?

4    A    I would have to -- I don't -- I'm not familiar with

5    what was done on it.

6    Q    Okay.  And so after Beane takes possession, brings it

7    back, it's after that that you get this conference call on

8    July 10th?

9    A    Correct.

10    Q    Okay.  And you said you'd spoken to True Brown.  Did

11    you ever speak to anyone with the FBI?

12    A    I would have spoke to -- I was confused.  I thought I

13    spoke to Parker with the FBI, but it was actually Parker from

14    USAA.  A lot was going on.  We had True Brown, the Parker

15    gentleman who spoke with myself and Don, and then I spoke with

16    Mr. Patterson the day that they --

17    Q    And is Patterson with the FBI?

18    A    He is.

19    Q    Okay.  And you spoke with him the day of, what do you

20    mean, which day?

21    A    He spoke to us the day -- he spoke to us on Monday.

22    Q    Monday, is that July 10?

23    A    Correct.  And then the day that Mr. Beane came back

24    to pick up the motor home.

25    Q    And that would be the 11th?

UNITED STATES DISTRICT COURT

Jerald Byrne - Direct Examination

1    A    The 11th.  Correct.

2    Q    So on the 11th, did you talk to the FBI again?

3    A    Yes.  They -- they gave us a call and explained what

4  was going on and that they were in transit to the dealership.

5    Q    They were coming to the dealership?

6    A    They were.

7    Q    Did you tell them that Randall Beane had been -- that

8  the motor home was ready to be picked up?

9    A    I did.

10   Q    Did you tell them that Randall Beane was there?

11   A    I did.

12   Q    Shortly after that, they arrived?

13   A    Correct.  Actually, Randall had came in when we were

14  on the phone, so --

15   Q    When you were on the phone with the FBI?

16   A    Correct.

17   Q    And that's Jaron Patterson?

18   A    Correct.

19   Q    And at that point, you knew that the FBI was coming?

20   A    Correct.

21   Q    Okay.  Did you tell Randall Beane?

22   A    I did not.

23        MS. SVOLTO:  That's all I have.

24        THE COURT:  Is that it?

25        MS. SVOLTO:  Yes.  That's all I have.

UNITED STATES DISTRICT COURT

1          THE COURT: All right. In light of the hour, why
2    don't we conclude for right now and let the jury go home for
3    the day, and we'll pick back up with cross-examination in the
4    morning. So you'll need to come back at nine o'clock to
5    conclude your testimony. So the jury is excused.
6          Again, a reminder, leave your notes in the jury room.
7    Don't talk about the case with anyone and don't read anything
8    about the case.
9          Have a pleasant evening. The jury is excused.
10        (Jury out at 5:10 p.m.)
11         THE COURT: You're excused, sir. Thank you. You can
12   step on down.
13        Everybody be seated just a moment. A couple things
14   to discuss. I'm not sure when the government might anticipate
15   ending, if it might be tomorrow or might be the next day. You
16   may not know.
17         MS. DAVIDSON: I really don't know. And, you know,
18   it's hard for me to judge. I thought we would get two more
19   witnesses on today, and we only got the one. So I think we'll
20   probably go the full day tomorrow.
21         THE COURT: Okay. Well, let me go ahead and mention
22   a couple things in anticipation if not tomorrow, on Thursday.
23         MS. DAVIDSON: Tomorrow is Thursday.
24         THE COURT: If not tomorrow, Friday, the government
25   will rest at some point on its case. So let me just go ahead

                    UNITED STATES DISTRICT COURT

1  and talk with the defendants about that just in case it is

2  tomorrow.  I don't think we'll get to closing arguments

3  tomorrow, so I'm not worried about that.

4         But just a reminder to the defendants,

5  Ms. Tucci-Jarraf and Mr. Beane, once the government rests on

6  its case, each of you deferred your opening statements.  So you

7  will need to first make a determination as to whether you want

8  to make opening statements.

9         Again, you don't have to.  It's your right to make

10  one or not make one.  I want to remind you to think about that,

11  because I'll ask you if you want to make an opening statement.

12         And in that regard, I want you to keep in mind, just

13  as you heard me tell the jury yesterday, opening statements are

14  not evidence.  They are instead the opportunity for, in this

15  case, the parties themselves, respectively and individually, to

16  discuss with the jury what they believe the evidence will show.

17         So if you do make an opening statement, even though

18  it's at the end of the government's proof, it's not a closing

19  argument.  It's not a chance to argue what you believe the

20  evidence has shown.  Again, it's an opening statement for you,

21  again, individually, respectively -- and respectively to say

22  what you believe the evidence will show in terms of whether --

23  in terms of any presentation of evidence that you anticipate

24  making.  So think about opening statements.

25         The second thing I want to discuss, and I talked

UNITED STATES DISTRICT COURT

1    about this at the final pretrial conference, think about

2    whether during your respective cases in chief, you know, one,

3    whether you will present any evidence.  Again, you don't --

4    you're not obligated to do so.

5           You heard me tell the jury, the burden of proof is on

6    the government to prove your guilt.  The burden is not on you

7    to prove your innocence.

8           But in that respect, think about whether you will

9    present any evidence.  We may not get to that point tomorrow,

10   but if the government does for some reason finish early

11   tomorrow, I'll ask you if you're ready for your opening

12   statements and proceeding with any evidence.

13          Along those lines, we did discuss, as I recall, the

14   final pretrial conference, your -- and I'm talking to you

15   individually -- but your, Ms. Tucci-Jarraf, and your,

16   Mr. Beane, constitutional rights to testify or not testify in a

17   criminal trial as you see fit.

18          The government cannot call you as a witness, but you

19   yourselves will have to decide during your respective cases

20   whether you want to present your own testimony.

21          And I may have discussed this last week, but

22   certainly you have very competent standby or elbow counsel that

23   is there for you to discuss, if you would like, a decision to

24   testify or not to testify, but I discussed with you at the

25   final pretrial conference an understanding, want to make sure

UNITED STATES DISTRICT COURT

1    you understood that ultimately the decision whether to testify

2    or whether not to testify is yours and yours alone.  So keep

3    that in mind.

4          If you do decide to testify, since you're

5    representing yourself, it's a little unusual if you take the

6    witness stand, because you've got a couple choices, and you

7    should think this through.  And I'm not giving you advice in

8    any fashion.

9          If you decide to testify, and you don't have your

10    standby counsel asking you questions -- that's one thing you

11    can consider.  You may decide to do that, you may not.  But if

12    you take the witness stand to testify, I want you to keep in

13    mind that, again, you're not taking the witness stand to argue

14    your legal positions or make a closing argument to the jury.

15          What I tell pro se defendants or pro se individuals,

16    whether it's in a criminal case or civil case, if you take the

17    witness stand and nobody is asking you questions, I don't

18    require -- I think some courts actually make you ask yourself a

19    question and then answer the question.  I don't do that.  But

20    you have to provide basically a fact narrative.  It's almost

21    like you're giving the answers without the question.

22          So you can testify factually, but, again, it's not an

23    opportunity to make arguments.  So I want to make sure you

24    understand that, if you do decide to testify.

25          So any questions in that regard, either regarding

UNITED STATES DISTRICT COURT

1    your right to testify or not to testify or how you would need

2    to present your testimony if you do decide to testify?

3              Any questions?

4              MS. TUCCI-JARRAF:  I'm clear on the information.

5    Thank you.

6              THE COURT:  Mr. Beane?

7              MR. BEANE:  Yeah, I'm clear as well.

8              THE COURT:  Okay.  That's what I wanted to bring up.

9    Unless there's anything else to bring up, we'll pick up with

10   cross-examination of this witness at 9:00 a.m. tomorrow

11   morning, which would be Thursday, January 25.  Thank you.

12             THE COURTROOM DEPUTY:  All rise.  This honorable

13   court shall stand in recess.

14        (Proceedings recessed at 5:16 p.m.)

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                    **CERTIFICATE OF REPORTER**

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4            I, Rebekah M. Lockwood, RPR, CRR, do hereby certify

5    that I was authorized to and did stenographically report the

6    foregoing proceedings; and that the foregoing pages constitute

7    a true and complete computer-aided transcription of my original

8    stenographic notes to the best of my knowledge, skill, and

9    ability.

10       I further certify that I am not a relative, employee,

11   attorney, or counsel of any of the parties, nor am I a relative

12   or employee of any of the parties' attorneys or counsel

13   connected with the action, nor am I financially interested in

14   the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand at

16   Knoxville, Knox County, Tennessee this 22nd day of April, 2018.

17

18

19

20   _____
     REBEKAH M. LOCKWOOD, RPR, CRR
21   Official Court Reporter
     United States District Court
22   Eastern District of Tennessee

23

24

25