IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                                  )
UNITED STATES OF AMERICA,         )
                                  )
            Plaintiff,            )
                                  )
vs.                               )   Case No.:  3:17-CR-82
                                  )
RANDALL KEITH BEANE AND           )
HEATHER ANN TUCCI-JARRAF,         )
                                  )
            Defendants.           )
_____ )


**VOLUME III of VIII**


**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**January 25, 2018**
**9:08 a.m. to 4:50 p.m.**


**APPEARANCES:**

**FOR THE PLAINTIFF:**          CYNTHIA F. DAVIDSON, ESQUIRE
                                ANNE-MARIE SVOLTO, ESQUIRE
                                Assistant United States Attorney
                                United States Department of Justice
                                Office of the United States Attorney
                                800 Market Street
                                Suite 211
                                Knoxville, Tennessee 37902

**FOR THE DEFENDANT:**          RANDALL KEITH BEANE, PRO SE
**RANDALL BEANE**               Blount County Detention Center
                                920 East Lamar Alexander Parkway
                                Maryville, Tennessee 37904

**FOR THE DEFENDANT:**          STEPHEN G. McGRATH, ESQUIRE
(As Elbow Counsel)              9111 Cross Park Drive
                                Suite D-200
                                Knoxville, Tennessee 37923


**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **FOR THE DEFENDANT:** | HEATHER ANN TUCCI-JARRAF, PRO SE |
| **HEATHER ANN** | 105 Orchard Lane |
| **TUCCI-JARRAF** | Oak Ridge, Tennessee 37830 |
| | |
| **FOR THE DEFENDANT:** | FRANCIS LLOYD, ESQUIRE |
| (As Elbow Counsel) | 9111 Cross Park Drive |
| | Suite D-200 |
| | Knoxville, Tennessee 37923 |

**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

1                            **INDEX**

2   **GOVERNMENT'S WITNESSES**                           **PAGE**

3   JERALD BYRNE
  Cross-Examination by Mr. Beane                  5
4   Cross-Examination by Ms. Tucci-Jarraf        17
  Redirect Examination by Ms. Svolto            87
5   Recross-Examination by Mr. Beane              97
  Recross-Examination by Ms. Tucci-Jarraf   104
6

7   LAUREN PALMISANO
  Direct Examination by Ms. Svolto               111
  Cross-Examination by Ms. Tucci-Jarraf     143
8   Cross-Examination by Mr. Beane             172

9   SEAN O'MALLEY
  Direct Examination by Ms. Davidson           174
10   Cross-Examination by Ms. Tucci-Jarraf     198

11           **GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**

12   **NO.**   **DESCRIPTION**                               **PAGE**

13   98   Buddy Gregg Email - RK Beane Duly Verified Proof and  119
        Declaration of complete ownership title and
14       authority

15   153  Whitney Buddy Gregg Motor Incoming Wire       119

16   154  Whitney Email - HATJ - Confirmation of Duly     119
        Authorized Fed Wire Transfer for full payment of
17       Coach 07-11-2017 447PM

18   154A Attachment - 070717 Fed Wire from FT-OD-rkb-092967  119

19   155  Whitney Email - HATJ - Copy of the Paradigm Report  119
        incorporated into Factualized Trust 07-12-2017 134PM
20

  155A Attachment - Paradigm-Document              119
21

22   157  Whitney Email - HATJ - Copy of the Paradigm Report  119
        incorporated into Factualized Trust 07-12-2017 644PM

23   158  Whitney Denial Letter to USAA Bank 07-12-2017     119

24   163  HATJ Email to Whitney Re declaration & factualized  119
        trust
25

                     Rebekah M. Lockwood, RPR, CRR
                      Official Court Reporter
                        (865) 210-6698
                        P.O. Box 1823

GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)
(CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 163A | Attachment - Declaration | 119 |
| 163B | Attachment-Trust | 119 |
| 164 | Fedwire Appended Information | 189 |
| 162 | Printout of Internet page for FAQs from Board of Governors of the Federal Reserve System website | 195 |

DEFENDANTS' EXHIBITS (ADMITTED INTO EVIDENCE)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Drawing of Buddy Gregg Motor Home property | 68 |
| 2 | Google Map printout of Buddy Gregg property | 74 |
| 1 | Hand drawing of Buddy Gregg facility | 87 |
| 2 | Google Map of Buddy Gregg facility | 87 |
| 2A | Google Map of Buddy Gregg with markings | 87 |
| 3 | Copy of 1649 Protection of Government Property - Goods in Transit | 98 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

1           (Call to Order of the Court)

2                THE COURT:  Morning, everyone.  Looks like we're

3      ready.

4                Ms. Tucci-Jarraf, are you going first on

5      cross-examination?

6                MS. TUCCI-JARRAF:  No.  Mr. Beane.

7                THE COURT:  Mr. Beane.  Okay.  Then we'll start in

8      that regard.  Bring our jury in.

9           (Jury in at 9:08 a.m.)

10               THE COURT:  Thank you.  Everyone may be seated.  Good

11     morning to our members of the jury.  Hope everyone had a

12     pleasant evening.

13               If you will recall, the government finished with its

14     direct examination of this witness yesterday afternoon, so the

15     defendants now have the opportunity for cross-examination.  I

16     believe the defendant Mr. Beane is going to begin with

17     cross-examination.

18               Mr. Beane.

19                          **CROSS-EXAMINATION**

20     BY MR. BEANE:

21          Q    Good morning, Mr. Byrne.

22          A    Morning.  How are you?

23          Q    I'm good.  How are you?

24          A    Good.  Thank you.

25          Q    I want to ask you a few questions about some of the

                        UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    stuff I heard you testifying on yesterday.

2              This is the -- okay.

3              THE COURT:  Is this a copy of a previously introduced

4    exhibit?

5              MR. BEANE:  Yes, one minute.

6              THE COURT:  Government's 116?

7              MR. BEANE:  Yes.

8              THE COURT:  Okay.

9              THE WITNESS:  Trying to get to it there.  That's a

10   worksheet, Preliminary Work Sheet.

11   BY MR. BEANE:

12        Q    Yesterday you made mention whoever had filled this

13   out evidently didn't know what they were doing?

14        A    No.  I said that the date was wrong on the top of it.

15   See, every time something is entered into our system, which is

16   the second the customer comes in, when you walk in and somebody

17   meets you, greets you, and your information goes in the system.

18   It's time stamped in our -- in our computer system.

19        Q    All right.  This Mr. Lassetter, Dan Lassetter, is

20   that his name?

21        A    Yes.  Yes, sir.

22        Q    He's a salesman.  Correct?

23        A    I'm sorry?

24        Q    He's a salesman.  Correct?

25        A    Yes, he is.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q     Mr. Lassetter is one of the first people I met at

2   Buddy Gregg and I actually did meet him on the 5th.  Do you

3   remember that day?

4      A     No, sir.  It wasn't entered in the system.

5      Q     I actually spent several hours there with

6   Mr. Lassetter looking at coaches and sitting in his office and

7   conversing about how he got in the luxury motor home business.

8   I'm wondering why it would have not been put in I was there on

9   the 5th?

10     A     It says here date of the 5th.  It's not in the system

11  on the 5th.  It means that --

12     Q     But I was there --

13           THE REPORTER:  I need you to speak one at a time.

14  BY MR. BEANE:

15     Q     Okay.

16     A     There's no entity created.

17     Q     Okay.

18     A     The entity was created on the 6th.  The entity number

19  is 1056552.

20     Q     Okay.

21     A     And it was entered somewhere in the vicinity, I

22  believe, if I -- I pulled it up when I was -- I spoke with

23  earlier on by the folks from -- from the prosecution.  The

24  first entry was at 10:52 on -- on 7/6/17.

25     Q     Okay.  Would it be possible that he saved the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  paperwork and did it the next morning after I left?

2       A    I guess anything could have happened.  But there is a

3  receptionist that enters this stuff up front.  Dan would have

4  had to get this sheet from the receptionist.  So it would have

5  been entered the second Dan got the sheet.  They're not -- as

6  you can see, they're numbered at the top.  This isn't something

7  that just randomly flows throughout the dealership.  It's

8  something that's controlled so we understand what the traffic

9  flow is.

10       Q    My main point I wanted to point out was Mr. Lassetter

11  was the first person I met.  I don't recall meeting you until

12  the 10th.  Do you remember meeting me before the 10th?

13       A    Yes.  Well, I shook your hand out in the -- in the --

14  on the -- I guess it would be the foyer right there in front.

15  Spoke with you on -- it would have been -- if I could have that

16  calendar again, I believe it was the 8th I spoke with you.

17            And I -- forgive me, are you Heather?  Okay.  I just

18  never put the face -- it would have been on the -- on the 8th,

19  I spoke with you first.  On the 10th, I believe is when we

20  started having the phone call between USAA and ourselves.  So I

21  know I spoke with you plenty on the 10th.  But on the 8th was

22  our first conversation.

23       Q    Okay.  That was on a Saturday?

24       A    It would have been on a Saturday.  We would have

25  scanned -- we would have scanned the documents on Friday for

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    the --

2        Q    Right.

3        A    -- for the wire transfer.  We also would have -- we

4    would have gotten a copy of a -- of a -- of the trust, so the

5    conversation would have been -- it would have been on the 8th.

6        Q    Okay.  So I've got another document here.  Talking

7    about the delivery date yesterday, you said it was delivered on

8    the 8th.  According to this document, it was delivered on the

9    7th.  It actually was delivered on the 7th, because I actually

10   spent the night in it on the 7th.

11       A    It was walked on the 7th.  It was walked on the 7th.

12   The delivery would have been -- correct, the delivery would

13   have been the second the money hits Whitney account, which was,

14   I believe, somewhere on the 8th.

15       Q    Let me find this document.

16       A    At ten, I believe that was like 10:17 or 12:17 or

17   something like that on Saturday.

18       Q    Okay.  I apologize for taking so long here.

19       A    That's all right.

20       Q    We decided last minute I was going to go first.  I

21   thought I was going to have a little more time to get ready.

22            Let me get this thing out of here, see if I can help

23   out.

24       A    Basically, what I assume you're trying to find is the

25   registration through Spartan.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q      Through Entegra Coach?

2      A      Through Entegra and Spartan.  Yeah, that's a

3  preliminary list saying we walked the coach with you.  Doesn't

4  give you delivery of the coach, because we don't have the funds

5  of the coach.  So you walked it on the 7th, because we don't

6  have anybody to walk it on the 8th for you.

7      Q      I actually walked it and left with it on the 7th.

8      A      And then --

9      Q      Exhibit 129.

10             THE COURT:  Let's show this document.  This is

11  Government's Exhibit 129.  You want to ask him a question about

12  that, Mr. Beane?

13             MR. BEANE:  Yeah, that's the one I wanted to confirm

14  this delivery date on the 7th here.

15             THE WITNESS:  I'm sorry.  This is 120.

16             THE COURT:  129.

17             THE WITNESS:  129.  Okay.  This is the -- this is

18  basically the walk.  It says that we -- we've walked the unit

19  with you.

20  BY MR. BEANE:

21      Q      Right.

22      A      You've went through -- you've went through your --

23  you know, your final walk-on, see, understand the operations of

24  the coach.  We frequently let you spend the night without the

25  money.  The coach will leave the premises.  It will leave the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1 premises on a test drive, contingency upon something, but the

2 coach was returned back to the dealership. It didn't spend the

3 night out on -- on Friday night.

4     Q   I actually stayed on the property there on the coach.

5     A   On the property, correct.

6     Q   The coach, I was given all documentation, all owner's

7 manuals, both sets of keys?

8     A   That's right.

9     Q   And it was hooked up to power and water for me that

10 night --

11     A   Correct.

12     Q   -- to stay on the property.

13     A   Correct.

14     Q   But I had the opportunity to take the coach at that

15 point if I decided to?

16     A   And that would have been a problem, but, I mean, I

17 guess you could have drove off the lot with it.

18     Q   That was never discussed with me. I was told it was

19 my coach at that point, I could do whatever I choose to do.

20     A   Well, if the funds aren't in the account, we're not

21 letting the coach leave the premises. I mean, we'll let it

22 leave, but it's got to return for it -- it's got to stay on

23 property.

24     Q   I guess my question to you is, at that point, being

25 that I had both sets of keys and all the paperwork and the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  warranties, all the information I needed, I could have left

2  that night.  Correct?

3      A    Our security here probably would have had a problem

4  with it, but I guess if you could have gotten around him, you

5  could have left.

6      Q    Right.  I had a gate code to get in?

7      A    Oh, absolutely.  Yeah.  Yeah, we give you that in the

8  event --

9      Q    I had that.

10     A    Yes.

11     Q    And Mr. -- actually, Mr. Dan Lassetter --

12     A    Lassetter, yes, sir.

13     Q    -- he gave me the gate code that night --

14     A    Sure.

15     Q    -- so I could get in and out.

16     A    Sure.

17     Q    I have some more questions here.  Also, I wanted

18  to -- on the day of the arrest, I was accompanied by two other

19  individuals.

20     A    Yes.

21     Q    One of whom was a female --

22     A    Right.

23     Q    -- who told the FBI agents we were headed to Texas.

24     A    That's right.

25     Q    And this was confirmed --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1          MS. SVOLTO:  Objection.  It appears that Mr. Beane is

2     testifying.  We'd ask him to shorten his questions.

3          THE COURT:  You need to ask a question.

4          MR. BEANE:  I'm asking a question, yes, sir.

5          THE COURT:  You're giving a factual summary and then

6     leading up to questions.  You just need to ask the question.

7     Thank you.

8          MR. BEANE:  Okay.

9     BY MR. BEANE:

10     Q    It says in here that Buddy -- one of the Buddy Gregg

11     employees confirmed that that was true, that I was going to

12     Texas.  Are you that employee?  Did you know in fact -- you

13     said yesterday I was going west?

14     A    West.  I didn't know whether it was Texas or --

15     Q    How did you know I was going west?

16     A    Dan.  Dan.  Dan talked to me.  You also talked to me

17     on -- it would have been the 7th or the 8th and indicated that

18     you were -- you were heading out west, that you had folks out,

19     I believe it was Seattle and -- I don't know anything about

20     Texas.  I know it was out west.

21     Q    Okay.  One other question I have here, on the -- on

22     the sales -- sales order, I don't remember what --

23     A    Probably 105.

24          THE COURT:  Witness is suggesting it's 105.

25          THE WITNESS:  No, it's going to be 100 or 95.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1          MS. TUCCI-JARRAF:  Is that the purchase, Exhibit 122,

2     123?

3          THE COURT:  Let's try 122.

4          MS. TUCCI-JARRAF:  122 and 123.  123 was the

5     original, 122 was the revised.

6          THE WITNESS:  122 is the power of attorney.

7          MS. TUCCI-JARRAF:  Oh, excuse me.  You're right.  I

8     think it's 95 or 96 was the -- nope.

9          THE WITNESS:  100 isn't there.  This is after the

10     trust.

11     BY MR. BEANE:

12     Q     Right.

13     A     When the trust was entered.

14     Q     The line I want to focus on is the vehicle sales tax.

15     A     Okay.

16     Q     Is it typical for a -- for a dealership like yours

17     to -- when someone is purchasing and they get the

18     manufacturer's certificate of origin to charge taxes?

19     A     Correct.

20     Q     And are these tax -- have these taxes been turned

21     into the DMV?

22     A     They have.

23     Q     And what paperwork were they turned in with?

24     A     They would have been turned in with Randall Keith

25     Beane Duly Factualized.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q    And what paperwork would you have used to do that

2  since I have the certificates of origin?

3      A    The -- well, we would have used the power of

4  attorney.  We would have had three powers of attorneys

5  submitted.  We would have had the registration form, which is,

6  I don't know what exhibit it is, but whatever the -- is that

7  122 or -- we would have used Exhibit 121, which would have been

8  the taxpayer multiple purpose, it does registration.  It does

9  everything for the thing.  It also -- we have a copy of the

10  certificate of origin to turn it in so it comes back with your

11  name on it.

12      We collect sales tax in the state of Tennessee.  It's

13  mandatory.  If somebody comes from Washington and buys --

14  Washington state and buys a motor home from me, and we -- it's

15  cash, we don't pay their sales tax.  They go back to Washington

16  and pay their own.

17      Q    Right.

18      A    In Tennessee, it doesn't happen that way.  You're

19  required in your own state to collect the sales tax.

20      Q    So you just take a copy of the certificate of origin

21  to the --

22      A    Correct.  That's right.

23      Q    You don't have to have the actual certificate?

24      A    We usually -- to be honest, unless you requested it,

25  we would have brought it for titling.  So the certificate of

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  origin wouldn't have had Jayco and Buddy Gregg, and on the

2  back, Randall Keith Beane Duly Factualized.  If we would have

3  done the actual titling, it would have came in the mail to you,

4  under -- we would have been removed, there wouldn't have been

5  any names on the backside of the certificate of origin.  It

6  would have been your name on the front.

7       So we didn't do the titling.  If you have the -- if

8  we would have done the registration, we would have paid the

9  sales tax, but we wouldn't have done the titling, because you

10  had the certificate of origin.

11     Q     Did you at any point, once you met me, feel like that

12  I was in any way scamming you?

13     A     To be truthful with you, the only time we got any

14  indication that anything was going on differently than the

15  typical purchase at Buddy Gregg was when we got a call from

16  True Brown and Donald Patterson and multiple people, and then

17  we started to try to kind of put things together.

18       So, I mean, you were a gentleman when you were in

19  there.  You were -- I mean, you were always kind to us, so, I

20  mean, there wasn't anything that we -- there's nothing out of

21  the ordinary for us.

22     Q     Would you agree that once we -- we were sitting in

23  your office conversing over what was taking place, would you

24  agree that I was as surprised as you were that anything was

25  happening?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    Yeah.  I mean, it's hard to know how you were

2  feeling, but I know I was feeling kind of confused because too

3  much stuff was going on at once.

4    Q    I think we were all trying to -- you know, just kind

5  of -- we didn't know what to do, because we'd never dealt with

6  that before either, none of us.

7         Oh, I did want to ask you, on the extended warranty,

8  is it typical of someone who is -- in all your years in the

9  business, for someone who is planning on turning around and

10  selling the vehicle for profit to buy an extended warranty on

11  it?

12    A    I was never under the impression you were trying to

13  sell it for profit.

14         MR. BEANE:  Thank you.  No further questions.

15         THE COURT:  Thank you.

16         Cross-examination?

17         MS. TUCCI-JARRAF:  Yes, please.

18         THE COURT:  Ms. Tucci-Jarraf.

19                         **CROSS-EXAMINATION**

20  BY MS. TUCCI-JARRAF:

21    Q    Without prejudice, I have a few questions for you,

22  Mr. Byrne.

23         Mr. Byrne, I'm sorry?

24    A    Yes, sir.

25    Q    I mispresented your name.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1          Okay.  The first time that you and I did have a phone

2   conversation, but I've -- we've never met.  Is that correct?

3       A    No, ma'am.

4       Q    Until this moment?

5       A    Correct.

6       Q    Okay.  You stated that you had been a general sales

7   manager for two years with Buddy Gregg?

8       A    Yes, correct.

9       Q    But that you had been in the industry for 31 years?

10      A    Correct.

11      Q    Okay.

12      A    Close to 31 years, not quite.

13      Q    Yeah.

14      A    Twelve days away, so, yeah.

15      Q    I remember our conversation.  In fact, why don't we

16  just start there, as far as our conversation, I'm going to go a

17  little out of order, chronological order from Ms. Davidson and

18  of course Mr. Beane, that discussion that we've had on

19  approximately July 8th --

20      A    Sure.

21      Q    -- was that the first conversation that you and I had

22  ever had?

23      A    That would have been our first, yes.

24      Q    Right.  And do you recall that conversation that we

25  had, what it revolved around?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    Briefly from the notes I have from the CRN.  Whenever

2  there's a call that's generated, it also goes into our computer

3  system.  So if Randall called you, which is indeed what

4  happened, it would have -- it would have -- we would have had

5  it registered in our system, so --

6    Q    And, in fact, when we spoke, I asked for the MSO or

7  the origin certificate.  Isn't that correct?

8    A    You would have asked for that, yes.

9    Q    Yeah.  In fact, that's why we even had the

10  conversation is I was saying that I was calling for the MSO to

11  see if you had it on site or off site?

12    A    Well, you -- you -- it didn't quite go that in depth

13  on the -- so I'm just kind of going by what I can remember on

14  that.  It doesn't record the conversation, but there's probably

15  a good shot you would have asked if we would have had it on

16  premise or not.  That's what the majority would ask.

17        The -- other thing was what we're doing.  We had it

18  in Randy's name.  It was under Randy Beane instead of Randall

19  Keith Beane Duly Factualized.  And you made him aware that it

20  had to go into the trust's name.

21    Q    That's right.  On 7/8 after --

22    A    On the 8th.

23    Q    -- after the purchase order, after all the paperwork

24  had been done, and the wire transfer had come in, as well as

25  the PO, which was in Randall Beane's name, not in the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    factualized trust, I said that had to be -- that I had asked

2    you if you would redo the paperwork so that it was lawful and

3    legal.  Is that correct?

4        A    Correct.  That would have been -- no.  No, ma'am.

5    No.  We got documents on the 7th.  We did it without -- we did

6    it without you originally on the 7th.

7        Q    Right.

8        A    And we had it in Randy's name and Randall Keith -- we

9    had two buyers.

10       Q    Right.

11       A    And you said it has to go into the factualized which

12   is when we put the note on the thing that it was to be

13   registered --

14       Q    Right.

15       A    -- to Duly Factualized.

16       Q    After the paperwork had already been done.

17       A    That's right.

18       Q    And the wire had been sent before the MSO was

19   delivered to Mr. Beane --

20       A    True.

21       Q    -- I said that had to be correct, so that the title

22   was --

23       A    Would come back correct.

24       Q    -- correct on the back?  Is that your recall as well?

25       A    That's right.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    In fact, I remember not knowing if you would know

2    since you'd said you'd only been there for two years, and

3    that's when you told me you'd been in the industry for 31.

4    A    True.  And it's different from state to state.  I

5    mean, it's --

6    Q    Okay.

7    A    You know, Tennessee is different than a lot of other

8    states.

9    Q    In fact, you had given me the information about how

10   the state -- like, if you were to register the title with the

11   MSO, that you would have to keep the MSO is what you told me.

12   Do you remember that?

13   A    Yeah.  We would have to -- in order to title it, we

14   would have to submit the original MSO.  We can register it

15   without a title.  We'd have a copy of the MSO bill of sale.  We

16   would collect the sales tax.  We would then put the

17   registration in effect.

18   Q    And by you guys doing the MSO, you would actually

19   register that with who?

20   A    It would have been Tennessee Motor Vehicle.

21   Q    So you would have registered it with the State of

22   Tennessee?

23   A    Correct.

24   Q    And what happens to that MSO title then, it gets

25   transferred to a state title.  Is that correct?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    It would go to a state title, and then it would go to

2  Randall Keith Beane Duly Factualized.

3    Q    I think the words that you used was that it's

4  converted to a state title when you explained it to me?

5    A    Correct.

6    Q    I'm sorry.  What was your response?

7    A    Correct.

8    Q    Thank you.

9         In fact, you had stated when it was converted to a

10  state title, that's where you would have to pay with the power

11  of attorney that would be signed over to you to be able to do

12  that by Mr. Beane, that you would pay the state tax from the

13  money he gave --

14    A    We did pay the state -- we paid the state tax when we

15  register it.  In order to -- in order to get -- we have to have

16  it in within a certain length of time, and Tennessee is a

17  little different than other states, but I think it's within 21

18  days of the purchase, the sales tax has to be in.

19    Q    Right.  When -- so that MSO, which they showed and

20  let's -- just so that we can have this clear.

21    A    A copy of the MSO.

22    Q    That would be -- David, if you wouldn't mind helping

23  me with 117, please.  Now, there's two titles -- you have the

24  cab and you have the title for the chassis?

25    A    Yeah.  The chassis doesn't get registered with the

UNITED STATES DISTRICT COURT

                    Jerald Byrne - Cross-Examination

1    state, just the cabin.

2        Q    Right.  Just the cabin.

3             Am I able to operate to make it bigger?

4             MS. DAVIDSON:  You can just draw on it.

5             MS. TUCCI-JARRAF:  With my finger?

6             MS. DAVIDSON:  Just use your finger to circle

7    whatever you want.

8             THE COURT:  I think she's asking if it can be

9    magnified.

10            MS. DAVIDSON:  Can you make it bigger?

11            MS. TUCCI-JARRAF:  Thank you.

12   BY MS. TUCCI-JARRAF:

13       Q    Can you see that?

14       A    I can.

15       Q    Okay.

16            THE COURT:  There we go.

17   BY MS. TUCCI-JARRAF:

18       Q    So who is the certificate -- the certificate of

19   origin, can you let everyone know what a certificate of origin

20   actually is?

21       A    Yeah.  It's the beginning of a title.

22       Q    So like a birth certificate?

23       A    It is -- well, similar.

24       Q    Okay.  And who is this -- this certificate of origin

25   given to?

                    UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    It would be -- it would be given to us, Buddy Gregg

2  Motor Home.  It would be given to us with -- to our floor plan.

3  We pay for the unit, and they put our name on the certificate

4  of origin.

5    Q    And that was done on 11/30/16?

6    A    Yes.

7    Q    Okay.  And so within 90 days, a tax has to be paid on

8  that?

9    A    No.  No.  We don't pay tax.  We're the dealer.

10   Q    You're the dealer, so you get exempted because it's

11 for a sale?

12   A    Yes.  Correct.  It never gets titled until it goes to

13 the owner.

14   Q    Okay.  And which at that point, it usually gets

15 converted to a state title?

16   A    Yes.  It would -- it would be turned in -- it would

17 be turned in with the -- when you have your registration, it

18 will also show that you paid your sales tax, and it would be

19 turned in, and Randall could have gotten the title that it was

20 Duly Factualized with the trust.

21   Q    So that would be a copy that the state would actually

22 issue to him would be a copy of this particular one?

23   A    No.  He'd have the original.

24   Q    He got the original?

25   A    Yeah.  He was titling his own unit.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q      Okay.  So at this point, it only -- with him holding

2  this title, it would only belong to him with no state

3  conversions?

4      A      Correct.  But you have to -- you have to convert it

5  to a state title.  You've paid your state sales tax, it has to

6  be titled to that state.  He can bring it somewhere else,

7  change -- change the title to whatever he wants to change it

8  to.  He can go to Guam, if he wants, and have that, but it

9  originally has to start out as the State of Tennessee.

10     Q      Well, if I recall correctly, you stated that you

11  could give him like a 30-day license tab pass so he can take it

12  to whatever state that he wanted to actually register or do a

13  state conversion to.  Is that correct?

14     A      Yeah.  But the sales tax had to be paid in the state

15  of Tennessee.  He would have gotten -- he could have converted

16  this over, but his original title would have had to have been

17  from Tennessee.  That stops people from avoiding sales tax.

18          In other words, they're not allowed to go to Montana,

19  create an LLC and pay absolutely no tax.  I mean, that's

20  something that's been -- people set up trusts, go to -- go to

21  Montana or go to other states that don't have sales tax, save

22  $33,000 in sales tax from the State of Tennessee and never have

23  an actual address in Montana.  They get a P.O. Box that cost

24  them 15, $1800.  And they've kind of stopped that.

25          That's why we collect -- if you buy it in the state

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  of Tennessee, we require you to pay the Tennessee tax.  If you

2  have a trust set up in Montana and we do not collect your tax,

3  we don't do any of your registration.  We don't do anything.

4  We hand you the certificate of origin, you can go do what you

5  want, and when you get caught, you're in trouble, not us.

6       Q    So when they go to register in another state, for

7  instance, to do a state conversion of this title, they -- that

8  state actually collects that tax and sends it to Tennessee,

9  their portion?

10      A    No.  No.  We paid -- when you buy in the state of

11 Tennessee, the dealer is -- it's mandatory that the dealer pays

12 Tennessee tax.  All the stuff is being registered to whatever

13 his address was, it was somewhere here in Knoxville anyway, I'm

14 not sure what the thing is.  But it was being registered to 300

15 State Street, Knoxville, Tennessee.

16      Q    Uh-huh.

17      A    Is that his address?

18      Q    So what would be the purpose of giving them the

19 30-day license tab pass to be able to register the certificate

20 of origin in another state --

21      A    No.  You would be -- you would have to register --

22 you would have -- this was being registered in Tennessee.  The

23 taxes had to be paid in the state of Tennessee.

24      Q    I'm understanding what you're telling us here today.

25 What I'm asking is that 30-day license tab?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    That 30 days is so you can go out on the road.

2    That's all that it is.  It's the same as a motor vehicle.  You

3    get a 30-day temp tag to let all the paperwork process through

4    the motor vehicle, to -- so you're not driving down the road

5    without a tag.  That's the only reason you need a 30-day tag.

6    Q    Okay.  So then on the back of the MCOs, you actually

7    wrote -- was it you that wrote over?

8    A    That would have been Don, Nelson Forbes.

9    Q    Nelson Forbes?

10   A    Correct.

11   Q    Thank you.  And what date would that have been done

12   on?

13   A    I'd have to find the exhibit.  It would have been

14   done within the 30 days, I can say that.  So it would have been

15   done before the 7th of August.  I -- I don't know what --

16   Q    The 7th of August, the title?

17   A    The title work -- the registration would have been

18   done before the 7th of August.

19   Q    7th of August or 7th of July?

20   A    It would have been done -- you have 30 days from the

21   day --

22   Q    Oh, excuse me.

23   A    -- that it's issued, so it would have been before the

24   7th of August.  Now not knowing how -- I mean, I don't follow

25   up on all the title work.  I only get the complaint calls if

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    it's not done by then.

2            But the -- considering the circumstances, I don't

3    know if the FBI or anybody else had gotten in the middle of

4    that and of this or if the plate's sitting at 300 State Street,

5    Apartment 365 in Knoxville.  I don't know.  I -- I -- there's

6    no way for me to know that.

7            Once it's -- once the sales tax is paid and the stuff

8    is processed through our thing, I get no more -- it's now

9    Randall's.  It's now Randall's deal.  You know what I mean?

10   It's up to him.

11      Q    His property?

12      A    Yeah.  So --

13      Q    And you guys received the wire on the 8th?

14      A    8th.

15      Q    Of July?

16      A    Correct.

17      Q    And that was Exhibit 103 at 12:10 p.m.  Correct?

18      A    Correct.

19      Q    And when I had contacted you, and we had spoke the

20   first time -- in fact, it was after 12:10 p.m., because the

21   paperwork still showed Randy Beane, and I had instructed you

22   that that actually had to be changed to the factualized trust.

23      A    Well, it was changed on the 7th.  We've got a copy

24   of -- it would have scanned -- we would have scanned a copy of

25   the duly factualized.  It doesn't have to be an original with

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    the scan, but we would have done that.  And then it would

2    have -- it would have transferred over instantaneously to the

3    trust account on the 7th, which is what the paperwork

4    indicates.

5        Q    Yes.  I understand what the paperwork indicates.

6    And, in fact, so when you received the factualized trust

7    paperwork was the first time that you would have been able to

8    actually know the factualized trust and to be able to put the

9    correct language into that paperwork.  Is that correct?

10       A    Correct.

11       Q    And you believe that it was on 7/7?

12       A    It would have been on 7/7.  Now, I'm seeing -- I

13   can't tell because these are photocopies, but we have two

14   copies of the trust.  We have an actual copy of it, and then we

15   had -- when Randall came in and he had -- he had red dye on his

16   fingers and stuff and brought this thing in, that was after --

17   that was after the initial contact, I believe it was on the

18   10th or the 11th.  It would have been the 11th.  He would have

19   brought in the actual trust paperwork, because I asked, please,

20   bring something in that is original documents.  And he didn't

21   have the original documents of the original trust.  We got --

22   we got a photocopy of it.  And we wanted that for our records.

23   Want to protect the customer.  And to, of course, protect us.

24       Q    Okay.  So Exhibit 105, please, David.

25            On this exhibit here, is this part of the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1   documentation from July 11th that you're talking about that you

2   received?

3       A    This could be the copy or it could be the original.

4   I don't know.  This is a photocopy on the screen, so this is --

5   this is -- I mean, the gist of the trust was -- let's see, on

6   July 7th.

7       Q    This, I believe, is what documentation Ms. Davidson

8   showed you yesterday, and you said that this was the

9   factualized trust?

10      A    This is the factualized trust.

11      Q    When in fact this is actually a declaration of valid

12  purchase, which is what Lauren Palmisano -- Palmisano and

13  Mr. Cohen had asked for.

14      A    I don't know which exhibit this is.

15      Q    It's Exhibit 105.

16      A    Let me look at it so I can see it a little closer on

17  my end.

18      Q    Just going to clarify the record here, because you

19  had said this was the factualized trust documentation that you

20  had received.  This was the first documentation of the

21  factualized trust that you guys had actually received.

22           May I see Page 2 of that exhibit, please.  Thank you.

23           THE COURT:  Can you tell from this document she's

24  referencing whether it was the first reference to the

25  factualized trust?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1        THE WITNESS:  This is the first reference to the

2   trust.

3        THE COURT:  Okay.

4        MS. TUCCI-JARRAF:  Thank you.  I'm sorry.

5        THE WITNESS:  And if it's original due declaration,

6   yeah.  Correct.  Now --

7   BY MS. TUCCI-JARRAF:

8   Q    If you go to the last page, Mr. Byrne, could you look

9   at the notary stamp there and please read what date it said.

10  A    Well, no, I noticed yesterday it was the 11th.

11  Q    Right.

12  A    And -- but this here was sent on -- this here was

13  sent to -- I believe this is what you sent to Brad in the bank,

14  if I'm not mistaken.

15  Q    And Nahil Mishu is the notary there indicated?

16  A    I'm sorry?

17  Q    The notary symbol, the stamp?

18  A    Yeah.  Nahil Mishu.

19  Q    Nahil Mishu, is that a notary in your office?

20  A    No.

21  Q    Do you have a notary in your office?

22  A    Five or six, yeah.

23  Q    Okay.  May I please have -- I'm going to use this,

24  but only to show -- thank you.

25        This is just -- look at it and only answer the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    questions at this point that I ask you, please.

2           Do you recognize this document?  Can you see it?

3    A    I can see it, yeah.

4    Q    I'm going to move it up.  Do you recognize that

5    document?

6    A    I do.  It looks like the one in front of me.  So that

7    would have been done on the 11th.

8    Q    Sorry.  Was just waiting for you to say whether you

9    recognize that document.

10   A    Oh, yeah, I did.  It's the same document I have in

11   front of me.

12   Q    Okay.  And what exhibit is that?

13   A    Except with red dye.

14   Q    What exhibit is that?

15   A    That's exhibit -- looks like -- this would be 105,

16   part of 105.

17   Q    Okay.  So Exhibit 105, which was previously admitted

18   by the government, David, if you could pull that up, please,

19   for the first page, and specifically show this -- is that --

20           MS. DAVIDSON:  Third page.

21           MS. TUCCI-JARRAF:  Third page.  Thank you.  Page 3,

22   please, David.

23   BY MS. TUCCI-JARRAF:

24   Q    Okay.  So this is Page 3, which is the factualized

25   trust documentation?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    Okay.

2    Q    Okay.  And the dates on the notary, David, if you

3    could please move it up?

4    A    That's the 11th.

5    Q    It shows the 11th?

6    A    It does.

7    Q    Okay.  So that was the first time that you had seen

8    the factualized trust documentation?

9    A    This is the -- this is the second -- no, this is the

10   second copy of this that we've gotten.  We got a copy of it and

11   then we got an original.  We've got an original with the --

12   with the red dye, which, of course, I can't tell by looking at

13   this that it's the original with the red dye.

14        But from what you've indicated, the original date

15   that we received something with that trust would have been the

16   7th, because it was scanned -- it was scanned through in order

17   to create the document that had Randall Beane Duly Factualized.

18   Q    And did you provide that document to Ms. Davidson or

19   the FBI?

20   A    I'm going to be honest with you, I didn't provide any

21   documents.  I just got blessed to come here, so --

22   Q    Okay.

23   A    Nelson Forbes would have provided the document.  I

24   did share with them when they were in my office that you could

25   tell every time stamp, anything on our computer, and it would

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  have had to come over in a scan in order to be used.  You

2  cannot print a buyer's order or a bill of sale if you do not

3  have verification that there's an actual trust.  If there's an

4  actual, if you're tax exempt, I have to have forms in order to

5  do that.  We just can't randomly just throw things on a piece

6  of paper --

7      Q    Right.

8      A    -- so --

9      Q    And in fact, on the 10th, July 10th, in a

10  conversation, which they played yesterday, not -- only in part

11  and not in whole, that particular conversation, you hear us

12  discussing how all the documentation would need to be provided

13  and would be provided to Buddy Gregg as well as Whitney Bank so

14  that they had full title, origin of funds, history of funds.

15  Do you recall that --

16      A    Yeah.

17      Q    -- on that tape?

18      A    Yeah, absolutely.

19      Q    Because this document, this factualized trust

20  document did not exist prior to July 11th.

21      A    Okay.  That particular one, you're correct, it didn't

22  exist.

23      Q    It didn't exist.  I had to write it and get it to

24  you.

25      A    We -- on July 11th, or excuse me, it would have been

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    on the 10th when we had our discussion on the thing, and we

2    indicated we needed all this information in order to proceed

3    further.

4         Q    Correct.  Exactly.

5         A    And we needed it -- we needed it in order to create

6    the original document also, which would have been done on the

7    7th, as you can see on -- I'm not sure what exhibit that is.

8    But in order for it to be created in our system, it has to --

9    you have to have a copy of it.  If it's -- if there's a

10   misspelling, if there's anything on it, it will pick up that

11   misspelling.

12        Q    Exactly.  That's my point, is that this document,

13   this factualized trust document didn't exist until July 11th.

14   Whatever was provided to you is not a factualized trust

15   document.

16        A    Well, I wouldn't have gotten it.  I wouldn't have

17   gotten it by anybody other than Randall.

18        Q    And on July 8th, when we spoke, after you had already

19   received the wire and after Mr. Beane had already received the

20   purchase order, which originally said Randall Beane.

21        A    Correct.  Randy Beane.

22        Q    Right?  All the paperwork said Randall Beane, and it

23   all had to be changed, and I told you that on our conversation

24   on July 8th.

25        A    Correct.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    Correct?

2    A    Well, we had two documents. We're either going

3  with -- it said Randy Beane, not Randall. It said Randall

4  Keith Beane Duly Factualized. You had one or the other.

5    Q    So then let's go through that. This is very

6  important with dealerships, they tend to like to only issue

7  paperwork in one sitting. If there's something that has to be

8  changed, all of it has to be changed. Isn't that correct?

9    A    No. Not necessarily.

10    Q    Not necessarily. Which ones would have to be changed

11  if the correct buyer is not listed?

12    A    Anything to do with the registration, anything to do

13  with the titling, anything to do if there was a lien or

14  anything, which there's not.

15    Q    Uh-huh.

16    A    It would be -- you couldn't do it with the warranty

17  information, because a warranty can't be issued to a trust. It

18  has to be issued to an individual. Because you can't go in and

19  say, you know, he let you borrow the motor home and go in and

20  say, okay, it's -- you know, it's for the trust, it's got to be

21  for Randall Beane. So that's the only thing that wouldn't -- I

22  mean, you wouldn't need to change it for that. You wouldn't

23  need to change it for --

24    Q    No. I'm not trying to fog you up here.

25    A    Sure.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    When we had that conversation on July 8th, I wanted

2    to make sure everything was legal and lawful so that all

3    parties were protected.  That was our discussion.  That's why

4    the MSO needed to be handed over to Randall.  And you stated

5    that you'd have to check to see if it was on site or off site.

6    Isn't that correct?

7    A    Yeah.  Because the 8th, if I'm not mistaken, was the

8    8th a Saturday?

9    Q    Yeah.

10   A    That's why we would have had to wait.

11   Q    Right.

12   A    Because I didn't have anybody in the titling office

13   downstairs.

14   Q    Exactly.

15   A    So --

16   Q    There was nobody there on that day, and you said that

17   you would get it as quickly as possible, but you'd have to

18   figure out if it was off site or on site?

19   A    Correct.

20   Q    And that was in the afternoon on July 8th that we

21   spoke, because you had confirmed to me that you had received

22   the wire.  Correct?

23   A    Yes.  We received a wire at like 12:10.  Would have

24   been 11:10 Louisiana time, so ...

25   Q    Right.  Okay.  And at that point when we spoke on

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    July 8th, in the afternoon, after the wire had been received

2    and the paperwork, I had already reviewed, that had been issued

3    on the 7th that I had told you it had to be reissued with the

4    duly -- with the factualized trust?

5         A    Correct.

6         Q    And at that point?

7         A    Well, no, it was -- no.  We've already had it printed

8    as a duly factualized trust.  We had some -- whether it be --

9    and this would have been done in the finance office.  In order

10   to have that piece of paper on the 7th, he would have had to

11   have gotten something, okay, by Randall, yourself, whoever, in

12   order to create that document, in order to create that bill of

13   sale, we would have had to have something that said "Randall

14   Keith Beane Duly Factualized."

15        Q    Okay.  Could you please pull up Exhibit 123.  Thank

16   you.

17             So this Exhibit 123 --

18        A    Yeah.  That would have been the original bill of

19   sale, Randy Beane.

20        Q    Right.  This is the -- well, this is only one of

21   them.

22        A    Yeah.  There was three -- there's actually three bill

23   of sales, two that you have in exhibits.

24        Q    Uh-huh.

25        A    Okay.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q      And they're all marked for what date?

2      A      They all would have been on the 7th.

3      Q      On the 7th?

4      A      What would have happened is, it would have been

5  created as Randy Beane, which the salesman would have typed

6  that in.  Okay.  And it would have been under Randy Beane.

7  Knowing that he is Randall Keith Beane, they would have then

8  brought the documents in to me, I would have changed the --

9  this is the original.  This is the very first purchase order

10  that was done.  I would have then changed it to Randall Keith

11  Beane.  I would have made any changes and documents on that.

12          Beyond that point, if we're going to put it in a

13  trust, you have to -- you have to enter -- it has to be scanned

14  to the actual computer for it to create a trust or anything to

15  do with like someone who doesn't have -- have to pay tax, you

16  actually have to have the document before it allows us to

17  create the thing.  Whether the document is -- it can be real,

18  it could be fake, it could be whatever.  It's got to be in our

19  hands in order to -- in order to change this buyer's order,

20  which was also on the 7th.

21      Q      And yet you didn't provide any -- that document that

22  you say that you got on the 7th to the FBI, DOJ, Buddy Gregg

23  itself did not provide?

24      A      I didn't provide any of these documents.

25      Q      Right.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    I'm not -- I'm not in the --

2    Q    Okay.

3    A    There's different departments.  That's something that

4  the -- that the controller would have provided.

5    Q    Uh-huh.  Thank you.  Okay.  In the normal course of a

6  purchase for any product that Buddy Gregg sells, did

7  Ms. Davidson enter into exhibits everything that you would

8  normally have filled out by any customer?

9    A    Pretty much, yeah.  I mean, there's quite a bit.  I

10 mean, there's certain -- I'd have to go through them, but I

11 believe pretty much everything is there.

12   Q    Okay.

13   A    A couple new forms, but --

14   Q    So it's consistent with purchases that all your

15 clients in the past or present --

16   A    Correct.

17   Q    -- would get?

18   A    Correct.

19   Q    Okay.  So your statement that all this documentation

20 was done on July 7th and it was never corrected at a later

21 date, you're still maintaining July 7th?

22   A    July 7th it was all -- we would have had -- it could

23 have been corrected with a new trust.  I don't know.  I -- I

24 can't tell because it's not original.  This is just photocopies

25 of what we provided.  And not only that, my memory just isn't

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    quite that awesome, but it's -- it would have been time

2    stamped.  Okay.  Everything in this -- in this company is time

3    stamped.  If you call me --

4         Q    Yep.

5         A    -- it's time stamped.  I mean, regardless of what

6    happens, they want to know why we failed with a customer or why

7    we -- how we succeeded with a customer.  And that's the way

8    it's done there.

9         Q    Okay.  Okay.  So in your system with these time

10   stamps, is it possible to print reports --

11        A    It's not.

12        Q    From that particular system?

13        A    It's not.  We tried the other day.  We had to get

14   ahold of Systems 2000.  It would take 10 or 12 days to get it

15   done.

16        Q    But if you had been asked any time from July 11th

17   onwards to get those printouts, would you have been able to

18   produce them for today?

19        A    It would have been -- it would have been tough.  I

20   mean, you have to read the -- you'd have to be able to read the

21   lingo of how it -- the history reads.

22        Q    Do you know how to read that lingo?

23        A    For the most part, yeah.

24        Q    Okay.  At any time, did FBI or Ms. Davidson or

25   someone from the Department of Justice ever ask you for those

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  reports?

2      A    They did.  They asked the other day if I could get a

3  printout of it, and I couldn't.  It takes too long.  I've got

4  the request in to get it, but the only reason that we even went

5  over that document was because some of it didn't make sense for

6  what we had on the -- on the thing.  That's the only reason why

7  I went over it.

8           But you can see in every single one of those things

9  where you've got the scan and it's time -- time stamped when we

10 got our first copy of this -- of this -- you know, of the -- of

11 the original -- well, it wasn't the original -- the thing for

12 the -- for the duly factualized, so --

13     Q    Does it also list how long your phone calls are, like

14 how long our phone call would have been, what time, date?

15     A    No.  Only because it was on a cell phone.  It wasn't

16 on our company phone.  If it would have been done -- any

17 conversation that would have happened with us on our company

18 phone, it would have -- it would have -- it would have

19 registered.

20     Q    Uh-huh.  And whose cell phone were you and I

21 speaking?

22     A    You were on Randall's.

23     Q    July -- on July 8th?

24     A    July 8th.  Every conversation that I had with you was

25 on Randall's cell phone.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    So it wasn't in your system?

2    A    No.  But we -- but, again, we make -- we manually

3  make notes --

4    Q    Uh-huh.

5    A    -- that register in that system.

6    Q    So there are supplemental notes that you entered into

7  your system, even though we were using other phones or

8  conference calls?

9    A    Yeah.  I mean, for the most part, I left during a lot

10  of the conversations on the 11th.

11    Q    Uh-huh.

12    A    Or, excuse me, was it -- no, the 10th.  I kept -- I

13  kept leaving the room, because there's more -- there's more

14  calls coming in on what was going on --

15    Q    Uh-huh.

16    A    -- with the purchase, so ...

17    Q    During your testimony with Ms. Davidson yesterday

18  during -- after the video, excuse me, was played, you were

19  asked -- did you recall in that video that was played or during

20  our conversation, I should say, when I stated that you guys

21  would get the documentation of the full title --

22    A    Correct.

23    Q    -- origin of funds, history of funds, authority,

24  ownership, et cetera?

25    A    That's right.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q    Okay.  And Ms. -- I believe it's exhibit -- I'm sorry

2    was it Ms. Davidson or Ms. Svolto that -- Ms. Svolto that asked

3    you, have you received any of that documentation?

4      A    I have not.

5      Q    Okay.  And, in fact, the video or the recording, the

6    merged recording that the DOJ and FBI created was the one that

7    we watched, Exhibit 94 yesterday?

8      A    Okay.

9      Q    That very long one.  You had stated that you didn't

10   receive any -- that video cut off prior to Lauren Palmisano --

11   Palmisano and Mr. Cohen giving their e-mails so that they could

12   receive the documentation.  Isn't that correct?

13     A    If Brad would have gotten the document, I would have

14   gotten the document.  It's -- it's that -- I mean, I know it's

15   very hard to believe that a company these days is that tight.

16   It is that tight.  So -- I've received no documents.

17     Q    You've received no documents of -- other than the

18   Exhibit 105, the factualized trust?

19     A    I received this from Randall.  This was never scanned

20   or anything.  Randall brought this in.

21     Q    On July 11th?

22     A    This one here would have been done on the 11th.

23   Correct.

24     Q    Uh-huh.  Just prior to the FBI showing up?

25     A    Or, no -- yes, correct.  It would have been -- well,

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    probably within an hour and a half, two hours.

2        Q    Uh-huh.

3        A    Well, no, actually, probably a little less, about an

4    hour, yeah.

5        Q    An hour?

6        A    It probably would have been an hour, maybe an hour

7    and a half.  I mean, I didn't look at the time or anything like

8    that, but ...

9        Q    Okay.

10       A    Randall went up to -- there was a couple things that

11   had to be done on the motor home, and he went up there, and I

12   believe Paul Chapman was our technician that was -- that was

13   doing the repair work on it.

14       Q    Uh-huh.

15       A    And he went up to the coach and then they came,

16   so ...

17       Q    Okay.  So Exhibit 105, David, I apologize for going

18   back, but 105, Page 1, can you read that?

19       A    Can I read what, I'm sorry?  Oh, Number 5?

20       Q    Uh-huh.

21       A    "Number 4" --

22       Q    Number --

23       A    Well, yeah, but you want me to read five, and it says

24   "Number 4," after Number 5, so ...

25       Q    Uh-huh.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    It says, "Number 4" --

2         THE COURT:  I think she's just asking do you see

3    Exhibit --

4    BY MS. TUCCI-JARRAF:

5    Q    If you can see it.

6    A    I do.

7    Q    And Exhibit 1 -- excuse me, Number 1 on there, who

8    does that identify?

9    A    That's the manufacturer.

10   Q    Uh-huh.  Okay.  And Number 2?

11   A    Number 2 is -- that's the bill date of the unit that

12   we gained possession.

13   Q    Uh-huh.  And Number 3.

14   A    Is the cost of the unit to Randall Beane Duly

15   Factualized.

16   Q    It actually states on July 7, 2017, could you please

17   read that whole section in there?

18   A    On what, Number 4?

19   Q    Uh-huh.  No, Number 3.

20   A    Number 3, "On July 7th, 2017, Buddy Gregg Motor

21   Homes, LLC sold/transferred vehicle/property to Randall Keith

22   Beane Duly Factualized for $493,110.68 evidenced by Purchase

23   Agreement Account Number" -- and the account number is his

24   customer number, Deal Number 10934 [sic].

25   Q    Uh-huh.  And Number 4, please.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1        A       Number 4, "On July 7th, Trustee, Randall Keith Beane,

2   tendered full payment of $493,110.68 to Buddy Gregg Motor Homes

3   LLC by Wire Transfer from Randall Beane USAA Account Number

4   ending 0949, evidenced by USAA wire transfer confirmation

5   number," whatever that is, so ...

6        Q       And that wire transfer confirmation number?

7        A       Would have been probably 2017.

8        Q       Is that consistent with -- Exhibit No. 51, please.

9        A       Exhibit what, I'm sorry?

10       Q       He's showing you Exhibit No. 1, the wire transfer --

11  51, excuse me.  This wire transfer.

12       A       See, we don't see this.  As a dealership, we don't

13  see this.

14       Q       True.  But there's a wire confirmation number.

15       A       I don't know where that would be, because I don't see

16  these.

17       Q       Is that for the same amount, 493,110 -- excuse me,

18  493,110.68?

19       A       Yeah.  It's the same amount.

20       Q       So back to Exhibit No. 105.  Could you please read

21  number 5?

22       A       "Number 4, restated, said funds tendered for full

23  payment, the originating account of initial transfer, and

24  account of origin with account number 1135, account name

25  Randall Keith Beane, and located at Federal Reserve Bank of New

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    York, are lawfully and duly held in Original Factualized Trust,

2    reference Randall Beane, Original Due Declaration Of" -- I'm

3    sorry -- "Of Issue By Original Depository, with reference

4    number FT-OD-rkb-092967, inclusive of all UCC record numbers

5    therein, and Originally -- Original Due Declaration And Notice

6    Of Factualized Trust, reference name, Randall Keith Beane, said

7    restated and incorporated here by reference as if set forth in

8    full, never rebutted, 'Owner, Title, Rights, Trustee, Origin of

9    Funds, and History of Funds.'"

10        Q    David, may I please have the next page?

11        A    I'm sorry.

12        Q    Oh, I was speaking with David to go ahead and bring

13   up the next page.  And Number 6?

14        A    "Number 5, restated, and the sole duly appointed

15   Trustee for Original Factualized Trust, is Randall Keith Beane,

16   Original Due Declaration Of Issue By Original Depository, and

17   Original Due Declaration And Notice Of Factualized Trust,

18   restated."

19        Q    Okay.  And Number 7, please.

20        A    "Number 6, restated, and Trustee, Randall Keith

21   Beane, is the lawful sole administrator and executor, with sole

22   authority of said Factualized Trust, inclusive of said account

23   located at Federal Reserve Bank of New York, with said account

24   name, and said account number, and all value and funds located

25   therein, Original Due Declaration Of Issue By Original

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1   Depository, and Original Due Declaration And Notice Of

2   Factualized Trust, restated."

3        Q    And Number 8, please.

4        A    "Number 7, restated, and said Trust, Randall Keith

5   Beane, did knowingly, intentionally, and willingly purchase the

6   property identified in number 1, above, restated, and cause the

7   funds identified in number 4, above, restated, to be duly and

8   lawfully paid to Jayco, Inc."

9             And that's wrong there.  So --

10       Q    And Number 9.

11       A    "Number 8, restated, and said Trustee, did not

12  authorize, nor enact a request, demand, or return, directly nor

13  indirectly, for duly paid and transferred funds identified in

14  number 4, above."

15       Q    Okay.  And Number 10, please.

16       A    "Number 9, restated, and Trustee, did duly and

17  lawfully receive the property identified in number 1 and 2,

18  restated."

19       Q    And Number 11?

20       A    "Number 10, restated, and said Trustee does verify

21  and confirm that a successful, legitimate, and lawful purchase

22  has been duly completed between the Factualized Trust, Randall

23  Keith Beane, and Jayco, Incorporated."

24       Q    Okay.  So that is a declaration validating the sale

25  and lawful and legal per your own reading in number --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    Our attorney would have told me that if -- if there

2  is anything that -- I don't read these.

3    Q    Right.

4    A    I have an attorney.  I pay an attorney, and he reads

5  these.

6    Q    Okay.

7    A    So if he -- if he let this go through, he felt

8  confident with it.  And if he did not feel confident with it,

9  it wouldn't have mattered, because we would have had to release

10  it anyway, because he already paid for the unit, so ...

11    Q    And you received that document on the 11th.  Correct?

12    A    This document would have been received by Nelson

13  Forbes on the 11th.

14    Q    Along with -- David can you please go to the next

15  page?

16         Along where the factualized trust document?

17    A    Correct.

18    Q    Thank you.  So you did receive documents after our

19  conversation on July 10th?

20    A    I didn't receive -- I didn't receive all the

21  information that you sent.  This here was -- we already had a

22  copy of this.  Okay.  And we had a copy of this or it wouldn't

23  have been printed on the thing.  So regardless what -- where we

24  go and what direction we go with this, I already had a copy of

25  something in order for it to go on this paperwork.  So --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    Did you -- did you read that factualized trust copy

2  that you claim that you received prior to July --

3    A    I didn't read this one, so ...

4    Q    You didn't read the other one?

5    A    -- the answer would be no.  I have attorneys that

6  read this stuff.  I don't do that.

7    Q    Do you claim that if Mr. Cohen had received any

8  further documentation that you would have received it also?

9    A    I would have received it.  If Brad got anything

10 from -- it doesn't matter who it's from.  I receive things that

11 I would never need ever in my life from Brad because it

12 transfers over.  If it has something that comes in indicated

13 for -- for any sales of anything, I get the document.

14   Q    You get the document?

15   A    That's right.  Now, if it's a muffler, I don't get

16 the document.

17   Q    Okay.

18   A    You know, my service department gets that, and my

19 attorney gets this --

20   Q    Okay.

21   A    -- so ...

22   Q    So anything Mr. Cohen gets, you get for Buddy Gregg?

23   A    For sales, correct.

24   Q    For sales.  Okay.  And in this instance, you're

25 saying you didn't receive any other documentation other than

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1   these documents --

2       A     The document that you --

3       Q     -- 105?

4       A     -- that you're referring to -- the -- you're opening

5   up a case, I mean, we'd have to go back to the -- to the video.

6   I did not receive any further documents besides -- and I've

7   already had a copy of this, okay, originally.  So I have

8   received no further documentation than what I was originally

9   provided, except I asked for the original document, okay, so it

10  was protecting Buddy Gregg and it was protecting Randall Beane.

11  Okay.  That's the only thing that I care about is the

12  customer --

13      Q     Uh-huh.

14      A     -- and my boss continuing to write me a check, so ...

15      Q     Understood.

16      A     That's it.

17      Q     Okay.  And are you aware of whether Buddy Gregg and

18  Whitney Bank have returned the actual wire funds or funds in

19  the amount of the wire to date?

20      A     I have not.

21      Q     You have not returned them?

22      A     Well, I should say, if I -- if they would have been

23  returned, it would have been prior to -- or it would have been

24  after Monday morning at nine o'clock, so --

25      Q     Monday morning, what date are you --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      A    Monday morning, this Monday morning.

2      Q    Oh, this Monday morning?

3      A    Correct.

4      Q    And to the best of your knowledge, they haven't been

5  returned?

6      A    That's right.

7      Q    And all the paperwork that you and Mr. Cohen, in this

8  particular instance, have received, has all that paperwork.  Is

9  that correct?

10     A    I'm sorry?

11     Q    You stated you have an attorney that goes through all

12 this paperwork, the factualized trust?

13     A    Yeah.

14     Q    The wire, the -- anything, you have an attorney that

15 actually does all that?

16     A    Anything that creates a problem, my attorney has it.

17     Q    Your attorney has it?

18     A    That's right.

19     Q    In this particular matter as well?

20     A    Yes, he would have it.

21     Q    Okay.  Let me just check to make sure I don't have

22 any further questions for you, Mr. Byrne.

23     A    Okay.

24     Q    Oh, I do have a question.

25     A    Sure.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    When we were discussing on July 10th, you had -- we

2  were trying to figure out, obviously, on the video what was

3  going on.  Isn't that correct.

4         On July 10th --

5    A    Okay.

6    Q    -- we actually initiated a call between all of us.

7  And, in fact, there was more than one call?

8    A    That's right.

9    Q    Okay.  And that was to determine what was going on

10  with Whitney Bank saying that the money had been asked to be

11  given back?

12   A    Correct.

13   Q    Okay.  And during our initial phone call, which was

14  not shown, there were -- which is why I called for a conference

15  call to be made between all of us, you had made a statement

16  that a man -- you had spoken to a man named True Brown?

17   A    Correct.

18   Q    And that he had identified -- you had told me he

19  identified himself as FBI.  Isn't that correct?

20         MS. SVOLTO:  Objecting to the hearsay, Your Honor.

21         MS. TUCCI-JARRAF:  Your Honor, they testified that

22  FBI contacted --

23         THE COURT:  Well, the objection is you're asking him

24  to talk about what somebody else told him.

25         MS. TUCCI-JARRAF:  Okay.  Let me rephrase the

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    question.

2              THE COURT:  Thank you.

3    BY MS. TUCCI-JARRAF:

4         Q    Okay.  You were contacted by a man named True Brown.

5         A    Correct.

6         Q    And who did you believe Mr. Brown worked for?

7         A    At the end of the conversation --

8         Q    At the beginning of your conversation.

9         A    At the beginning, it was identified that he worked

10   for the FBI.

11        Q    Okay.  And by the end of your conversation?

12        A    That he was a prior employee of the FBI.  He is a

13   current investigator for USAA Bank.

14        Q    And you told me all that information that day on

15   July 10th?

16        A    I don't believe I let -- I don't believe I told

17   you -- I mean, that -- I believe our conversation was that

18   there was an investigator from USAA Bank, that I was under the

19   impression that he was from the FBI originally, and he

20   cleared -- he cleared up the idea that he was a prior FBI

21   agent.

22        Q    And, in fact, the reason I asked for the conference

23   call with Lauren Palmisano of Whitney Bank, Buddy Gregg's bank,

24   and Mr. Cohen was because you had told me that someone named

25   True Brown from the FBI had contacted you and said that

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Mr. Beane -- to confirm that the vehicle was still on the

2    property.  Isn't that correct?

3         A    No.  We had the conversation with Lauren and Brad,

4    not for that purpose.  We had the conversation to figure out

5    who was, I believe it was -- forgive me if I'm -- if I'm off

6    with the name, but I believe it was Donald -- Donald Parker,

7    Donald K. Parker or Dan K. Parker from USAA Bank had called and

8    said he wanted his money back.

9         Q    In fact, on that day, there were multiple people that

10   had called?

11        A    Oh, yeah.

12        Q    That's why it was so confusing and why we got onto a

13   phone call and conference call in the first place.  And on the

14   first call, it was just you, me, and Mr. Forbes.  Is that

15   correct?

16        A    No.  The first call was myself, you, Don Forbes,

17   Randall Beane, and some other gal that -- forgive me, I don't

18   know her name.

19        Q    You don't know who that was?

20        A    I don't know her name.  She wasn't with me.  She was

21   with Randall.

22        Q    Okay.  Okay.  In fact, you had told me that Dan

23   Parker from USAA had contacted you guys, saying that,

24   number one -- or somebody had called --

25        A    Dan -- I think it was Donald or Dan K. Parker called

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Whitney Bank, also called Nelson Forbes.

2         Q     Right.

3         A     And requested the money back from USAA -- for USAA.

4         Q     Saying that Randall Beane had -- had ordered that the

5    money be sent back?

6         A     No.  No.  He said that it was -- I mean, everything

7    was brought up as a scam.  I mean, that's how -- that's how it

8    was presented.

9         Q     That who presented that to you?

10        A     USAA and True Brown and Donald or Dan.

11        Q     Uh-huh.  And you said that you had talked that day of

12   a Jaron Patterson.  Who was Jaron Patterson to the best of your

13   knowledge?

14        A     He -- he was actually an FBI agent.

15        Q     He identified himself as an FBI agent?

16        A     He called me from the FBI building, so --

17        Q     And was that before or after our conversation that we

18   watched from Exhibit 94 yesterday?  Do you recall?

19        A     No, I -- it was after.  It was after, because the

20   conversation with True Brown was prior to -- to Mr. Patterson.

21        Q     Uh-huh.  And you actually provided me with True

22   Brown's number that he had given to you on the 10th?

23        A     I don't recall, but I -- I most likely would have.

24        Q     Uh-huh.  You also gave me Dan Parker's number?

25        A     No.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  Q    On the 10th?

2  A    No.  Nelson Forbes would have given you his number.

3  Q    Right.  During the conference call.  We were actually

4  trying to get Mr. Parker on the phone.

5  A    I believe it was when you were speaking with Lauren.

6  Well, no, I got -- I called Mr. Parker from my office with --

7  the problem we had is, it can't accept -- you can't have three

8  people on the line.  Because USAA cannot process, and not only

9  that, at that stage, they wouldn't have believed Randall,

10 myself, or you, so, you know, because it was, you know --

11 Q    Right.

12 A    It was just a little -- little --

13 Q    Suspicious?

14 A    -- little -- well, that, and a little more drama

15 they're used to dealing with without being face to face.  You

16 know what I mean?  It's something they don't -- they're good to

17 their customers.  They don't care about you and they don't care

18 about me.  They care about Randall, and that's the only person

19 they care about.

20 Q    Which is why Randall said he was headed to Texas and

21 picking up the vehicle on the 11th.

22 A    I don't remember Texas.  I remember west.  I don't

23 remember Texas.  I don't remember -- I remember him saying

24 something about Seattle, and I don't know why I remember that

25 as well as I do, but it kind of registers in the memory bank.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  But I remember he wanted to spend 300 days on the road, and he

2  wanted to head out west.

3      Q    Right.  That was prior to the July 10th conference?

4      A    That's right.

5      Q    So that's prior to, but on our conference call that

6  we had stated that he was going to come to Texas so he could

7  clear all this up at San Antonio headquarters of USAA.

8      A    Now, I may have not been in that part of the

9  conversation.  I was continuing to get phone calls from other

10 people in reference to this deal, so ...

11     Q    And who were you getting phone calls in reference to?

12     A    I got a couple from -- someone from USAA that I

13 missed.  I got a 504, which I'm assuming is going to be Whitney

14 Bank.  I've got Brad kind of blowing up the phone.  I mean, it

15 was a lot going on.

16     Q    Yeah.  Brad Cohen?

17     A    Correct.

18     Q    And so that was prior to Brad and Lauren Palmisano

19 getting on the phone with us on July 10th?

20     A    Correct.

21     Q    So that was our first phone call that we had had,

22 because it's not very clear from Exhibit 94 that DOJ and FBI

23 put together that there was actually more than one phone call

24 between all of us that day?

25     A    Well, no.  There was one phone call.  I believe you

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    got -- everything was done on Randall's phone.  Then Brad

2    called in and somehow attached you guys, and you're operating

3    off of Brad's -- Brad wound up contacting everybody and getting

4    everybody on the line.  I left for that to go and discuss --

5         Q    You were not present?

6         A    In and out.

7         Q    And that was the second phone call that Brad had

8    called us from his phone and not from --

9         A    I only remember one phone call Brad calling anybody,

10   and if something happened without me in the room, that's highly

11   possible, but there's one call that was made.  We couldn't get

12   a way to get everything on the thing.  And not only that, you

13   don't dump something on Brad without warning Brad that you're

14   dumping it on him.  So that's kind of the way we handle things

15   there.

16        Q    So you're stating you weren't there for the phone

17   call --

18        A    I was there for part of it.

19        Q    -- when Lauren was there?

20        A    Lauren, no.  Lauren was in Louisiana.

21        Q    Excuse me.  When Lauren Palmisano from Whitney Bank

22   and Mr. Cohen were on the phone with us, you're stating that

23   you don't -- you weren't present --

24        A    Not for --

25        Q    -- to hear --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    -- the entire conversation.

2    Q    Okay.  But you did hear Ms. Palmisano on the phone

3    with us?

4    A    Part of it, correct.

5    Q    Okay.  And you stated you had spoken with Jaron

6    Patterson after our phone call on July 10th, sometime after our

7    phone call on July 10th?

8    A    Yeah.  One or two times, yeah.

9    Q    On the same day of July 10th?

10   A    No.  On July 10th, I heard from him once.

11   Q    Uh-huh.

12   A    On July 11th, one or two times.

13   Q    One or two times.  And the one on July 10th, were you

14   instructed to do anything?

15   A    I instructed him.  I mean, he asked questions.  Until

16   I can verify who somebody is, I'm not giving any information of

17   Randall's to anyone.  I'm not letting anybody -- I mean, we

18   protect the client.  It's about the client.  And we protect

19   Buddy Gregg.

20   Q    So was that phone call initially with Mr. Patterson

21   on July 10th, you just trying to confirm he was who he said he

22   was?

23   A    Yeah.  I would have liked to have actually identified

24   somebody that was truly who they said they were.  I mean, you

25   can't tell anything over a phone, you know, and -- you know,

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    it's -- you know, that's the biggest -- but it was pretty easy

2    to find out that he actually, truly was who he was.

3        Q    And who -- how did you do that?

4        A    I Googled.  I didn't even know we had FBI in

5    Knoxville, so I Googled that first.  And then went through and

6    called and questioned and got down to the safe bet that

7    Mr. Patterson actually existed.

8        Q    So he was listed in the FBI website?

9        A    I don't know if he was listed on the website or if I

10   just called and questioned -- you know, explained that somebody

11   is calling me indicating they're from the FBI, and I'd like to

12   make sure that the person actually exists.

13       Q    Were you taking extra precautions because of what had

14   already happened with True Brown?

15       A    Yeah.  Because I didn't know -- I didn't know -- at

16   this stage, I didn't know if you were real, if Randall was

17   real, who was -- I just -- I mean, it wouldn't have mattered.

18           If -- at that stage -- and this is what everybody has

19   to understand.  If at that stage I found out Randall was -- was

20   a criminal, I found out that True Brown was a criminal or

21   anybody else was, it did not matter.

22           The money was in the account.  He was an owner.  He

23   had signed the documentation, got himself -- could have came in

24   there to take this motor home and I could not release it to

25   him.  Okay.  And that's it.  That's how that happened.  It

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    didn't matter, he had ownership of that motor home.

2        Q    So you took all the steps that you felt were

3    required --

4        A    Every single one.

5        Q    -- within your experience to protect Randall as a

6    client until proving different as well as Buddy Gregg?

7        A    Correct.

8        Q    Okay.  And what is the name of your attorney that

9    would have had all the documentation -- you stated -- let me

10   rephrase this.  Strike that.  You stated that all the

11   documentation regarding this entire sale was given to your

12   attorney to be able to review?

13       A    Correct.  That would have been in July.  That would

14   have been on July 10th.  And it would have been sent over to

15   Howard Jackson, which is right down here somewhere in the Bank

16   of America building, yes.

17       Q    Is that your personal attorney or the attorney for

18   Buddy Gregg?

19       A    No.  He's our attorney for Buddy Gregg.

20       Q    For Buddy Gregg.  Did you also give that -- all this

21   documentation over to Lauren Palmisano or anyone from Whitney

22   Bank?

23       A    No.  Brad would have -- Brad would have done that.

24   If there was anything that was sent to her, it would have been

25   done through corporate office.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    Which is Mr. Cohen?

2    A    Mr. Cohen.

3    Q    And his staff?

4    A    Yeah.  Correct.

5    Q    Okay.  And after reviewing all that documentation,

6  Buddy Gregg, you were told by your attorney that Buddy Gregg

7  still has the money?

8    A    I was told by Brad.  He --

9    Q    By Mr. Cohen?

10   A    Yeah.  Everything goes from myself to Brad to Howard,

11 and then Brad calls me and tells me what he wants me to do.

12   Q    It was Mr. Cohen that told you Monday, this Monday,

13 that the money -- that the --

14   A    No, no, this Monday, I checked our accounts.

15   Q    You checked your accounts?

16   A    Correct.

17   Q    And the money is still there?

18   A    It -- it reflects that it is, yes.

19   Q    It reflects that the money from Mr. Beane's sale

20 is --

21   A    No.  It reflects on the balance that nothing drastic

22 has came out of my account that I don't know about, so --

23   Q    Okay.  Thank you.  Were you present on July 11th to

24 be able to witness the FBI approaching Mr. Beane?

25   A    I was -- I was on premise.  I didn't chase him down.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    So you had -- you didn't -- not see anything that
2  occurred?
3    A    No.  I -- I seen part -- I seen parts of what
4  happened.  But I -- I was called to come up to -- we have two
5  separate locations.  We have -- well, not separate locations.
6  The same thing.  But the shop is up top.  It's not visible from
7  my office.  I seen them come in.
8    Q    Come in where?
9    A    They kind of blocked off the driveways and came on up
10 through.  And, you know, did -- did what they did.  I didn't --
11   Q    What did you see them actually do?
12   A    I seen them run towards the -- towards the motor
13 home.
14   Q    Did they have weapons drawn?
15   A    Well, I mean, they didn't have them aiming at
16 anybody.  They had them with them.
17   Q    No.  Did they have them out of their holsters?
18   A    All I saw is -- is -- I mean, they didn't have -- I
19 guess they were just -- I mean, it's like any other type raid.
20 They didn't have -- you can't holster a gun, you know.
21   Q    They had a shotgun?
22   A    It wasn't a shotgun.  It was a --
23   Q    How large was the gun?
24   A    Couple I seen, probably, I don't know, I mean -- I
25 don't know what kind it was, but I mean, I assume it's --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    Can you show us with your hands?

2    A    Probably something like that, I guess.

3    Q    So, like, what is that three feet, four feet?

4    A    I mean, somewhere in that area.

5    Q    Okay.

6    A    I didn't see any -- you know, I didn't see any --

7  there were people coming up the side.  We have two separate

8  driveways.  I didn't see anything on the shop side.  I seen

9  people running up the hill on our side --

10   Q    Right.

11   A    -- on the sales side.  And, you know, it kind of

12 happened pretty quick, so I didn't get a real good visual.  The

13 only other thing that I had anything to do with was to go up

14 and check on our staff.  That was what I was asked to do,

15 so ...

16   Q    So when you saw them approaching the vehicles with

17 these -- these, what, three to four feet -- foot guns, did you

18 see them actually touch the vehicle?

19   A    They weren't -- it wasn't anywhere near Randy.  It

20 was on the backside of --

21   Q    Oh.

22   A    They -- they came in on one side.  They didn't really

23 have a good layout of our dealership.  I mean, it wasn't

24 like -- I don't think they had a plan, you know, at the time

25 to -- you know, like they had weeks to plan it out or anything.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  They just came in and did what -- you know, did what they felt

2  best to keep everybody safe.

3      Q    Are you able to draw for us just sort of a general

4  map, so that we can understand where the --

5      A    Sure.

6      Q    May I?  Is there a piece of paper that he could have

7  and a pen to be able to draw?

8      A    If you could just imagine a horseshoe.  You know, a

9  horseshoe, it goes -- our initial driveway come in.  And to get

10 towards the shop, you go up and around, and to go back out, you

11 go back down and out.  The two driveways are probably 240 feet,

12 225 to 240 away from each other.  One goes up into the shop.

13 One goes up in, you can go this way to the right, to the sales

14 department.  You can go this way to go up to the shop and the

15 parts department.

16     Q    How big is Buddy Gregg property?

17     A    22 acres.

18     Q    22 acres?

19     A    Yeah.

20     Q    How far from the entrance of any of the entrances to

21 the property is it to these buildings?

22     A    From the -- calling the shop entrance Entrance 1,

23 it's probably 175 feet to the shop.

24     Q    I'm sorry.  Could you please draw just a general map.

25     A    Yeah, I don't --

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      Q    I'm not sure where the shop is versus this horseshoe

2   so that the jury and myself and Mr. Beane could actually

3   understand what went down.

4      A    I haven't been known for my artistic ability.

5      Q    Just an accurate representation as far as

6   measurements and to scale, we're just looking for an idea so we

7   can picture it.

8           THE COURT:  Go ahead and switch over to the screen

9   and put it on the screen, Ms. Tucci-Jarraf.  We'll mark this as

10  Defendant's Exhibit 1.

11          MS. TUCCI-JARRAF:  Actually, at this moment, would it

12  be possible to take a short recess so I can speak with the

13  clerk so I know exactly how to --

14          THE COURT:  Well, I think just put it on the screen.

15  Let's see if we can keep going.  Go ahead and put it on the

16  screen.

17          MS. TUCCI-JARRAF:  Can you see that?

18          THE COURT:  Everybody can see it?  Is that the map

19  you drew, Mr. Byrne?

20          THE WITNESS:  Yeah.  Yeah.

21          THE COURT:  All right.  Why don't you just orient us

22  on the screen?

23          THE WITNESS:  The three, if you look to the far

24  bottom right, there's -- you'll see, that's the -- that's

25  the -- we'll call that -- I guess we'll call that Driveway 2.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1   BY MS. TUCCI-JARRAF:

2       Q     Which one, I'm sorry?

3       A     Far bottom right.

4       Q     Far bottom right?

5       A     Yeah.  It's from the end -- that's right.  From the

6   end of the driveway to the top of the shop where you park is

7   about 300 feet.  You see as it goes around the building, that

8   little shop, or that little sales office right there?

9       Q     Okay.

10            THE COURT:  Point -- when you say right there, you

11  can touch the screen.

12      A     Okay.  Right here, that's the sales office.  Terrible

13  drawing, but forgive me.

14  BY MS. TUCCI-JARRAF:

15      Q     Okay.

16      A     Okay.  It goes 300 feet around to the parking area

17  behind the sales building.

18            You can see the roadway loops around and goes back

19  down so you can go back out the other side.  There's a roadway

20  here that goes up the side that goes from the sales to the

21  shop, so we can take golf carts out where you can drive motor

22  homes, so you can do whatever you want to do through there.

23            The FBI blocked off this area, they blocked off this

24  area.

25            This from here up through to the shop is about

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1   250 feet, and the furthest point that anyone is allowed beyond

2   is right there where there's a stop sign, and we have a lot guy

3   that will stop you from going through there.

4          There's a campground over here, kind of goes

5   around -- good God, this is terrible.  Right there.

6          And the shop is -- it's 24 bays, 13 feet per bay.

7   Somewhere in the vicinity of 275 feet.

8          There's also a body shop over here, which does not

9   look like that at all, so ...

10  Q   So that's the body shop that you just drew, that's a

11  separate building from the main shop of 24 bays?

12  A   It is.  It's 32 feet from the edge of the shop to the

13  body shop.

14  Q   And where would -- where was the RV -- Mr. Beane's RV

15  at this point?

16  A   Right here.

17  Q   Right --

18  A   I'm sorry?

19  Q   Right in front of the shop?

20  A   Well, it's -- it's -- yeah, it's in front of the

21  shop.  Here's the -- oh, man, this is --

22  Q   Could you draw just a square or something so we can

23  tell the difference?

24  A   Yeah.  If my finger wasn't so big, I could probably

25  do a pretty good job of it.  Yeah, I can't.  Yeah, it's not

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  that big either, and it doesn't look like that either.

2          So it's actually lengthways in front of the shop.

3  It's -- the little stick indicator did better.  It's right

4  there, right where the O is, down below the O is where the

5  office is for the shop.

6      Q    Could you perhaps put a -- write RV, if you can right

7  next to that square just so that we --

8      A    You can't.  You can't.  It's going to -- try it

9  yourself.  Right there.

10     Q    I will.

11     A    Give it a roll.  Give it a roll.  You got small

12 fingers and you can --

13     Q    Just fingernails, is that right, for touching the

14 screen?

15     A    Pretty good, huh?

16          THE COURT:  Someone wrote "RV."

17          THE WITNESS:  That wasn't me.

18          THE COURT:  Is that where the RV was?

19          THE WITNESS:  No.  The RV was over -- well, now it

20 looks like a truck -- right over by the -- between S and the O.

21 That's where the RV was.  But it was parked lengthwise.  It

22 wasn't parked widthwise.  It was parked lengthwise.

23          So they simply come in.  I don't know if you can --

24 they come in and they blocked this right here.  See where my

25 finger is moving at the bottom?  They block there.  They

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    blocked there.  Nobody can get in, nobody can get out.

2    BY MS. TUCCI-JARRAF:

3        Q    Okay.  Those are the only two entrances and exits to

4    the property?

5        A    Well, out in the woods there's some, but nobody is

6    going through with an RV.

7        Q    Would it help if -- because I have a red pen here.

8            THE COURTROOM DEPUTY:  Don't draw on --

9            MS. TUCCI-JARRAF:  Don't draw on it?  Just color in

10   the box.  Oh, on the piece of paper.

11           THE COURT:  Why don't we do this, we'll go ahead and

12   take a break and --

13           MS. TUCCI-JARRAF:  Thank you.

14           THE COURT:  If the attorneys and defendants present,

15   if you need to talk with the witness and you want to get a

16   diagram, that's fine.  So let's take a recess.

17       (Jury out at 10:44 a.m.)

18           THE COURT:  As I mentioned, we'll take a recess.

19   Mr. Byrne can stick around.  He could maybe during the break

20   could draw a few things on his drawn map.

21           But, also, the courtroom deputy may try to print out

22   a Google Map, so you may be able to use that as well for this

23   testimony.

24           So why don't y'all figure that out over these 15

25   minutes.  Give Mr. Byrne time for a break as well.  But if you

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    could hang around for a few minutes, they may want you to

2    confer.  Just make sure everybody does it right here in the

3    well.  Thank you.

4            THE COURTROOM DEPUTY:  This honorable court shall

5    stand in recess till eleven o'clock.

6        (Recess from 10:45 a.m. to 11:11 a.m.)

7            THE COURTROOM DEPUTY:  This honorable court is again

8    in session.

9            THE COURT:  All right.  We're going to bring our jury

10   back in.

11       (Jury in at 11:11 a.m.)

12           THE COURT:  All right.  Thank you.  Everyone may be

13   seated.

14           Ms. Tucci-Jarraf, you may continue.

15   BY MS. TUCCI-JARRAF:

16       Q    Thank you.  Without prejudice, I will continue.

17            Mr. Byrne?

18       A    Yes, ma'am.

19       Q    Okay.  You've received a Google printout from the

20   clerk?

21       A    I did.

22       Q    Prosecution has a copy and Mr. Beane has a copy.

23       A    You probably want to turn that around.

24       Q    Okay.

25       A    Much better.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Q    So this was printed by the clerk.  Is that an

2  accurate representation of the 22 acres?

3    A    Pretty close, yeah.  Yeah.

4         THE COURT:  This will be Defendant's Exhibit 2.  You

5  can put a sticker on afterwards.

6         MS. TUCCI-JARRAF:  Afterwards.  Okay.

7         Excuse me, which one is showing, this one or -- can I

8  write on it up here and it will show?

9         THE COURTROOM DEPUTY:  Yes.  That's correct.

10 BY MS. TUCCI-JARRAF:

11   Q    Okay.  So, Mr. Byrne, the exits that you had drawn on

12 Defendant's Exhibit No. 1, is that up here in the right-hand

13 corner off of Snyder Road?

14   A    It's off Snyder Road.  Correct.

15   Q    Okay.  So this right here -- and I'm marking it in

16 red.  Can you see that?

17   A    Yep.

18   Q    Is that where that first blockade --

19   A    That's right.

20   Q    Multiple law enforcement blockade was?

21   A    Well, yeah.

22   Q    Okay.  And then the second entrance, because it looks

23 like there's three here?

24   A    There's only two.

25   Q    Okay.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

 1     A     You have what they have indicated as Herron Road.

It's not really Herron Road, but they still somehow show it.

That's the first entrance.  The second entrance is over here,

the little yellow line there.  That's Number 2.

 5     Q     So that's Number 2.  So what is the one to the left

of that?  What is that?

 7     A     To the left of it?

 8     Q     Or is that just fenced off?

 9     A     Oh, that's all fenced off, yeah.

10     Q     Okay.

11     A     You mean -- I'm sorry, you mean here?

12     Q     Yeah.

13     A     That's just an emergency exit in the event that

something happens to the gate and there's a fire, we can get

all the people out of the campground.

16     Q     Okay.  So that's an emergency -- so these -- the one

you marked in yellow and I marked in red --

18     A     Correct.

19     Q     -- those were the two gates you were showing on the

first time?

21     A     That's right.

22     Q     Okay.  Perhaps now you can go ahead and identify --

23     A     They actually have this -- where this motor home is

right here --

25     Q     Uh-huh.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    -- that's where Randall's motor home was.

2    Q    Okay.

3    A    That's Bay 17.  That's the only thing wide enough to

4  take 45 feet with four slots.

5    Q    So on here where they had the blockades, did they

6  have any officers inside on the property --

7    A    Yes.

8    Q    -- where the blockades -- how many officers do you

9  think were at each --

10    A    I seen -- I seen probably two or three here, you

11  know, on what they have indicated as Herron Road.  We shut our

12  blinds because we had customers in our office.

13    Q    Shut the blinds?

14    A    Yeah.  So --

15    Q    Could you just mark with an X where you think the

16  officers were and approximately how many?

17    A    There's three between -- between -- three or four

18  that I seen between -- now I can't do Xs very well on this

19  thing either.  There we go.  Between there --

20    Q    Three or four?

21    A    -- and here.  And then there's plenty over here.

22    Q    Plenty over where?

23    A    Well, I mean, over -- this is where the majority --

24  right where Randall's coach is was where the majority -- you

25  know, the fun was happening.  This down here.  I mean, they

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  just stopped it so people couldn't -- they didn't want people

2  to get involved.  So they sent people up in here to keep

3  customers and keep other people safe.

4      Q    When you say "up in here" --

5      A    Where I put that second X right here.

6      Q    The second X?

7      A    Yeah.  They came up through here, and they cleared

8  this going down so people would not get involved in anything

9  going on over here.

10      Q    And that's to the right-hand corner of the shop.  Is

11  that correct?

12      A    Oh, yeah.  That's actually the parts department.

13      Q    The parts?

14      A    Yeah, it's attached.  This part right here --

15      Q    Uh-huh.

16      A    -- over is parts.

17      Q    Okay.  So I'm going to -- hold on a second.  This is

18  the --

19      A    What's that?

20      Q    Hold on.  My finger is marking it instead of the pen.

21  I'm just going to put a P for the parts department so we know.

22  Right there, that yellow mark?

23      A    Yeah.

24      Q    Okay.  And so you had FBI where those two Xs are and

25  at the entrances?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1      A     Yeah.  And they're proceeding to go to where

2  Randall's coach was.

3      Q     And did you -- were you able to see Randall's coach

4  from your --

5      A     No.  My office is where this X is going right here.

6  That's my office.

7      Q     That's your office?

8      A     Yeah.

9      Q     So the officers that you saw were the -- with the

10 weapons, those were the ones that you -- were in plain sight of

11 your office?

12     A     Yeah.  I just seen people going up over the hill

13 to -- you know, I -- I can only assume it's to make sure that

14 no one leaves or -- or gets hurt along the way.  I mean,

15 they --

16     Q     Okay.  So at that moment when you saw that activity

17 going on --

18     A     I closed my blinds.

19     Q     You closed your blinds.  And did you order everyone

20 in your office to close their blinds?

21     A     I told everyone to stay where they were and not to

22 leave the building.

23     Q     So prior to law enforcement and all these guns coming

24 in on the property, you had a phone call prior to that from --

25 from law enforcement?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

```
 1        A    Yes.  Right before Randall -- right before Randall
 2   finished off in my office -- see, all of our conversations, the
 3   conversations that I had with you and Randall were right here.
 4             Okay.  Randall came in the front door, and he was in
 5   the thing when I got my call from the FBI asking me questions.
 6             I said I wasn't expecting Randall that early.  You
 7   know, Randall was coming in to go up and take his coach.  I
 8   figured he was an hour, hour and a half out, and then all of a
 9   sudden he was there.
10             They're asking me questions.
11             And I said, you know, "I'm finishing delivering up
12   the unit.  It's being delivered here shortly.  You know, so if
13   there's anything that you need to do or you need to speak to
14   him, you may want to speak to him, because he's going up here
15   to get his coach and he's leaving."
16        Q    Okay.  Did you contact them?
17        A    No.  I got a call.
18        Q    You got a call from them?
19        A    Correct.
20        Q    Saying that -- and you told them Randy was in your
21   office?
22        A    No, they're just -- well, Randy wasn't in my office
23   yet.  Randy was out in the lobby.  I was already speaking with
24   them.
25        Q    Uh-huh.
```

UNITED STATES DISTRICT COURT

1    A    And Randy just happened to come in.  And when he came

2    in, you know, I indicated that whatever you need to -- you

3    know, if you guys have discussions you need to have, you may

4    want to do it.  I can't detain him.  He owns the coach, so ...

5    Q    Okay.  And how long had you approximately been

6    talking to them before Randy came in?

7    A    Two, three minutes.  There's never any long

8    conversation.

9    Q    And you had stated earlier in our cross-examination

10   here that you had spoken to them twice on the 11th, once on

11   July 10th and then twice on July 11th?

12   A    It was once on the 10th, twice on the 11th.

13   Q    Right.  So you had a phone call with them prior to

14   this phone call when Randy came in?

15   A    I had a phone call when -- right as Randy was going

16   into the office.  I, you know, just said that, you know, it

17   would be just a couple minutes to finish the conversation, and

18   he came in the office.  We spoke with him for anywhere probably

19   25, 30 minutes in our office.

20        I got a call directly afterwards, asking if the coach

21   was still on premise.  I said it was.  They said they were

22   coming to -- to do whatever they were going to do, so ...

23   Q    That was the first phone call that day?

24   A    No.  That was the second.  They were within -- they

25   were within a half hour of each other.  The first one was when

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    Randy first showed up.  The second one was probably six minutes

2    after he left my office.

3        Q    Uh-huh.  So 25 to 30 minutes between these two phone

4    calls?

5        A    Yeah.

6        Q    And both of those phone calls were initiated by

7    someone claiming to be the FBI or was the second --

8        A    Well, I was pretty confident he was FBI.  That's the

9    one that I --

10       Q    Oh, was that Mr. Patterson?

11       A    It was Mr. Patterson.

12       Q    Okay.  Someone that you had already gone through

13   the -- to vet that he actually was who he said he was?

14       A    Correct.

15       Q    So who initiated that second call?

16       A    Both was initiated by the FBI, not by me.

17       Q    Okay.  And both times, Mr. Patterson was that --

18       A    Correct.

19       Q    And why was Randy there that morning?

20       A    He was -- he had -- I'm trying to think if there was

21   something else that we had missed with a signature or not.

22   I -- I know that we went over the -- on the 11th we went over

23   the -- the trust.  Don -- Nelson Forbes went over the trust

24   with -- with Randy.

25       Q    Would that be the Exhibit 105 that you and I had gone

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1  over earlier?

2      A    Correct.

3      Q    That's the paperwork that Randy --

4      A    That was the one with the red dye, that was the one

5  that we -- was what we went over.

6      Q    And he actually borrowed your copier so that he could

7  make copies of it?

8      A    Correct.  That's right.

9      Q    In your office in that --

10     A    No, not in my office.  It was in the hallway.

11     Q    In the hallway?

12     A    Yeah.

13     Q    So that was approximately -- do you remember what

14  time?

15     A    You know, I -- it was -- it was probably close to --

16  back up about -- about 45 minutes from the time he got

17  arrested, that's about when it was.  So it was within -- it was

18  within probably one to three area in the time frame.

19     Q    A one what?

20     A    One to about three.  It -- I can't give you much

21  closer than two hours, because, I mean, I can't --

22     Q    Okay.

23     A    -- tell you what time of day it was --

24     Q    You believe the whole -- from Randy showing up to the

25  time that law enforcement came in and started blocking things

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    off was approximately how long?

2        A    It was within a two -- well, it was within -- it was

3    within probably the hour of him showing.  He went up and

4    Randall went up and went over a couple items with Paul Chapman,

5    one of our -- one of our techs, and at that stage it just kind

6    of all unfolded.

7        Q    And how were the rest of the -- you said you had to

8    calm people down --

9        A    No.

10       Q    -- during the event or told people to stay inside?

11       A    We just told -- we didn't want the customers, nor --

12   I don't want anybody involved in that.  I mean, we -- I -- I

13   didn't want it for Randall, I didn't want it for us, I didn't

14   want it for the FBI people.  We just -- that just doesn't

15   happen to Buddy Gregg.

16       Q    Were people trying to go outside to see what --

17       A    People were -- yeah.  It's kind of like anything.

18   They -- everybody gets curious about what's going on, and next

19   thing you know, you have somebody hurt or somebody, you know --

20       Q    How did you explain that to your clients?

21       A    Sit down, don't go outside.

22       Q    That's all the comments you made?

23       A    That's all you had to make, yep.

24       Q    Okay.  Did anyone help you in preparation for your

25   testimony here today?

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1    A    No.  We just went over, you know, each exhibit.  I

2  mean, nobody told me to say something or --

3    Q    Who did you go over your -- in preparation for your

4  testimony?  Who specifically?

5    A    These two folks here.

6    Q    Ms. Davidson and Ms. Svolto?

7    A    Correct.  That's right.

8    Q    Anybody else in this room from law enforcement?

9    A    We have -- forgive me, I'm sorry, gentleman back

10  there, he was -- both gentlemen, they came in to --

11    Q    Who is that gentleman?

12    A    You got to forgive me.  I'm not --

13    Q    This gentleman --

14    A    -- great with names.

15    Q    -- with the glasses?

16    A    Him and the gentleman before him, right there.

17    Q    And FBI Agent Durand?

18    A    Yes.  Correct.

19    Q    I'm sorry I don't know.

20        MR. PACK:  I'm Special Agent Jason Pack.

21        MS. TUCCI-JARRAF:  Jason Pack?

22        MR. PACK:  Yes, ma'am.

23  BY MS. TUCCI-JARRAF:

24    Q    And I have one last question here, who's the finance

25  manager for Buddy Gregg?

UNITED STATES DISTRICT COURT

1    A    At the time of this, it was Daron Walker.

2    Q    Derek?

3    A    Daron.

4    Q    Daron Walker.

5    A    D-a-r-o-n, Daron, Daron.  And it was Walker.

6    Q    And how long has he been with Buddy Gregg?

7    A    He was there for a short period.

8    Q    How short of a period?

9    A    Less than 90 days.

10   Q    What was his last day?  Do you know, approximately?

11   A    It would have been -- it would have been somewhere --

12   somewhere around school time, because he brought his daughter

13   back to North Carolina to put her in school.

14   Q    September?

15   A    Early September.

16   Q    Early September, possibly end of October -- or

17   August?

18   A    No.  It was in September.

19   Q    Okay.  And where did he work before working for Buddy

20   Gregg?

21   A    Camping World of North Carolina.

22   Q    How long had he worked there prior?

23   A    I believe two or three years.

24   Q    His father had owned the Camping World?

25   A    I'm sorry.

UNITED STATES DISTRICT COURT

Jerald Byrne - Cross-Examination

1        Q    He had worked there for approximately two to three

2    years, his father had owned that?

3        A    No.  No.  That was -- no, Camping World was owned by

4    one person.  That's -- Tom Johnson owned it prior to Camping

5    World.  But Daron's dad didn't own it.

6             MS. TUCCI-JARRAF:  Okay.  I have no further questions

7    at this time.

8             THE COURT:  Thank you.

9             MS. TUCCI-JARRAF:  But I would like to -- how do we

10   save this with the markings on there.  If you can get it back

11   to where it was.

12            Does that look accurate?

13            THE WITNESS:  It's pretty close.

14            THE COURT:  Got it, Julie?

15            THE COURTROOM DEPUTY:  Yes, sir.

16            THE COURT:  So Defendant's Exhibit 1 will be the

17   hand-drawn -- hand drawings.  Defendant's Exhibit 2 will be the

18   plain copy of the Google Map.  Defendant's Exhibit 3 --

19            THE COURTROOM DEPUTY:  2A.

20            THE COURT:  -- or 2A will be the Google Map with the

21   markings on it.

22            Thank you, Ms. Tucci-Jarraf.

23         (Defendants' Exhibits 1, 2, 2A admitted into evidence.)

24            THE COURT:  Ms. Svolto, redirect?

25            MS. SVOLTO:  Yes, please.

UNITED STATES DISTRICT COURT

**REDIRECT EXAMINATION**

1

BY MS. SVOLTO:

2

    Q    How are you doing, Mr. Byrne?

3

    A    I'm good.  How are you?

4

    Q    I'm good.  So if we could switch to the -- thank you.

5

           So on which date did Mr. Beane first arrive to Buddy

6

Gregg?

7

    A    My paperwork indicates the 6th.

8

    Q    Okay.  And when he came, he picked out a motor home.

9

Right?

10

    A    That's right.

11

    Q    And did you draw up purchase agreement documents?

12

    A    We did.

13

    Q    All right.  Could we go to Exhibit 123, please.

14

           Were these the original documents that you drew up?

15

    A    That's the original.

16

    Q    And you drew those up on which date?

17

    A    The 7th.

18

    Q    If we could highlight the 7th.

19

           All right.  And whose signature there by the dealer

20

manager?

21

    A    That actually was printed up by Daron Walker.

22

    Q    Okay.  And the buyer's signature there?

23

    A    Is Randall Keith Beane.

24

    Q    And the date of those signatures?

25

UNITED STATES DISTRICT COURT

Jerald Byrne - Redirect Examination

1    A    Both have 7/7.

2    Q    Okay.  And now if we could have Exhibit 100.

3         All right.  Is this a new purchase agreement

4    document?

5    A    That's a -- that's the final of three.

6    Q    Okay.  And so there was a second one in between these

7    two?

8    A    Correct.  It would have had actual Randall Keith

9    Beane instead of Randy Beane.

10   Q    Okay.  So there was a Randy Beane purchase agreement

11   and then a Randall Keith Beane purchase agreement?

12   A    Correct.

13   Q    And then there was this agreement?

14   A    Correct.

15   Q    All right.  If we could go to the top where it says

16   "Buyer" and "Address."

17        All right.  And so this is -- it says at the "Buyer,"

18   what does it say there?

19   A    "Randall Keith Beane Duly Factualized."

20   Q    And so as the date there is also July 7th?

21   A    It is.

22   Q    All right.  And so that would indicate that this

23   document was prepared on July 7th?

24   A    Correct.

25   Q    And it was prepared at whose request?

UNITED STATES DISTRICT COURT

1    A    It would have been at Heather and Randall's request.

2    Q    Okay.  So after the second, after the first document

3 was prepared that said Randy Beane --

4    A    That's right.

5    Q    -- at what point did you learn that there was a

6 change requested?

7    A    In the beginning when he was speaking with Dan

8 Lassetter, he said that there was -- there's a possibility of

9 something -- of something changing.

10        Dan is my salesperson.  He kind of indicated that it

11 may -- you know, that he was speaking with his attorney or his

12 consultant to determine whether or not it was going to be put

13 into a trust name.

14   Q    Okay.  So, initially, there were documents filled out

15 that said Randy Beane?

16   A    That is right.

17   Q    And then when was it determined to be put in Randall

18 Keith Beane Duly Factualized?

19   A    That would have been after he -- Randall had had a

20 discussion with Heather.

21   Q    Okay.  And what date was this document prepared?

22   A    That's on 7/7.

23   Q    And is it your recollection that he provided trust

24 documents at the time he requested this change?

25   A    That's right.

Jerald Byrne - Redirect Examination

1  Q   And that would have been on July 7th as well?

2  A   Correct.

3  Q   All right.  Could we go to the signature line.  And

4  so is there a dealer manager signature there?

5  A   That's Daron Walker.

6  Q   And also dated July 7, 2017?

7  A   Correct.

8  Q   And buyer, there's a signature there?

9  A   There is.

10  Q   Is that consistent with all the other signatures you

11  received on these documents --

12  A   Absolutely.

13  Q   -- for the buyer.  Okay.  Also dated July 7, 2017?

14  A   Correct.

15  Q   Okay.  Thanks.  And so your recollection is that you

16  received some trust documents on July 7th, 2017.  Correct?

17  A   Correct.  We would have had to have something scanned

18  to us in order to -- to change from Randall Keith to Randall

19  Keith Beane Duly Factualized.

20  Q   Okay.  And so after you received those documents,

21  that's when this document here --

22  A   Correct.

23  Q   -- the purchase agreement, Exhibit 100, was prepared?

24  A   That's right.

25  Q   Okay.  And so when you received the trust documents,

UNITED STATES DISTRICT COURT

Jerald Byrne - Redirect Examination

1  do you review them personally?

2      A    I don't.

3      Q    No.  You send them to a legal division?

4      A    Well, I usually let the finance department, you know,

5  read through to make sure it's -- we -- we do probably 12, 14

6  trusts a year.  And out of those, I've never had not one issue.

7  We usually take it at face value.  If something is -- is

8  noticeably different, you know, there's -- they're normally

9  financed.  They're not paid cash on the trust.  They use it to

10  write things off for the trust.  You know, if there's something

11  that's noticeably different, the F and I manager will tell me

12  and I'll stop the sale.

13      Q    So if you don't hear anything from the F and I

14  manager, you carry on --

15      A    Correct.

16      Q    -- with the regular course of the sale?  And so when

17  you turn things over to the legal department, you don't check

18  to ask if they've reviewed it or anything?

19      A    No.  We don't usually have to turn anything over to

20  the legal department.  We -- I mean, we just never -- it's easy

21  like Sunday morning.  We never have problems.  I mean, it's

22  just -- this is the first.

23      Q    Have you ever had a deal go like this?

24      A    Absolutely not.

25      Q    All right.  Could we go to Exhibit 105.  And so you

UNITED STATES DISTRICT COURT

Jerald Byrne - Redirect Examination

1    changed the purchase agreement documents on July 7th?

2        A    Correct.

3        Q    Correct?  And then you received trust documents also

4    on July 7th?

5        A    Correct.

6        Q    And then you received a second set of trust

7    documents?

8        A    Correct.  We didn't -- after the -- we wound up

9    getting the second set on the 11th.  And it was -- it was a new

10   thing.  I said I want original documentation so we could see

11   the original documentation.  We had calls indicating that the

12   sale was not -- it was a fraudulent sale.

13           And in order for me to be comfortable, I asked

14   Randall to bring in the original documents.  He did it

15   within -- not very long anyway.  He brought it back and it was

16   all -- I mean, I don't know what red dye means on anything.  I

17   asked Howard afterwards, but he said he'd never seen that,

18   so --

19       Q    All right.  So looking at this document, you

20   understood this document to be a trust document?

21       A    Correct.

22       Q    All right.  And so could we go to Page 2 of

23   Exhibit 105.

24           So looking at Paragraph 8, I think you indicated on

25   your cross-examination, it was incorrect?

UNITED STATES DISTRICT COURT

1      A      It is.

2      Q      What's incorrect about it?

3      A      Because nothing was lawfully paid to Jayco by anybody

4  but me.

5      Q      Okay.

6      A      Well, Buddy Gregg.

7      Q      Right.  Because Buddy Gregg purchased the motor home

8  initially as the dealer?

9      A      Correct.

10      Q      Did you prepare this document?

11      A      No.

12      Q      It was provided to you by whom?

13      A      Randall.

14      Q      Okay.  And could we go to Paragraph 11, please.  And

15  is Paragraph 11 correct?  And specifically I'm looking at the

16  last line started with "purchase."

17      A      No, it's not correct with Jayco.  It's between

18  Randall Beane Duly Factualized and Buddy Gregg.

19      Q      Okay.  So the incorrect portion of that is it

20  references Jayco?

21      A      Jayco.

22      Q      All right.  Could we go to the bottom of this page,

23  starting with the signature line, go all the way to the bottom,

24  please.  All right.  Great.

25              And so the date on this particular document is

UNITED STATES DISTRICT COURT

Jerald Byrne - Redirect Examination

1   July 11th.  Correct?

2      A    It indicates it.  It's -- I mean, it -- yeah.  I

3   mean, it kind of looks like something could have been -- I

4   mean, if you could see the over -- everything else is kind of

5   fine and to the point, and that second -- that middle section

6   looks like there's --

7      Q    Okay.  And so if we could highlight the signature

8   line and the sentence underneath the signature line.  All

9   right.

10          Do you recognize that signature?

11     A    Randall's?

12     Q    Uh-huh.

13     A    Yes, I do.

14     Q    And underneath it, can you read that out, the

15  sentence underneath Randall Keith Beane?

16     A    "The original depository" --

17     Q    Oh, no, I'm sorry.  Right above that in the

18  highlighted portion, "All inquiries."

19     A    "All inquiries regarding the declaration of the duly

20  completed sale, are duly directed to my lawyer, Heather Ann

21  Tucci-Jarraf, telephone No. 253-241" -- I think it's 2008.

22     Q    Okay.

23     A    2000 something.

24     Q    Okay.  Thank you.  And so is that consistent with

25  what your previous conversations with Mr. Beane had been?

UNITED STATES DISTRICT COURT

1    A    With Mr. Beane and with Heather, and all -- any

2  other -- any other issues to contact his attorney directly.

3    Q    All right.  So you understood that Heather was

4  Beane's attorney.  Correct?

5    A    Correct.

6    Q    Okay.  So you stated a couple times on

7  cross-examination that Randall Beane had ownership of the motor

8  home?

9    A    Correct.

10   Q    And, in fact, did you have a storage agreement and a

11 delivery agreement with Mr. Beane?

12   A    Yeah.  The storage agreement is signed to let

13 everybody know we're, one, not charging them anything to store

14 their unit there until they take it away.  The main reason to

15 have that signed, and at the bottom, there's a second page that

16 you don't have, but it states that you are an owner.

17         You know, and there's three lines.  One states

18 that -- that you agreed to the purchase of the unit, the second

19 line agrees that if there's any financing, you're bound to the

20 finance contract.  There was none.  And the third line

21 indicates that this is considered as delivered to me.

22         So, in other words, if you buy it from California and

23 you want to pick it up, we give you the paperwork, you sign

24 everything on the -- on the thing, and it means that you own

25 it.  There's -- it's nonnegotiable, so --

UNITED STATES DISTRICT COURT

1    Q    Was that -- can we put up Exhibit 113, please.

2         And is that this document here?

3    A    Yes.  There's a second page to this document, but it

4    all says the same thing, so --

5    Q    Is this 115?

6    A    Yes.  Correct.

7    Q    Okay.  And could we go to --

8    A    Well, this is a -- well, no, I'm sorry, this is a

9    privacy notice stating that we're not going to -- we're not

10   going to sell any information.  We didn't have any information

11   to sell because he didn't finance anything.

12   Q    Okay.  Could -- and I apologize, could we go to

13   Exhibit 113.

14   A    Yeah.  That's the delivery -- that's delivery and

15   storage.

16   Q    Okay.

17   A    That's actually -- this one here is done by -- this

18   one here is done by the -- looks down here like -- I'm not sure

19   who the authorized signature is on that one, but it would have

20   been somebody up in the shop, because this is a shop storage

21   agreement.  It might have been Daron.  I'm sorry.  It is Daron.

22   But he would have -- he would have signed it with Randall when

23   he came down after doing the walk.

24   Q    Okay.  And could we go briefly to Exhibit 103.  All

25   right.  And so the wire you've testified you received -- the

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1  wire was sent on July 7th.  Is that correct?

2      A    No.  The wire was started on July 7th.  It was

3  received on July 8th, 2017 at 12:10 p.m.

4      Q    Okay.  And once that wire is received, the cash is in

5  Buddy Gregg's account.  Correct?

6      A    That's right.

7      Q    A wire works just like cash?

8      A    It was.  We prefer wiring.

9      Q    And once that wire came through on the 8th,

10  Mr. Byrne, was it Buddy Gregg's position that Randall Beane

11  owned that RV?

12      A    It is the position that he owns it, yes.

13          MS. SVOLTO:  Okay.  Thank you.

14          THE COURT:  Thank you.

15          Mr. Beane, any recross-examination in follow-up to

16  the redirect?

17          MR. BEANE:  Yes, sir.

18                    **RECROSS-EXAMINATION**

19          MS. DAVIDSON:  Your Honor, he would like -- he wants

20  to put in an exhibit that we have not admitted yet.  We don't

21  have an objection to it, but it hasn't been admitted yet.

22          THE COURT:  All right.  Why don't you put it on the

23  screen.

24          MR. BEANE:  Okay.

25          THE COURT:  Can this witness identify it?  I mean, if

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1   there's no objection to this document, let's just mark it as

2   Defendant's Exhibit 4 and we'll admit it.  So go ahead.

3           MS. TUCCI-JARRAF:  Three?

4           THE COURT:  Three.  Excuse me.  Thank you.

5        (Defendants' Exhibit 3 admitted into evidence.)

6           THE COURT:  All right.  Go ahead, Mr. Beane.

7   BY MR. BEANE:

8       Q    Mr. Byrne, do you recognize this logo on this

9   letterhead?

10      A    The Whitney logo?

11      Q    Yes, sir.

12      A    Yes, I do.

13      Q    Would that be your bank that you deal with with Buddy

14  Gregg Motor Homes?

15      A    One of many, yeah.

16      Q    Okay.  Do you see the date there at the top?

17      A    We received the -- oh, July 12th?

18      Q    Yes, sir.

19      A    Yes, I see that.

20      Q    The arrest happened on the 11th?

21      A    Correct.

22      Q    This letter is dated the 12th.  Correct?

23      A    Okay.

24      Q    Would you read this letter, please?

25      A    Sure.  It's indicates USAA Federal Savings Bank.

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1        THE COURT:  Just start with the "We received."

2        THE WITNESS:  Okay.  "We received a Hold Harmless

3   from USAA Federal Savings bank on 7/10/2017 regarding a

4   fraudulent wire deposited into Whitney Bank account on

5   7/7/17 in the amount of $493,110.68.  We have completed

6   research and are unable to return the funds per your request

7   for the following reason(s):

8        "Documentations have been provided by your customer,

9   Randall Keith Beane, acknowledging that the wire, in the amount

10  of $493,110.68, sent on 7/7/17 to recipient, Buddy Gregg Motor

11  Home LLC, was a valid transaction and should not be disputed.

12  Mr. Beane has acknowledged that he is in possession of the item

13  purchased by the recipient.

14        "Should you have any questions, please contact me."

15        And that looks like Lauren's -- yeah, it's Lauren's

16  number.

17  BY MR. BEANE:

18   Q    Thank you for reading that.  Would you say that in

19  order for this letter to be drawn, that an attorney would have

20  had to gone over the documents for this letter to go out?

21   A    That's something I don't -- I mean --

22   Q    You wouldn't know that?

23        MS. SVOLTO:  Your Honor --

24   A    I don't.

25        MS. SVOLTO:  -- we'd object.  The witness has no

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1  knowledge.

2          THE COURT:  He said he didn't know.  That's probably

3  objectionable.

4          Go ahead, Mr. Beane.

5          Not within his personal knowledge --

6          MR. BEANE:  Right.

7          THE COURT:  -- so I'll sustain the objection.

8  BY MR. BEANE:

9      Q    Would you assume that --

10         MS. SVOLTO:  Your Honor, object.

11     A    I don't assume.  This is something --

12         THE COURT:  Let me -- excuse me, when she objects,

13  let me --

14         THE WITNESS:  Oh, okay, I'm sorry, yeah.

15         THE COURT:  She objects for the same reason.  I'll

16  sustain the objection.  It's not within the witness' personal

17  knowledge.

18         MR. BEANE:  All right.  Thank you for answering that.

19  BY MR. BEANE:

20     Q    You said you never read the factualized trust?

21     A    I don't read -- no, I don't read those.

22     Q    You stated earlier that you did not feel that in any

23  way that I was being fraudulent with Buddy Gregg Motors or that

24  I had any intentions of doing anything with the coach other

25  than using it for its intended purpose?

UNITED STATES DISTRICT COURT

1    A    300 days a year, correct.

2    Q    You still feel that way?

3         THE COURT:  What did you say?

4         THE WITNESS:  I said 300 days a year.  Correct.

5    That's what he had on our notes.

6    BY MR. BEANE:

7    Q    And you still feel that way?

8    A    Randall, please, forgive me, I don't -- I mean, at

9    this stage, I -- I'm not -- I'm not here to --

10   Q    The reason I'm asking --

11   A    -- defend them, you, or any -- I'm here just to tell

12   my statement, so ...

13   Q    I understood that you had sent word by someone

14   that -- to let me know that I was a good customer and that you

15   were truly sorry for everything that had happened?

16   A    And that's the truth.  I'm truly sorry for anybody

17   that has this type of break.

18   Q    Was there a warrant shown to you in order to take the

19   RV off the property, once I was arrested?

20   A    It's not.  It wouldn't be shown to me.  This would be

21   handled by -- most likely it would have been -- it would have

22   been Eric Bivens, which was the people that had possession of

23   the unit.

24   Q    Is it common practice to let a vehicle go without

25   seeing a warrant?

UNITED STATES DISTRICT COURT

1    A    None of this was common.

2    Q    Do what?

3    A    None of this was common.

4    Q    I mean, is it common practice to let a vehicle go

5  without proper authority unless the owner has approved it?

6    A    No.  We don't frequently do that.  We don't let

7  people borrow other people's stuff.

8    Q    There was no approval for me to remove the vehicle

9  from the property at that point?

10   A    Again, I -- I would assume not.  But, again, I

11  don't -- I mean ...

12   Q    Is it -- in all the years you've been in business,

13  would it be usual business practice if funds are stolen and the

14  property is still on the retail lot to take the property rather

15  than try to retrieve the funds?

16   A    This has never happened to me.

17   Q    Right.

18   A    I don't --

19   Q    But you -- in business, would you think that would be

20  usual practice?

21   A    They would -- they would usually -- I mean, it

22  would -- it was indicated that you were the owner of the coach,

23  and they collect the collateral, not the cash.  Right now, they

24  had no bearing against the money.

25   Q    Right.

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1      A    All they had was -- was the collateral that -- that

2  USAA felt that they owned, so ...

3      Q    But the funds had proven to be legitimate?

4      A    The funds had cleared our account.

5      Q    Okay.  Who convinced you -- at some point, you said

6  that you felt comfortable with me as a customer, and you wanted

7  to protect me as a customer.  Who convinced you otherwise to

8  let you believe that I had committed a crime to the point where

9  you allowed the FBI on the property to ambush me, basically?

10     A    Well, it wasn't a convincing of anything.  It's

11 called obstruction of justice.  I'm not going to get involved.

12 My main goal is to keep our customers satisfied and safe.

13 Okay.  When someone above my authority comes in on that

14 property, I don't get involved until the dust settles.

15     Q    Had they been on the property prior to --

16     A    Never.

17     Q    Never?  Just on phone calls?

18     A    I'm sorry?

19     Q    Just phone calls?

20     A    Phone calls.

21          MR. BEANE:  All right.  I have no further questions.

22          THE COURT:  All right.  Thank you, Mr. Beane.

23          Ms. Tucci-Jarraf, any recross in response to the

24 redirect?

25          MS. TUCCI-JARRAF:  Without prejudice, just brief

UNITED STATES DISTRICT COURT

1   recross.

2                    **RECROSS-EXAMINATION**

3   BY MS. TUCCI-JARRAF:

4        Q    Mr. Byrne, Ms. Svolto had shown you the purchase

5   agreement -- or the purchase sales order?

6        A    Correct.

7        Q    Okay.  And you had stated that it was Daron Walker's

8   signature at the bottom?

9        A    Daron Walker would have done the final paperwork.  It

10  would have been drawn up by me.  It would have been saved and

11  Daron would have had Randall sign in the office.  My copy would

12  have came out.  He would have seen the thing across the top

13  that said something similar to nonrefundable deposit.

14            When I -- when I print the things, I take a stamp, I

15  stamp it, I send it back.  Daron then goes back, has Randall's

16  signature on this until Daron -- because he then sells product.

17  He sells wheel and tire.  He sells wheel and tire and extended

18  service contracts and paint and fab and stuff like that.

19            It then changes again.  It's not signed by me.  If

20  they by-product, it's then Daron's signature.  If they -- well,

21  not any longer, but I mean, when he was there with us, it was

22  Daron's signature.  It's originally stamped by me and signed by

23  me, holding the customer to the purchase.

24        Q    So are you saying that you prepared that paperwork

25  then?

1      A    I would have prepared the final paperwork.  Correct.

2      Q    Not Daron Walker?

3      A    No.  He would have printed out what I already had and

4  anything additional that he added to it.  In other words,

5  Randall purchased an extended service contract, wheel and tire

6  and paint and fab, I believe is -- I don't have the document in

7  front of me, but I believe it was that three product totaling

8  somewhere around 10,000.  That would be about 10,250, 10,249,

9  somewhere around there.  That would have been prepared by

10  Daron.

11      Q    Right.  You had said in your cross earlier and as

12  well with Mr. Beane that July 8th was the first time that you

13  had actually met Mr. Beane.  How would it be possible for you

14  to have prepared that paperwork on July --

15      A    I would have prepared all the paperwork on -- I

16  prepare all the paperwork.  I don't meet every customer by any

17  means until -- until -- sometimes I don't meet them.  Sometimes

18  I'm in court and I don't get to do my job.  So -- but I don't

19  meet every customer.  But I usually try to make it a point to

20  walk out and shake hands and congratulate a customer and to let

21  them know that they're talking to the person that makes the

22  final decision, so ...

23      Q    So Daron Walker was the one that worked with him on

24  July 7th?

25      A    Daron would have had him -- Dan, Dan Lassetter and

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1   Daron would have done -- would have done -- I would have

2   prepared the paperwork and prepared the numbers.  If there is

3   any objection to any of the numbers, I would have met him at

4   that point.  There was no objection to any of the numbers, so I

5   didn't have to go out and meet anybody.

6        Q    You also said that any paperwork that Brad Cohen

7   would have received regarding any kind of sale, you would have

8   received as well?

9        A    I would.  He would send it to me.

10       Q    You stated that you didn't receive any paperwork

11  other than Exhibit 105?

12       A    Brad sent me nothing to my personal e-mail.  The --

13  the -- what I got was from Randall.

14       Q    Uh-huh.

15       A    And that's --

16       Q    And no further paperwork?

17       A    No.

18       Q    Okay.  You talked about Mr. Beane had asked you

19  regarding someone taking his property, you said you weren't

20  going to get involved with obstruction?

21       A    I can't.

22       Q    Exactly.  So, in fact, you and I never even had a

23  conversation on 7/8, it was actually Daron Walker that I had

24  spoken with --

25       A    No.

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1    Q    -- who -- Daron Walker, and I had told Walker that --

2    Mr. Walker that I've always had many Walkers involved

3    throughout my entire career.  Correct?

4         MS. SVOLTO:  Your Honor, we're going to object to

5    this line of questioning.

6         MS. TUCCI-JARRAF:  That's fine.  I'll strike it.

7         THE COURT:  I'll sustain.

8    BY MS. TUCCI-JARRAF:

9    Q    You and I never spoke on July 8th.  In fact, the

10   first time that you and I spoke was on July 10th?

11   A    No, ma'am.

12   Q    And on that day, I had asked you to spell out your

13   name, because I didn't know your voice and I didn't know how to

14   spell your name.

15   A    You were confused about the people that were in the

16   room on the 10th, because you kept saying Nelson Forbes and you

17   kept -- you know, Mr. Forbes, Mr. Byrne, who is this, who is

18   that.

19        You and I spoke on the 8th.  And then Daron Walker

20   took the remainder of the phone call, and I never met -- I met

21   with Randall on the 8th, and it was on his phone, not on our

22   phone, so ...

23   Q    In fact, it was Mr. Walker that I had spoken to and

24   not you who told me about the MSO and the actual tabs, that's

25   why you can't recall the conversation correctly and we had some

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1    issues with getting the information?

2        A    No, ma'am.  Daron would have to ask me --

3        Q    I --

4            MS. SVOLTO:  Objection.

5            THE COURT:  Excuse me, Mr. Byrne.  Excuse me, both of

6    you.  Excuse me.  Remind everyone when counsel rises to make an

7    objection, the Court will listen to the objection and make a

8    ruling.

9            MS. SVOLTO:  Objecting on the same grounds as

10   earlier.

11           THE COURT:  I'll sustain the objection.  Just ask the

12   question of this witness and -- go ahead.

13   BY MS. TUCCI-JARRAF:

14       Q    It wasn't actually you that I spoke to on July 8th.

15   Is that correct?

16       A    No, it's not correct.

17       Q    In fact, it was Daron Walker that I spoke to on

18   July 8th?

19       A    No, ma'am.

20       Q    And, in fact, it was Mr. Walker who had told me that

21   he worked in North Carolina prior to coming to your --

22           MS. SVOLTO:  Objection.

23       Q    -- facility?

24           MS. SVOLTO:  Same grounds, and also asked and

25   answered.

UNITED STATES DISTRICT COURT

1    THE COURT: I think -- there's obviously a dispute in

2  that regard, and the witness has answered that question.

3    MS. TUCCI-JARRAF: That's what I'm asking for is that

4  he can say he didn't say it. I'm asking for a record of it.

5    THE COURT: Well, I think you've made the record, so

6  let's move on. Thank you.

7  BY MS. TUCCI-JARRAF:

8    Q    And, in fact, all the paperwork that I told

9  Mr. Walker to redo --

10    MS. SVOLTO: Again, I'm sorry, Your Honor, I have to

11  object again.

12    THE COURT: Let me hear the question. Go ahead.

13    MS. TUCCI-JARRAF: I can finish my question?

14    THE COURT: Yes. Go ahead.

15    MS. TUCCI-JARRAF: Okay.

16  BY MS. TUCCI-JARRAF:

17    Q    In fact, the paperwork that is marked July 7th, that

18  we went through regarding the purchase of this vehicle was not

19  the final paperwork -- excuse me, reflects the date the final

20  paperwork was actually issued?

21    A    I'm sorry. I didn't understand.

22    Q    That the paperwork -- the original -- the final

23  paperwork for the purchase of that vehicle was -- actually had

24  to be redone and was redone after July 7th?

25    A    No, ma'am. If it would have been done after

UNITED STATES DISTRICT COURT

Jerald Byrne - Recross-Examination

1   July 7th, it would have said July 8th, it would have said

2   July 10th.  All the paperwork goes by the date of the thing.

3           The original -- the original contact date, if he

4   would have purchased this on the 6th, it would have indicated

5   the 6th.  If the paperwork would have been changed at ten

6   o'clock on the 7th, it would have indicated ten o'clock on the

7   7th.  If it would have been done on the 11th, it would have

8   been done -- it would have marked the 11th.

9           This computer does it for us.  We don't have to -- we

10  don't have to recall anything.  It recalls it for us.

11      Q    And do you have that report for the systems

12  indicating the dates and times that the changes were actually

13  made?

14      A    I could pull it up on my computer.  I can't -- I

15  mean --

16      Q    Do you have it here today?

17      A    I wasn't allowed to bring my cell phone, I certainly

18  wouldn't bring my computer.

19           THE COURT:  The answer is no?

20           MS. TUCCI-JARRAF:  Thank you.

21           THE WITNESS:  No.

22           THE COURT:  Go ahead.

23           MS. TUCCI-JARRAF:  Thank you.  I have no further

24  questions.

25           THE COURT:  Thank you, Mr. Byrne.  You may be

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    excused.

2              THE WITNESS:  Thank you.

3              MS. DAVIDSON:  You want our next witness?

4              THE COURT:  Yes.

5              MS. SVOLTO:  Government calls Lauren Palmisano.

6              THE COURTROOM DEPUTY:  Raise your right hand.

7    WHEREUPON,

8                      **LAUREN PALMISANO,**

9    was called as a witness and, after having been first duly

10   sworn, testified as follows:

11                    **DIRECT EXAMINATION**

12             THE COURTROOM DEPUTY:  Have a seat.  If you would,

13   scoot in as close as you can.  State and spell your name for

14   the record.

15             THE WITNESS:  Lauren Palmisano.

16   BY MS. SVOLTO:

17        Q    Hi, Lauren.  How are you?

18        A    I'm good.

19        Q    And would you tell us where you work?

20        A    Whitney Bank.

21        Q    And where is Whitney Bank?

22        A    Well, Whitney is -- we've merged with Hancock, so

23   we're pretty much along the Gulf Coast, Louisiana, and Texas.

24   It's Whitney and then Hancock is Florida, Mississippi, and

25   Alabama.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    So the --

2    A    But Whitney Bank is --

3    Q    All right.  Whitney Bank.  And so is Whitney Bank

4  FDIC insured?

5    A    Yes.

6    Q    And how long have you worked at Whitney Bank?

7    A    Sixteen years.

8    Q    And what do you do there?

9    A    I'm a senior investigator with the corporate

10 security.

11   Q    How long have you been a senior investigator?

12   A    Four years.

13   Q    Four years.  And prior to that, what did you do for

14 Whitney Bank?

15   A    I started as a teller and worked my way into the

16 credit card fraud department, and then moved on to corporate

17 investigations.

18   Q    And what are some of your primary job

19 responsibilities?

20   A    Pretty much investigating financial fraud, both

21 internal, external.

22   Q    Did you receive any training for that work?

23   A    Just experience throughout the years with fraud and

24 then just learning.

25   Q    And were you working at Whitney Bank in July 7, '17?

UNITED STATES DISTRICT COURT

1    A    Yes.

2    Q    Were you working as a corporate fraud investigator?

3    A    Uh-huh.

4    Q    And Whitney Bank, do they have customers all over?

5    A    Just along the Gulf Coast.  They do have some clients

6  who open accounts online, but pretty much within our footprint.

7    Q    Okay.  Is Buddy Gregg Motor Homes, LLC one of your

8  customers?

9    A    Yes.

10   Q    All right.  And so in July of 2017, did you become

11  aware of a problem with Buddy Gregg Motor Home's account?

12   A    Yes.

13   Q    What was the problem you --

14   A    We received a wire recall on July 10th for

15  unauthorized from USAA Bank.

16   Q    So you received a wire recall.  What exactly is that?

17   A    It's just a recall from the originating bank, from

18  where the wire came from, advising us that -- electronically

19  that they're wishing to have the funds returned back to them.

20   Q    And what was the reason for the recall on that?

21   A    Unauthorized.

22   Q    Unauthorized.  Okay.  And who requested the recall?

23   A    USAA Bank.

24   Q    So once you received that wire recall request, what

25  did you do, if anything?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    A    I contacted Brad Cohen who works with Buddy Gregg,

2    advised him of the recall, and he had already been aware of it

3    prior to my call.

4    Q    What was your goal at that point?

5    A    Just letting him know that we received a recall, and

6    that if he had any idea of this wire amount and what it could

7    be for.

8    Q    And Brad Cohen, where is he located?

9    A    He's located in Lafayette, Louisiana.

10    Q    That's Lafayette, Louisiana?

11    A    Yes.

12    Q    Is he -- what is his position at Buddy Gregg?

13    A    He's the president of Buddy Gregg and also an

14    authorized signer on the account.

15    Q    Mr. Cohen is located in Lafayette.  And, again,

16    Whitney Bank, where is its central location?

17    A    Central location, we have a Whitney Bank main office

18    in New Orleans and also a Hancock main office in Gulfport.

19    Q    Okay.  That's in New Orleans, Louisiana and Gulfport

20    Mississippi?

21    A    Mississippi, yes.  And Whitney Bank is housed in

22    Texas and Louisiana.

23    Q    Thank you.  And so when you spoke with Brad Cohen,

24    what did you -- did you decide to take any steps after that?

25    A    Well, he had stated that the wire was for a purchase

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1  of an RV, and that he, Randall Beane, was in possession of that

2  and would supply me with a copy of that purchase agreement.

3       Q    About when was this, what day?  Do you remember?

4       A    This was July 10th.

5       Q    Was that the same day that you received the wire

6  recall?

7       A    Yes.

8       Q    Did you receive any other communications on -- around

9  that time from USAA?

10      A    I actually reached out to USAA Bank requesting a

11  little bit more information after reviewing the purchase

12  agreement.  I contacted USAA just to get a little bit more

13  information.  The representative told me that their customer,

14  Randall Beane, was recalling that wire.  Upon speaking with

15  them, I asked the representative to confirm the phone number

16  that was listed on the purchase agreement, if that matched to

17  what they had on the system and she did confirm it.

18      Q    Did you receive a hold harmless agreement from --

19      A    I did.  As soon as I got off the phone with USAA

20  Bank, the representative e-mailed it to me.

21      Q    And could we have Exhibit 80, please.  All right.  Do

22  you recognize this document?

23      A    Yes, I do.

24      Q    And could we highlight the date, please.  Is that the

25  correct date, July 10th?

UNITED STATES DISTRICT COURT

1    A    That's correct.

2    Q    That's when you received this letter, is that also

3  the same date you received the wire recall?

4    A    Yes, it is.

5    Q    Okay.  If we could expand out and go to the

6  substantive paragraphs, please.

7    A    Can I grab my glasses?

8    Q    Oh, yes.  I'm sure there's no problem.

9    A    Okay.

10    Q    So when you say you talked to your customer, who is

11  your customer that you're referring?

12    A    To Buddy Gregg, Brad Cohen.

13    Q    Okay.  So Buddy Gregg is your customer because they

14  have an account at Whitney Bank?

15    A    That's correct.

16    Q    So what's the effect of a hold harmless agreement on

17  Whitney Bank?

18    A    It's just a letter to request funds.  We usually

19  receive this when the -- for any type of fraud where the

20  receiving bank, such as in this case is Whitney Bank, is not

21  required to send the funds back.  This is -- letter is just

22  releasing us from any liability if anything comes from us

23  returning the funds.

24    Q    So did you begin to conduct your own investigation

25  into the purpose of the recall?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1      A    I did.  After receiving the purchase agreement

2    confirming the phone number, I contacted Randall Beane and was

3    forced to leave a message.

4      Q    And what were you trying to determine exactly?

5      A    Exactly what the reason for his -- him recalling the

6    wire, just to discuss the purchase agreement that I received

7    from Buddy Gregg.

8      Q    So when you were making this determination, did you

9    look at a number of different documents?

10     A    At this point, I just had the purchase agreement.

11     Q    Okay.  And who provided you that purchase agreement?

12     A    Buddy Gregg.  I can't recall his name.

13     Q    But someone from Buddy Gregg provided the document?

14     A    Yes.

15     Q    And so you reviewed the purchase agreement?

16     A    Uh-huh.  It was Nelson Forbes that e-mailed me.

17     Q    All right.  I'd like to show you, and only the

18   witness at this point and defense counsel, government's

19   proposed Exhibit 98.

20          Do you recognize this document?  You can just let me

21   know if you recognize it.

22     A    I do.

23     Q    153.  Do you recognize that document?

24     A    I do.

25     Q    154, and 154A, and 155.  I believe there's a 155A as

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    well.

2         A    I recall all those.

3         Q    And 159.  Or, I'm sorry, 160, excuse me.  Oh, 163.

4    Thank you.  And I think there's an attachment there.  Is that

5    163A?  Do you recognize that?

6         A    I do.

7         Q    And then 163B.  Do you recognize that?

8         A    I do.

9         Q    Okay.  And are these documents that are kept in --

10   I'm sorry, I have a couple more.  Exhibit 157.  Did I say 157

11   already?  Okay.  And then finally Exhibit 158.  Do you

12   recognize these documents?

13        A    Yes.

14        Q    All right.  And are these documents kept in the

15   regular course of business at Whitney Bank?

16        A    Yes, they are.

17        Q    Are they kept by someone who has knowledge of the

18   events as they occur?

19        A    Yes, they are.

20             MS. SVOLTO:  And we ask that these exhibits be moved

21   into evidence at this time.  All right.  That would be --

22             THE COURT:  So admitted.  We'll double-check the

23   numbers at the break, but all those you identified are

24   admitted.

25

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    (Government's Exhibits 98, 153, 154, 154A, 155, 155A, 157,

2    158, 163, 163A, 163B admitted into evidence.)

3    BY MS. SVOLTO:

4        Q    All right.  Can I show you Exhibit 96, which has

5    already been admitted into evidence.  Do you recognize this

6    document?

7        A    I do.

8        Q    And what is it?

9        A    This is a form that is printed out upon opening of

10   the account, shows the account number and the signatures listed

11   on the account who are authorized to withdraw and make any

12   maintenance.

13       Q    So is this account sheet for Buddy Gregg Motor Home?

14       A    Yes.

15       Q    And then could we go to Exhibit 103.

16            Are you familiar with this document?  It may be a

17   different version of another document we have.

18       A    I don't recall seeing --

19       Q    I think we have another document that might be more

20   familiar.  We can move to that.  Could you pull up Exhibit 153.

21            So what is this document?

22       A    This is the wire information through our online

23   system.

24       Q    Okay.  Is this information you pulled during the

25   course of your investigation into this matter?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1      A     This information was provided to me by the wire

2  department, that I do have knowledge of this document.

3      Q     Okay.  So can you explain to us what some of the

4  information on here is?

5            Again, maybe we can highlight that or expand that a

6  little bit there.

7      A     Right, the arrow, those two are the routing numbers

8  of the sending bank and the receiving bank.  You have the

9  amount.

10     Q     What's that amount there?

11     A     $493,110.68.

12     Q     Okay.  And just below that, it has "ABA," what does

13  that indicate?

14     A     That's the routing number.

15     Q     That's a routing number.  And the name underneath

16  that, "USAA Federal," what is -- what's that the name of?

17     A     The sending bank.

18     Q     Okay.  So is that the routing number for the sending

19  bank?

20     A     Yes.

21     Q     Okay.  And then beneath that where it says "Credit

22  info"?

23     A     That is Buddy Gregg Motor Homes' account number.

24     Q     Okay.  And so "Credit info" indicates what exactly?

25     A     Where the wire is going to, being credited to.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    All right.  Does it state the time that -- that this

2  occurred, the date and time?

3    A    Actually, the wire was received on 7/7.  That date,

4  the 7/10 is when we were notified.

5    Q    Okay.  So that's the date the wire is received by

6  Buddy Gregg?

7    A    At the time.

8    Q    All right.  If we could expand out, please.

9         All right.  If you go to the bottom of that where it

10  says "ORG."  Can you tell us what "ORG" means?

11   A    Originating.

12   Q    Well, is that -- what's the information that's

13  provided there?

14   A    Well, it's Randall Beane's account number with USAA

15  Bank and the address.

16   Q    And so is that the name and account number for the

17  originating --

18   A    Yes.

19   Q    So the person who originated the wire transfer?

20   A    Yes.

21   Q    Okay.  And could we go down -- you could just scroll

22  down in that expanded box, that's fine.

23        And so what's "OGB"?

24   A    Originating bank.

25   Q    All right.  Originating bank.  And what's the bank

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    that was the originating bank here?

2         A    USAA Federal Savings.

3         Q    Okay.  All right.  So you've reviewed this document

4    during the course of your investigation?

5         A    Yes.

6         Q    And did you -- what steps did you take after finding

7    this information out?

8         A    I'm sorry, can you say that again?

9         Q    What steps did you take after you reviewed this

10   document?

11        A    Well, after reviewing this document, I was sent this

12   in the very beginning, prior to calling Buddy Gregg Motor

13   Homes.  And this information I was able to provide to Buddy

14   Gregg, letting him know we were receiving a recall from a wire

15   that was sent from a Randall Keith Beane.

16        Q    Okay.  All right.  So did you ultimately speak with

17   Randall Beane?

18        A    I did through a conference call.

19        Q    Okay.  Did you initiate that conference call?

20        A    No.

21        Q    So you were called?

22        A    I was called.

23        Q    Did you -- you had initially used --

24        A    I contacted Buddy Green -- Buddy Beane -- sorry,

25   Randall Beane twice, and he called back.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    And when he called back, that was the conference

2  call?

3    A    That was the conference call.

4    Q    What day was that?

5    A    That was on July 10th.

6    Q    And who was on that conference call?

7    A    Heather Jarraf, Randall Beane, Brad Cohen, Nelson

8  Forbes, to my knowledge.

9    Q    All right.  And what was the purpose of this

10  conversation?

11    A    Well, the purpose of me calling Randall was to find

12  out a little bit why he was recalling the wire.  During the

13  conference call, Heather had stated that she was representing

14  Beane, and just to discuss that the wire was in fact sent by

15  Randall Beane.

16    Q    I'd like to show you previously admitted Exhibit 94.

17  In fact, I'm going to use the Elmo for this.  I'm sorry.

18         Do you recognize this?

19    A    Yes.

20    Q    Okay.  So after that phone call, did you become aware

21  that there was a recording of the phone call?

22    A    I believe not until two days later through an e-mail.

23    Q    A few days later you received an e-mail saying there

24  was a recording?

25    A    Correct.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1      Q    Did you listen to that recording?

2      A    I was not sent that recording via e-mail.  It wasn't

3  until days later when I found out about it through law

4  enforcement.

5      Q    Okay.  And do you remember the conversation that

6  you -- the conference call?

7      A    Uh-huh.  I do.

8      Q    And in preparation for today, did you sit down and

9  listen to that recording?

10     A    I did.

11     Q    Was that the full recording or at least the full

12 recording that was available?

13     A    Yes.

14     Q    And did that recording accurately reflect the

15 conversations you remember?

16     A    It does.

17     Q    Okay.  And did you sign a disc?

18     A    I did.

19     Q    And is that your signature on here?

20     A    It is at the top.

21     Q    Okay.  And that's the disc that you listened to to

22 determine whether that was the same conversation?

23     A    That is.

24     Q    All right.  Thanks.

25     A    Uh-huh.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    So during the conference call, did you learn any

2    information?

3    A    I learned that Randall Beane did not initiate the

4    recall.  He did send the wire, and that was pretty much it.  I

5    learned that, you know -- that Heather was going to send me

6    several documents.  In that call, I requested a letter from

7    Randall Beane stating that he did initiate that wire and did

8    not recall it, and it was still a question as to why was it

9    recalled, the reason for it.

10    Q    What -- what would Whitney Bank do if they learned of

11    an unauthorized transfer of funds?

12    A    Well, first, we'll try to get as much information as

13    possible from the receiving party, our customer, to find out if

14    they were in fact awaiting this wire or awaiting these funds,

15    and, you know, the reason for it.  If we have contact

16    information and the fact that I was able to confirm it with

17    USAA Bank, I felt comfortable calling the individual,

18    Mr. Beane, to find out more information.

19    Q    And if in a case where it's determined that it is an

20    unauthorized transfer, can Whitney Bank decide to honor the

21    recall and send, you know, basically -- claw that money back,

22    give that money back?

23    A    We can, yes.

24    Q    Okay.  And so you conducted determination --

25    investigation to determine whether that was suitable in this

UNITED STATES DISTRICT COURT

1    case?

2         A    Yes.

3         Q    Okay.  And so back to the conference call, you stated

4    that Ms. Tucci-Jarraf indicated she was sending you some

5    documents?

6         A    Yes.

7         Q    And the call again was on --

8         A    July 10th.

9         Q    -- July 10th.  Did you in fact receive --

10        A    I received several documents on July 11th and 12th.

11        Q    And were those documents sent to you --

12        A    E-mail.

13        Q    -- by e-mail.  Thanks.

14             So if we could pull up Government Exhibit 98.

15             THE COURT:  Why don't we do this, why don't we take

16   our lunch break at this time.  I don't think we're going to get

17   done with this witness before lunch.  Ms. Palmisano, if you'll

18   enjoy lunch in Knoxville and come back at 1:45, we'd appreciate

19   it.  We'll stand in recess until 1:45.  Jury is excused first.

20        (Jury out at 12:26 p.m.)

21             THE COURTROOM DEPUTY:  This honorable court shall

22   stand in recess until 1:45.

23        (Recess from 12:27 p.m. to 1:50 p.m.)

24             THE COURTROOM DEPUTY:  All rise.

25             THE COURT:  Ready for our jury in just a moment.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1          Who needs to take up something?

2          MS. TUCCI-JARRAF:  We can take it up, yeah.

3          THE COURT:  Do we need to, because the jury is

4    probably going to be here in a moment.  Is this something

5    pertaining to this witness?

6          MS. TUCCI-JARRAF:  It's pertaining to the schedule of

7    the court for today.

8          THE COURT:  Let's take it up at the break then.

9          MS. TUCCI-JARRAF:  Okay.

10        (Jury in at 1:51 p.m.)

11        THE COURT:  Thank you.  Everyone may be seated.

12   Mrs. Svolto, you may continue with direct examination of this

13   witness.

14        MS. SVOLTO:  Thank you.

15   BY MS. SVOLTO:

16   Q    Ms. Palmisano, when we left last, we were looking at

17   Government's Exhibit 98.  Do you recognize this document?

18   A    I do.

19   Q    I do.  And what is it?

20   A    It's one of the e-mails that I had received on

21   July 11th.

22   Q    And was this e-mail in reference to the conference

23   call --

24   A    Yes.

25   Q    -- that we discussed.  Could you look at the first

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1  paragraph there?

2       A    Okay.

3       Q    And so who sent this e-mail?

4       A    Heather Jarraf, Tucci-Jarraf.

5       Q    When was it sent?

6       A    On July 11th.

7       Q    When was that conference call?

8       A    July 10th.

9       Q    And so were you expecting e-mails from

10 Ms. Tucci-Jarraf?

11      A    Yes.

12      Q    Okay.  And so did you -- in this e-mail, does she

13 list out documents that she's intending to send?

14      A    She said on the call that she was going to send

15 several documents.

16      Q    And did you have any appreciation of

17 Ms. Tucci-Jarraf's role here?

18      A    Well, she identified herself as someone representing

19 Randall Beane.  I took it that she was his lawyer, his attorney

20 in the call, and these documents definitely increased the

21 credibility of her being, you know, an attorney representing,

22 so I thought nothing differently.

23      Q    Okay.  And did -- was there an attachment to this

24 e-mail?

25      A    Yes.  Would be two of them.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1     Q    Okay.  And there was a declaration, and did you
2  review the attachments?
3     A    I reviewed the attachment that pertained to the
4  letter that I requested on the conference call from Randall
5  Beane stating that he did in fact send the wire.  I did not
6  review in detail the attachments or the e-mails until I got
7  that -- that specific document they requested.  There were
8  several of them, and so I just took them all and -- because it
9  all came down to USAA stating that their customer, Randall
10 Beane, did not submit the wire.
11    Q    So your concern was whether a USAA customer
12 authorized a wire from USAA to Whitney Bank?
13    A    Correct.
14    Q    You didn't look at anything prior to that.  Correct?
15    A    Correct.
16    Q    Okay.  And so -- all right.  So let's go to
17 Exhibit 154.
18         And this is another e-mail from Ms. Tucci-Jarraf?
19    A    Yes.
20    Q    Okay.  And can we look at the date and time of that.
21         And when is that?
22    A    July 11th at 4:47 Central Time.
23    Q    Because you're located in the Central Time Zone.  Is
24 that correct?
25    A    That's correct.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    Who else is included on this e-mail?

2    A    It appears to be Brad Cohen.

3    Q    Who does Brad Cohen work for again?

4    A    He works for Buddy Gregg Motor Home.

5    Q    And Buddy Gregg is your customer.  Right?

6    A    That's correct.

7    Q    So in reviewing these documents and in determining

8  whether to recall a wire, did you take any consideration into

9  what the customer wants, your customer?

10    A    I do.  I do, yes.

11    Q    Do you put a lot of weight on that?

12    A    I do.  I do.  The fact that there was a sale and with

13  a purchase agreement, I try to gather all the facts, you know,

14  is our customer going to take a loss for this?  Was this part

15  of a scam?  The fact that these wires were funds for a valid

16  purchase agreement for a vehicle, you know, that and the fact

17  that USAA Bank's customer was being represented by an attorney,

18  providing me all these docs definitely played a role in my

19  decision.

20    Q    Sure.  So if we could go to the subject line of

21  Document 154, please.  And so this is a document that was

22  provided as an attachment to this e-mail?

23    A    Yes.  I'd have to see.

24    Q    Sure.  Could we go to 154A?

25    A    Yes.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    And do you -- do you know what this document is?

2    A    It appears to be a receipt from USAA stating that a

3    wire was in fact sent for $493,110.68 to Whitney Bank customer

4    Buddy Gregg Motor Homes.

5    Q    All right.  Do you see -- if we could go to the top

6    where it says "From."

7         All right.  And it is sent from USAA.  Is that --

8    A    That is correct.

9    Q    To -- do you see that e-mail?

10   A    I do see that e-mail.  However, the letter is

11   addressed to Randall Beane.

12   Q    Okay.  So -- and it was sent on what date?

13   A    July 7th, so the date that the wire was received --

14   Q    Okay.

15   A    -- into the Whitney Bank account.

16   Q    And that's the wire sent from --

17   A    From USAA Bank to Whitney Bank and deposited into

18   Buddy Gregg.

19   Q    Okay.  And could we go back to the body of 154.

20   Thanks.  And so that -- that confirmation number, what is that?

21   Do you know what that confirmation number is?

22   A    I do not.

23   Q    And so -- but we know that's got -- this is a

24   document prepared by -- not by you.  Correct?

25   A    Not by me, no.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    And so the beneficiary is Buddy Gregg Motor Homes,

2    LLC?

3    A    That is correct.

4    Q    And that would be your customer?

5    A    That is correct.

6    Q    Okay.  And could we go to 154, the e-mail.  And so if

7    you could highlight the bottom two paragraphs and that

8    hyperlink.

9         So this is when -- again, this is 154, an e-mail you

10   received from Ms. Tucci-Jarraf.  Correct?

11   A    That is correct.

12   Q    And so could you read that first paragraph there?

13   A    "The way things are evolving at the moment, the

14   Federal Reserve Bank of New York is laying the groundwork for

15   you to have a copy of the meta data, and out-going ACH

16   transmissions, for account name Randall Keith Beane, located at

17   said Fed Res Bank, which was the originating bank and account

18   name of the funds paid to you in full for the coach, for any

19   requirements of reporting you may need to do pursuant to AML's,

20   et cetera."

21   Q    And then right underneath that, do you see that quote

22   there?

23   A    I do.

24   Q    Where does that quote appear to be from?

25   A    Appears to be from the Federal Reserve.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    Okay.  And, again, this is in the body of the e-mail

2    that Ms. Tucci-Jarraf sent you?

3    A    That is correct.

4    Q    And she also sent that to Mr. Cohen?

5    A    That is correct.

6    Q    And in the blue there, do you understand it to be a

7    hyperlink?

8    A    Yes.

9    Q    Which would, if you click on it, it would take you to

10   where?

11   A    It would take you to the website.  I don't recall if

12   I did or not.

13   Q    Thank you.  All right.  Could we go to Government's

14   Exhibit 155.  All right.  If we could go to the "From, Sent."

15   That's fine.

16        So is this another letter from Ms. Tucci-Jarraf?

17   A    That is correct.

18   Q    And it's sent to you and?

19   A    Brad Cohen.

20   Q    And was it sent on July 12th?

21   A    Yes.

22   Q    So this is now a couple days after that conference

23   call?

24   A    Two days.

25   Q    Okay.  All right.  And so if you could highlight the

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    attachment line.

2              And so she attached another document to this e-mail?

3    A    Yes.

4    Q    All right.  And could we go all the way down to the

5    signature line, if you could highlight that, if possible.

6    Perfect.

7              All right.  So it appears Ms. Tucci-Jarraf left a

8    phone number there?

9    A    Yes.

10   Q    Did you understand that to be her phone number?

11   A    Yes.

12   Q    Did she also sign it -- has a signature line all the

13   way at the bottom there?

14   A    Yes.

15   Q    What does it say?

16   A    "Lawyer for Factualized Trust Randall Keith Beane,

17   and its Trustee, Randall Keith Beane."

18   Q    Okay.  Thank you.  Could we go to 155A.

19             Is this the attachment you received with that e-mail?

20   A    I recall that attachment.

21   Q    And, again, you didn't -- you didn't review these

22   in-depth?

23   A    No, I did not.

24   Q    And this document is also sent to Mr. Cohen, too?

25   A    That is correct.

UNITED STATES DISTRICT COURT

1    Q    Could we go to Exhibit 163.  All right.  Excuse me,

2  I'm sorry, I meant to go back to 155, the e-mail, 155.  Can you

3  highlight the middle paragraph for me.

4         All right.  Could you read that out?

5    A    Sure.  "I personally ran that investigation and

6  coordinated with other local, international, and global

7  investigators.  If you have any questions in regards to that

8  investigation, for the purpose of your own records and

9  reporting, feel free to contact me with them."

10   Q    And how about the last paragraph there?

11   A    Read that one?

12   Q    Yes, please.

13   A    Okay.  "Now, all documentation and due verification,

14  confirmation, reconfirmation, and notice has been duly served

15  upon you for your own records of Origin of Funds and History of

16  Funds regarding the funds you duly received as full payment

17  from Trustee Randall Keith Beane, for said coach."

18   Q    So these are the representations that you received,

19  and did you print these e-mails out, did you save these

20  e-mails?

21   A    I saved every single one of them.

22   Q    Did you put them in some sort of file?

23   A    I -- yes.

24   Q    All right.  Can we go to Exhibit 156, please.  All

25  right.  If we could expand just the "From" and "Sent" line.

Lauren Palmisano - Direct Examination

1      And so this is another e-mail you received?

2      A    Yes.  Well, that's an e-mail that I sent.

3      Q    Oh, this is the e-mail you sent.  Okay.  And this was

4  an e-mail you sent in response to the e-mails Ms. Tucci-Jarraf

5  sent?

6      A    That is correct.

7      Q    And if I could go jump ahead to 163, please.  This is

8  another e-mail you sent -- I'm sorry, that you received from

9  Ms. Tucci-Jarraf?

10     A    Correct.

11     Q    Can you read that.  All right.  This was on the 12th?

12     A    Yes.

13     Q    And it appears that she sent some attachments with

14 this one as well?

15     A    That is correct.

16     Q    Okay.  Do you recall looking at these documents?

17     A    Very briefly.

18     Q    All right.  And if we could go to the signature line.

19          And is it signed for Ms. Tucci-Jarraf?

20     A    That is correct.

21     Q    With the phone number there?

22     A    Yes.

23     Q    Same phone numbers --

24     A    Yes.

25     Q    -- as previous?  And does she sign it as his lawyer?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    A    Yes.

2    Q    Okay.  And could you go to 163A.

3         Does that appear to be one of the documents that was

4    attached to that e-mail?

5    A    I don't recall if it was attached to that e-mail, but

6    I do recall seeing this.  This was the letter that I was

7    expecting, not in this format, but mentioning that he did in

8    fact send the wire.

9    Q    Okay.  And could you look at -- sorry, expand on

10   Paragraph 3 there.

11        And so is that the wire?

12   A    Yes.

13   Q    That you're referring to there?

14   A    Yes.

15   Q    And that's the wire from USAA to Buddy Gregg?

16   A    Correct.

17   Q    Okay.  And could we go to the last page of that

18   document.  All right.  Could you go to the full signature, all

19   the way to the bottom of the page.

20        Can you tell what the date is of this document?

21   A    7/11.

22   Q    Okay.

23   A    '17.

24   Q    Does Ms. Tucci-Jarraf also -- does it look like

25   there's a number associated there?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1   A    Yes.

2   Q    All right.  Could we expand out.  And can you enlarge

3   the text of the document, please.  All right.  If we could

4   highlight Paragraphs 6 and 7.

5        And so this information, this was all provided to

6   you, you didn't prepare it?

7   A    No.

8   Q    All right.  Can we go to 163B, please.  Okay.

9        Does this appear to be one of the attachments to this

10  e-mail as well?

11  A    I don't recall if it was attached to that specific

12  e-mail, but I do recall seeing this attachment.

13  Q    Okay.  And could we highlight the paragraph right

14  beneath that logo.  Thank you.

15       Do you recall seeing this on this document?

16  A    Yes.

17  Q    And is there an e-mail at the bottom of that?

18  A    That is.

19  Q    Okay.  All right.  If we could expand out again and

20  go to the list right before the paragraph.  That's perfect.

21  Towards the bottom of there, again, you didn't -- you didn't

22  review these closely, did you?

23  A    No.

24  Q    And they were sent to your customer also.  Right?

25  A    I'm sorry?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    Q    They were sent to your customer as well?

2    A    Yes.

3    Q    And that being Buddy Gregg?

4    A    Yes.  Brad Cohen.

5    Q    All right.  And there's an account number there.

6  Correct?

7    A    That is correct.

8    Q    At the bottom, did you see those last four digits?

9    A    1135.

10   Q    The account name?

11   A    Randall Keith Beane.

12   Q    Okay.  And then so this -- all right.  If we could go

13  to Exhibit 157.

14        This was also sent on July 12th?

15   A    Yes.

16   Q    And this is a response to your previous e-mail to

17  her.  Actually, why don't we go to 158.  I'm sorry, not 158,

18  excuse me.  Let's go to Exhibit 156.

19   A    I do recall getting that e-mail, though.

20   Q    Okay.  And 156, so after you received the documents

21  and the e-mails and there -- were there other e-mails and

22  documents that -- Ms. Tucci-Jarraf that we did not talk about?

23   A    No.  There were several e-mails that she sent in the

24  two-day period.

25   Q    Okay.  And so you took note of those e-mails?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1      A    I saved them.  I briefly reviewed them, but our whole

2   thing was that he did in fact send that wire and that it wasn't

3   what USAA was claiming, that it -- he was the one that recalled

4   it.

5      Q    Okay.  So you -- they made a determination on whether

6   to recall the wire?

7      A    Following the conversation, the conference call, we

8   sent an electronic denial back to USAA denying their recall.

9      Q    And then did you send this e-mail to

10  Ms. Tucci-Jarraf?

11     A    I did.

12     Q    And could we highlight the date that it was sent?

13     A    On July 12th.

14     Q    Okay.  And so what does this e-mail indicate?

15     A    Well, it indicates that I placed all the documents

16  that she sent via e-mail in a case file electronically and that

17  I closed my case, based on the provided information, which is

18  the purchase agreement, the letter that I requested, and the

19  fact that, you know, there was a lawyer involved and I didn't

20  think any reason to deny of who she was.

21     Q    Okay.  Can we go to Exhibit 158.

22          And is this the electronic transmission you're

23  referring to?

24     A    No.  This is the letter that I personally sent to

25  USAA Bank via e-mail letting them know we had denied their hold

UNITED STATES DISTRICT COURT

1    harmless.

2         Q    Okay.  And that's the agreement to hold Whitney Bank

3    harmless?

4         A    Yes.

5         Q    Okay.  And this was sent on what date?

6         A    On July 12th.

7         Q    Okay.  And you personally sent that to USAA?

8         A    Correct.

9         Q    Okay.  And can you highlight the first paragraph in

10   the body of the letter.

11             Okay.  So that's in regards to the wire transfer from

12   USAA to Buddy Gregg?

13        A    Yes.

14        Q    And indicating you've denied the request?

15        A    Yes.

16        Q    Okay.  And then the next paragraph, please.  Just

17   scroll.

18             And so could you read that out?

19        A    "Documentation has been provided by your customer,

20   Randall Keith Beane, acknowledging that the wire, in the amount

21   of $493,110.68, sent on 7/7/17 to the recipient, Buddy Gregg

22   Motor Homes LLC, was a valid transaction and should not be

23   disputed.  Mr. Beane has acknowledged that he is in possession

24   of the item purchased by the recipient."

25        Q    And did you -- how did you learn that Beane was in

UNITED STATES DISTRICT COURT

Lauren Palmisano - Direct Examination

1    possession of the item?

2        A    My initial call with Brad Cohen, Buddy Gregg.

3        Q    When was that call?

4        A    July 10th.

5        Q    And on July 10th, that's when you learned that Beane

6    already had possession of the motor home?

7        A    Immediately following the notification of the recall,

8    when I contacted Buddy Gregg or Brad Cohen, that's when he

9    informed me.

10       Q    And so when you have a purchase agreement and your

11   customer is telling you that it's a valid transaction and the

12   asset is gone, that's how you make your decision on this?

13       A    Yeah.  I mean, that was part of it and with

14   acknowledgment from Randall Beane.

15       Q    Okay.  Thank you.  Did you receive an e-mail from

16   Heather Ann Tucci-Jarraf after -- after this time?  Did you

17   receive any further e-mails?  Can you recall?

18       A    I can't recall after this letter was sent to USAA

19   Bank, but I did receive a couple on July 12th.

20       Q    And could we go back to Exhibit 157.  And so if you

21   could just enlarge the document.  Thank you.

22            So is this another one of -- an e-mail on July 12th?

23       A    Yes.

24       Q    Did you send any response to this e-mail?

25       A    No.  I don't recall.

UNITED STATES DISTRICT COURT

1    Q    And so after the 12th, did you take any other steps?

2    A    No.  I closed my case out and that was it.

3         MS. SVOLTO:  Just a minute, Your Honor, please.  I

4    have nothing else.  Thank you.

5         THE COURT:  Thank you.

6         Cross-examination, Ms. Tucci-Jarraf?

7         MS. TUCCI-JARRAF:  Yes.  Thank you.

8                        **CROSS-EXAMINATION**

9    BY MS. TUCCI-JARRAF:

10   Q    Without prejudice, I will proceed with

11   Ms. Palmisano -- is it Palmisano or Palmisano?

12   A    Palmisano.

13   Q    Palmisano.  Thank you.  Okay.  You had stated that,

14   Ms. Palmisano, that you received numerous amount of e-mails

15   starting on July 11th --

16   A    Correct.

17   Q    -- through the 12th?

18   A    Correct.

19   Q    Pursuant to our conversation and agreement on the

20   10th of July.

21        That you would give the declaration of valid sale and

22   all the underwriting and title?

23   A    I received what you had stated on the conference

24   call.

25   Q    Okay.  And did Ms. Anne-Marie Svolto for the DOJ, did

                    UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    she present all those e-mails and documents that you had

2    received starting July 11th through the 12th or only in part?

3         A    Like I said, there were several e-mails.

4         Q    Uh-huh.

5         A    And all of them were documentation that I did not

6    really review, just partial.  As far as the number of e-mails,

7    I couldn't be for sure, for positive, but there were several,

8    some of which seemed to be repetitive, but ...

9         Q    Okay.  If we could, David, if you don't mind,

10   Exhibit 105, I believe it was.  Sorry, I believe it was 98.

11        Ms. Palmisano, could you look at this -- was this the

12   first e-mail you had received from this e-mail address, from my

13   e-mail address?  Do you remember -- do you recall if that was

14   the first e-mail?

15        A    I can't recall, but this -- this is one of the

16   e-mails, yes.

17        MS. TUCCI-JARRAF:  Excuse me, if we could just have a

18   few minutes so that I can speak with Ms. Davidson.  There were

19   a number of discovery which we were not able to open.  I

20   believe those were the e-mails that they sent in discovery, I

21   just wanted to check to see if she had them.

22        THE COURT:  Go ahead.

23        MS. TUCCI-JARRAF:  Thank you.

24        Just one moment, Your Honor.

25        THE COURT:  Is there a question about documents?  Can

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1   we move forward with questioning with this witness?

2           MS. TUCCI-JARRAF:  Yeah.  When it's -- when I

3   received discovery from DOJ, on it, there were files that I'm

4   now becoming aware that might have been these e-mails.  We

5   weren't able to open them, and I had given a copy of them to

6   Mr. Lloyd, telling him that we weren't able to open them.  I

7   was notified by Mr. Beane today that this is the first time

8   he's been able to see these e-mails, that they even existed.

9           We're trying to determine if there are e-mails --

10  because this goes to title, possession, that there was no

11  intent to defraud anyone or to commit any crimes.  They are

12  essential and vital to be able to prove that part of it.

13          THE COURT:  So what are we trying to do?

14  BY MS. TUCCI-JARRAF:

15      Q    What we're going to do is I'm -- first, I'm going to

16  ask, Ms. Palmisano, did you provide every e-mail, plus the

17  attachments that you received from me to Department of Justice

18  or FBI?

19      A    I did.

20      Q    You did.  Okay.  Do you have those e-mails and

21  attachments with you today?

22      A    No, I do not.

23      Q    Okay.

24          MS. DAVIDSON:  Your Honor, might I respond?

25          THE COURT:  Yes.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1        MS. TUCCI-JARRAF:  I haven't finished yet.  What we

2    were going to ask for is either a continuance so that we're

3    able to get all those e-mails, because I do have copies from my

4    own e-mail that I'm able to bring in since they haven't

5    produced every e-mail, which also has the title, the ownership,

6    the origin and funds, history of funds, which was what we had

7    discussed on the 10th and I sent over on the 11th and the 12th,

8    or to just hold this witness over so that we are able to --

9    until tomorrow wherein I can bring those in so we can go

10   through them since they have not produced them.

11       MS. DAVIDSON:  Your Honor, let's just start with the

12   fact that we 100 percent did produce these documents.  And I

13   have the discovery letter on September 5th, 2017, we referenced

14   that we produced all financial records and documents obtained

15   from Whitney Bank.

16       I've just checked on my system and a copy of those

17   documents are on our actual hard drive at the U.S. Attorney's

18   Office.  If there's a problem with this disc, she has had since

19   September 5th, 2017 to bring it to the U.S. attorney's

20   attention.  There's no problem with our disc, so she got it.

21       Furthermore, the attachments which she's referencing

22   are the documents which this Court has already ruled are

23   irrelevant and should not be admitted to the Court.

24       THE COURT:  What's your response?

25       MS. TUCCI-JARRAF:  Thank you.  Aside from that whole

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1   issue as far as that was regarding lack of jurisdiction and

2   lack of authority of this Court or DOJ, that's where those were

3   filed.  However, this is a title, ownership, we're going to the

4   intent to commit a fraud.  These were documents that were

5   produced over, which are title, authority, ownership, and

6   rights of the funds itself --

7           THE COURT:  All right.  Well --

8           MS. TUCCI-JARRAF:  -- were sent over to

9   Ms. Palmisano, and we -- I did notify Mr. Lloyd that I was not

10  able to open up -- gave him the thumb drive with the disc that

11  we were not able to open, and I showed him on my laptop how you

12  couldn't open it.  And it brought up just the Outlook, and I

13  wasn't able to access it.  So I did notify Mr. Lloyd.

14          And per Shirley said that there was to be -- if there

15  was any contact, it was between Mr. Lloyd and Cynthia Davidson

16  and Anne-Marie Svolto and not myself.  So I did follow

17  procedure on that particular, and I never received any of the

18  documentation.

19          MS. DAVIDSON:  Your Honor, Ms. Tucci-Jarraf has

20  contacted me personally by e-mail multiple times, and she

21  certainly could have done so in this regard.

22          MS. TUCCI-JARRAF:  And that was only after the

23  praecipe had gone in regarding the lack of jurisdiction and

24  authority, as well as the dismissal.

25          THE COURT:  All right.  I've heard enough.  Thank you

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    both for your input.

2          Based on what I've heard, the Court is not, to the

3    extent Defendant Ms. Tucci-Jarraf is seeking a continuance or

4    to hold over this witness, the Court is going to deny those

5    requests.

6          Mr. Beane are you joining in that request by

7    Ms. Tucci-Jarraf?

8          MR. BEANE:  Yes.  Because there's been several pieces

9    of documentation that I have not had at all to view.

10          THE COURT:  Well, I mean, based on the

11   representations that all discovery has been turned over, the

12   Court, first, is not going to grant any continuance or -- and

13   we're going to go forward with this witness.

14          To the extent there are other documents that arise, I

15   will withhold a ruling on whether -- if you come with further

16   documents, even if this witness is not available, the Court

17   will consider whether allowing those into evidence, if they're

18   not already into evidence.  So let's go ahead and continue with

19   this witness.

20          MS. TUCCI-JARRAF:  Without prejudice, moving forward.

21   BY MS. TUCCI-JARRAF:

22    Q    Ms. Palmisano, just to make a record of the

23   documentation that had been sent to you, since we don't have

24   the original e-mails and the attachments with them except for

25   the few that Ms. Anne-Marie Svolto put in, I'm going to go over

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    the one document that she did have you identify.

2            Okay.  Document -- excuse me, Exhibit 163B.  So this

3    is the factualized trust.  Inside of this particular document

4    that you did receive -- do you recall this document?

5        A    I recall seeing this document.

6        Q    Okay.  And inside would have been every single

7    attachment is actually listed that you would have received

8    inside of those various e-mails.  So I'll just go in for the

9    record then and list which documents that you did receive, and

10   we can always gather the e-mails and the documents and then I

11   can put them in that way, so at least today there's a record of

12   this.

13           Could you go to the next page of that, please.  Okay.

14           So this particular document is Page 2 of that

15   document that you had received, and this reference number for

16   this particular document is capital F.

17           Could you read that -- could you highlight that.

18   This right here.  Thank you.  Are you able to read that?

19       A    Uh-huh.

20       Q    What does that say, please?

21       A    FT-OD-rkb-09291967.

22       Q    Thank you.  Okay.  If you could unhighlight that,

23   please.  Thank you.

24           Okay.  Within this document, if you go to the next

25   page, please, in here, it lists the underwriting, which lists

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    the various e-mails you received.  Do you recall whether those

2    attachments were UCC documents?

3        A    I will say, like I said before, I did not go over

4    these in-depth.  I do recall seeing those documents.  But as

5    far as verbatim, what they said, so forth --

6        Q    I'm not asking verbatim, just if you recognize them

7    as UCC filing?  Do you recall?  If you don't recall, that's

8    fine.

9        A    No.

10       Q    Okay.  So within this document that you received, and

11   in the other e-mails you received, you would have received each

12   and every document that's listed in here beginning with UCC

13   record number 2000043135 dated May 4th, 2000 and receipt number

14   36090.

15            That would have been one separate e-mail -- that

16   would have been in the e-mail that you received.

17            MS. TUCCI-JARRAF:  So at this time, I would move,

18   without prejudice, that this document that's already in

19   evidence, and each of these -- I can either go through and list

20   each of these documents that are in there, and there's

21   numerous, so that we can bring them in at a later time as soon

22   as we're able to get them from our site, since Ms. Davidson

23   didn't bring them in and these were attached to the e-mails

24   that Ms. Palmisano got, or I can just have them restated as if

25   they're set forth in full.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1          THE COURT:  All right.  I'm not entirely sure what

2     you're asking.  Are you -- I mean, we've identified the

3     documents by government exhibit number that are in evidence.

4          MS. TUCCI-JARRAF:  True.  But what I'm asking for is

5     each of these -- each of these documents that are listed here

6     were actually presented to Ms. Palmisano inside of e-mails,

7     numerous e-mails, because they go to the title, the

8     authorization, the authority and the ownership of where the

9     funds came from, the originating facility, as well as the funds

10    she says she received and got a declaration of valid sale.

11         THE COURT:  So what are you -- what are you wanting

12    to establish now?

13         MS. TUCCI-JARRAF:  Well --

14         THE COURT:  I mean, you've asked her did she

15    receive -- you've identified this exhibit number and referenced

16    to attached documents.

17         MS. TUCCI-JARRAF:  Uh-huh.

18         THE COURT:  So ...

19         MS. TUCCI-JARRAF:  This document, but nobody -- she

20    states she doesn't have all the full e-mails and the

21    attachments with her, which are the title --

22         THE COURT:  I understand all that.  Is there anything

23    else you need to ask of this witness about that?

24         MS. TUCCI-JARRAF:  No.  I'm asking if we want to go

25    through all of these numbers to see if she has received them?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1        THE COURT:  Go ahead and ask your questions.

2        MS. TUCCI-JARRAF:  I'll just go ahead and --

3        THE COURT:  You can ask -- I don't want -- you ask

4    the question you think you need to ask and then we'll see if

5    there's objection, and we'll just go on, same process we've

6    been using.  Thank you.

7        MS. TUCCI-JARRAF:  Thank you very much.

8    BY MS. TUCCI-JARRAF:

9        Q    Ms. Palmisano, do you remember receive that UCC

10   record number 2000043135?

11       A    I don't recall.  Like I said, I received numerous

12   e-mails, numerous attachments.  Once you sent them, I put them

13   in a file electronically.

14       Q    Okay.  I'm just going to go through, then, and list

15   these numbers, ask you the same question and you can respond.

16       A    Okay.

17       Q    Okay.  UCC record number 20111125781, do you recall

18   receiving that document in an e-mail?

19       A    I don't recall.

20       Q    Okay.  UCC document 2011055259.  Do you recall

21   receiving that document in an e-mail.

22       A    I can't recall.

23       Q    Thank you.  UCC number 2011055260, do you recall

24   receiving that in an e-mail as an attachment?

25       A    I cannot recall.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    Q    2012049126, do you recall receiving that UCC document

2    in an e-mail?

3    A    I do not recall.

4    Q    Record two -- UCC record 2012012675, do you recall

5    receiving that document attached to an e-mail?

6    A    I can't recall.

7    Q    Document 2012025545, do you recall receiving that

8    document in an e-mail as an attachment?

9    A    I could have.  I really -- I cannot recall.

10   Q    I -- thank you for answering.  I apologize for making

11   you do this, but as part of the record, we need to go through

12   it.  Thank you.

13        Do you recall receiving the document -- UCC

14   document 2012049126 as an attachment in an e-mail?

15   A    I can't recall.

16   Q    Thank you.  Do you recall receiving UCC

17   document 2012-125-1787-8 as an attachment in an e-mail?

18   A    I can't recall.

19   Q    Do you recall receiving document 2012012555 as an

20   attachment in an e-mail?

21   A    I can not recall.

22   Q    Do you recall receiving document 2012028312 as an

23   attachment in the e-mail?

24   A    I can't recall whether I did or didn't.

25   Q    Thank you.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1          Do you recall receiving document -- UCC

2   document 2012012659 as an attachment in an e-mail from me?

3          A    I can't recall.

4          Q    Do you recall receiving document -- UCC

5   document 2012028311 as an attachment in an e-mail from me?

6          A    I cannot recall.

7          Q    Do you recall receiving document -- UCC document

8   2012028314 as an attachment in an e-mail from me?

9          A    I cannot recall.

10         Q    Okay.  Do you recall receiving UCC

11  document 2012079290 and UCC document 2012079322 in an e-mail as

12  attachments in an e-mail from me?

13         A    I don't know.

14         Q    Okay.  Do you recall receiving UCC record

15  number 2012094308 as an attachment in an e-mail from me?

16         A    I don't know.

17         Q    Do you recall receiving a record, UCC record

18  number 2012113593 as an attachment in an e-mail from me?

19         A    I don't know.

20         Q    Okay.  Do you recall receiving UCC record

21  number 2012127914 and 20 -- record number 2012127907 and record

22  number 2012127854 as attachments in an e-mail from me?

23         A    I don't know.

24         Q    May I have the next page, please, David?  Thank you.

25         Do you recall receiving the paradigm report dated

UNITED STATES DISTRICT COURT

1  March 6th, 2011 as an attachment in an e-mail from me?

2      A    Where are you looking?

3      Q    This would be number -- article two, letter A, and

4  it's sort of in the top third of the page.

5      A    I do recall a report with that verbiage.

6      Q    Okay.  And I believe that is exhibit -- I'm sorry,

7  155A, but I'm not going to call those up yet.  We'll finish

8  going through -- and I apologize for any inconvenience here,

9  but we need to get this on the record.

10          Okay.  Ms. Palmisano, do you recall receiving UCC

11  record 2012012555 and UCC record 2012028312 from me as

12  attachments in an e-mail?

13     A    I don't know.

14     Q    Excuse me?

15     A    I don't know.

16     Q    Do you recall receiving UCC records 2012012659 and

17  record number 2012028311 --

18     A    I don't know.

19     Q    -- in an -- as attachments in an e-mail from me?

20     A    I don't know.

21     Q    Do you recall receiving UCC record 2012028314 as an

22  attachment in an e-mail from me?

23     A    I don't know.

24     Q    Do you recall receiving UCC record

25  number 2012-125-1787-8 as an attachment in an e-mail from me?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    A    Where are you looking?

2    Q    That would be article two, letter C.

3    A    I don't know.

4    Q    Moving to article two, letter D, do you recall

5  receiving UCC record number 2012083304 as an attachment in an

6  e-mail from me?

7    A    I don't know.

8    Q    Moving to article two, letter E.  Do you recall

9  receiving UCC record number 2012083304 as an attachment in an

10  e-mail from me?

11    A    I don't know.

12    Q    Moving to letter F.  Do you recall receiving UCC

13  record number 2012086794 as an attachment in an e-mail from me?

14    A    I don't know.

15    Q    Thank you.  Moving to G.  Do you recall receiving UCC

16  record number 2012086802 as an attachment in an e-mail from me?

17    A    I don't remember.  I don't know.

18    Q    Thank you.  David, if you would, please, go to the

19  next page.  Okay.  Excuse me, Ms. Palmisano.

20         Ms. Palmisano, do you recall receiving UCC record

21  number 2012088865 as an attachment in an e-mail from me?

22    A    I don't remember.

23    Q    Thank you.  Moving to letter I.  Do you recall --

24         THE COURT:  Let me ask a question.

25         Ms. Palmisano, there are several UCC numbered

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    documents referenced in this exhibit.  And you've stated so far

2    with respect to each one that Ms. Tucci-Jarraf has asked you

3    about that you don't recall whether you received them or not.

4    Would your answer be the same for each of these --

5              THE WITNESS:  Yes.

6              THE COURT:  -- numbered UCC documents?

7              THE WITNESS:  I don't remember specifically.

8              THE COURT:  Why don't we move on.  I think that

9    establishes the record.  Her answer would be she does not

10   recall whether she received any of the listed UCC referenced

11   documents in this exhibit.

12             MS. TUCCI-JARRAF:  Without prejudice, I'll move

13   forward.

14   BY MS. TUCCI-JARRAF:

15   Q    Thank you, Ms. Palmisano, for your assistance with

16   that.

17        Okay.  Ms. Palmisano, how long had you -- how long

18   had you been working for Whitney Bank?

19   A    Sixteen years.

20   Q    Sixteen years.  And I remember you stated that you

21   had been working -- you started as a teller and worked your way

22   up?

23   A    Correct.

24   Q    Okay.  How long have you been in the corporate

25   investigations division?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1      A     Four years.

2      Q     And approximately how many cases have you

3   investigated of financial fraud?

4      A     Hundreds.

5      Q     On 7/10 you stated you received a wire recall from

6   USAA electronically?

7      A     Correct.

8      Q     And the recall says that it was unauthorized?

9      A     Correct.

10     Q     Okay.  Is there electronic -- or a printout of that

11  electronic report?

12     A     Yes.

13     Q     Did you provide that to the Department of Justice?

14     A     I did.

15     Q     And who shows on the electronic report, do you

16  recall?

17     A     I'm sorry?

18     Q     Do you recall who the sender is?  There's an ID

19  typically of not just the sender, but sometimes the person that

20  is actually from the sending entity.  Do you recall?

21     A     It was -- it was just USAA.  It was nobody -- it's

22  all done electronically, so ...

23     Q     Did you print that report out before --

24     A     Yes.  I submitted everything.

25     Q     Did Ms. Anne-Marie Svolto put that document on the

UNITED STATES DISTRICT COURT

1    screen for you today, that electronic report that you printed

2    and gave to them?

3         A    I don't recall seeing it.

4         Q    You don't recall seeing it?

5         A    No, it was just the initial wire.

6         Q    Okay.  And staying with that, just the messaging

7    between you and USAA, you stated that you had reached out to

8    them on 7/10 after you received that wire recall to --

9         A    After --

10        Q    Sorry.

11        A    After I spoke with our customer, Buddy Gregg --

12        Q    Okay.

13        A    -- I reached out to USAA.

14        Q    Uh-huh.  And do you recall who you spoke to at USAA?

15        A    I do.

16        Q    Who was that?

17        A    Shelsea Anderson.

18        Q    And it was Ms. Shelsea Anderson, you had mentioned in

19   your direct with Ms. Anne-Marie Svolto, that they told you

20   their client was recalling the wire?

21        A    Correct.

22        Q    And that was Shelsea Anderson that had told you that?

23        A    Correct.

24        Q    Okay.  And at that point, did she state that she was

25   going to send you a hold harmless agreement from USAA or did

Lauren Palmisano - Cross-Examination

1   you just receive that later?

2       A    No.  She said she would send us -- send me the hold

3   harmless via e-mail.

4       Q    Did she say why?

5       A    I'm sorry?

6       Q    Did she say -- did she say why she would send -- is

7   it typical to send a hold harmless agreement if their client is

8   the one that's saying he didn't authorize?

9       A    It's typical to send a hold harmless outside of time

10  line, like you have -- if you have a time frame to return

11  items, and once you've gone without, like outside of that, the

12  hold harmless is just basically releasing the receiving bank

13  from any liability.

14      Q    And what's that time frame?

15      A    Well, wires it's immediate.  So there really is no

16  guarantee of sending funds back for wires.

17      Q    Okay.  So with a -- for instance, with a purchase

18  with like a check or anything like that, it's a -- are you

19  talking about the three-day time period?

20      A    Twenty-four hours.

21      Q    Twenty-four hours?

22      A    For most checks, yes.

23      Q    Okay.  And so anytime after that 24 hours, a hold

24  harmless agreement would have to be sent in that particular

25  scenario?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    A    Depending on the type of fraud.

2    Q    So hold harmless is really truly for situations of

3  fraud?

4    A    To my knowledge, yes.

5    Q    Okay.  So if she told you that their client was

6  recalling the wire, did she also tell you that that client

7  committed fraud?

8    A    She did not go into specifics.  I did not get any

9  information really from them, except that their client was

10  recalling the wire.

11    Q    And then she told you she would send over a hold

12  harmless agreement, which is typically involved in cases of

13  fraud?

14    A    From what I've done in the past with cases, all of

15  mine have been fraud.  I am not sure if there's other

16  circumstances for hold harmless, but from all the hold

17  harmlesses that I've dealt with, it's been on a fraud basis.

18    Q    And did you believe that in this instance she was

19  sending it over because there might be an issue of fraud?

20    A    Well, she claimed that her customer was recalling it.

21  So I didn't know any of -- any story behind why it was being

22  recalled.

23    Q    And did you receive any other information in regards

24  to -- from law enforcement at any point or someone saying they

25  were in law enforcement, did you speak with anyone that day?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    A    What day?

2    Q    Excuse me, July 10th, from law enforcement.

3    A    No.  No.

4    Q    Okay.  Did you speak with a True Brown from USAA?

5    A    I believe he may have -- he contacted the bank.  I

6  contacted him, but was not able to speak with him.

7    Q    You never spoke with True Brown?

8    A    No, did not.

9    Q    And was that on 7/10 that he left a message for you

10  to contact him?

11    A    I can't recall whether it was -- he called me or

12  called my boss.  He called Whitney Bank.  I returned that phone

13  call, but did not speak with him.

14    Q    And you -- when he called and left a message at

15  Whitney Bank, did he identify who he was or who he was with.

16  Do you recall that?

17    A    I can't recall what was said on the voice mail, but I

18  did know that it was True Brown from USAA.

19    Q    And did you provide a recording of that voice mail

20  for -- to the Department of Justice or FBI?

21    A    No.  Our calls are not recorded.

22         THE REPORTER:  No what?

23         THE WITNESS:  Our calls are not recorded.

24  BY MS. TUCCI-JARRAF:

25    Q    And just to stick with the wire messaging, you stated

UNITED STATES DISTRICT COURT

1    that on 7/12, July 12th, that you had sent an electronic denial

2    to USAA?

3         A    No.

4         Q    Is that correct?

5         A    On 7/10, our wire department sent an electronic

6    denial.

7         Q    So on 7/10, you sent an electronic denial?

8         A    Yes.

9         Q    And do you have a printout of that denial?

10        A    I provided it.

11        Q    You provided it to the DOJ and FBI?

12        A    Yeah.  Uh-huh.

13        Q    And has that document -- that printout of --

14        A    I have not seen that document today.

15        Q    -- of that electronic printout been shown to you

16   today?

17        A    No.

18        Q    On that conference call that we had on 7/10/2017,

19   which would have been -- that would have been Exhibit 94, I

20   believe.  I believe 94 was when she put up the disc and said do

21   you recall that?

22        A    Yes.

23        Q    Okay.  During that call that yourself, Brad Cohen,

24   myself, and Randall Beane, and I believe Mr. Forbes and

25   Mr. Byrne possibly may have or may not have been on there, at

UNITED STATES DISTRICT COURT

1    that time, you had given me your e-mail address and Mr. Cohen

2    had given me his e-mail address in order to send those e-mails

3    with all those documents.  Isn't that correct?

4         A    I know I had given, I believe, my fax.

5         Q    Right.

6         A    But I know that Nelson Forbes had my e-mail address,

7    because he's the one that sent me the purchase agreement.  I

8    can't recall if the e-mail address was given.

9         Q    You had given me your fax number and I said I had

10   multiple documents to send you.

11        A    I know I got your e-mails via e-mail.

12        Q    Right.  Because you had given me your e-mail address

13   as well as Mr. Cohen on the same call together, and I had read

14   them back to you to verify that I had it correctly and stated

15   that I would start sending them as immediately as possible

16   after Mr. Beane had signed those documents --

17        A    Yes.

18        Q    -- the declaration of valid sale.  Correct?

19        A    Yes.

20        Q    Okay.  And you had given me a number to be able to

21   reach you back in case there was a problem.  I verified your

22   phone number with you on that same call?

23        A    I can't recall if I gave you the phone number.  I

24   know I gave you the fax number.

25        Q    Okay.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1      A    And I know I gave you True Brown's number as well.

2      Q    Yes.  You had given me True Brown's number.

3      A    Uh-huh.

4      Q    Okay.  Did you -- you stated you received a hold

5  harmless agreement on July 10th.  Did you receive another hold

6  harmless agreement at a later date from USAA?

7      A    What happened was, USAA had actually faxed another

8  department a copy of that hold harmless, at which point I did

9  not get a copy of that fax until after I received the e-mail

10  from USAA, from Shelsea.

11      Q    And do you recall what date that was?

12      A    July 10th.

13      Q    So you don't recall receiving another --

14      A    I -- yeah, they forwarded that to me.  I mean, after

15  I had received the e-mail from Shelsea, it was the same hold

16  harmless.

17      Q    So you don't recall receiving another copy of the

18  hold harmless in November of 2017?

19      A    In November?

20      Q    Uh-huh.

21      A    No.

22      Q    While I continue to look to that, Ms. Palmisano, do

23  you -- are you aware of whether your client has returned the

24  money back to USAA Bank for the -- regarding that purchase?

25      A    I have no knowledge of that.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1     Q    So, essentially, on July 12th, when you closed your

2  case, you had no more further involvement or awareness of

3  anything going on with this particular case?

4     A    Not until I got the subpoena.

5     Q    Okay.  So -- then let's go to that e-mail,

6  Exhibit 156, please, David.  Can you blow that -- thank you.

7          On this particular e-mail, it was Wednesday.  Could

8  you please read that, what date it was and time stamp, please.

9     A    July 12th at 4:10 p.m., Central Standard Time.

10         "Thank you very much for the information you have

11  provided.  I have placed all the documents you have supplied

12  via e-mail in a case file.  Whitney Bank Corporate

13  Investigations has marked this case closed based on the

14  provided information."

15    Q    And that was the last time you and I had contact?

16    A    You had e-mailed me after that regarding a recording,

17  which I never received.

18    Q    Excuse me?

19    A    I never received the recording you had mentioned in

20  the last e-mail.  You had replied to this e-mail.

21    Q    Right.  Okay.  And if you could go to Exhibit 163,

22  please.  Yeah, I believe the last e-mails that we shared

23  together was on July 12th.  There was no e-mails between us

24  after July 12th.  Is that correct?

25    A    That is correct.

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    Q    And this e-mail, I'm sorry, this is 2:47, so that was
2    before your e-mail to me.  If you could, please, David.
3              In this one, on this particular e-mail, because as we
4    were archiving them, there was one showing possibly that you
5    hadn't received the declaration and trust as attachments that
6    are listed there, and I had resent this to you.  Is that
7    correct?
8    A    I can't -- I can't recall.
9    Q    That's okay.  Yeah.  Looks like there was -- this was
10   a forwarded e-mail from our archives in the event because it
11   was missing from my e-mail server, and so I was forwarding you
12   the archived of the original e-mail that had been sent out so
13   that you had everything for your records.  Do you recall
14   receiving two e-mails?
15   A    I do recall seeing -- I mean, to be -- to be exact, I
16   have no idea, but I do -- you know, earlier, I had said that
17   some of them seemed repetitive, so that could have been one of
18   them.
19   Q    Okay.  And then Exhibit 157, please.  Are you --
20   thank you.
21            And this -- can you say what time this was dated,
22   date and time stamp, can you see this e-mail?
23   A    July 12th at 6:44 p.m.
24   Q    Right.  And are you -- when you received this e-mail,
25   were you in Central Time Zone or Eastern Time Zone?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    A    Central.

2    Q    Central?

3    A    Uh-huh.

4    Q    Right.  That's right.  Because I was an hour ahead.

5 Okay.  So would this -- this is the date from -- or the time --

6 east coast time, you would have received it Central Standard

7 Time?

8    A    Well, this is coming from my e-mail, then it would

9 have been 6:44 Central.

10    Q    Central Standard Time.  Okay.  And this is just

11 requesting me if there's any other further investigation that

12 comes in to -- for that, can you please state what you read

13 from that, in this particular e-mail?

14    A    I'm sorry?

15    Q    Could you please just tell me what that e-mail

16 signifies to you when you had received it?  Is this a request

17 for any further information you may receive in regards to

18 Randall Keith Beane and this transaction?

19    A    So you're asking -- clarify that.  Like, you're

20 asking what do I take from this, just stating that your --

21 stating that I've closed my case, that Whitney Bank has closed

22 the case?

23    Q    So this was -- in fact, I have requested -- you had

24 just stated in your e-mail, which we had pulled that up, your

25 response, confirmations saying you had closed the case?

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    A    Right.

2    Q    And that was the only information you had given us

3   was that you had closed the case.  Is that correct?

4    A    With the documentation that I've been provided.

5    Q    Right.

6    A    Uh-huh.

7    Q    Just that statement.  And you received this after you

8   had sent me that --

9    A    Yeah.

10   Q    -- was to request these four items, the -- can you

11  please read one through four?

12   A    "The allegation initiating the investigation, all

13  subsequent allegations included for investigation, and the

14  findings causing the case to be closed, and define and

15  identify, specifically and particularly, all that constitutes

16  'the provided information.'"

17   Q    Below that, could you read that please?

18   A    "In further transparency, I will e-mail you and Brad

19  a recording of the telephonic conference from July 11, 2017

20  that I was recently made aware of to complete your files."

21   Q    Did you ever receive a copy of that recording?

22   A    No, I did not.

23   Q    Okay.  So Ms. Anne-Marie Svolto asked regarding

24  your -- I wanted to ask you, you stated you did receive the

25  paradigm report?

UNITED STATES DISTRICT COURT

1    A    I recall seeing a report with that verbiage on it,

2    yes.

3    Q    Right.  155, David, please.

4         Did you read through it at all?

5    A    No, I did not.

6    Q    And Ms. Anne-Marie Svolto asked you basically if you

7    put a lot of weight on what your customer wants.  Could you

8    please clarify what you mean by that?

9    A    Well, it's about collecting all the facts, and our

10   customer had provided a transaction receipt, a purchase

11   agreement, that, and with Randall Beane's acknowledgment that

12   he did in fact send the wire play a big part, because that was

13   the reason for the recall, was that he supposedly recalled the

14   wire.  And the fact that he had someone representing himself --

15   representing him also played a big part in my decision.

16   Q    Uh-huh.  All right.  In fact, the first e-mail, 98 --

17   Exhibit 98, please.  Yes, here, if you could pull up that first

18   paragraph, please, David.

19        And I know that she's asked you already to read it.

20   You've read it into the record.  Can you read from, "and at the

21   direction"?

22   A    "And at the direction of my client, Factualized

23   Trust, Randall Beane -- Randall Keith Beane, and its trustee,

24   Randall Keith Beane."

25   Q    Did you understand that Randall Keith Beane in this

UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

 1   particular transaction was a trustee of a trust?

 2        A    I recall hearing trustee.  I knew it has something to

 3   do with that, but --

 4        Q    Thank you.

 5        A    -- it was --

 6        Q    Did Mr. Cohen ever contact you after July 12th saying

 7   there was any problem?

 8        A    I don't recall hearing from him.

 9        Q    And you never received any other contact from your

10   department in regards to the wire after July 12th?

11        A    No.

12        Q    And who is your supervisor?

13        A    Jerry Kuhn.

14        Q    Could you spell that for me, please?

15        A    Last name?

16        Q    Is Jerry with a J or --

17        A    It's actual Gerald or Gerald.  Oh, goodness.  Jerry,

18   J-e-r-r-y -- or G-e-r-r-y.  I'm sorry.  Last name, Kuhn,

19   K-u-h-n.

20        Q    K-u-h-n?

21        A    Uh-huh.

22        Q    Thank you.

23        A    You're welcome.

24             MS. TUCCI-JARRAF:  I don't have any other questions

25   for you.  Thank you, Ms. Palmisano, for your patience.

UNITED STATES DISTRICT COURT

1        THE COURT:  Thank you.

2        Mr. Beane, cross-examination?

3        MR. BEANE:  Yes.

4                        **CROSS-EXAMINATION**

5    BY MR. BEANE:

6        Q    Good afternoon, Ms. Palmisano.

7        A    Hello.

8        Q    Now, you said earlier you had listened to the

9    recording that the Court played for us yesterday?

10       A    I did.

11       Q    In the recording, do you recall hearing me say,

12   "Heather, I'm getting a call from New Orleans" twice?

13       A    Yes.

14       Q    Would that have been in the time frame or the time

15   period between that call that you hear me say that and our

16   conference call that you called me?

17       A    Say that one more time.

18       Q    The time period between when you hear me saying that

19   in the recording and our conference call, would that have been

20   the time period between when you called and --

21       A    I heard that on the recording, yes.

22       Q    And your number does show up New Orleans.  Correct?

23       A    Correct.

24       Q    Okay.  You also made mention that when you first

25   heard that I had called and requested the funds back, that you

                    UNITED STATES DISTRICT COURT

Lauren Palmisano - Cross-Examination

1    had the number cross-referenced to the purchase agreement.  How

2    did you do that?

3         A    Well, I received the purchase agreement from Buddy

4    Gregg, which had your phone number on it.

5         Q    Where did the call come into to where you could see

6    the number calling?

7         A    When I contacted USAA Bank, I confirmed with them, is

8    that what you're asking?

9         Q    No.  You said there was a number -- when I called --

10   when somebody posing as me called in?

11        A    Oh, after I tried calling you?

12        Q    No.  You said that someone had called and said they

13   were me and wanted the funds reversed.

14        A    USAA told me that you were recalling the funds.

15        Q    Oh, so you never got the call yourself from someone

16   posing as me?

17        A    No.

18             MR. BEANE:  Okay.  No further questions.  Thank you

19   for your time.

20             THE WITNESS:  Uh-huh.

21             THE COURT:  Thank you.

22             Any redirect?

23             MS. SVOLTO:  No, thank you, Your Honor.

24             THE COURT:  Thank you.

25             Ms. Palmisano, you may be excused.

UNITED STATES DISTRICT COURT

1          MS. SVOLTO:  Your Honor, may this witness be released

2     from her subpoena so that -- such that the rule would not apply

3     to her?

4          THE COURT:  Yes, based on the Court's previous

5     rulings and discussions.

6          So you're free to remain in the courtroom or leave as

7     you see fit.

8          THE WITNESS:  Thank you.

9          THE COURT:  The government can call its next witness.

10          MS. DAVIDSON:  We call Mr. Sean O'Malley.

11          THE COURTROOM DEPUTY:  Raise your right hand.

12     WHEREUPON,

13                         **SEAN O'MALLEY,**

14     was called as a witness and, after having been first duly

15     sworn, testified as follows:

16                       **DIRECT EXAMINATION**

17          THE COURTROOM DEPUTY:  Have a seat.  If you'll scoot

18     in as close adds you can.  State and spell your name for the

19     record.

20          THE WITNESS:  Yes.  It's Sean O'Malley.  S-e-a-n.

21     O-apostrophe-M-a-l-l-e-y.

22     BY MS. DAVIDSON:

23          Q    Mr. O'Malley, what do you do?

24          A    I'm the senior vice president and the chief

25     investigator in the enforcement group at the Federal Reserve

Sean O'Malley - Direct Examination

1    Bank of New York.

2        Q    Okay.  What -- how long have you been with the

3    Federal Reserve Bank of New York?

4        A    It's coming up in a couple weeks, it will be 19

5    years.

6        Q    Nineteen years.  And what are your responsibilities?

7        A    It varies quite a bit, but my unit gets involved in a

8    lot of investigations, regulatory investigations of banks in

9    the anti-money laundering and the sanction violation area.  We

10   also get involved in a lot of internal investigations and in

11   some instances external investigations, sometimes fraud

12   related, and also as a liaison for law enforcement, me and my

13   team gets -- we get called to come to trials on occasion, to

14   talk about payment systems, talk about fraud related issues, so

15   it's quite a varied area.

16       Q    Okay.  So for us laypeople, what exactly is the

17   Federal Reserve?

18       A    So the Federal Reserve is the central bank of the

19   United States.  And as part of that, it has many different

20   functions.  The main part of the Federal Reserve is in

21   Washington.  That's the Board of Governors.  People forget

22   about that.  And there's 12 regional reserve banks around the

23   country.  So altogether they make up the Federal Reserve

24   System.

25            Typically, what most people think about the Federal

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1   Reserve is they execute monetary policy, which includes setting

2   interest rates, you know, that are being used by the banks.  In

3   addition, they also coordinate with other central banks.  And

4   in addition to central banks, they also coordinate with other

5   international monetary policy entities, like the International

6   Monetary Fund, the IMF, or The World Bank.  And part of that

7   interaction is actually providing services to them.

8           So the Federal Reserve Bank of New York is the

9   reserve bank responsible for having accounts services.  So we

10  actually have accounts for well over a hundred central banks in

11  the New York Fed, and that allows them to conduct U.S. dollar

12  transactions, buy securities, even -- they're even allowed to

13  have gold in the vault downstairs in the Federal Reserve, and

14  many of them do.  So that's -- that's another part of it.

15          We also conduct -- basically provide fiscal services

16  for the United States, so we are the fiscal agent for the U.S.

17  government.  And as part of that, we'll process transactions on

18  behalf of the government.

19          And what most people think about also is that when

20  the U.S. government is trying to fund itself, they quite often

21  do that by selling treasury securities.  So the Federal

22  Reserve -- in fact, the Federal Reserve in New York has a

23  markets group that operates the area where they sell treasury

24  securities out to the public.  That's done through what's known

25  as primary dealers.  So there's a certain group of institutions

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    that buys the U.S. debt from the Federal Reserve on behalf of

2    the Treasury.  So that's how the U.S. government funds

3    themselves in large part in addition to tax revenue and other

4    things.

5         The Federal Reserve also has an area where they --

6    they execute transactions on behalf of the depository

7    institutions, so that would include wire transfers, electronic

8    transfers, like wire transfers and the Fedwire system.  It

9    would also include other types of electronic transmissions,

10   such as ACH transactions through the FedACH process.  In

11   addition, they clear checks on behalf of financial

12   institutions.  And, finally, they distribute currency

13   throughout the nation, and even, in fact, it's distributed

14   internationally in some cases as well.

15        So those are the payment -- the internal payment

16   operations of the Federal Reserve.  We also have another area,

17   which is involved in the supervision of financial institutions.

18        They -- this -- the institutions that are regulated

19   by the Federal Reserve, we have examiners that go out, and they

20   go on site and they make sure that the banks are adhering to

21   U.S. laws and regulations and then that the banks are safe and

22   sound.

23        So my unit, the investigative unit, often works hand

24   in hand with supervision, and if there's a problem with one of

25   the financial institutions, then it gets referred to my area,

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1  which is the enforcement area.

2     Q    Okay.  So how exactly is the Federal Reserve owned?

3  Is it a government agency, or is it a combination of government

4  agency and bank?

5     A    Well, it's a federal instrumentality, so it was

6  created by Congress in I believe it was 1913.  And so there are

7  members of the Federal Reserve, the banks.

8         The banks are not allowed to lend a hundred percent

9  of the deposits that they take in.  They're required to keep a

10 certain amount of reserves that they can't lend out in case

11 there's an emergency and some people want to come back and, you

12 know, access their deposits.

13        They have to keep a certain amount, and they do in

14 fact keep a certain amount at the Federal Reserve.  And those

15 deposits themselves are part of the structure, and they are

16 actually in -- the banks are part owners in theory of the

17 Federal Reserve, because they share in the Federal Reserve.

18        But it's not ownership in the common definition of

19 you can tell the institution what to do or direct the

20 executives what to do.  That -- that activity is with the

21 Federal Reserve, the 12 regional banks in coordination with the

22 Board of Governors in Washington.

23        The Board of Governors is actually not an

24 instrumentality.  They are actually part of the U.S.

25 government.  The reserve banks themselves are these entities

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1  that were created by Congress, and they are quasi public, but

2  in fact funded, as you described by the sharers of some of the

3  financial institutions.

4      Q    Okay.  And so do any individuals, like me or

5  Ms. Svolto, do any individuals own or have accounts at the

6  Federal Reserve?

7      A    No.  Just depository institutions or, as I mentioned

8  earlier, central banks, you know, IMF, World Bank, things like

9  that.

10     Q    So central banks are like the banks of a country?

11     A    Yeah.  So, I'm sorry, the central banks -- you know,

12 the Federal Reserve is the central bank of the United States.

13 And, similarly, there are central banks in most other

14 countries.  And those central banks can apply to maintain an

15 account at the Federal Reserve.  And, you know, if -- we don't

16 have one for every single country in the world, but for well

17 over a hundred countries have an account at the Federal Reserve

18 Bank of New York.

19     Q    So the only -- I guess the only things, because

20 they're not really individuals, the only groups that have

21 accounts, personal accounts, are banks -- are the central banks

22 or depositories?  You said depositories?

23     A    Depository institutions, yes.

24     Q    Okay.

25     A    So it could be a credit union as well.

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    Q    Right.  So does the Federal Reserve hold any secret

2    accounts for individuals?

3    A    No.

4    Q    Does the Federal Reserve and its member banks, is

5    that how you say it, member banks, or is there all the banks?

6    Okay.  There's the Federal Reserve and then there's 12 Federal

7    Reserve Banks?

8    A    Right.  So there's -- they're by districts.

9    Q    Okay.

10    A    So the New York Federal Reserve district is the

11    Second District.  But, yeah, so there's 12 regional Reserve

12    Banks, if you'd like, but those banks themselves all have

13    depository institutions that will have accounts at those

14    Federal Reserves.

15         So, you know, depending on where you are, it's

16    usually the closest location to the nearest Reserve Bank that

17    we open your account.

18    Q    Okay.

19    A    Those are known as master accounts.  So a big bank

20    might have one master account.  And if you think about the

21    account, when they have an account with the Federal Reserve,

22    it's their ABA routing number.  Okay.  So if individuals have

23    an account at the bank, the bank will determine what that

24    account number would be.  But at the Federal Reserve, all the

25    accounts are their ABA routing numbers.  That is the bank's

UNITED STATES DISTRICT COURT

1  account number at the Federal Reserve.

2      Q    Okay.  Yeah.  I follow.  And so does the Federal

3  Reserve and its district banks, am I saying that right?

4      A    So the Federal Reserve in Washington doesn't -- is

5  not a bank.

6      Q    Okay.

7      A    So they don't have any accounts.  It's only the

8  reserve banks themselves, the 12 reserve banks that have --

9  that maintain accounts for depository institutions.  And if it

10 wasn't clear before, they also maintain accounts for the

11 U.S. -- if the U.S. government.

12     Q    Okay.  So the 12 reserve banks, that's the way to say

13 it.  Right?

14     A    Yes.

15     Q    Did they have their own routing numbers?

16     A    They do.

17     Q    And are these routing numbers published?

18     A    Yes.

19     Q    Okay.  Is it pretty easy to find Federal Reserve

20 Banks' routing number?

21     A    Yes.  Or commercial banks, the U.S. government

22 entities, yeah.

23     Q    So you mentioned that the Federal Reserve, parts of

24 it regulate ACH transactions.  And just without asking for a

25 treatise on ACH, but roughly, what is an ACH transaction?

UNITED STATES DISTRICT COURT

1    A    Okay.  Can I just -- I would just like to comment,

2 they don't regulate the ACH.

3    Q    Okay.  I'm sorry.

4    A    So what -- what they do is they operate a payment

5 platform.  And one of the payment platforms and the services

6 they provide is ACH services.  So there's also a competing ACH

7 service called Electronic Payment Network, which is a private

8 entity -- you know, run by a private entity.  So I'm just going

9 to keep mine to the FedACH program.

10    Q    Okay.

11    A    And that's basically where -- I think, for most

12 people, to try to keep it a little easier to understand, if

13 people think about their direct deposits of their paychecks,

14 that comes into their -- into their bank account

15 electronically.  That is an ACH payment.

16         In many instances, if you pay your utilities or your

17 car loan or things like that, in many instances, you will give

18 your utility the right to take money out of your account on

19 your behalf and to pay your utility bill.  So you would give

20 them the right to debit your personal account, take money out

21 and apply that funds to your payment.  And so that is all part

22 of the ACH.

23         You can either direct an ACH payment out or you can

24 give somebody the rights to pull or debit money out of your

25 account.  Those are electronic payments, but there's different

Sean O'Malley - Direct Examination

1   legal differences between ACH and Fedwire, which we'll talk

2   about in a second.

3           ACH gives more rights to the consumer.  They have

4   more -- you know, they have the ability to pull back, you know,

5   payments which are -- which were not properly approved.  And

6   same with financial institutions.  Financial institutions -- if

7   one financial institution tries to extract money from another

8   financial institution's account holder, that -- the account

9   that's being debited or the money's being pulled from, they

10  have two days to determine whether in fact that's a valid

11  payment or not.  And if -- within that two day period, if it's

12  not valid, they can basically take the money back and revoke

13  the earlier payment.

14      Q    Okay.  And so that time period, which you just

15  discussed, is two days?

16      A    Two days that the banks will have to go back to the

17  other financial institution that debited the funds from their

18  account to determine whether it was valid or not.  If it was

19  not valid, but they waited till three days, then if they

20  couldn't get the money back from the customer, it's on the bank

21  that didn't return those funds in a proper period of time.

22      Q    Okay.  So I guess, bottom line, an ACH transaction is

23  not instantaneous.  There's a two-day time period before most

24  banks would consider it final?

25      A    That's correct.  Although, you know, that's kind of

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1  like the legal responsibilities, so, you know, each bank has

2  its own back office.  So when it's apparent to the customer,

3  versus when it's apparent to the bank, you know, might depend

4  on how fast their systems are, how fast they update, you know,

5  each customer, because ACH in many cases, it's -- it's a batch

6  system.

7          So let's say if it's your utility company and they

8  would take payments out, they might take a hundred customers'

9  payments all out at once from a big bank, let's say.  There

10  might be a hundred customers from that big bank that have

11  authorized them to pay their monthly utility bill.

12          But each -- the bank has to go down to each account

13  holder to make sure that that was valid, because each account

14  holder will have the right to say, no, that that wasn't a valid

15  debit out of my account.  And then on the other side, the

16  utility would have to credit each individual account holder's,

17  you know, account.  So that takes time for each of them to do

18  that internally.

19      Q    And so what you're saying is, it can take more than

20  two days?

21      A    It might appear that way, yeah.  But from bank A to

22  bank B, if bank A is debiting or pulling money out of bank B's

23  account, bank B has two days to say that was an improper debit

24  of my account and I'm taking the money back because it was

25  improper.

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    Q    Okay.  So are you familiar with Fedwires?

2    A    Yes.

3    Q    And how are -- what are Fedwires?

4    A    It's another electronic payment, but Fedwires are

5  more immediate.  So when a wire transfer is executed, that --

6  that payment gets executed by their financial institution and

7  it will go through the Fed -- the Fedwire funds transfer

8  system, and that payment is immediate, and that payment can't

9  be revoked.  Right.  You don't have the legal right to pull it

10  back anymore.

11        So there's a significant difference legally between

12  the two.  Typically, there is -- ACHs are often free, usually

13  free, when a wire transfer could be 20 to $40 in a processing

14  fee that goes along with the wire, with the Fedwire transfers.

15    Q    So do all federal wires with U.S. dollars, do they go

16  through the Federal Reserve, Fedwires?

17    A    No.  So --

18    Q    Okay.

19    A    -- the -- I would say the vast majority of domestic

20  wire transfers get processed by the Fedwire Funds Transfer

21  Service.  And the majority of the international wires gets

22  processed by another competing entity that is owned by the

23  banks, and that's called Clearing House Interbank Payments

24  System or CHIPS.  So CHIPS and Fedwires are competitors.  And

25  you can send international via Fedwire, but you don't have to.

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    You could use the CHIPS system, and I guess you could use CHIPS

2    domestically as well.

3              But that's generally the way it works out, is that

4    for whatever reason, most domestic institutions choose to use

5    Fedwire and a lot of the big banks that are clearing

6    internationally tend to use CHIPS.

7        Q    Okay.  And how is -- and you may have already

8    explained this, but how is the Fedwire different from ACH, just

9    the immediacy?

10       A    Well, it's -- it is the immediacy, but it's more

11   about the ability to -- to tell somebody there was an incorrect

12   payment.  Okay.  And also Fedwire, you don't have -- you have

13   to push out a Fedwire.  Okay.  You have to initiate the

14   Fedwire, where an ACH is much different.

15             To help spur the economy, if you will, they created

16   ACH so that other big institutions, like your utility or like

17   your car, you know, GMAC, or whoever it would be, if you give

18   them the right, they can initiate and they can pull money out

19   of your account with your authority into -- you know, to pay

20   off your loans.

21             You can't do that with a Fedwire.  Nobody else can

22   take money out of your account via wire transfer, because it's

23   immediate.  So you wouldn't have the ability to say, "No, that

24   was an improper withdrawal of those funds."

25             But with ACH, because they have those built-in

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1   controls, that gives them the right to say, "No, it was an

2   improper withdrawal out of my account," that's generally the

3   legal difference between the two, and that's why one takes

4   longer to settle than the other.

5       Q    Okay.  That makes sense.

6            So does USAA Bank have authority to pull money out of

7   the Fed Reserve of New York if they use the proper routing

8   number?

9       A    Yeah.

10      Q    Through an ACH transaction?

11      A    They would have access to the ACH system so they

12  could execute that kind of a transaction, yes.

13      Q    Okay.  And then the Federal Reserve in New York would

14  check to see if it was a valid account?

15      A    Well, see, the first process is, they check to see if

16  it's a valid routing number.

17      Q    Okay.

18      A    Okay.  Because if it's not a valid routing number, it

19  will get automatically rejected.

20      Q    Okay.

21      A    So if it's a valid routing number, then there's going

22  to be an account number also as part of that, but they won't

23  know whether that account number is right or wrong.  The

24  Federal Reserve System won't be able to determine that because

25  that's going to be on the books and records of the party that

UNITED STATES DISTRICT COURT

1    account's being debited.

2         Okay.  So when they execute that, that's why, you

3    know, there's this two-day window so you can figure out whether

4    that account number is valid or not.

5         So -- so when -- if USAA wanted to execute it, they

6    could.  As long as it was a valid routing number, they would be

7    able to pull funds out of the routing number of the receiving

8    depository institution, the one that they're sending the

9    payment -- they're sending a message to but they're pulling the

10   funds from.

11   Q    Uh-huh.

12   A    And then that institution then has two days to say

13   either -- in the vast majority, 99.9 percent of the time, it's

14   a valid routing number.  So two days goes by, nobody rejects

15   it, and, you know, they get to keep their money.

16        But if, in fact, there was no account number there,

17   or there was some other reason why, maybe they don't have funds

18   in their account, right, and they tried to pull it, but the

19   person had a zero balance, so the bank isn't going to give them

20   credit, so they're going to reject that.  So for whatever

21   reason they reject it, they have to do it within a two-day

22   window.

23        And then the financial institution that initiated the

24   ACH debits, in this case, USAA, then the counterparty would

25   pull those funds back and say that that was not a valid

Sean O'Malley - Direct Examination

1   transfer, transaction.  And those funds would then be credited

2   or taken back out, you know, so -- I'm sorry.  They would have

3   debited the other financial institution so it's a credit into

4   their account, and now that credit gets reversed and that gets

5   pulled out or debited back out of the USAA's account, if it was

6   an invalid transaction.

7       Q    Okay.  So specifically in this case, there was a

8   Fedwire from USAA Bank to Whitney Bank that on July 7th,

9   2017 -- and did I serve a trial subpoena on you to receive an

10  information whether this Fedwire went through the Federal

11  Reserve of New York?

12      A    Yes.  As part of my trial subpoena, I brought that

13  with me, yes.

14      Q    Okay.  And is this a record which is maintained in

15  the ordinary course of business?

16      A    Yes, it is.

17          MS. DAVIDSON:  Your Honor, at this time, I'd like to

18  admit Government's Exhibit 164.  He brought it with him, but I

19  have provided a copy to both defendants.

20          THE COURT:  We'll go ahead and admit -- absent

21  objection, admit 164.

22      (Government's Exhibit 164 admitted into evidence.)

23  BY MS. DAVIDSON:

24      Q    Thank you.  Do you recognize this document?

25          I'm sorry, we can blow it up on screen.  We had time

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    to scan it.  Could you pull it up?  And if you could expand it.

2          Could you tell me what this document is?

3      A    Yes.  It is -- it's a Fedwire wire transfer that we

4    processed about a half million of them a day, so this is just

5    one of many.  And in this case, you can see the -- well, it's

6    got a lot of codes that may be a little hard to read.  But you

7    can see, there's a line that says "Amount," and the field tag

8    is the "2000" field tag, and this is in the amount of

9    $493,110.86 [sic].

10     Q    If you can scroll up some.

11          Sender reference -- I'm sorry, if you could go a

12   little bit further to expand.  Okay.

13          What's the "Sender Reference Number"?

14     A    The sender reference number is a number that the

15   financial institution that created the wire transfer, they put

16   that number in, so it's not a number that's assigned by the

17   Federal Reserve.  It's initiated by the institution.

18     Q    Okay.  And so -- and the "Originator"?

19     A    So in the originator, what that's saying here is this

20   wire transfer -- and if you'll look at the IMAD, which is in

21   "1520" field tag, you can see the date of the wire transfer.

22   So that was on July 7, 2017.

23          And what this is saying is that the originator, who

24   initiated this wire transfer, is in the 5,000 field.  And that

25   would -- the originator is identified as Randall Keith Beane at

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

300 State Street, Apartment 365, Knoxville, Tennessee.

1

2      Q     Okay.  Can you go further down?

3      A     Well, the -- the other thing is the account number

4   that's associated is that 020787, that -- that would be the

5   account number at the bank that initiated the wire transfer,

6   which would be USAA.

7      Q     Okay.  The identifier is the USAA Bank number

8   associated with Randall Keith Beane?

9      A     Correct.

10     Q     Okay.  And then the financial institution USAA

11  Federal?

12     A     Yes, so the sender ABA, 3100 at the top, that is --

13  and you see right below that is the receiver ABA at 3400, those

14  are the customers of the Federal Reserve System.  Okay.  So

15  these are the two depository institutions whose accounts are

16  being debited and credited.

17          So in this case, the Federal Reserve is debiting the

18  account of the sender, taking money out of the sender, which is

19  USAA, and putting a credit into the account of the receiver,

20  which is Whitney Bank.  And both of them have their ABA routing

21  numbers in front of their name.  So, again, those would be the

22  account numbers in the Federal Reserve System.

23     Q     Okay.  If you could scroll down further, please.  And

24  so -- and what is the beneficiary information?

25     A     So the beneficiary is the person who's -- the wire

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1   transfer is being sent to, so the funds would be put into their

2   account.  And the beneficiary is identified as Buddy Gregg

3   Motor Homes, LLC in Knoxville, Tennessee.  And the account

4   number associated with Buddy Gregg Motor Home is 046074960

5   number.

6       Q    Okay.  If you could expand, David.  And could you go

7   to the top, which is OMD.  What does OMD -- what kind of

8   information is in there?

9       A    Well, there's -- there's an IMAD and an OMAD.  So one

10  is really the incoming message, and then the OMAD is the

11  outbound message.

12      Q    Okay.

13      A    And that's really the Federal Reserve sending this

14  message, if it's -- if it's got an OMAD, it's an executed wire

15  transfer.

16      Q    Okay.  That's what this is.  If it's got an OMAD,

17  it's an executed wire transfer.  And so does Document 164

18  indicate that it's an executed wire transfer?

19      A    Yes, it does.

20      Q    And can you assume from the numbers, the "20170707,"

21  is that the date?

22      A    Yeah.  It's the same date as it was initiated, right,

23  so the -- before we talked about the IMAD, it had that date,

24  the OMAD has that date.  And I believe the actual execution is

25  that 0918.  I think that's 9:18 in the morning.

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    Q    Okay.  And so if we -- are you familiar with the

2    electronic transmissions that would cause a Fedwire to happen?

3    I hate to use the word "wire," because it confuses everybody

4    dealing with Fedwires versus wires in the legal sense, which

5    are telephones and Internet.

6          But are you familiar with the way a transaction would

7    go?  Do these transmissions go through the Federal Reserve of

8    New York from the member banks?

9    A    We're talking Fedwire right now?

10   Q    Yes.  Fedwire.

11   A    So in Fedwire, we've got two processing centers.

12   There's a primary processing center and a secondary center.  On

13   the date of this wire transfer, the processing, the primary

14   processing center was in New Jersey and then a secondary was in

15   Texas.

16   Q    Okay.

17   A    And, basically, the way it works is the -- you know,

18   the -- the requests for payment, right, from USAA would come

19   into the Fed Reserve, the Fed Reserve gets ready to process it,

20   and before it actually does the debiting and crediting, it

21   sends a payment to its secondary facility.  The secondary

22   facility sends an acknowledgment that it was received, because

23   that's the backup site.  And then it would be -- debiting and

24   crediting gets executed, and then the outbound advice of

25   payment goes to both institutions.

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1    So the first institution, which executed the payment

2  is USAA, they would know that it had been completed.  And then

3  Whitney Bank, which doesn't know that a wire transfer is being

4  initiated, will get that advice of payment, and then they would

5  say, okay, who's this payment on behalf of, and they'll find

6  the account, the beneficiary, and they'll be able to apply the

7  payment.

8    Q    Okay.  So if I understand you correctly, basically,

9  this Fedwire, you know at least went through New Jersey and

10 Texas?

11    A    Correct.

12    Q    Okay.  And you testified, does -- and I think I

13 already asked you this, but does the Federal Reserve of New

14 York have any individual accounts linked to people based on

15 their Social Security number?

16    A    They don't have individual accounts.  They don't have

17 accounts for individuals for any number.

18    Q    Okay.  And are you familiar with the Federal Reserve

19 of New York website?

20    A    Yes.

21    Q    And is this very easily accessible to anyone who's

22 familiar with the web at all?

23    A    Yes.

24    Q    Okay.  And does the Federal Reserve website

25 specifically say that individuals do not have -- that no

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1   individual has an account?

2       A   Yes.  I believe it's on the Federal Reserve Bank of

3   New York's website and it's certainly on the Board of

4   Governors' website as well.

5       Q   I'm going to show you what's been marked as

6   Government's Exhibit 162, and just for the witness.

7           And do you recognize that?

8       A   Yes.  This is on the Board of Governors frequently

9   asked questions.

10          MS. DAVIDSON:  Okay.  And, Your Honor, I'd like to

11  admit Government's Exhibit 162 at this time.

12          THE COURT:  Just one-page document?

13          MS. DAVIDSON:  Just this one-page document.  It's a

14  screenshot of the -- the internet for the Federal Reserve.

15          THE COURT:  Any objections?

16          MR. BEANE:  I'm sorry.  No, I don't have any

17  objection.

18          THE COURT:  Okay.  So admitted.

19      (Government's Exhibit 162 admitted into evidence.)

20          MS. DAVIDSON:  Can you publish it to the jury?

21          THE COURT:  Let me ask the jury, we were going to --

22  I need to leave a little early today, about 4:45, or leave the

23  courtroom to attend to some matters.  Do y'all want to take a

24  ten-minute break or so now or keep going for another 45 minutes

25  or so?  Totally up to you-all.

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1          JURY PANEL:  Break would be good.

2          THE COURT:  Take a break.  Okay.  Let's go do that.

3     Sounds good.

4          (Jury out at 3:51 p.m.)

5          THE COURTROOM DEPUTY:  This honorable court shall

6     stand in recess until 4:05.

7          (Recess from 3:52 p.m. to 4:09 p.m.)

8          THE COURTROOM DEPUTY:  Please remain seated and come

9     to order.

10         THE COURT:  Looks like we're ready to continue.

11    We'll bring our jury in.

12         (Jury in at 4:09 p.m.)

13         THE COURT:  Thank you.  Everyone may be seated.

14         Ms. Davidson, continue, please.

15    BY MS. DAVIDSON:

16    Q    Yes.  I just brought to your attention Government's

17    Exhibit 162, and you stated you recognized this document?

18    A    Yes.

19    Q    And could you read this document for the Court,

20    please, just basically where it starts at the "Does."  And this

21    is frequently asked questions.  Correct?

22    A    That's correct.  So the question is, "Does the

23    Federal Reserve maintain accounts for individuals?  Can

24    individuals use such accounts to pay bills and get money?"

25         And the answer is, "No.  The Federal Reserve Banks

UNITED STATES DISTRICT COURT

Sean O'Malley - Direct Examination

1   provide financial services to banks and governmental entities

2   only.  Individuals cannot, by law, have accounts at the Federal

3   Reserve Bank.

4       "A recent hoax circulating on the Internet asserts

5   that the Federal Reserve maintains accounts for individuals

6   that are tied to the individual's Social Security number, and

7   that individuals can assess" -- "access," excuse me -- "these

8   accounts to pay bills and obtain money.  These claims are

9   false."

10      Do you want me to continue?

11      Q   Yes, please.

12      A   "The Federal Reserve does not maintain accounts for

13  individuals, and individuals should not attempt to make

14  payments using Federal Reserve Bank routing numbers or false

15  routing numbers.  Individuals who attempt to pay bills or

16  conduct other transactions using a Federal Reserve Bank routing

17  number may face penalty fees from the company they were

18  attempting to pay, or the suspension or closure of their

19  commercial bank or payment service provider accounts.  Law

20  enforcement, including the Federal Bureau of Investigation, the

21  FBI, is aware of this scheme, and individuals who participate

22  in such schemes could also face criminal charges."

23      Q   Okay.  That's far enough.  And beside this posting to

24  the Internet, the Board of Governors Federal Reserve System,

25  are there other places on the Federal Reserve Internet that

UNITED STATES DISTRICT COURT

1    explains that no individuals have accounts at the Federal

2    Reserve?

3         A    Yes.  The Federal Reserve Bank of New York has a

4    frauds and scams website, section of the website, which also

5    explains that, as does -- the scheme that they're talking about

6    has also been posted on the Atlanta Reserve Bank's website as

7    well.

8              MS. DAVIDSON:  Okay.  May I have a moment?

9              THE COURT:  Yes.

10             MS. DAVIDSON:  That's all I have.

11             THE COURT:  Thank you.  Cross-examination,

12   Ms. Heather Tucci -- excuse me, Tucci-Jarraf.

13                    **CROSS-EXAMINATION**

14             MS. TUCCI-JARRAF:  Without prejudice, I have a few

15   questions.

16             THE WITNESS:  Good afternoon.

17   BY MS. TUCCI-JARRAF:

18        Q    Good evening, Mr. O'Malley.

19        A    Good evening.

20        Q    Earlier you had stated that you're a senior vice

21   president, and I didn't catch the rest of the title.  Could you

22   please repeat that for me?

23        A    Sure.  I'm also the chief investigator, and that's

24   within the legal group and there's an enforce -- in the legal

25   department of the New York Fed, there's an enforcement group,

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    so I'm in that area.  I guess my official title is financial

2    intelligence and investigations unit in the enforcement group.

3        Q    Financial intelligence?

4        A    And investigations unit, yes.

5        Q    Is that separate than the senior vice president --

6    senior vice president title that you have?

7        A    So there's -- senior vice president is kind of like

8    your rank within the bank.  So there's many other senior vice

9    presidents in the bank.  It's a senior management position.

10   But there are others that are not investigative in nature, and

11   then there's other people in the financial intelligence and

12   investigation unit that are not senior vice presidents.  There

13   are other areas, you know, could be --

14       Q    Okay.  And this is for the Federal Reserve Bank New

15   York.  Correct?

16       A    Yes.  Each reserve bank has their own staff.

17       Q    Okay.  And so that senior vice president is not for

18   the chief investigator of the legal department that you're

19   working in, it's separate?

20       A    No.  So I just became senior vice president.  So,

21   before I was vice president and chief investigator of the

22   financial intelligence.

23       Q    Okay.

24       A    So I -- I was given a promotion, so my title of --

25   changed from vice president to senior vice president, but

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1  within the unit, my title stayed the same.

2      Q    Okay.  I'm sorry.  I'm only familiar with chief

3  counsels in your guys' legal department, so ...

4      A    No, that's okay.

5      Q    And you've been with them for 19 years in the

6  enforcement arm of it or did you start out in a different

7  department?

8      A    No.  I started in the -- as an investigator in the

9  enforcement unit, yes.

10      Q    Okay.  And prior to that, did you have military

11  experience or anything like that?

12      A    So I've got an accounting background.  I'm a CPA in

13  New York state, and I'm a certified fraud examiner.

14          And the -- I guess what people term as my first real

15  job was -- I spent seven and a half years being an

16  investigative auditor for the New York State Attorney General's

17  Office for Medicaid fraud, so healthcare fraud.

18          And then after that, I spent another seven and a half

19  years at a large corporate -- a private investigation firm that

20  specialized in corporate investigations in Manhattan.

21      Q    So in the New York area?

22      A    Also in the New York area, yeah.

23      Q    But the -- with Federal Reserve Bank New York, you

24  also -- do your investigations take you outside of the New York

25  area as well?

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    A    Well, the New York Reserve Bank includes part of

2   Connecticut, parts of New Jersey, Puerto Rico, Virgin Islands.

3   So it varies.  Many of the banks we investigate are foreign

4   banks, so they will have operations overseas as well.  So,

5   yeah, I've -- I've been to Europe conducting investigations,

6   you know, so it's hard to say, because the -- the banks have

7   such a wide geographical footprint.

8    Q    And it says here that you had stated you were a

9   liaison with law enforcement.  Can you please give us a little

10  bit more information what you mean by with -- liaison with law

11  enforcement?  What does liaison mean?

12   A    It means I'm one of -- one of the investigators in my

13  unit, Robert Amenta, and myself are generally the point people

14  for law enforcement.  So there's an area of the Treasury

15  Department called FinCEN, the Financial Crimes Enforcement

16  Network, and they do a lot of training for law enforcement

17  agents.  And they have both of us listed as references that if

18  you need information from the Federal Reserve Bank of New York,

19  call either Robert or myself.

20   Q    Okay.  And that's with FinCEN only, or is that with

21  also with other law enforcement agents?

22   A    I would say I get calls from agents on at least a

23  weekly basis.  I got a call earlier this afternoon from an FBI

24  agent, so I get calls all the time, Homeland Security, FBI,

25  IRS, a lot of different agencies.

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1      Q    And so FinCEN is just a separate when you -- because

2  you brought that up.  So most people don't know FinCEN and U.S.

3  Treasury.  So when you say "law enforcement," I don't -- I

4  wasn't thinking FinCEN.

5      A    So, I'm sorry.  FinCEN has a manual for law

6  enforcement agents, so -- to do financial investigations.  And

7  that's why many of the agents who -- you know, a lot of agents,

8  they might do gang, you know, or drug crimes, right, but if

9  they're getting involved in financial investigations, and if

10 they have any connection with the Federal Reserve, there's a

11 high likelihood they will call either me or somebody on my

12 team.

13     Q    The manual is where they can look to figure out what

14 numbers, departments, does it list that kind of information?

15     A    Yes.  Yes, it does, yes.

16     Q    Okay.  So it's not like they would contact FinCEN,

17 the U.S. Treasury to say, "Who do we contact," it's in that

18 manual?

19     A    Yes.  I mean, they could call -- you know, a lot of

20 times what happens is they'll say, "Oh, I worked with another

21 agent in my office, and he referred me to you."  So a lot of

22 times it's just within their agencies anyway.

23          But, officially, yes, you know, we're listed in the

24 manual that a lot of agents take home with them and go back to

25 their offices to help them when they conduct investigations.

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    Q    Okay.  And when you said Robert Amenta is your
2  partner, can you please spell his last name for me?
3    A    Yes.  It's A-m-e-n-t-a.
4    Q    A-m-e-n-t-a?
5    A    Yes.
6    Q    Okay.  And you're physically stationed, typically
7  your office is in New York?
8    A    Lower Manhattan, yes.
9    Q    Okay.  And do you train -- do you do training for law
10 enforcement regarding financial crimes?
11   A    Yes, I do.
12   Q    Is that the legal department that does that or the
13 enforcement?
14   A    I guess I'm in the legal and enforcement group, so I
15 guess both, but, you know, we have other areas in the legal
16 that wouldn't do it.  It would be the investigators in the
17 enforcement group that would conduct the training.
18   Q    Do you do training for FBI then?
19   A    Yes.  I've conducted it for FBI, for U.S. Attorney's
20 Offices, for many different federal investigations and state
21 agencies as well.
22   Q    And has that mainly been just in fraud, financial
23 fraud that you do that training?
24   A    Yeah.  Mostly payment systems to let them understand
25 how the payment systems work and how to -- how money moves

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    internationally.

2        Q    So it sounds like you get a lot of calls from law

3    enforcement.  Is there any time that the Federal Reserve, any

4    of the Federal Reserve Banks would actually contact and refer

5    to the FBI, for instance?

6        A    Yes.  We did in fact on this case in July of 2017,

7    when this -- we had a major ACH fraud being attempted on the

8    reserve banks, so we were in coordination with the FBI, and

9    we -- we were working with them on these matters.

10       Q    So was it Federal Reserve Bank of New York that

11   actually initiated the investigation throughout all the FRBs?

12       A    I can't really say that, because the -- the folks

13   that were not on the investigative said, they were on the

14   payment side, had already knew about this, because they were

15   rejecting tens of thousands of ACHs that were coming through

16   the system at that time.

17           So -- so when the FBI got involved, yes, it was -- it

18   was around that same time period.  So there was an agent who I

19   think might have been out of Washington who was involved, and I

20   think he was contacted by the USAA investigator, and then we

21   coordinated and I contacted the cyber fraud unit in the New

22   York FBI to help make sure that they were involved as well.

23       Q    Okay.  Because I want to make sure that you mentioned

24   Washington, D.C. and New York, and I want to make sure -- a

25   cyber fraud.  Can I please help you -- excuse me, could you

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1   please help me identify -- you stated that you contacted -- you

2   initiated -- on this particular case, you initiated the contact

3   with the FBI.  Is that correct?

4       A    The New York FBI, not -- the FBI had agents that

5   already knew about the fraud before I -- before I did.

6       Q    Okay.  So you were actually notified by the FBI in

7   New York regarding this case?

8       A    I'm sorry.  Let me go through it.  So -- and this is

9   my understanding, is that USAA, an investigator there had

10  reached out to the FBI, and I believe that was Brad Carpenter,

11  special agent, and --

12      Q    For which office?  I'm --

13      A    So he was -- Brad, I believe, is headquartered out of

14  the Washington office of the FBI.

15      Q    Washington, D.C.?

16      A    Yes.

17      Q    District of Columbia?

18      A    Yes.  I'm sorry.  However, he may be detailed to New

19  York.  So I'm unclear exactly where Brad physically resides,

20  but I think he's operating out of either headquarters or the

21  Washington field office of the FBI.

22      Q    So headquarters.  And he's the one that contacted

23  you?

24      A    No.  Because -- because there's a network, I got

25  contacted by an agent in the Inspector General's Office of the

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    Federal Reserve.  So the Federal Reserve has inspector general

2    agents, and we coordinate with them, we provide training on

3    their behalf, and one of their agents contacted me when they

4    heard about this fraud.  So -- and then they referred me to

5    Brad Carpenter.  So that's how I got involved, and that was mid

6    to early July 2017.

7         Q    Okay.  I just want to make sure I have this straight.

8         A    Uh-huh.

9         Q    Because before you had said that you called the FBI

10   and then the FBI -- so I'm just making sure we have it.

11        A    So to follow that up, then, as I mentioned that Brad

12   Carpenter, I was dealing with him, and then I reached out to

13   Mitch Thompson, who's a supervisor in the New York FBI who runs

14   one of their cyber fraud units.

15        Q    Okay.  So Federal Reserve Bank, OIG, Office of --

16        A    Inspector General.

17        Q    -- Inspector General contacted -- an agent contacted

18   you and referred you to Brad Carpenter.  Is that correct?

19        A    Ask me if I knew about the ACH fraud going on.  I did

20   not.

21        Q    Okay.

22        A    Gave me a little bit of insight and referred to Brad

23   Carpenter, yeah, so ...

24        Q    Okay.  And that was early July, mid July, you stated?

25   Can you give me a time frame?

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    A    Could have been the 10th.  I don't know the exact

2  date.

3    Q    So possibly on July 10th --

4    A    Uh-huh.

5    Q    -- was when you became aware of this ACH problem in

6  general?

7    A    Correct.

8    Q    Okay.  And so at that point, you talked to Brad

9  Carpenter after the OIG contacted you to come and notify you in

10  general, you then were referred to Brad Carpenter and you spoke

11  to Brad Carpenter?

12    A    Yes.

13    Q    Okay.  And did Brad Carpenter give you more general

14  information on the ACH than OIG made you aware of?

15    A    He confirmed he had an open investigation, and that

16  they were -- they were aware that -- that these were

17  generally -- there was linkage to videos that were on YouTube.

18    Q    Okay.  So when you say he had an open -- because, I

19  mean, we're here on a specific case.  When he says he had an

20  open investigation, was that just a general investigation

21  regarding this ACH?

22    A    There was a general investigation, and then there was

23  a specific investigation with USAA and --

24    Q    Okay.

25    A    -- the case that we're talking about right here,

UNITED STATES DISTRICT COURT

1    yeah.

2         Q    I was just clarifying what Brad Carpenter was

3    speaking of when you had said that.

4              Okay.  So was Brad Carpenter on this particular case?

5         A    Not that I know of, no.

6         Q    Okay.  So where is Brad Carpenter located?

7         A    I don't know if he's physically located in the New

8    York office.

9         Q    I'm sorry, what office is he -- what agency is he

10   with?

11        A    The FBI.

12        Q    He's with the FBI?

13        A    Uh-huh.

14        Q    And you're not sure what field office or --

15        A    So I believe -- so Brad is also part of like a cyber

16   fraud group, okay, and this is my understanding, because I

17   don't know Brad outside of this interaction.  My understanding

18   is, he's with a lot of institutions that like threat finance --

19   a threat -- a cyber threat working area.  So he -- this came to

20   his attention.

21        Q    So are you talking about cyber fraud group, do you

22   mean like a task force?

23        A    I don't know how I could describe it.  I mean, it

24   could be considered task force.  I don't know if it's an

25   official task force.

UNITED STATES DISTRICT COURT

1    Q    You don't know if it's an official task force?

2    A    No.

3    Q    And you're still not sure what -- is he with New York

4  FBI?

5    A    That task force that I'm talking about, if we're

6  going to call it a task force, I understood operated in New

7  York.  So I think Brad went back and forth between New York and

8  headquarters.

9    Q    Headquarters in Washington, D.C.?

10   A    D.C., yeah.

11   Q    If you could give me just a second so I can write

12  this down.  Thank you.  I appreciate your patience.

13        So Brad Carpenter was the one you spoke about in

14  general about this open investigation.  And please continue so

15  that we can figure out -- you mentioned a Mitch Thompson.  Was

16  Brad -- did Brad Carpenter refer you to Mitch Thompson?

17   A    No.  I referred the matter to Mitch Thompson, because

18  I knew --

19   Q    Which matter?

20   A    The ACH fraud.

21   Q    In general?

22   A    In general.

23   Q    Okay.  I'm just trying to keep this clear.

24   A    No.  Okay.  And I'm sorry, to make it clearer, Mitch

25  Thompson is in the New York office, and I was trying to refer

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

 1   that to him to see if they'd have an interest in opening a case

 2   and not on this matter.

 3           My understanding is that Mr. Beane was arrested, that

 4   that matter was handled entirely within Tennessee and it did

 5   not have anything to do with Mitch Thompson and/or Brad

 6   Carpenter, but the -- the scheme, if you will, was the same.

 7   It was all related to ACH frauds which occurred in July of

 8   2017.

 9       Q    So Mitch Thompson, at what point -- who told you

10   about this particular case, I guess, maybe we could start here,

11   because there's --

12       A    Yeah, so I was told --

13       Q    -- no clear way we know how you found out about this

14   case.

15       A    So I was subpoenaed to come here and testify in this

16   case, not -- I didn't have any particular involvement in the

17   investigation, okay, but I knew that this was going on, because

18   at the time, when we were trying to fight and stop the ACH

19   frauds from attacking the Federal Reserve Systems, what we were

20   doing was reaching out to different law enforcement agencies to

21   see who would coordinate and who would become involved in this

22   investigation.

23       Q    Okay.  Because we have a --

24       A    The broader investigation, if you will.

25       Q    Yeah, because you --

UNITED STATES DISTRICT COURT

1    A    The broader ACH investigation as opposed to your

2    specific matter here.

3    Q    Okay.  So when you first became aware of this

4    specific matter here, was that when you were subpoenaed?

5    A    No.  I knew about it before then, but I wasn't

6    involved in investigating it.  It wasn't until after I was

7    subpoenaed that I got involved more in the details, and I asked

8    from the Federal Reserve System to look at the actual

9    transactions themselves.

10         So I got -- I got involved, if you will, in the

11    nitty-gritty after I was subpoenaed, but I was involved -- I

12    had a general knowledge of the fraud in relation to the bigger

13    ACH fraud that was going on in the attack on the Federal

14    Reserve System in July of 2017.

15    Q    Okay.  Okay.  So you speak with Brad Carpenter about

16    this, and then you go to Mitch Thompson, and you refer the

17    whole general ACH investigation -- and Mitch Thompson is in New

18    York, FBI, he's head of FBI in New York?

19    A    He's a supervisor.

20    Q    A supervisor.  Okay.  And you refer the whole ACH

21    general investigation to ask him if they're going to open an

22    investigation, just in general on the ACH?

23    A    General, that's correct, yes.

24    Q    Okay.  So at that point, did Mitch Thompson tell you

25    about the Randall Beane case?

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    A    No.  They knew that Tennessee was handling that case.

2  They extricated themselves.  They were not involved in that at

3  all.

4    Q    Okay.  So -- but I'm asking, where did you learn

5  about the Randall Beane case, was it from Mitch Thompson?

6    A    No.  It was from Brad Carpenter.

7    Q    You said Brad Carpenter only told you about the ACH

8  general.  And when I asked you if he had told you about the

9  Beane, and you said no?

10   A    No.  I thought you said was he working that case, no,

11 so --

12   Q    No, I just --

13   A    -- I knew basically within realtime or within days of

14 the -- the USAA loss, I knew of that relatively right around

15 the time of the loss.

16   Q    Okay.  So you knew from Brad Carpenter, he's the one

17 that first made you aware of the Randall Beane case?

18   A    Correct.

19   Q    And Brad Carpenter is New York, he goes between New

20 York and headquarters in D.C.?

21   A    Correct.

22   Q    Okay.  Feel like I gave birth.

23        Okay.  We have -- and was it Mitch Thompson that told

24 you -- or excuse me, Brad Carpenter that told you it was

25 handled by Tennessee, that was being handled, or was it Mitch

UNITED STATES DISTRICT COURT

1    Thompson?

2         A    I think that it may have been both, but certainly

3    Brad Carpenter.  I knew that Mitch Thompson had no interest in

4    getting involved in a case in Tennessee.

5         Q    So Mitch Thompson is just a supervisor at FBI.  Brad

6    Carpenter, he has no title, just on that task -- maybe a task

7    force or a cyber group?

8         A    I believe he's a special agent, and he's probably in

9    some sort of cyber-related area as well.

10        If you look at one of the exhibits was on the Fed

11   Reserve website, and I don't know if we could pull that exhibit

12   back up, but it -- the Federal Reserve, I believe, in Atlanta,

13   and I believe in New York, I think Brad Carpenter's listed

14   there as the FBI person to contact.

15        Q    Was that on Exhibit 162, the announcement about the

16   scam?

17        A    If we could pull that back up, we could take a look

18   at it.  I don't know if it was on this one.

19        Q    I think she only showed you one exhibit.

20        David, could you please help me with 162?  Thank you.

21        A    If you could go down.

22        Q    I'll let you direct him where you need to go.

23        MS. DAVIDSON:  That's the entirety of the exhibit.

24        THE WITNESS:  Okay.  So this refers people to the

25   IC3.gov website, which is where people were being asked to

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1  report this to, but I believe that the -- there were other

2  notices on the Atlanta Feds website and, I believe, also the

3  New York Feds website that specifically references Brad

4  Carpenter and gives a go-to, an e-mail or a phone number.

5  BY MS. TUCCI-JARRAF:

6      Q    All right.  Okay.  And do you know when this notice

7  was put out?

8      A    I think it was -- this notice?

9      Q    Uh-huh.  This specific one.

10     A    I'm not --

11     Q    I mean, we may not be able to, because it's cut off.

12     A    I'm not sure.

13     Q    Do you recall from memory?

14     A    It would have been the summer of 2017, this one.

15     Q    Summer.  Did you give other law enforcement, you

16  know, like Brad Carpenter or Mitch Thompson, did you give them

17  any notice to put out on the FBI website as well, or did -- did

18  you give them any verbiage to put in to their -- any notices

19  about this alleged -- or this scam that you've noticed here?

20     A    So it's my understanding that the Board of Governors

21  put this on their website.  I don't know who approved that

22  language.

23          The Federal Reserve Bank of Atlanta also put a notice

24  on their website and their internal people did it.

25          My group, the enforcement group, was involved in

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    putting the warning on the New York Federal Reserve's website.

2         And then, I think your question is, did the FBI

3    distribute something else additionally internally.  I believe

4    that occurred as well.

5         Q    Okay.

6         A    But I don't know if that's published anywhere.

7         Q    Yeah.  Just what you know of is all I'm asking for.

8    So you didn't work directly with the FBI here in Tennessee

9    on -- on this particular case at all, except for being

10   subpoenaed to come here?

11        A    Until I got called and requested to come testify,

12   yes.  That was my first discussion of -- with anybody about

13   this particular case, except for referencing of the case

14   knowing that it occurred.

15        Q    And what details, if any, did Brad Carpenter give you

16   regarding this particular matter?  I'm asking, because it's

17   unusual for New York or for D.C. to mention one case

18   specifically.

19        A    Well, it wasn't, because this is really the only case

20   where somebody was able to actually execute the fraud, you

21   know, successfully.  Because in most cases, the ACHs were

22   rejected and nobody actually was able to extract the money from

23   their financial institutions.  In this case, USAA released the

24   funds, and my understanding is, is that there was -- you know,

25   we saw the wire transfer before, almost a half million dollars

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1  was used to purchase an RV.  That didn't occur in any other

2  cases, as far as I know.

3      Q    So it was only regarding a wire or close to 500,000

4  for an RV that Randall Keith Beane's case was on the floor in

5  New York, in Washington, D.C.?

6      A    It was part of it --

7      Q    Or was it because of the CDs?

8      A    So there were -- as I think I said, there were tens

9  of thousands of ACH debits attempted to be done in a fraudulent

10 manner.  And what happened was, the largest ones stuck out.  So

11 there was, I believe, 32 transactions that involve Mr. Beane

12 for approximately $30.5 million.  That volume got people's

13 attention.

14      And it -- although the reserve bank was able to

15 successfully pull back within that two-day period, they were

16 able to take those funds back from USAA Bank, as they did in

17 almost every other instance that I know of, this is the only

18 instance that I knew of that there was a substantial fraud that

19 was actually not only attempted, but actually executed.

20      Q    Thank you for clarifying why one case would stick out

21 as opposed to, I believe, there was something like, I

22 personally knew of what, 300,000 different cases or instances

23 of this particular -- and I only knew a fraction, because I

24 didn't -- I didn't get all of the data.  Obviously, you would,

25 because it was Federal Reserve, involving Federal Reserve Bank.

UNITED STATES DISTRICT COURT

1       So was there even more?

2       A    So I don't dispute that it was hundreds of thousands.

3  I know that it was in the -- at minimum in the tens of

4  thousands in a very short period of time, so it very well could

5  be.  I wasn't involved in looking at the aggregate numbers as

6  to what it ended up being at the end of the day.

7       Q    Okay.  Thank you for explaining how you found out

8  about this case and clarifying who you actually spoke with.

9            You stated that when Ms. Davidson had spoken to you

10 about the Federal Reserve, you had stated -- she asked if it

11 was the government agency, you had stated that it's a fiscal

12 agent for the government, that it was an instrumentality,

13 excuse me, a federal instrumentality, could you please explain

14 what that means?

15      A    Yeah.  To my knowledge, it's an instrumentality --

16 Congress created the Federal Reserve, and then they create the

17 ability to have certain corporate vehicles that operate based

18 upon their creating this structure, and that's how the -- the

19 12 Federal Reserve regions were created.

20      Q    Okay.  When you say it's a fed instrumentality, are

21 you talking about the Board of Governors of the Federal

22 Reserve?

23      A    No.  I'm talking about the 12 regional reserve banks.

24      Q    So the 12 regional reserve banks.  So you're saying

25 that it is -- that's part of the government, that is a

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    government bank?

2       A    It's kind of like the postal service.  You know, the

3    postal service, people consider it part of the government, but

4    I think that's also a private corporation that's, you know,

5    part of the government, if you will, so ...

6       Q    Okay.  So the Federal Reserve Banks are actually

7    private banks that serve the U.S. government?

8       A    I wouldn't describe it like that.  I wouldn't -- a

9    private bank is -- connotes that it's a commercial bank, that

10   it's -- that it's owned and controlled by individuals without

11   any sort of delegated authority from anybody else, right, that

12   they were operating on their own.

13           That's not the way that the Federal Reserves work,

14   right.  The Federal Reserves are created, there's a special

15   structure that's created by Congress, and the reserve banks,

16   especially on many of these things, and supervision,

17   especially, their power comes from the delegated authority from

18   the Board of Governors.

19      Q    Okay.  But -- and we'll get to the power authority.

20   I'm talking about the ownership.  You had mentioned that banks

21   are part owners of the 12 branches or the Board of Governors or

22   both.

23      A    The twelve branches.

24      Q    Okay.  And who owns the Board of Governors?

25      A    It's just another U.S. government agency.

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1    Q    Okay.  So you're saying the Board of Governors at the

2 Federal Reserve are actually part of the government?

3    A    That's correct.

4    Q    They are the government, they aren't a private entity

5 at all?

6    A    That's correct.

7    Q    Okay.  And the 12 member banks -- actually, there's

8 more than 12, because Seattle has one too.

9    A    So you have branches.  So, you know, I think Seattle

10 is probably a branch of the San Francisco Fed.

11    Q    But the main ones we're talking about are the 12

12 branches, because the Seattle is underneath the San Francisco

13 branch?

14    A    Yes, the Federal Reserve Banks.

15    Q    Okay.  And so those banks are part owners of

16 themselves?

17    A    I wouldn't describe it that way.

18    Q    Okay.  So then please explain to us, because this

19 is -- you say the banks are part owners of the Federal Reserve?

20    A    They have shares.  Okay.  So, you know, based upon

21 their deposits and how much money that they need to, you know,

22 they need to hold it reserve at the Federal Reserve, then they

23 become part shareholders, if you will, by putting up the

24 capital.  So the Federal Reserve has funds sitting there.  It's

25 a requirement that the depository institutions maintain certain

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

 1  reserves at the Federal Reserve.  So the bigger the bank, the

 2  bigger the reserves.

 3      Q    Okay.  So when you say banks are part owners, it

 4  indicates that there are other owners.  Is that a correct

 5  statement?

 6      A    If that's the case, then I would like to stand

 7  corrected.  They are shareholders.  Okay.  You're the one who's

 8  putting the word "owner" into it, not me.  So I'm --

 9      Q    I am quoting here --

10      A    -- looking at, the way I look at the Federal Reserve,

11  it's an instrumentality of the United States created by

12  Congress.  So it's owned by the people of the United States.

13  That's my understanding of how the Federal Reserve is, even the

14  reserve banks.  There are shareholders.  The banks have

15  reserves there and then they're shareholders.  But it's not as

16  you are trying to equate that this is like a private bank in

17  any sort of way.  It's not a private bank.  It's a public

18  institution.

19      Q    Thank you for that clarification.  And I'm not trying

20  to disrespect you.  I just wrote your quote down, banks are

21  part owners.

22      A    Okay.  So I hope I clarified --

23      Q    Clarified that.

24      A    I hope I clarified it.  Thank you.

25      Q    Okay.  Thank you.

UNITED STATES DISTRICT COURT

1    Okay.  I'm going to -- do we still -- do I still have

2 time to address an exhibit or --

3    THE COURT:  How much cross-examination do you think

4 you have left?

5    MS. TUCCI-JARRAF:  Quite a bit.

6    THE COURT:  Let's go ahead and dismiss the jury for

7 the day.  All right.

8    MS. TUCCI-JARRAF:  Thank you.

9    THE COURT:  And, again, just remind you you're

10 continuing to hear evidence in this case, not to discuss it

11 among yourselves or with anyone else.  Continue to keep an open

12 mind as you hear all the evidence in this case, and otherwise,

13 I appreciate the jury's attention over these last three days.

14 Looking forward to see you here tomorrow, Friday, January 26th

15 at 9:00 a.m.  Thank you.

16    (Jury out at 4:49 p.m.)

17    THE COURT:  Okay.  See everybody here tomorrow at

18 9:00 a.m.  Thank you.  Have a pleasant evening.

19    THE COURTROOM DEPUTY:  This honorable court stands in

20 recess.

21    (Proceedings recessed at 4:50 p.m.)

22

23

24

25

UNITED STATES DISTRICT COURT

## CERTIFICATE OF REPORTER

STATE OF TENNESSEE

COUNTY OF KNOX

I, Rebekah M. Lockwood, RPR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Knoxville, Knox County, Tennessee this 22nd day of April, 2018.

_____
REBEKAH M. LOCKWOOD, RPR, CRR
Official Court Reporter
United States District Court
Eastern District of Tennessee