IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
        Plaintiff,               )
                                )
vs.                              )   Case No.:  3:17-CR-82
                                )
RANDALL KEITH BEANE AND          )
HEATHER ANN TUCCI-JARRAF,         )
                                )
        Defendants.              )
_____)


**VOLUME IV of VIII**

**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**January 26, 2018**
**9:04 a.m. to 4:32 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          CYNTHIA F. DAVIDSON, ESQUIRE
                                ANNE-MARIE SVOLTO, ESQUIRE
                                Assistant United States Attorney
                                United States Department of Justice
                                Office of the United States Attorney
                                800 Market Street
                                Suite 211
                                Knoxville, Tennessee 37902

**FOR THE DEFENDANT:**          RANDALL KEITH BEANE, PRO SE
**RANDALL BEANE**               Blount County Detention Center
                                920 East Lamar Alexander Parkway
                                Maryville, Tennessee 37904

**FOR THE DEFENDANT:**          STEPHEN G. McGRATH, ESQUIRE
(As Elbow Counsel)              9111 Cross Park Drive
                                Suite D-200
                                Knoxville, Tennessee 37923


**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**APPEARANCES (CONTINUED):**

**FOR THE DEFENDANT:**            HEATHER ANN TUCCI-JARRAF, PRO SE
**HEATHER ANN**                   105 Orchard Lane
**TUCCI-JARRAF**                  Oak Ridge, Tennessee 37830

**FOR THE DEFENDANT:**            FRANCIS LLOYD, ESQUIRE
(As Elbow Counsel)                9111 Cross Park Drive
                                  Suite D-200
                                  Knoxville, Tennessee 37923

**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

1                              **INDEX**

2    **GOVERNMENT'S WITNESSES**                              **PAGE**

3    SEAN O'MALLEY
     Cross-Examination by Ms. Tucci-Jarraf                      5
4    Cross-Examination by Mr. Beane                            72
     Redirect Examination by Ms. Davidson                     75
5    Recross-Examination by Ms. Tucci-Jarraf                   79
     Recross-Examination by Mr. Beane                         82
6
     DWAYNE GRIFFITH
7    Direct Examination by Ms. Svolto                         83
     Cross-Examination by Mr. Beane                          108
8    Cross-Examination by Ms. Tucci-Jarraf                   112
     Redirect Examination by Ms. Svolto                     119
9
     TERRY WILSHIRE
10   Direct Examination by Ms. Svolto                        121

11   ZACH SCRIMA
     Direct Examination by Ms. Davidson                     127
12   Cross-Examination by Ms. Tucci-Jarraf                  146
     Cross-Examination by Mr. Beane                         152
13
     Government Rests                                       152
14
     **DEFENDANT BEANE'S WITNESSES**                        PAGE
15
     RANDALL KEITH BEANE
16   Direct Examination by Mr. Beane                        164
     Cross-Examination by Ms. Svolto                        178
17
              **GOVERNMENT'S EXHIBITS  (ADMITTED INTO EVIDENCE)**
18
     **NO.    DESCRIPTION**                                 **PAGE**
19
     133A   Ted Russell Buyer's Order                        88
20
     133B   Ted Russell TN Dept. of Revenue Application      88
21
     133C   Ted Russell Odometer disclosure                  88
22
     133D   Ted Russell Power of Attorney                    88
23
     133E   Ted Russell Proof of Insurance                   88
24
     133F   Ted Russell Options                              88
25
     133G   Ted Russell Work Order                           88
                    Rebekah M. Lockwood, RPR, CRR
                       Official Court Reporter
                          (865) 210-6698
                          P.O. Box 1823

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 133H | Ted Russell Privacy Notice | 88 |
| 133I | Ted Russell Tag Work | 88 |
| 133J | Ted Russell Insurance ID | 88 |
| 133K | Ted Russell Drivers License | 88 |
| 133L | Ted Russell PowerTrain Warranty | 88 |
| 133M | Ted Russell Shadow Mark Warranty | 88 |
| 133N | Ted Russell Finance Payment Sheet | 88 |
| 133O | Ted Russell Retail Buyer's Order | 88 |
| 133P | Ted Russell Cash Payment Authorization | 88 |
| 134 | Ted Russell Check | 88 |
| 135 | Ted Russell Dead Deal Book-Out Sheet | 104 |
| 135-1 | | 104 |
| 135-2 | | 104 |
| 132-1 | Photo of red truck | 107 |
| 132-2 | Photo of red truck | 107 |
| 159 | Jail call recording | 125 |
| 160 | Flowchart | 131 |
| 165 | Warrant | 229 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823
Knoxville, Tennessee 37901

Case 3:17-cr-00082-TAV-DCP Document 165 Filed 04/20/18 Page 4 of 239 PageID #: 16822

Sean O'Malley - Continued Cross-Examination

1          (Call to Order of the Court)

2               THE COURT:  Thank you.  Good morning, everyone.

3               Bring our jury in, and you can continue with this

4    witness.

5          (Jury in at 9:04 a.m.)

6               THE COURT:  Thank you.  Everyone may be seated.

7               Good morning to our members of the jury.  We'll

8    continue with the cross-examination of this witness.

9                    **CONTINUED CROSS-EXAMINATION**

10              MS. TUCCI-JARRAF:  Thank you.  Without prejudice,

11   I'll proceed.

12   BY MS. TUCCI-JARRAF:

13        Q    Good morning, Mr. O'Malley.

14        A    Good morning.

15        Q    Okay.  Yesterday, when you were giving your direct,

16   as well as your cross, just to clear up, you had clarified that

17   banks -- excuse me, your statement before in your direct was

18   that banks are part owners, and during your -- is that correct?

19        A    Shareholders.

20        Q    That was your later clarification during your cross.

21   So during your direct, you said that they were part owners,

22   during the direct?

23        A    Okay.  If I said that, then I'm glad we clarified it.

24        Q    Okay.  And then during your cross with myself, you

25   clarified that by saying they have shares?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    Correct.

2    Q    Okay.  So they're part shareholders?

3    A    Yes.

4    Q    Okay.  And that indicates that there's other

5    shareholders.  Who are those other shareholders?

6    A    The capital at the Reserve Banks are the shares that

7    are put in by the reserves of the banks and only the banks.

8    Q    Right.  And you said that the banks were part owners

9    or part shareholders.  Who are the other shareholders of the

10   Federal Reserve Bank?

11   A    Well, there's hundreds of banks in each Reserve Bank,

12   so there would be many, many shareholders, all of which would

13   be depository institutions.

14   Q    So the only owners of the Federal Reserve Banks are

15   other banks.  Is that what you're saying?

16   A    The shareholders of the Federal Reserve are banks,

17   yes.

18   Q    Only banks?

19   A    Yes, to my knowledge.  And just to clarify, you know,

20   I'm an expert in payment systems and I'm an expert in fraud.

21   I'm not an expert in the structure of the Federal Reserve.  I

22   mean, I've worked there for a long time, but, you know, there

23   is information on the website which would probably make it much

24   more clearer than I could make it for you today.

25   Q    I appreciate that statement.  So the statement as far

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  as they're part owners, shareholders, part shareholders, to

2  make the statement, I'm asking you just to clarify those, and I

3  appreciate that, but to make a blanket statement like that --

4      A    So to my understanding, all the shares are owned by

5  banks.  But there's various banks.  So the bigger banks would

6  have more shares.  The smaller banks would have less shares.

7  That's my understanding.

8      Q    And at the time that they fund those shares, they

9  become a member of the Federal Reserve System then?  They're

10  considered members of the Federal Reserve Bank System?

11      A    Correct.  But not all banks have to be a member of

12  the Federal Reserve System.

13      Q    Is USAA Bank a member of the Federal Reserve System,

14  a shareholder?

15      A    I don't know.

16      Q    Earlier you said that in your direct, you stated that

17  the U.S. government, that you are -- that the Federal Reserve

18  is a fiscal agent for the government.  Correct?

19      A    Correct.

20      Q    And that the U.S. government issues U.S. securities

21  to fund itself?

22      A    Treasury securities, yes.

23      Q    And you've been in the legal department in financial

24  intelligence for approximately 19 years.  Correct?

25      A    Yeah.  In the investigations area, yes.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Okay.  And when you receive securities or that

2    possibly may be fraudulent, do you have to look behind in the

3    underwriting of those securities to determine whether a

4    monetary instrument is fraudulent or not?

5    A    So I think what -- if you're talking about U.S.

6    Treasury securities, it's -- it's different than if it's a

7    commercial security, so commercial securities have

8    underwriters.  In Treasury securities, they're just sold to the

9    public via the Fed Reserve selling it to primary dealers who

10   sell it onward down to others or to TreasuryDirect where

11   individuals who can purchase Treasury securities directly from

12   the government.

13   Q    So it's the U.S. Treasury's responsibility to

14   package -- create and package those U.S. securities to -- for

15   the Federal Reserve to be able to fund themselves?

16   A    For the Federal Reserve to sell --

17   Q    Uh-huh.

18   A    -- so that the funds that they receive from the

19   selling of the securities goes to help fund the U.S.

20   government, yes.

21   Q    And those U.S. securities for the Fed Res sell, they

22   are required to have collateral within those securities?

23   A    No.

24   Q    So what do the U.S. securities actually consist of

25   then?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    The faith of the U.S. government.

2    Q    You stated that individuals do not have accounts at

3  the Federal Reserve Banks.  Correct?

4    A    Correct.

5    Q    Do U.S. citizens have accounts at the Federal Reserve

6  Banks?

7    A    U.S. citizens?

8    Q    Uh-huh.

9    A    No individuals, whether they're U.S. citizens or

10  foreign citizens, have accounts at the Federal Reserve Bank.

11    Q    What is a TreasuryDirect deposit account?

12    A    TreasuryDirect is a system that they set up so that

13  individuals can purchase securities directly from the

14  government, from the U.S. Treasury without having to go through

15  a financial institution.

16    Q    And where are those TreasuryDirect deposit accounts

17  held at?

18    A    Where are they held at?  Well, I'm sure that when

19  you're paying the funds, those -- those accounts that the

20  Treasury have would be held at one of the Federal Reserve

21  Banks.

22    Q    One of the Federal Reserve Banks?

23    A    Yeah.

24    Q    And who manages those TreasuryDirect deposit

25  accounts?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1      A    It's not clear to me who handles TreasuryDirect, but

2  different Reserve Banks have different responsibilities and

3  certain Reserve Banks are responsible for certain accounts with

4  the U.S. government, and how they're -- how that's determined

5  as to who's responsible, I'm not clear.  I do know that the New

6  York Reserve Bank where I work is the ones that sell the U.S.

7  Treasury securities to the marketplace.

8      Q    So Federal Reserve Bank of New York has

9  TreasuryDirect deposit accounts that they hold?

10     A    So I want to distinguish between selling treasuries

11 to the primary dealers, which is --

12     Q    I'm not asking about selling, because you said --

13     A    So I --

14     Q    I'm not asking about the settling, sir.  You stated

15 when I said where the TreasuryDirect deposit account's held,

16 you said at one of the Federal Reserve Banks.  And I asked you

17 who managed it, you weren't sure that there were -- each bank

18 had its responsibilities.

19          Okay.  What I'm asking is, does the Federal Reserve

20 Bank of New York hold TreasuryDirect deposit accounts?

21     A    I don't know.

22     Q    So your 19 years at the Federal Reserve Bank and in

23 the legal department for foreign -- or financial intelligence,

24 you have never had to work on any fraud matters regarding a

25 TreasuryDirect deposit account?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    That's correct.

2    Q    And who in your department actually does work any

3  kind of fraud with TreasuryDirect deposit accounts, if not you?

4    A    To my knowledge, it hasn't come up in 19 years.

5  There's also -- we talked about Office of Inspector General, so

6  the Treasury Department has its own Office of Inspector

7  General.  So they might be the people that would be involved in

8  those kind of investigations if they came up, so --

9    Q    Uh-huh.  Actually, you just reminded me of something.

10  Yesterday, when we were speaking about how you became aware of

11  this, after we were able to sort of ferret out, you had stated

12  that you were actually originally noticed about the larger ACH

13  problem by a Federal Reserve Bank office, the OIG, who was

14  there, who's actually physically located in the FRB.  Who is

15  that agent?

16    A    I don't recall offhand which agent.

17    Q    How many OIGs are in the Federal Reserve Bank?

18         MS. DAVIDSON:  Objection, Your Honor.  At this point,

19  this line of questioning is irrelevant.

20         MS. TUCCI-JARRAF:  Actually, it leads to --

21         MS. DAVIDSON:  Your Honor, could we have a sidebar?

22         THE COURT:  Well, let me hear the response to the

23  objection.

24         MS. TUCCI-JARRAF:  The DOJ's whole case revolves

25  around the fact that these CDs, including the one that was

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    liquidated, and is the issue with USAA Bank in this matter,

2    that they received some kind of report, which they couldn't

3    produce, that the funding bank --

4            THE COURT:  I don't want to interrupt you, but the

5    question is, what is the relevance of the question, how many

6    OIGs are in the Federal Bank?  Why is that relevant?

7            MS. TUCCI-JARRAF:  We're trying -- I'm trying to

8    figure out -- this gentleman says he can't remember who the

9    Federal Reserve Bank OIG was that notified him about all of

10   this, which led all the way down to Tennessee FBI.

11           THE COURT:  Go ahead.  We'll let -- go ahead.  I'll

12   overrule for the time being.  Just answer the question.

13           MS. DAVIDSON:  Your Honor, may we have a sidebar?

14           THE COURT:  Let's wait and -- let's wait for a few

15   more questions.

16           MS. TUCCI-JARRAF:  Thank you.

17           THE COURT:  Go ahead.  Can you answer that question,

18   how many OIGs are in the Federal Bank?

19           THE WITNESS:  There are multiple OIG offices.  The

20   main headquarters is in Washington.  There's agents in New

21   York.  There's agents in Chicago.  There's agents in Miami, and

22   there are agents in California.  How many agents, I'm not sure.

23   BY MS. TUCCI-JARRAF:

24       Q    Well, I'm asking you for the agent you said that was

25   in your office in New York.  So how many are of the OIGs that

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   would -- that are in the New York Federal Reserve Bank office,

2   how many are there?

3       A    There's only a few.  There's approximately three,

4   but --

5       Q    Three.

6       A    -- but -- I think --

7       Q    And you can't remember out of the three which one

8   actually --

9       A    I think I got the call from Chicago.

10      Q    So it was FRB Chicago OIG that actually contacted

11  you?

12      A    No.  So the -- so the Federal Reserve Banks don't

13  have OIGs.  It's the Federal Reserve in Washington that has the

14  OIGs, and then --

15      Q    Okay.  So it was actually Federal Reserve Bank OIG in

16  Washington, D.C. that contacted you?

17      A    I know it's semantics, but, you know, the FRBs or the

18  Reserve Banks, those are the 12 regional Reserve Banks.  Okay.

19      Q    Uh-huh.

20      A    The Board of Governors is in D.C., so the Office of

21  Inspector General is, they're headquartered out of Washington.

22  So -- now, they have a satellite office in Chicago, and one of

23  the agents from that satellite office, I believe, is the one

24  who called me, and I can't recall the name.  I think there

25  might have been two on the phone at the time.  It was a

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    relatively brief call.  Carolyn Working is one of the agents in

2    Chicago.  She may have been on that call, but I'm not sure.

3        Q    How do you spell her last name?

4             MS. DAVIDSON:  Objection, Your Honor.  How is this

5    relevant?

6             THE COURT:  What's the relevance, Ms. Tucci-Jarraf?

7             MS. TUCCI-JARRAF:  This goes to show lack of intent.

8    We have a number of questions as far as -- excuse me -- where

9    the report came from that Mr. Beane supposedly committed a

10   fraud.  I'm trying to discover where that information is, and

11   nobody seems to have any reports from the Federal Reserve.

12            This gentleman here from Federal Reserve Bank New

13   York is claiming that he received a report of the fraud of this

14   particular case, and I'm trying to determine who actually holds

15   those reports.  Because if they exist --

16            THE COURT:  What's your response to that?

17            MS. DAVIDSON:  Your Honor, we believe that this is

18   simply to harass the agent.  The -- all of the agents which

19   she -- were identified yesterday during her cross have been

20   receiving multiple calls, the FBI -- and so we believe that

21   she's simply doing this to try to harass the various agencies.

22            THE COURT:  Well, that may or may not be the case,

23   and I'm not sure that goes directly toward whether it's

24   relevant.  And I question somewhat the relevance, but because

25   there was some questions on direct about the structure of the

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Federal Reserve, I'll allow limited inquiry from this point.

2         MS. TUCCI-JARRAF:  Thank you.

3         THE COURT:  And whatever -- if something is not

4    within the knowledge of this witness, then we move on.

5         MS. TUCCI-JARRAF:  Of course.

6         THE COURT:  Go ahead.

7         MS. TUCCI-JARRAF:  Thank you.

8    BY MS. TUCCI-JARRAF:

9    Q    Mr. O'Malley, how do you spell Carolyn's last name?

10   A    I believe it's W-o-r-k-i-n-g.

11   Q    W-o-r-k-i-n-g, Working?

12   A    Yeah.  To be clear, the call was about the ACH fraud

13   in general, not about Mr. Beane.

14   Q    You had stated that Brad Carpenter in the Washington,

15   D.C. office at headquarters, at one point, you had said he had

16   informed you, and he knew about Mr. Beane's case.  You had said

17   the first time you heard about Mr. Beane's case was actually

18   from Brad Carpenter in Washington, D.C. headquarters.  That's

19   FBI.  Correct?

20   A    Yes.  That's how I think it came to my attention.

21   Q    And then you had stated he led you to Mitch Thompson?

22   A    No, he didn't lead me to Mitch Thompson.  I took the

23   liberty to call Mr. Thompson.

24   Q    Look the liberty.  And you had stated that he had

25   told you that it was being handled by Tennessee.  Correct?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    Correct.

2    Q    Okay.  What do you mean by "being handled," just so

3    we have a clear --

4    A    Meaning that his office was not -- his unit in the

5    New York office was not going to participate in any

6    investigation on Mr. Beane, because it was already being

7    handled by the FBI office in Tennessee.

8    Q    So Mr. Thompson had already notified Knoxville FBI.

9    Is that correct?

10   A    I think -- I don't know what Mr. Thompson did.

11   Q    Okay.  But he -- so it was his statement it's being

12   handled, not yours, that was his statement?

13   A    Yeah.

14   Q    Okay.  Regarding -- let's go to the -- what steps did

15   you personally take -- you said you didn't know anything about

16   this case, as far as details, just that it existed on the 10th

17   of July.  Correct?

18   A    Correct.

19   Q    Okay.  And were you involved -- you said that there

20   were a number of issues with -- in similar scenarios as

21   Mr. Beane's that were occurring.  Correct?

22   A    Correct.

23   Q    Were you involved in any kind of policies or actions

24   to be taken as far as handling these kinds of scenarios, like

25   Mr. Beane's?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    Well, I was working to try and limit the problems and

2  to try and make sure that everybody in this system who was

3  affected knew about it and that we were returning the ACH

4  credits in a timely manner so that there would be no loss to

5  the Fed Reserve.

6    Q    I'm sorry, could you repeat that last --

7    A    So that they would return the ACH credits -- we

8  talked about that you have two days to return them.  We wanted

9  to make sure they were returned timely so that there would be

10  no loss to the Federal Reserve System.

11    Q    Okay.  So in this particular instance with Mr. Beane,

12  for example, is if there was not a return of the credits by

13  USAA, for example, that it would be a loss to the Federal

14  Reserve and not a loss to USAA.  Is that correct?

15    A    So I think the way you described it was not correct,

16  but if you'd like me, I will state how I understand that --

17    Q    Let me go back then.  Perhaps I misunderstood your

18  statement.  You said that you're trying to limit problems and

19  the loss and trying to get everyone to return ACH credit.  Who

20  would be returning ACH credits?

21    A    The Federal Reserve.  The Federal Reserve would

22  basically return the item as being -- that there's no account.

23  There's different reasons you can return an ACH.  So if there's

24  no account that's there to be debited, then you can return it

25  for that reason, and you have to return it within a two-day

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  window.

2      Q    So, then, ACH credits are given to USAA in this

3  particular instance.  Is that what you're saying?

4      A    So in this particular instance, USAA received a

5  credit, but basically what they did is they debited out of the

6  Ginnie Mae's securities account at the Federal Reserve Bank of

7  New York, and they pulled $30.5 million out of the account in

8  30-some-odd tranches, and each one of those ACH debits that

9  were pulled out of the Ginnie Mae securities had to be returned

10  within a two-day window, and they were, so that USAA -- the

11  funds were taken back out of the USAA account, put back in the

12  Ginnie Mae securities account, and there was no loss to the

13  U.S. government.

14      Q    What is Ginnie Mae securities account?

15      A    That is the account -- the routing number of the

16  account that was debited.

17      Q    Okay.  So each routing number of all 12 Federal

18  Reserve Banks, they all go to the Ginnie Mae's securities

19  account?

20      A    No.  So the ACH fraud started out by people looking

21  up Federal Reserve routing numbers and using those routing

22  numbers to debit or pull money out of those routing numbers.

23  It morphed into looking for any U.S. government routing number

24  and then they started pulling it from the various different

25  routing numbers that we talked about, U.S. -- the Federal

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   Reserve being the fiscal agent for the U.S. government.

2        In this case, we're the fiscal agent for the U.S.

3   government, and one of those accounts for the U.S. government

4   was the Ginnie Mae securities routing number, and that's what

5   USAA, they pulled it out of that account.

6   Q   Okay.  Routing numbers are assigned -- it's a

7   transfer.  Correct?  A routing number is the actual road, for

8   instance, from one destination to another.  Correct?

9   A   Each financial institution will open what's known as

10  a master account at the Federal Reserve.  That master account,

11  during the process of obtaining the master account, they have a

12  routing number.  They'll get a routing number assigned, and

13  that routing number is effectively the bank account number that

14  the financial institution has at the Federal Reserve.

15  Q   So you're saying that each routing number in the Fed

16  Res System of routing numbers is basically a master account for

17  specific banks?

18  A   No.  Because you could -- so I'll just tell you, I'm

19  not exactly clear as to how the routing numbers are assigned.

20  Okay.  But what I do know is that when you open a master

21  account at the Federal Reserve, if a financial institution is

22  attempting to open it, they'll have to provide their routing

23  number, and then they will request privileges to have access to

24  certain services.

25        So it could be check-clearing services, it could be

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   ACH services, it could be wire transfer services.  So that's

2   all part of the master account opening process.  So when we're

3   talking about Ginnie Mae, they have a master account, and

4   that's maintained at the Federal Reserve Bank of New York.

5       Q    My understanding in this particular instance is that

6   this routing number that was apparently used was actually the

7   routing number assigned to the Federal Reserve Bank of New

8   York?

9       A    That's not correct.  It's -- the routing number was

10  for Ginnie Mae securities, and the Federal Reserve Bank of New

11  York was the fiscal agent for Ginnie Mae, and Ginnie Mae

12  securities is part of the U.S. government.

13      Q    So you're aware of on the Federal Reserve Bank's

14  website, each of the 12 Federal Banks are listed.  Correct?

15      A    Yeah.

16      Q    Okay.  And with each one, there's a routing number

17  that is assigned to each of the individual Reserve Banks.  Are

18  you familiar with that?

19      A    Yeah.  There might be more than one routing number,

20  but yeah.

21      Q    I'm just talking about the one the Federal Reserve

22  actually lists next to each Federal Reserve Bank.  Are you

23  familiar with that?

24      A    I know it's available on the website, yeah.

25      Q    And you were saying the routing number that is

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   assigned to Federal Reserve Bank New York, that you list on the

2   Federal Reserve Bank website for New York -- or for the Federal

3   Reserve Board, that that number is solely the Ginnie Mae

4   securities account, master account routing number?

5        A    No.  What I'm saying is, that the Federal Reserve,

6   each one of them will have their own routing number, and

7   different agencies within the U.S. government will also have

8   their own routing number, and different agencies within the

9   Federal Reserve will be assigned to particular Reserve Banks

10  for -- that they'll be responsible for particular agencies in

11  the U.S. government.  One of those agencies is Ginnie Mae, and

12  the New York Reserve Bank was responsible for Ginnie Mae

13  securities.  And that account number was debited or money was

14  pulled out of it by USAA.  And Mr. Beane's name was on the --

15  each one of those ACH debits.

16       Q    So then the actual Ginnie Mae securities account that

17  you're saying, the master account number routing number that

18  was used, that it's actually Ginnie Mae that loses on the ACH

19  credits, not the Federal Reserve?

20       A    Well, the Federal Reserve might have been responsible

21  if they didn't return it within the two-day window.

22       Q    Okay.  Your earlier statement during this morning was

23  that you were trying to limit the problem so there would be no

24  loss to the Federal Reserve?

25       A    Yeah.  Or their customers.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Inside of those TreasuryDirect deposit accounts that
2 are held at the Federal Reserve, such as Ginnie Mae security
3 account, would that be one of them?

4    A    No.  You're confusing TreasuryDirect with routing
5 numbers.  They're totally separate.

6    Q    Was the Ginnie Mae accounts and the assets that are
7 in there, are those part of the U.S. securities that are
8 wrapped -- or excuse me, created and then wrapped by the U.S.
9 Treasury Department?

10   A    To my knowledge, and I'm not an expert in the Ginnie
11 Mae securities, that Ginnie Mae provides insurance for
12 securities to be sold in the marketplace.

13   Q    That's why I said wrap, an insurance wrap around the
14 security.

15   A    Yeah.

16   Q    So just so that we can understand, how is it that a
17 security -- explain to me what a Social Security -- the Social
18 Security number is on the Social Security cards.

19   A    I don't think I'm --

20   Q    The Treasury doesn't deal with anything having to do
21 with an identifier, the Social Security number?

22   A    The Treasury does, but the Federal Reserve does not,
23 so I'm not qualified to discuss that.

24   Q    So did the U.S. Treasury --

25   A    Excuse me?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    It's the U.S. Treasury that deals with those

2    particular cards and those particular identifiers?

3    A    Well, I think it's the Social Security

4    Administration, but, again, it's not the Federal Reserve.

5    Q    So in your 19 years in financial intelligence, have

6    you ever worked on a case that included a fraud regarding the

7    Social Security numbers before the ACH was -- let me go back.

8    Okay.  Before the ACH was created, which is just a digital of

9    actually having to do paperwork, correct, the paperwork

10   process?  It digitized the paperwork process?

11   A    Well, if you're saying that they're digitizing it so

12   that they could reduce check clearing, I guess that's fair to

13   say.  I mean, it's an alternative to clear funds.

14   Q    Well, prior to ACH existing, okay, or any transfer

15   systems, prior to someone from USAA, for example, if they had a

16   particular payment that was being made, that would have to be

17   pulled from the Federal Reserve.  Okay.  They would walk it to

18   a discount window at the Federal Reserve.  Correct?

19   A    I think you're confusing a bunch of different terms.

20   No.  No.  The discount window is where institutions borrow from

21   the Federal Reserve.  It's -- but if you're asking how things

22   would have been processed in -- you know, checks get cleared

23   and the Federal Reserve, years and years ago in the '60s or

24   whenever you're talking about, each Reserve Bank would clear

25   checks for the institutions that they maintained accounts for.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    And they would do that manually.  Correct?

2    A    In the 60s, I would imagine so, yeah.

3    Q    Okay.  So the ACH system was to basically make that

4    process easier and faster?

5    A    Make payments easier and faster, yes.

6    Q    Right.  And I apologize, you're right.  The

7    Treasury -- excuse me, the discount window is for the borrowing

8    and exchanging monetary instruments, so that's completely

9    different.

10        So the Federal Reserve, when they do the sale

11   contracts for the United States of U.S. securities, do you do

12   any other sale contracts for any securities that involve U.S.

13   citizens?

14   A    Can you repeat the question?  I'm sorry.

15   Q    You stated that you do sell contracts for the U.S.

16   securities for U.S. Treasury.  Correct?

17   A    I don't think that's what I said.  I said that we

18   have the markets group at the New York Fed sells U.S. Treasury

19   securities out into the marketplace.

20   Q    Uh-huh.

21   A    Okay.

22   Q    And that you're only responsible for selling those,

23   not creating them or patching them, that would be U.S.

24   Secretary of Treasury?

25   A    I'm not clear on the mechanics of it.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1     Q    Okay.  So the Federal Reserve Bank of New York

2  doesn't sell any other securities where U.S. citizens are the

3  collateral.

4     A    No, they don't get involved in any -- I don't know of

5  any security with U.S. citizens as collateral.

6     Q    You had stated in your direct yesterday that the

7  Federal Reserve was a federal instrumentality created by

8  Congress.  Is that correct?

9     A    Correct.

10    Q    And who created Congress?

11    A    I don't know.  You'd have to go back to the 1700s, I

12  guess, you know.

13    Q    You don't want to say the U.S. people, the Americans?

14    A    Our founding fathers, I guess, you know.  And they

15  were part of the U.S. -- the people of the United States.

16    Q    Okay.  You said that the FedACH does investigations

17  of fraud and internal as well as external?

18    A    Repeat that again.  I didn't --

19    Q    Yesterday, you testified that --

20    A    Yeah.

21    Q    -- the Federal Reserve does fraud investigations or

22  investigations for internal matters?

23    A    That my unit does, yeah.

24    Q    Okay.  As well as external matters?

25    A    Yes.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Okay.  And this one with Randall Beane would be

2 deemed an external matter?

3    A    Correct.

4    Q    And when did you actually find out about the details

5 of this particular case with Mr. Beane?

6    A    So when you talk details, I knew of the general

7 details in July of 2017, and I knew about the specific details

8 in January 2018.

9    Q    When you say "general details," what do you mean by

10 that?

11    A    I knew that he used USAA to pull funds out of an

12 account that the U.S. Federal Reserve Bank of New York

13 maintained, and I knew it was in the millions of dollars, tens

14 of millions of dollars, and I knew that the Federal Reserve

15 Bank of New York returned those as deemed inappropriate, there

16 were no account to be debited, so we did not incur a loss.  But

17 I understood that USAA had actually allowed him to break the

18 CDs and issued funding to his personal account, which was used

19 to buy an RV.

20    Q    So you're saying that with USAA, when they went to go

21 and credit that account, they had no way to know whether the

22 account existed on -- at the Federal Reserve Bank or not?

23    A    So they knew an account existed, because you had to

24 have a routing number that was active to try to debit those

25 funds out of.  But when you talk about an account at Ginnie Mae

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  securities, because that was the routing number that was used,

2  yeah, the system doesn't -- the system won't know whether the

3  account is valid or not, or whether there's funds in the

4  account or not.

5          So that's why you have that two-day window, so that

6  if -- if there is no account or if there's no funds in the

7  account of a valid account, that the financial institution that

8  was debited has two days to return it and say, "No, that was an

9  appropriate debit, give me my money back."

10  Q    Okay.  And that's just specifically using a routing

11  number that sits in Ginnie Mae -- or excuse me, that Ginnie Mae

12  has at the Federal Reserve Bank New York?

13  A    That's what Mr. Beane did with the Ginnie Mae routing

14  number, yeah.

15  Q    I'm asking in general, Ginnie Mae's routing number,

16  have you seen the routing number that supposedly was used in

17  this case?

18  A    Yeah.

19  Q    And you're saying that that routing number is a

20  routing number assigned to Ginnie Mae -- Ginnie Mae securities

21  account, which is a master account for the U.S. government?

22  A    One of the master accounts, yeah.

23  Q    Now, when they do a -- when someone goes in and does

24  a routing number, they have to have an account name as well.

25  Correct?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1     A    Again, I'm -- the creation of routing numbers, I'm --

2     Q    I'm not asking about the routing number, I'm asking

3 about in your ACH system --

4     A    Yeah.

5     Q    -- they have to put a routing number.  Why don't you

6 tell us, when they do the ACH, what do they have to put in?

7     A    So when you create a master account, you're providing

8 your routing number to the Federal Reserve, along with your

9 name, and then you'll request different services.  FedACH is

10 one of the services that you can request.

11     Q    Uh-huh.  Now, when they're this master account, when

12 it's being used and they want to pull credit from the account

13 that's sitting at Federal Reserve Bank of New York, they use

14 the routing number, and then they have to give an account

15 number that is a subaccount inside of the master account.  Is

16 that what you're saying?

17     A    Yes.  So if you're trying to execute an ACH, you'll

18 have to provide the routing number of your financial

19 institution, and then your account number at that financial

20 institution.

21     Q    And that account name that would be put in, that

22 would be a subaccount listed under the master account?

23     A    From the Federal Reserve's perspective, it would be a

24 subaccount.  From the financial institution, it would just be

25 an account of their customer.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Okay. So let me make sure I got this right. Routing

2    number is assigned to the actual institution in order to access

3    and pull credit from the ACH -- using the ACH system from the

4    Federal Reserve Bank New York?

5    A    No. I wouldn't describe it that way.

6    Q    How would you describe it?

7    A    So a routing number is assigned to a financial

8    institution. That process, I'm not clear as to how that

9    process gets executed. Okay.

10   Q    Uh-huh.

11   A    Separately, if you have -- if your financial

12   institution or a government agency, and you have the routing

13   number that's assigned to you, you can request privileges to

14   have different types of services at the Fed Reserve. And that

15   would be wire transfers, ACH, check clearing, things like that,

16   and once you do that, if you are approved for those services,

17   then you would have a terminal and you could engage in

18   different financial transactions, including ACH.

19        So once you're approved, then you're in the Federal

20   Reserve System, and then other institutions can send your money

21   or you could send them money. And if you are approved for ACH,

22   then other financial institutions would have the ability to

23   debit funds out of your account unless that feature was

24   disabled.

25   Q    Okay. And for myself and for everyone else, when you

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   say a master account, obviously, it indicates that there's

2   something less than master accounts within it. Correct?

3      A   Yeah. So there's -- so a master account -- let's say

4   a big bank like Bank of America, right, they will have their

5   master account at their Reserve Bank, which is probably Federal

6   Reserve Bank of Richmond. Okay. But a big bank like that

7   might have a hundred routing numbers. So they might have

8   different routing numbers for different branches. All of those

9   routing numbers would be, in theory, funneled back up to the

10   master account.

11      Q   So any time that they would go in and put in one of

12   those, for instance, a Bank of America, Knoxville, it would

13   have its own routing number. Correct?

14      A   So I don't know for sure. We're talking

15   hypothetically. Bank of America in Knoxville could have a

16   different routing number than Bank of America in Charlotte,

17   yeah.

18      Q   Okay.

19      A   But then if it did, then it would be part of -- in

20   effect, it would be a subaccount of the master account.

21      Q   So would that also be in connection with an ABA

22   number then, American Banking Association number on the master

23   account?

24      A   Yeah. So we've been talking about routing numbers.

25   When people talk about ABA routing numbers, it's the same

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  thing.

2     Q    Okay.  So in order to get from the individual bank's

3  routing number that gets funneled up to the master routing

4  number, as you stated -- did I state that correctly of what you

5  had stated?

6     A    Yeah.  I think -- it's getting probably more

7  complicated than it needs to be, because if the subaccount, if

8  the Knoxville branch of Bank of America that we're describing,

9  they would have -- that routing number itself would have

10  different privileges.

11         So that would -- that account, if you would put an

12  ACH debit to that routing number, it would effectively come out

13  of that routing number.  And then all the different routing

14  numbers of Bank of America ultimately at any end of year

15  accounting period would flow back up into a master account,

16  because they would have a bunch of different balances.

17         Just like you had different bank accounts at the same

18  bank, you know, the total of -- if you had $3,000 in three

19  accounts in the same bank, yeah, there's only $3,000 in each

20  bank, but if you were looking at it, at your net worth, you'd

21  have $9,000 in that one bank.

22     Q    So when they go in and do the actual -- to make

23  payments at USAA Bank, for instance, they go in and they have

24  to actually -- for an external account, they actually have to

25  put in the routing number of the institution, as well as an

UNITED STATES DISTRICT COURT

1  account name?

2       A    And number.

3       Q    And then account number?

4       A    Correct.

5       Q    Three things?

6       A    Yeah.

7       Q    Okay.  And the ACH system, if you don't have the

8  routing number, it automatically rejects it.  Correct?

9       A    Correct.

10      Q    Okay.  And if you don't have the right account name,

11  does it instantly reject it?

12      A    No, it doesn't.  It would actually process the

13  transaction as if there was an account number, and then there

14  will be the two-day window for the bank that's -- that the

15  funds were taken out of to come back and return that prior

16  debit as -- they return it as saying there's no account, so

17  they would pull the money back.

18      Q    Okay.  So if they put in the wrong account number,

19  okay, not the routing number or the name of the account, but if

20  they put in the wrong account number, would it automatically

21  reject it or would that be processed for two days?

22      A    No.  It gets processed, yeah, for the two-day period.

23  Because they wouldn't know whether the account number is valid

24  or not.  It's the financial institution, that money was taken

25  from them, they have to determine whether the account is valid

UNITED STATES DISTRICT COURT

1   or not.

2       Q    Okay.  And the Federal Reserve, when you get, it's

3   not instant that you receive this information from the -- the

4   ACH receiving bank or the one that's pulling the ACH, you don't

5   receive that information for two days, or do you receive it

6   immediately and it takes two days to process?

7       A    So my understanding is that since the Federal Reserve

8   runs the system, the Reserve Banks that are responsible for

9   their own routing number for the U.S. government as a fiscal

10  agent, they would know that on the same day.

11          And so in many cases, I think in most cases, you

12  know, the rejects would be on the same day, but they have two

13  days to legally pull it back without incurring a loss.  If they

14  waited longer than two days and the money was paid out

15  inappropriately, then they would try to pull it back, but they

16  might not be able to do it.  They might have to go to court.

17          You know, so the way that the ACH rules are, is it

18  provides the institution that was debited a two-day window to

19  pull it back so that they won't be at a loss if they return it

20  within that two-day window.

21      Q    So, for instance, if USAA waits more than two days,

22  it takes that much longer for it to be processed, like if they

23  batch it at a certain time each day and you're not getting that

24  batch request through the ACH transfer system, then it takes

25  longer to process.  Is that correct?

                    UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1     A    No.  I think the two-day window, regardless of

2  whether it was processed in the morning or processed in the

3  afternoon, that two-day window gives financial institutions a

4  proper time frame to determine whether the account is valid,

5  whether the account is funded properly, and if not, then they

6  can reject it.

7     Q    Okay.

8     A    Or return it.

9     Q    Sounds like a huge vulnerability is being discovered

10  regarding ACH payments, settlements, and has allowed a risk of

11  these type of situations, like Mr. Beane's and others who are

12  not familiar with the banking system, sounds like there's a lot

13  of vulnerability there that's inherent in the system.

14        Would you say that's an accurate statement?

15     A    The system is created for legitimate transactions and

16  processes, huge volumes of money on behalf of commercial

17  entities every day.  And like many things, if you've -- you're

18  trying to scam a system, you might be able to find a

19  vulnerability to utilize, and, yeah, I think that's what

20  happened in this case.

21        But the system is set up, you know, if you have a --

22  if you try to complete a perfect system to stop all frauds,

23  then you can't really help the economy.  So there's a balancing

24  act.

25     Q    Yeah.  This is sort of where this whole thing sort of

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  revolves around.  It would take someone to know the ACH system

2  and know that it takes -- that there's a window there for that

3  two-day settlement period.  They would have to actually know

4  how the ACH system works and the settlement periods to be able

5  to pull off some kind of scam like that, wouldn't they?

6      A    I don't know.  I mean, I think -- I don't know what's

7  in the minds of the people who do it.

8      Q    If someone didn't know how the actual system worked

9  for ACH and the facts -- actually, didn't you provide --

10            MS. DAVIDSON:  No, that's not him.

11            MS. TUCCI-JARRAF:  Who was that?

12            MS. DAVIDSON:  Those exhibits which I provided were

13  not provided by him.

14            MS. TUCCI-JARRAF:  You handed them with the wire.

15            MS. DAVIDSON:  It was just timing.  He provided the

16  wire.  Our expert witness prepared the exhibits.

17            MS. TUCCI-JARRAF:  Oh, okay.  I didn't know that.

18            MS. DAVIDSON:  And he's coming later.

19            MS. TUCCI-JARRAF:  Okay.  I didn't know that.

20  BY MS. TUCCI-JARRAF:

21      Q    Would you say, sir, someone that didn't know about

22  how the ACH system actually worked, between pulling and

23  crediting and all that, that it's not easily something that

24  hasn't been a problem since ACH existed.  Is that correct?

25      A    That has or has not been a problem?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    I'll strike it.  Let me rephrase.  I apologize.  How
2    long has the ACH system been in place?
3    A    I don't know for sure.
4    Q    You don't know for sure?
5    A    No.
6    Q    Did it not exist while you've been in your 19 years
7    at the Federal Reserve?
8    A    I believe it's probably existed for the whole 19
9    years I've been there.
10   Q    The whole 19 years?
11   A    Uh-huh.
12   Q    So in that 19 years, the Federal Reserve Bank System
13   and its members have never experienced this sort of a situation
14   like Mr. Beane's or, you know, the thousands, tens of thousands
15   that have occurred since July.  Is that correct?
16   A    So the individual instances --
17   Q    Right.
18   A    -- I'm sure happens all the time.  Okay.  But
19   wholesale attempts, if you will, like whether it's many people
20   trying to do the same scam at the same time, I believe happened
21   once before.
22   Q    Once before?
23   A    Uh-huh.
24   Q    Do you remember when?
25   A    I think it was a couple years ago, within the last

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    five years, I think.

2        Q    Within the last five years?

3        A    Uh-huh.

4        Q    And it was like this, it was the same kind of

5    scenario, pulling, and it not getting caught within that

6    window?

7        A    A lot of people were, you know, just like this, you

8    know, things get put out on the Internet, and all of a sudden,

9    you get a lot of people trying to do the same scam.  And it was

10   some sort of a scam that a -- I'm not familiar with

11   specifically the details, but my understanding is that people

12   said it was a free -- you could get free phone or something

13   like that, that -- some program that didn't exist, but they

14   said President Obama had created it, and they gave a routing

15   number of a small financial institution in the northeast and

16   that institution was -- was hit with thousands of ACH debits.

17       Q    Were those ACH debits that you just spoke about

18   during this particular scam, is that the Obama phone that

19   you're talking about?

20       A    I believe that is, yeah.

21       Q    Okay.  During that, were they doing the same kind of

22   processes which you are seeing happening now, since July?

23       A    I wasn't involved in that case, but my understanding

24   is it's similar.

25       Q    It's similar, where they were using Social Security

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  numbers?

2      A    No, no.  I'm sorry.  I don't know that -- I don't

3  know the details, so -- I just know that they were using ACH

4  debits, and that financial institution was -- their routing

5  number was used as part of the scheme.

6      Q    Okay.  So that --

7      A    As opposed to --

8      Q    Thank you for clarifying that.

9      A    Yeah, as opposed to U.S. government routing number.

10     Q    All right.  Because that would be pretty significant

11 if they were using Social Security numbers as well as account

12 names and then a legit routing number?  That's why I was asking

13 the same details.

14     A    Yeah.  I don't know the details about that one.

15     Q    Okay.  So in this particular case, in this instance,

16 Mr. Beane's case, you said, had come on the radar because of

17 the significant amounts that had been accessed.  Correct?

18     A    Correct.

19     Q    Okay.  And the only amounts you haven't been able to

20 recover, supposedly RV -- the funds that were used for the RV.

21 Is that correct?

22     A    So no.  From the Federal Reserve's point of view, we

23 returned all of those items within the two-day window.  So any

24 loss is on USAA.  The loss is not on the Federal Reserve with

25 Ginnie Mae securities.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1     Q    Okay.  So this -- and I'll take you to, I believe

2  it's Government Exhibit 164.

3          This is the wire, Fedwire information that you had

4  provided?

5     A    Yeah.

6     Q    Okay.  And, David, would you be able to -- okay.

7  Thank you.

8          So, Mr. O'Malley, just so that we can go through this

9  and understand it, because obviously there's a vulnerability

10 here, and there are a lot of people at risk, would you say

11 there's a lot of people at risk due to the scam?

12    A    A lot of -- a lot of financial institutions are at

13 risk.

14    Q    What about the individuals who believe it's not a

15 scam and the information that they're relying on is accurate,

16 would you say they're at risk too?

17    A    I would say that the people who are initiating the

18 scam are not victims, they're the perpetrators.

19    Q    I would agree with you, but I'm saying the ones that

20 are actually relying on information that was released regarding

21 the process?

22    A    Well, if it's released by some guy on a YouTube

23 video, there's no reason to believe it's accurate.  We've got

24 frauds and scams section on our website.  We've got a report

25 fraud e-mail box.  We get calls from the public and e-mails

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  every day, and we answer these types of questions all the time.

2  So people -- they should know better than to follow a guy on a

3  YouTube video as opposed to calling the Reserve Bank to see if

4  this is a real issue or not.

5      Q     Right.  But -- would you say banking, the actual

6  industry of banking is transparent?

7      A     Well, you know, you --

8      Q     Let me rephrase that.  That might be a little too

9  general.  Would you say that the actual inner workings, such as

10  ACH, would you say that that is transparent to the people about

11  how it works?

12     A     There's information out there, but it's a complex

13  system, so it's probably not clear to most people.

14     Q     And would you say that how money is created and

15  funded and borrowed, that that is transparent to all the people

16  in America?

17     A     That's probably a little too broad for me to answer.

18     Q     Okay.  Let me restate that.  How the Federal Reserve

19  and its member banks do the ACH credits and the ACH pulls, is

20  that transparent to the America people, how that works?

21     A     I think most people understand the mechanics of it,

22  you know, that they can send a payment to their utility or

23  they're getting a direct deposit in their paycheck, but the

24  inner workings and the mechanics of it, they probably don't

25  know, and they probably don't really care that much as long as

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    it gets done.

2         Q    And you had stated that, you know, some guy who puts

3    out a YouTube video, that -- would you state -- would you say

4    that it's a correct statement that a lot of info is put out

5    there regarding the Federal Reserve that is incorrect?

6         A    Yeah.  There's lots of conspiracy theories about the

7    Federal Reserve.

8         Q    Would you say there's a lot of info put out on the

9    Internet regarding the Federal Reserve that is accurate?

10        A    When the Federal Reserve puts it out, yeah.  If you

11   go to the Federal Reserves websites, either the Board of

12   Governors, which is where the one exhibit we talked about was

13   posted, or any of the Reserve Banks, there's -- there's a vast

14   amount of information as to how the system works.  It's just a

15   matter of whether people want to take their time to look at it

16   and research it.

17        Q    So like a Federal Reserve circular, would that be

18   considered something put out by the Federal Reserve?

19        A    Yeah.

20        Q    A circular?  Are you familiar with the Federal

21   Reserve circular "Money Mechanics" put out by Chicago Federal

22   Reserve Bank?

23        A    No.

24        Q    You're not familiar with the "Money Mechanics"

25   circular?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    There's plenty of circulars that are put out all the

2    time, so you're describing one, no, I don't know it.

3    Q    This particular circular is one of the most famous

4    amongst, let's say, grassroots movements and the people that

5    are actually looking at this particular scam that you -- that

6    initiated this whole entire action starting in July of 2017.

7    A    So if you showed me the circular, I --

8    Q    Okay.

9    A    -- I may or may not have seen it before.  You know,

10   I've been involved in a lot of frauds against the Federal

11   Reserve, and there's a lot of pieces of information that people

12   take and then try to use it to support, you know, their

13   position to facilitate a scam.

14   Q    So you've reviewed the video from Harvey Dent?  You

15   had stated you'd seen the YouTube video.

16   A    There's -- Harvey Dent put out many videos, but, yes,

17   I've seen some of the videos.

18   Q    I'm -- I will narrow that down.  Have you seen the

19   video that Harvey Dent supposedly put out on July 1st, 2017

20   regarding use your secret accounts?

21   A    I've seen Harvey Dent talking about using your secret

22   account at the Federal Reserves.  I don't know what the date of

23   the YouTube video was.

24   Q    Okay.  Was it around July 1st that this ACH problem

25   started to be incurred?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    It was in the first few days of July, yeah.

2    Q    And was it just the Federal Reserve Bank of New York

3  that experienced this issue or was it all 12 of the Federal

4  Reserve Banks?

5    A    It was actually only about half of them.  Because --

6  well, we're not really sure why, but we speculate that -- I

7  believe that the person who goes by the name of Harvey Dent

8  talked about looking at your Social Security card and flipping

9  it to the other side, and then I think that there was a number

10 on the other side of the Social Security card, and he said that

11 that number relates to the Federal Reserve Bank in -- that

12 maintains your account.  This is the scam that he -- you know,

13 the theory that he was putting out.

14        It may be that the number only went up to six.

15 Because it looked like the Federal Reserve in the regions, I

16 believe, one through six or one through seven seemed to

17 experience that problem.  And the other ones, like the Twelfth

18 District is San Francisco, I don't think that they -- they had

19 many ACH frauds like that at all.

20    Q    There's some of the Federal Reserve Banks that don't

21 even offer ACH services.  Is that correct?

22    A    Yeah.

23    Q    Like Virginia, the one in Virginia doesn't --

24    A    No, that's not --

25    Q    -- do ACH?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    No.  So you have to clarify.  That's not accurate.

2    All of the Reserve Banks would participate in the ACH program,

3    because FedACH, it's a service that the Federal Reserve System,

4    all 12 banks participate in.  Just like Fedwire, it's all -- so

5    the ACH program is for all Reserve Banks, you know, and their

6    customers, as is Fedwire.

7         Now, as we talked about before, certain -- you know,

8    if you're a customer of the Federal Reserve, and you're opening

9    an account, that master account that we talked about.  You have

10   to ask, you know, the specific services you request, so there

11   might be some financial institutions that don't have access to

12   ACH, but that's because they weren't granted it when they

13   opened their account.

14   Q    Okay.  In their membership, you mean when they bought

15   their shares?

16   A    No.  Unrelated, that's when they -- because they

17   might not be a member, but they could still process

18   transactions.

19   Q    Okay.  So in specific regards to their master

20   accounts, you're saying.  Okay.  Thank you for that

21   clarification.

22        Now, you stated when this Harvey Dent video had come

23   out, that the public in general should have called the Federal

24   Reserve, they shouldn't just have believed it?

25   A    Well, I think a lot of people were just greedy, and

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    they just figured they could make a quick buck, so they didn't

2    really want to find out if it was real or not.  They just went

3    after it and they tried to grab the money.

4            And so people initially, when you look at the

5    responses, right, they were all excited, because, you know, if

6    they were paying their credit card or auto loan, it looked like

7    the balance was paid, because the financial institution that

8    executed the transaction, we talked about, they don't know if

9    the other side is good or not, so they got credit for that --

10   for that ACH.  And it wasn't until two days later that it was

11   returned, so then later on, they realized, oh, it didn't work,

12   but initially they thought it did work.

13       Q    You called them greedy and for most of the --

14       A    I said many of these people were just greedy, yes.

15       Q    And in their greediness, they went to go pay off all

16   their debts, their utilities, their mortgages, their cars?

17       A    Some people were doing that, and other people were

18   buying RVs.  You know, there's lots of different reasons that

19   you could do.

20       Q    So if someone believes that they were actually

21   accessing funds that belonged to them, you would call that

22   greedy, you would call that a fraud?

23       A    Well, certainly fraud.  I mean, these accounts didn't

24   exist, you know.

25       Q    Well, fraud requires intent to steal something from

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  someone else.  Correct?

2       A    I think if you -- if you --

3       Q    If fraud -- fraud requires intent.

4       A    Yeah.

5       Q    That someone wants to steal something from someone

6  else, doesn't it?

7       A    Yeah.

8       Q    Okay.  If these people believed that the funds that

9  they were using actually belonged to them, there's no intent to

10 fraud possible.  Correct?

11      A    I don't -- I can't identify each individual person

12 what was their intent or not, but if you look at --

13      Q    I'm not saying --

14           MS. DAVIDSON:  Objection, Your Honor.  He needs to be

15 able to answer.

16           THE COURT:  Let him finish his answer.  Go ahead.

17           THE WITNESS:  Well, when I look at that video, it

18 does not seem plausible to me.  I look at it and say, this

19 is -- this is such a scam.  So could there be some people that

20 were so gullible?  I guess they could be.  But I think the vast

21 majority of people were just looking and saying, "We're going

22 to scam the system."

23 BY MS. TUCCI-JARRAF:

24      Q    Uh-huh.  You're familiar with TARP, correct, the

25 program that they had regarding the mortgage industry from

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    U.S. -- U.S. Treasury to be able to help people with their

2    homes.  Do you remember that in 2009, 2010?

3        A    So I know of different mortgage programs.

4        Q    And this specific one was to help the people come out

5    of mortgage difficulties, it was a mortgage assistant program.

6    Is that correct?

7        A    That's a Treasury program.  I wasn't involved in it.

8        Q    Fair enough.  Thank you.  And, in fact, trillions of

9    dollars have gone missing from the Federal Reserve, which the

10   whole public is finding out about now.

11       A    Can you say that again?

12       Q    That trillions of dollars throughout the years here

13   have gone -- the Federal Reserve cannot account for trillions

14   of dollars, where it went?

15       A    I have no idea what you're talking about.

16       Q    Would you state that -- or would you say that it's

17   correct to state that there are a lot of Americans that feel

18   the Federal Reserve and the banking institution in general are

19   not acting in good faith?

20       A    I think that there's a lot of misinformation out on

21   the Internet, which could cause people to believe that the

22   government is not acting in good faith.

23       Q    And what steps have you -- if you're aware of any

24   steps that have been taken to assist the people to understand

25   that you are acting in good faith?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    We have a public information department that -- we

2  have people come in for tours every day at the Federal Reserve.

3  I mean, we try to have outreach to the public.  You know,

4  whether we're as effective as we'd hoped to be is, I guess,

5  debatable.

6    Q    When you say outreach to the public, is that in

7  putting out announcements that there's a scam, you know, is

8  that having FBI go arrest people without explaining the issue

9  to the people?

10    A    So --

11    Q    What kind of steps?

12    A    The steps, we do -- you saw some of the notice from

13  the Federal Reserve public website, yeah, that's one way to do

14  it.  You know, that might reach the most people if they're

15  doing it.

16         But as I mentioned before, we got a report for an

17  e-mail box that we get inquiries every day.  Could be dozens of

18  people a day that, excuse me, will send inquiries to us, and we

19  respond that way as well.

20    Q    Well, my concern is that you have this problem, you

21  say, is huge.  I mean, obviously, Randall Beane's case, you

22  said, stuck out more.  The big ones always do.  Correct?

23    A    Uh-huh.

24    Q    Okay.  How many people do you think watched that

25  initial video that got sent out by Harvey Dent?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1         MS. DAVIDSON:  Objection, Your Honor.

2         MS. TUCCI-JARRAF:  If you know.

3         MS. DAVIDSON:  Relevance.

4         MS. TUCCI-JARRAF:  It goes to lack of intent.

5         THE COURT:  I'll sustain the objection.  Not sure of

6 his personal knowledge in any event, so I'll sustain the

7 objection.

8         MS. TUCCI-JARRAF:  That's why I asked if he was

9 aware.  Okay.

10 BY MS. TUCCI-JARRAF:

11    Q   How many cases if -- are you aware of how many cases

12 the Federal Reserve is testifying in regarding situations

13 similar to this one with Mr. Beane?

14    A   Well, are you asking me about scams, you know,

15 involving the Federal Reserve, or are you asking me about the

16 ACH scenario that occurred in July of 2017?

17    Q   I'm talking about this particular one, and we'll --

18 I'll go ahead and make this as clear as possible.  Let me find

19 the exhibit.  Is it Exhibit 164, please.  Oh, that's this one.

20 The other exhibit, the notice.  162, please.

21    Okay.  This is an official announcement that you went

22 over with Ms. Davidson yesterday?

23    A   Yes.

24    Q   Okay.  Is this the only thing that you've put out

25 regarding this particular scam?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    No.  This notice is on the Federal Reserve Bank of

2    New York's website, the Federal Reserve Bank of Atlanta's

3    website and maybe other Reserve Banks as well.

4    Q    Okay.  Do they all basically say the same thing or

5    similar to?

6    A    Similar to.

7    Q    Similar to.

8    A    The --

9    Q    Okay.  This is much -- can you read this to me,

10   please?  Read it from the record, here, the big paragraph, just

11   so that we can go over what it says here and then the

12   difference between what you've explained here in court --

13        THE COURT:  Well, let me -- just to keep things

14   moving along, I think he read it yesterday, so -- and it's in

15   front of him and --

16        MS. TUCCI-JARRAF:  Okay.

17        THE COURT:  -- the jury, so why don't --

18        MS. TUCCI-JARRAF:  I'll go --

19        THE COURT:  -- you go ahead and ask a specific

20   question.

21        MS. TUCCI-JARRAF:  A specific one.

22        THE COURT:  Thank you.

23   BY MS. TUCCI-JARRAF:

24   Q    It says here, "The Federal Reserve does not maintain

25   accounts for individuals.  Individuals should not make attempt

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    to make payments using Federal Reserve Bank routing numbers or

2    false routing numbers."  Correct?

3        A    That's what it says, yeah.

4        Q    Okay.  That's a lot more -- it's pretty vague

5    compared to the information you shared with us yesterday as

6    well as today regarding how the actual payment -- if you could

7    bring up example -- or excuse me, Exhibit 164 -- how you

8    explained to us regarding this pull came in for the OMAD to

9    actually go out, the payment from the pull that USAA had made,

10   that it takes two days.  I mean, you gave us a lot more detail

11   here.  Correct?

12       A    Okay.  So I need to clarify.  164 is a wire transfer.

13   It's not an ACH, so that was not pulled at all.  That was

14   initiated from USAA by Mr. Beane sending it to somebody.  There

15   was no ACH pull on this.

16       Q    And that's correct.  Thank you for making that

17   clarification between the wire.  So when there's an ACH pull,

18   is there a small report that's made for every ACH pull, similar

19   to this one?

20       A    Yes.  There -- well, it would be different, because

21   it's an ACH rather than wire transfer, yeah.

22       Q    Okay.  But there would be a report like this one, but

23   to the specific information for the ACH transaction.  Correct?

24       A    Correct.

25       Q    Okay.  And so there would be a report for each of the

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    31 plus transactions or CDs that Mr. Beane tried to --

2         A    So when you say "report," I mean, you know,

3    everything is electronic, right, so, you know, you can create a

4    report that -- there's no report like at the end of the day

5    there's a report that would be, all right, this is a Randall

6    Beane report, this is a Sean O'Malley report, you know -- you

7    know, but if you're asking, can you extract information from

8    the ACH system to identify how many debits were pulled by USAA

9    on behalf of Randall Beane from the Ginnie Mae account, yeah,

10   that's -- that's possible.

11        Q    Okay.  And since there's a fraud investigation that

12   your office is doing regarding the ACH issues that started in

13   July of 2017, about how many reports do you believe actually

14   have been created due to this scam?

15        A    Well, the reports in general were on how many ACH --

16   unauthorized ACHs occurred at each routing number.  You know

17   what I mean, like when you've got tens of thousands, you're not

18   really looking at an individual level, you're looking at big

19   chunks of information as to how -- what patterns are you

20   seeing.

21        Q    In order to deem this a large scam that would

22   potentially put the Federal Reserve at loss, would you use

23   however many reports are coming in for ACH pulls like that,

24   would you consider that -- that volume of numbers to determine

25   whether it's a significant scam or a lesser scam?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1      A     You'd have the ability to sort it by the bigger ones

2  versus the smaller ones, yeah.

3      Q     Would you consider this particular scam to be one of

4  the largest that have occurred in the Federal Reserve's history

5  or a specific time period of history?

6      A     Certainly for the July 2017 ACH scam, this was very

7  large.

8      Q     Uh-huh.  And did it include people from all over the

9  United States doing this particular scam?

10     A     I believe so.

11     Q     Did the Federal Reserve Bank receive a lot of calls

12 from a lot of people trying to determine if it was real or not?

13     A     Not as many as you think, but, yeah, there was --

14     Q     Did the Federal Reserve Banks get a number of calls

15 from people asking what return meant or trying to confirm their

16 accounts, these, quote, unquote, TDA accounts, did they try to

17 call them?

18     A     There were some people that called because they --

19 they were -- the items were returned.

20     Q     And when they did call regarding that, did you make

21 that same explanation that you did yesterday and today as far

22 as how ACH transaction actually worked, that, for instance,

23 USAA Bank wouldn't know that those accounts didn't exist for at

24 least two days?  Did you make that explanation to them?

25     A     So I didn't have any calls personally.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Okay.  Are you aware if anyone in the Federal

2    Reserve, do you have a task force that's dealing with that?

3    A    I have people that spoke to others, and I think

4    more -- it was more along the lines of -- there is no account,

5    it does not exist, so therefore, you know, it was an invalid

6    attempt to pull the money out.

7         THE COURT:  We're going to take a break at this time.

8         MS. TUCCI-JARRAF:  Thank you.

9    (Jury out at 10:26 a.m.)

10        THE COURT:  How much longer do you anticipate with

11   your cross?

12        MS. TUCCI-JARRAF:  Well, right now I'm just going

13   in -- I would say probably maybe another hour.

14        THE COURT:  How long was the direct?

15        MS. DAVIDSON:  Far less than an hour, 30 minutes.

16   What was it?

17        THE COURT:  All right.

18        MS. TUCCI-JARRAF:  I'm going into the intent that

19   there is no intent, there's a fraud not only committed on the

20   Federal Reserve and possibly member banks, but also on the

21   people, such as Mr. Randall Beane.

22        THE COURT:  We spent a lot of time on matters that

23   have been mildly relevant, and --

24        MS. TUCCI-JARRAF:  This goes to --

25        THE COURT:  -- under -- let me finish.  Under Rule

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    611, the Court can exercise reasonable control over the mode

2    and order of examining witnesses, including, but not limited to

3    the amount of time that a witness is examined.  And the Court

4    has to weigh, you know, there are other witnesses to be

5    presented in this trial, both by the government and perhaps by

6    one or both defendants, so I don't know if I'll let you go an

7    hour, but I'll probably hold you to no more than an hour, so

8    keep that in mind as you ask your questions.

9            MS. TUCCI-JARRAF:  Thank you.

10           THE COURT:  All right.  We'll take a recess.

11           MS. DAVIDSON:  Your Honor, can I bring up one --

12           THE COURT:  Yeah.  Before we do, go ahead.

13           People in the audience can be seated, if you'd like.

14           You can step down, sir.

15           MS. DAVIDSON:  Your Honor, I briefly mentioned the

16   fact that many calls have been received by various individuals

17   that were identified during her cross-examination, and I wanted

18   to alert the Court that I will continue to object to the fact

19   finding of who people work with, because we do believe that

20   it's simply an attempt to harass the various agents.

21           THE COURT:  Well --

22           MS. TUCCI-JARRAF:  Do you want me to respond?

23           THE COURT:  Respond.

24           MS. TUCCI-JARRAF:  I have no intent to harass anyone.

25   I'm going in to figure out why Mr. Beane -- because a lot of

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   the -- my actions were based on the actions that were done

2   against Mr. Beane, which is why I inserted myself in.  I'm

3   trying to figure out why these things were done, by who, so

4   that we can get the correct information.  That's all.

5          THE COURT:  All right.  We'll come back --

6          MS. TUCCI-JARRAF:  So I know who to subpoena.

7          THE COURT:  Come back at 10:45.  We'll give you to

8   11:30 to finish your cross, then we'll go to Mr. Beane for

9   cross-examination.

10          And remind you, Mr. Beane, as I did at the final

11   pretrial conference, that while you heard Ms. Tucci-Jarraf say

12   she's inquiring of certain matters pertaining to you relevant,

13   she believes, to her defense, that you are representing

14   yourself, you face counts above and beyond what

15   Ms. Tucci-Jarraf faces, and potential punishment, depending on

16   the jury's verdict, above and beyond what Ms. Tucci-Jarraf may

17   face.

18          So just keep that in mind, that you are, while the

19   questions she's asking may be relevant to your defense in your

20   mind, you have the right to ask whatever questions you want in

21   terms of representing yourself.  In fact, you have a right to

22   object to questions that Ms. Tucci-Jarraf may ask.

23          You understand all that?

24          MR. BEANE:  I do.

25          THE COURT:  Okay.  Let's take a recess.  We'll give

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  Ms. Tucci-Jarraf till 11:30, then we'll pick up with

2  Mr. Beane's cross-examination, and then see if there's any

3  redirect.  Thank you.

4          THE COURTROOM DEPUTY:  This honorable court shall

5  stand in recess.

6      (Recess from 10:30 a.m. to 10:46 a.m.)

7          THE COURTROOM DEPUTY:  Please remain seated and come

8  to order.

9          THE COURT:  We'll bring our jury back in.

10     (Jury in at 10:47 a.m.)

11         THE COURT:  Thank you.  Everyone may be seated.

12  Continue cross-examination.

13         MS. TUCCI-JARRAF:  Thank you.  Without prejudice,

14  I'll proceed.

15  BY MS. TUCCI-JARRAF:

16     Q    Okay.  Mr. O'Malley, we were discussing about the

17  scam, the specific scam in July of 2017.

18     A    Okay.

19     Q    Okay.  Is that scam still being done?

20     A    It's -- I can't say it isn't being done at all, but

21  the volume dropped dramatically.

22     Q    Do you know about when the volume dropped?

23     A    It was very high for about a month or so.

24     Q    Did you say this particular scam was initiated by

25  this video that Harvey Dent -- that someone called Harvey Dent

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1   put out, the initial video on July 1st?

2       A    There's a high probability, the linkage, yeah.

3       Q    Okay.  High probability of linkage, you said?

4       A    Yeah.

5       Q    Thank you.  During these particular transactions that

6   were being processed over to the Federal Reserve in the same

7   manner as what occurred in this particular case, certain codes

8   would have been given.  You stated in this particular case, it

9   was a return code.  Is that correct?

10      A    Correct.

11      Q    How many codes do you have for -- are there different

12  codes than just a return code?

13      A    No.  There's different types of return codes.

14      Q    Okay.  Different types of return codes.  Do you know

15  approximately how many kinds of return codes there are?

16      A    I don't.

17      Q    Would one of those return codes be "account does not

18  exist -- "account does not exist"?

19      A    Yeah.  I believe that was R03, the code itself.

20      Q    R03?

21      A    I think, so yeah.  And I think that that's the code

22  that was used on Mr. Beane's, all the transactions that were

23  returned for Mr. Beane.

24      Q    Is that in regards to the CDs funded by ACH?

25      A    Right.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Okay.  Because, obviously, the Fedwire one that you
2  brought in is a completely different system?
3    A    Totally different system, yeah.
4    Q    Okay.  Is there a return code limited participation?
5    A    What -- say that again.
6    Q    You stated that there were different return --
7  different codes for the type of return?
8    A    Yeah.
9    Q    Correct?
10   A    Correct.
11   Q    Is there a code -- a return code described as limited
12 participation?
13   A    Not that I know of.
14   Q    So you're not aware of any other kinds of return
15 codes other than account does not exist?
16   A    Insufficient funds.
17   Q    Any others?
18   A    I'm sure there were others, but I don't know.
19   Q    So those are the only two that you know of.  In broad
20 cases regarding ACH, have you come across any other types of
21 returns for fraud?
22   A    Not that I can recall.
23   Q    Okay.  Let's get back to the -- on July 1st, you had
24 this massive video go out, that, as you stated, it was about a
25 month of heavy transactions using this particular process that

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    was outlined in that video.  Is that correct?

2        A    That's correct.

3        Q    Okay.  And I said around 300,000.  Those are just the

4    ones I knew about.  You stated 10,000 -- tens of thousands.  Is

5    that correct?

6        A    Yeah.

7        Q    Okay.

8        A    At least tens of thousands, yes.

9        Q    At least tens of thousands.  Thank you.  And those

10   tens of thousands involved just average, ordinary, day

11   Americans, is that correct, per your knowledge?

12       A    So there were a lot of people who participated.  It

13   wasn't just all from one individual, so -- but I don't know

14   about the other individuals.

15       Q    Okay.  There were at least -- per your knowledge,

16   there was at least tens of thousands of people involved in

17   those transactions, though?

18       A    Well, tens of thousands of transactions.  There could

19   be -- in many instances, I think a lot of the people executed

20   multiple transactions.

21       Q    Okay.

22       A    But it was a substantial number of individuals.

23       Q    Individuals.  Are you aware of whether they had seen

24   this video by Harvey Dent?

25       A    I don't know.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    Q    Okay.  Did the Federal Reserve take any action to

2 take this video off of YouTube?

3    A    Yes.  There were discussions with the FBI and the

4 folks who control YouTube, yeah.

5    Q    To control YouTube or --

6    A    Well, control the posting, you know, the people -- I

7 think it was -- I didn't initiate the call, but I know that

8 there were discussions about it.  And I think eventually they

9 did take the videos down or some of the videos down anyway.

10    Q    Was the person that made that particular -- to the

11 best of your knowledge, was that person that made that video,

12 was he interviewed by the Federal Bureau of Investigation or

13 someone from your financial intelligence unit?

14    A    I don't know.  Certainly not from my unit.

15    Q    Do you know whether the individual going by the name

16 of Henry -- Harvey Dent who made that video or that he was

17 arrested?

18    A    I don't know whether he was or not.

19    Q    Well, it's been pretty clear from the data that you

20 have shared with us that there was an inherent vulnerability in

21 the ACH system.  Would that be an accurate statement?

22    A    I would say that these individuals exploited a

23 vulnerability in the system, yeah.

24    Q    I'm not -- I'm going to get to that question in a

25 moment.  I'm asking, is it evident that there was a

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

vulnerability inherent in the system at this time?

A    Again, I don't know if I agree with your term "vulnerability." The system is created to help speed commerce. So if you stop all ACH debits, that can impact financial transactions very significantly.

Q    If someone can go in with just a routing number and put in whatever account name and account number in there, and it will process, and it has to be caught within that two-day window, you would -- would you consider that an inherent vulnerability in the system?

A    Again, we talked about, you know, there's -- you have to weigh the benefits of the system versus how people can exploit the system. So that's the way the system was created, that there's a two-day window, you have a two-day window to catch an inappropriate transaction.

Q    So are you saying that the Americans that participated, whether knowingly or unknowingly, in a scam were actually the vulnerability?

A    No. I'm not --

Q    Because either it's vulnerabilities in the system or it's someone with knowledge of how that system actually works.

A    The system is created to speed commerce, right. And if you -- if you're going to try and stop all potential fraud, you could shut down, you know, the ACH system. But that doesn't benefit anybody. Right? This is a system that's used

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

by millions and millions of people, you know, on a regular

basis.  So, you know, that's the way the system was designed,

and that two-day window is the -- provides the opportunity for

false transactions to be returned.

    Q   So the -- it appears from your testimony that it's

just the actual routing number, which aren't all routing

numbers published somewhere on the Internet for each -- excuse

me, each bank in America as well as the Federal Reserve Bank?

    A   They're very well-known -- they're widely distributed

on the Internet, yeah.

    Q   Uh-huh.  So just from having the correct routing

number, someone would be able to pull off this scam effectively

unless their -- the banks caught it.  Is that correct?

    A   Just --

    Q   Repeat that?

    A   Rephrase or repeat it, yeah.

    Q   Maybe I can make it clearer, because there might be a

structural issue there.  If someone had just the routing

number, a valid routing number, even with incorrect account

name and incorrect account number, they would be able to, at

least for a period of time, make that pull using the ACH

system?

    A   They could direct their financial institution to

execute the ACH debit, if that's what you're saying.  The

answer is yes, except for the scenarios in which some -- some

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  routing numbers may have the ACH debit disabled, so absent

2  that, yes, it would go. But most -- most institutions won't

3  have it disabled.

4      Q   So at the individual Federal Reserve members or

5  participating ACH -- excuse me, ACH participants, they would

6  have to turn the ACH -- disable it on their end. Is that

7  correct?

8      A   They would ask the Fed to disable the ACH feature on

9  their account, yeah.

10     Q   Was that done sometime from July 2017 onward by --

11 were any applications made by ACH participants to shut it off

12 until they could situate a solution?

13     A   So the Fed did shut off many of the routing numbers

14 that were being used. They shut many of them off for ACH

15 debit, yeah.

16     Q   Was that the only action that was taken as far as

17 system management to be able to stop immediate abuse of the ACH

18 system?

19     A   No. We also reached out to others, you know, so

20 PayPal, the fraud people in PayPal, and others to notify them

21 of the fraud, because a lot of the traffic was being processed

22 through the PayPal system and others.

23     Q   So you only reached out to institutions or ACH

24 participants in order to deal with stopping the scam at that

25 point?

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    A    Well, we also notified the public by putting it on

2    the website, yeah.

3    Q    And that would be the notice that we just went over?

4    A    That was one of the notices, yeah.

5    Q    Okay.  I believe that was 162 or 4.  Yes.  That one,

6    thank you.  Exhibit 162.

7         In here, you don't state -- in here, is there stated

8    anywhere details that you've gone over with us?  Because as far

9    as the process of how the fraud actually occurs, step by step,

10   from entering in an account name, a routing number and all of

11   that, all the way to the pull and the returns, is there that

12   information here so the public can be aware?

13   A    The information here would make it clear that anybody

14   who wanted to execute that type of transaction, that it's

15   inappropriate.

16   Q    All right.  So if there's a fraud going on, a true

17   fraud going on, and you have individuals who over the years

18   have -- would you say there's individuals over the years who

19   have a certain attitude towards the Federal Reserve that is

20   negative to the Federal Reserve?

21   A    Yeah.  I'm sure there are, yeah.

22   Q    Okay.  And, in fact, I believe you have specific

23   terms for those types of movements.  Is that correct?

24   A    Can you expand?

25   Q    For example, sovereign citizens would be one.  Is

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    that correct?

2        A    Yeah.

3        Q    What are some others?

4        A    I can't come to -- none come to my mind right now.

5        Q    And what is a sovereign citizen?

6             MS. DAVIDSON:  Objection, Your Honor.

7             MS. TUCCI-JARRAF:  I wasn't going to --

8             THE COURT:  Well, as I understood the question, the

9    objection is?

10            MS. DAVIDSON:  What is -- the objection is relevance.

11   I'm sorry, Your Honor.

12            MS. TUCCI-JARRAF:  I haven't finished the question.

13            MS. DAVIDSON:  Okay.

14            THE COURT:  What's your question?

15            MS. TUCCI-JARRAF:  Okay.  In the Federal Reserve's

16   knowledge and belief, how do they define a sovereign citizen

17   for that particular movement that you made us aware of?

18            MS. DAVIDSON:  I'm still -- relevance is my

19   objection.

20            MS. TUCCI-JARRAF:  That's actually part of the

21   state's whole case has been that Mr. Beane is a sovereign

22   citizen.  So I think it is highly relevant.

23            THE COURT:  I haven't heard anything about that in

24   this trial.

25            MS. TUCCI-JARRAF:  It was in the briefings.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    THE COURT:  We're only dealing with the evidence in

2    the trial.  I haven't heard any evidence presented in that

3    regard, so I'll sustain the objection.

4    MS. TUCCI-JARRAF:  Okay.

5    THE COURT:  Remind the jury, again, that the

6    evidence, for purposes of your upcoming deliberation purposes,

7    and I've told you this before, is confined to the evidence

8    presented within the context of this trial and the four corners

9    of this courtroom.  Thank you.

10    Go ahead, Ms. Tucci-Jarraf.

11   BY MS. TUCCI-JARRAF:

12    Q    So I guess my question is, why did the Federal

13   Reserve not include the American people in making them aware of

14   what was going on as far as being the solution?

15    A    I think we did.  We attempted to.

16    Q    So threatening -- in this particular announcement

17   that you gave us, you had read the part, law enforcement,

18   including the Federal Bureau of Investigation, is aware of the

19   scheme, and individuals who participate in such schemes could

20   also face criminal charges.

21    Is that what you refer to as including the people and

22   being the solution to stop this?

23    A    So as I said, we've got frauds and scams section on

24   the New York Fed's website.  We've got the Board -- notices at

25   the Board of Governors.  We've got -- the Atlanta Fed had

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  notices.  There were many notices that went out to the public.

2  We've got an e-mail that folks were using to report fraud.  We

3  had outreach.  Whether we could have done a better job, maybe

4  we could have.

5      Q    In your opinion -- or excuse me, not in your opinion,

6  but based on your knowledge of how many American U.S. citizens

7  there are, do you think that they could have been included more

8  in assisting to stop this scam if they knew this information

9  that you went over yesterday and today?

10          MS. DAVIDSON:  Objection, Your Honor.  Relevance.

11          MS. TUCCI-JARRAF:  It goes to intent.  If people knew

12  what actually was going on, they'd be able to help stop it

13  instead of believing or having the belief that this wasn't even

14  a scam, but it was actually real.

15          THE COURT:  That may be appropriate for closing

16  argument, but I think that's more argument.  I think you've

17  asked sufficient questions to make that argument if you'd like

18  to make it.  So I'm going to sustain the objection to the

19  question as presented.

20  BY MS. TUCCI-JARRAF:

21      Q    I just have a few more questions.  Thank you.

22          Mr. O'Malley, the ACH as of September 15th, the

23  ACH -- the Federal Reserve announced that the ACH system would

24  be doing same-day settlements.  Correct?

25      A    I don't know the exact date, but I know they were

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1  moving towards that, yes.

2      Q    That they would be -- excuse me, let me rephrase that

3  then.  That the Federal Reserve announced that starting

4  September 15th, 2017, ACH settlements could be done same-day

5  settlement?

6      A    So I'm just telling you my personal knowledge as I

7  know that they're moving towards the same-day settlement.  I

8  don't know where they are in that process.

9      Q    Okay.  And also, in fact, isn't it true that New York

10  Federal Reserve Bank, President Dudley, William Dudley

11  announced that he was retiring on November 6th, 2017?

12      A    His intent to retire in 2018, yes.

13      Q    Yes.  And that was announced on November 6th, 2017?

14      A    That sounds like around the time period.  I don't

15  know the exact date.

16      Q    Okay.  And you're familiar with the Federal Reserve

17  board members in Washington, D.C.  Is that correct?

18      A    Not personally.

19      Q    But you're aware of who they are?

20      A    I believe so.

21      Q    Okay.  And isn't it correct that Stanley Fischer from

22  the Board of Governors announced that he's retiring on

23  October 13th, 2017?

24          MS. DAVIDSON:  Objection, Your Honor.  Relevance.

25          MS. TUCCI-JARRAF:  It goes to intent.

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1       THE COURT:  What is the relevance of if and when the

2  current chairman of the Federal Reserve may be retiring?

3       MS. TUCCI-JARRAF:  Because their retirements -- part

4  of my case is that the retirements are due to this very case

5  and all the other cases regarding a fraud that actually was

6  committed on the people and not the people on the Federal

7  Reserve.

8       THE COURT:  I don't think there's been any proof in

9  that regard, and I'm not sure the relevance of that.  But

10  anyway, I'll sustain the objection to the question at this

11  time.

12       MS. TUCCI-JARRAF:  Let me just check to see if I have

13  any further questions.  I have one last question.

14  BY MS. TUCCI-JARRAF:

15       Q    Isn't it true that some of these ACH settlement

16  issues similar to this one in the Randall Beane case, that it

17  actually took longer than two days, and in some instances, it

18  took weeks and up to a month to actually catch those particular

19  transactions?

20       A    So to my knowledge, the Federal Reserve and the U.S.

21  government did not sustain any losses, and the returns were

22  done in the proper two-day time period.

23       If you're asking me whether commercial entities were

24  harmed during this process and that they didn't return in a

25  proper time period, it's quite likely that that happened, but I

UNITED STATES DISTRICT COURT

Sean O'Malley - Continued Cross-Examination

1    can only respond for my -- my personal knowledge of -- in the

2    Federal Reserve, and I don't think that happened here.

3         Q    So you're stating that anything over a two-day

4    process would have been the responsibility and the fault of the

5    institution that enacted the first ACH transfer?

6         A    No.  I don't think it's -- the responsibility is on

7    the person who executed the transaction, from my point of view,

8    okay.  Now, legally, if you're talking about an institution

9    that pulled funds from another financial institution, the one

10   that funds were pulled from has two days to respond.  Right?

11   And let's say they responded on the third or fourth day.  If

12   that money had not been paid out yet, and they might be able to

13   still get that -- those funds returned, but if that institution

14   that pulled the money out had already paid out to their

15   customer, and the funds were gone, then the bank that did not

16   act within two days is probably going to have incurred a

17   financial loss.

18        Q    Okay.  So the Federal Reserve System, including

19   Federal Reserve Bank of New York doesn't engage in any

20   fraudulent behavior at all?

21        A    Not to my knowledge.

22        Q    Okay.  And the Federal Reserve Bank of New York and

23   the Federal Reserve System, to the best of your knowledge,

24   doesn't engage in human trafficking at all?

25             MS. DAVIDSON:  Objection, Your Honor.

UNITED STATES DISTRICT COURT

1          MS. TUCCI-JARRAF:  I'm just asking a question,

2    please.

3          MS. DAVIDSON:  Relevance.

4          THE COURT:  I see the question.  I'll sustain the

5    objection to relevance.

6          MS. TUCCI-JARRAF:  Thank you.  I have no further

7    questions.

8          THE COURT:  Thank you.

9          Cross-examination, Mr. Beane?

10                        **CROSS-EXAMINATION**

11   BY MR. BEANE:

12       Q    Mr. O'Malley, you stated earlier with your -- in your

13   cross with Ms. Tucci-Jarraf that you testified that because I

14   had purchased an RV that I was considered to be greedy.  Is

15   that correct?

16       A    I don't think that's exactly what I said.

17       Q    You don't think that's exactly what you said?

18       A    No.  I don't recall using those words.

19       Q    What was it that you said about being greedy?

20       A    I said a lot of the people who were executing this

21   scam were greedy.

22       Q    But you mentioned an RV in that?

23       A    Yeah, yeah, that was the RV that you purchased.

24       Q    So that would allude to the fact that you considered

25   me to be greedy?

UNITED STATES DISTRICT COURT

1      A      You could -- I did not say those words.

2      Q      But you alluded to that?

3      A      If you want to link them, then you can link them, but
4   I did not use those words.

5      Q      Do you know anything about me other than the fact
6   that I purchased those CDs through USAA?

7      A      I know nothing about you, other than that.

8      Q      Thank you.  And are all people who purchase RVs in
9   your eyes greedy?

10     A      No.  The vast majority of them are fine citizens, I'm
11  sure.

12     Q      Have you ever been homeless, Mr. O'Malley?

13     A      I have not.

14     Q      Is it possible that actually I was being wise in
15  purchasing an RV to have a home to call my own for the first
16  time in my life?

17     A      If you used it with your own funds, that would have
18  been fair.

19     Q      Did I -- and if I felt like those funds were mine,
20  would that not be a legitimate reason to purchase the home?

21     A      The funds were used --

22     Q      Just answer the question.

23     A      So repeat the question.

24     Q      If I felt like those funds were legitimately mine,
25  would I be wise in purchasing a home?

UNITED STATES DISTRICT COURT

Sean O'Malley - Cross-Examination

1      A     If those were legitimately your funds, you would be

2   free to use them for any purpose you want.

3      Q     Another question.  You haven't made it very clear

4   just how many people like myself have been arrested out of the

5   tens of thousands who have accessed accounts that they felt

6   like were legitimate.  Could you make that clear to me?

7      A     I don't know the numbers.

8      Q     Are you the fraud investigator?

9      A     So, remember, the Federal Reserve doesn't have

10  jurisdictions over individuals.  That would be the FBI, so --

11  or the local police.

12     Q     Have you made calls to the FBI to have other people

13  arrested?

14     A     I've made calls to the FBI to tell them about the

15  scam so that they could open investigations or that they were

16  at least aware of it, yeah.

17     Q     Could you give us a average number of how many calls

18  you might have made to have people arrested?

19     A     So you're linking the arrest.  What I'm saying is to

20  open an investigation -- so, you know, I don't direct this

21  person to be arrested, that person.  It's -- there is a crime

22  going on, which I want to make sure you are -- you have

23  knowledge of it.  And because of that, you may -- "you" being

24  the FBI -- may want to open up a criminal investigation on it.

25     Q     Are you aware that no one contacted me and asked me

UNITED STATES DISTRICT COURT

Sean O'Malley - Redirect Examination

1    if I felt like these funds were legitimate or not, or are you

2    just assuming that I was scamming?

3         A    As you said before, I know nothing about you or --

4              MR. BEANE:  Right.  Thank you.  No further questions.

5              THE COURT:  Thank you.

6              Any redirect?

7              MS. DAVIDSON:  Yes, Your Honor.

8                        **REDIRECT EXAMINATION**

9    BY MS. DAVIDSON:

10        Q    Okay.  The Treasury deposit accounts, okay, as I

11   understood your testimony, these are the accounts of the United

12   States Treasury?

13        A    I think the term that we -- that was used before was

14   TreasuryDirect.

15        Q    Okay.  But she kept saying Treasury deposit accounts.

16   What are Treasury deposit accounts?

17        A    I don't know if I know that term itself, so --

18        Q    So is that -- that's not a real term?

19        A    Not to my knowledge.

20        Q    Okay.  And so the real term that you told us about,

21   what was that, regarding the securities?  This is how I

22   understood your cross, is -- and, again, they always tell you

23   not to ask a question you don't know the answer to, but here

24   goes.

25              Okay.  The Treasury -- the United States Treasury can

UNITED STATES DISTRICT COURT

1   sell its own securities directly to the United States citizens?

2       A    They can through TreasuryDirect, yeah.

3       Q    Okay.  Through TreasuryDirect.  And then when they

4   sell those securities, they deposit the money that they

5   received from those securities in one of the Federal Reserve

6   Banks?

7       A    I'm sure they do, because the Treasury has their

8   accounts at the Federal Reserve.  I just don't know which

9   Reserve Bank.

10      Q    Okay.  And so in order to -- who controls the money

11  in the Federal Reserve that the Treasury has deposited based on

12  these securities that are purchased by other people?

13      A    So there will be Treasury officials who have the

14  rights and responsibility to direct the Fed to execute

15  financial transactions on their behalf.  So each agency will

16  have people who are authorized to do that.

17      Q    Okay.  And so no individual, like me with my Social

18  Security, do I -- am I authorized to somehow go to the Federal

19  Reserve, even if I have a Treasury deposit or a Treasury

20  security certificate, am I authorized to go get my money

21  directly from a Federal Reserve?

22      A    No.  You --

23      Q    So I would sell my security, isn't that how I would

24  get my money?

25      A    Right.  So you either have your securities with a

                    UNITED STATES DISTRICT COURT

Sean O'Malley - Redirect Examination

1   brokerage account or you would have your securities with

2   TreasuryDirect, which is directly with the Treasury.  And you

3   would request that financial institution to sell your

4   securities, and then they would send you a check or -- if you

5   directed them, possibly you could have a wire transfer sent to

6   your account.

7        Q    Okay.  So you would sell the security that you owned.

8   You couldn't just put in a routing number and pay all your

9   bills?

10       A    That's correct.  That's --

11       Q    Okay.  And so there's a little discussion about the

12  Harvey Dent video.  And you said that you reviewed the Harvey

13  Dent video telling people to pay all their bills?

14       A    Yes, I've seen it.

15       Q    And instructed people to pay their bills.  Is that

16  correct?

17       A    Generally pay your bills, pay your mortgage, pay your

18  car loans, things like that.

19       Q    Did it mention anywhere in there to buy CDs and cash

20  them?

21       A    Not that I'd seen.

22       Q    Okay.  And so in the very essence of the Harvey Dent

23  video, you have to believe somewhere there's a secret account.

24  Is that true?

25       A    That's what he's telling people.

UNITED STATES DISTRICT COURT

Sean O'Malley - Redirect Examination

1    Q    So the secret account that you didn't earn, this

2  mystery account?

3    A    Yes.

4    Q    Okay.  And so you can call the Federal Reserve to see

5  if you have a secret account, can't you?

6    A    Yes, you can.

7    Q    And so do you have to understand ACH transactions to

8  know whether or not you have $31 million?

9    A    I don't believe so, no.

10   Q    And so if you have been informed that your ACH

11 transactions have been returned, is it reasonable to try to

12 leave with your assets that you purchased with those ACH

13 transactions?

14   A    No.  Because that would show that you didn't actually

15 have those funds.

16   Q    Okay.  Do you believe that -- you've seen this video.

17 Do you believe that someone who went to law school and was

18 trained as a lawyer would know how to research whether or not

19 there were secret accounts?

20   A    I would think that they would.  I would think that at

21 least they could call the Federal Reserve.

22   Q    Exactly.  Because it's easily accessible?

23   A    Correct.

24        MS. DAVIDSON:  That's all I have.

25        THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

1        Any recross based upon the redirect?

2        MS. TUCCI-JARRAF:  Yes.

3                    **RECROSS-EXAMINATION**

4   BY MS. TUCCI-JARRAF:

5        Q    Without prejudice, I have a few questions for you,

6   Mr. O'Malley.

7             Ms. Davidson just brought up the TreasuryDirect

8   deposit accounts, and is it a fair statement to say that the

9   people who do the scam incorrectly call them a TDA or

10  TreasuryDirect account?

11       A    I don't know.

12       Q    Okay.  You said that you saw the video, though.

13  Correct?

14       A    I did.  I don't remember that part of it.

15       Q    Okay.  And regarding these secret accounts that

16  Ms. Davidson just questioned you on, what's your understanding

17  as far as these secret accounts?

18       A    There are no secret accounts.

19       Q    Okay.  To the best of your knowledge, is there any

20  commandeered value -- illegally commandeered value?

21       A    I don't understand the question.

22       Q    In those TreasuryDirect deposit accounts that we

23  discussed earlier, is there any illegally commandeered value in

24  those accounts that possibly belong to the people.

25       A    So to make sure we're talking on the same wavelength,

                    UNITED STATES DISTRICT COURT

Sean O'Malley - Recross-Examination

1    the TreasuryDirect accounts that I was talking about are true

2    actual accounts that the Treasury allows people to buy U.S.

3    Treasury securities through the web.  They'll create an account

4    for the individuals.

5           If you're talking about some other TreasuryDirect

6    account related to the videos, then those accounts don't exist.

7    Q    You brought up a good point, because TreasuryDirect

8    accounts are what you described where you can sign up and you

9    can buy directly U.S. securities from the U.S. Treasury?

10   A    Correct.

11   Q    You also -- you and I have both talked about the

12   TreasuryDirect deposit accounts are completely different

13   account with the U.S. Treasury?

14   A    Okay.  So I don't -- if I understood when we were

15   talking initially that if you were saying that if somebody

16   wanted to buy U.S. Treasury securities through TreasuryDirect,

17   that they would send a check in and then that check would be

18   negotiated at a Federal Reserve, and it would be put in an

19   account for the U.S. Treasury.

20          I thought that that's what we were talking about.  So

21   if you thought I was talking about something differently, then

22   we should explore it.

23   Q    Okay.  Well, then, that was the -- I think that's

24   where the issue may be.  I'm not talking about TreasuryDirect

25   accounts, which is what you've just described?

UNITED STATES DISTRICT COURT

1     A     Right.

2     Q     I was talking about TreasuryDirect deposit accounts.

3     A     And if it was referenced in the Harvey Dent video,

4  then no such accounts exist, so I don't --

5     Q     No.  TreasuryDirect deposit accounts were not

6  discussed in that video.  He was talking about TreasuryDirect

7  accounts, which are a completely different thing, and then,

8  yes, there would be some kind of fraud.  But an average

9  individual wouldn't know that, would they?

10    A     Frankly, I'm very confused.  It sounds, to me, like

11 you're talking about the same term for two different types of

12 transactions.  So I -- we need to clarify.

13    Q     Okay.  TreasuryDirect account is what you've just

14 described multiple times, which apparently was what we were

15 talking about yesterday when I thought we were talking about

16 something different.

17    A     Okay.  So we'll keep that to the side.

18    Q     Okay.  TreasuryDirect accounts exist.  Correct?

19    A     The ones that I described exist, yes.

20    Q     Okay.  Is there such a thing called TreasuryDirect

21 deposit account?

22    A     If it's not -- if it's not the same TreasuryDirect

23 that I'm talking about, then, no, I have no knowledge of those

24 such accounts.

25          MS. TUCCI-JARRAF:  I'm just going to check to see if

                     UNITED STATES DISTRICT COURT

1  there's anything further.  I don't think I have anything

2  further, Mr. O'Malley.  Thank you very much.

3          THE COURT:  Thank you, Ms. Tucci-Jarraf.

4          Mr. Beane, anything further on recross in response to

5  the redirect?

6                      **RECROSS-EXAMINATION**

7  BY MR. BEANE:

8      Q    Mr. O'Malley, have you ever heard the term "straw man

9  account"?

10     A    Yes.

11     Q    Could you define that term for us?

12     A    I believe typically that would be where somebody

13 would open an account in their name, but with the understanding

14 that the true beneficiary, ultimate beneficiary is somebody

15 else.

16     Q    Thank you.  Have you ever heard of the Cestui Que

17 Trust.  I can spell that if you need.

18          MS. DAVIDSON:  Objection, Your Honor.  Relevance.

19          THE COURT:  What's the relevance, Mr. Beane, to that

20 question?

21          MR. BEANE:  The Cestui Que Trust?

22          THE COURT:  What's the relevance of asking him about

23 that trust?  I don't recall that it came up in redirect at all.

24          MR. BEANE:  I was asking if he heard of the trust,

25 because it's a trust account that's supposedly held within the

                    UNITED STATES DISTRICT COURT

Sean O'Malley - Recross-Examination

1   Federal Reserve System.

2           THE COURT:  I'll go ahead and let him ask the

3   question.  I'll overrule the objection.

4           THE WITNESS:  I've never heard of such account.

5   BY MR. BEANE:

6       Q    The Cestui Que Trust, you've never heard of?

7       A    No.

8       Q    Have you ever heard of the accounts being linked to

9   the birth certificates of American citizens?

10      A    I know that that folklore was in the Harvey Dent

11  videos, but that's not accurate.

12      Q    That's folklore?

13      A    Yeah.  It's false.

14          MR. BEANE:  Thank you very much.

15          THE COURT:  Thank you.

16          Mr. O'Malley, you may be excused.

17          THE WITNESS:  Thank you.

18          THE COURT:  Government may call its next witness.

19          MS. SVOLTO:  The government Calls Dwayne Griffith.

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    WHEREUPON,

2                        **DWAYNE GRIFFITH,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                        **DIRECT EXAMINATION**

6              THE COURTROOM DEPUTY:  Have a seat.  If you can scoot

7    up close.  Please state and spell your name for the record.

8              THE WITNESS:  I'm sorry?

9              THE COURTROOM DEPUTY:  State and spell your name for

10   the record.

11             THE WITNESS:  Dwayne Griffith.  D-w-a-y-n-e,

12   G-r-i-f-f-i-t-h.

13             THE COURTROOM DEPUTY:  Thank you, sir.

14   BY MS. SVOLTO:

15        Q    Good morning, Mr. Griffith.  Could you give us some

16   background information about yourself.  Where do you work?

17        A    Ted Russell Ford.

18        Q    And where is Ted Russell Ford located?

19        A    Here in Knoxville.

20        Q    And what do you do there?

21        A    I'm the general sales manager.

22        Q    And what sort of job duties do you have as the

23   general sales manager?

24        A    Overseeing the day-to-day activity as far as the

25   sales side.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    And how long have you been doing that?

2    A    A year and a half.

3    Q    And have you been in sales long?

4    A    26 years.

5    Q    And were you working at Ted Russell Ford in July of

6    2017?

7    A    Yes.

8    Q    And were you working as the general sales manager

9    then as well?

10   A    Yes.

11   Q    Are you familiar with a Randall Beane?

12   A    Yes.

13   Q    And could you describe how you became familiar with

14   him?

15   A    He purchased a truck at that time.

16   Q    And when was that?

17   A    In July.

18   Q    Of 2017?

19   A    Yes.

20   Q    And can you describe that purchase?

21   A    He purchased a 2017 or a new Super Duty King Ranch

22   pickup.

23   Q    And what color was that?

24   A    It's called ruby red.  It's kind of a cranberry

25   color.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    Do you know what day that was?

2    A    I don't recall the actual day.

3    Q    All right.  And do you recall the -- how much the

4    truck was?

5    A    It was over 80,000.

6    Q    All right.  I'd like to show just the witness and the

7    defendants the Government's collective Exhibit 133.  And then

8    that's 133A.  We're going to flip through these real quick.

9    I'm going to ask you if you recognize what these documents are.

10   A    Okay.

11   Q    Do you recognize this document?

12   A    Yes.  This is our buyer's order.

13   Q    You can just tell me if you recognize it first.

14   Thanks.

15        All right.  133B, please.

16        And you recognize this document?

17   A    Yes.

18   Q    C?

19   A    Yes.

20   Q    Keep going.

21        And D?

22   A    Yes.

23   Q    E?

24   A    Yes.

25   Q    F?

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1      A    Yes.

2      Q    G?

3      A    Yes.

4      Q    H?

5      A    Yes.

6      Q    I?

7      A    Yes.

8      Q    K?

9      A    Yes.

10     Q    L -- I'm sorry, did I say 133J, please?  You've

11  reviewed that.

12          All right.  And then K and L also?

13     A    Yes.  I --

14     Q    Then I'm going to go -- M?

15     A    Yes.

16     Q    And then N?

17     A    Yes.

18     Q    O?

19     A    Yes.

20     Q    And P?

21     A    Yes.

22     Q    And I'd like to also show the witness Exhibit 134.

23     A    Yes.

24     Q    All right.  And are you aware of the recording

25  practices at Ted Russell, a custodian of records at Ted

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Russell?

2        A    Am I aware of them?

3        Q    Yeah.  Of the practices of custodian of records at

4    Ted Russell Ford?

5        A    Yes.

6        Q    Are you familiar with the business recordkeeping

7    practices there?

8        A    Yes.

9        Q    And so are these records records that are kept in the

10   ordinary course of business at Ted Russell?

11       A    Yes.

12       Q    And were they kept at or near the time of the events

13   as they occur?

14       A    Yes.

15       Q    Kept by someone with knowledge of the events?

16       A    Yes.

17            MS. SVOLTO:  I'd like to move to admit Government's

18   collective Exhibit 133A through P and Exhibit 134.

19            THE COURT:  So admitted.

20       (Government's Exhibits 133A through P and 134 admitted

21   into evidence.)

22   BY MS. SVOLTO:

23       Q    All right.  I'd like to turn your attention to

24   Government Exhibit 133A.

25            If you could, expand the buyer name and address.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1          All right.  So, first, what is this document?

2     A    This was our buyer's order.

3     Q    A buyer's order.  And what is a buyer's order?

4     A    It tells us and the customer what they are purchasing

5  and where the vehicle is to be titled, whose name it's going

6  in.

7     Q    Are those prepared on the date the sale is made?

8     A    Yes.

9     Q    And so it signifies the date on those sales, on the

10  buyer's order?

11    A    Yes.

12    Q    And what's the date on here?

13    A    July 6th.

14    Q    And so is that the date that the sale went through?

15    A    Yes.

16    Q    Okay.  And the buyer name and address is the buyer of

17  the vehicle?

18    A    Yes.

19    Q    And so the buyer's name there is what?

20    A    Randall K. Beane.

21    Q    And it shows the address and e-mail address.

22  Correct?

23    A    It does.

24    Q    And a phone number?

25    A    Yes.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1      Q     And is this information provided to Ted Russell Ford

2 by the purchaser?

3      A     Yes.

4      Q     And who is it provided to?  Is it provided to a

5 salesperson?

6      A     To a salesperson.

7      Q     Okay.  And if you could expand out, zoom out again,

8 please.

9            And so on the buyer's order, does it outline all the

10 terms of the agreement?

11     A     Yes.

12     Q     All right.  Could you expand the right column.

13           And so what are the terms of this agreement?

14     A     Mr. Beane was purchasing the vehicle for $80,510.86.

15 Do you want -- are you wanting me to go down through this?

16     Q     No.  You do not have to go down through it.  So what

17 was the final, at least -- can we get to the final total, is

18 that it at the bottom there?

19           Okay.  So, then, does it indicate whether there are

20 any financing options on this page?

21     A     No.  There was no financing.

22     Q     Okay.  And so does that mean that the buyer purchased

23 with cash?

24     A     Correct.

25     Q     And so do you remember Mr. Beane when he came into

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1   the dealership that day?

2       A    Yes.

3       Q    And was there anything unusual about the transaction

4   to you?

5       A    The only thing that struck me odd that particular day

6   was the salesperson came to me and was excited.  It was one of

7   her first sales, and she said that Mr. Beane had purchased the

8   vehicle for the window price or sticker price, which is

9   somewhat odd.  Normally, people negotiate something there.  So

10  it happens occasionally, but in today's world with the

11  Internet, we negotiate most every deal.

12      Q    And so, then, Mr. Beane purchased the vehicle for

13  sticker price?

14      A    Yes.

15      Q    All right.  And can we go to Page 2 of 133A.  All

16  right.  So on Page 2, if you could go to the middle of the

17  page, and all the way over to the end.

18           All right.  So does it indicate the buyer's initials

19  there?

20      A    Yes.

21      Q    And so that's the purchaser of the vehicle.  Correct?

22      A    Yes.

23      Q    And there it has the total amount for the balance on

24  the vehicle?

25      A    Yes.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    And that's the total amount paid?

2    A    Yes.

3    Q    Okay.  All right.  So can you read the balance due

4  there, please?

5    A    It's hard to read on here.  But I believe it's

6  $86,153.93.

7    Q    All right.  And do you recall whether Mr. Beane spent

8  a long time searching for a vehicle?

9    A    I don't recall that.

10   Q    Okay.  And so if we could look at 133B.

11        All right.  And what is this exhibit?

12   A    This is the title application.

13   Q    And what is the purpose of the title application?

14   A    So that our accounting group can go to the courthouse

15  and title it into this customer's name and address.

16   Q    All right.  And could we focus on the name there.

17  Okay.  And does it also give an address?

18        I'm sorry.  Could you state what the name is there?

19   A    Randall K. Beane.

20   Q    And there's an address.  What is that?

21   A    300 State Street, Apartment 365.

22   Q    All right.  And is that in Knoxville?

23   A    Knoxville, Tennessee 37902.

24   Q    Okay.  Is this document produced with information

25  provided by the buyer?

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1      A     Yes.

2      Q     And so the last name you just read, that was the

3   buyer.  Correct?

4      A     Yes.

5      Q     Is there a signature on this document as well?

6      A     Yes.

7      Q     Can we expand on that.

8            Does that appear to be the signature of the buyer

9   here?

10     A     Yes.

11     Q     Okay.  And what was the date of this?

12     A     July 6th, 2017.

13     Q     All right.  Could we go to 133C.

14           All right.  What's this document?

15     A     This is an odometer statement.

16     Q     And are these documents that are typically provided

17  at every sale?

18     A     Yes.

19     Q     And with information provided to the salesperson or

20  personnel at Ted Russell Ford?

21     A     I don't understand your question.

22     Q     Is it -- are these documents created with information

23  provided to the salesperson by the buyer, such as --

24     A     The names and addresses, yes.  The odometer would be

25  the salesperson.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    All right.  And so this is done in every case?

2    A    Yes.

3    Q    All right.  Can we go to 133D, please.

4         All right.  And what is this document?

5    A    This is a power of attorney allowing one of our

6    people from the store to do the title work without the customer

7    being present at the courthouse.

8    Q    Is that pretty common to do that?

9    A    Yes.

10   Q    Was there anything particularly unusual about the

11   title in this case?

12   A    No, not -- I don't think so.  Not at this point.

13   Q    Okay.  And at any point during your dealings with

14   Mr. Beane, was there anything unusual?

15   A    At one point, we stopped the sale, because he wanted

16   to change the way he wanted it titled.

17   Q    Okay.  And do you recall when that was?

18   A    That was three or four days later, probably, two to

19   three days later.  He said that his attorney would get in touch

20   with us in order to give us the way it needed to be titled.

21   Q    And so if -- did he describe how it needed to be

22   titled?

23   A    Not at that point.

24   Q    Okay.  Did he at a later point describe how it needed

25   to be titled?

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1       A    He did not, no.

2       Q    Okay.  So --

3       A    He did say that it was going to be in a trust.  He

4   did not tell me any more than that.  I was to talk to -- with

5   his attorney for the rest.

6       Q    And did you talk to an attorney about that?

7       A    Yes.

8       Q    Who was that?

9       A    Someone named Heather Tucci.

10      Q    And what did that -- so you had a discussion with

11  Heather Tucci?

12      A    A phone --

13      Q    Phone call?

14      A    -- conversation.

15      Q    What was the phone call regarding?

16      A    That they were going to change from doing a -- paying

17  with check to paying with a wire transfer of the money, and

18  that Mr. Beane was going to change the way -- or they were

19  going to change the way that they titled the vehicle.

20      Q    Okay.  So, initially, how was Mr. Beane planning on

21  paying for the vehicle?

22      A    He wrote a check.

23      Q    And could we go to Government's Exhibit 134, please.

24           Do you recognize this document?

25      A    Yes.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    And what is it, please?

2    A    It is the check that he wrote that day.

3    Q    All right.  And is it made out to Ted Russell?

4    A    It is.

5    Q    And could we focus on the name and address line there

6    on the top left-hand corner?

7    A    Randall Keith Beane, 300 State Street, Apartment 365,

8    Knoxville, Tennessee 37902.

9    Q    All right.  And so it was for the -- and then the --

10   the bank that this check is drawn from, can we focus on that

11   and highlight that, please.  And what bank is that?

12   A    USAA Federal Savings Bank.

13   Q    All right.  And so when Mr. Beane gave Ted Russell --

14   or Ted Russell Ford this check, what happened after that?

15   A    He, of course, did the paperwork that we've seen, and

16   then our finance manager would call the lender or the bank and

17   verify funds, which we did do.

18   Q    Okay.  Was that all done on what date?

19   A    That would have been done the same day.

20   Q    Okay.

21   A    July 6th.

22   Q    And so after the finance manager called, you said he

23   called and verified funds?

24   A    Yes.

25   Q    Who does he call to do that?

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    A    He would call USAA.

2    Q    Okay.  And is the check then immediately deposited?

3    A    No.  We put it into a deposit with our accounting

4    group and they'll drop it off at a certain point.

5    Q    So did Ted Russell ever cash this check?

6    A    No, we did not.

7    Q    Okay.  So what happened?

8    A    A day or two, I don't recall, I'm a little foggy on

9    that, but Mr. Beane came in and asked for an MSO.  And I

10   explained to him that we don't give out MSOs.

11   Q    Could you tell us what an MSO is?

12   A    It's a manufacturer's statement of origin.

13   Q    And so what does that mean?

14   A    When a vehicle is built at the factory, it does not

15   have a title.  It has an MSO.  The reason being is they do --

16   the factory has no idea where that vehicle will be titled.  So

17   when they send Ted Russell a vehicle, I may sell the vehicle in

18   Virginia or North Carolina, Tennessee, so it comes with an MSO,

19   and that is changed into a title once --

20   Q    So do -- I'm sorry.

21   A    -- once it's sold to that customer at that address.

22   Q    So do individuals usually request an MSO when they

23   purchase a vehicle?

24   A    No.  I felt that was a little odd, just because I've

25   done this about 26 years, in management about 24, and I've

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    never had a customer ask me for an MSO.

2        Q    And so once he asked you for an MSO, what happened?

3        A    I explained to him that we don't do anything with an

4    MSO until we actually have the funding and the deal is finished

5    with funds in the house, and he seemed to accept that.

6            Came back the next day and asked about the MSO again,

7    and, again, we had the same similar conversation.  And then,

8    again, time frame, I'm not really a hundred percent, but at one

9    point, he came back and said that his attorney had advised him

10   to cancel that check so that they could in turn wire the money

11   and change the title work.

12       Q    And so did you do that?

13       A    I held onto the check and all the paperwork, and he

14   had given me a time frame on that following Monday to contact

15   his attorney.

16       Q    Okay.  So after the discussion about the MSO, did --

17   if -- did you discuss with if there -- if you had turned over

18   the MSO to the individual, would there be any resource for Ted

19   Russell if they had the MSO and the vehicle?

20       A    No.  Once a MSO is given out, they could -- they

21   could title it anywhere they wanted to.

22       Q    And is that why -- why you don't typically give out

23   MSOs?

24       A    MSOs do not leave without funding.  I've never known

25   us to give an MSO to a customer at all.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    Thank you.  So after that, was there any other

2    interaction with Mr. Beane?

3    A    He tried to leave the truck that day.

4    Q    To leave -- I'm sorry, to leave the truck with Ted

5    Russell?

6    A    To leave the truck there.  He did.  And because I had

7    had someone tell me the funds were good, for customer service

8    reasons, I told him to go ahead and hold onto the truck, and we

9    would get with his attorney Monday and finish out how we needed

10   to do it.

11   Q    Is that something that Ted Russell would typically

12   do?

13   A    We do that quite often.

14   Q    All right.  So did anything happen after that?

15   A    He did bring the vehicle back.  I believe it was on

16   Monday and left the keys, and said that when I got time to talk

17   with her, his attorney, that she would give me all the

18   information that I needed and he would be back.  He had to

19   leave town, and he would be back later on to pick up the

20   vehicle and finish it up.

21   Q    Okay.  And before returning the vehicle, did you

22   become aware of any issues with the check or any issues with

23   the transaction?

24   A    No.  It was -- it was more after that, I think, when

25   I was talking with the attorney.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    Okay.  And do you recall when that was?

2    A    That would have been -- if I remember right, he gave

3    me the block of time between 10 and 11 that Monday to call.

4    Q    And so who -- who gave you that block of time to

5    call?

6    A    Can I back up just a second?  He did return the truck

7    after I had spoke to the attorney.  I apologize.  Thinking

8    back, he did return it after that.

9    Q    Okay.  So before the truck was returned to Ted

10   Russell, you had a conversation with an attorney?

11   A    Yes.

12   Q    And, again, who was that?

13   A    Heather Tucci.

14   Q    And do you recall maybe what date that was?

15   A    That would have been Monday.

16   Q    Okay.  So Monday after the 6th?

17   A    Yes.

18   Q    Okay.  And so were there any steps you took

19   particularly after that phone call?

20   A    During the phone call, the one thing that stood out

21   with Ms. Tucci was, there was a comment made -- exactly word

22   for word, I don't recall how it -- but the comment was made

23   that Mr. Beane would be back in touch.  He was good for the

24   money.  And there was a -- there was a dollar figure that she

25   gave.  He has, and I'm going to use the word 6 million --

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    $6 million -- oh, wait, just a minute, no, he just purchased a

2    motor home that was 600,000.  Again, the number may be off a

3    little bit.  So he's down a little bit from the 6 million or

4    whatever.

5            And my thought there was, I just can't imagine an

6    attorney volunteering that information when it really didn't

7    have anything to do with me.  The 86,000 was all I was worried

8    about.

9            And so after that, I got off the -- at one point, he

10   had -- Mr. Beane had come in and said he had bought that motor

11   home, and it was during one of those times where he was asking

12   about an MSO, that he had a folder in his hand, and showed me

13   that Buddy Gregg had given him an MSO to the RV or motor home.

14           And so when I got done with the call from the

15   attorney, being after those comments that were made, I called

16   Buddy Gregg and just said, "Hey, is this -- is this gentleman

17   real?"  You know, there was some issue there.

18           I had also, and I don't recall if it was before I

19   called Buddy or not, but I did call USAA, because I got to

20   looking at the check, and the address -- I did finance for

21   several years, so I did a lot with USAA.  The address looked

22   correct, but the phone number did not.  So I decided to call

23   the phone number and reverify funds.

24           And when I called, whoever I spoke with really didn't

25   give good answers, and it was like they were fumbling around.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1   So I looked up -- Googled the number that I was more familiar

2   with in doing finance before.

3           I called that number, and that person told me that

4   the funds were not there, they were no longer there or it

5   wasn't good.  So that's when I called Buddy Gregg to see if --

6   and they said that everything was fine there.

7           So getting off the phone, I really didn't know what

8   to think at that point.

9       Q    So at this point, did Ted Russell Ford have the

10  truck?

11      A    Yes.  We got the truck that day.

12      Q    That day, but at the time that you were -- you called

13  USAA --

14      A    No, I had to -- I got off the phone and was a little

15  worried, because I had given the truck back out after he had

16  told me he canceled the check.  So I drove to where he was

17  supposed to reside, and the truck was there.  It was fine.

18          So I went back to the store, that was probably

19  midday, and tried to reach him by phone and was not able to do

20  that.  So after three or four hours, I again drove by the

21  residence one more time, and the truck was there.  It was fine.

22  And then not long after that, I got the truck back.

23      Q    And so -- and that was the day he came back and

24  said -- and did he -- did he tell you why he was returning the

25  truck exactly?

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    A    Just said that once we got all the things worked out

2  with Ms. Tucci and the titling and the wire, that he would be

3  back to get the vehicle.  He had some business out of town.

4    Q    Okay.  Thank you.  Did he discuss purchasing anything

5  else at Ted Russell Ford?

6    A    Yes.  At one point -- well, the first day he was

7  there, at some point said that he wanted a blue truck just

8  exactly the same way, the same options on the truck for his

9  brother.  He was going to purchase one for his brother, which

10  was -- again, we don't see that very often.  It's a little odd.

11    Q    Okay.  So after the truck is returned to Ted Russell,

12  what happens next?

13    A    We wait for a few -- for a day or two, still wasn't

14  able to reach him.  So with knowing that the funds were no

15  longer available on the check, we just put the vehicle back out

16  for sale.

17    Q    Okay.  And I'd like to show for the witness and

18  defense only previously marked Exhibit 135.

19         Do you recognize this document?

20    A    Yes.

21    Q    And that's 135-1.  And could we show the witness and

22  defense Government's Exhibit 135-2.

23         And do you recognize that?

24    A    Yes.

25    Q    And are these -- is -- excuse me.  Is 135-1 and 135-2

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    records that are commonly kept by Ted Russell?

2        A    This was the deal folder that all the other paperwork

3    would be in and filed away.

4        Q    Okay.  And --

5        A    This is the front of that folder.

6        Q    Are those folders part of the documents that are kept

7    in the regular course of business?

8        A    Yes.

9        Q    And would it have been kept at or near the time the

10   events occurred?

11       A    Yes.

12       Q    And kept by someone in the business of -- excuse me,

13   someone with knowledge of the records?

14       A    Yes.

15       Q    And is this actually a -- is this the actual document

16   or a photograph of the document?

17       A    Well, it's the actual document.

18            MS. SVOLTO:  Okay.  So at this time, we'd like to

19   move to admit Government's collective Exhibit 135, 135-1, and

20   135-2.

21            THE COURT:  So admitted.

22       (Government's Exhibits 135, 135-1, 135-2 admitted into

23   evidence.)

24   BY MS. SVOLTO:

25       Q    Could we go to 35-1, please.  If we could zoom in to

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    this area circled there.  So this folder is -- was for which

2    transaction here?

3        A    The one we've been talking about.

4        Q    Okay.  And so -- so that's the buyer's name there?

5        A    Yes.

6        Q    And what's the name?

7        A    Randy Beane.

8        Q    And gives an address as well?

9        A    300 State Street.

10       Q    And is that the same address you went to looking for

11   the truck?

12       A    Yes.

13       Q    Okay.  All right.  Could you zoom back out, please?

14            All right.  There's clearly some notes on there.

15   Could you describe what those notes mean and who -- who made

16   them?

17       A    The ones to the left there are the way his attorney

18   wanted -- was telling me that it was going to be titled,

19   Randall Keith Beane Duly Factualized.

20       Q    Is that on the left side there?

21       A    That's on the left side there.

22       Q    Okay.

23       A    And then the -- in the center there, it says "changed

24   to trust," and Heather Jarraf, and then her phone number is

25   there.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    Q    Okay.  And what's the phone number there?

2    A    (253) 241-2008.

3    Q    Okay.  Thank you.  And so the writing in the middle

4    in purple, what's that say?

5    A    "Dead Deal."

6    Q    What does that indicate to you?

7    A    When we unwind it due to nonpayment or any other

8    reason, we will label it a dead deal and file it away.

9    Q    Okay.  And could we go to 135-2, please, just for a

10   second.  Is this the same document that we were just looking

11   at?

12   A    Yes.

13   Q    So it's -- it's just a different part of 35-1?

14   A    Yes.

15   Q    And so could we, yeah, highlight that or zoom in a

16   little bit.

17        So that's what you were describing earlier.  Is that

18   correct?

19   A    Yes.

20   Q    And so, again, this was -- notation was based on

21   what?

22   A    My conversation with the attorney.

23   Q    Okay.  So did you write that note?

24   A    Yes.  That's my handwriting.

25   Q    Okay.  Thanks.  If we could now go to -- so -- go

UNITED STATES DISTRICT COURT

Dwayne Griffith - Direct Examination

1    back to 133A, please.

2           And so the -- when the deal was unwound, when exactly

3    was that roughly?

4           A    In my opinion, it was really the day that he brought

5    the truck back.

6           Q    Okay.  So after -- that was after the phone call --

7           A    Uh-huh.

8           Q    -- with the attorney?

9           A    Right.

10          Q    Okay.  And so did you ever prepare any documents in a

11   trust?

12          A    We did not.

13          Q    Did you give -- ever get any trust documents?

14          A    We did not.

15          Q    Just a second, please.  I'd like to show for the

16   witness and defense only Government's Exhibit 132.  The

17   Government's collective Exhibit 132-1 and dash 2.  Do you

18   recognize this?

19          A    Yes.  It's one of our trucks.

20          Q    Okay.  And could you show it to -- 132-2.

21               Is that the same?

22          A    Yes.  It's the same truck, very similar to the one he

23   was purchasing.

24          Q    Okay.  And is this a photograph?

25          A    Yes.

UNITED STATES DISTRICT COURT

1    Q    And is it an accurate reflection of -- of that truck?

2    A    Yes.

3         MS. SVOLTO:  I'd like to ask that Government's

4    collective Exhibit 132-1, dash 2 be admitted.

5         THE COURT:  So admitted.

6      (Government's Exhibits 132-1 and 132-2 admitted into

7    evidence.)

8    BY MS. SVOLTO:

9    Q    If we could go to 132-1.  So is this -- this is one

10   of the trucks?

11   A    Yeah.

12   Q    At your -- and is it the same kind of truck that

13   Mr. Beane purchased?

14   A    It's very similar, yes.

15   Q    And is that ruby red color --

16   A    Yes.

17   Q    -- that you're describing?  And if we could show

18   132-2.  Okay.  Thank you.

19        If I could have just one second, please, Your Honor.

20        THE COURT:  Yes.

21        MS. SVOLTO:  I have no other questions.

22        THE COURT:  Thank you.

23        Cross-examination, Mr. Beane?

24        MR. BEANE:  Yes.

25

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

**CROSS-EXAMINATION**

1

BY MR. BEANE:

2

    Q    Hello, Mr. Griffith.

3

    A    Hello.

4

    Q    Were you aware that I sold Ford vehicles for several

5

years?

6

    A    I don't recall that, no.

7

    Q    And you testified that Taylor was a new salesman?

8

    A    Yes.

9

    Q    Is it possible that because I'd been in the sales

10

business for that many years, that I knew how it would feel to

11

purchase a vehicle at full sticker price to boost the morale of

12

a new salesman, especially as -- one as eager to help someone

13

as Taylor was?

14

    A    I didn't catch the question of that.

15

    Q    Because I'd been in the sales business --

16

    A    Right.

17

    Q    -- would it be possible that because I understood

18

what it felt like to -- for a customer to come in and purchase

19

a vehicle at sales price, which had happened to me before, how

20

it would boost a new salesman's morale?

21

    A    Yes.

22

    Q    Is it possible?  Have you ever had someone buy a

23

vehicle at sticker price when you were new in sales?

24

    A    I'm sure that I did.  It's been many years ago.

25

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    Q    Yeah.  So it's not that uncommon?

2    A    It is uncommon, but it does happen.

3    Q    Right.  Are you aware that there's a gentleman in

4   this room that I was introduced to that was considered to be a

5   manager at Ted Russell Ford?

6    A    In here?

7    Q    Yes, sir.  This gentleman right back here with the

8   orange and blue tie on?

9         MR. PACK:  Pink today.

10  BY MR. BEANE:

11   Q    Pink.

12   A    I was not aware of that.

13   Q    You're not aware of that.  He was sitting in the

14  manager's booth and introduced to me as a sales -- as a sales

15  manager, when he's actually an FBI agent?

16   A    I -- I was not aware of that at all.

17   Q    Okay.  And you alluded to the discussion that you and

18  I had the day I dropped the truck off, as I was walking out the

19  door, I talked to you about where I was heading out of town to

20  take care of business.  Do you remember where I was telling you

21  I was going?

22   A    If I remember right, it was Texas, I believe.

23   Q    Yes, sir.  To the USAA Bank.  Correct?  To take

24  care --

25   A    That is correct.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    Q    Oh, and on the -- on the check that was written, too,
2    you said there was a number that was fake.  What number was
3    that?
4    A    I didn't say fake.  It's one I didn't recognize.
5    Q    A number you didn't recognize?
6    A    Didn't recognize.
7    Q    What number are you referring to?
8    A    It's not here in front of me.
9    Q    Can we have the exhibit for the check.
10         What number is it that you do not recognize.  Could
11   you point that out, please?
12   A    The (210) 456-8000.
13   Q    Where is that at?
14   A    It's there with USAA, right underneath San Antonio.
15   Q    We have a USAA employee in here, I don't know if --
16   can we --
17         THE COURT:  Ask questions of this witness.
18   BY MR. BEANE:
19   Q    These checks were sent to me by USAA.  I don't know
20   if the check could have been --
21   A    I don't know either.  It's just one I didn't
22   recognize.
23   Q    Okay.  So it's just -- it's not that it's fake.  It's
24   just that you didn't recognize the number?
25   A    Correct.  I didn't recognize the number.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    Q    Okay.  All right.  I just wanted to clarify that.

2         And as far as you were concerned, was the truck

3    brought back in good repair and clear?

4    A    Yes.  It was fine.

5         MR. BEANE:  All right.  Thank you very much.

6         THE COURT:  Thank you.

7         Ms. Tucci-Jarraf, any cross-examination?

8         MS. TUCCI-JARRAF:  Yes.

9                    **CROSS-EXAMINATION**

10   BY MS. TUCCI-JARRAF:

11   Q    Without prejudice, I have a few questions for you.

12   A    Okay.

13   Q    Mr. Griffith, I just wanted to really kind of go over

14   dates of when something happened.  That wasn't very clear going

15   through.  I'm going to show us a calendar here.

16   A    Okay.

17   Q    Should be on your screen, just so that we -- I can

18   figure out which dates you were talking about that certain

19   events happened on, and that's -- that's the primary part of my

20   cross here.

21        So you had stated that on January 6th, Mr. Beane had

22   come in to purchase a red truck?

23   A    Yes.

24   Q    Okay.  So it was January 6th?

25        MS. DAVIDSON:  July.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    BY MS. TUCCI-JARRAF:

2        Q    I mean, excuse me, July 6th.

3        A    July 6th, yes.

4        Q    2017.

5        A    I'm sorry, yes, July 6th.

6        Q    I think I initiated the error there.

7             Okay.  And then you stated that -- you stated that

8    Randall Beane had tried to leave the truck with you after

9    the -- all the paperwork was done?

10       A    Yes.

11       Q    And that was still on July 6th?

12       A    No.  I -- I think that -- and I'm a little foggy on

13   it.  But I think it was on Saturday that he did that, which

14   would have been the 8th.

15       Q    July 8th?

16       A    Uh-huh.

17       Q    July 8th is the day he tried to leave the truck with

18   you?

19       A    Yes.

20       Q    And you told him he could take it?

21       A    Yes.

22       Q    Okay.  And you said that he returned the vehicle to

23   the dealership and that was after we had had a conversation.

24   What date do you remember him returning the vehicle?

25       A    I want to say it was Monday, because that was the day

UNITED STATES DISTRICT COURT

1    that you and I --

2         Q    Talked?

3         A    -- had spoke.

4         Q    Okay.  So July 10th?

5         A    Uh-huh.

6         Q    And that was the date I remember that you and I had

7    spoke, too, was July 10th.

8         A    Okay.

9         Q    I think it was mid-morning or something like that.

10        A    The block of time he told me to call was between 10

11   and 11.

12        Q    10 and 11?

13        A    Yes.

14        Q    Thank you.

15        A    So it had to be between that time.

16        Q    And that was Eastern Standard Time.  Correct?

17        A    Yes.

18        Q    Yeah.  Okay.  So on July 10th between 10 and 11, you

19   and I did speak --

20        A    Yes.

21        Q    -- on the phone.  I don't remember who initiated the

22   call.  Actually, I think you called me.

23        A    I called you.

24        Q    You called me.

25             And at that time, you indicated to me Randall had the

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    truck?

2         A    Yes.

3         Q    In his possession?

4         A    Yes.

5         Q    And I asked you to clarify, because he was at the

6    dealership with you when we were speaking.  Is that correct?

7    Or was he off --

8         A    No.  He was not there when you and I were speaking.

9         Q    Okay.

10        A    I don't recall him being there.  I don't think he

11   was, no.

12        Q    Okay.  I do recall that you had said that he had it

13   in his possession?

14        A    Yes.  Yes.

15        Q    Okay.  So that's correct.

16             Okay.  And then I had asked if he had already paid

17   for the truck, and you said he had a check there.  Correct?

18        A    He had written a check, but he had canceled it before

19   I called you, is what he had told me.

20        Q    Right.  That he had canceled the check?

21        A    Uh-huh.

22        Q    And I had asked you to tell me who was the listed

23   purchaser, what was the name of the listed purchaser on there?

24        A    You may have.  I don't recall that.

25        Q    Okay.  And that I had told you that the listed

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    purchaser should not be Randall Keith Beane, but Randall Keith

2    Beane Factualized Trust?

3         A    Duly Factualized Trust.

4         Q    It was Randall Keith Beane Duly Factualized Trust?

5         A    Yes.

6         Q    And that was on the 10th as well during our

7    conversation?

8         A    Yes.

9         Q    And during our conversation, I told you that I had --

10   was the lawyer for the factualized trust and its trustee, who

11   was Randall Keith Beane?

12        A    I think you said you were his attorney.  I don't know

13   that you went into depth.

14        Q    Your recall is I actually used the word "attorney"?

15        A    Yes.

16        Q    And your claim is that I divulged private information

17   about Mr. Beane's financial information to you --

18        A    Yes.

19        Q    -- on that call?

20        A    Yes.

21        Q    And what was it again that I divulged?

22        A    The numbers may be off a little bit, but there was a

23   comment of somewhere, Mr. Beane had $6 million, oh, wait, just

24   a moment, he bought a motor home for 600,000, so he's less

25   that, so something to that effect.

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1      Q    And, in fact, on that call that we were on, it was a

2  conference call with Mr. Beane.  Isn't that correct?  Mr. Beane

3  was on the phone with you and I at the same time?

4      A    I don't recall that.

5      Q    And on that phone call, I confirmed with Randy that

6  he had the truck, and I asked him where he had it while we were

7  on that phone call?

8      A    I really don't recall that.

9      Q    And he actually stated to us on the phone call that

10 it was at his apartment complex?

11     A    I don't recall him being on the conversation at all.

12     Q    You said you had drove by, which would have been on

13 July 10th, drove by his apartment complex and did in fact see

14 that it was at his apartment complex?

15     A    It was.  It was there.

16     Q    And that I did say that since there was a canceled

17 check and he had the property, that he needed to return the

18 property to you to protect your interest as well as his

19 interest?

20     A    That's what he told me that you had --

21     Q    I actually stated to you on the phone call and

22 confirmed with him --

23     A    Again --

24     Q    -- that he needed to return the property, and you

25 said that's fine, and that there would be extra paperwork?

Dwayne Griffith - Cross-Examination

1    A    I don't recall him being on the phone.

2    Q    Okay.  And that on that particular call, you had

3  asked me if he was going to reissue a check.

4         I said, "I don't know.  That's up to Mr. Beane,"

5  Mr. Beane's decision of whether he would write a check or

6  whether he would do a wire.  That's not my call to make.

7    A    Okay.  Again, I don't recall him being on the line at

8  all.

9    Q    I'm asking you if you recall me saying I wasn't sure

10 how he was going to pay, that was his decision, whether it

11 would be a new check or whether it would be a Fedwire?

12   A    My thought process has always been you were telling

13 me a wire.  I don't recall you saying those other things.

14   Q    Just clarifying what you recall.

15   A    Okay.

16   Q    And that on that call, I said that no transaction

17 should occur unless there's correct paperwork as well as

18 funding?

19   A    You did say that you wanted the paperwork corrected,

20 yes, in order for it to --

21   Q    Correct.  And that he should not have the vehicle

22 until everything was step by step and done and legit.  Correct?

23   A    I think that's -- yeah, I believe you said that, yes.

24   Q    Okay.  And, in fact, you did get the truck back that

25 day?

UNITED STATES DISTRICT COURT

Dwayne Griffith - Cross-Examination

1    A    I did.

2    Q    Immediately, and there was no further follow-up with

3    any paperwork or Mr. Beane coming in to do a transaction after

4    July 10th.  Correct?

5    A    Not to my knowledge.

6    Q    Okay.  And you and I never had any contact after

7    that?

8    A    Not to my knowledge.

9    Q    Okay.  I'm just going to check here to make sure I

10   have no further questions.  Oh, I did have one other question.

11   A    Okay.

12   Q    For clarification regarding a date, you had stated

13   that you had -- after our conversation that we had had when you

14   had received the truck back, you had stated that you called

15   Buddy Gregg and USAA.

16        Do you remember what date that was that you made

17   those calls?

18   A    I would -- I would think that it was on that -- on

19   the 10th.  I don't really recall, but some of the red flags

20   that I felt were coming up was the reason for my call.

21   Q    Oh, of course.  I was just asking on which date you

22   would have called them, was it on the 10th?  I think it was on

23   the 10th, because by that time on the 10th --

24   A    I'm fairly certain it was the 10th.

25   Q    Okay.  But after you and I had spoke?

UNITED STATES DISTRICT COURT

1        A    Yes.

2             MS. TUCCI-JARRAF:  Okay.  Mr. Griffith, thank you

3   very much.

4             THE COURT:  Thank you.

5             Any redirect?

6             MS. SVOLTO:  Just briefly, Your Honor.

7                    **REDIRECT EXAMINATION**

8   BY MS. SVOLTO:

9        Q    Mr. Griffith, would you know whether an FBI agent was

10  sitting in your office posing as one of your -- one of the

11  employees there?

12       A    Yes.

13            MS. SVOLTO:  Thank you.

14            THE COURT:  Any recross on that limited redirect?

15            Mr. Beane, any further questions?

16            MR. BEANE:  No.

17            THE COURT:  Ms. Tucci-Jarraf?

18            MS. TUCCI-JARRAF:  No.

19            THE COURT:  All right.  Is that it?  Okay.  Thank

20  you.

21            MS. SVOLTO:  Yeah.  Sorry.

22            THE COURT:  This witness may be excused.  We'll go

23  ahead and break until 1:30.  Let the jury go first, and then

24  after that, Mr. Griffith, you can be excused.

25            (Jury out at 12:19 p.m.)

                    UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1        THE COURTROOM DEPUTY:  This honorable court shall

2   stand in recess until 1:30.

3        (Recess from 12:20 p.m. to 1:35 p.m.)

4        THE COURTROOM DEPUTY:  All rise.

5        THE COURT:  Got the next witness.  We'll bring the

6   jury in.

7        (Jury in at 1:36 p.m.)

8        THE COURT:  Thank you.  Everyone may be seated.  Ask

9   the courtroom deputy to swear in the next witness.

10  WHEREUPON,

11                          **TERRY WILSHIRE,**

12  was called as a witness and, after having been first duly

13  sworn, testified as follows:

14                       **DIRECT EXAMINATION**

15       THE COURTROOM DEPUTY:  Have a seat, please.  Scoot as

16  close as you can.  State and spell your name for the record.

17       THE WITNESS:  Terry Wilshire.  T-e-r-r-y,

18  W-i-l-s-h-i-r-e.

19  BY MS. SVOLTO:

20  Q    Captain Wilshire, where do you work?

21  A    Knox County Sheriff's Office.

22  Q    What do you do there?

23  A    I'm a assistant facility commander on the captain

24  level.  I'm over the intake center where they book everyone.  I

25  also do special projects.  I'm over all the communications that

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1  have to do with inmate communications going in and out of the

2  facilities.

3      Q    Does that include jail calls?

4      A    Yes.

5      Q    All right.  And how long have you been doing that?

6      A    I've been with the sheriff's department 27 and a half

7  years.  I've been over the jail stuff, communications about the

8  last ten.

9      Q    All right.  And so what are some of your primary job

10 responsibilities?

11     A    First of all, I have a facility there that has 1,034

12 inmates that I'm responsible for daily activities with.  Along

13 with that, I'm also liaison with the court system, local and

14 federal.  I work with all the federal agencies.  I help and

15 assist with any evidence they may need as far as jail phone

16 calls, e-mails, or anything they may need as far as they may

17 need for evidentiary value.

18     Q    What facility is that?

19     A    Roger D. Wilson Detention Facility.

20     Q    Okay.  And specifically regarding jail calls, are

21 jail calls recorded?

22     A    Yes, they are.

23     Q    And how is that done?

24     A    They're done through our contracted agency, Securus

25 Technologies who we have our contract with.  They provide the

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    services for us.  As inmates make phone calls, they're required

2    to use identifiers, such as PINs we issue when they come in.

3           We also have voice recognition systems.  When they're

4    first booked in, they say a phrase, a few phrases that actually

5    records their voice recognition, does a voiceprint.

6           And so upon making a phone call, they're required to

7    use the given PIN number and also required to use their voice

8    and it verifies who they are before they can make the call.

9    Q    So does each inmate have a unique PIN number?

10   A    Yes.

11   Q    And it's only for that inmate?

12   A    Yes.

13   Q    And each inmate also does a voice -- they have to

14   record their voice for the system?

15   A    Yes.

16   Q    And what's the purpose of that?

17   A    For identity of who the person is making the phone

18   call, to make sure it's no one else using the inmate's PIN or

19   anything like that fraudulent.

20   Q    Does that authentication happen at the beginning of

21   the call?

22   A    It happens at the very beginning of the call.  It

23   asks them to say their name or sometimes it will ask them to

24   say a phrase like United States.  It's also continuous

25   throughout the whole phone call.  It actually monitors their

UNITED STATES DISTRICT COURT

1 voice in case an inmate was to have someone use their voice to

2 get a phone call, for say, and then another inmate was to get

3 on the call afterwards.  So it would monitor if there was a

4 change in the person on there.

5      Q    So what happens if the voice and the PIN number do

6 not match when an inmate makes a call?

7      A    When they initially make it, it won't let them make

8 it.

9      Q    Okay.  Does the system store and maintain these phone

10 calls?

11      A    Yes.

12      Q    Is that every phone call at the facility?

13      A    Unless it's a privileged phone call, like an

14 attorney/client privilege or something like that, where someone

15 identifies themselves as an attorney, then we can change it

16 where it doesn't record it.

17      Q    But all other calls are --

18      A    All other calls are recorded, yes, ma'am.

19      Q    All right.  Are those calls recorded as part of the

20 ordinary course of business?

21      A    Yes.

22      Q    And by someone -- I guess it's a system here with

23 knowledge of the events at the time the event occurs?

24      A    Repeat the question.

25      Q    Yes.  I'm sorry.  That was long.  So -- so our --

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    they're recorded as part of the ordinary course of business?

2         A    Yes.

3         Q    And it's recorded at the time the events occurred?

4         A    Yes.  It's a live feed, live recording as it goes.

5         Q    Okay.  Do you recognize this?

6         A    Yes, I do.

7         Q    And is that your signature on it?

8         A    Can't see from there.

9         Q    Thank you.

10        A    Yes, ma'am, it is.  That's my initials, TW.

11        Q    Let the record reflect I'm showing what's been

12   previously marked as Exhibit 159.  So was this prepared in the

13   same manner that you just described?

14        A    The disc was prepared, yes, with the same file from

15   the system, yes.

16        Q    And so in preparation of this hearing today, did you

17   pull a phone call from January 10th, 2018?

18        A    I did.

19        Q    And with respect to that call, did you -- was that

20   a -- did you listen to that phone call?

21        A    I did.

22        Q    And did you also listen to this disc?

23        A    Yes.

24        Q    And is this disc an excerpt of that phone call?

25        A    Yes.

UNITED STATES DISTRICT COURT

1    Q    Does it match precisely with the phone call that you

2  listened to from your system?

3    A    The phone record matches the same file name.  I did

4  another download of it myself to verify it was the same file

5  name, yes, ma'am.

6         MS. SVOLTO:  Move to admit Government's Exhibit 159.

7         THE COURT:  So admitted.

8    (Government's Exhibit 159 admitted into evidence.)

9  BY MS. SVOLTO:

10   Q    And did you also verify who makes this call?

11   A    Yes.

12   Q    And who was that?

13   A    Can I pull the record?

14   Q    Sure.

15   A    The phone call I pulled was made on Roger D. Wilson

16  Detention Facility out of Pod 1C.  It was conducted -- it was

17  dialed to a phone (360) 547-9518.  It was a long distance phone

18  call that started on 1/10/2018 at 16:09:45.  The call concluded

19  at 1/10/2018 at 16:24:45.  The duration of the call was 900

20  seconds, which is the maximum amount of call that you can make

21  per call.  The account number used on it, which would have been

22  the inmates ID number was 1363357, used his PIN assigned to

23  him, 859843.  The inmate's name was identified as Randall

24  Beane.  It was a AdvanceConnect call, which meant that he

25  called someone who had an account with Securus Technologies

UNITED STATES DISTRICT COURT

1    that prepays calls.  It was a completed call, duration ended.

2    It was done in the English language, and it was voice checked

3    for voice enrollment.

4         Q    Okay.  Thank you.

5              MS. SVOLTO:  Ask to play Government Exhibit 159.

6         (Audio played in open court; not reported.)

7    BY MS. SVOLTO:

8         Q    All right.  So was the voice authentication features

9    done throughout that call?

10        A    Yes, they were.

11        Q    And that was the PIN number for Randall Beane?

12        A    Yes.

13             MS. SVOLTO:  That's it.  Thank you.

14             THE COURT:  Thank you.

15             Cross-examination?

16             MS. TUCCI-JARRAF:  No, thank you.

17             THE COURT:  No cross-examination, Ms. Tucci-Jarraf?

18             MS. TUCCI-JARRAF:  I know it's surprising, no.

19             THE COURT:  No cross-examination, Mr. Beane?

20             MR. BEANE:  No.

21             THE COURT:  All right.  Thank you.  You may be

22    excused.

23             THE WITNESS:  Thank you.

24             MS. DAVIDSON:  The government calls forensic

25    accountant, Zach Scrima.

                    UNITED STATES DISTRICT COURT

1   WHEREUPON,

2                             **ZACH SCRIMA,**

3   was called as a witness and, after having been first duly

4   sworn, testified as follows:

5                         **DIRECT EXAMINATION**

6            THE COURTROOM DEPUTY:  Have a seat, please.  Scoot

7   in, state and spell your name for the record.

8        A    My name is Zach Scrima.  Z-a-c-h.  Last name, Scrima,

9   S-c-r-i-m-a.

10           THE COURTROOM DEPUTY:  Thank you, sir.

11  BY MS. DAVIDSON:

12       Q    Mr. Scrima, what is your profession?

13       A    I'm a forensic accountant.

14       Q    Okay.  And who is your employer?

15       A    The FBI.

16       Q    And how long have you been with the FBI?

17       A    Approximately seven and a half years.

18       Q    Okay.  And what is your current position at the FBI?

19       A    I'm a forensic accountant.

20       Q    Okay.  And what -- what does a forensic accountant

21  do?

22       A    Well, in our sense, we analyze financial

23  transactions, accounting records, ultimately to be used in a

24  court of law.

25       Q    Okay.  And what are your official duties with the FBI

                        UNITED STATES DISTRICT COURT

1  currently?

2      A   I'm assigned at FBI headquarters in Washington, D.C.,

3  part of the forensic accountant support team.  And as part of

4  that role, I'm assigned cases throughout the country to help

5  special agents with their investigations focusing on the

6  financial aspect of their investigation.

7      Q   Okay.  And what is your educational background?

8      A   I went to the University of Illinois, and I have a

9  bachelor's of accounting from there.  I also have my --

10  registered CPA in the state of Illinois and I have certified

11  fraud examiner's license.

12      Q   So you said you were registered CPA.  So you sat for

13  the CPA exam and passed?

14      A   I did, yes.

15      Q   And prior to the FBI, were you an auditor in private

16  practice?

17      A   I was an internal auditor at corporations.

18      Q   And what does an internal auditor do?

19      A   They do a range of things.  My roles pertain mostly

20  to auditing the controls, the accounting controls, financial

21  controls of the company, checking books and records, and also

22  performing internal investigations.

23      Q   Okay.  And how is that different than a forensic

24  accountant?

25      A   Well, forensic accountant focuses -- typically will

UNITED STATES DISTRICT COURT

1    search out some sort of -- I guess an auditor looks at a broad

2    scope of information to make sure that everything is okay.  A

3    financial -- forensic accountant often has a pointed task.  So

4    it's either to trace certain transactions that have a

5    particular interest of an investigation or a business dispute

6    or a valuation of insurance losses.  So it's a little bit more

7    of a pointed analysis, I guess would be the best way to explain

8    it.

9         Q    Okay.  And what are your -- what types of cases do

10   you currently work on at the FBI?

11        A    For the most part, I've been working white collar

12   fraud and bank fraud type cases over the last five years.  But

13   in my role as the FBI investigates, you know, a plethora of

14   types of violations, we can be assigned to almost anything.

15   I've -- I've contributed towards a variety of cases, but for

16   the most part, I work in the white collar or financial

17   institution fraud.

18        Q    Okay.  And are you familiar with the banking system

19   in the United States?

20        A    Yes, I am.

21        Q    Okay.  And did you conduct a financial record

22   analysis on -- in this case?

23        A    Yes, I did.

24        Q    Okay.  And did you prepare several demonstrative

25   exhibits to explain the banking transactions in this case?

1    A    Yes, I did.

2    Q    And would they aid you with your testimony here

3  today?

4    A    They would, yes.

5         MS. DAVIDSON:  Your Honor, at this time, I would like

6  to admit Government's Exhibit 160.  And they're demonstrative

7  exhibits and they've been provided to both of the defendants.

8         THE COURT:  Any objections?

9         MS. TUCCI-JARRAF:  That's fine.

10         THE COURT:  All right.  Seeing no objections, we'll

11  admit Government's 160.

12    (Government's Exhibit 160 admitted into evidence.)

13  BY MS. DAVIDSON:

14    Q    Okay.  Before we start talking about 160, what is a

15  CD?

16    A    A certificate of deposit.  It's short for certificate

17  of deposit.  And, essentially, it's a bank -- it's a savings

18  product that a bank offers in that it's different than a

19  savings account that you can deposit money in, withdraw money

20  as you please, it's more of a fixed product in theory.  Sort of

21  like a U.S. savings bond might be.

22         And, essentially, the way it works is, you pay the

23  amount of money that the CD is valued at to the bank, and the

24  bank gives you that CD, which then earns a certain percentage

25  of interest over the time period that the CD is termed for.  So

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    it might be a six-month CD, a three-month CD.  It could be

2    multiple years.  But whatever the parameters of that CD, the

3    bank would then pay interest accordingly.

4         Q    Okay.  So why do people refer to it as purchasing a

5    CD?

6         A    Well, because you're essentially purchasing a product

7    from the bank versus putting your money into an account in the

8    bank.  It operates a little differently.

9         Q    Okay.  And so like you said, it is for a certain time

10   period.  After the 30 days, if you buy a 30-day CD, is -- is it

11   automatically liquidated and you have to buy another one or --

12        A    I think it depends on the terms of the CD.

13   Oftentimes you have maybe, let's say, a week after it expires

14   to decide if you want to liquidate the funds or cash out or if

15   you -- and oftentimes if you don't do that, the CD will just

16   roll over into another 30-month CD.

17             That's my understanding of typical arrangements, but

18   sometimes I'm sure there are CDs that would just end and then

19   automatically liquidate.  But my understanding is the majority

20   of them will roll over typically.

21        Q    Okay.  And is the theory of this banking product

22   typically that people would leave the money in the CD for the

23   time period which they purchased?

24        A    Yes.  So a CD generally will offer a higher

25   percentage interest rate than a savings account would.  So it

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    will earn the holder of the CD, the purchaser, a little bit

2    more money than just having their money in a savings account

3    would.  And also, oftentimes, the CD will have early withdrawal

4    penalties.  So if you take it out two weeks after you buy it,

5    they'll actually charge you a penalty for not keeping it for

6    the full term.

7         Q    Can you go ahead and explain Government's 160.  And I

8    think that you labeled this the Typical CD Purchase Flowchart.

9         A    Sure.  So this is a flowchart I created just kind of

10   based on my general knowledge of how a purchase of CD might

11   work in a normal transaction.  So we start with just a

12   fictitious character, John Doe, here on the document left.  And

13   he's got a USAA member number, and he wants to purchase a CD

14   for a hundred thousand dollars from USAA.

15        He would -- he could go, I guess, probably over the

16   phone, definitely online to do this.  And in doing that, he has

17   to provide some sort of funding information to USAA to pay for

18   this CD.  And in this example, he uses a account number 112233

19   at Any Bank, provides that bank's routing number and that --

20   his account number that he has with that bank, and that causes

21   two things.

22        So USAA is then funding the CD with that purchase,

23   and in return, USAA makes an ACH request to John Doe's bank at

24   Any Bank saying, "Please pay us a hundred thousand dollars for

25   the purchase," and then Any Bank through the ACH process would

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    conditionally credit USAA the money, and the -- you know,

2    presuming there's no problems with his bank account at Any

3    Bank, there's -- it's fully funded.  There's at least a hundred

4    thousand dollars in it, and it's a valid bank account.

5         That would be the end of the process, and the CD

6    would be purchased.  USAA would have their money for the CD,

7    and John Doe would have his CD.

8    Q    Okay.  And so I'm going to show you No. 2 of your --

9    Government's Exhibit 160.

10   A    Okay.

11        MS. DAVIDSON:  If I might have a moment, Your Honor.

12   BY MS. DAVIDSON:

13   Q    And so explain, you labeled this one "Randall Beane

14   USAA Accounts Flowchart," and this is in reference, "Indictment

15   Count 6."  Can you start -- this is the bank fraud in this

16   case?

17   A    It's a -- yeah, it's a general flowchart of the

18   general scheme from this case.

19   Q    Okay.  And so tell me what happens here.

20   A    So we'll start again with the bottom left.  We have

21   Randall Beane and his USAA member account number.  And he on

22   July 5th, 2017, between 10:32 p.m. and 12:39 a.m., which would

23   be the morning of July 6th, he purchases approximately 29 CDs

24   totaling over $28 million from USAA.com over the Internet.

25   Q    What is the little box down below that?

UNITED STATES DISTRICT COURT

1        A    That -- that just highlights that over the

2   cumulative -- the two days of July 5th and July 7th, his

3   account purchased 32 CDs totaling over $31 million.

4        Q    Okay.  And so what -- what routing number did he use?

5        A    He used the routing number of a Federal Reserve Bank.

6        Q    Okay.  And then he used a account number that -- do

7   you have his account number on here?

8        A    Yes.  If you look in the -- sort of above his name

9   and the dotted line.  So that's showing that it -- when

10  purchasing these CDs, he gave USAA the routing number of the

11  Federal Reserve and an account number 244391135, which, of

12  course, is just one digit off his Social Security number.

13       Q    Okay.  And so once he purchased the CD, can you

14  continue explaining of the CDs based on -- that he purchased on

15  the 5th?

16       A    So he purchased the CDs online on the 5th and the

17  early morning of the 6th.  USAA immediately fulfills those CDs,

18  they fund the CDs, as they do to sort of make immediate

19  processing of the CDs for their -- the benefit of their

20  members.  And then they follow this up with an ACH -- they

21  request an ACH from the Federal Reserve for the payment of

22  these CDs, which causes the Federal Reserve in return to pay

23  USAA the funds via the ACH system, which is more or less

24  automatic, and they're conditionally crediting USAA for the

25  CDs.

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    Q    Okay.  And then what happens -- I think you're

2    getting ready to explain the blue square.  What happens next on

3    the 6th?

4    A    So -- so now that Randall Beane has the CDs and his

5    member account.  On July 6th, you see the next solid arrow, he

6    withdraws the funds through -- via the telephone, so he closes

7    two of the CDs and has the funds cashed into his -- or

8    transferred into his checking account with USAA.

9    Q    Okay.  And then what happens on the 6th?

10   A    Well.

11   Q    And 7th?

12   A    In addition, so continuing on to the right, on that

13   same day, the 6th and then the following day, the 7th, there

14   are numerous external transfers and purchases made from his

15   USAA accounts.

16   Q    Okay.  And what happens on the 6th with the Federal

17   Reserve?

18   A    Well, between the 6th and the 7th --

19   Q    You're talking about your red lines now?

20   A    Yes.  The top red line.  That shows that between the

21   6th and 7th, the Federal Reserve recalled those funds from

22   USAA.  They realized that there was not -- that was a fake

23   account number that was provided to them, so they're telling --

24   basically pulling back the funds from USAA, which is within

25   their right.  And as a result of that, USAA, between July 7th

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    and July 11th, attempts to retrieve the funds from the

2    closed-out CDs, Beane's accounts, and then also tried to get

3    money from Whitney Bank.

4         Q    Okay.  If we can move on to the next flowchart,

5    please.  I think it's No. 3 of ours.  Okay.  And so this

6    flowchart references "500,000 CD Flowchart," which are

7    "Indictments Counts 1, 2, and 5."

8              And start with the Randall Beane and explain this

9    flowchart.

10        A    Yeah.  So it's -- this is an example of just the one

11   CD that he purchased for $500,000.  So it follows a very

12   similar pattern as I just went over.  He purchases, on July 5th

13   at 10:32 p.m., a $500,000 CD from USAA.  Again, he uses the

14   Federal Reserve routing number and the account number that is

15   one digit off his Social Security number, which causes USAA to

16   request an ACH from the Federal Reserve.

17        Q    Okay.  Let's start right here.  So Randall Beane, do

18   you -- where was Randall Beane located when he made this

19   purchase?

20        A    From what I understand, he was at his home.

21        Q    Okay.  In Knoxville, Tennessee?

22        A    Yes.  On his Internet.

23        Q    Okay.  And the Internet purchase went where?

24        A    He went to USAA Federal Savings -- USAA.com, which

25   would be their servers, which I understand to be in Texas.

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    Q    Okay.  And then go -- go forward with that.

2    A    Okay.  So, again, as mentioned before, this causes,

3    this is part of that ACH credit that was triggered that I

4    walked you through before.  So that $500,000 gets conditionally

5    credited from the Federal Reserve to USAA, and the CDs are --

6    the CD is funded by USAA.

7    Q    Okay.  And then if you're going on your solid black

8    line to the blue box, what happens on 7/6/2017?

9    A    Yeah.  So Randy Beane -- Randall Beane, over the

10   phone, telephoned, closes out that CD and transfers the cash

11   from the CD to his USAA checking account number ending in 3062.

12   Q    Okay.  And this was done on the 6th?

13   A    Done on the 6th.  Then for an amount just under

14   $500,000, because there were penalties for the early withdrawal

15   fee.

16   Q    And he did this from the phone.  And where was

17   Randall Beane located?

18   A    I understand he was at his home.

19   Q    In Tennessee?

20   A    Yes.

21   Q    And then he called San Antonio, the USAA Bank

22   headquarters in San Antonio, Texas?

23   A    That's how I understand, yes.

24   Q    Okay.  Is a telephone a wire in the legal sense?

25   A    Yes.

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    Q    Okay.  And then continue on with your --

2    A    A telephone call is a wire in the legal sense.

3    Q    A telephone call, not a telephone.  Thank you.  And

4    then talk about what happens in the blue square.

5    A    So as we mentioned, the funds were cashed into his

6    checking account 3062.  That same very day, he makes two

7    transfers from his checking account to his USAA savings account

8    in the amounts of $50,000 and $450,000.

9    Q    Okay.  And then go to the purchase of the CD -- I

10   mean, the purchase of the motor home.

11   A    Sure.  And the following day after he makes those

12   transfers on July 7th, he purchases the RV with almost a

13   $500,000 wire transfer from his savings account to Buddy Gregg

14   Motor Homes, which their bank is Whitney Bank in Louisiana.

15   Q    Okay.  And so this was done on the 7th?

16   A    Yes.

17   Q    And he made a phone call from Tennessee to Texas to

18   order this wire.  Is that your understanding?

19   A    It is my understanding, yes.

20   Q    And then the federal -- Fedwire, does it affect

21   interstate commerce just in the actual process of going from a

22   bank in Louisiana to a bank in Texas or vice versa, bank in

23   Texas to Louisiana through the Federal Reserve?

24   A    Yes.  Between the fact that -- presuming those two

25   banks have servers in different states in addition to the fact

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1   that the Federal Reserve has their processing in both Texas and

2   New Jersey.

3       Q    So every Fedwire goes between at least Texas and New

4   Jersey based on going through the Federal Reserve?

5       A    That's always been my understanding, yes.

6       Q    Okay.  And so explain the red lines now to me.

7       A    So the first top red line is July 6th, July 7th, the

8   Federal -- Fed Reserve recalls the funds from USAA because they

9   realize it was a fake account that was drawn from, and they do

10  it within a timely manner, so it's their rights to recall those

11  funds from USAA.  And on July 10th, USAA was -- unsuccessfully

12  attempts to retrieve the funds from Randall Beane's accounts

13  and also tried attempting to retrieve the funds from Whitney

14  Bank.  But at that point, the funds had already been spent.

15      Q    Okay.  And is it your understanding that Mr. Beane's

16  account was actually frozen on the 7th?

17      A    I believe so, yes.

18      Q    Okay.  If we could go to the next flowchart.  Okay.

19  And what is this flowchart?  It's "Randall Beane 999,000 CD

20  Flowchart, Indictment Count 3 and 4."

21      A    Yes.  So this is a diagram of his purchase of the

22  999,000 CD on July 5th at 10:55 p.m.

23      Q    Okay.  And so he purchases it at 10:50 -- and so you

24  start the little blue guy, Randall Beane, USAA member number.

25  And straight line is what you just described as the purchase.

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    And then what's the green box?

2        A    The green box is him purchasing the CD on USAA.com

3    over the Internet.

4        Q    And he uses the same account number and routing

5    number that he did with the other CD?

6        A    He did, yes.

7        Q    Okay.  And then what happens on the 6th with the

8    Federal Reserve?

9        A    Well, the Federal Reserve conditionally credits USAA

10   for those funds as part of the ACH request from USAA that was

11   triggered by Randall Beane.

12       Q    Okay.  And with regard to the purchase of the CD, was

13   the one -- the 5th was -- just like you testified on the last,

14   was it done over the Internet?

15       A    It was done over the Internet.  It looks

16   approximately 23 minutes after the previous one we walked

17   through, yes.

18       Q    And Randall Beane was in Tennessee?

19       A    He was to my knowledge, yes.

20       Q    And the -- the Internet went to Texas?

21       A    Yes.  It would have gone to USAA servers in Texas.

22       Q    Okay.  And so then explain what happened after that.

23       A    Well, once he has purchased the CDs, which is late

24   evening on July 5th, July 6th rolls around, he cashes out, he

25   closes out this CD, and he transfers the cash minus the

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1    penalties and fees for just over -- just under $999,000 to his

2    USAA checking account numbers ending in 3062.

3         Q    So for Count 4, he called in to the bank again?

4         A    Yes, he did.

5         Q    And so he was in Tennessee and he called Texas?

6         A    That's my understanding, yes.

7         Q    Okay.  And then what happened?  Go to your gray box.

8         A    So from -- once he has the funds in his checking

9    account, the first one going directly to the right -- arrow

10   directly to the right shows that that same day and the

11   following day, he spends approximately $53,560 on bill and loan

12   payments, retail charges using his debit card and making

13   transfers to individuals.

14        Q    Okay.

15        A    And also on July 7th, he makes a debit card charge

16   to -- of $10,000 to Buddy Gregg RVs and Motor Homes.

17        Q    Okay.  And then what are the red lines again?

18        A    Same thing.  Same fact pattern, the 6th and 7th --

19   between the 6th and 7th, the Federal Reserve recalls the funds

20   because it's a fake account, and USAA returns the funds.  And

21   then on July 10th, USAA is able to retrieve the remaining

22   amount in his account ending in 3062, which amounted to just

23   over -- it's $945,000.

24        Q    Okay.  And I'm going to go back to that flowchart

25   that is our 3rd.  And if you go to the red line, was USAA

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

1  successful in retrieving the funds that were sent by Fedwire to

2  Buddy Gregg Motor Home?

3      A    No.  By the time they had frozen his accounts and

4  tried to retrieve the funds, he had already moved the funds

5  from his USAA savings account to Buddy Gregg's account at

6  Whitney Bank via wire transfer, and USAA was unsuccessful in

7  retrieving those funds at that point.

8      Q    Okay.  And from your review of the financial

9  documents, is it your understanding that USAA Bank took a loss

10 of that amount and more?

11     A    That is my understanding, yes.

12     Q    Okay.  So what is ACH fraud?

13     A    Well, it's a type of bank fraud that essentially uses

14 the ACH system to steal funds.

15     Q    Okay.  And is that a type of bank fraud?

16     A    Yeah.  I would say that it would be a subset of bank

17 fraud, yes.

18     Q    And in your career being a forensic accountant, are

19 you familiar with various ACH fraud schemes?

20     A    Yes.  I've been -- I've investigated them before, and

21 I'm aware of them, yes.

22     Q    And what is a typical component to these?

23     A    Well, speed is always the number-one component.  You

24 know, I -- it takes advantage of the vulnerability of the

25 system.  As we've heard, ACH is basically an automatic transfer

UNITED STATES DISTRICT COURT

Zach Scrima - Direct Examination

 1   between banks, and it only takes one to two days to settle,

 2   which means it's a very quick process.  The funds move fast and

 3   actually faster than the other bank, the sending bank might

 4   have time to verify that that was a -- that each one of those

 5   transactions are a valid transaction.  In fact, they have a

 6   couple days beyond the settlement date of those funds to verify

 7   whether or not that was a legitimate transaction or one of

 8   those batch transactions was legitimate.

 9        Q    Okay.  And is it your experience that fraudsters

10   attempt to exploit the weekends and holidays?

11        A    Yes.  It's a common practice in ACH fraud and many

12   bank frauds.  The idea is that if you commit fraud when the

13   bankers are sleeping, they can't -- they don't know about it

14   till they wake up.  Or if they're out on the lake fishing on a

15   Saturday, they're not -- they can't find about that fraud till

16   they get in the office on Monday, because it's well-known that

17   banks are closed on Saturdays or weekends, I would say, and

18   holidays.

19        Q    And can I use the Elmo.  It's not -- it's just the

20   calendar.

21             And this is the calendar from July 2017.  And so

22   the -- paying his accounts -- paying his bills with his real

23   Social Security number and the federal routing number occurred

24   on the 3rd?

25        A    That's my understanding, yes.

UNITED STATES DISTRICT COURT

1    Q    And then what is July 4th?

2    A    That's a -- that is what we would call a bank

3 holiday.  As everybody knows, the Fourth of July, all banks are

4 closed.

5    Q    And then the Fedwire went through when?

6    A    The Fedwire to Buddy Gregg RV went through on

7 July 7th, Friday.

8    Q    Okay.  And then what is the 8th and 9th?

9    A    That's a weekend.

10   Q    And was that -- and then what's the 10th?

11   A    The 10th is Monday, that would be when the bank

12 reopens from the weekend, yes.

13   Q    And is the 10th when USAA tried to recall the money?

14   A    That's when they -- yes, that's when they tried to

15 recall the money from Whitney Bank.

16   Q    Okay.  What -- what is the -- every man's definition

17 of money laundering?

18   A    Very basic definition I would give is taking --

19 making financial transactions with funds derived from criminal

20 proceeds with an intent to hide or disguise the origin of those

21 funds.

22   Q    Okay.  And in your experience of ACH fraud, is it --

23 in your experience, do people often call the bank?

24   A    So at what point?  Well, yes, there are times when --

25 for example, if a recipient bank of a wire transfer from

UNITED STATES DISTRICT COURT

Zach Scrima - Cross-Examination

1  fraudulent funds receives a hold harmless letter, or they are

2  contacted by a law enforcement agency saying the funds you

3  received in this customer's account of yours is derived from a

4  fraud, can you please not move -- can you please hold those

5  funds.

6        I have experienced in my other investigations where

7  at times the perpetrators of the fraud will be very aggressive

8  by calling the bank, providing documentation, trying to

9  convince that bank that those funds are legitimate and that

10 they should be released.

11       At the end of the day, they want their money.  At

12 that point, they're very close to obtaining their funds and

13 getting away with those funds.

14            MS. DAVIDSON:  May I have a motion, Your Honor?

15            THE COURT:  Yes.

16            MS. DAVIDSON:  That's all I have of this witness.

17            THE COURT:  Thank you.

18            Cross-examination?

19            MS. TUCCI-JARRAF:  Okay.

20                    **CROSS-EXAMINATION**

21 BY MS. TUCCI-JARRAF:

22    Q    Without prejudice, I have a few questions.

23         Hi.  Do you pronounce your name Scrima?

24    A    Scrima.

25    Q    Scrima.  Excuse me.  I apologize.

UNITED STATES DISTRICT COURT

1    A    That's okay.

2    Q    I have a difficult last name, too, that nobody can

3  seem to pronounce.  I just have a few questions regarding your

4  past, just to clarify a little bit.

5    A    Sure.

6    Q    You have some dashed lines here.  On Exhibit 160, you

7  have dashed lines that go from John Doe to John Doe Account at

8  Any Bank.  Correct?  See the dashed lines?

9    A    Yes.  Yeah.

10   Q    Okay.  What do the dashed lines, what are you using

11 that to indicate?

12   A    That's representing that he is using his bank account

13 at Any Bank, account number 112233 to -- for -- to purchase the

14 CDs from USAA.  So he's given USAA those account -- that

15 account information for them to fund the CDs with.

16   Q    Okay.  So the dashed lines that you're using really

17 don't have a significant indication as opposed to using a

18 straight line or --

19   A    It's just to delineate the difference between

20 movement of his actions, his actions.

21   Q    Okay.

22   A    That's -- it's -- his action was entering the routing

23 number, but in the background, what happens once he enters the

24 routing number and the account number of the Federal -- or

25 excuse me, of Any Bank, USAA draws the money from Any Bank.

UNITED STATES DISTRICT COURT

1    Q    Okay.  So it was to distinguish actions?

2    A    It's really just not to -- to some extent, it's just

3  to keep things from getting too confusing with all the same

4  type of arrows.  In other words, if they're all black straight

5  arrows, it would be a little more challenging to walk through

6  the flowchart, so --

7    Q    Okay.  So for that transaction with the dashed lines

8  there --

9    A    Yes, uh-huh.

10    Q    -- that typically wouldn't be something that's seen

11  except for by the person that's actually on the site putting

12  that information in?

13    A    Well, right.  So John Doe would be the one physically

14  giving the information to USAA, either online or over the

15  phone.  However, he's purchasing the product, and he would be

16  passing that information, the routing number and the bank

17  account number.

18    Q    And with every action of that, were you able to see

19  what screenshots this -- in this particular instance, John Doe,

20  USAA member would use as far as creating these CD accounts,

21  like a creation, verification, authentication?

22    A    Well, this is a fictitious example that I created, so

23  I guess I could create fictitious examples of bank screenshots,

24  but I didn't do that.

25    Q    True.  I'm just asking if this is -- is this to

UNITED STATES DISTRICT COURT

1    indicate stuff that -- the actions -- you wouldn't be able to

2    see if someone showed you John Doe and a CD, you just see the

3    person and the end product?

4        A    If that's all you put in front of me, sure, that's

5    all I would see.

6        Q    Okay.  And in this particular case, regarding

7    Mr. Beane, did you see all the actions and steps that were

8    taken?

9        A    I saw a significant amount of documentation, sort of

10   account documentation from USAA and Whitney Bank, yes.

11       Q    Okay.  So you were able to review those?

12       A    Yes.

13       Q    Okay.  And then just to clarify, and in this case,

14   the dashed lines are the same thing, just to differentiate for

15   explanation?

16       A    It's the same -- sorry.

17       Q    Oh, there we go, the dashed lines?

18       A    For the most -- yeah, it's just to kind of keep

19   things consistent so it's easier to follow.

20       Q    Okay.  And then as far as these red lines --

21       A    Yes.

22       Q    -- that you have going from USAA to Federal Reserve,

23   and then Randall Beane accounts to USAA Federal Savings Bank,

24   are those -- do those have a significance, or is that just to

25   differentiate too?

UNITED STATES DISTRICT COURT

Zach Scrima - Cross-Examination

1    A    Well, the actions are significant.  But, again, just

2    if you're asking about the lines being red, again, that was

3    something I kind of changed after I -- I initially did this all

4    on black solid lines, and it was very confusing to follow how

5    it went.  So I changed those lines to red so that you saw they

6    kind of matched, they flowed together.

7         The significance of them both being red would be that

8    after, you know, the Fed recalls the funds and that kind of

9    triggers USAA to then attempt to retrieve the funds.  So

10   there's sort of a cause-and-effect relationship between those

11   two actions.

12   Q    And that's what the colored arrows that are --

13   A    Yes, it's just a -- exactly.  It's just to keep it

14   from being too confusing.

15   Q    Were you able to review the USAA attempts to -- the

16   documentation that they made to retrieve the funds?

17   A    Well, I saw -- I guess -- I saw the funds that were

18   retrieved.  I saw the documentation that showed that that

19   happened, yes.

20   Q    Okay.  And per -- are these dates accurate, then, as

21   far as -- per the data you reviewed -- well, that will go into

22   the next -- I believe the next one you showed.  Let me finish

23   with this one.

24        On here, it indicates that on 7/6 to 7/7/2017, that

25   there were Fed recalls of the funds.  Were you able to see that

UNITED STATES DISTRICT COURT

1  documentation of the actual Fed recalls?

2      A    No, I don't -- I don't know that I saw that actual

3  documentation.

4      Q    Okay.  And when you say you weren't able to, that

5  documentation, was that for just the CDs, the recall, the Fed

6  recalls for the money to the CDs?

7      A    So I guess I didn't see any of the ACH transactions

8  between USAA and the Federal Reserve.  I don't believe I did.

9  It's possible.  There was a lot of documentation.  I looked at

10 a lot of stuff, so I don't want to say I did or didn't for

11 sure, but --

12     Q    Okay.  Thank you.  And, however, all transactions --

13 all the ACH that Mr. Beane had done was from 7/5 -- excuse me,

14 I think you said 7/4 -- July 4th through July 6th for the CDs?

15     A    No.  July 5th and July 7th -- well, the evening of

16 July 5th, early morning of July 6th, he purchased CDs on

17 USAA.com, and then again on July 7th, he purchased some

18 additional CDs.

19     Q    Some additional CDs?

20     A    Yes.

21     Q    Okay.  And -- okay.  On this particular page, this is

22 160-3, Exhibit 160-3.  It says per the data that you've

23 reviewed, you had stated that USAA had frozen the accounts for

24 Mr. Beane, do you recall what date the freezing of those

25 accounts occurred?

UNITED STATES DISTRICT COURT

1    A    My understanding that they were frozen on July 7th,

2   which is Friday, sometime after the wire transfer was sent from

3   his savings account to Buddy Gregg.  That's my understanding.

4    Q    Okay.  And that's your understanding from the

5   documentation you reviewed?

6    A    From -- I don't know if it was documentation or from

7   testimony or from other records that I've seen.  I'm not sure

8   exactly where I saw that.

9          MS. TUCCI-JARRAF:  I don't believe I have any other

10  questions.  Thank you, Mr. Scrima.

11         THE COURT:  Thank you.

12         Mr. Beane, cross-examination?

13                    **CROSS-EXAMINATION**

14  BY MR. BEANE:

15   Q    I just have one question for you, Mr. Scrima.

16         You keep -- the prosecutor keeps bringing up

17  July 3rd.  I don't see July 3rd anywhere on these graphs.  Is

18  that --

19   A    That's correct.  They are not included in this --

20  these flowcharts.

21   Q    Did you see anything happen on July 3rd?

22   A    If I recall correctly, I don't have your statements

23  in front of me, but there were, I believe, purchases, bill

24  payments made on that -- on or before, around that time, yes.

25         MR. BEANE:  Okay.  All right.  No further questions.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  Thank you.

2          Redirect?

3          MS. DAVIDSON:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  This witness may

5  be excused.

6          MS. DAVIDSON:  Your Honor, at this time, the United

7  States rests.

8          THE COURT:  All right.  Thank you.  The government

9  has rested on its case in chief.

10          Why don't we do this, before we switch things over,

11  let's go ahead and let the jury take a little bit earlier

12  afternoon break than normal.  We'll excuse the jury for a

13  break.

14      (Jury out at 2:23 p.m.)

15          THE COURT:  All right.  Everyone may be seated.  Any

16  motions from the defendants or otherwise ready to proceed

17  forward with case in chief?

18          MR. LLOYD:  I think both defendants want to make

19  their motions, Your Honor.  Ms. Tucci-Jarraf asked if she might

20  have a couple of minutes to run to the hall.

21          THE COURT:  That would be fine.  Why don't we go

22  ahead -- let me ask this -- can I ask you a few questions, or

23  do you -- you got a couple minutes?

24          MS. TUCCI-JARRAF:  A few.

25          THE COURT:  Okay.  Give the defendants an opportunity

UNITED STATES DISTRICT COURT

1    to make any motions then.  Do the defendants anticipate making

2    opening statements?  We've talked about that.  You deferred

3    your opening statements.

4              MS. TUCCI-JARRAF:  I believe with -- still without

5    prejudice, that Mr. Beane is going to be doing his case first.

6              THE COURT:  You're going to go first, Mr. Beane?

7              MS. TUCCI-JARRAF:  And then I'm going to defer my

8    opening until after he's made his case.

9              THE COURT:  Are you going to give an opening

10   statement, Mr. Beane?

11             MR. BEANE:  Yes.

12             THE COURT:  All right.  We were going to give you up

13   to 20 minutes.  Is that sufficient time?

14             MR. BEANE:  Yes.

15             THE COURT:  I remind you opening statement is what

16   you anticipate the evidence to show, not an argument.

17             MR. BEANE:  Yes.

18             THE COURT:  What about witnesses?  Do you intend to

19   call yourself?

20             MR. BEANE:  Yes.

21             THE COURT:  Any other witnesses besides yourself?

22             MR. BEANE:  No.

23             THE COURT:  Why don't we -- we probably at least have

24   time for that today.  I don't think we'll finish the cases

25   today.  So why don't we -- with that in mind, why don't we take

                    UNITED STATES DISTRICT COURT

1    a recess, come back in and hear motions -- take about a

2    ten-minute recess, come back and hear motions, and then bring

3    the jury back in and start with Mr. Beane's case and opening

4    statement and case in chief.

5              All right.  Thank you.

6         (Recess from 2:26 p.m. to 2:39 p.m.)

7              THE COURTROOM DEPUTY:  This honorable court is again

8    in session.  Please come to order and be seated.

9              THE COURT:  Thank you.  Motions by the defendants?

10             MS. TUCCI-JARRAF:  Without prejudice, Heather Ann

11   Tucci-Jarraf, and this is in regards to a Rule 29.  And this is

12   a three-part --

13             THE COURT:  If you'll make it from the podium,

14   please.

15             MS. TUCCI-JARRAF:  Oh, I apologize.

16             Can you hear me up here?

17             THE COURT:  Go ahead.

18             MS. TUCCI-JARRAF:  Without prejudice, this is

19   regarding a Rule 29 and this will be a three part.

20             MS. DAVIDSON:  Your Honor, to be clear, is she only

21   addressing Count 7, which is what I think is appropriate?

22             THE COURT:  That's what --

23             MS. TUCCI-JARRAF:  I can only account --

24             THE COURT:  Count 7 as to you is what you --

25             MS. TUCCI-JARRAF:  Yeah.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  Great.

2          MS. TUCCI-JARRAF:  Yeah.

3          THE COURT:  Bringing a Rule 29 --

4          MS. TUCCI-JARRAF:  Unless there's more that she's

5  done that I don't know about.

6          THE COURT:  Go ahead.

7          MS. TUCCI-JARRAF:  Okay.

8          THE COURT:  Rule 29 motion as to Count 7 of the

9  indictment as to Ms. Tucci-Jarraf.

10         MS. TUCCI-JARRAF:  Okay.  So the first part is, I

11  said there were three parts.  So the first part was the

12  document on the clerk's records, Document 101 and 102, which

13  were filed on January 23rd, prior to jury selection, which is

14  also -- we handled it orally prior to a jury selection being

15  done, and that would be Document 101, Standing Praecipe

16  Declaration of Due Cause and Judgment and Order of Dismissal,

17  and I am restating and incorporating by reference the entire

18  document as set forth in full.

19         THE COURT:  All right.  That's part one.

20         MS. TUCCI-JARRAF:  No, that's -- okay -- part 1A.

21  And then part 1B is Document 102, which was Praecipe and Notice

22  of Standing of Notice and Filing of -- excuse me, Standing

23  Declaration, which was also filed on January 23rd, 2018, prior

24  to jury selection in this trial.  And I'm restating and

25  incorporating by reference as set forth in full the entire

UNITED STATES DISTRICT COURT

1    document.

2         Okay.  And number two, we go to Rule 20 under Rule

3    29, the government has closed the evidence for their case in

4    chief, and they are required to provide -- or excuse me, to

5    produce evidence sufficient to sustain a conviction.

6         And I'm stating that they have not produced evidence

7    for which a jury would be able to make judgment of a conviction

8    and that the evidence is sufficient to sustain that conviction

9    in this matter.

10        And, specifically, that there was any agreement

11   between Mr. Beane and myself, there's been nothing produced on

12   that at the time that the events occurred of alleged money

13   laundering, alleged transactions from -- regarding Federal

14   Reserve, USAA, et cetera, that nothing has been submitted

15   showing that prior to July 8th, there was any communication

16   presented by any of the state's witnesses at all.

17        And all those transactions had actually already been

18   done before I had even spoken to any of the witnesses that had

19   been presented.

20        Furthermore, there's been insufficient evidence as

21   regards to the element of intention, which is required for

22   conspiracies to money launder or conspiracy of Count 7, and

23   that there's an intention to commit the crime and do the

24   charge.

25        Again, every single date that was presented, all the

UNITED STATES DISTRICT COURT

 1   testimony was after July 7th, and there was no intent, period,

 2   provided in regards to myself trying to commit or hide

 3   anything, but was rather trying to protect and make sure

 4   everyone had documentation at that point.

 5           So at this time, pursuant to those praecipes,

 6   Document 101, 102, as well as the lack of insufficient evidence

 7   to show agreement, as well as the elements of intent to commit

 8   Count 7, I stand that this -- that this case should be

 9   dismissed against myself, Heather Ann Tucci-Jarraf.

10           THE COURT:  Thank you.

11           Mr. Beane, do you want to present a motion?

12           MR. BEANE:  Can I have a minute?

13           THE COURT:  Do you want to talk with Mr. McGrath?

14           MR. BEANE:  Yes.  Thank you.

15           THE COURT:  Why don't we do this, Ms. Davidson, while

16   giving Mr. Beane a few moments, why don't you go ahead and

17   respond to Ms. Tucci-Jarraf's Rule 29 motion.

18           MS. DAVIDSON:  Yes, Your Honor.

19           THE COURT:  On behalf of the government.

20           MS. DAVIDSON:  Your Honor, as this Court is aware,

21   Count 7 alleges conspiracy to commit money laundering, and it

22   says in or on or about July 2017.  It is not contained by a

23   specific date.

24           And the evidence is clear in this case that Jerald

25   Byrne testified that Randall Beane told him on July 7th that

UNITED STATES DISTRICT COURT

his attorney, Ms. Tucci-Jarraf, had advised him that these
documents need to be put in trust.

It's our position that those trust documents which
she provided were further ways in which she sought to assist
him in hiding the money, committing bank -- money laundering.

She also talked to Mr. Dwayne Griffith on the 8th.
And in that conversation, she tells him that -- I'm sorry,
Randall Beane tells Dwayne Griffith on the 8th that his
attorney, Heather Ann Tucci-Jarraf, has advised him that those
funds should be in a Fedwire and not a check, thus attempting
to launder more money with the Ted Russell Ford purchase.

And then on the 10th, as both defendants learned that
USAA is attempting to claw back the Fedwire, which was already
completed, she went through multiple phone calls and provided
documents at length to try to get the transaction to go
forward.  And we believe that this meets each and every element
of the conspiracy to commit money laundering.

While there's not a document that proves the
agreement between the two, it is clear by the circumstantial
evidence in this case.

And if you look at Rule 29, it requires that the
evidence must be viewed in the light most favorable to the
United States.  And based on that, we believe the Rule 29 with
regard to Count 7 should be denied.

THE COURT:  All right.  Thank you.

UNITED STATES DISTRICT COURT

1          Mr. Beane, are you ready to present your motion?

2          MR. BEANE:  I also want to do a Rule 29 motion.

3          THE COURT:  All right.  If you'll come up to the

4    podium then.

5          MR. BEANE:  I'm sorry.

6          THE COURT:  Thank you.

7          MR. BEANE:  I also want to do a Rule 29 motion as far

8    as Counts 1 through 7 are concerned.  I do not believe that all

9    the elements have been or the charges have been met,

10   specifically the element of intent.  I also want to --

11   Document 101, I want to adopt that.

12         THE COURT:  101 and 102?

13         MR. BEANE:  Yes.

14         THE COURT:  Adopt the argument --

15         MR. BEANE:  Yes.

16         THE WITNESS:  -- made by Ms. Tucci-Jarraf?

17         MR. BEANE:  Yes.

18         THE COURT:  Anything else?

19         MR. BEANE:  No.

20         THE COURT:  All right.

21         Ms. Davidson, would you like to respond to Defendant

22   Mr. Beane's Rule 29 motion?

23         MS. DAVIDSON:  Yes, Your Honor.  I -- I reiterate the

24   discussion that I made regarding Count 7 regarding the

25   agreement between the two parties.

                    UNITED STATES DISTRICT COURT

1          And, further, with Mr. Beane purchasing the RV, the

2     clear attempt, the evidence shows, of money laundering, and he

3     performed the Fedwire, which he knew, based on his

4     conversations with Ms. Tucci-Jarraf was extremely hard to call

5     back.  And so he was seeking to hide his ill-gotten gains with

6     the purchase of an asset.

7          The intent is shown in this case for 1 through 6,

8     based on many things, the fact that he was -- the speed with

9     which he created these transactions, the greed in which he

10    committed these transactions, $31 million worth of CDs.

11         Nowhere in that video, which has been referenced at

12    length, the Harvey Dent video, did it talk about purchasing CDs

13    worth $31 million and closing them all out.  That was

14    Mr. Beane's scheme.  And he accomplished it extremely well,

15    which is why USAA Bank has such a huge loss.

16         If you look at each of the elements, we've met all of

17    the jurisdictional requirements.  We've shown that the elements

18    of USAA Bank, that it was FDI insured, and we've proved all the

19    wire transactions.

20         And based on that and the intent that we believe is

21    shown by the circumstantial evidence in this case, we ask Rule

22    29 be denied with regard to all seven counts to Mr. Beane.

23         THE COURT:  All right.  Thank you, everyone, for your

24    arguments.  The Court, in the interest of time in part, will

25    take the motions under advisement and issue a ruling sometime

UNITED STATES DISTRICT COURT

1    hereafter.

2         So that -- motions having been made, then, Mr. Beane,

3    you're ready to proceed forward with your case in chief.

4         MR. BEANE:  Yes.

5         THE COURT:  All right.  We'll bring the jury back in

6    and you'll have the opportunity to make an opening statement,

7    what you said you indicated you would like to do.  And you

8    indicated further you'd like to call yourself as a witness.

9         MR. BEANE:  Yes.

10        THE COURT:  And remind you that you'll -- as a

11   witness, since you won't have an attorney or yourself asking

12   you questions, you'll be able to give a factual narrative, but

13   it needs to be a fact-based narrative, not an argument, like a

14   closing argument.

15        MR. BEANE:  Okay.

16        THE COURT:  You understand that.  And, you know, the

17   government's counsel will have the opportunity to, I guess,

18   interrupt your factual narrative to make objections if they

19   think you're offering testimony that's not relevant.

20        Just by way of example, if the government makes an

21   objection, if you'll just pause and give me an opportunity to

22   rule on any objection that might be made.

23        MR. BEANE:  Okay.

24        THE COURT:  All right.  Let's go ahead and bring our

25   jury back in.  Might take a minute to get them lined up, so you

UNITED STATES DISTRICT COURT

 1   can come on up to the -- well, why don't you just wait,

 2   Mr. Beane.  We'll wait until they come in.

 3        (Jury in at 2:53 p.m.)

 4             THE COURT:  Thank you.  Everyone may be seated.

 5             Remind members of the jury that immediately prior to

 6   our break, the government rested on its case in chief.

 7             The defendants now have the opportunity to present

 8   whatever evidence they would like to as part of their

 9   respective cases in chief.  The defendant, Mr. Beane, has opted

10   to go first.

11             You'll also recall that the government made an

12   opening statement, but the defendants both reserved the right

13   to make an opening statement at a later point in time, i.e., at

14   the beginning of their case, so Mr. Beane has the opportunity

15   to make an opening statement at this time.

16             And I'll remind the jury, as I did prior to the

17   government's opening statement, that opening statements are not

18   evidence, but this is the defendant Mr. Beane's opportunity to

19   present an opening statement to you as what he believes the

20   evidence, at least from the standpoint of his case in chief,

21   will show in this case.

22             Mr. Beane, you can proceed forward with opening

23   statement.

24        (Whereupon, Defendant Beane's opening statement was had

25   and reported but not herein transcribed.)

UNITED STATES DISTRICT COURT

1         THE COURT:  Thank you.  And we discussed this during

2   break, but you would like to call yourself as a witness in this

3   case.

4         MR. BEANE:  Yes, sir.

5         THE COURT:  If you'll take the stand.  Let me remind

6   the jury -- you can go ahead and take the stand.  Mr. Beane, as

7   you know, has decided to represent himself in this case.  So in

8   that regard, there won't be someone asking him questions and

9   then his giving answers.  Instead, the Court has allowed him to

10  give a factual narrative as his testimony in this case.

11        And then after he is done with that, which in effect

12  would be his direct examination, then counsel would have the

13  opportunity to cross-examine through questions.

14        So we'll now swear in this witness.

15        THE COURTROOM DEPUTY:  Raise your right hand.

16  WHEREUPON,

17                  **RANDALL KEITH BEANE,**

18  was called as a witness and, after having been first duly

19  sworn, testified as follows:

20                  **DIRECT EXAMINATION**

21        THE COURTROOM DEPUTY:  Have a seat, please.

22        THE COURT:  Mr. Beane, you can proceed forward with

23  your testimony via factual narrative.

24        MR. BEANE:  Do I need say and spell my name like

25  we've been doing?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1            THE COURT:  That's okay.  You can just go ahead right

2   into your testimony.

3            MR. BEANE:  I wanted to start out a little bit of my

4   background and kind of lead into why I'm even in this courtroom

5   today.

6            I grew up in North Carolina on a farm with my

7   grandparents.  Actually, both sets of my grandparents had

8   farms, so I grew up with a lot of the respect of things that --

9   like gardening where, you know, we raised gardens to where we

10  had enough produce in abundance to supply food for a lot of

11  families in the area that didn't have the ability to have a

12  garden or have food like we did.  So we -- I was raised to

13  share things in a way that my grandparents taught me.

14           I learned at an early age that I liked to dissect

15  electronics.  I would find old telephones, clock radios, VCRs,

16  it didn't matter, as long as it had a cord going to it, I was

17  going to pull it open and find out the guts inside and what

18  made it work.  And that eventually led into me being interested

19  in computers.

20           And after realizing at the time period, that this --

21  the time period was in the early -- late '70s, early '80s, when

22  I became interested in this.  There wasn't a lot in computers.

23  But by the time I got into high school, the first year -- well,

24  first, I think it was either eleventh or twelfth grade was the

25  first year that they had data processing classes, which it was

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1     a class where we learned basic computer programming.  And it

2     was -- I was so excited to sign up for that class, because it

3     was something that I felt like that I could do.

4          So once I got into the class and realized that -- one

5     day, the teacher came to me, she said Randy, "I need to talk to

6     you after class."

7          I was like, "Oh, no."

8          She came to me, she said, "You're doing so good in

9     this class, she said you can almost teach this class better

10    than I do."  She said, "I've talked to the principal and we

11    would like for you to maybe give up your study hall time and

12    come and be an assistant teacher in my class with me."

13         I was so excited.  I was like, wow, I can't believe

14    this.

15         I did -- I -- a lot of the students in school were

16    coming to me, and it was exciting to be able to share something

17    with people that was very simple to me, but complicated to

18    them, and be able to share with them in a way that they

19    understood because I was on their level.

20         So when I graduated school and went into the

21    workforce, I graduated high school in '85, and, you know, back

22    then, factory jobs were the norm.  When you got out of school,

23    if you didn't have a college education, a factory job was your

24    bread and butter, because they had benefits, they had ways of

25    increasing your worth as you worked.

UNITED STATES DISTRICT COURT

1    And that just didn't interest me.  I tried it.  It

2    didn't work.

3    So I really had this longing to be -- to do something

4    with computers.  And so a buddy of mine talked to me about the

5    military.  So I took the course, the ASVAB was the entrance

6    exam for the military, and I -- I won't say I aced it, but I

7    did really well on it, and was able to just about get any job

8    in the military I wanted, aside from college education, which

9    would be an officer.  I could do anything that an enlisted

10   person could sign up for.

11   So I found out that they had an opening for a

12   electronics engineering and computer programming specialist.  I

13   didn't know what that meant, but I liked the sound of it.  And

14   so I ended up going to school in the mil -- in the Air Force

15   and graduated top of my class in electronics engineering and

16   computer programming.

17   And during the graduation period, I was investigated

18   by the FBI for a top secret clearance, which I was awarded.

19   Once I got that clearance and got out into the field in doing

20   my job, it took a few months before I realized what I was

21   really doing.

22   The top secret clearance, I didn't understand why I

23   needed it.  But when I found out what I was doing on my job was

24   listening to phone calls of my fellow Americans, it bothered

25   me.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1          It hurt me, because being from a country -- from the

2   country, where I'm from, you know, just your friends and

3   family, your neighbors, everybody trusts each other in a way

4   that you don't have to spy on each other, you don't have to

5   worry if somebody's coming to steal from you.  We could leave

6   our doors unlocked at night.  I mean, we did a lot.  We didn't

7   have to worry about locking the house up tight or worrying

8   about things that people said or done.

9          But when I realized that here we were, keywords would

10  tag phone calls, like, let's just say, for instance, you're

11  giving directions to someone, and you say go down to the white

12  house and turn right, that might key your phone call to be

13  listened to.  Well, this is in the early '90s when I'm doing

14  this.

15         So I'm letting my friends, my buddies know back home,

16  "Hey, don't say anything on a phone call you don't want the

17  government to hear."

18         And they're all thinking I'm crazy, because this is

19  unheard of.  Who would spy on us?

20         And so that began a quest in me, like I said, at a

21  young age, I had a desire to dissect electronics, and that

22  desire only manifested as I got older in different areas.

23         Well, what happened was, while I was in the military,

24  I learned some things.  One thing I learned about was our birth

25  certificate was actually printed on bank bond paper.  Well, at

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

 1     the time that I heard that, it didn't mean a lot to me.  But as

 2     I became to learn some things and I wondered why is it printed

 3     on bank bond paper.

 4            Well, you may be wondering what bank bond paper is.

 5     Think about a car title, think about a deed.  They're all

 6     printed on bank bond paper, and the reason is, is because they

 7     have value to them, and you use those to gain value or to maybe

 8     borrow money to purchase them.

 9            So I had to wonder on occasion what does it mean to

10     have your birth certificate printed on bank bond paper?  Well,

11     I don't know if you've ever heard of microprinting, but if you

12     take your original birth certificate and you look around in the

13     scrolling around the edges of it, you can actually take a

14     magnifying glass and read that it's printed on bank bond paper.

15            So that began my quest into some things that were

16     going on.  Actually, my quest began when I was learning we were

17     spying on our American neighbors, and -- let me drink some

18     water here.

19            I also learned at the same time that -- back to

20     microprinting -- on our -- when you write a check, the

21     signature line on your check looks like a line, but if you take

22     a magnifying glass and look at that line, it's actually words.

23     I didn't know that.  But when I realized that and you realize

24     there's little things going on that you don't see all the

25     time -- there's things right in front of your face that you

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1    can't see sometimes.

2         So I started learning, and I was telling some friends

3    the other day, I had gotten -- at one point, as I was getting

4    older and out of the military now, I started my own business

5    and I'm doing things, you know, there's things that came along,

6    like 9/11, and you just hear horror stories about our

7    government being involved in things that we wouldn't dream of.

8         We wouldn't dream of our government doing a lot of

9    things to us, but sometimes information comes to you, and you

10   just have to digest it and do what you can with it.

11        Well, one of the things that I learned at some point

12   was that birth certificate was actually a trust account held in

13   trust, like I asked the fellow earlier, a straw man account.

14   And I began to learn some things about the straw man account,

15   and I was doing a lot of research.  I did years and years of

16   research on a lot of stuff.  There was a lot of military -- my

17   military friends doing the same research, and I would run into

18   people who are doing the same research.

19        Well, I ran across an interview, and I started

20   listening to this program on Blog Talk Radio, and one of the

21   people who came on this radio show was Ms. Heather

22   Tucci-Jarraf, and she started sharing with us some things

23   that -- some investigations that she had held and things that

24   she had discovered.

25        One of the things she did was investigate the

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1    mortgage market.  And you remember when all the home mortgages

2    and people were being thrown out of their homes, and we had

3    a -- 2008, the foreclosures, people were being thrown out on

4    the streets.

5         I mean, those things, when you have a heart for your

6    fellow Americans, you -- things like that, if you're not -- if

7    it doesn't happen to you, you don't really care, but when you

8    do know people it happens to, it affects you.

9         Well, things like that were affecting me because it

10   was happening to people I knew.  And I started learning things

11   that -- for one, there were some military -- there was a

12   military general whose family had passed away, and he had

13   learned of the discrepancies and the fraud in the mortgage

14   documents, and to my knowledge, I think Heather was -- had

15   uncovered a lot of that fraud.

16        And so I built up a trust in listening to what she

17   had done, and I admired her for what she had found and what she

18   had gone through in order to help others see that.

19        And so she had brought up the fact that these

20   accounts were actually there and that they were -- we were the

21   value behind all the money in the world.  And I had to -- you

22   know, that caught my ear.  We're the value.

23        What does that mean?  Well, let's go back to the

24   birth certificate.  If the birth certificate -- if the birth

25   certificate holds the value, then who's holding that value?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1    Who's gaining the value from it?  I'm not.  Somebody is.

2              And so when she told me that I was the value, and

3    that the trust was created to fund and that I could get into a

4    lot of different things, but there's a lot of things funded

5    that we don't know about, we have no idea.

6              And I saw a lot of that when I was in the military.

7    I saw $10,000 hammers.

8              One of the expressions was made one time, "Well, why

9    do you need a $10,000 hammer?"

10             "To drive a $10,000 nail."

11             But, really, it's to hide money.  Because if you can

12   spend $10,000 on a hammer and it only costs $5 and you don't

13   have to account for that other $9,995, you can actually hide

14   money that way.  And that's just an example.  That's just an

15   example.  There's a lot more going on like that.

16             So to fast-forward a little bit, going through a

17   period of time when I was researching some information that I

18   had, some information that I got from Ms. Jarraf and from other

19   various sources, she came on and told us that she had done this

20   paperwork -- I don't -- my mind is not -- I am very nervous, so

21   bear with me.

22             But when I heard what she had done, the factualized

23   trust papers is what -- the UCC documents is what they were.

24             MS. SVOLTO:  Objection, Your Honor.  The United

25   States filed a motion in limine regarding the relevancy of

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1  those documents.

2       THE COURT:  I'll sustain that objection, so you don't

3  need to talk about that.

4       MR. BEANE:  Okay.  The documents that she told us --

5  she came on, this was December of 2012, she said, "Merry

6  Christmas."  I think it was 2012 or 2011, she said, "Merry

7  Christmas."  And as I got into reading the documents and the

8  wording, a lot of it just -- I could feel it energetically

9  inside me resonating to the point where it's like, yeah, this

10  makes sense.

11       And so that was in 2012.  Here we are in 2017, and

12  Ms. Tucci-Jarraf and I have not ever had any communication

13  until 2017.  And we -- it was just basically to catch up,

14  because we had -- we had a group of close friends who they all

15  went to Morocco together, they took care of some business over

16  there.  There's a lot of things that were going on that I

17  wasn't privy to, but I understood what was taking place.

18       But anyway, Ms. Tucci-Jarraf and I had never really

19  communicated until spring of this past year, 2017, and it was

20  just basically catching up on how are you done, thank you for

21  what you've done.

22       And I had gotten into a situation in the summer in

23  July back in my hometown of Randolph County, North Carolina.  I

24  got caught up in a court case, and ended up being illegally

25  jailed.  And the first person I could think of to call when I

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1    got back home, because I ended up -- actually, they were going

2    to put me in jail for eight months.

3              A friend of mine helped me get an attorney while I

4    was in jail, and the attorney came to the jail.  We talked for

5    two hours.  When he left, he said, "I'll have you out of this

6    jail in the morning," and he did.  Otherwise, I would have been

7    illegally jailed for eight months, and I only had to be there

8    for two to three weeks.

9              When I got out, I called Ms. Tucci-Jarraf, because

10   all I could think about was, this is not fair.  Things are

11   going on that are literally not fair.  But nobody -- I didn't

12   feel like I had a voice enough to make a difference, but I felt

13   like maybe I had contact with somebody who did.

14             So I contacted Ms. Tucci-Jarraf, and I let her know

15   the situation and her words were, she said, "Randy, that's the

16   old energy.  Do you want to go back into that old energy and

17   stay there, or do you want to move forward and be creative?"

18             I said, "I like that, moving forward and being

19   creative."

20             Well, we hung up the phone and never thought about

21   anything else.  And I went and signed on Facebook and saw this

22   video by Harvey Dent.  And I listened to this for a minute, and

23   I was like, "Where did this come from?"  It just appeared on my

24   Facebook page.

25             I listened to it, and I immediately called

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1   Ms. Jarraf, and I said, "I just found a video about the

2   accounts."

3           And so we talked about it, and she said, "It's -- you

4   know, it's what -- it's the documents that I've told you about.

5   It's -- it's your money."  And so she said, "Go and be and do

6   with it.  Go do what you will with it."

7           There was no plan by to us do anything together.  I

8   simply went on my own accord and decided to try this out,

9   because I had a trust document showing me this account that had

10  been hidden for many years by -- and a lot of people have made

11  effort to find these accounts.  Well, finally, here it is.

12          So I paid off some -- I think my insurance was first.

13  And I actually did that on -- I talked to Ms. Jarraf on the

14  4th.  I called her and told her Happy Independence Day, and I

15  pointed in my heart.  I said Happy Independence Day.  We talked

16  for a little while.

17          And then, later that afternoon on the 4th, I saw the

18  video.  I shared it with Ms. Jarraf.  Like I said, we talked,

19  and she let me know that that had a lot to do with the

20  documents that she had filed.

21          And so like I said, I decided to go ahead and try it.

22  And I did.  I paid my car insurance and it went through.  I was

23  sitting there shaking, and I thought, wow, this is real.

24          If this -- and a matter of fact, I thought, you know,

25  if this wasn't real, I travel a lot with my job, I travel all

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1    over the United States.  I stay at a different hotel every

2    night.  Like I was saying the other day, with USAA, they have a

3    very high security protocol.

4          And so when I'm out on the road, and I get a phone

5    call and USAA is calling, "Mr. Beane, are you in Pennsylvania?

6    Did you just purchase gas?"

7          "No.  How did you know?"

8          "Well, we just saw a purchase on your card and we

9    didn't think it was you."

10         Thank you for calling and telling me that."

11         Developed a trust in me that I felt like that I was

12   taken care of.

13         And so when I logged on the computer with this

14   account, and it went through, to me, in my thinking, the

15   security level is there, that if this isn't real, it ain't

16   going to work.

17         Well, when it went through, I felt like that the

18   security protocols had been met, and that everything was on the

19   up and up.  There was no reason for me to try to fraud anybody.

20   I don't know anything about banking.  Haven't the first clue.

21   I'm not interested.

22         But I'm interested in having financial freedom.  I

23   think we all are.  We've been -- we've all felt -- I've heard

24   many conversations of people feeling like they're in bondage to

25   their job.  So financial freedom is exciting.  Well, I thought

UNITED STATES DISTRICT COURT

Randall Keith Beane - Direct Examination

1    I had found it.

2           And so then I began to think of things, and one of

3    the things that I thought of was the coach.  I thought, you

4    know, I'm staying at a different hotel every night, I'm

5    spending a thousand to $1500 a week on hotel rooms.  I'm paying

6    $2,000 a month for an apartment.  As a matter of fact, at the

7    time, I was paying for two apartments.  I thought, if I get a

8    coach, I can eliminate those hotel cost, I can move out of my

9    apartment, and I've got something to live in and be on the road

10   and do my job.  I can continue to work, because I love my job.

11          So that was my intention in purchasing a coach.  I

12   was excited about that.  I saw a future with it.  No intention

13   of hiding money.  It was using it wisely in my eyes.  That was

14   all the intention that I had.

15          And I -- if any one can attest to who I am, I'm not

16   greedy.  I'm probably one of the most giving people that you'll

17   ever meet.  If you need something and I know you need it, I'm

18   going to get it for you, I promise you with all my heart.  And

19   if it means getting the truth for you, that's what I'm going to

20   do.

21          And that's what I vowed to do when I went into the

22   military was to protect our freedoms, protect who we are.  And

23   I came out feeling defeated in that way after I learned what

24   was going on behind the scenes.

25          And it's still to this day going on behind the

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1  scenes.  When you look at the news and you see things that are

2  shocking, we're getting ready to be revealed a lot of things

3  that are going to be shocking.

4          And I'm telling you, there's a picture being painted

5  in this courtroom that is not true.  So please pay attention,

6  because the truth will shock you.

7          Thank you.

8          THE COURT:  All right.  Thank you, Mr. Beane.  That

9  concludes your direct examination.

10          We'll now proceed to cross-examination, Ms. Svolto?

11          MS. SVOLTO:  Yes, Your Honor.

12                    **CROSS-EXAMINATION**

13  BY MS. SVOLTO:

14      Q    Good afternoon, Mr. Beane.

15      A    Good afternoon.

16      Q    So let's start with some basics, let's see if we can

17  find what we actually agree on.  So you don't dispute that you

18  live in Knoxville at 300 State Street?

19      A    Not at all.

20      Q    Okay.  Apartment 365?

21      A    No, ma'am.  I tell everybody I live in heaven.

22      Q    All right.  You don't dispute that your Social

23  Security number is 24391135 [sic]?

24      A    No, ma'am.

25      Q    And you don't dispute that you initiated the

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    transactions at -- with USAA Bank?

2        A    No, ma'am.

3        Q    So you agree that you used the Internet to access the

4    Federal Reserve, to take that money and put it in your account?

5        A    Yes, ma'am.

6        Q    So you agree that you did that?

7        A    I sure do.

8        Q    And you agree that you purchased over 30 super jumbo

9    certificates of deposits?

10       A    Yes, ma'am.

11       Q    And you agree that you almost immediately cashed

12   those CDs and put that money into your account?

13       A    I don't know what you mean by almost immediately.  I

14   can explain a little better on that if you'll allow me.

15       Q    Sure.

16       A    The night that I did the CDs, I told you I was

17   excited because they went through.  The next morning I got up

18   and I thought, I've got all these -- I've got all these CDs.  I

19   don't remember the exact amount, so I'm not going to say

20   amounts, because a lot of the amounts I'm seeing are differing

21   from what I have a recollection of.  I haven't seen anything in

22   six months.  I've been in jail, so --

23       Q    You purchased the CDs --

24       A    Yes.

25       Q    -- the evening of July 5th and --

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    On the evening of July 5th, correct.  The next

2  morning when I woke up, and I looked at my phone, it was kind

3  of like, I've got to wake up, this is really still here.

4        And so I called USAA to find out how I could go about

5  obtaining a line of credit against the CD.  I didn't want to

6  cash the CD.  I didn't even know I could cash the CD in at that

7  point.  I thought that was not even an option.  I thought I've

8  got to wait 30 days before I can spend any of this money.  That

9  was my initial thinking.

10   Q    And let me back you up to July 3rd.

11   A    I wasn't home on July 3rd.

12   Q    All right.  So in July, early July, you were heavily

13 in debt, weren't you?

14   A    No.

15   Q    You had four auto loans that were -- that were

16 defaulted?

17   A    I was not heavily in debt, no.

18   Q    Okay.  So you had four auto loans that amounted to

19 over $50,000?

20   A    Can I correct you on something?

21   Q    Sure.

22   A    I was not defaulted.  I was in jail for three weeks,

23 and I wanted to make sure that my bills stayed paid.  I was

24 looking in advance.  I was not behind.

25   Q    Okay.  So you contacted USAA --

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1      A    I did.

2      Q    -- to defer payment on those?

3      A    I sure did.

4      Q    Okay.  And do you agree that you were bouncing checks

5    during this time frame?

6      A    Ma'am, I was not bouncing checks.  I have -- I had so

7    many accounts doing automatic draft out of my bank account, and

8    I told you I was on the road a lot.  Those automatic drafts

9    were coming out at times when I didn't realize it.  They

10   weren't -- maybe sometimes my paycheck wouldn't be wired in at

11   exactly when I thought it would when an automatic draft would

12   come out, and so they're going to charge you.

13          Do you know they refunded every single one of those

14   NSF charges on my account, every single one of them?

15     Q    So let me ask you this.  So on July 3rd, you didn't

16   pay off those debts, those auto loans?

17     A    Not on July 3rd, no, ma'am.

18     Q    You didn't pay off any debts on July 3rd?

19     A    No, ma'am.

20     Q    Is that what you're saying?

21     A    Yes, ma'am.

22     Q    Do you remember Government's Exhibit 139?

23     A    Yes, ma'am.

24     Q    I was using the Elmo, but he can bring it up.

25          Government's Exhibit 139.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1        All right.  And so is this your Facebook page?

2    A    It is.

3    Q    Can you please expand where it says "Randy Beane" at

4    the top.  All right.  So this is in July of 2017?

5    A    Yes, ma'am.

6    Q    And then can you go over to the right-hand column

7    where it says Randy Beane in the thumbnail photo.  Thank you.

8        And so what's the date on this post?

9    A    July 3rd.

10   Q    July 3rd.  And what does it say?

11   A    It says, "I just paid off all my debts with my trust

12   account.  Ask me."

13   Q    Okay.  So it sounds like you did pay off your debts

14   on July 3rd?

15   A    I didn't pay off anything on July 3rd, and I can

16   prove it.

17   Q    Okay.  Well, we'll -- we'll take what's in evidence,

18   which is the Facebook post.

19       How about the 5th, you purchased the CDs, they go

20   through 5th, 6th, and 7th.  So you stated that you were the one

21   who made all the CD purchases?

22   A    I did.

23   Q    And you were accessing your trust account.  Is that

24   correct?

25   A    Yes.

UNITED STATES DISTRICT COURT

1    Q    Based on information you received from the Internet?

2    A    Yes.

3    Q    From the Harvey Dent video?

4    A    Correct.

5    Q    And also in part with your extensive research, you

6   testified to --

7    A    Correct.

8    Q    -- into the straw man theory?

9    A    Correct.

10    Q    That your birth certificate is actually redeemable?

11    A    Correct.

12    Q    Also sometimes called the redemption theory?

13    A    I don't know about that.

14    Q    Okay.  So was it your testimony that you learned that

15   the birth certificates, you can cash them in --

16    A    No.

17    Q    -- and they're valuable?

18    A    No.  That was not my testimony.

19    Q    Okay.  So then the straw man theory that the birth

20   certificate has some value to it?

21    A    The birth certificate has value to someone.  I don't

22   know if it has value to me, but it has value to someone because

23   it's printed on bank bond paper.

24    Q    Okay.  So in all your research into the straw man

25   theory and birth certificate theory, did you ever come across

UNITED STATES DISTRICT COURT

1    any Snopes articles?

2         A    Any what?

3         Q    Articles from Snopes.com?

4         A    I have no idea what that is.

5         Q    Okay.  Wikipedia?

6         A    I have no idea what that is.

7         Q    So you have no idea what those websites are, but you

8    did extensive research --

9         A    Yes.

10        Q    -- into the theory?

11        A    Yes.

12        Q    You never came across a website that would have told

13   you the straw man theory is not a valid theory?

14        A    No.

15        Q    So you never came across in any of your research a

16   Snopes article saying that the straw man theory is false?

17        A    I don't know what Snopes are.

18        Q    Okay.  You've never heard of Snopes.com?

19        A    No, ma'am.

20        Q    So your research on the Internet didn't lead you to

21   any websites that told you these theories were false?

22        A    No.

23        Q    Okay.  And so your position is that you believed you

24   had a trust account?

25        A    Yes.

UNITED STATES DISTRICT COURT

1    Q    Okay.  And that the trust account --

2    A    Can I correct you?  I believe we all have one.

3    Q    So I have a trust account too?

4    A    Yes, ma'am.

5    Q    So let me ask you this.  How much money is in your

6  trust account?

7    A    I have no idea.  I am unlimited value is -- if you're

8  unlimited, where -- how much is in it?

9    Q    Okay.  So are you the trustee of that trust account?

10        What do you understand a trust to be?

11   A    We have a beneficiary, a trustee, and a fiduciary.

12   Q    So who's the beneficiary of the trust?

13   A    That's what I'd like to know.

14   Q    So it's not you?

15   A    Well, I thought it was that day.

16   Q    So you thought you were the beneficiary of a trust?

17   A    That day, yes.

18   Q    And that you don't know who the trustee of the trust

19  is?

20   A    Well, according to the factualized trust, I don't

21  understand -- I'm not a lawyer or an attorney, so I'm not going

22  to stand up here and tell you words about things that I have no

23  idea what I'm saying, but I don't understand how you would --

24  who a trustee is and -- I know that a beneficiary reached the

25  benefits, a trustee takes orders from the beneficiary on what

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    to do with the trust, and the fiduciary pays out.  That's what

2    I know about a trust.

3         Q    In all your research, you didn't research what a

4    trustee is or a beneficiary, or who controls the trust?

5         A    The beneficiary reaps the benefits of the trust.  The

6    trustee, in my understanding, is told by the beneficiary how to

7    carry out the orders of the beneficiary.

8         Q    So the beneficiary under this theory tells the

9    trustee what to do and the trustee does it.  Right?

10        A    Yes.  Pretty much.

11        Q    So who's the trustee?

12             So how can you as the beneficiary control anything if

13   you can't go to the trustee, who makes the things happen?

14        A    The documentation of the factualized trust, when I

15   saw that, it says original depository on it, the trustee, so

16   there was some questions I had, but I was just trusting that

17   everything legally was --

18        Q    So let me ask you about this trust document.

19        A    Yes.

20        Q    Where did you get that trust document?

21        A    From the IUV website.

22        Q    From the IUV website?

23        A    Yes.

24        Q    Whose website is it to your understanding?

25        A    BZ Riger, I think that's how you say her last name.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    Q    BZ Riger.  And so she's an associate of Heather Ann

2  Tucci-Jarraf?

3    A    She's a friend of all of us.

4    Q    Okay.  So she posted on that website a trust?

5    A    Yeah.

6    Q    And you believe that is your trust?

7    A    They're our trusts.

8    Q    All your trusts.  So how does the money go into the

9  trust?  Whose money is that?

10   A    It's our money.

11   Q    Okay.  Did you put a deposit into the trust?

12   A    It's energetic.  We are the value.

13   Q    So the --

14   A    The money is created because we have value.

15   Q    Well, okay.  So in a typical trust, for example, you

16  might have a trust that's created for an heir.  Right?

17        So, you know, father dies, leaves money in a trust

18  for the heirs, the children.  And the children contact their

19  trustee when they need to access the fund.  So in that

20  situation, would you agree that the money in that trust came

21  from an inheritance.  Right?

22   A    I wouldn't even associate the two -- the idea with

23  this trust.

24   Q    So that's different.  You can't compare the two?

25   A    No.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    Q    So a trust exists without -- in your view, can a

2  trust exist without anyone making any deposit of money

3  anywhere?

4    A    The trust is created from the value that we have as a

5  human being, energetically on this planet, and money is created

6  from -- here's my -- to go a little deeper, it's my

7  understanding that when you're born, there's an account created

8  that you're going to put so much value into the economy by

9  paying taxes.

10   Q    Just by being born?

11   A    By paying taxes, by working.

12   Q    So did you pay -- would you pay taxes on this

13  $30 million trust or $30 million of trust funds?

14   A    I didn't have time.

15   Q    Okay.  So do you pay taxes on any trust money?

16   A    Not to my knowledge.

17   Q    So you haven't had a trust since the day you were

18  born?

19   A    I didn't know about it.

20   Q    But it existed and money went into it?

21   A    Yes.

22   Q    Did you ever receive a statement from a bank saying,

23  "This is your trust"?

24   A    Why would I?  It's my understanding that you have

25  seven years from the time the trust is created to claim it.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    Q    And where did you hear that information?

2    A    This is in general for a trust.  Within seven years,

3  if you don't claim it, the original creator owns the trust.  If

4  the original creator was the Federal Reserve, then the Federal

5  Reserve owns the trust.

6    Q    So if the Federal Reserve owns the trust, you don't

7  own the trust.  Correct?

8    A    But Ms. Jarraf did documentation that you won't allow

9  me to mention that changed all that.  That's what's missing in

10  this trial.

11    Q    So you claim that there's some documentation that

12  says that when every human being is born -- is this just in the

13  United States?

14    A    No, ma'am.  This is worldwide.

15    Q    Worldwide.  Every human being worldwide --

16    A    Yes, ma'am.

17    Q    -- is born --

18    A    Yes.

19    Q    -- and if they had a birth certificate, the Federal

20  Reserve has money set aside for them for at least -- forever?

21    A    I wouldn't say they set it aside for them, actually.

22  They steal our value from us.

23    Q    The value of your energy?

24    A    Yes.

25    Q    Okay.  All right.  But you personally made no

UNITED STATES DISTRICT COURT

1    deposits into a trust?

2        A    I don't understand what you mean by I made no

3    deposits.  If I'm the value, where's my deposit?

4        Q    So you just have to exist to have value in a trust?

5        A    Do you have any value?

6        Q    I'd certainly like to think so.

7        A    I'd like to think so too.

8        Q    But -- so what you're saying is that me and everybody

9    else in the courtroom can go and access an infinite amount of

10   funds from the Federal Reserve?

11       A    According to the paperwork that I've seen, yes.

12       Q    And that's the paperwork you're relying on?

13       A    I am.

14       Q    Okay.  And so if that's the case, then, let me ask

15   you this, if you have $30 million in a trust account, and I'm

16   using $30 million because that's the amount here, right, would

17   you have kept going?  Would you have kept purchasing

18   certificates of deposit?

19       A    Let me explain this.  The reason that I kept going

20   was because I thought, well, where is the end, click, click,

21   click, click, click?  And I told Heather at the time, I said,

22   "I don't know where to stop."  I said, "Well, my mouse just

23   died, I guess that means I got to stop."

24            So, yes, I would have kept going, because I was

25   proving something that existed that had been covered up for

1    years.

2        Q    So it's your theory that this -- the existence of

3    these trust accounts has been covered up for years?

4        A    Yes.

5        Q    So if that's the case then -- and you believed it's

6    rightfully yours, is that what you're saying?

7        A    It's all of ours.

8        Q    So if it's all of ours and we can access it any time,

9    then you purchased CDs instead of just cashing it.  Right?

10       A    Excuse me?

11       Q    You purchased certificates of deposit instead of

12   taking in direct cash.  Correct?

13       A    Yes.  Because at the -- that evening when I -- when I

14   was on the computer, people were trying to access -- they were

15   buying through PayPal, eBay.

16       Q    And that wasn't working for them, was it?

17       A    Yes, it was.

18       Q    It was working for them in small amounts, large

19   amounts?

20       A    It doesn't matter.  It was working.  It doesn't

21   matter if it's a penny.  If the account clears, it clears.

22   Right?  If it's a million dollars or a penny and it clears,

23   that means there's an account there.

24       Q    Did other people use the purchase of certificate of

25   deposit?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    No.  I was the only one -- I was the first one to do

2    that.

3    Q    Okay.  And was that your idea, Mr. Beane?

4    A    Of course.

5    Q    And so it was your idea to purchase the certificates

6    of deposit --

7    A    Yes, ma'am.

8    Q    -- instead of a direct payment?

9    A    I don't understand what you mean by that.

10   Q    A direct cash withdrawal from your trust, put it that

11   way.

12   A    A direct cash withdrawal from my trust?

13   Q    Uh-huh.  Just like you would do with a withdrawal

14   from your bank account.  Right?

15   A    I bank online, so a direct cash withdrawal is not

16   possible the way I bank.

17   Q    Okay.  So you can transfer money into your account.

18   Right?

19   A    Which is what I did.

20   Q    Exactly.  So if you did that -- but can you take

21   money from an account that is not your account?

22   A    No.

23   Q    So the fact that you were able to get money, at least

24   it made it look like you had money in your account, that, to

25   you, was enough?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    Yes.

2    Q    So you're saying that you just thought it was your

3    money from that point forward?

4    A    With the security protocol set in place with USAA,

5    yes, ma'am, that's exactly what I thought.

6    Q    So you thought USAA gives you the credit for taking

7    withdrawal from what appeared to be the Federal Reserve and

8    some bank account number, right, which, as you said, you don't

9    dispute you did these, so it was your bank account -- the

10   funding bank account information in there?

11   A    I didn't pull numbers out of thin air.

12   Q    Right.  You used your Social Security number.

13   A    Yes.

14   Q    And then your Social Security number with one digit

15   off.  Correct?

16   A    No, ma'am.

17   Q    But the documentation from USAA said that.

18   A    I don't care what the documentation has.  That can be

19   altered.

20   Q    Okay.  You're saying that you didn't put a Trust2

21   into --

22   A    Oh, I did do that.  I labeled the account Trust2,

23   yes.

24   Q    Okay.  And so the Trust2 number was a different

25   number than your original trust number?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    What happened was, that evening when I did that, they

2   started changing routing numbers because so many people were

3   effective at getting into accounts.  They started changing

4   routing numbers.  They changed routing numbers three times that

5   afternoon.

6    Q    Okay.  So then after you get the deposits, and the

7   next day you said you were just shocked to see it's still in

8   your account?

9    A    Yes.

10   Q    All right.  So then you quickly make purchases, don't

11  you?

12   A    No.

13   Q    You went -- that was -- I'm talking about July 6th.

14   A    Can I finish?

15   Q    You can finish.

16   A    I haven't finished what I started explaining earlier.

17  The next morning when I got up and the money was still there, I

18  called USAA to find out how I could go about obtaining credit

19  against a certificate of deposit.  I had no intention of

20  cashing a certificate of deposit.  I didn't even know that was

21  an option.

22       The lady at USAA looked at my account, and she -- she

23  talked with me about my options.  That should have been a

24  recorded phone call that should have been played in this

25  courtroom, but it wasn't.

UNITED STATES DISTRICT COURT

1    She asked me what I wanted to do.

2    I said, "Well, I want to purchase some things."

3    She said, "What kind of things do you want to

4    purchase?"

5    I said, "Well, I want to buy me a truck, and I've

6    been looking at some coaches.  I want to buy a coach" --

7    Q    But --

8    A    -- "for the purpose" -- can I finish, please?

9    THE COURT:  Don't ask questions.  Just -- in effect,

10   you need to make --

11   MR. BEANE:  So US -- when I got on the phone --

12   THE COURT:  Please, sir, let me finish.

13   MR. BEANE:  Okay.

14   THE COURT:  If you feel like you haven't answered the

15   question, then state an objection, you haven't answered the

16   question.

17   MR. BEANE:  Okay.

18   THE COURT:  And then I'll respond.  So go ahead and

19   finish.

20   MR. BEANE:  Okay.  Thank you.

21   THE COURT:  Go ahead.

22   MR. BEANE:  When I was on the phone with USAA

23   inquiring as to what my options were in order to be able to use

24   against a certificate, not cash it in, she said she couldn't

25   think of any way.  She said, "But you do have the option of

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1   cashing it in."

2           I said, "I can do that?"

3           She said, "Yes."

4           I said, "Well --"

5           She said, "It might cost you a penalty."

6           I said, "How much is that penalty?"

7           She said, "Which one do you want to cash in?"

8           I said, "I don't know."  I said, "Well, just --"

9           She said, "Do you want to try a $500,000 one?"

10          I said, "Yeah, that's fine."

11          So at that point, I said, "Well, what's the fee to

12  cash a $500,000 CD in?"

13          She said -- she came back and she "ch, ch, ch, ch,

14  ch," she said, "$47."

15          I said, "Oh, that's all?"

16  BY MS. SVOLTO:

17      Q    All right.  So you decide to deposit the CDs into

18  your banking account.  Correct?

19      A    Yes.  Yes.

20      Q    All right.  And then as soon as it hits your banking

21  account, you make some plans with that money.  Right?

22          You purchase a truck on July 6th from Ted Russell

23  Ford.  Correct?

24          You purchased a truck from Ted Russell Ford on

25  July 6th.  Is that correct?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1      A    I did.

2      Q    Okay.  And then you attempted to purchase that with a

3   check.  Correct?

4      A    I did.

5      Q    And you gave that check to Ted Russell in exchange

6   for an $86,000 truck?

7      A    I did.

8      Q    You got keys to that truck?

9      A    I did.

10      Q    You left with the truck?

11      A    I did.

12      Q    At some point on the 7th, you learned that USAA Bank

13   had frozen your accounts?

14      A    No, ma'am.

15      Q    You learned there was a problem with your accounts?

16      A    Not on the 7th.

17      Q    You did not learn that on the 7th?

18      A    No, ma'am.

19      Q    So that is not why you called Ted Russell Ford back

20   to change the arrangement of the payments?

21      A    On the 7th?

22      Q    On 7th or the 8th?

23      A    No, that's not the reason.

24      Q    Okay.  So on July 7th, you learned that USAA as --

25   there is an issue with your account?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    Not on the 7th.

2           MS. SVOLTO:  Just one second, Your Honor, please.

3           I'd like to ask David to play Government's

4    Exhibit 86.

5           THE COURT:  Already been introduced?

6           MS. SVOLTO:  It has already been introduced.

7           THE COURT:  Go ahead.

8           MS. SVOLTO:  All right.  Government 86, in just a

9    second, we're going to play this.

10          And this Government Exhibit 86 was recorded on

11   July 7th, 2017.

12          (Audio played in open court; not reported.)

13          (Audio paused in open court.)

14   BY MS. SVOLTO:

15   Q    So on July 7th, you find out your checking account is

16   unavailable?

17   A    Ma'am, that is not the 7th.  That is the 8th, on

18   Saturday.  I'm in a restaurant --

19   Q    Let's keep this --

20   A    I'm in a restaurant when I made that call on the --

21   Saturday, the 8th, I've got friends in town who are sitting in

22   the restaurant waiting on me.

23   Q    Mr. Beane, we're going to play the rest of this tape.

24   A    You play it.

25          (Audio played in open court; not reported.)

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1          (Audio paused in open court.)

2     BY MS. SVOLTO:

3          Q     Mr. Beane, you initiated that call to USAA --

4          A     Yes.

5          Q     -- Bank, is what you're saying?

6          A     I did.

7          Q     We clearly hear that.  And you're saying you're at a

8     restaurant when you did this?

9          A     I'm at a restaurant in a parking lot.

10         Q     In a parking lot of a restaurant to initiate a call

11    on why your account is showing unavailable?

12         A     Yes.

13         Q     So you thought that was a good time to make a call

14    about this?

15         A     Excuse me?

16         Q     You thought that was a good time to make a call on

17    this while you're at a restaurant?

18         A     I just found out.  Yes, I'm going to make a call.  I

19    want to know what's going on.

20         Q     And so you seem just shocked in that audio.  Right?

21         A     Wouldn't you be?

22         Q     Well, if $30 million of money I put in there --

23         A     Exactly.

24         Q     Well, let's ask -- let me ask you another thing about

25    some of these recordings.  In one of the recordings, you're

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    asked where the money came from.  Right?

2              USAA asked you, I think it's this call, later on in

3    this very call, on July 7th, you're asked where the money came

4    from, where did you deposit the money from.

5              And do you remember your answers?

6         A    Trust account.

7         Q    You said trust account.  They asked you which bank,

8    and you said you didn't know, it was in your briefcase.

9         A    Yeah.  It was in my briefcase.  I had written it

10   down.

11        Q    You didn't remember that it was the Federal Reserve?

12        A    No, ma'am.  It's not titled the Federal Reserve.  It

13   has a name to it.  It was clearinghouse or something.  When you

14   type in the routing number, it automatically pulls up the bank

15   name on your computer.  It did on mine.  And so I had written

16   down that bank name, and it was in my briefcase.  It was not

17   called the Federal Reserve Bank.  It was called the New York

18   Clearinghouse or something like that.

19        Q    Where did you get that routing number?

20        A    From the Federal Reserve website.

21        Q    So you went to the Federal Reserve website and that

22   was because of the Harvey Dent video?

23        A    No.  Actually, Harvey had the same -- what he was

24   showing was, you'd flip your Social Security card over, there's

25   a -- at the bottom, there's a letter and some numbers.  He said

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1   that letter represents the routing number.  When you go to the

2   Federal Reserve website, you -- they list all these letters.

3   You pull -- you take -- you choose your letter that's on the

4   back of your card, and then you pick the routing number that

5   goes with that letter.

6           Well, his -- his number -- his letter actually

7   happened to be the same as mine.  So I didn't even have to go

8   on the website.  The letter was right there for me.  The

9   routing number was right there for me.

10      Q   So you get the routing number from the Federal

11  Reserve website?

12      A   No.  Actually, I got it from Harvey Dent's video.

13      Q   Okay.  So when you find out your account is

14  unavailable, you make some quick arrangements, don't you?

15      A   Like what?

16      Q   Like you go to Ted Russell Ford and ask them to

17  change the documents from Randall Beane to a trust?

18      A   No, ma'am.  That has nothing to do with the accounts

19  being closed.  Ms. Jarraf, after I had purchased the coach,

20  Ms. Jarraf informed me that I should get --

21      Q   This was before the coach, Mr. Beane.

22      A   No, ma'am.

23      Q   This was during the transaction at Ted Russell Ford.

24      A   No, ma'am.  I think I know when I did what I did.

25          The transaction for the truck was done on the -- on

UNITED STATES DISTRICT COURT

1    the 6th -- no, the 5th.  I can't remember.  I've got the

2    paperwork over there.

3         Q    So do we.

4         A    Okay.  Anyway, when I had done the coach purchase,

5    she suggested that I get the MCO because I'm paying cash.

6         Q    When you say "she," you're talking about Heather Ann

7    Tucci-Jarraf.  Correct?

8         A    Yes, I am.  Because whether you realize it or not,

9    the MCO goes to the state and the state actually owns your

10   vehicle, and the title is giving you use of the vehicle.  You

11   don't actually own it with a title.  You actually own it with

12   the MCO or the MSO, whatever they call it.

13        Q    A title registration through the state is no good to

14   you, Mr. Beane?

15        A    I'm not saying it's any good, but you -- that's the

16   reason the state can tax you on the vehicle is because the MCO

17   gives you full legal ownership.  If you take the MCO to the

18   DMV, then they own it, they just give you a title to use it.

19   You don't own it.  That's how come the state can take things

20   from you, because they actually own it, and they allow you to

21   use it.

22        Q    According to you, if we have an MSO, right, the

23   manufacturer of the --

24        A    Certificate of origin.

25        Q    -- origin, if we have an MSO, we --

                    UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    Then you outright own it.

2    Q    -- we outright own it and we don't have to pay state

3  tax?

4    A    That's not my motive here.

5    Q    So you want to make sure you own it and the state

6  can't tax you, though?

7    A    I'm not saying that.

8    Q    Okay.  So, then, you make arrangements after talking

9  to your codefendant to change the trust document -- change the

10  purchase documents to a trust?

11    A    Yes.

12    Q    And you also make arrangements to cancel the check

13  and do a wire instead, don't you?

14    A    Correct.

15    Q    But that never happens, does it?

16    A    No.

17    Q    It doesn't happen, because USAA finds out --

18    A    No.

19    Q    -- they freeze your account.  No?

20    A    No, ma'am.

21    Q    That's not what happens?

22         So on July 6th after Ted Russell Ford, you also go to

23  Buddy Gregg Motor Homes.  Correct?

24    A    Repeat the question, please.

25    Q    After you make your initial purchase of the truck on

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    July 6th, you also go to Buddy Gregg Motor Home.

2        A    I had been going to Buddy Gregg Motor Homes for a

3    while looking at coaches before I ever found Harvey Dent's

4    video.

5        Q    So -- and before you came in to a trust fund worth

6    infinite --

7        A    Yes.

8        Q    -- amount of dollars?

9        A    Yes.

10        Q    Okay.  And so you went to Buddy Gregg and you picked

11    out a motor coach.  Right?

12        A    No.  Actually, I did not pick out a motor coach.  I

13    went and looked at some coaches.  I had been looking at some

14    coaches that weren't --

15        Q    On July 6th, you went and picked out a motor coach?

16        A    No, ma'am, I did not.

17        Q    Okay.  So on July --

18        A    No, ma'am, I did not.

19        Q    So on July 6th --

20        A    Let me explain what I did.

21            THE REPORTER:  Wait a minute.  I need y'all to speak

22    one at a time, please.

23            THE WITNESS:  Let me explain what I did.  I went to

24    Buddy Gregg, I spoke to a fellow named Dan Lassetter.  We spent

25    quite a bit of that evening together looking at coaches.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    When -- when he -- when we finished up that afternoon, I feel

2    like I had made a new friend.  We talked about how we got

3    along, how we just felt like we had known each other for a long

4    time.  And I left that evening.  I didn't make a decision on

5    any --

6    BY MS. SVOLTO:

7         Q    You didn't make a decision --

8         A    No, ma'am.

9         Q    -- on July 6th?

10        A    No, ma'am.

11        Q    All right.  We'd like to pull up a Government

12   Exhibit.  Give me one second.

13        A    So I'm going to finish talking while you're looking

14   for what you're looking for.

15        Q    I haven't asked you a question yet.

16        A    But I'm not finished explaining what I was

17   explaining.

18             THE COURT:  Let's just wait for the next question.

19             MR. BEANE:  All right.

20             MR. McGRATH:  Your Honor, may I use this time to

21   approach Mr. Beane to explain some routine procedure while

22   they're looking at the documents?

23             THE COURT:  Yes.

24             MS. TUCCI-JARRAF:  May I use the restroom?  I have an

25   issue to take care of.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1          THE COURT:  Go ahead.  We won't ask any questions

2    till you get back.

3          Any members of the jury need a restroom break?  All

4    right.  We'll take a two-minute break right here.

5          He wants to have some documents up with him.

6          Looks like we're ready to continue.

7    BY MS. SVOLTO:

8     Q    Okay.  Mr. Beane, now I'm showing you what has

9    already been admitted as Government's Exhibit 102.  So you

10   stated you did not go and pick out a truck at Ted Russell Ford

11   on July 6th -- I'm sorry, excuse me, you did not pay a deposit

12   to Buddy Gregg on July 6th.  Is that your testimony?

13    A    That's not the question you asked me.

14    Q    So on July 6th, 2017, did you go and pick out a motor

15   home and put down a deposit of $10,000 to Buddy Gregg Motor

16   Home?

17    A    There's two parts to that question.  I did put down a

18   deposit, but I did not go to Buddy Gregg that day.

19    Q    Okay.  So you made a deposit on July 6th, you didn't

20   go on July 6th?

21    A    No.

22    Q    Okay.  So Mr. Byrne, when he said you first came in

23   on July 6th --

24    A    Was incorrect.

25    Q    -- to make this -- okay.  Great.

UNITED STATES DISTRICT COURT

1          So -- but can we highlight the receipt area on the

2     left-hand side?

3          Okay.  So it does show a deposit for $10,000?

4     A    Correct.

5     Q    Okay.  But you weren't there that day, is what you're

6     saying?

7     A    No, ma'am.

8     Q    So you gave them that deposit on what day then?

9     A    This 10,000?

10    Q    Uh-huh.

11    A    7/6 at 17:42 in the afternoon.

12    Q    Okay.  And so on July 7th, you called to find out how

13    you can wire the money to Buddy Gregg.  Correct?

14    A    On July.

15    Q    On July the 7th, you called USAA?

16    A    Yes.  Yes.

17    Q    To wire money to Buddy Gregg?

18    A    While I was eating breakfast, yes.

19    Q    Okay.  And then you wire $493,000 -- $493,110 to

20    Buddy Gregg?

21    A    Correct.  Actually, if I may expound on that, the

22    coach that I ended up purchasing was not the coach that I

23    originally thought that I had picked out.

24    Q    All right.  So on July 7th, when you wired the money

25    to Buddy Gregg and you purchased -- you complete the purchase

UNITED STATES DISTRICT COURT

1   of the coach, you fill out the purchase agreement paperwork.

2   Correct?

3       A    On the 7th?

4       Q    On July 7th.

5       A    Correct.

6       Q    And on July 7th, you also tell Buddy Gregg to change

7   the paperwork.  Correct?

8       A    Actually, when I got to the dealership on the 7th,

9   the paperwork was ready with Randy Beane on it.

10      Q    And so you told them that it has to be changed.

11  Correct?

12      A    Yes.  Correct.

13      Q    And needed to be changed and put into a trust name?

14      A    Correct.

15      Q    And you said that was on the basis of recommendation

16  from your attorney.  Correct?

17      A    Correct.

18      Q    All right.  So you consider your codefendant your

19  attorney.  Is that correct?

20      A    On this -- on the trust document, she's an attorney

21  for the trust document.  She knows all about the trust.

22      Q    Is she everyone's attorney on the trust document?

23      A    She created the paperwork.

24      Q    So is the trust document that you referred to earlier

25  and you're referring to now, are those the same document?

Randall Keith Beane - Cross-Examination

1     A     Excuse me?

2     Q     The trust document that you've been referring to --

3     A     The factualized trust.

4     Q     The factualized trust, are those the same documents?

5     A     That I'm referring to?

6     Q     Right.  You talked about having --

7     A     No.

8     Q     -- learning about the trust initially and then --

9     A     No, there's other documents I'm not allowed to

10    mention.

11    Q     And those are the documents that establish the trust,

12    you're saying?

13    A     Correct.

14    Q     So then we've got these trust documents that you

15    provided Buddy Gregg?

16    A     Yes.

17    Q     So these documents, though, don't show the origin of

18    the trust, do they?

19    A     They reference the documents that we can't discuss in

20    court.

21    Q     And -- all right.  So then we've got on Buddy -- so

22    on July 7th, you go finish your purchase with Buddy Gregg, you

23    learn that your USAA account is unavailable.  Correct?

24    A     Not on the 7th, no.

25    Q     So that call that we heard that was recorded on

UNITED STATES DISTRICT COURT

1    July 7th, 2017 --

2        A      That was the 8th.  That was recorded on the 8th.

3        Q      That's your testimony?

4        A      That is my testimony, correct.

5        Q      So USAA records are wrong there?

6        A      Something is wrong, because I -- on the 7th, I was

7    going through the coach and I spent the night in the coach.  I

8    never -- I wasn't in that restaurant on the 7th.

9        Q      Okay.  So -- so those USAA records are wrong.

10              And so you find out that the account is unavailable.

11              Do you then try and figure out -- like you said

12   earlier, you were surprised it worked?

13       A      I was.

14       Q      You were surprised that money got deposited into your

15   account?

16       A      Yes.

17       Q      You were surprised you were able to purchase 31 CDs

18   in a row?

19       A      I was, yes.

20       Q      You were surprised by that.  You were surprised the

21   next morning when the money showed up in your account?

22       A      I was.

23       Q      So surprised that you almost immediately spent it?

24       A      I didn't immediately spend it.  I called USAA to find

25   out how I could get a line of credit against it.

Randall Keith Beane - Cross-Examination

1      Q     So you call USAA to figure out how you're going to

2 use the money?

3      A     Correct.

4      Q     All right.  And then that day, you make the

5 purchases, don't you?

6      A     I purchased the truck that day.

7      Q     And you make the deposit to Buddy Gregg that day?

8      A     That afternoon, yes -- or that evening, I'm sorry.

9      Q     All right.  And you tried to get the MSOs to Ted

10 Russell Ford for the truck.  Correct?

11     A     That day, no.

12     Q     But on the 7th or 8th, you go to Ted Russell Ford?

13     A     Can I see a calendar, please?

14     Q     Sure.  I'm sorry, I don't have the calendar.

15           MS. DAVIDSON:  Here it is.

16 BY MS. SVOLTO:

17     Q     Here it is.  Can we have the Elmo back?  All right.

18           Okay.  So on July 6th, you pay a down deposit with

19 Buddy Gregg, you purchase the $86,000 truck?

20     A     That receipt was for the 6th?  Yes.

21     Q     Okay.  So then you get the M -- you attempt to get

22 the MSO from -- for the 2017 Ford truck on which day?  What's

23 your testimony?

24     A     On Saturday morning.

25     Q     The 8th?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    No.  Yes.  Saturday morning.

2    Q    Okay.  So on July 8th, you attempt to get the MSO,

3   and Ted Russell Ford won't give you the MSO.  Correct?

4    A    No.  I sat down and talked with the finance manager.

5   I don't remember talking with the guy that was here today about

6   that.  I talked to the finance manager, and he understood

7   everything.  I was going to bring the factualized trust in for

8   him to do the paperwork.

9    Q    So it's your testimony that you did not go and ask

10   for the MSO on July 8th?

11    A    I told him we needed to redo the paperwork with --

12   and do the MSO.

13    Q    Okay.  And so you do recall asking for the MSO as

14   opposed --

15    A    Yes, I do actually recall asking for the MSO.

16    Q    You asked for the MSO.  And you asked for the MSO

17   that weekend?

18    A    No.  Not to take with me, no.  I wanted to make sure

19   all the paperwork was done correctly before I ever got the MSO.

20   I was not asking for anything that wasn't due to me.

21    Q    That wasn't due to you?

22    A    Correct.

23    Q    Okay.  But you have infinite value?

24    A    So do you.

25    Q    All right.  But the truck, you had to get the -- you

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

 1    had to wait until it was in the trust name?

 2        A    Correct.

 3        Q    Even though you had cash in the trust.

 4             You'd gotten the money from the trust.  Right?

 5             It's your testimony the money came from a trust

 6    account being held at the Federal Reserve.  Correct?

 7             Is that your testimony?

 8        A    Yes.

 9        Q    So the money came from an account at the --

10        A    An account held in trust.

11        Q    Held in trust.  Then why did you need to put the

12    truck and the motor home -- why did it have to be registered in

13    a trust name?  Why can't it be registered to Randy Beane or

14    Randall Beane?

15        A    According to speaking with Heather, she said that

16    that was the best way to do trust documents when you're doing

17    things with a trust, so I was just trusting that that was the

18    right way, correct way to do it, and it made sense what she

19    explained to me.

20        Q    Okay.  It made sense when she explained it?

21        A    Yes.

22        Q    And so it's your understanding that it just needs to

23    be in a trust.  That's your understanding?

24        A    Yes.

25        Q    And that makes sense to you?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1        A     Yes.

2        Q     A vehicle has to be named in a trust?

3        A     Yes.

4        Q     And that's the best way to do it?

5        A     Yes.

6        Q     Okay.  And so at this point, you know that your funds

7   are not available?

8        A     At what point?

9        Q     At what point?  You know on July 7th?

10       A     No, ma'am.

11       Q     According to USAA records and the recording we just

12   heard, you find out on July 7th, 2017?

13       A     No, ma'am.

14       Q     On July 8th and 9th, you changed purchase agreements?

15       A     No, ma'am.

16       Q     You changed documents?

17       A     No, ma'am.

18       Q     On 7th, 8th, and 9th, you do?

19       A     No, ma'am.

20       Q     You're saying that that's not the case?

21       A     That is correct, I'm saying that's not the case.

22       Q     Okay.  And so -- all right.  So let's go to the

23   morning of July 10th.

24       A     Okay.

25       Q     All right.  You are aware that there is a problem

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1  with your account?

2      A    I am aware at that point in time.

3      Q    Okay.  You didn't hear anything about your account

4  before July 10th?

5      A    On July 8th when I was at the restaurant, I made the

6  call to USAA, that that's when I discovered a problem, which

7  was Saturday night.

8      Q    Okay.  And so on the 10th, you for sure know there's

9  something with your account.  And so -- so then you decide to

10  get Heather Ann Tucci involved even more.  You two decide

11  you've got to make some phone calls, you've got to clear all

12  this up.  Right?

13     A    Correct.

14     Q    You clear it up by getting on a big conference call

15  to see what's going on.  Correct?

16     A    Actually, if I may, I got a phone call first thing

17  Monday morning from Buddy Gregg, from Mr. Forbes or Mr. Byrne,

18  I'm not sure which one it was.

19          He said, "Mr. Beane, I just got a phone call from

20  somebody saying they were you, who wanted to reverse the wire

21  transfer."

22     Q    Mr. Byrne didn't testify to anything like that, did

23  he?

24     A    I'm -- I'm testifying to what I heard on my end of

25  the phone call.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    Q    Okay.  So let me ask you this.  If -- if -- so your

2    testimony is that on July 10th, you thought everything should

3    be just fine with the purchase of that motor home.  Is that

4    your testimony, that there were no issues with the funds in

5    your account on July 10th?

6    A    That is not my testimony.

7    Q    That everything you'd heard from USAA Bank was wrong,

8    that the fact that your account being unavailable --

9    A    No, ma'am, that's not what I'm saying.

10   Q    Okay.  And so on July 10th, there's a conference call

11   to clear everything up.  Correct?

12   A    There's a conference call to start an investigation

13   on the problem.

14   Q    Okay.  And so on July 10th, there's a conference call

15   between you, Tucci-Jarraf, and --

16   A    Brad Cohen.

17   Q    -- Buddy Gregg, folks at Buddy Gregg.  Brad Cohen

18   comes on later, doesn't he?

19   A    Yes.

20   Q    Initially, it's you and Mr. Byrne?

21   A    Mr. Forbes.

22   Q    And there's someone else there, right, who's

23   recording your call while you're at Buddy Gregg.  And Heather's

24   in Texas.  Correct?

25   A    Correct.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1      Q    And you were headed to Texas with the motor home,

2  weren't you?

3      A    At that point in time, I wasn't headed anywhere.

4      Q    Okay.  So you never mentioned you were going to Texas

5  to anyone?

6      A    Not that morning, no.

7      Q    You never mentioned you were planning to head out

8  west?

9      A    Not that morning, no.

10     Q    And so then after this conference call, or during the

11 conference call, there's an attempt to contact USAA Bank, isn't

12 there?

13          During the conference call, you-all attempt to

14 contact USAA Bank?

15     A    Yes.  Yes, that's right.

16     Q    And then just when it starts ringing to get somebody,

17 you hang up, don't you?

18     A    I'm not on the phone.  Mr. Byrne was the one dialing

19 the number.  It wasn't me.  We were on my phone.

20     Q    And so on the call, you're direct -- there's a

21 direction to hang up the call.

22          And then you talk to Lauren Palmisano with Whitney

23 Bank.  Correct?

24          Or I guess you talk to Brad Cohen first.  Right?  You

25 don't remember that?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1      A    I don't remember who came on first.  I thought they

2  were all on -- came on at the same time.  Everybody was to be

3  on the call.  Nothing was to be discussed without everybody on

4  the call.

5      Q    Okay.  Except for USAA.  They weren't on the call.

6  They weren't on the call, were they?

7      A    No, they weren't on the call.

8           MS. SVOLTO:  Thank you.  Could I have just a second,

9  please, Your Honor?

10  BY MS. SVOLTO:

11      Q    So on July 10th, after the conference call, right,

12  you take some steps after July 10th to prepare to go, don't

13  you, to prepare to leave?

14      A    To go to Texas?

15      Q    Or wherever.

16      A    To go to Texas, yes.

17      Q    Okay.  So you were preparing to go to Texas on

18  July 10th?

19      A    To USAA.

20      Q    To USAA Bank to clear it up?

21      A    Yes.

22      Q    Better to do that than have them on the phone.

23  Right?

24      A    There is no branch here in Tennessee.  As a matter of

25  fact, it's an online banking source.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    Q    That's right.

2    A    Whose main office is in San Antonio, Texas.

3  Ms. Tucci-Jarraf was in Houston, and I thought it would be best

4  if we went -- if I went and picked her up and went straight to

5  San Antonio and take care of the problem immediately.

6    Q    Okay.  And so the plan was to go to Texas and take

7  care of this problem?

8    A    Yes, ma'am.

9    Q    And you know they've been calling you?

10   A    No, ma'am.

11   Q    You've had conversations with USAA?

12   A    Yes, I have.

13   Q    So you know that there's an issue with your account?

14   A    Yes.

15   Q    You know that you took a risk in taking the money

16  from the Federal Reserve account using that Harvey Dent video

17  instructions, didn't you?  You knew there was a risk that it

18  wouldn't work?

19   A    No, ma'am.  I said I trusted the security protocols

20  of USAA.  I did not feel a risk at that point in time when I

21  took the money, no.

22   Q    So you thought if you get away with it, it's going to

23  be fine, it's your money.  If it goes into your account, it's

24  your money.  If USAA stops you from -- from it coming into your

25  account, then you don't get it.  Right?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1       A    Excuse me, repeat the question.

2       Q    So you think that when the money shows up in your

3   account, that it's yours to use because USAA didn't stop it

4   from going into your account?

5       A    Can I -- can I elaborate on this answer a little bit

6   to explain a little bit more?

7            THE COURT:  Go ahead.

8            MR. BEANE:  When 9/11 happened and the banking

9   protocols, the Patriot Act --

10           THE COURT:  Hold on a second.  Let's -- elaborate on

11  your answer --

12           MR. BEANE:  I am.

13           THE COURT:  -- but try to answer that question

14  directly.

15           MR. BEANE:  I am.  The Patriot Act increased security

16  protocols for banking industry, I guess, after 9/11.  And so --

17  BY MS. SVOLTO:

18      Q    And this has to do with your answer to my question --

19      A    It sure does, yes.

20      Q    -- to whether you believe the money was in your

21  account --

22      A    Yes, ma'am, it does.

23      Q    -- that meant it was yours?

24      A    Yes.

25      Q    Yes, you believe that?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    A    I believe --

2    Q    If the money is in your account --

3    A    Okay.  Can I please finish?

4         After 9/11 when the security protocols were highly --

5    from my understanding, Basel III was the protocol for banks

6    to -- for the security for their deposits, for things like that

7    to be handled, and I understood that it -- terrorism changed

8    this country in a way that banking was made more secure.  A

9    terrorist -- if a terrorist can access this account this easy,

10   and --

11   Q    Are you a terrorist, Mr. Beane?

12   A    No, ma'am, I'm not saying I'm a terrorist.

13   Q    So --

14   A    I'm saying if it's that easy to access an account

15   that's not yours, that you're using your account numbers for,

16   then we've got a serious problem here.

17   Q    I'd say so.  I think you have a serious problem,

18   Mr. Beane.

19        So you're saying that because the money -- I'm going

20   to ask my question again.  You've been allowed to explain your

21   answer.  And now I'm going to ask you the yes-or-no question.

22   A    All right.

23   Q    Do you believe that because the money went into your

24   account and showed up online in your account, that it was your

25   money?

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1        A    I do.

2        Q    Okay.  So the fact that it was there meant it was

3   yours?

4        A    Exactly.

5        Q    Even though you knew you were taking a risk by trying

6   this instructional video idea?

7        A    I didn't feel like I was taking a risk with the

8   security protocols.

9        Q    You didn't feel like you were taking a risk?

10       A    No.

11       Q    But you said you knew that -- you were certainly

12  surprised?

13       A    I was surprised.

14       Q    You were surprised.  But it wasn't a risk, you

15  expected it, though?

16       A    If it cleared, yes.

17       Q    But you didn't expect it to clear, did you?

18       A    No, I didn't expect it to clear.

19       Q    Because it's not your money, is it, Mr. Beane?

20       A    It's actually not about the money.

21       Q    Let's talk more about July 11th now.

22       A    Talk about it.

23       Q    So July 10th, you were ready to go to Texas, and on

24  July 11th, you go to pick up the RV.  Right?

25       A    Yes.  Actually, I go to take the factualized trust to

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

Mr. Byrne.

Q    That's right.  You were going to give another copy of the factualized trust.  Right?

A    Yes.

Q    And the factualized trust has a red thumbprint?

A    Yes.  That's biometrics.

Q    Biometric, so that it's certainly your thumbprint?

A    That's correct.

Q    So just signing the trust documents and having it notarized wouldn't be enough?

A    No.

Q    Why do you need a red dyed thumbprint?

A    That's your energetic signature.

Q    Oh, okay.  And so who instructed you to do that?

A    Ms. Jarraf -- Tucci-Jarraf.

Q    Where did you get the copies of the red dyed thumbprint?

A    That's not a copy.

Q    Where -- where did you get the document you provided to Buddy Gregg?

A    From Ms. Tucci-Jarraf.

Q    So she gave it to you?

A    She -- she drafted the documents.  I took the documents and had them notarized at the office supply store.

Q    Okay.  And so you had it notarized there.  And who

UNITED STATES DISTRICT COURT

1    instructed you to use a red dyed thumbprint?

2        A    There -- she told me to use blue ink, because the

3    document's printed in black, use blue ink for the signature and

4    red for the thumbprint, because in days gone past, when they

5    used to sign letters, they used their -- they use their blood,

6    so it represents blood, the red does.

7        Q    Okay.  So a green thumbprint wouldn't be sufficient?

8        A    No.

9        Q    That's not biometric?

10       A    No.  Well, I guess you could, but it's representative

11   of the blood to use red.

12       Q    All right.  So on July 11, you're in your motor

13   coach, you've got the motor running.  Right?

14       A    Okay.

15       Q    Right.  So you've got the motor home running.  You've

16   told everyone about your purchase.  Right?

17       A    No, I don't agree with that.

18       Q    You didn't tell everyone that you had bought a motor

19   home and ready to go?

20       A    Who's everyone?

21       Q    I guess the public that can view your Facebook page.

22       A    That's not everyone.

23       Q    Okay.  So you publicly announced on Facebook that you

24   bought a motor home.  Correct?

25       A    I showed a picture of it, said this --

Randall Keith Beane - Cross-Examination

1    Q    Okay.  Let's bring it up.  Government Exhibit 144,

2  please.  It's already been admitted.

3         All right.  So here's your Facebook post.  Correct?

4    A    Correct.

5    Q    And you're talking about traveling with the motor

6  home?

7    A    I just said earlier that I travel a lot for my job,

8  yes.

9    Q    So you know it's on Facebook that you've got a motor

10 home?

11   A    Correct.

12   Q    You post photos of it?

13   A    Yes.

14   Q    That's on July 9th?

15   A    Correct.

16   Q    And you're getting ready to go?

17   A    No, ma'am.

18   Q    You don't get ready to travel?

19   A    Not on the 9th.

20   Q    Okay.  But you do post, "Let's get ready to travel"

21 in the Facebook post.  Correct?

22   A    I travel for my job, yes.

23   Q    Okay.  So travel for whatever reason?

24   A    Exactly.

25   Q    All right.  So on July 11th, you're getting ready to

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    travel, but at this point, you know you're traveling to Texas?

2        A    Correct.

3        Q    All right.  And in -- and in the motor home, are

4    you -- you're in the driver's seat in the motor home when FBI

5    approaches you?

6        A    I am.

7        Q    All right.  You were getting ready to go, weren't

8    you?

9        A    No, ma'am.

10       Q    And you wouldn't come out of the motor home when they

11   came to get you?

12       A    They knocked on the door.  I'm on the telephone

13   trying to figure out what's going on.

14       Q    With what?

15       A    With Ms. --

16       Q    As far as you know, the money was in your account, so

17   you're good.  Right?

18       A    It had nothing to do with the money.

19       Q    So what did you think was wrong?

20       A    I didn't know.

21       Q    You had no idea?

22       A    No, ma'am.

23       Q    You're telling us you had no idea there was something

24   wrong with the money that was used to purchase the motor

25   home --

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1      A      Yes, ma'am.

2      Q      -- on July 11th, you had no idea?

3      A      I didn't know what was going on at the current

4  moment.

5      Q      Okay.  So who are you on the phone with?

6      A      Ms. Tucci-Jarraf.

7      Q      You just happened to call her up at the moment you

8  thought something was happening?

9      A      No.  I was on the phone with her letting her know

10 that I had delivered the trust -- factualized trust document to

11 the dealership, and that I was on my way to Texas to come and

12 get her, as soon as we could get loaded and ready.

13     Q      Okay.  And so FBI comes and you don't want to open

14 the door, do you?

15     A      I'm on the telephone.

16     Q      So you can't open the door when you're on the

17 telephone?

18     A      Not when I'm in the middle of discussing something

19 and I don't understand what's going on outside the door.

20     Q      Okay.  And so you don't think to end the phone call

21 and find out what's going on, do you?  You don't think to do

22 that?  Is that your testimony?

23     A      Okay.  The door was open and they -- they told me

24 that I had a warrant for my arrest out of Jasper, Colorado.

25     Q      So you knew at that point there was a warrant out for

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    your arrest, and they were there because of the warrant for

2    your arrest?

3        A    They said there was a warrant for my arrest out of

4    Jasper, Colorado.  And I'm trying to discuss with them I've

5    never been to Colorado.

6        Q    Uh-huh.

7        A    And they're telling me that it doesn't matter, I'm

8    going -- I'm under arrest.  So I'm trying to let these guys

9    know that there's no arrest warrant for me in Jasper, Colorado.

10   I've never been.  They're saying I'm a fugitive of a place I've

11   never been.  Wouldn't you refuse?  Would you just give up and

12   go with someone when they're telling you you've been somewhere

13   you've never been?

14       Q    Well, I'm not answering the questions.

15       A    Okay.

16       Q    So you're being told there's a warrant for your

17   arrest.  You disagree that there's a warrant?

18       A    Yes, I do.

19       Q    You disagree there's a warrant in general or just a

20   warrant out of Colorado?

21       A    I disagree there's a warrant in general.

22       Q    So you think there was no warrant for your arrest?

23       A    Yes, ma'am.

24       Q    I'd like to show you, the witness and defense only,

25   what's now been marked as -- oh, they're not in the system, but

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    I'll have to put a sticker on, excuse me.

2           This will be Government Exhibit 165.

3           Do you see that document?

4    A    Yes, I see that.

5    Q    Okay.  All right.  So you see that there?

6    A    Yes.

7           MS. SVOLTO:  I'd like -- I'd like to move to admit

8    this as an exhibit, please, Exhibit 165.

9           THE COURT:  Any objections?

10          MS. TUCCI-JARRAF:  Not from me.

11          MR. BEANE:  No objections.

12          THE COURT:  All right.  So admitted.

13        (Government's Exhibit 165 admitted into evidence.)

14   BY MS. SVOLTO:

15   Q    Can you read the top of that, please?

16   A    "State of South Carolina, County of Jasper, Bench

17   Warrant, failure to appear, the State versus Randal Keith

18   Beane."

19   Q    All right.  If we could scroll down to the bottom of

20   the page, right under the word "Witness."

21          Oh, I guess I'm in charge, now, huh.  This is all

22   going to go badly.

23          So can you read the date down there, please?

24   A    April 17th, 2015.

25   Q    So you would agree with me that this is a warrant.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1  Correct?

2      A    It appears to be.

3      Q    All right.  What's the name there on that warrant?

4      A    "Randal Keith Beane."

5      Q    All right.  And so --

6      A    It's a miscorrect spelling.

7      Q    A miscorrect spelling.  All right.  And then it says

8  "State of South Carolina"?

9      A    Yes.

10     Q    "County of Jasper"?

11     A    Correct.

12     Q    All right.  So you were told you had a warrant out

13 for your arrest, and your testimony just now is that there was

14 no warrant for you?

15     A    Correct.

16     Q    All right.  So this warrant, which, again, I'll refer

17 to the date at the bottom there, April 17, 2015.

18     A    Correct.

19     Q    You're saying that this warrant doesn't exist?

20     A    It didn't until the 10th of July or -- it was --

21 actually, let me rephrase it.  It didn't until the 13th of

22 July.

23     Q    Okay.  So the date on there is fabricated.  Is that

24 your testimony?

25     A    Could be.  I don't know.  But it didn't exist until

UNITED STATES DISTRICT COURT

1    July 13th of 2017.

2         Q    Is that because you hadn't seen a paper copy of it?

3         A    Never seen anything.

4         Q    All right.  But -- so they -- they come -- the FBI

5    comes, tells you that there's a warrant for your arrest?

6         A    Out of Jasper, Colorado.

7         Q    Okay.  So there's a warrant for your arrest, and you

8    refused to open the door?

9         A    No.  The door had to be open for me to talk to them.

10        Q    And, in fact, you didn't -- you instructed your

11   friends who were in the RV not to open the door.  Isn't that

12   true?

13        A    I didn't say nothing about my friend opening the door

14   or not, because immediately when they came up, he opened the

15   door.  I was on the phone with Ms. Tucci-Jarraf.  I had no

16   option to say anything to anyone.  I was talking to her.

17        Q    You never screamed at them not to open the door?

18        A    No.

19        Q    Okay.  So rather than figure things out with FBI,

20   you're on the phone with Codefendant Tucci-Jarraf?

21        A    I was on the phone with her before the FBI showed up.

22        Q    And you stay on the phone with her for a while.  Is

23   that your testimony?

24             When do you hang up with her?

25        A    When they come into the coach and start telling me to

 1    give up my phone and stuff, I mean, it becomes a scuffle, and

 2    me trying to explain that I don't have a warrant out of Jasper,

 3    Colorado, and they didn't want to hear it.

 4        Q    All right.  And so you continue to scuffle with the

 5    agents, don't you?

 6        A    No, I do not.

 7        Q    You continue to scuffle with them until you get all

 8    the way to the ground, don't you?

 9        A    No, I do not.

10        Q    Because, in fact, you were resisting the arrest --

11        A    No, ma'am, I was not.

12        Q    -- based on a warrant?

13        A    No, ma'am.

14        Q    You disagreed with the warrant, so you -- and you

15    resisted arrest?

16        A    No, ma'am, I did not.

17        Q    You weren't resisting arrest?

18        A    No.

19        Q    Okay.  So if USAA Bank had not allowed the money to

20    go in your account, it's your position that, okay, it didn't

21    work.  Right?

22        A    Right.

23        Q    And then I'm -- if the money didn't end up in your

24    account, you wouldn't insist that you had a trust account.  Is

25    that true?

Randall Keith Beane - Cross-Examination

1      A     No, no, no.  That's not true.

2      Q     So you'd still have a trust account, but you weren't

3  able to access it unless USAA lets you access it?

4      A     No.  That's not true either.

5      Q     All right.  So then if USAA had told you that it was

6  a mistake, and USAA is working with you to figure out the

7  mistake, you would not have returned any of the money?

8      A     That's not true.

9      Q     But USAA was telling you there was mistakes, weren't

10  they, that there was something going on?

11      A     That's why I was on my way to USAA to talk to them.

12      Q     But you were used to talking to USAA by phone,

13  weren't you?

14      A     They closed my account.  I couldn't access my

15  accounts.  Couldn't get on the phone.

16      Q     Okay.  But the phone call on July 7th is after your

17  account is --

18      A     No, ma'am.  You keep referring to the 7th.  I never

19  knew anything on the 7th.

20      Q     All right.  So is it still your position that this

21  warrant that's now Government Exhibit 165 did not exist back --

22      A     It is, yes.

23      Q     Okay.  So is it your testimony that this warrant

24  could never have been confirmed?

25      A     Yes.

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    MS. SVOLTO:  Okay.  I'd like to show the witness what

2    has been marked as Exhibit 166.  Actually, I'll withdraw the

3    offer.  I don't want to introduce 166.  I strike that, if

4    possible.

5    BY MS. SVOLTO:

6        Q    Okay.  So after --

7            THE COURT:  Let me interrupt for a moment.  Sounds

8    like you've got a little bit more cross left.

9            MS. SVOLTO:  Very little, Your Honor.

10           THE COURT:  All right.  Go ahead.

11           Why don't we do this.  I don't want to let the

12   jury -- I don't think we're going to get done with this

13   witness.  Do you have cross to do, Ms. Tucci-Jarraf?

14           MS. TUCCI-JARRAF:  Yes, sir.

15           THE COURT:  All right.  I'm going to let the jury go

16   a little bit early today, get a head start on the weekend.

17           So let me say this.  You've heard the government's

18   case, you're hearing Defendant Mr. Beane's case, you'll still

19   hear, if she wants to present evidence, Ms. Tucci-Jarraf's

20   case, so you have not heard all the evidence in this case, nor

21   the Court's charge, or the closing argument, so continue to

22   keep an open mind as you hear the evidence in this case.

23           Continue not to discuss this case among yourselves or

24   with anyone else.  To the extent there may be any media reports

25   about this case, do not read them, refrain from reading them or

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1   listening to any reports.  So just put the case aside.

2           And I do appreciate your being here all four day this

3   week.  I told you we may have to come back next week, and

4   obviously we do.  Monday morning, I may talk with the parties a

5   little bit more and give you a little better indication Monday

6   when I think you may get the case.

7           But with that being said, on everyone's behalf, I

8   appreciate your attention paid to this case this week, and

9   we'll see everybody back here Monday, which is January 29th, at

10  9:00 a.m.  Jury is excused.

11      (Jury out at 4:28 p.m.)

12          THE COURT:  Mr. Beane, you can walk back over.

13          MR. BEANE:  Thank you.

14          THE COURT:  All right.  Everyone be seated just a

15  moment.  Couple things.  We'll pick back up Monday morning.

16  The government can finish its cross.  Ms. Tucci-Jarraf is a

17  codefendant.  She does have the right for cross-examination as

18  well.

19          And then, Mr. Beane, if you desire after

20  cross-examination, you would have the opportunity in the same

21  fashion that you did your direct to give a -- you've seen the

22  redirect of the government's witnesses.

23          MR. BEANE:  Yes, ma'am -- I mean, yes, sir.  I'm

24  sorry.

25          THE COURT:  You'll be able to give a redirect, if you

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1   want, and then there would be a limited opportunity for

2   recross.  This could change, I understand, but as of now, I

3   anticipate you would rest your case at that point?

4          MR. BEANE:  Yes.

5          THE COURT:  And then we would allow Ms. Tucci-Jarraf

6   to give opening statement, if she desires, and then to present

7   any evidence that she wishes.

8          Before we leave, I think a request was made through

9   Mr. McGrath to have -- we -- we -- to have a copy of the draft

10  jury charge and verdict form, so I'm going to get --

11         MR. McGRATH:  Yes, I was just hoping to send one with

12  Mr. Beane, so when I visit him on Sunday --

13         THE COURT:  So we're not going to give, not for

14  reproduction, but my law clerk will give both of the defendants

15  hard copies of the draft jury charge.

16         You need to read through those, because as I told you

17  at the conclusion of the evidence, which may not come on

18  Monday, but at the conclusion of the case, of everybody's

19  cases, you know, we'll have a charge conference.  So I will

20  ask -- I will go through the draft jury charge and the draft

21  verdict form and see if anybody -- any of the parties have any

22  questions about these proposed jury charge.

23         When you read through them, you'll see there's some

24  options depending on, for example, if the defendant elects to

25  testify, use this charge, if the defendant elects not to

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1    testify, use this charge.  But a lot of those are standard

2    charges.  So -- but we'll go through them and finalize them in

3    a charge conference at the conclusion of the cases.

4         Ms. Tucci-Jarraf, you filed, and it was placed under

5    seal, an ex parte motion this morning that was filed, and

6    handed to you only is an order that's placed under seal in

7    response to your ex parte motion, so that's been given to you

8    as well.  So you don't have to find that on the system, but it

9    has been entered on the system.  I don't have it in front of

10   me, but it's got --

11        MS. TUCCI-JARRAF:  Is that what the young gentleman

12   just handed me?

13        THE COURTROOM DEPUTY:  108.

14        THE COURT:  Document 108 that the law clerk just gave

15   to you along with the jury charge, so you alone have that

16   additional document.

17        MS. TUCCI-JARRAF:  Thank you.

18        MS. DAVIDSON:  Your Honor, I unfortunately have not

19   had an opportunity to look at the draft charge.  Based on the

20   testimony of Mr. Beane, the government does request the Court

21   look at pattern jury instruction Sixth Circuit 2.09.

22        THE COURT:  Okay.  We'll do that --

23        MS. DAVIDSON:  Thank you.

24        THE COURT:  -- between now and Monday as well.

25        And that would be an opportunity -- that's a good

UNITED STATES DISTRICT COURT

Randall Keith Beane - Cross-Examination

1  point.  At the charge conference, all the parties will have the

2  opportunity to state whether they have any issues with what the

3  Court has put in the draft charge, and will also have the

4  opportunity if they desire to say, I think as Ms. Davidson is

5  suggesting, there's a charge that's not in there that we would

6  like the Court to consider.

7         So that's what the charge conference is about so

8  everyone knows.  All right?

9         We'll see everybody -- or some or all of us back here

10 on Monday.

11         THE COURTROOM DEPUTY:  All rise.

12         THE COURT:  Excuse me just a moment.

13         MR. LLOYD:  One question.  Last night, your excellent

14 law clerk sent out digitally a copy of the charge and the

15 proposed verdict, which I then printed for myself and for

16 Ms. Tucci-Jarraf.

17         Is what was distributed just now a second draft or --

18         THE COURT:  That's the same thing, since they didn't

19 get one electronically and Mr. McGrath asked for a hard copy.

20 I thought you might have done that, but in the event you

21 hadn't, we provided a hard copy, but it's the same thing.

22         MR. LLOYD:  Thank you.

23         THE COURTROOM DEPUTY:  This honorable court shall

24 stand in recess until Monday, January 29th.

25         (Proceedings recessed at 4:32 p.m.)

UNITED STATES DISTRICT COURT

1        **CERTIFICATE OF REPORTER**

2   STATE OF TENNESSEE

3   COUNTY OF KNOX

4            I, Rebekah M. Lockwood, RPR, CRR, do hereby certify

5   that I was authorized to and did stenographically report the

6   foregoing proceedings; and that the foregoing pages constitute

7   a true and complete computer-aided transcription of my original

8   stenographic notes to the best of my knowledge, skill, and

9   ability.

10       I further certify that I am not a relative, employee,

11  attorney, or counsel of any of the parties, nor am I a relative

12  or employee of any of the parties' attorneys or counsel

13  connected with the action, nor am I financially interested in

14  the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand at

16  Knoxville, Knox County, Tennessee this 22nd day of April, 2018.

17

18

19

20                              _____
                                REBEKAH M. LOCKWOOD, RPR, CRR
21                              Official Court Reporter
                                United States District Court
22                              Eastern District of Tennessee

23

24

25