IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )
vs.                               )   Case No.:  3:17-CR-82
                                  )
RANDALL KEITH BEANE AND           )
HEATHER ANN TUCCI-JARRAF,         )
                                  )
          Defendants.             )
_____ )


**VOLUME VI of VIII**


**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**


**January 30, 2018**
**9:19 a.m. to 4:18 p.m.**


**APPEARANCES:**

**FOR THE PLAINTIFF:**          CYNTHIA F. DAVIDSON, ESQUIRE
                                ANNE-MARIE SVOLTO, ESQUIRE
                                Assistant United States Attorney
                                United States Department of Justice
                                Office of the United States Attorney
                                800 Market Street
                                Suite 211
                                Knoxville, Tennessee 37902


**FOR THE DEFENDANT:**          RANDALL KEITH BEANE, PRO SE
**RANDALL BEANE**               Blount County Detention Center
                                920 East Lamar Alexander Parkway
                                Maryville, Tennessee 37904


**FOR THE DEFENDANT:**          STEPHEN G. McGRATH, ESQUIRE
(As Elbow Counsel)              9111 Cross Park Drive
                                Suite D-200
                                Knoxville, Tennessee 37923


**REPORTED BY:**
Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **FOR THE DEFENDANT:** | HEATHER ANN TUCCI-JARRAF, PRO SE |
| **HEATHER ANN** | 105 Orchard Lane |
| **TUCCI-JARRAF** | Oak Ridge, Tennessee 37830 |

| | |
|---|---|
| **FOR THE DEFENDANT:** | FRANCIS LLOYD, ESQUIRE |
| (As Elbow Counsel) | 9111 Cross Park Drive |
| | Suite D-200 |
| | Knoxville, Tennessee 37923 |

**REPORTED BY:**

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

1           **INDEX**

2  **DEFENDANT TUCCI-JARRAF'S WITNESSES**                    **PAGE**

3  HEATHER ANN TUCCI-JARRAF
   Direct Examination by Ms. Tucci-Jarraf                     5
4  Cross-Examination by Ms. Davidson                          60
   Cross-Examination by Mr. Beane                            130
5  Redirect Examination by Ms. Tucci-Jarraf                  145
   Recross-Examination by Ms. Davidson                       164
6
   Defendant Heather Ann Tucci-Jarraf Rests                  167
7

8  **GOVERNMENT'S REBUTTAL WITNESSES**                        **PAGE**

9  MONICA ALCALA
   Direct Examination by Ms. Davidson                        168
   Cross-Examination by Ms. Tucci-Jarraf                     178
10 Cross-Examination by Mr. Beane                            183

11 STEVEN DYER
   Direct Examination by Ms. Davidson                        185
12 Cross-Examination by Ms. Tucci-Jarraf                     188
   Cross-Examination by Mr. Beane                            192
13
   TERRY WILSHIRE
14 Direct Examination by Ms. Svolto                          194

15         **GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**

16  **NO.  DESCRIPTION**                                      **PAGE**

17  167  USAA call history spreadsheet                        169

18  166  USAA "No Authentication" account page                172

19  168  USAA "Verify A Check" page                           174

20  169  USAA "Account/Recipient Detail" for Randall Keith    177
          Beane
21
22  170  Randall Keith Beane booking photo                    196

22  171  County of Jasper, State of South Carolina Bench      197
23        Warrant

24  173  General Sessions Court, Knox County, Tennessee,      198
          Affidavit of Complaint and Judgment
25

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

**GOVERNMENT'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 174 | Corrected General Sessions Court, Knox County, Tennessee, Affidavit of Complaint | 199 |
| 175 | Knox County Sheriff's Office Inmate Processing Form, Arrest Report, Medical Consent Form, Waiver of Extradition | 200 |
| 176 | Randall Keith Beane booking photo left side | 215 |
| 177 | Randall Keith Beane booking photo right side | 216 |

**DEFENDANTS' EXHIBITS (MARKED FOR IDENTIFICATION)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 5 | Bank of America Account Setup | 9 |

**DEFENDANTS' EXHIBITS (ADMITTED INTO EVIDENCE)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 12 | E-mail to Randall Beane | 22 |
| 17 | E-mail for bill of sale for coach | 27 |
| 18 | E-mail, updated factualized trust | 29 |
| 20 | E-mails from Heather Ann Tucci-Jarraf to Lauren Palmisano and Brad Cohen | 43 |

Rebekah M. Lockwood, RPR, CRR
Official Court Reporter
(865) 210-6698
P.O. Box 1823

Heather Ann Tucci-Jarraf - Continued Direct Examination

1       (Call to Order of the Court)

2               THE COURT:  Morning, everyone.

3               Ms. Tucci-Jarraf, if you'll take the witness stand,

4       and we'll bring the jury in, and continue with your direct

5       examination.

6       (Jury in at 9:20 a.m.)

7               THE COURT:  Thank you.  Everyone may be seated.

8               Good morning to our members of the jury.

9               Ms. Tucci-Jarraf, you may continue with the factual

10      narrative of your direct examination testimony.

11      WHEREUPON,

12                      **HEATHER ANN TUCCI-JARRAF,**

13      was called as a witness and, after having been first duly

14      sworn, testified as follows:

15                      **CONTINUED DIRECT EXAMINATION**

16              MS. TUCCI-JARRAF:  Thank you.  Good morning.

17              Okay.  So yesterday we discussed the factualized

18      trust document that Randy had provided to Buddy Gregg, and

19      inside is all the UCCs that were used back in 2012.

20              THE COURT:  Ms. Tucci-Jarraf, I think when we

21      readjusted you, the microphone picked you up better yesterday,

22      to make sure --

23              MS. TUCCI-JARRAF:  Can you hear me now?

24              THE COURT:  Go ahead.

25              MR. McGRATH:  Just pull it up more.  I want to make

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    sure Randy can hear.  He has trouble hearing you.

2              MS. TUCCI-JARRAF:  Is that better?

3              THE COURT:  Go ahead.

4              MS. TUCCI-JARRAF:  So the factualized trust, which

5    Randy had submitted, which was 155A, lists all the UCCs that

6    were done over -- the perpetuity was done in 2000, and then it

7    took 11 years -- approximately 11 and a half years to do all

8    the amendments to be able to secure the property of the United

9    States, secure the people of America, and all their individual

10   property.  That is what those UCC documents that are cited in

11   the factualized trust are all about.

12             The same thing was done for every country around the

13   planet in order to protect from the use and abuse that was

14   being done by Federal Reserve Bank System as well as Bank of

15   International -- or Bank for International Settlements, which

16   is in Switzerland.  It's the central bank of all the central

17   banks.  So each country was in the same position, but I'm only

18   going to -- this case only refers to America and to an

19   individual in America.

20             So at the time on July 4th, I had received a message

21   from Randall Beane saying that he paid off all his debt and

22   that he was doing these ACH payments from that process from the

23   video he had also sent on July 4th for me to review.

24             At that point, I reviewed the video.  And Randy, I

25   could see what the situation would be back in June of that same

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    year, so probably about a month before, we had just started

2    doing the factualized trust documents which were a tool to help

3    the banking and the government and all the agencies, branches,

4    and departments globally change their systems in order to not

5    have any fraud whatsoever while still keeping the systems up

6    and not disrupting commerce and economy. Okay.

7         So when he had mentioned that he had done numerous

8    transactions and CDs, I went in to go and test it myself just

9    to see what had happened. And through the testing that I did,

10   I was able to discover a number of things and learn the ACH

11   process, at least from a user standpoint, and then communicate

12   with all of our intelligence that we are in contact with during

13   the cleanup to see what they were seeing on their end, which on

14   their end, they can see inside the Federal Reserve Bank, they

15   can see inside the Bank for International Settlements, they can

16   see inside any bank, really, so that they can see the entire

17   transfer process.

18        Now, at the time I did this testing, which began on

19   July 5th, I didn't have any personal access to be able to see

20   what was behind the screens on our intelligence side. I only

21   reviewed what was being seen from a user side.

22        Mr. Lloyd, if you would help me with exhibits,

23   please. And Cynthia's copies are behind each one.

24        These are the tests that I personally ran using debt

25   accounts.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    Actually, it's just exhibit -- those are our exhibits

2 and those are hers as well, so the whole package.

3    Your Honor, may I have a moment just to make sure he

4 keeps the -- our exhibits and hands Cynthia only her exhibits?

5    MS. DAVIDSON:  Your Honor, I would point out to the

6 Court that we requested discovery in this case from the

7 defendants, and none of this was provided to us.  I'm just now

8 seeing this for the first time.  Just like the United States

9 provides discovery, the defendants are supposed to provide

10 discovery, and we've not seen these.  I'm not really sure how

11 they're relevant.

12    THE COURT:  Well, let's -- I guess we're going to

13 have to take them one at a time.  I don't see how -- and give

14 you the opportunity to object.  Are you concerned about the

15 order that Mr. Lloyd has them in?

16    MS. DAVIDSON:  Yes.  And hers are behind our exhibit

17 for each exhibit.

18    THE COURT:  Why don't we start with -- let's start

19 and if you need to --

20    MS. TUCCI-JARRAF:  Excuse me.  Mr. Lloyd, could you

21 please take all the papers back from Cynthia, and as you go

22 through each exhibit --

23    THE COURT:  Why does -- why do you need to take them

24 back from Ms. Davidson?

25    MS. TUCCI-JARRAF:  Because our exhibit is sitting on

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  top, her copy is behind it, and then our next exhibit is there,

2  and her copy is behind it.

3          THE COURT:  All right.  Go ahead --

4          MS. TUCCI-JARRAF:  Sorry, Mr. Lloyd.

5          THE COURT:  -- and take them one at a time.  Mark

6  this as Defendants' Exhibit 5 for identification.  We'll see if

7  it's relevant.

8       (Defendants' Exhibit 5 marked for identification.)

9          MS. DAVIDSON:  Your Honor, I object to the relevance

10 of this document.  First of all, it's hearsay.  There's no

11 foundation.  And anything doing with Bank of America and

12 Ms. Tucci-Jarraf has nothing to do with the issues before the

13 Court and the bank fraud that was committed by Mr. Randall

14 Beane.

15         THE COURT:  What's your response to that relevancy

16 objection?

17         MS. TUCCI-JARRAF:  It goes to my personal knowledge

18 of the actual activities that Mr. Beane did as well as to my

19 intent for my actions of communicating with USAA as well as

20 with Whitney Bank.  So it's regarding my personal knowledge of

21 the ACH and the transactions that he did.

22         THE COURT:  You can testify about your personal

23 knowledge, but I don't see how this document is relevant to

24 that testimony.  This is just a sheet of paper that's got Bank

25 of America on it.  We've had no testimony today about Bank of

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   America. I don't see how their involvement is -- so I'm going

2   to sustain the objection at this time.

3           Go ahead with your testimony or another document.

4           MR. LLOYD: Shall I mark it for ID?

5           THE COURT: Yes. Defendants' Exhibit 5 for

6   identification.

7           MS. TUCCI-JARRAF: Thank you. If we might, Your

8   Honor, there were other exhibits of the test cases in the same

9   thing, and it shows that there's no routing number except for

10  the last four as opposed to the one Ms. Davidson put in for

11  USAA to show the difference of the data, so I would just ask

12  that they be marked.

13          THE COURT: Go ahead. If they're all like this,

14  we'll mark them for identification.

15          MS. TUCCI-JARRAF: Thank you.

16          THE COURT: How many are there?

17          MS. TUCCI-JARRAF: There is -- we had Exhibit 5, so

18  that was one, two, three, four, five, six, seven, eight --

19          THE COURT: Are these all within the same context?

20  Can we mark them as collective Defendants' Exhibit 6 and they

21  would all be subject to the same effort to introduce an

22  objection?

23          MS. TUCCI-JARRAF: Yes.

24          THE COURT: All right. We'll mark these as

25  collective. Mark all of these documents that appear to be

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    other bank transactions of some sort, and the Court will

2    sustain a similar objection to all of them, and we'll mark them

3    for identification as Defendants' Exhibit 6.

4          MS. TUCCI-JARRAF:  Since they're already premarked,

5    may we do that at break --

6          THE COURT:  Yes.

7          MS. TUCCI-JARRAF:  -- so we don't take more time?

8    Thank you.

9          THE COURT:  Let me ask, have they been marked with

10   separate numbers?

11         MR. LLOYD:  They have, Your Honor.

12         THE COURT:  Let's leave them as marked.  Could you

13   call out the numbers?

14         MR. LLOYD:  Exhibit 6.

15         MS. DAVIDSON:  Your Honor, I add to my objection that

16   these are also business records, which there's been no

17   foundation, so they're hearsay and inadmissible.

18         MS. TUCCI-JARRAF:  I wasn't allowed to make a

19   foundation yet.  She objected to them before I could.

20         THE COURT:  Well --

21         MS. DAVIDSON:  Business records are entered by a

22   custodian of those records.

23         THE COURT:  I understand.  I think that's a valid

24   objection.  They don't appear to be relevant.  Furthermore,

25   they appear to be subject to a hearsay objection and not a

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    business record exceptions.  So on all those grounds, the Court

2    will sustain the objection.

3              Go ahead and call out the numbers, Mr. Lloyd.

4              MR. LLOYD:  No. 6 consists of one page.

5              THE COURT:  Why don't we do this in the interest of

6    time, that's a good suggestion by Ms. Tucci-Jarraf, let's, for

7    now, leave them separately identified, but we might go back and

8    combine them into one exhibit at the break as a collective

9    Exhibit 6.

10             MR. LLOYD:  Okay.  I need to know from the witness,

11   Your Honor, how far to go.

12             THE COURT:  How far down to go?  All right.  Go

13   ahead.

14             MS. TUCCI-JARRAF:  So exhibit marked Exhibit No. 7,

15   marked Exhibit No. 8, marked Exhibit No. 9, marked Exhibit

16   No. 10.

17             MR. LLOYD:  You'll have to give me a moment.

18             MS. TUCCI-JARRAF:  I apologize.

19             MS. DAVIDSON:  I don't have that copy yet.  Is that

20   it?  This one right here looks like my copy.

21             MR. LLOYD:  I think this -- that was yours.

22             MS. DAVIDSON:  Yeah.  This is my copy.  Is it

23   multiple pages?

24             MR. LLOYD:  Yes.

25             MS. DAVIDSON:  I only got one page of Exhibit 8.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    MS. TUCCI-JARRAF:  Your Honor?

2    THE COURT:  Yes.

3    MS. TUCCI-JARRAF:  In the interest of time, I'll just

4 go ahead and strike the entrance for the identification.  I can

5 always -- if we have a break and I'm not done, I can always go

6 in and correct these, so strike that.

7    THE COURT:  Let's go ahead with the direct

8 examination testimony then.  Go ahead.

9    MS. TUCCI-JARRAF:  Thank you.

10    So on July 5th, I went in and tested it, the ACH

11 system, so that I could see exactly what information he was

12 putting in and what it looked like.  And on July 5th, I -- on

13 July 5th --

14    THE REPORTER:  Can you scoot back so we can hear you

15 on the mic?

16    MS. TUCCI-JARRAF:  Thank you.

17    On July 5th, I did two with different institutions,

18 and when I went to go put in the routing number that would --

19 and I used my own personal information to test it.  I used my

20 own name, my own Social Security number, and I already knew

21 what the Federal Reserve was for my particular one.

22    When I went to go do the routing number that

23 corresponded with that Federal Reserve, it didn't work.  It

24 would say, "Routing number not valid."

25    So I then had to go and figure out which routing

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    number went along with that bank.  And a lot of the Federal

2    Reserve Banks will have like a processing agreement with some

3    of the other banks.  So it was, in this particular case, I

4    believe it was Amalgamated, a bank in Chicago, Amalgamated

5    Bank.

6          And in that particular one, once the routing number

7    was in, even after I put it in, it literally had the name pop

8    up below, so I clicked on that.  And then I went in and I put

9    the account name, which I used Heather Ann Tucci-Jarraf, and

10   then I put in the account number, which was my Social Security

11   number.  That process went -- went fine.

12         Then for the second bank that day, I did the same

13   thing, and it went fine.  And I -- so I added those as other

14   payments, other payment options within an existing account

15   already.  So then from there, I would be able to go and make

16   payments, pulling -- choosing from which payment method I would

17   just choose, and I named it HATJ Trust or Heather -- excuse me,

18   Tucci-Jarraf Trust.

19         I made different -- during the tests, I made

20   different nicknames.  In this particular case, it was Trust

21   Heather Ann Tucci-Jarraf on those days.

22         And then on the 5th, Randall had noticed me that he

23   was doing CDs, and the amounts were anywhere from 400 -- excuse

24   me, 500,000, and then the rest for a million.  I believe he did

25   four at 500,000 each and then the rest were all at a million

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  dollars each, jumbo CD loans -- or jumbo CD accounts, excuse

2  me.

3       And the process that was described regarding the CDs

4  was correct from my experience and also from what Randy had

5  described to me.

6       When I went in to go and test that, number one, there

7  was no confirmation page.  It just said "Application pending."

8  And then I received e-mails, and it -- it wasn't until I

9  believe July -- it was July 5th -- or excuse me, July 17th, it

10 was the day I left for Knoxville from Houston, I had received

11 letters in the mail from the bank, which I had made the

12 applications, which was my own institution that I bank at, at

13 Bank of America.

14      So there was a whole application process done online.

15 However, the approval was done, and they sent out a letter of

16 whether you were denied or accepted.  And, of course, in this

17 instance that I experienced and tested, they were all denied.

18 Okay.

19      So then on July 6th, due to the amount of CDs and the

20 value that -- of each CD, I went in to go and test more of them

21 because he was starting to pay off other things and also trying

22 to do Amazon.

23      And the thing that became very clear was on July 7th,

24 I had received a phone call that there were a whole bunch of

25 people who had watched this Harvey Dent video, and they were

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    having a radio show about it that night.

2            So I listened on the radio show and listened to all

3    these people's testimony about their experiences.  And at that

4    point, I just said if anyone -- first off, this is -- the

5    TreasuryDirect deposit accounts, as far as my knowledge, would

6    not have been accessible through an ACH transfer processing

7    system, however, it did look like it was somehow.

8            So I would have to look more into it.  If people were

9    actually doing these accounts and doing this -- and I had

10   mentioned that I had gone in to test, and so far the tests, at

11   least for ACH, adding it as an account within the existing

12   entity, it did work.

13           But as far as whether it was directly tied, that was

14   something I had to look more into.  But I told everyone keep

15   screenshots of every step so that I can see exactly what --

16   where the issues were, or if there was success, figure out how

17   in the banking ACH system they had actually tied it to the

18   TreasuryDirect deposit accounts, which would be sitting within

19   the U.S. Treasury master accounts inside Federal Reserve Bank.

20           So at that point, after I got off the call,

21   immediately my e-mail started beeping and I was receiving tens

22   of e-mails with screenshots already.  People had already

23   started to do it and had been doing it prior to even me

24   speaking, but they started to send them to me to my e-mail,

25   which my e-mail has been public for years, so there wasn't

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    much -- I was going to set up a separate account to be able to

2    receive those so it could act as an archive.  I didn't have

3    time.

4          People just started sending me.  And total, as of to

5    date, there have been 300 -- over 300,000, I just rounded it

6    off to 300,000 individuals, and they've been doing multiple.

7    Even to this date, I've received notice that ones that have

8    been done months ago, back in July, were still paid.  They

9    hadn't been returned.

10         So on July 7th, I spent time to go in and do one

11   more, to check out some of the issues that people had mentioned

12   on the phone call.  And every single time that I went in to

13   test, never did it give the whole account number.  It would do

14   a star, star, star, star, and then only give the last four

15   digits of the actual Social Security number or account number

16   as it was showing on the test.

17         And it was Amalgamated Bank of Chicago, which my own

18   personal data that I was using to test this, that's where it

19   was running through.  I never had it where the Federal Reserve

20   switched the routing number in my particular Social Security

21   number.

22         So then once that occurred, and I saw how many people

23   were doing it, I continued to do tests, but on different --

24   through different institutions and different platforms.  I

25   think I did a total from July -- July 5th through July 8th, I

UNITED STATES DISTRICT COURT

1    did a total of 14 -- 14 to 16 tests.

2           And each one, if there was a time, because there was

3    also an issue of account names, what would -- what would

4    automatically reject and what would go through, so the routing

5    number, you had to have the correct routing number, a valid

6    routing number, or it would just automatically say, "Valid

7    routing number," and it wouldn't let you proceed till you fixed

8    it.

9           The account name, entering the wrong account name

10   also produced, even if I had the correct account number and the

11   correct routing number, it would reject it and say, "No valid

12   account."

13          And then if I had the correct name, the correct

14   routing number, but not the correct account number, it would

15   reject it and say, "Account not found."

16          So that was during those testing, that was my

17   experience, but every time each of the reports that were

18   printed out and confirmations would show just stars and

19   wouldn't show the whole name of the account, the account name,

20   and it wouldn't show the whole number of the account number.

21          Also on the routing number, it wouldn't show the

22   whole routing number, it would only show partial, the last four

23   digits.  The other thing that I looked at when I was doing each

24   of the test cases was to see what language people were getting

25   when they would hit each process.  So it would say, "Submit

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    your information."  You'd submit it, and then you would have to

2    go and you would have to click "Submit."

3          But there was legal language that was on there, so I

4    also evaluated the legal language that was there just to be

5    able to give feedback when we did meet in D.C. for the cleanup

6    and how to change whatever this --

7          MS. DAVIDSON:  Objection, Your Honor.  At this point,

8    I've let her go on for a while.  But I'm unsure about how the

9    actions of all these other people are relevant with regard to

10   Randall Beane and Ms. Tucci-Jarraf.

11         THE COURT:  What's your response to that objection,

12   Ms. Tucci-Jarraf?

13         MS. TUCCI-JARRAF:  It goes to my personal knowledge

14   so that I was prepared to do a conference call with Whitney

15   Bank as well as with Mr. Beane and Buddy Gregg, so I could

16   actually speak to whether or not there was a valid transaction.

17         THE COURT:  Well, why don't we just talk about the

18   conference call then.  Isn't that where we are?

19         MS. TUCCI-JARRAF:  I was almost there.

20         THE COURT:  All right.  Go ahead.

21         MS. TUCCI-JARRAF:  I just had a few seconds there to

22   finish.

23         Okay.  So based on what I had seen, and on July 7th,

24   I understood that there was a -- there was a big problem.  And

25   so at that point, like I said, on -- in June, we had put out

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  for all the intelligence agencies, the government, the banking

2  institutions, the factualized trust, which was originally only

3  three pages when formatted correctly.

4  And so in order to at least protect Mr. Beane until

5  we could figure out what was going on, as well as Whitney Bank,

6  as well as -- or, excuse me, not Whitney Bank, Buddy Gregg,

7  because at the time, I didn't know about Whitney Bank, I only

8  knew about Buddy Gregg, was that I had e-mailed Mr. Beane the

9  factualized trust, which was in testing and discussion phases

10  for D.C. and sent that to him with his information that was

11  particular to him.

12  And that was for Buddy Gregg to be able to do the

13  paperwork properly in the event that there was an issue and --

14  on the -- behind the side of the user application for ACH

15  transfer systems.  And the actual factualized trust looks a lot

16  different than the one Mr. Beane gave them on July 11th.

17  And that would be Exhibit 21.  If we could -- you

18  could do the foundation questions, please.

19  MS. DAVIDSON:  Your Honor, I'd like a copy of this.

20  I know that something like this exists.  We believe that Buddy

21  Gregg didn't give it to us, because they were probably confused

22  thinking they were the same document.  But I think testimony

23  has established this document was presented likely to Buddy

24  Gregg.  So I don't know that we object to it, but I would like

25  to see it.

UNITED STATES DISTRICT COURT

1          MS. TUCCI-JARRAF:  There's a copy there for you.

2          MS. DAVIDSON:  Okay.

3          THE COURT:  It's Exhibit 21, I believe we're dealing

4     with now.

5          MS. TUCCI-JARRAF:  Yes.

6          MR. LLOYD:  Your Honor, may I approach the witness?

7     I have an Exhibit 20, but I don't have a 21.

8          THE COURT:  Do you have it, Ms. Tucci-Jarraf?

9          MS. TUCCI-JARRAF:  They were in the stack of

10    exhibits.  They were in the stack of exhibits that I had given

11    you.

12         MR. LLOYD:  Yes.  That's what I'm looking at.

13         MS. TUCCI-JARRAF:  Okay.

14         MR. LLOYD:  May I approach?

15         MS. TUCCI-JARRAF:  There was an e-mail on top with

16    the factualized trust document that was attached as a -- to the

17    e-mail.

18         MR. LLOYD:  The copy of the Exhibit 21 shows a

19    photograph of Mr. Beane.

20         MS. TUCCI-JARRAF:  Oh, no, that's not correct.

21         It is 12.  I had it upside down.  I apologize.  It's

22    Exhibit 12, not 21.  It was upside down.

23         THE COURT:  Show Exhibit 12 to Ms. Davidson,

24    Mr. Lloyd, and see if there's any objection.

25         MS. DAVIDSON:  Your Honor, this is an unsigned copy,

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    so presumably it's the one that she sent, but we don't have any

2    objection.

3            THE COURT:  We'll admit Exhibit 12.  You can display

4    it for the jury and you can continue your testimony about that

5    document.

6            (Defendants' Exhibit 12 admitted into evidence.)

7            MS. TUCCI-JARRAF:  Thank you.

8            So this is the e-mail that I had sent to Randy at

9    approximately 2:18 Central Time, because I was in Houston,

10   Texas, on July 7th.  And this was -- I had to go in and take

11   the factualized trust that we had on my website for all the

12   testing purposes for D.C. and take it and do a -- a changeover,

13   so that instead of my information on there, because I also use

14   myself for -- any time that we test any kind of policy change

15   or document change within the system, I always use myself.  I

16   do not involve any other individuals.

17           This particular case, you'll see that this was the

18   e-mail I sent.

19           Could you please go to the second page for me,

20   Mr. Lloyd?

21           So on this one, it looks very similar to the first

22   one.  This particular information that sits on the first page

23   was for title, ownership.  This is how it looks in banking when

24   you have to show title, ownership, identification, the account

25   information.  This is basically the same structure that any

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   title for any kind of asset in banking would have.

2          So for the factualized trust and an individual's

3   property, it was just copied over so that banking wouldn't have

4   too much of a changeover as far as learning a new format or a

5   new system or a new style.

6          Now, the other pages, you'll notice when you compare

7   this particular unsigned copy, because it was sent over to him

8   for his review and at least to show Buddy Gregg the factualized

9   trust information -- or excuse me, the name to put on there.

10  Of course, they -- they didn't write it correctly, they put

11  "Duly Factualized," and it should have just been "Factualized

12  Trust."

13         But like I said, all of this was in testing phase.

14  It wasn't ready do go into the public.  The intention was, it

15  never would, that the banking system would be able to change

16  things internally, and there would be no disruption to any of

17  the individuals or commerce or amongst the different

18  institutions that were inside using the banking systems.

19         And this document, each of the pages, you'll see,

20  there really is only -- after the title page, there's only two

21  pages really of content, because at the time, we were still

22  going through which particular UCCs needed to go into the

23  underwriting in the factualized trust to correspond with what

24  was already inside of the commercial registry systems,

25  globally, as well as here in America, as well as with the

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  particular asset structures inside of Federal Reserve, as well

2  as Bank for International Settlements, and then of course all

3  the international equivalent.

4       So it was really -- there had to be a lot of

5  coordination, so it was just a matter of getting a uniform

6  format and then of course style.

7       So this particular document was only really two

8  pages.  Here, it's formatted incorrectly, so it ended up being

9  four with a signature at the bottom.

10      There was discussion, because in the final product,

11 if there was to be a final product, there was to be no notaries

12 or anything like that.  Everything was supposed to be done

13 because all the biometric identifiers, such as thumbprints,

14 DNA, Social Security numbers, all of that was already inside of

15 the systems themselves so the people wouldn't have to go in and

16 do anything new.  It would just be connected to the actual

17 factualized trust that would be instituted within the system

18 itself.  But like I said, we weren't even to that point.

19      This happened.  And at that point, I had to

20 hyperaccelerate in order to protect the individual parties,

21 which we had a conference call on July 10th.  We had a

22 conference call, and you've heard that.

23      You've seen a video, only the video part was my

24 recording.  There was no -- you couldn't hear the voices of

25 anyone at Buddy Gregg location or Whitney Bank location.  You

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    could only hear mine.

2           There was a recording that was made by another

3    individual I didn't know at the time.  I found out after the

4    fact, and I asked for a copy of that.  Due to the events that

5    occurred, I never received a copy of that directly.  It got

6    sent to someone else.

7           And by that time, Randy, I was dealing with sheriffs

8    and had the FBI calling and was dealing with the bankers and

9    the intel agencies to figure out what was happening with Randy,

10   that I never got to receive a copy directly or send one over to

11   Lauren Palmisano.

12          However, I asked all the different teams that had

13   received it to please just publish it on YouTube.  That way, it

14   would be there and I could pull it at any time when I needed

15   to.

16          So after that point, that was the one that Mr. Beane

17   apparently, according to testimony, had submitted.  However, we

18   haven't seen it, so I don't know if that is the exact one.

19   However, that's the only one I know that I had delivered over

20   to Mr. Beane.

21          So during our conversation, as you've heard with

22   Ms. Palmisano and Mr. Cohen as well as Mr. Forbes and

23   Mr. Nelson, there were certain actions that we needed to take.

24          First off, I didn't know who anybody was.  So I had

25   to get all their names, have them spell it, give me their phone

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  numbers.

2          In the particular case of Ms. Palmisano and

3  Mr. Cohen, they had given me their e-mail addresses so that I

4  could send all the documentation we agreed on via e-mail rather

5  than fax, because I didn't have access to fax.  I was on a farm

6  in Houston working on another matter.  So they gave me that so

7  I could send it via e-mail.

8          So on July -- between July 10th and our phone call,

9  and before I had revised that public trust -- or, excuse me,

10  that factualized trust document, I had asked to see the bill of

11  sale for the coach as well as a copy, the front copy, not the

12  back copy, of the certificate of origin for the actual vehicle

13  so that I could prepare the declaration of valid sale, which

14  Ms. Palmisano had asked for.  So that, I had received from

15  Mr. Beane on July 10th at approximately 6:47 p.m.

16          Your Honor, I have the exhibit with me here.  May I

17  have it passed down to -- so we can ask about foundation?

18          THE COURT:  Yes.

19          MS. TUCCI-JARRAF:  And there's a copy here for

20  Ms. Davidson.

21          MS. DAVIDSON:  No objection, Your Honor.

22          THE COURT:  What is this number?

23          MR. LLOYD:  17, Your Honor.

24          THE COURT:  We'll admit 17.  Go ahead.

25

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

(Defendants' Exhibit 17 admitted into evidence.)

1           MS. TUCCI-JARRAF:  Thank you.

2           Just so you can see the full communication of what

3    actions I took, this is the e-mail for the bill of sale of the

4    coach, which Ms. Davidson for the U.S. actually presented and

5    put into evidence that you saw throughout last week.

6           So this is just the e-mail that I had received, and

7    then there's a link, and that led me to the scanned copy of

8    exactly the documents that she -- or that they had -- that they

9    put into evidence.

10          And then the second page, this is for the

11   manufacturer's certificate of origin for the coach.  This is

12   just the e-mail, so that you can see that Mr. Beane did send it

13   to me after we had the particular conference call and I could

14   prepare the documents, which Ms. Palmisano and from Whitney

15   Bank as well as Mr. Cohen from Buddy Gregg would need in the

16   event there was a problem with the Fedwire, the sale itself,

17   the particular -- these particular documents would be needed

18   for anti-money laundering laws as well as any kind of other

19   laws that Federal Reserve typically in the past has used to be

20   able to exert pressure through their -- their agents inside of

21   law enforcement and the justice department.

22          Now, during that time, once I had received those

23   documents, it took me quite a while to actually insert all of

24   the underwriting into the factualized trust, because I had to

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  first pull all of the documents out of archive to be able to do

2  that.  They had already been prepped and archived.

3       I had to pull them all, double-check them,

4  triple-check them in some instances, and grab a few that had

5  been missing so that they -- Buddy Gregg and Whitney Bank as

6  well as Mr. Beane could have a copy of the actual underwriting

7  that's inside of the factualized trust.

8       Now, again, these haven't been made public, other

9  than the UCCs themselves have been made public over the years,

10  but nobody knows how to use them.

11       And, in fact, that's what the meetings in D.C., as

12  well as globally, if there was travel anywhere, hoping to have

13  everything done in D.C. since there was all the embassies

14  there.  Everything was basically prepared for that and not

15  prepared for actual usage and e-mail to third parties.

16       So I had to put all of that together and write the

17  underwriting that would be at least satisfactory at that

18  particular point.  And I didn't finish that until approximately

19  10:00 a.m. on July 11th, at which time was e-mailed over to

20  Mr. Beane.

21       May I -- the exhibit is here with a copy for

22  Ms. Davidson.  I apologize.

23       THE COURTROOM DEPUTY:  That's all right.

24       MS. TUCCI-JARRAF:  Thank you.  So as you can see,

25  10:10 a.m. on July 11th.

UNITED STATES DISTRICT COURT

1      MS. DAVIDSON:  I have no objection.

2      MS. TUCCI-JARRAF:  Sorry.

3      THE COURT:  What is the number?

4      MR. LLOYD:  18.

5      THE COURT:  We'll admit 18.

6      MS. TUCCI-JARRAF:  Thank you.

7      (Defendants' Exhibit 18 admitted into evidence.)

8      MS. TUCCI-JARRAF:  On this particular document, you

9   can see where I wrote a quick note to Randall regarding the

10  account number I had to actually -- what was missing, because I

11  didn't fill any information out.  I didn't have the Social

12  Security at hand for the last four digits for the account

13  number.  And then explained that needed to be print, signed,

14  and notarized, and scanned, and e-mailed back.

15      You know, at this particular time, all the energetic

16  signatures are already -- the system and protocols in banking

17  actually have moved to energetic signature, like I explained,

18  with the different technologies that the banks have been

19  preparing since 2011 to have that switched over.

20      Everything traditionally has been done by biometric,

21  biometric meaning your thumbprint, Social Security number.

22      However, in this particular case, I wanted to make

23  sure Mr. Beane as well as Buddy Gregg and Whitney Bank had the

24  particular protocols that I particularly used so that if there

25  was a problem later on, I would be able to address it.

UNITED STATES DISTRICT COURT

1          Everyone in banking, everyone in the government, they

2     are all familiar at the highest levels with my security

3     protocols that I have developed, as well as used, with all of

4     those entities since 2008, so they were familiar for them, and

5     we could figure this out very quickly.

6          And then to notify the different agencies and intel,

7     because at that point, everybody knew.  I had made phone calls

8     to all my contacts in intelligence, as well as banking,

9     government, to figure out who put the pressure on -- or who was

10    going to put the pressure on, I should say.  At that point,

11    they were just going in to do discovery.  So I didn't have that

12    information.

13         All I had for them on July -- the evening of July

14    10th were some names I had gotten from Ms. Palmisano,

15    Mr. Forbes, and Mr. Nelson, as well as Mr. Cohen, which were

16    True Brown, and all I knew was that he had identified himself

17    as a FBI agent and then later switched it to a USAA employee.

18    So I gave them True Brown.

19         I had also gotten the name of Agent or Officer

20    Patterson, so I had given them that name as well.  I gave them

21    any names that I was given in that conference call to be able

22    to go check so we could figure out what was about to happen and

23    who was going to do it.

24         At that particular point, in order to protect

25    Mr. Beane, also Whitney Bank, Buddy Gregg, and anyone else that

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   would eventually end up, as well as USAA Bank -- excuse me, I

2   keep leaving them out -- as well as USAA Bank, I went in and

3   signed, because I never -- I'll never issue anything, whether

4   it's tests or whether it's usage, that I wouldn't put my own

5   signature and seal on or incorporate in with the authorization

6   or with the approval of different agencies, intelligence.

7          However, Mr. Beane was fast, escalated to a very

8   serious and grave matter, in my experience.  And so I actually

9   issued my own factualized trust and put it on my website, which

10  is where I archived different things that the intelligence

11  agencies, the government, the different branches that are

12  involved in the cleanup, and the bankers that are involved in

13  the cleanup would know to go look at.  As long as it's on my

14  website, they know that that's something I've issued and that

15  I'm standing behind.

16         So I went and issued the same exact factualized

17  trust, but with my identifiers on the same day, approximately

18  about eleven o'clock in the morning, and then had that put on

19  my website.

20         Now, at that time, I was still doing also the

21  declaration of valid sale, so that I could get that over to

22  Mr. Beane, which I did get over to Mr. Beane at approximately

23  noon.  And when I called -- after I had sent over that to

24  Mr. Beane and he was notarizing them, I gave a call to Lauren

25  Palmisano at the phone number that she had given to me, to let

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  her know Mr. Beane has them, he was getting them notarized, and

2  he was delivering them to Buddy Gregg, and that I was going to

3  send over the underwriting, the actual individual UCCs to their

4  e-mail as soon as I had gotten home to my computer to do that.

5       Only Ms. Palmisano didn't answer her phone.  She was

6  gone.  It said that she was out of the office, which during our

7  call, she said that she would be in the office.  So at that

8  point, I started to suspect something was going to go on.  And

9  then -- so I left her a voice mail of exactly what I just told

10  you guys.

11       And then I called Mr. Cohen at the phone number he

12  had given me.  And I started talking to Mr. Cohen and repeated

13  the same things that I left in the voice mail for

14  Ms. Palmisano.

15       And he said, "Okay.  That's good."  He goes, "Because

16  there's -- you know, I don't want there to be a problem," and

17  he went in to some of the discussion.

18       By that point, I knew that there was a problem.

19  Didn't know how fast it was going to go, so I needed to get

20  over the UCCs, the underwriting for the actual factualized

21  trust that they would need to show origin -- proof of origin of

22  funds, history of funds, title and ownership for the funds that

23  Buddy Gregg had already received.

24       All of the transaction had already been done before I

25  even came on on the 8th.  They had received the money.  The

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  paperwork had already been done.  Randy had the keys to the

2  coach.  So, really, I came in after the fact with the exception

3  of giving Mr. Beane the factualized trust on July 7th, which

4  was the first one that's only three pages when formatted

5  correctly.  And that's in evidence now.

6          So other than that, it was just a lot of figuring out

7  what was going to happen at that point.  So Mr. Cohen had given

8  me a heads-up.

9          And as I was driving home, I received a phone call

10  from Randall.  He had already given the paperwork to Buddy

11  Gregg.  They had everything.  And I told him that was great.

12  Now they have that, I'm headed home so I can get them the

13  underwriting, every single piece that's listed in that

14  factualized trust.

15          As we were talking on the phone, that's when he said,

16  "There's some suits outside, out in the parking lot or they

17  just got out of the car in the parking lot."

18          And I said, "Are they indicating to you?  Are they

19  signaling for you?  Are you sure they're suits?"

20          Suits for me means something different than, I

21  believe, for Mr. Beane.  For me, it means a different -- a

22  whole different agency that's not very known.  What it ended up

23  being eventually was the FBI, Mr. Still and Durand -- I may be

24  saying that wrong -- and others.

25          And so when he said, "No, they -- they're just

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

getting out of the car," I said, "Okay.  Just be calm.  Sit
there.  No problem.  If they come to you, just open the door,
hand them the phone, and let me just figure out who they are."

Because I asked if it was a marked vehicle, and he
said no.  But it looks like a super Charger, a Charger, a
Chevrolet, a Chevy Charger is what he had said, which, in my
experience, is law enforcement.

So at that point, I just communicated to him just to
stay calm.  If they came, we'd handle it.  No problem.

And at that point, things just started to explode, as
far as Randall started making excited utterances.  I heard
noise in the background.  I heard yelling and pounding on the
background.

I told Randall, I said, "What's happening?  Talk to
me.  What's happening?"

And he couldn't.  At that point, he said, "They're
trying to break into my RV."

And he was very excited as far as -- I mean, in a bad
way.  He started to become scared.

I said, "Just calm down, calm down, hand them the
phone."

So I was actually on the phone and trying to walk him
through it so that somebody could hand me off to whoever was
there, and we could figure out who they were, what they needed,
since Mr. Beane had already provided all the documentation that

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  was necessary for not just the valid sale, that had already

2  occurred on July 8th, but for the underwriting and everything

3  else so that that copy could be gotten if there was an issue.

4  But we didn't know at the time because of this interruption.

5          So all of a sudden, the phone, as I'm listening, I

6  can hear Randall screaming, plus people talking, and it was

7  like talking over another.  To me, it sounded, in my experience

8  with incidents similar to this, it sounded like someone was

9  being grabbed, pulled, resisting, asking for questions.  I

10 heard warrants, but I didn't hear anything else.  I just heard

11 warrant.  And I'm not sure who it came from, whether it was

12 Randy asking for -- to see a warrant or whether it was them

13 saying they had a warrant.

14         So at that point, the phone, sounds like it drops and

15 it goes dead.  So I'm sitting there and I'm waiting for someone

16 to call me back.  I'm calling.  When nobody calls me back

17 immediately, I end up calling.  No answer.

18         So at that point, I'm trying to figure out -- I knew

19 there were two individuals with Randy, because I had spoken to

20 them the night before, but I didn't have their numbers.

21         And so at that point, I contacted another friend of

22 Randall's to try to figure out what the phone numbers were.  In

23 fact, I had a difficult time even trying to find Randall's

24 number, because I didn't have it programmed into my phone.  The

25 one that I had that he called me from, I'm not sure if that's

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    his phone, because we usually do Skype.  That's how we usually

2    talk.  And so I didn't know whether I was calling Randall's

3    phone back at the number that had just called me or if there

4    was another number.  So I was trying to find a number.

5         Then, while I was doing that, and we're still in the

6    car driving, there was a phone call that came in from a number

7    that I didn't know.  I answered the phone.  And at that point,

8    one of my colleagues that helps me with all the archiving for

9    the test cases and things like that, I was with her.  We were

10   working on the stuff for preparation for D.C.  She started

11   filming.

12        While I was on the phone, I heard a voice, but it

13   sounded like it was down low, because they weren't talking

14   directly to me.  And so I stayed very quiet and listened as

15   best as I could.  I could still hear screaming.  I could still

16   hear yelling and what sounded like an altercation, a physical

17   altercation, but I had no details.

18        So at that time, I started saying, "This is Heather

19   Ann Tucci-Jarraf.  This is Randall Beane's lawyer.  Identify

20   yourselves immediately."  Those are the words that I kept

21   repeating as loud as I could just so someone could pick up the

22   phone and talk to me to let me know and pass me off to law

23   enforcement or whoever it was at that point.

24        Then I heard a voice speak to me, which I know now is

25   Alex -- I can't remember his last name, the two individuals

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

that were with Randy that day. And he just said, "Hold on a second." And then I heard him speaking to someone that was unidentified to me. And I heard him say, "This is Randall Beane's attorney, she wants to talk to you."

And I'm saying, "It's lawyer, not attorney," and stop myself from correcting it.

At that point, I heard an unidentified male speak back saying, "I'm not talking to any attorneys. I'm not talking to anybody. There's some other characters that may be involved with this," and that was it. Then it cut.

I received another call almost immediately after that at that point. And during this particular call, it was Alex, he was speaking to me. He said he was outside of the RV, that Valerie, his wife, was inside the RV with FBI or some kind of agency.

When I asked him to look around and tell me what kind of law enforcement vehicles were there, just so I could figure out which agencies were involved, so I walked them through, and I said, "Please tell me which law enforcement vehicles you see."

He said most of them were unidentified, but there was one Knox sheriff's vehicle at the scene.

At the same time, he -- I said, "Please look to see how are they dressed."

He said, "Most of them are in suits." He said that

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    there was only one officer in uniform.

2             I asked him to see which kind of uniform, as well as

3    whether the other plain-clothed apparent officers had any kind

4    of badge, some kind of identification that he could see on

5    them.

6             He said, "I see things that are -- what looks like a

7    badge.  It's just metal.  I can't read anything on them."  He

8    said, "The sheriff, the Knox Sheriff, I can't get close enough

9    to actually read his name tag or anything like that."

10            I said, "Okay.  Who's in the vehicle with Val?"

11            At that point, he said, "I don't know.  They're in

12   suits."  He goes, "I believe it's FBI."

13            I said, "Okay.  Do they have anything that shows FBI,

14   like jackets, do they have their windbreakers on that say FBI

15   on the back, anything like that?"

16            He said, "No."

17            So at that point, all I could do was wait.

18            I said, "Please find a law enforcement officer, hand

19   them the phone so that I can speak with them."

20            And Alex was worried about handing them his phone,

21   because apparently at that time he was on his phone.  He didn't

22   want to hand them his phone.

23            I said, "Fine, write my number down, write my name

24   down, and then hand them the piece of paper and please have

25   them contact me as soon as possible, like immediately."

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    So Randy -- excuse me, Alex did write it down.  He

2  said he wrote it down at least.

3    And I said, "Okay.  Now go and give that to them."

4    He turned his phone off or ended the call at least.

5    And I waited.  At that point, I had to wait for about

6  five minutes.  I made it all the way home.  We had to pull over

7  on the side of the road, because it was very hard to hear.  So

8  I continued on to the house so that I could get to the house,

9  get situated, and also -- until somebody called me, I could

10  start the actual UCC delivery, the underwriting to

11  Ms. Palmisano as well as Mr. Cohen.

12    At that time, another individual called.  This time,

13  I spoke with a woman who said that it was Val.  So I spoke with

14  Valerie, and Valerie had said that she had spoken with the FBI,

15  and that they had given her two business cards.  One was a

16  Parker Still, and the other one, I'm going to -- I'm going to

17  really mispronounce this name, Vehippy [phonetic], Vealy

18  [phonetic] was her name.  She was a special agent.

19    So I asked them to hold onto those cards so that they

20  could take a picture and send it to me as soon as possible so I

21  could start making the phone calls that needed to be done.

22    At that time, Valerie, as she was on the phone with

23  me, a woman approached her.  I could hear a woman's voice, and

24  it ended up being this Special Agent Vealy.  And when I asked

25  to speak with her, she was already in the middle of a speech to

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

them, speaking to them, trying to ask if, you know, "Do you
need anything" -- this is what I heard was, "Do you need
anything?  Thank you so much.  This is a stressful, stressful
situation."

        And then I couldn't hear the rest.  And the phone
must have gotten passed to Alex, because at that point, Alex
had gotten on the phone.

        And I said, "Do they have a warrant?  Please find out
if they have a warrant."

        He goes, "We've already asked that.  They don't have
a warrant.  They told us that it was an electronic warrant,
that someone in their office said that it was being sent to
their office."

        So at this point, after the events had -- basically
was wrapping down, there still was no warrant, no warrant
number that they could give him, no copy, and there was
definitely no physical, but not even the electronic had been
produced in their office yet according to what -- what the
officer had said.

        And there was a video, apparently, that had been made
about that as well.  I'm not sure who it was from, but there
was a video out showing Valerie and the Special Agent Vealy, I
believe her name was, speaking.  And you could only see their
feet, and then they showed -- and Special Agent Vealy was very
pregnant.  She looked about seven to eight months pregnant,

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   based on my own experiences.

2        And you could see the Knox County Sheriff's car and

3   you could see different agents, what appeared to be agents,

4   because none -- all of them were in suits.  There was some

5   windbreakers.  But I couldn't see from the video any of -- like

6   initials or acronyms on the back, like FBI or sheriffs or

7   anything like that.

8        But there were approximately about nine or ten

9   officers, not including the uniformed one, but there was only

10  one uniformed officer that I could see on this video.

11       So at this point, I had to make a decision

12  regarding -- they had taken Randy and put him into the car.

13  Nobody would speak with me.  There was one officer who was put

14  on the phone with me, and when I identified myself, they hung

15  up immediately.

16       At that point, I just went in and started the e-mail

17  process to Palmisano, to Whitney Bank, and to Buddy Gregg, so

18  at least that part could get done.  So at approximately 4:21, I

19  began the e-mail process.

20       And I have that exhibit.  Excuse me one moment.  The

21  copy, I believe, is down with you.  It would be Exhibit 20.

22  The original exhibit as well as Ms. Davidson's copy is with

23  you.

24       May I continue?

25       THE COURT:  Go ahead.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    MS. TUCCI-JARRAF:  While we're looking for the

2    exhibit and giving it to Ms. Davidson, at this particular

3    point, I sent him an initial e-mail to begin a marker for the

4    process of all the data and communication that would be sent

5    regarding the factualized trust and this particular

6    transaction.

7          Now, the transaction was already done on the --

8    July 8th.  However, this, I believed, in my experience in

9    banking, was something that was required in order to protect

10   all the parties, especially now that law enforcement was

11   involved, although we still didn't know which agencies

12   completely.

13         And the first e-mail was delivered on July 11th,

14   2017, beginning at 4:21 p.m.  And the last e-mail -- most of

15   the e-mails were one -- part one through part five were all

16   sent on July 11th.

17         And then as we went to go archive all of these, there

18   were -- one was missing in the archive, so I went to go in and

19   resend it, which was the factualized trust and the -- I believe

20   it was the factualized trust and the declaration of valid sale.

21   So I did resend those.

22         So the communication went from July 11th at 4:21 p.m.

23   all the way through July 12th at 4:25 p.m.

24         So if Mr. Lloyd is ready, we can ask some foundation.

25         MS. DAVIDSON:  We have no objection to these.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    THE COURT:  All right.  Are they all one number or
2 are they --

3    MS. TUCCI-JARRAF:  Yes.

4    MR. LLOYD:  They're all one number, Your Honor, and
5 it's 20.

6    THE COURT:  All right.  Defendants' Exhibit 20 is
7 admitted.

8    (Defendants' Exhibit 20 admitted into evidence.)

9    MS. TUCCI-JARRAF:  So the first e-mail was on
10 July 11th, 4:21 p.m., and at the top, you'll see Lauren
11 Palmisano and Brad Cohen.  I didn't e-mail a copy over to -- or
12 I didn't add Mr. Beane to this particular one, because at that
13 point, I'm still reeling as far as what just occurred with
14 Mr. Beane.  I'm also running intelligence inquiries to figure
15 out what just happened, who was involved, who ordered it.

16    Because while this was occurring from July 5th
17 onwards, I was in communication with different intelligence
18 agents as well as different bankers in order to not have a
19 situation like this happen.

20    So this particular e-mail was just an introductory.
21 There was -- excuse me, there were two attachments to this
22 e-mail with the due declaration and the factualized trust,
23 which you have seen as exhibits, Exhibit 1 of 155A, for the
24 declaration of factualized trust and of valid sale.

25    If you go to the July 11th at 4:46 p.m., please.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   Now, these will just be the e-mails.  I'm not putting in the

2   attachments of the UCC underwriting.  So these are just the

3   e-mails, but they discussed the attachments.

4           This is the attached -- or the e-mail with the

5   Fedwire, which was the proof of Fedwire that Randall had gotten

6   from USAA Bank because his bank is online, everything is

7   online.  They had sent an e-mail to him, the actual

8   confirmation of the Fedwire, and that was an exhibit from the

9   state in their case.  So this was the e-mail that I had used to

10  send over to Ms. Palmisano as well as Mr. Cohen for the proof

11  of the Fedwire, and attached to that was a copy of what you

12  have seen in this trial.

13          The one marked 7:34 p.m., before I get to this one, I

14  believe it's part one that I need.  Okay.  Just prior to part

15  one being sent out, because we had to pull all the attachments

16  into each of the e-mails, which took some time due to being out

17  at the farm.

18          So in between 4:46 p.m. and 7:23 p.m. on July 11th,

19  and I don't recall the exact time, but it was in between these

20  two e-mails, I had received a phone call from our intelligence

21  and banking contact, and that particular phone call was

22  essentially them telling me that I could -- if I stopped what I

23  was doing and made sure that all the people stopped what they

24  were doing as far as researching TreasuryDirect -- the correct

25  term is TreasuryDirect deposit accounts, but the people were

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   calling them, due to that video from Harvey Dent, TDAs or

2   TreasuryDirect accounts.

3          I was told that -- if I went in and took action to

4   stop all of this from happening, as far as the people becoming

5   too aware about TreasuryDirect deposit accounts, because it was

6   only going to be a moment between going from TreasuryDirect

7   account to TreasuryDirect deposit accounts, and there were a

8   lot of transactions.

9          Apparently, there were over 10 million in

10  transactions done, not people, but in transactions done up to

11  that point throughout the United States of America, and that

12  the banks actually had to make emergency crews to manually go

13  in --

14         MS. DAVIDSON:  Objection, Your Honor.  Relevance and

15  no foundation whatsoever in fact.

16         MS. TUCCI-JARRAF:  I'm testifying to my personal

17  knowledge of the situation.

18         MS. DAVIDSON:  Her personal knowledge has to have

19  some foundation, and she's laid no foundation to any of this

20  knowledge.  Someone told her.  Who told her?

21         MS. TUCCI-JARRAF:  The banks and the intel agents

22  that I worked with on this particular matter.

23         MS. DAVIDSON:  Your Honor --

24         THE COURT:  What intelligence agents?

25         MS. TUCCI-JARRAF:  I can enter the exhibit, if you

UNITED STATES DISTRICT COURT

1  would like.

2          THE COURT:  You can tell me.

3          MS. TUCCI-JARRAF:  The name?

4          THE COURT:  The objection is --

5          MS. TUCCI-JARRAF:  I have the name of the agents.  I

6  can actually identify them and lay the proper foundation for

7  the agent and for the testimony.

8          THE COURT:  What's the relevance of this testimony?

9          MS. TUCCI-JARRAF:  It goes to weight and credibility

10 of the severity of the actions that were about to follow as far

11 as Mr. Beane's situation and also to my state of mind to make a

12 determination whether I would enter into this case in the role

13 of a defendant.

14         THE COURT:  What do you mean?

15         Well, I'll sustain the objection.

16         Go ahead.

17         MS. TUCCI-JARRAF:  Okay.  So at this point, I was

18 given an offer to stop things, to be able to have access to my

19 own personal TreasuryDirect deposit account, which I've seen.

20 There's more numbers in there than I could possibly use.  That

21 was essentially what I was asked to do.

22         At that point, I said I would consider everything

23 that they had told me and make my decision.  And it was

24 expressed to me that physical harm or worse would come if I

25 continued on.  And, basically, what they mean by that or what

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  they -- what I understood that to mean was that if I continued

2  to be involved with this instance and protect Mr. Beane with

3  the particular --

4          MS. DAVIDSON:  Objection, Your Honor.  Hearsay, no

5  foundation.  These people supposedly told her there would be a

6  war.  What people?

7          MS. TUCCI-JARRAF:  I believe she can handle it on

8  reproach.  I said --

9          THE COURT:  The objection is hearsay.  You're

10  offering testimony as to what someone else told you, which in

11  general terms is hearsay.  What's your response to the hearsay

12  objection?

13          MS. TUCCI-JARRAF:  Actually, I didn't say that.  I

14  said it was my understanding that there was going to be

15  physical --

16          MS. DAVIDSON:  It came from the hearsay, so that's

17  still a hearsay objection.

18          THE COURT:  What's your response to that objection?

19          MS. TUCCI-JARRAF:  It's based on my personal

20  knowledge with -- after years of experience with these agencies

21  and with Federal Reserve Bank and how they operate.

22          MS. DAVIDSON:  Your Honor, my response is still

23  whatever she was told on this day is hearsay, even if she

24  believed it based on her personal experience.

25          THE COURT:  Go ahead for now.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1      I'll overrule this particular objection.

2      MS. TUCCI-JARRAF:  Thank you.

3      To clear up as far as my experience of why I believed

4  that it was credible was because in 2011 during the mortgage

5  cases that I spoke to you about yesterday, the Federal Reserve

6  Bank did take action, but didn't enter themselves into the

7  particular case, and ended up stealing a million dollars of my

8  father's money -- of my mother and father's money.  There was

9  no paper trail.

10      So as far as how this particular case needed to go,

11  that's why I say, when there is a threat, I consider all the

12  information taken, I look at what possible actions are -- with

13  the specifics of a particular event, then I make my own choice

14  as to what my actions will be in the follow-through.

15      So the one thing that was not desired was that I

16  would be involved in any kind of case in this particular

17  matter, regarding Mr. Beane and the Federal Reserve.

18      So that night, I left that alone for the moment and

19  continued on with making sure that Whitney Bank and Buddy Gregg

20  had all of the underwriting and the data that they needed for

21  their origin of funds, their history of funds, which is all

22  necessary when you're dealing with law enforcement or

23  regulatory agencies for the anti-money laundering laws and for

24  them to be able to use those funds.

25      And, in fact, Ms. Palmisano -- at this point, I still

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  have no information that they've returned the funds based on

2  the documentation that was provided in these e-mails as

3  attachments.

4          So part one, it lists every UCC, which is also listed

5  in the factualized trust.  And those particular ones that are

6  listed there were attached to this particular e-mail and sent

7  over as part one.

8          And then with each -- each part of this exhibit here,

9  it was the same thing.  Each attachment was identified, and it

10 was basically incorporated, used as legal language as far as

11 all restated, incorporated here as if set forth in full, as if

12 each UCC that was listed, or each attachment that was listed

13 was actually in the content of this e-mail for service

14 purposes.

15         I also gave them a copy of the paradigm report, which

16 came after part five.  There were five parts that were sent

17 with all of the underwriting and the UCCs that are listed in

18 the factualized trust.

19         I also re-sent the declaration of duly completed

20 lawful sale.  And this one was from July 12th at 1:00 p.m when

21 we discovered it possibly may not have arrived to them in the

22 beginning.  I wanted to make sure that they had a complete

23 paper trail and anyone else that would be involved in this

24 particular matter at that point.

25         During this -- the end of these e-mails, I did

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   receive communication from Lauren Palmisano on July 12th at

2   approximately 4:25 p.m.

3           So from July 11th at 4:21 p.m. to July 12th to

4   4:25 p.m., we were working nonstop on this particular matter,

5   as well as trying to locate Mr. Beane, because we were still

6   unable to locate Mr. Beane at that point.

7           On July 13th, I did receive a phone call and came to

8   learn that Mr. Beane was being held at a detention facility in

9   Knoxville.  When I tried to find out under what warrant, what

10  kind of document, what kind of information there was regarding

11  the arrest, what was the name of the facility, getting the

12  phone number so I could contact the facility and figure out

13  what was going on.

14          And so I was able to speak with Mr. Beane's cousin,

15  Patricia, who her --

16          MS. DAVIDSON:  Objection, Your Honor.  Hearsay.

17          THE COURT:  Well --

18          MS. TUCCI-JARRAF:  I wasn't --

19          MS. DAVIDSON:  She was -- she just testified that she

20  was able to talk to Patricia and presumably --

21          THE COURT:  She hadn't testified yet -- you can't

22  necessarily testify what other people told you.  You can say

23  you talked to someone.

24          So I'll overrule the objection for the time being.

25          MS. TUCCI-JARRAF:  Thank you.

UNITED STATES DISTRICT COURT

1    Okay.  So, apparently, his family was just trying to

2  figure out where he was as well.  It was later on DOJ -- excuse

3  me, at the facility in Knoxville, the large one, Wilson D.

4  Detention Facility, we were able to look on their website to be

5  able to find Randall.  And he had been finally at least

6  processed.

7    And it did show on their own website that there was a

8  case number, the document type was a warrant, and that it was

9  booked and served on July 12th on 2017 and that the charge was

10  a fugitive from justice, a felony.

11    However, per the information I had had with working

12  with Randall, that there -- he didn't have any felony charges.

13  So I, again, put out an inquiry for any warrants that were

14  outstanding or any warrants in the name of Randall Keith Beane

15  so that I could see the actual copies.

16    On this particular -- on July 12th, when I went to go

17  look at this, the case number, we tried to pull up any

18  information that we could through the normal judicial as well

19  as calling the clerk's offices to figure out what kind of case.

20    Now, obviously, at this point, it showed that on

21  July 12th, there was a jail arraignment, however, we weren't

22  able to get any information on it.  And the case number looked

23  like basically a warrants number, it would be a number assigned

24  to the warrant that was supposedly put in.

25    And underneath it, so it showed July 12th that there

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    would be a jail arraignment.

2            MS. DAVIDSON:  Objection, Your Honor.  This line of

3    testimony, I don't understand how this is relevant to the

4    charge of money laundering against Ms. Tucci-Jarraf.

5            THE COURT:  All right.  Your response to that

6    objection?

7            MS. TUCCI-JARRAF:  It goes to intent and state of

8    mind, that there was never an intent to commit money

9    laundering.  There was no conspiring at all.

10           MS. DAVIDSON:  By the time that Mr. Beane was

11   arrested, we don't allege that she participated in any money

12   laundering.

13           THE COURT:  Based on that, I'll sustain the

14   objection.

15           MS. TUCCI-JARRAF:  So what we did find at this point

16   and through my particular analysis was that there was going to

17   be a situation similar to this one.  What charges would be, we

18   didn't know at that point.  Whether I would be brought into the

19   case, I didn't know at that point.

20           I had hoped that I would be brought in so I would be

21   able to share the particular information in regards to a

22   cleanup that we ended up hyperaccelerating due to this

23   particular case being filed.

24           So at no time was there ever an intent on my part to

25   conspire to hide money or have money stolen or laundered.  No

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1   fraud at all.

2          My intent was just to stop crimes from happening,

3   definitely a crime of fraud, but it was Federal Reserve that

4   was my target because of my experience for all the years that I

5   had worked on Federal Reserve Bank over the last 20 years.

6          We were trying to set up a situation where we would

7   be able to put Federal Reserve Bank and all the foreign actors

8   that use it, that I have experienced commit crimes and been a

9   part of those investigations throughout the years, to put them

10  into a situation where the foreign actors, we would have a

11  clear line from the foreign actors to the foreign agents and

12  their process of how our systems in America are actually used

13  for their benefits for those foreign actors and their foreign

14  agents' benefits.

15         Also to be able to identify the foreign agents which

16  are embedded as officials and employees of the United States

17  government so that they could be rooted out, and that's -- that

18  is why I got involved, period, in this particular case, was to

19  be able to establish that line and to establish the line going

20  from the foreign actors all the way through to Tennessee, which

21  we were able to do.

22         We were able to discover that Mr. Still had been

23  ordered by the Federal Reserve Bank, and at that point, it was

24  just a matter of trying to get Mr. Still to get me involved in

25  this case somehow, someway.

UNITED STATES DISTRICT COURT

1      I did receive a phone call from Mr. Still.  At that

2  point, we were trying to coordinate between the different

3  military intelligence agencies and everyone else that had

4  already been involved in the cleanup since my time in the last

5  20 years, but also because the Federal Reserve Bank has their

6  own police force, their own force that they use, so there was a

7  lot of details trying not to make this visible.

8      This is that war that I was talking about that's been

9  going on behind the scenes.  It bled out.  And, unfortunately,

10  Mr. Beane, in order to protect him and everybody else involved

11  who don't know about what's going on in the financial system

12  and amongst the -- within the government of the world, as well

13  as the agencies, departments, and branches, these are the

14  actions that I took.

15      These are the actions that I took to be able to

16  assist in ferreting all this out, which has resulted since this

17  particular case has been filed.  The indictment has resulted in

18  a lot of things becoming visible, even yesterday the FBI deputy

19  director resigning in a large part due to this case.

20      MS. DAVIDSON:  Objection, Your Honor.  Relevance and

21  that has no basis in fact.

22      THE COURT:  Well, let's just go on.

23      MS. TUCCI-JARRAF:  So the -- my particular intent

24  with even involving myself was to be able to create a situation

25  where I would be able to go in and lay an evidentiary trail for

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

 1    law enforcement, corruption, collusion, and ignorance that

 2    resulted in crimes against -- not just the American people but

 3    also humanity throughout, from July 7th all the way through to

 4    today.

 5              And that's what we've been hearing about in this

 6    trial.

 7              May I just check my notes?  If we're going to do a

 8    break, I can check my notes to make sure I don't have anything

 9    else.

10              THE COURT:  Can you check them there?  Because I'm

11    not quite ready to take a break.

12              MS. TUCCI-JARRAF:  Okay.

13              There was one thing on July -- July 17th when I made

14    my inquiry to figure out where the RV was, as well as what was

15    happening with Mr. Randall, I had asked for any warrants, and I

16    did receive copies of those warrants, which were verified in

17    the clerk's office; however, they are not any warrants that

18    we've been presented in this trial.

19              On July 17th, without receiving any of that

20    particular data, I made it an emergency to get to come to

21    Knoxville to be able to figure out what actually was going on

22    at that point.  There was -- I -- I was under the impression

23    that it was a Colorado warrant and --

24              MS. DAVIDSON:  Objection, Your Honor.  Again, this

25    goes to relevance of the warrants with regard to the charge

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

against Ms. Tucci-Jarraf.

THE COURT:  Are you about finished with your direct?

MS. TUCCI-JARRAF:  I'm almost done.

THE COURT:  All right.  Go ahead.

MS. TUCCI-JARRAF:  Thank you.

So I made an emergency to get on the 17th, flew in, and came to the court.  At that time, law enforcement didn't contact me about any charges, no indictments.

At that point, I was here from July 17th through -- or excuse me, July 18th through July 19th.  So it wouldn't be until Washington, D.C. that I would find out that there was a charge against me or an indictment that was done on the 18th, and yet I was here in Knoxville and in the courts, talking with attorneys as well as with law enforcement to figure out what had happened.  And that was the information that I had at that time.

So, again, there was no intent to conspire for anything regarding money that's -- that's my field of work.  It wasn't to hide anything.  It was to expose everything, expose the crimes that are not seen by the public, by the very institution of the Federal Reserve, as well as utilizing subversion with the FDIC and DOJ and FBI.

And that led me to D.C.  After being here in Knoxville, I flew on an emergency flight out to Washington, D.C., because the same threats against Mr. Beane were the same

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1  people that were doing threats in D.C.

2         So I flew out immediately to be able to figure out

3  what happened to the money transaction here and who was

4  involved and who gave the particular orders.

5         At that time, when I landed in D.C., Washington,

6  D.C., and the ticket was made on the evening of the 18th after

7  I'd come here to get some answers.  No answers were

8  forthcoming.  I went to D.C., made the ticket on the 18th and

9  flew in on the 19th.

10        As of the 20th, that's when the Federal Reserve Bank,

11 I went to the U.S. Treasury and the White House to be able to

12 speak with everybody about what had gone on.  Val and Alex, who

13 had been with Mr. Beane on that particular day, had insisted on

14 coming to D.C.  I was flying.  So they chose to drove and

15 joined me at the place where I was staying at a hostel.

16        At that point, while we were at the hostel, because

17 they didn't like the hostel, they decided they wanted to stay

18 in a hotel.  In order for all the people that I work with to be

19 able to monitor and track, I was the one that paid for the

20 particular rooms, using the credit card I had opened up to be

21 able to do different testing.

22        And so they knew where we were at that point.  Law

23 enforcement never came to speak with me during that time.  But

24 on July 20th, when I went to 1600 Pennsylvania Avenue, as soon

25 as I approached, Secret Service came out, and locked -- Secret

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    Service, law enforcement, military, locked down the whole

2    street, pushed all the tourists back to the park so you could

3    still see U.S. Treasury and the White House.

4           During this time, on July 20th, approximately around

5    11:00 a.m., I was on the phone with a particular agent that

6    works in the cleanups with all the banking, as well as with law

7    enforcement and intelligence agencies, as we were trying to

8    track everything that was going down, and the Federal Reserve

9    was involved.  It was just a matter of laying an evidentiary

10   trail all the way from the Federal Reserve down to this case in

11   Tennessee.

12          So the entire time this case has been in this court,

13   from the indictment onwards, it's been tracked in Washington,

14   D.C., because in all the agencies and branches and departments,

15   you have agents that engage in good behavior and agents that

16   engage in bad behavior, by my experience.

17          So we were trying to work on cleaning that up, not so

18   publicly as it is being done now.  Unfortunately, this is where

19   we're sitting.  So thank you.

20          THE COURT:  All right.  Thank you.  That concludes

21   the direct examination.

22          Let's go ahead and start with the cross.  Is it all

23   right with the jury, we'll go to about 11?  Is that okay with

24   everyone?

25          MR. McGRATH:  Your Honor, I'm sorry to interrupt, if

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Continued Direct Examination

1    I may?

2              THE COURT:  Need a break?

3              MR. McGRATH:  Yes.

4              THE COURT:  All right.  We'll go ahead and take our

5    recess at this time.  Thank you.

6         (Jury out at 10:48 a.m.)

7              THE COURTROOM DEPUTY:  This honorable court shall

8    stand in recess until 11:05.

9         (Recess from 10:48 a.m. to 11:09 a.m.)

10             THE COURTROOM DEPUTY:  This honorable court is again

11   in session.

12             THE COURT:  Ready to proceed with cross-examination?

13             MS. DAVIDSON:  Yes, Your Honor.  But we would like to

14   put something on the record before the jury enters.

15             THE COURT:  Go ahead.

16             MS. DAVIDSON:  Ms. Svolto?

17             MS. SVOLTO:  Your Honor, I was just discussing with

18   Mr. Beane and Mr. McGrath the possibility of agreeing to the

19   forfeiture, subject to an appeal, in the event there is a

20   guilty conviction just regarding the forfeiture of the motor

21   home.  And it looks like we have an agreement as to that in

22   principle, such that there would be no need to retain the jury

23   to determine the forfeiture.

24             THE COURT:  Mr. Beane, you agree with that?

25             MR. BEANE:  I do.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1      THE COURT:  You understand if there were to be a

2  guilty verdict, you have or are working out an agreement with

3  the government on forfeiture, such as there would not need to

4  be a separate forfeiture proceeding?

5      MR. BEANE:  Correct.

6      THE COURT:  All right.  Thank you.

7      Bring our jury in.

8    (Jury in at 11:10 a.m.)

9      THE COURT:  All right.  Thank you.  Everyone may be

10  seated.

11      Ms. Davidson, you may proceed with cross-examination.

12      MS. DAVIDSON:  Thank you, Your Honor.

13                  **CROSS-EXAMINATION**

14  BY MS. DAVIDSON:

15  Q    Ms. Tucci-Jarraf, you said that your family was in

16  construction.  Is the name of the company Tucci & Sons?

17  A    Tucci & Sons, Inc.

18  Q    So they build roads, right, and other big things in

19  the northwest?

20  A    That is one of their businesses, yes.

21  Q    And so if you do -- I looked, researched it a little

22  bit, and I saw where they own asphalt companies, but I didn't

23  see anywhere where they own banks.

24      What bank do they own?

25  A    That would be Puget Sound.  It would be Bill Hamilton

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

and Michael A. Tucci are the names of the owners of that bank.

Q   On the actual Tucci & Sons website, they actually list that they do all their banking with a Columbia Bank. Isn't that correct?

A   That is some of their banking, yes.

Q   Oh, okay.  So that's what their website says.  It doesn't mention these other two.

A   Tucci & Sons utilizes a number of banking facilities, including KeyBank as well.

Q   Okay.  So you went -- you said you went to law school at Gonzaga University in Washington state?

A   Spokane, Washington.

Q   Spokane, Washington.  It's not easy to get into law school, is it?

A   No.

Q   In fact, Gonzaga is a very well respected law school, and it's hard to get into, isn't it?  You have to be smart.

A   It actually wasn't an issue of smartness.  I had great LSATs.  It was more a matter of my undergrad grades was the issue.

Q   Okay.  So you got in, though.  You worked hard, you got into Gonzaga Law School.

A   I met with the dean at the time, Dean Clark.  He was Assistant Dean Clark.  I spoke with him.  I arranged to do two meetings.

UNITED STATES DISTRICT COURT

1    The first time that I met with him or that I went to

2  go meet with him, I flew over to Spokane and had hotel

3  arrangements and the meeting was not on the calendar.  And they

4  apologized to me profusely and asked if I could come back on a

5  Monday, and this was on a Friday.

6    So I flew back home per my flight that I had already

7  had round trip, and then I made arrangements and paid for

8  another flight and hotel.

9    I met with Dean Clark, and we had a big discussion

10  about it.  His concern was my grades.  That was it.  Because my

11  family is very -- they're big supporters of Gonzaga University.

12  Everyone in my family, all 20-some have gone to Gonzaga, my

13  aunts, my uncles, my grandfather was an alum.

14    So his concern was, he didn't want to use that

15  particular influence to be able to let me in, and I agreed with

16  him.  And I explained to him, because I was on the university

17  volleyball team at Puget Sound, the same kind of passion that I

18  put in -- we were national champs -- was the same passion I put

19  into law school.  That's why my grades were so low in undergrad

20  was because I put everything into volleyball, all my time.  So

21  he did give me a chance.

22  Q    And then you did well and you graduated?

23  A    Uh-huh.

24  Q    And you passed the bar.  That's not easy, is it?

25  A    Well, I was actually studying for the California bar

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    at the time, for my federal defender's job down in San Diego,

2    left three days before the bar and decided to do Washington

3    State bar and passed it.  It was not hard.  It was easy.  It

4    was an essay, all essays.

5        Q    No problem.

6        A    No.

7        Q    And after you graduated, you were state prosecutor in

8    Washington state.  Right?  That's what you testified to.

9        A    Actually, no.  I went overseas.  At one point, for --

10   during the cleanup, I did take on a job at the -- at the public

11   defender's office first, and then moved over to the

12   prosecutor's office in Pierce County.

13       Q    Okay.  And so you did work for the state prosecutor's

14   office.  Right?

15       A    I did.  For three years, approximately -- May 26th,

16   2003 all the way to February of 2006.

17       Q    Okay.  And so you're very familiar with the law?

18       A    Yes.

19       Q    Yes.  And you know that the law applies to everyone,

20   don't you?

21       A    Yes.

22       Q    And you've seen this Black's Law Dictionary?

23       A    I'm familiar with Black's Law.

24       Q    Everybody buys --

25       A    It used to be a joke book --

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Q    I'm sorry.

2    A    -- and then it got turned into a dictionary.  Yes,

3    I'm very familiar with it.

4    Q    Okay.  And so you know that there is absolutely no

5    difference between the definition of attorney and lawyer, don't

6    you?

7    A    Actually, in Bouvier's Dictionary, which is the law

8    book or the law dictionary that at least the judges I worked

9    with at the federal and state levels, that's the one they use.

10   It was Bouvier's.  Black's Law, that's what we used in law

11   school.

12   Q    Okay.  And so you know there's no difference between

13   attorney and lawyer?

14   A    Actually, I know there's a difference between

15   attorney and lawyer, based on my experience with DOJ and with

16   the attorneys and the judges that assisted here.  That was the

17   part of the fraudulent legal -- or excuse me, the fraud in the

18   legal structure is the difference, the legal terms and how, you

19   know, the general public doesn't understand what the legal

20   standing is of the terms that are used, so pro -- excuse me,

21   pro se and pro per, persona, the difference between that and

22   the legal standing and the consequences, the legal consequences

23   that come from each of those.

24   Q    So you're the only one that knows the difference

25   between attorney and lawyer?

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    A    Oh, no.  Actually, there was -- the United Nations

2    did a judicial corruption investigation.  I wasn't a part of

3    it.  But I did receive the information during the mortgage

4    investigations that were run in Pierce County, Washington.

5    This was the information from the federal judges, the state

6    judges, the district court judges, and the Department of

7    Justice attorneys that I was working with at the time during

8    those investigations.  They were the ones that brought it up.

9    Q    Who were the --

10   A    Until that point, I didn't know.

11   Q    -- Department of Justice attorneys you were working

12   with at that time?

13   A    At that time, it was retired DOJ Brenda Stealey.

14   Q    And what time was that?  What date?

15   A    It would have been around March -- excuse me, January

16   and February of 2011.

17   Q    2011.  Retired Brenda Stealey?

18   A    Stealey, S-t-e-a-l-e-y.

19   Q    She told you there was a difference between lawyer

20   and attorney?

21   A    No.  She was talking about the bar, the association

22   and the history of it.  She had been with the DOJ for 30-some

23   years and then retired and went to the senate as a -- as one of

24   the assistants to a senator.  I can't recall the name of the

25   senator.  And she's also in the Geneva Trade platforms or the

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Geneva Trading groups.  She was a ghostwriter for the Supreme

2    Court of the United States.

3        Q    Ghostwriter?

4        A    That's what they call them.

5        Q    Do they teach at the DOJ the history and the bar and

6    the difference between the -- I must have missed that class.

7    Is that -- they teach that at DOJ?

8        A    They actually back -- she explained it to me, was

9    that prior to the six -- around 1965, they were teaching

10   constitutional law to all of their attorneys in continuing

11   legal education.  And then at a certain point, because most --

12   according to her, most of the attorneys at that time were not

13   allowed to hold a position or, as an employee, an office or a

14   title in the United States government because they would have

15   to register under the foreign -- foreign registration --

16   Foreign Agent Registration Act, which was enacted in 1930.

17           This was information that she had shared with me,

18   that the federal judges and I had discussed and talked about.

19   Most people don't know about that.

20           And then the United Nations report that came out

21   regarding judicial corruption in the United States was at the

22   top of the list.

23           MS. DAVIDSON:  Objection, Your Honor.  She's not

24   answering my question.

25           THE COURT:  Let's go on to the next question.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  BY MS. DAVIDSON:

2      Q    Okay.  So you know you have to have a license to

3  practice law.  Right?

4      A    Yes.  I know that an attorney has to be a licensed

5  bar attorney.

6      Q    And you know that it is a crime to hold yourself

7  up -- out as a lawyer or an attorney if you are not licensed to

8  practice law, don't you?

9      A    I know that it is illegal to hold yourself out as an

10  attorney and represent other people as an attorney, yes.

11      Q    It's also illegal to make -- do any sort of legal

12  documents, isn't it?

13      A    As an attorney, yes.

14      Q    Oh, but you think there's a difference between being

15  an attorney and a lawyer?

16      A    I was writing documents for a factualized trust,

17  which I'm -- I was the lawyer for the factualized trust and its

18  trustee, not for individual persons.

19           And I never jumped in as a lawyer or an attorney in

20  any instance.  This was only done in order to protect all of

21  the different parties using something that we were already

22  producing and refining for Washington, D.C. to be able to

23  implement throughout the financial system here in the United

24  States while other countries were working to refine it in

25  connection with Washington, D.C. in their particular locales.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Q    Okay.  But Exhibit 94, we heard multiple times, and

2    all the exhibits attached to Ms. Lauren Palmisano -- is that

3    it -- you held yourself out as an attorney?

4    A    Actually, it was lawyer.  Only one time did I

5    actually say the word attorney.  Never wrote it, because it's

6    lawyer that I'm actually.  But attorney, I did do in the video,

7    and that was for a specific purpose was to be able to enter

8    into this case, which it took more than just that in order for

9    myself to enter into this case.

10   Q    Okay.  And so you said that you were -- that you were

11   asked right before you graduated from law school to participate

12   in the cleanup.

13        Who asked you?

14   A    Well, they used other words that I can't recall.  I

15   called it a cleanup.

16   Q    Okay.  Who?  Who asked you?

17   A    These are --

18   Q    You said, "They asked me."

19        Who asked you to participate in a cleanup?

20   A    It was a representative that works with all of the

21   different cleanup parts, such as the space programs, the

22   militaries, U.S. Navy, specifically, U.S. Army.

23        And then throughout my career in the last 20 years,

24   it -- I found out that it involved different agencies,

25   departments, and branches from every government on the planet

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  in order to clean up their particular fraud that was instituted

2  or created through legislative acts, judicial acts by the

3  respective countries in order for the fraud in the banking

4  system to run through their systems.

5      Q    So who was the individual that asked you?  What was

6  his name?  Her, his, her name?

7      A    At law school or throughout the --

8      Q    At law school.

9      A    At law school?

10      Q    Uh-huh.

11      A    They didn't identify themselves at that time.  It was

12  only later on that I found out who that was.

13      Q    Okay.  Who was it?

14      A    It was a Commander Thorak.

15      Q    Why did they pick you as a third-year law student?

16  What was special about you?

17      A    It had to do with just my personality as well as my

18  connections that I already had growing up.  It had to do with

19  my belief system and that I was always searching for the truth.

20  These are things that they told me.  So I'm just giving you

21  what -- what their reasons are, and they'll be limited because

22  there's probably more.  I don't know.

23          As far as my belief system, that was the biggest key,

24  that, and money didn't mean anything to me.  So as far as not

25  getting corrupted or being able to be bribed, that was a

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    significant part that was repeated to me over and over.

2         But mainly the belief systems, because the belief

3    systems that we grow up with, everything that I've discussed

4    here today, yesterday, and even throughout the trial can seem

5    pretty unbelievable, especially at that time.

6         So it was -- on my part, it was a leap of good faith,

7    but at the same time, I had ten months to research it before I

8    did my own decision.

9    Q    Okay.  And so you mentioned, you were talking about

10   your time in Italy and how you went there, and you knew you

11   didn't really know Italian and you learned it when you got over

12   there, and you said you were asked to help with the financing

13   of the World Trade Center in Sicily.  Who specifically asked

14   you?

15   A    I don't recall his name.  He was a local politician

16   that came to Taormina.  Taormina basically is a fortified city

17   in Sicily.  And you end up having Taormina Film Festival in the

18   year I was there living for six months, approximately six

19   months before I moved to Florence.  Oh, it's also where

20   President Trump gave his speech last year.  He was in Taormina,

21   Sicily.  That's where I was.

22        And it was a local official that worked from Catania

23   as well as in Taormina, because Taormina is a very -- it's

24   probably the wealthiest area of Sicily.  And you had

25   politicians coming in from all over.  You had Chinese -- excuse

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    me, the Japanese would send the girls over to have a year of

2    experience before they got married.

3           So there was a real international community there.

4    But it wasn't -- it wasn't a big area.  It was like one street

5    with stores and restaurants on either side.  That's -- that's

6    where I was.

7           So I don't remember the name of this local

8    politician.  That was what, 18 years ago.  I don't.

9       Q    Okay.  So who were you working for at that time?  Why

10   would they just ask you, someone studying Italian in Italy?

11   Who were you working for in Italy?

12      A    I wasn't working for anyone.  I was prepping for the

13   particular -- the particular job I would end up having to do

14   for the next 20 years and also deciding how I wanted to do it.

15   So it really was a matter of from 2000 to approximately

16   2000 and-- what year did I come in, 2002, so December of 2002,

17   it was mainly me researching and figuring out the nexus points,

18   the networks I would -- identifying the networks I would have

19   to go in and be able to see where the connections were.

20          So in Italy or in Sicily, really, it was me having a

21   break.  I had to learn Italian.  I had to learn French,

22   Spanish, and Chinese.  That's what I knew.

23      Q    How did this politician find you?  You're there

24   studying Italian, and for some reason, they come and ask a

25   private individual to help them secure financing with the World

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  Trade Center?  Is that your testimony?

2      A    No.  Actually, along my whole way, starting at the

3  beginning, because I needed more assistance, I obviously didn't

4  know so much about what was going on in the cleanup.  It was

5  not a lot of details.

6          It was just that I would have all the tools required

7  in order to do the job that I was going to do.  So there were

8  people already in place and in Italy, throughout Italy, because

9  I started out in Taormina -- and I chose Taormina to be able to

10  learn the language and have the professional skills to be able

11  to speak, because it was in Rome and Florence that I would

12  mainly need to be at due to the Vatican Bank.  Vatican Bank was

13  a nexus, but I didn't understand that at the time.

14          So I was introduced by people who were already in

15  Italy in the different fields, whether it was political,

16  judicial and whatnot.  So they had arranged the meeting.  But I

17  was living in Taormina and people just came there.

18      Q    Okay.  And so you grew up around people who had

19  multinational corporations.  Right?

20      A    Uh-huh.

21      Q    That's what you said?  And so because you grew up

22  around multi -- people that own multinational corporations, you

23  became an expert in multinational corporations.  Is that your

24  testimony?

25      A    I never testified I was an expert.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Q    Okay.  And so you said that prosecutors and defense

2    attorneys both are working for the same people and are paid by

3    the same entity.

4         That's just not true.  You've testified to a lot of

5    stuff that is just absolutely not true, haven't you?

6    A    Why don't you ask me which ones.  But as far as the

7    payment, yes, we were paid from -- when you backtracked the

8    check all the way back, it was from the same Pierce County

9    organization, yes, the same entity.  That would be the auditor.

10   And then we backtracked it all the way so that depending on

11   which level that we were checking -- and this is later.

12        After that, I left the prosecutor's office in

13   February of 2006, was when we began to plan on how we would

14   need to handle any kind, if the situation where the exposures

15   would come out in a courtroom or it would come out politically

16   or it would come out socially.  And, in fact, what we have

17   going on right now is a combination of all of it.

18   Q    So as a line prosecutor, someone asked you to

19   research where all the money was coming from?  That's what your

20   testimony is?

21   A    No.  I took the job at the public defender's office

22   and the prosecutor's office in order to do the investigations.

23   My sole job for the last 20 years has been the cleanup.  I took

24   the prosecutor and the defender's office job in order to figure

25   out the inner mechanics of how it operated, because human

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    trafficking was a big issue, and most of the human trafficking

2    was through the judicial system having defendants come in and

3    out.

4         Q    You said you worked in human capital.

5              What does that even mean?

6         A    No.  I said that there are those that have

7    departments that work with human capital.

8              Essentially, humans, individuals are not only

9    registered, but they are shuffled around as cattle, but they

10   call it human capital.  Okay.  It's registered as capital.  You

11   have a money value to you, and each one has their own accounts,

12   which, you know, aren't known about.  TreasuryDirect deposit

13   account just happens to be one of many.

14        Q    So why do you know about them?  If no one knows about

15   them, why are you the only one that knows about them?

16        A    I'm not the only one.

17        Q    Oh, okay.  So --

18        A    Never said I was.

19        Q    -- at your family's company, Tucci & Sons, do they

20   have a director of human capital?  You said all these companies

21   have a director of human capital.

22        A    Multinational companies --

23        Q    Oh, but you said your --

24        A    -- yes, do.  Tucci & Sons isn't multinational.  It's

25   multistate or it was at least.  I haven't worked there since I

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    graduated from law school -- no, excuse me, undergraduate at

2    University of Puget Sound.

3         Q    Okay.  And so you -- you know, you've done a really

4    good job with this trial.  You like to talk, and you're a good

5    talker, and you expect people just to say -- just to believe

6    everything you say, don't you?

7         A    No.

8         Q    Okay.  And you -- let's -- you specifically said that

9    the Swiss -- the Swiss company that was talking about the shell

10   companies, you said it's really just a matter of you would try

11   to get anyone that had a monetary instrument to come and

12   hypothecate that through -- through or within a bubble called a

13   shell company.

14        Hypothecate doesn't mean what you said it does in

15   that test -- if you look at -- in Black's Law Dictionary, you

16   use a lot of terms that don't mean what you say they mean?

17        A    I'm sorry.  The question -- was there a question that

18   you were stating or were you just --

19        Q    I'm saying hypothecate doesn't mean what you said it

20   did in that sentence, that you're -- a Swiss shell company

21   hypothecated monetary instruments and they put them in a bubble

22   or something to that effect.

23        A    Actually, I never said that.  I stated that there are

24   shell companies that are used mainly out of Switzerland.  Now

25   they use Panamanian as well as -- and they've moved more from

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Panamanian to Spanish until the scandal happened in Spain

2    regarding the bankers that were all arrested.

3           The particular shell companies, I never went out to

4    go and get people with monetary instruments.  That wasn't my

5    job.  My job was anyone who brought monetary instruments in

6    from other people, I had to do the compliance and research,

7    whether it was legit.

8           First, I had to do a forensics, and I was taught how

9    to do the forensics of a document for forgery.  A lot of the

10   forgery with electronic signatures, you can usually tell.  It

11   was pretty easy.  FBI does a lot of work with forged documents

12   and whatnot.  So using protocols and processes that were very

13   familiar to me personally, most of that was done with training

14   from different agents and FBI who were familiar with that as

15   well as CIA and then the bankers themselves.

16          The bankers themselves are pretty good at

17   identifying, and they were the ones that taught me how to

18   identify fraudulent instruments starting when I was younger.

19   Q     Okay.  You testified right after that that you said

20   in 2000, it became illegal to do these hypothecate-type

21   contracts.  Where did it become illegal?

22   A     No.  That's not correct.  No.  I talked about --

23   maybe you misunderstood hypothecation.  Hypothecation means

24   someone who brings you a monetary instrument, like a standby

25   letter of credit.  Obviously, a standby letter of credit, you

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  can't just take to the grocery store and use the money and all

2  of that.

3          So they do what they call hypothecation.  So with

4  this instrument, they go to look, and if they can cash it,

5  obviously, the instrument is no longer there, you actually have

6  cash.

7          Hypothecation would mean this instrument can't be

8  cashed right now, or we want to hold onto it, but we want to,

9  for instance, get a loan or get -- get some cash that we're

10 able to use in our everyday life or with our projects

11 immediately.  So they will use that as like a collateral.  So

12 that's what we mean by hypothecation.

13         And then I went into an insurance wrap after that.

14 So you misquoted or misheard.  But hypothecation isn't done by

15 shell companies.  It's done within shell companies, and it's

16 done by banks.

17     Q    That's not what the definition of hypothecate says in

18 this law dictionary.

19     A    In banking, we don't use Black's Law Dictionary.

20 It's Uniform Commercial Codes as well as International

21 Commercial Codes and the international equivalents for each

22 local area.

23     Q    Which bank did you work at?

24     A    I worked with all the different banks.

25     Q    Which ones?  Name me one.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    A    I never worked -- was employed by a bank, but I

2  worked with all the banks.  I was employed with different

3  companies, such as Treasury Finance AG until I left them.  That

4  was the last one that I worked with.  Loan Stone Capital was

5  another.

6    Q    Treasury AG Finance, where is that?

7    A    Treasury Finance AG, that was in Switzerland.

8    Q    And who are the owners of that company?

9    A    Those are done by bearer bonds -- or excuse me,

10  bearer shares, so whoever holds them.  You never know.  All you

11  know is the director of the company, which is registered in the

12  Swiss registry and has to be published in the newspaper.  So

13  you only typically know the director that is registered and you

14  work with them.  However, a lot of the directors don't do any

15  of the daily stuff.  Basically, their job is to sign off on

16  paperwork.  That was the issue with shell companies.

17    Q    Okay.  And so did you know who the director was of

18  this?

19    A    Yes.  For both Treasury AG as well as Loan Stone

20  Capital, those were Kristof Ray, who's the Swiss authority that

21  is also the owner, cofounder of Leo Trade [phonetic] who

22  does -- who sells all these shell companies, they were his

23  people in these particular two companies.

24    Q    Okay.  And so you said that the judges that were

25  being attacked by the Mafia contacted you when you were in

UNITED STATES DISTRICT COURT

1  Italy.  Why?  Why you?

2      A    No.  I had an opportunity to speak with them as I

3  just spoke to you earlier.

4      Q    Which judge?

5      A    I don't remember the judges' names.  That was 20

6  years ago.  They were all in the newspapers regarding the

7  bombings that were going on and the shootings and whatnot.  It

8  was Mafia involved.

9           I didn't get involved.  I spoke to them.  I was

10 offered a job by an organization that ended up that was Mafia.

11 I don't recall which one.  This is 20 years ago, and it was a

12 brief conversation.

13          When they -- I asked them about the retirement plan,

14 and they laughed at me.  I said, "Is there one, like, can you

15 walk away?"

16          I just walked away from the whole thing.  To me, I

17 wasn't even -- that wasn't my goal, and I was there for other

18 reasons.  I was there to learn the language as quickly as

19 possible by submersing myself into the culture, as well as the

20 school.  It was a professional school called Babilonia run out

21 of Catania but in Taormina.

22          From there, I was scheduled to go to France and

23 Spain.  I could pick which one I wanted to do.  And then from

24 there to China.

25      Q    Okay.  And so you -- many times during your

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  testimony, both yesterday and today, you said you had

2  intelligence contacts. Who are they?

3      A    I have different intelligence contacts, mainly the

4  last two for the last, I would say, five years that I use

5  pretty much exclusively, because all the other ones I've met

6  through them and worked on different jobs with, Karl

7  Langenstein is one. He was the trader for Switzerland, for the

8  country of Switzerland up until -- I'm going to have this date

9  wrong probably. It was the year that -- excuse me, the year

10  before Swiss Air, which was the national airlines, went

11  bankrupt.

12      Q    And so that is your intelligence contact that --

13      A    That is one.

14      Q    One?

15      A    The other one is Jonathan D. Betts. He is the

16  financial trader for the White House, one of them.

17      Q    The financial trader for the White House?

18      A    He does the trading for the White House.

19      Q    And the White House does financial trading?

20      A    The White House, I don't know exactly how it all

21  works. All I know, in my years of experience with him, since

22  I've met him has been that he is the trader for the White

23  House, which hasn't exactly been known, but I've made it public

24  over the last two years.

25          And so that Secret Service, I gave all their contact

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

 1    information, plus e-mails and whatnot to Secret Service when I

 2    met with them on the 24th of July.  And Jonathan is under

 3    Secret Service protection since I believe it was 2016, so ...

 4        Q    Okay.  And you testified that your kids' birth

 5    certificates in Morocco were registered with the IMF.  IMF is

 6    the International Monetary Fund?

 7        A    No, that's not what I said.  I said that we had birth

 8    certificates --

 9        Q    I've actually got this one tabbed.

10        A    We had birth certificates in order to register the

11    children.  At that time, there was only three.  I have four

12    children.  So three of the children were existing at that time.

13    We went to Morocco, and we had to go down to Marrakesh, because

14    in order to enter them into what they call a family book, which

15    would be the Moroccan version of their registration system, we

16    had to bring the original birth certificates of the two that

17    were born in America and the other two were born in Florence,

18    so we had consular certificates, you only get one of those.  We

19    had to bring them in.

20             I asked if I could get -- just have a copy of it, and

21    they explained to me, no, I could not, it had to be a certified

22    copy on their bond paper in order for them --

23        Q    And you testified right here, "And that they

24    explained it to you, how they sent it to the IMF, so we were

25    there, and they get to be able to collect for everyone."

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    A    I'm sorry, could you repeat that?

2    Q    I'm directly reading from your testimony.

3         "I had two children in Italy.  I had two children in

4    America.  We went to register their birth certificates in

5    Morocco in what they call a family book.  My -- so that was

6    really where I learned that birth certificates and getting into

7    that level, and the Moroccan government was very good about

8    explaining it, and how they needed to -- so they could stamp it

9    and send to it the IMF."

10   A    Yes.  It would eventually end up to the IMF.  They

11   had different departments that it had to go through in their

12   own interior state, was my understanding.  However, it does end

13   up at the IMF, according to him.

14   Q    Okay.  And that's simply not true?

15   A    Is it not?

16   Q    It's not.  Okay.  And all of these factualized trust

17   documents that you keep going on and on and on about, none --

18   nothing in here is true, is it?

19   A    It is all true.

20   Q    Okay.  And you know that the UCC, you studied this in

21   law school, I'm sure, that UCC stands for the Uniform

22   Commercial Code, doesn't it?

23   A    The Uniform Commercial Code.  However, those UCCs

24   that we're talking about are from the uniform commercial

25   registry.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Q    So the Uniform Commercial Code is nothing but a bunch
2  of proposed laws that aren't even law unless a state adopts
3  them in their particular state.  Isn't that true?

4    A    Say that one more time.

5    Q    That there is no UCC code.  There is -- it's --

6    A    There is UCC.

7    Q    The Uniform Commercial Code, it's just proposed
8  codes, which aren't even law unless they are adopted in a
9  certain state.  Is that true?

10   A    Each of -- the Uniform Commercial Code in banking is
11 the law of the land, and there is no borders with that.  And
12 each country has its own equivalent.  Okay?

13   Q    That's simply not true.

14   A    The UCC, and then each state here in the United
15 States has adopted some form of the Uniform Commercial Code and
16 put their own exact coding and numbers.  So Washington would
17 have different code numbers.  However, in banking, they use the
18 UCC codes.

19   Q    Okay.  And so you keep talking about -- there's no
20 UCC registry.  There's no such thing as a UCC registry?

21   A    You can actually go into the state department, here
22 even in Tennessee, you can go in, even online -- most of the
23 states have an online portal.

24        However, in the last, I would say, I checked about
25 three months ago, where they -- they are not allowing filings

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   of UCC ones for instance online.  You have to actually walk

2   them in, because too many people are becoming aware of the

3   Uniform Commercial registries within their local communities

4   and going in trying to file things.

5           So, yes, there are Uniform Commercial registries, and

6   they usually, typically have offices.  I know in Pierce County,

7   they have an office.  In Washington, D.C., they have an office.

8   As far as going into any other local offices, I've never been

9   into any other local offices.

10  Q    And all of these, it's actually -- all of these UCC

11  documents that you keep referencing are actually filed at the

12  recorder of deeds, aren't they?

13  A    Yes.  Just like every state, every state has their

14  autos office where they go to register claims of property or

15  proof of property, well, it's the same thing.  The recorder of

16  deeds for the uniform commercial registry, they are the ones

17  that actually hold all the records of all the property claims

18  made in the United States of America.

19  Q    There is no UCC registry.

20  A    Yes, there is.

21  Q    You can record anything you want to at the record of

22  deeds, can't you?

23  A    There are other departments at the recorder of deeds,

24  but UCC is one of them.

25  Q    So all these documents are the documents that you

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   keep referencing, all the UCC documents?

2       A    I don't know.  I can't see from here.  I'd be willing

3   to look at them if you would like.

4       Q    Well, you've already had your day in court on these

5   documents, haven't you?

6       A    I don't know which documents you're referring to,

7   because I can't see from here.

8       Q    I've got your pleadings and all the attachments.

9   You've already had your day in court on all these documents,

10  and the Court ruled that these were frivolous and devoid of any

11  intelligible argument.

12          MR. LLOYD:  Your Honor, I do object to counsel for

13  the government arguing issues of law as opposed to asking

14  questions on cross-examination.

15          MS. TUCCI-JARRAF:  I believe this was an issue that

16  she herself --

17          THE COURT:  Let me -- go ahead.  What's your

18  response?

19          MS. DAVIDSON:  Your Honor, she made this an issue.

20  She continually references these UCC documents and says that

21  this negates all of her intent.  She's made it.  She's put this

22  exact issue -- and she's acted like it's some vast conspiracy

23  by the United States to keep all of these out of the court.

24          THE COURT:  I'm going to sustain the objection

25  offered by standby counsel in this record.

UNITED STATES DISTRICT COURT

1          Instruct the jury to disregard any questions or

2    answers pertaining to those documents.

3    BY MS. DAVIDSON:

4          Q    Okay.  So what's preterea and praeterea?

5          A    Praeterea preterea.

6          Q    Yes.  What's that?

7          A    That means in hereafter.  It's Latin.

8          Q    Okay.  But it's nowhere in Black's Law Dictionary, is

9    it?

10         A    It goes along with nunc pro tunc, which the courts

11   use all the time, which, you know, now for then, as well as ab

12   initio, from the beginning, that's also something we use in the

13   court system.

14         It's legal language derived from Latin.  Excuse me,

15   it is Latin that we use in our legal filings and pleadings

16   throughout the legal system.

17         Judges use nunc pro tunc in order to correct

18   something that's actually happened in the beginning so that

19   it's the same standing as before.  So praeterea preterea is one

20   that is with those as well.  It's just you don't hear many

21   people using it.

22         Q    And so these documents are basically just a bunch of

23   gobbledygook.

24         A    No.  They are not.

25         Q    Okay.  I'll read from one of the contracts.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    A    I'm sorry, which document are you -- I don't know

2  what you're referring to.  Contract, I don't remember a

3  contract being in here.  Is this an exhibit?

4    Q    This is "Heather Tucci-Jarraf, as Trustee, UCC

5  Financing Station -- and UCC Financing Statement."

6         MS. TUCCI-JARRAF:  Objection.  I just would like to

7  see the document that she's referring to before I make any

8  comment.

9         THE COURT:  Put it on the screen.  Is it an exhibit?

10        MS. DAVIDSON:  No, it's not.  I was going to ask her

11 about some of these documents that she's made it such an issue

12 about how she's relied on these.

13        THE COURT:  Let's go on from that based on the

14 Court's previous ruling.  Thank you.

15 BY MS. DAVIDSON:

16   Q    So you run a website where you help people create

17 fake legal documents, don't you?

18   A    No.

19   Q    And you've tracked this fraud scheme, haven't you?

20   A    Which fraud scheme?  I've tracked many.

21   Q    This ACH fraud scheme that you participated in, and

22 you've published that on the website, everywhere it's worked

23 and everywhere it hasn't worked?

24   A    Actually, I didn't participate in a fraud, because

25 there was no fraud in this particular instance.  And I did go

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  in to see what the ACH system was, because I was unfamiliar

2  with the ACH system. I work on the inner system and policies

3  within banking, not with just a system. I don't do the system.

4     Q   So you were the pied piper for another fraud scheme,

5  weren't you? What is One People's Public Trust?

6     A   It was not a fraud, and it wasn't a scheme. It was

7  actually part of the cleanup. It was the tool that was

8  actually instituted when the particular 1871 contract went in,

9  that's known as the constitution. It was a tool that was

10 preexisting. And even one of the departments of defense, his

11 son, used to be one of the trustees to it, and then it was

12 abandoned. It was just a tool that was used to be able to go

13 and clean it up.

14    Q   And you know the people that followed you in that

15 fraud have been prosecuted for fraud, don't you?

16    A   It wasn't a fraud, and I'm not aware of that. But I

17 do know that as far as the work that I did with the public

18 trust, like I said, it was a tool that was used to go and clean

19 everything up and close everything down to return the

20 government and the systems to the people, as well as to those

21 officers and employees that were in those titles of U.S. --

22 United States government.

23         I didn't run any kind of -- everything I did, nobody

24 even knew I was part of the public trust until December of

25 2012, and that was because there was a notice requirement to

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  the public to let them know what had happened, and then retire

2  the trust, which we did, in March 18th of 2013, it was retired.

3      Q    Okay.  So you operate a blog, a YouTube channel,

4  website, various podcasts?

5      A    No.  I did open a YouTube channel for a particular

6  interview that I did with a gentleman named Sacha Stone, but

7  that's the only video that's on there.  And that was back in

8  2000 and -- I think that was 2014.  I can't remember the exact

9  date.

10      And then as far as a website, I've only opened two.

11  One was HeatherAnnTucciJarraf.info, and that's where I put all

12  of the results for the UCC documents and everything else from

13  2012 so people could go in and look at them.  Anything that I

14  put on my website was something that could be verified by the

15  different agencies, organization, et cetera.

16      It wasn't until 2000 -- December of 2012, I became

17  even known or that what went down even became known.  But it

18  wasn't really until January of 2013, people had blogs and radio

19  shows and whatnot.  I only did a few of those at the beginning,

20  because I had the other stuff that I was doing as far as the

21  restructuring and the plans for the restructuring that I was

22  working on with the bankers and the agencies at that time.

23      Q    Okay.  And you've got one video that's got almost

24  60,000 views, don't you?

25      A    I'm not aware of -- my son Zacharia [phonetic] got

UNITED STATES DISTRICT COURT

1    upset at me, saying, "Mom, you do these -- I have an issue.

2    I'm trying to make some money."  And he was about ten.  He was

3    like, "I'm trying to make some money.  You do videos."

4                I was like, "I just do interviews.  I've never done

5    videos."

6                And he wanted me to, when I did them, put them on his

7    YouTube.  He was going to start a YouTube site so he could make

8    some money and that could be his job.

9                I don't know how many clicks anything I do does.  I

10   don't put anything out.  People ask for interviews.  That's

11   their thing.  They put it out.  So I don't know.  And I'm not

12   aware of how many clicks.

13               I don't even like watching myself.  Watching that

14   video in here during the trial, that was pretty upsetting for

15   me.

16       Q    So you have supporters, right, you have followers?

17       A    I wouldn't say anyone is a follower.  I've always

18   stated everybody needs to be a leader, period.

19       Q    You actually make money off of your supporters and

20   followers, don't you?

21       A    No.  Until July of -- or excuse me, yes, around

22   July 25th, which was the day that Mr. Still had some of his

23   colleagues come to Washington, D.C. or from Washington, D.C.

24   come to Trump Hotel, at that point, I know that a lot of people

25   who have been following the information regarding Federal

1    Reserve and a lot of different systems, corruption within the

2    government, things like that, that they were notified that I

3    was put in.

4             And from there, I believe that moneys have been

5    received, but I haven't received any kind of funding or

6    campaign or being paid for any of the work.  Everything I've

7    done in the last 20 years has been funded by myself, and that

8    was due the fact that if I was paid from any agency, branch or

9    department or government or even private entity, that the

10   information and all the research and all of the actions taken

11   could be seen as tainted, similar to what's going on in D.C.

12   right now with people accepting money here and doing things

13   over here.

14            So that was something that we prepared and protected

15   from the entire time, so that the validity and integrity of

16   what happened and the research that was done was not at

17   jeopardy.

18       Q    Okay.  And so your supporters, you begged money --

19   for money to buy an RV to travel the world to -- to spread your

20   message, the OPAL Tour?

21       A    I wasn't involved with the OPAL Tour.  There was a

22   group run by -- well, not run by, but kind of influenced and

23   started by a woman named Lisa M. Harrison, who was in

24   Australia.  And she came to Morocco, along with a whole bunch

25   of other people.  She was the one who started what was called

UNITED STATES DISTRICT COURT

1   the opt in and opt out, OPPT.

2           For us, when we were doing the work we did without

3   any public knowledge whatsoever, except for the agencies and

4   the bankers from 2000 to 2012, nobody knew anything.  In fact,

5   we were just known -- we were known as the big trust amongst

6   the governments and the bankers.  We were also known as the

7   public trust.

8           And then when the mortgage scandals came -- or when I

9   worked the mortgage fraud investigations and the mortgage

10  scandals came out, that's when the One People's Public Trust

11  sort of -- that's what they called us, the One People's Public

12  Trust.

13      Q    So your supporters paid for you to actually move to

14  Morocco, didn't they?

15      A    No.  And I don't have supporters.

16          My husband and I actually paid for -- like I said,

17  everything is funded by myself and my husband.  He takes care

18  of housing and whatnot.  I was making over, you know, $5500 a

19  month, plus I come from a well-to-do family.  I wouldn't say

20  extremely wealthy, but wealthy family.  I paid for my own law

21  school myself.  So that was 120 grand.

22          So I've always funded and I've always worked.  I've

23  worked since I was ten.  But I've never made money or asked for

24  money or received money regarding any of the work I've done

25  from outside sources.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    The only time that there was help was after the FBI

2 came in and took me in Washington, D.C. on July 25th, and then

3 I went on a 30-day tour across the United States, courtesy of

4 the FBI and the U.S. Marshals, and got to see the different

5 facilities. But they helped out with commissary. Even now,

6 they're helping out with rent, but that doesn't come to me, and

7 I've never put out the call for that.

8    But there are people that I have -- that I've worked

9 with throughout the years who believe in cleaning things up,

10 and they have supported this particular incident, but until

11 then, for 20 years, I paid for everything. I've spent at least

12 over $2 million at this point.

13    Q    You didn't ask for money to help start a commune in

14 Morocco?

15    A    No.  No.  That was again, Lisa M. Harrison, Dani

16 McKinney, she's from Canada.  She was with the Royal Military

17 as a paramedic.  Her family are actually in the royal family in

18 the United Kingdom.  Those were the two that were starting up

19 communities and everything else.

20    My job and my focus a hundred percent has always been

21 to clean up the financial system and clean up the government.

22 I don't care about anything else.

23    And they came the first time, we discussed certain

24 things, because each one had their area that they focused on,

25 plus all of their interests.  I wasn't -- my only interest was

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    cleaning things up in the financial and the government.

2           So I didn't have anything to do with OPAL Tour.  I

3    was asked about OPAL Tour, I mean, as far as to join it, no

4    way.  I had my focuses.  Plus I had four kids.  So at some

5    point, I have to sleep.  I wasn't involved with all that.

6      Q    Okay.  So you believe, based on your testimony here

7    today, that everyone, every human being has a secret account?

8      A    I don't call them secret accounts.  That's what

9    people call them, so I will refer to them, because that's their

10   reference point.  TreasuryDirect deposit accounts, and then

11   each bank, central bank around the world has their

12   international equivalent.

13          But everything comes back to Bank for International

14   Settlements, which would be your top of those.  So each central

15   bank around the world is a member of the Bank for International

16   Settlements.  The Federal Reserve is just one of the

17   facilitating banks.

18          And that was -- that's how it's been since 1997,

19   1999, because in 1997, 1999, there was a consolidation, the

20   banks themselves here in the United States, for instance, were

21   too exposed, and the Federal Reserve had blanket immunity that

22   was granted to Bank for International Settlements by the

23   Federation of Switzerland.

24          So by making every bank in the United States a member

25   of the Federal Reserve Bank, they each got immunity, and that's

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   why most of the time you don't see banks being -- going to

2   trial.  You always see settlements, which actually is just now

3   the cost of doing business, $50 billion fine, you know, a

4   hundred-million-dollar fine.  It's just the cost of business.

5   They all have immunity.  But if the people knew that, they

6   wouldn't stand for it.

7           So does that answer your question?

8       Q   Yes.  And so -- but you asked the Sean -- what was --

9       A   O'Malley.

10      Q   O'Malley, yeah, Sean O'Malley and he'd never heard of

11  these secret accounts or these TreasuryDirect deposit accounts.

12      A   Yeah.  It's kind of like the FBI saying trade

13  platforms don't exist, and yet two days ago you had six traders

14  from those platforms, as well as three big banks, Deutsche -- I

15  can't remember the others, Deutsche, HSBC being arrested and

16  civil and criminal actions taken against them by your own

17  department, Department of Justice, as well as the Federal

18  Bureau of Investigations.

19          So, yes, they do exist.  And that's why I loved

20  having O'Malley on the stand was for him to just admit whatever

21  statements he wanted to admit, because the truth is, they do

22  exist, they do hold them, that commandeered value.  And all I

23  needed for him to say was no so they could become visible in

24  the cleanup.  And that's what's happening now.

25      Q   You said you were offered your secret money, but you

UNITED STATES DISTRICT COURT

1  refused it.  Is that your testimony?

2      A    I was offered in order to shut -- in order to have

3  access to my own TreasuryDirect deposit account, and that's

4  just one, but also my other accounts, as well as have a small

5  group that I would select and control to have access to theirs,

6  if I shut down everyone becoming aware of all these different

7  parts, and I did not -- I turned it down.

8      Q    You turned it down.  You turned down your billion

9  dollars?

10     A    I've always turned it down.  It's been offered to me

11 so many times, as well as other bribes, to stop the mortgage

12 investigations.  There have been more bribes and threats in

13 that -- I've never taken them.

14     Q    And who offered you this last time?

15     A    This last time, it was communicated through Karl

16 Langenstein.  However, it was regarding AIIB and the officials

17 there.  I have in my notes the name of the gentleman, if you

18 would like me to look and review my notes and give you that.

19     Q    No, that's fine.

20          You -- so you -- when we were in a hearing before

21 Magistrate Judge Shirley, you stated that you were going to

22 reject it until everyone got theirs.  Isn't that --

23     A    I'm sorry.

24     Q    You said you were going to reject your secret money

25 until everyone else got theirs?

Heather Ann Tucci-Jarraf - Cross-Examination

1    A    That's not what I said in the court hearing.  He was

2 making fun of me and saying thank you so much for giving up

3 yours so that all -- until all the rest of us have ours.

4         I had stated very publicly that everyone was going to

5 get their accounts.  However, the point was, the money system

6 itself, all of it's fraud, all of it.  So even those accounts,

7 releasing them, Federal Reserve notes, which are the dollars

8 that you have in your pockets, it's all fraud.

9         So that's why you have U.S. Treasury working at the

10 time, even right now to issue its own currency, United States

11 notes.  There's a lot of different names that they have for it.

12   Q    Okay.  So you mentioned that you saw Harvey Dent's

13 video, and it talks about the ACH transactions.  Right?

14   A    Yes.  In general, I remember it.  If you ask me

15 anything specific from it, I just remember him going through a

16 process similar to what we've reviewed here, as far as going in

17 and filling out other payments, the screens that you showed

18 that went all the way to the confirmation.  It was very similar

19 to that in process.

20        It involved the Social Security number, the name on

21 the Social Security card number, as well as the letter that's

22 on the back, designating -- which those letters do designate

23 specific Federal Reserve Banks, and then from there, showing

24 them how to pay certain things.

25        And then I believe there were other videos that

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Harvey Dent and others did.  It really took off, because these

2    people have been looking for a way to access these accounts.

3    Of course, he referred to them as TDAs, TreasuryDirect

4    accounts, which they're not.  It's TreasuryDirect deposit

5    accounts.

6          And within this particular system -- or excuse me,

7    process that he put out, he showed some documents and all that.

8    That's what I recall of it, plus he showed an actual photo or I

9    would say it's just a -- it was a list, and it had a Federal

10   Reserve routing number, but then there was a red number that

11   was next to it.

12         That's what I recall in general.  If there's

13   something specific, I would have to review the video, which I

14   don't believe you've put into evidence.

15   Q    I haven't even seen it, so the -- you testified that

16   you were trained at the highest levels of banking, trade,

17   finance, and collections, but you don't know anything about ACH

18   transactions?

19   A    Not collections.

20   Q    I guess you said that in 94, Exhibit 94, you said I

21   was at the highest level of bank trade, finance and --

22   A    Recovery.

23   Q    -- collections?

24   A    Recovery, yes.  Recovery, I have done, as far as

25   recovering assets.  These are particular monetary instruments

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    that have a value of a million dollars on the face value up to

2    a hundred billion dollars.

3        Q    Okay.

4        A    Okay.

5        Q    And so --

6        A    Those are the instruments I'm talking about.  We

7    don't use ACH for those kinds of instruments.

8            In fact, there are -- in the AMLs, the anti-money

9    laundering laws, you can only have so much value that you're

10   able to transact.  I believe it's $500,000 or more, you have to

11   actually get authorization from the U.S. Treasury -- or excuse

12   me, the Federal Reserve in order to make that transaction, and

13   then it becomes -- a suspicious activity report gets issued.

14       Q    Okay.  So you have all this banking experience and

15   you know nothing -- you didn't recognize the Harvey Dent video

16   as ACH fraud?

17       A    I don't work at that level of banking.  I don't work

18   with ACH.  I work with Fedwires, SWIFT, CHIPS is the other one,

19   the AIIB, which is the Asian bank's answer to the World Bank.

20   I work with those systems.  I am not familiar with ACH, not

21   even for paying -- I don't even have bills that I pay online,

22   so I wasn't familiar with the ACH system.

23       Q    Okay.  And so you know that in the Harvey Dent video,

24   the ACH transactions, he specifically says it has to be an ACH

25   transaction and that it only works because of the two-day float

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  of the ACH system.  You know that?

2      A    I didn't remember that part, no.  I didn't even hear

3  that part.  In fact, it wasn't until we were here --

4      Q    No.  I understand you do know that the only reason

5  this fraud works is because of the two-day float?

6      A    First off, it's not a fraud.  Secondly is, is that

7  I'm not aware of the two-day float until we were here in court.

8      Q    Okay.  So you knew what Beane was doing every step of

9  the way?

10     A    No.  I just would receive notice, like I said, the

11  first time that I found out what he was doing was, he sent

12  me -- or posted something over to me in messenger.  And it

13  said, "I paid off all my debts."  It looked like a post that he

14  just put on his wall and was making sure he shared it with me

15  in messenger.

16          And then it was speaking with him later that day,

17  because he had sent me Harvey Dent's video as well as that

18  message, and then stated that he was starting to pay off all

19  his credit cards, how he did it, and then CDs.

20     Q    Okay.  And so you were on the phone with -- or you

21  were on Skype with him when he was purchasing these CDs.

22  Right?

23     A    At one point, I believe it was in the evening, late,

24  late evening.  I was working on the D.C. matter, and he called

25  in, asked me if I had a moment, and we started talking.  And he

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  said that he was doing all these CDs.  He had done quite a few

2  at that point.  I don't know if it was, I think, 12, at that

3  point.

4          And as we were talking, I said, "What are you doing?

5  What do you mean you're doing CDs?"

6          Because with CDs, it's basically an account that you

7  open, and you have to deposit money in and then leave it there

8  and not touch it for a certain amount of time.

9          So I asked him what he was talking about.  I didn't

10  even know you could purchase CDs online.  Everything I do is

11  through the bankers, you know, vice presidents, presidents of

12  banks.

13          So I'm not familiar with the process of ACH and going

14  in, so I asked Mr. Beane to explain to me, but I also asked a

15  number of people who said they were doing this ACH deal how

16  would -- what actions, like PayPal, Amazon, or were they just

17  paying credit cards.  Most everyone was paying debt.

18          That was the hilarious part, is that here are these

19  people going, finally, we get our value that's been stolen from

20  us, and they were all excited because they got to pay their

21  debt off.  It wasn't like they were trying to go buy, you know,

22  vehicles.

23          In fact, that didn't happen until -- Mr. Beane was

24  the only one that I know of that successfully actually went in

25  to purchase.  Harvey Dent apparently was doing a deal.  I

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    didn't really keep up with Harvey's stuff other than to know

2    how far this guy was going, how far he was reaching, and

3    inspiring others to reach out.  Because it's like a Calgon

4    commercial going on acid, you know, so you end up covering the

5    whole planet like a virus very quickly.

6            So as far as ACH, I didn't know anything about it.  I

7    did ask Mr. Beane, and the session timed out, so I didn't get

8    to know how it was going -- what the actual steps and processes

9    were.

10   Q    You also testified that you didn't have any debt, but

11   your exhibits that you proposed, Government's Exhibit 11, shows

12   a Macy's balance of over $5,000?

13   A    Those aren't mine.  I don't have any debt.

14   Q    It says right here --

15   A    I don't have any debt or accounts.  That Macy's

16   account actually belongs to James G. Tucci, which is my father.

17   I used my sister and my dad's accounts and would take full

18   responsibility.

19           I needed to know how it all worked, and I didn't have

20   the time to go set up accounts at different places for myself.

21   They had preexisting, and I used his, because of the million

22   dollars that was stolen that was in collusion with Federal

23   Reserve Bank and everything else.

24           And they're very aware of that case.  That was the

25   one case they didn't want to show up at, so I was very excited

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    that they showed up at this one.

2        Q    And your Costco card, it's got your name right here

3    on it?

4        A    That's my sister's Costco card.  And I believe you

5    kept these exhibits out.

6             MR. LLOYD:  Your Honor.

7             THE COURT:  Hold on a second.

8             MR. LLOYD:  Your Honor, I have to state an objection

9    to cross-examination on the basis of exhibits that the

10   government objected to, and as a result, they weren't admitted.

11   Now they're being used by the government that objected to their

12   introduction.

13            MS. DAVIDSON:  Again, this is proper cross.  She said

14   that she had no debt, and the documents which she just provided

15   to me, not in discovery, but just provided to me shows she does

16   in fact have debt.

17            THE COURT:  I'm going to overrule the objection,

18   because based on the examination, I think it's opened the door

19   to this line of questioning.

20            And then if Ms. Heather Tucci or through standby

21   counsel wants to come back on redirect and seek to introduce

22   those documents, I'll consider it at that time.

23            Go ahead.  Let's make sure we got the question out.

24   Go ahead and ask the question, Ms. Davidson.

25

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  BY MS. DAVIDSON:

2      Q    Okay.  The Costco card ending in 4569, it clearly has

3  your name on it, has a balance of $18,493.

4      A    No, that's not my Costco account.  I don't have a

5  Costco account.  My sister has a Costco account, my father has

6  a Costco account.  And during this testing, my sister actually

7  put me on her Costco account in order for me to be able to

8  test.  But I don't have a Costco account.

9      Q    Did you tell your sister that you were going to use

10  the routing number of the Federal Reserve Bank and your Social

11  Security number in order to try to pay off her credit card?

12     A    Due to the event -- my family did not know the kind

13  of work I did with the exception of my mom, and that was very

14  limited data that was given to her, until 2011.

15         And in 2011, in order to stop me from doing --

16  exposing the mortgage scandal, along with Marie McDonald, the

17  forensics fraud examiner from Massachusetts, the Federal

18  Reserve Bank went in and had KeyBank and my family, who has a

19  bank, go in and exert pressure and take my father's retirement,

20  which they did.  And they're actually now in re-litigation

21  since everything is being cleaned up.

22         However, Federal Reserve is very hard to draw a line

23  from local actions, what you see here, like today, to the

24  Federal Reserve.  But, fortunately, in this case, we were able

25  to draw that line and actually get the names, so that it can be

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    cleaned up by law enforcement that actually is doing their job

2    and not serving the Federal Reserve Bank over the interest of

3    the American people.

4         So none of these accounts, which I tried to enter

5    into evidence that you are now questioning about, none of them

6    are mine.  They were my sister's and my father's.  They know

7    the work that I do.  They're a hundred percent for cleaning

8    everything up.

9         And I explained to them I was going to test something

10   out, but I would stand fully responsible if there was any

11   issues, any problems whatsoever, if they got contacted by

12   anyone, that I would stand there and tell them I did those, but

13   I would also explain why I did it.

14        So they were very willing to assist.  My sister and

15   especially my dad, after he's -- he's in the process right now

16   in court getting his million dollars back that got stole with

17   the collusion with the Federal Reserve.  So, yes, they helped.

18        They did not know what I was doing, though.  I never

19   explained the process.  I just said I need to test something

20   out.  I don't know the system, this ACH system.

21        In fact, my sister was the first one that kind of --

22   had to walk me through how to actually even access the online

23   account and what page things were on.  She did walk me through

24   that part.  And then I said I'm good.

25        Then from there, I went and did what I've explained.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    My sister and my father did not know any of that.  They did not

2    know it was regarding Social Security number and account number

3    or secret accounts or TreasuryDirect deposit accounts.  They

4    didn't know any of that at all.

5         Q    Okay.  So when you talked to Beane on July 5th,

6    July 6th, July 7th, you agreed to help Mr. Beane, didn't you?

7         A    On July 7th, when I saw everything that was going on,

8    I gave him -- I told him to go to my website, that there was a

9    factualized trust, it wasn't finished, regarding the testing

10   and actually going -- not testing, but going into, because my

11   intent was to have the banks and the governments themselves put

12   it within their process.  And that way, there wasn't so much --

13   I mean, when you find out you've been lied to by the government

14   as well as Federal Reserve and your bankers and everything

15   else, it can cause a lot of upset.

16        And, unfortunately, that's what we have going on in

17   D.C. right now with the upset with the FBI and with the DOJ

18   itself and Congress people that are resigning, and it's just a

19   big mess.

20        This is what we're trying to avoid.  And, actually,

21   it's even less than what it could have been because of actions

22   that were taken to mitigate and diffuse the toxic situation

23   that was going to explode.

24        So as far as these accounts and assisting with

25   Mr. Beane, I was assisting to keep him protected as well as

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   Whitney Bank, as well as USAA Bank, Federal Reserve Bank, as
2   well -- and, really, it's mainly protecting them from
3   themselves.  Because there are things they could do to change
4   it, which is what we've been working on constantly and solely
5   for the last five years, and now we're at this --

6       Q    You were trying to protect USAA Bank too?  That's
7   what you just said.  But you didn't send any of these documents
8   that you sent Whitney Bank, you didn't send any of that to USAA
9   Bank?

10      A    Actually, I didn't have any contact number for USAA,
11  except for True Brown.  But at that point, Mr. Beane, before I
12  could even contact Mr. Brown to find -- if he did indeed work
13  for USAA and all of that.  And then Mr. Beane had already been
14  arrested.

15           So I had so much on my plate, because I had the
16  threat against POTUS, assassination attempt against POTUS that
17  I was working on before any of this even happened, to make sure
18  to stop that one, then to find out, because it was the same
19  actors that were involved in that one that also ordered the
20  arrest and humiliation of Mr. Beane, who got caught up in this
21  whole thing that he didn't even know was going on.

22      Q    But you admit that it was Mr. Beane's idea to
23  purchase the CDs.  Right?

24      A    All I know is that by the time that I actually spoke
25  with Mr. Beane, they were already purchased, credit cards were

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    already paid off and whatnot.

2            So as far as what I could do for him at that point --

3    because, in my opinion, he became human fodder.  A lot of

4    innocent people stood at risk.  And as, you know, you sitting

5    there, as well as FBI and everyone else, I have worked for

6    years to make sure that you guys knew the data.

7            Obviously, Tennessee office did not know what was

8    going on.  You had no idea what the big picture was.

9            You know, for me, I'm even in here protecting what

10   went down.  I don't care what went down.  What I care about at

11   this point is that things change.  And, unfortunately, the

12   environment, and when you receive orders from a superior that

13   you know in New York or from headquarters in D.C., you do the

14   order.  Right.  And you don't really question it.  But they

15   don't see what's behind it.

16           Now, they don't change things.  You usually don't

17   change things unless it touches and affects your life.  It's

18   never going to affect the life of law enforcement until it

19   does, and that's what we're seeing now.

20           Like, with your deputy director who resigned.  It

21   touched his life because he committed crimes or potentially

22   committed crimes and he resigned.  And the investigation is

23   still going on about that.

24           But it's now touching law enforcement, isn't it,

25   unfortunately, because we couldn't change it without this

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   display that's happened.

2          MS. DAVIDSON:  Objection, Your Honor.  I asked her in

3   the CD idea was Mr. Beane's.

4          THE COURT:  Sustained.

5          MS. TUCCI-JARRAF:  The CD -- no, the CD idea came

6   from a video -- my understanding was it came from a video, and

7   Mr. Beane went to go test it out, if it was connected.  My

8   question -- my questions followed after that.

9          So from what I understood, it wasn't Mr. Bean's idea.

10  It was a guy named Harvey Dent, who most likely, in my opinion,

11  knowing what I know now, was given that information from

12  someone inside the banking at the highest levels of

13  intelligence or government.

14  BY MS. DAVIDSON:

15    Q    Okay.  And so you admit that the idea of -- the

16  reason this whole scheme to defraud worked is because he

17  purchased the CDs and cashed them immediately.  So that's a

18  pretty smart idea, wasn't it?

19    A    First off, there was no fraud, no intent to fraud.

20  As far as a scheme, it was absolutely a scheme.  The whole

21  banking system is a scheme.  The legal system is a scheme.  A

22  scheme -- perhaps you could look up the word "scheme."

23         You make it sound like it's something illegal,

24  something deceptive.  And, you know, a scheme is actually what

25  they call proposed bills.  Scheme is a plan.  That's what it

UNITED STATES DISTRICT COURT

1   is.  That's what scheme means.

2        Q    Okay.  So this buying the CD and cashing it

3   immediately the next morning, that's not the work of a

4   delusional man, is it?

5        A    Actually, from what I heard on the audio, and I

6   believe everyone was here was that he went to go and actually

7   get a line of credit, which he had stated was something he had

8   done in the past, with a CD that he's had at other institutions

9   as well.

10            When he went in to go get that line of credit, it was

11  actually -- and we could hear it on the audio -- was, it was

12  suggested by the USAA employee who said, "Well, why don't you

13  just cash it?"

14            That's where the idea came from, not from Mr. Beane

15  himself.  He didn't even know he could cash it from his

16  testimony.  At least that's what I heard.  Maybe you heard

17  differently.

18       Q    So it's USAA's fault?

19       A    I think it is the fault of the Federal Reserve.  It's

20  the fault of all of us that have been trying to do this cleanup

21  for not finding a solution fast enough, not just for this

22  incident, but as Mr. O'Malley even stated, you know, fraud -- a

23  little bit of fraud is a good thing for the financial system.

24  If you took out a hundred percent of the fraud, the systems

25  wouldn't work.

1    I disagree.  And I've disagreed very explicitly to

2 them and to other institutions and agencies for years, and I've

3 actively worked with them in order to clean that up.  So that's

4 where I believe the fault is.  But then again, that's just my

5 personal opinion.

6    And here we have a man who's sitting here because

7 things couldn't be cleaned up that were behind the scenes that

8 the public doesn't know about.

9    And the FBI now is in a situation where it has

10 questionably used extreme force in a situation where it could

11 have just been as simple as, hey, do you got this or don't you?

12    You know, so now I feel like everyone has been abused

13 and victimized in this, from Mr. Beane to the FBI to even us

14 having to sit here.

15    Q    Yes.  And so you told Mr. Beane to put the RV in a

16 factualized trust on the 7th.  Isn't that correct?

17    A    No.  I stated that anything that would be used with

18 TreasuryDirect deposit accounts -- because at this point,

19 nobody really knows TreasuryDirect deposit accounts, at

20 least -- except for the information that Harvey Dent or whoever

21 this guy is that goes by Harvey Dent.  Okay.  The information

22 that they have -- as far as ACH, like I said, I didn't know

23 that system.

24    However, TreasuryDirect deposit accounts, plus other

25 accounts with other names, all the international equivalents,

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    they do exist.  Okay.

2              As far as people being able to access it, it shocked

3    me they might be able to access it using an ACH system just

4    from their home computers.  I cannot imagine that the Federal

5    Reserve would be so stupid to have a system created where

6    someone from their house or their phone at a party or wherever

7    could access a TreasuryDirect deposit account when I know the

8    security protocols of being able to access those accounts.

9              Only bankers at the highest levels with the proper

10   security clearances can even see those accounts on computer

11   screens that are registered within the Federal Reserve System.

12   So, yes, excuse me.

13   Q    So the question I asked you was, did you tell

14   Mr. Beane to put the RV in the factualized trust?

15   A    I said anything that he purchases using those --

16   Q    So the answer is yes.

17   A    -- funds.

18   Q    The answer is yes?

19   A    If it was being purchased with funds from the

20   TreasuryDirect deposit accounts, then, yes, it has to go in

21   there.

22   Q    Okay.  And so you told Mr. Beane that on the 8th that

23   he needed to cancel the F250 Ford pickup truck and that he

24   needed to do a Fedwire to pay for that, didn't you?

25   A    No, I did not.  And, actually, regarding the

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  factualized trust, it's all -- it's all paperless.  So, really,

2  truly, everything is already in there.

3         But as far as him writing out paperwork, that was

4  because none of this has been addressed publicly or even within

5  the system itself, other than going in and refining policy

6  changes.

7         So as far as Mr. Beane putting -- excuse me, what was

8  the second question?  Your first question was RV.

9    Q    Wiring --

10   A    Oh, wiring, no.

11   Q    -- the money -- Fedwiring the money so --

12   A    No, I did not.

13   Q    So Dwayne Griffith was lying when you heard him

14  testify up here that he talked to you and you said the word

15  Fedwire?

16   A    No.  Actually, I believe that's a recall issue.  But

17  as far as speaking with him, I can't speak on behalf of

18  Mr. Beane.  Okay.

19         I said that as far as the paperwork went, I said that

20  if he's purchasing this vehicle using his funds from his trust,

21  then it would have to be put into the factualized trust -- or

22  have a document stating that it's, you know, inside the

23  factualized trust.  I said that Mr. Beane -- I asked him if he

24  had the vehicle or did Mr. Beane.

25         He said Mr. Beane had the vehicle.

UNITED STATES DISTRICT COURT

1    I said, "Okay.  Do you have the cash?"

2    He said, "There's a check."

3    Okay.  At that point, I said, "That check needs to be

4    canceled.  He needs to be sent back over with the truck to drop

5    it off to you" --

6    Q    Why did the check need to be canceled?

7    A    So that he could write "Factualized Trust."  At the

8    bottom on the memo, there needs to be at least some note.  So I

9    said Mr. Beane would make the decision to do another check or

10   to have a Fedwire done.  I wasn't sure what he was going to do.

11   Q    That's not what Mr. Griffith testified to.  And he

12   actually said that Mr. Beane said his attorney said that he

13   needed to cancel the check.

14   A    Okay.  Well, everyone has their recall.  I'm telling

15   you what my recall is.  Mr. Griffith got his chance to say what

16   his recall is.  I never told Randall to cancel the check.  I

17   said that it needed to have the memo.  Most of the time,

18   they'll have the check.

19   Randy said he didn't have the check, the dealer had

20   the check.

21   So that's why I asked the dealer whether or not he

22   had the check or had the cash.

23   And he said, "No, I have a check."

24   So when I asked Randall, he said, "Yes, I gave him a

25   check."

UNITED STATES DISTRICT COURT

1    I said just -- you've got to have the memo.  If it

2  doesn't have the memo, then everything needs to be canceled.

3    And at that point, with everything that was going on,

4  I couldn't take on much more.  I had D.C. and the banking

5  stuff.  I had D.C. and the threat against the president.  I now

6  had an escalating situation with not just Mr. Beane, but

7  everyone that was watching this crazy Harvey Dent video.

8    You know, so at that point, I couldn't handle another

9  thing to be able to have to go in and protect.  So trying to

10 minimize it, I just said until a deal is done -- and my family

11 and our -- we also have auto lots.  So with our auto lots, if

12 someone pays, they get the car.  If someone doesn't pay all the

13 way but there's financing, okay, fine, that's still paying and

14 having the car.

15    You don't get the car with -- I mean, they have a

16 different protocol.  He says, yeah, I let them take the truck,

17 and there was no payment.  So those are their practices.

18 That's fine.  That's their practices.

19    I told Mr. Beane to take the truck back until

20 everything could be worked out, paperwork in order, as well as

21 payment being done.

22    Otherwise, there's no way he should have that truck

23 in his possession, in my opinion.  But then again, this is

24 Tennessee, they do things a little bit differently from what

25 I've experienced being here the last five months.

1    Q    Okay.  And so you know that a Fedwire is just like

2  cash.  Right?

3    A    I am familiar with a Fedwire system.  Like I said,

4  SWIFT -- Fedwire -- basically, the Fedwires that we use and

5  that I'm familiar with, it's like going to Western Union,

6  sending money, and in less than 30 minutes later, it's to the

7  other side.

8         So as far as Fedwires, yeah, I'm very familiar with

9  Fedwires.  There is the opportunity to do a recall system.

10  However, at this level with Fedwires, this is the first time as

11  far as not having a recall.  So I've been where we can do

12  recalls.  That's my experience with Fedwires.  Now, you're not

13  able to.

14    Q    Okay.  So you knew that because of all of your study

15  of the law, that if Mr. Beane, if Whitney Bank and Buddy Gregg

16  had the Fedwire, had the cash, and he had the property, there

17  was nothing that USAA Bank could do to get it back, didn't it?

18    A    No, actually --

19    Q    You say that multiple times on Exhibit 94, don't you?

20    A    No.  Actually, my understanding of the Fedwire,

21  because my experience has always been we've been able to have

22  recalls of Fedwires.  You just -- it's communication between

23  the two banks, and they give it up.  Not a problem.  And

24  there's paperwork -- or, excuse me, a digital trail, messaging

25  that goes on.

1    It was only afterwards, as I was prepping for this,

2  that I found that when I went in for the Fedwire to go in and

3  see what the Federal Reserves -- so that's why I copied it over

4  to them.

5    But as far as him returning the money, I didn't see

6  where there would be a problem of him having the wire returned

7  and then --

8    Q    But you didn't do that?

9    A    And them getting the RV back.  That's not how it went

10  down, but they need to have all the information.  There was a

11  valid transaction, in my professional opinion, in banking and

12  trade and finance, as well as my legal training, that there was

13  a valid transaction.

14    He had the cash, which I already knew the origin of

15  funds and history of funds for the cash, and they had given him

16  the vehicle.  So there was a valid transaction, which had

17  already taken place before I even spoke with him on the 10th.

18    Q    Okay.  But you heard that Ms. Palmisano testified

19  that she gave a lot of credence to the fact that you were an

20  attorney on the phone and you said that they were --

21  Mr. Beane's funds.  She gave a lot of credence to that.  Did

22  you hear?

23    A    I heard her say that she gives a lot of weight to her

24  client's desires.  That's what I heard.  So which part?

25    Q    Okay.  So she also testified that she gave you True

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  Brown and made it completely clear that it was True Brown from

2  USAA Bank, but you didn't call him, did you?

3      A    I couldn't at that point.  I was trying to prepare

4  the paperwork for Palmisano, as well as the declaration of

5  facts.  I already went through today, showing you all the work

6  that -- the difference between what it was at the moment to

7  what it needed to be in order to protect all of them.

8          But True Brown, yes, we actually had calls that went

9  in.  He never answered, never returned phone calls.  So I've

10 never spoken with True Brown, nor Tom Shaw who was the vice

11 president of the criminal investigations for USAA.  He's left

12 USAA in July of 2017 right after this whole incident went down.

13 That was who the -- your witness testified was her boss' boss.

14     Q    Right.  So you didn't call True Brown, because you

15 knew what he would say?

16     A    Oh, no.  I have no problem talking to law

17 enforcement.  I would have sent him all the documents as well.

18 Because the FBI in their white collar crime divisions, I've

19 never worked with, but as far as working on particular banking

20 and whatnot, we do have to always consider law enforcement.

21         I have no problem talking to law enforcement.  I'd

22 make sure they'd have everything, and I would have pulled in my

23 own contacts to be able to figure out what are they missing,

24 what's the issue.  But it's Federal Reserve.  What Federal

25 Reserve wants Federal Reserve usually gets until now.

UNITED STATES DISTRICT COURT

1    Q    So let's talk about that conference call that we all

2  heard that you recorded and that you put on a YouTube --

3    A    I didn't --

4    Q    -- because you want to be YouTube famous.

5    A    I didn't put it on YouTube.

6    Q    Okay.  You recorded your part --

7    A    No.  Actually, it was someone that was there with

8  me --

9    Q    At your direction?

10   A    -- started -- no.  First, they recorded without my

11 direction.  And then they stopped the video, because I started

12 to roll -- I roll cigarettes.  I smoke pipe tobacco and roll my

13 own cigarettes.  Number one, it's cheaper, so I can put more

14 money towards the activities that I do for the cleanup.

15        But I sat there and she cut the video, and you could

16 actually see that it kind of goes dark for a couple minutes

17 there or maybe less than a couple minutes.  Then she starts it

18 back up.

19        I said, "Don't worry about it.  It's fine.  If you're

20 going to record, fine."

21        Because I didn't want to be recorded.  I don't like

22 video.  And, really, it's just a matter of I don't like looking

23 at myself.  Okay.

24        And so when she did the recording at the second time,

25 she -- I told her, "If I smoke, don't stop the recording."

UNITED STATES DISTRICT COURT

1          So we went along and did that.  Is that the video?

2     Q    That is the video I'm talking about.  And --

3     A    I didn't put that on YouTube.  I didn't even

4  distribute it.  I didn't even record it.  I didn't have any

5  access to it in files or anything else until after I got off my

6  30-day tour.

7     Q    Okay.  And so you're all about transparency?

8     A    Yes.

9     Q    You've said that many, many times?

10    A    I absolutely believe in transparency.

11    Q    Okay.  And so why didn't you share the truth with the

12  people on that conference call?  Why didn't you tell them, you

13  know --

14    A    What truth?

15    Q    -- the truth that this money actually came from the

16  Federal Reserve and Mr. Beane's secret account?  Why didn't you

17  just say that?  Why did you call --

18    A    I actually did share with everyone where it came from

19  with the factualized trust.  That is all the documentation.

20  And every bank on this planet knows about the UCC filings.  It

21  has gone through for every single bank.  It was delivered to

22  all the Federal Reserve Banks.  It's also been looked at and

23  conferred with for it's correction and revision while they were

24  being written as well as after they were written.

25          Once they -- after they were written, that's when the

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  Federal Reserve really got nervous, especially DOJ Jack Smith,

2  who used to be director of the public integrity in Washington,

3  D.C. and then got demoted and came down here to Tennessee,

4  Western Tennessee as U.S. Attorney.  He retired on August 4th

5  after only being U.S. Attorney, Chief U.S. Attorney for five

6  months due to this particular incident.

7       Q    Okay.  So throughout that exhibit, you call it the

8  originating bank, originating bank?

9       A    No.  It says originating depository.

10      Q    You say in that exhibit originating bank.  You never

11 once say, oh, it's a secret account from the Fed Reserve.  You

12 don't say Fed Reserve because you know it's going to raise red

13 flags, and your goal is to get Mr. Beane out the door in that

14 RV, isn't it?

15      A    Oh, are you talking about the --

16      Q    I'm talking about the conference call you had with

17 Whitney Bank and Buddy Gregg.

18      A    No.  But originate -- because there's originating

19 bank and originating depository.  An originating depository is

20 what is in the factualized trust.  An originating bank is where

21 any transaction starts from.  That's originating bank.

22           THE COURT:  We'll let you follow up after lunch,

23 Ms. Davidson.  We'll excuse the jury until 1:45.

24           MS. TUCCI-JARRAF:  Sorry I misunderstood you.

25      (Jury out at 12:32 p.m.)

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1      THE COURT:  You can step down.

2      MS. TUCCI-JARRAF:  Thank you.

3      THE COURT:  Just a quick housekeeping measure.  I

4  hadn't followed up on this.  The juror questionnaires that were

5  distributed, I think we've gotten them back from the government

6  and Mr. Beane.

7      Ms. Tucci-Jarraf, do you have yours?

8      MS. TUCCI-JARRAF:  I still have to find it.  I put it

9  into a space where it wouldn't get lost, and I can't remember

10  where that space is, and I was trying to do -- prepare for the

11  directs and the crosses, so I am going to find it and

12  immediately turn it in.  I'm the only one that has --

13      THE COURT:  It's not here with you today?

14      MS. TUCCI-JARRAF:  It's not here with me.

15      THE COURT:  Let's make sure we turn it in tomorrow

16  morning.

17      MS. TUCCI-JARRAF:  Yes, sir.

18      THE COURT:  Thank you.  We're in recess.

19      THE COURTROOM DEPUTY:  This honorable court shall

20  stand in recess until 1:45.

21    (Recess from 12:33 p.m. to 1:49 p.m.)

22      THE COURTROOM DEPUTY:  All rise.

23      THE COURT:  Thank you.  We'll bring in our jurors.

24    (Jury in at 1:50 p.m.)

25      THE COURT:  Thank you.  Everyone may be seated.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Ms. Davidson, you may continue.

2    MS. DAVIDSON:  Thank you, Your Honor.

3  BY MS. DAVIDSON:

4    Q    So you're familiar with Federal Reserve website,

5  aren't you?

6    A    Recently in the last months, I've gone on there a few

7  times to grab a few things, but I haven't been on there since

8  before July.

9    Q    And so you actually cite the Federal Reserve website,

10  you even included a link in one of your e-mails to Whitney

11  Bank, don't you?

12    A    I believe that was regarding Fedwire.

13    Q    Exactly.

14    A    Uh-huh.

15    Q    And you got that from the Federal Reserve website?

16    A    On February 10th, when I went to go look at the

17  rules.

18    Q    January 10th?

19    A    Excuse me, July 10th.

20    Q    July.

21    A    Thank you.  I keep transposing those two months.  On

22  July 10th, when I went to go look at the bill of sale and the

23  manufacturer, certificate of origin and all that, in order to

24  have the correct information, I did go in to look at the

25  Federal Reserve, their website regarding Fedwires, what their

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  policies -- because they've been changing their policies, now

2  ACH payments, the settlements aren't two days, it's same day.

3  And that changed as of September 15th.

4      Q    So you are familiar with the website?

5      A    I'm familiar with keeping up with the Federal

6  Reserves activities, but not from their website.

7      Q    Okay.  And you know that all over the website, it

8  says that this TDA scheme that you keep talking about is a

9  fraud?

10     A    Actually, I hadn't seen any of the notices until you,

11 I think, had presented it into evidence.  That was the first

12 one I had seen.  Usually, it's the FBI that puts out notices.

13     Q    You're familiar with Google, aren't you?

14     A    Yeah.

15     Q    And so if you research on Google, TDA accounts, it

16 says it's a fraud, doesn't it?

17     A    I don't know.  The only thing I was researching

18 regarding the ACH things was regarding this transaction, what

19 the process was.  As far as TreasuryDirect deposit accounts,

20 those are absolutely real.  I have experience with them.  I

21 have seen them.

22          As far as TDA, for me TDAs don't exist, but

23 TreasuryDirect deposit accounts, absolutely exist, and I have a

24 lot of experience with them.

25     Q    Okay.  And -- but everywhere on the Internet, like

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  Snopes.com and Wikipedia say they don't exist.  They're all

2  lying, you're the only one that has the truth?

3      A    They also said the Federal Bureau of Investigation

4  and our Congress serves the people, and yet we're finding out

5  differently this month, aren't we?

6      Q    And that's your opinion?

7      A    It's what's on the Internet, Google.

8      Q    Uh-huh.  And so you say, just to be clear, that your

9  very first contact with Beane was on July 4th regarding --

10     A    With who?

11     Q    With Randall Beane --

12     A    Mr. Beane?

13     Q    -- regarding this whole scheme?

14     A    As far as the video from Harvey Dent, the first that

15  I had seen it was on July 4th, when I woke up and found his --

16  or his message in my messenger box with a video.

17     Q    And when did Beane pay off all of his debts?  I

18  thought it was your testimony that y'all were together when he

19  paid them off on the 5th?

20     A    No.  I said I had received the video link in

21  messenger, from Facebook Messenger, the link of that.  And then

22  I had seen -- he had also shared with me the post where he

23  said, "I paid all my debts off."  The first time I saw that was

24  on July 4th.

25          I didn't speak to him about the CDs and all of that

UNITED STATES DISTRICT COURT

1    stuff -- or excuse me, when I actually was on the phone with

2    him while he was working on the CDs, that would have been on

3    July 5th, I believe.  And that was when he -- it got sessioned

4    out.  That was the one and only time we were actually on while

5    he was doing something.

6        Q    Okay.  And so you knew that his purchase of the CDs

7    was related to this Harvey Dent video involving the ACH fraud?

8        A    I knew the process that he was -- that's what I was

9    trying to figure out.  Was it the same process for a CD as it

10   was for credit card payments or the loan mortgages that he had

11   done?  I was trying to figure out if it was the same process

12   for each of these particular portals and the ACH system.  So

13   that's what I was trying to figure out.

14       Q    So is it your position that the money that Mr. Beane

15   accessed was his TDA account and was not in fact USAA's money?

16       A    TDAs don't exist.

17       Q    Okay.

18       A    TreasuryDirect deposit accounts do.

19       Q    Okay.  TreasuryDirect deposit.  Is it your position

20   that he actually accessed his secret account?

21       A    That's something we'd have inside of the Federal

22   Reserve.  I do know that the Federal Reserve holds those

23   TreasuryDirect deposit accounts and they hold commandeered

24   value from the people of America as well as other people around

25   the globe.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Q    And so when Mr. Sawn O'Malley testified there were no

2   secret accounts at the Federal Reserve, he was lying?

3    A    I know there are accounts that the people in America

4   as well as on this planet don't know exist, and they are used

5   every day.  That's what the Social Security card actually is.

6   It's a deposit -- TreasuryDirect depository account as well as

7   other accounts that are linked to the identifier called a

8   Social Security number.  That's why you get the card.  It's

9   like an ATM card, but you can only deposit.  You're not allowed

10  to pull out.

11        If -- and that's what the Social Security Act was

12  for, which is why President Trump went in -- I think it was in

13  November and said we're just going to do away with Social

14  Security completely.  I don't know.  That's something we'll

15  have to discuss in D.C. when I get there.

16   Q    I still don't understand why, if you have all the

17  truth, you didn't open the eyes of the people that were

18  participating in that conference call.  I mean, in fact, you

19  kind of -- you know, you talk about the Ford truck, well, he

20  rejected the Ford truck, but -- and you knew a hundred percent

21  that they were dealing with USAA wanting their money back, the

22  Fedwire?  Did you not?

23   A    Look how you're acting with the information.  The

24  bankers, they know.  Those are conversations I would have.

25  With Nelson and Forbes, I gave them -- I said that I would give

UNITED STATES DISTRICT COURT

1    them the information.  The factualized trust gave them all the

2    information.

3         I can only give them the information, and it is their

4    choice as well as their opportunity to go in and verify and

5    validate that information, which is why I gave it to Whitney

6    Bank to be able to go in and do that and work with USAA.

7    Q    But you didn't give to it USAA?

8    A    I didn't have a chance, because I had FBI beating up

9    and detaining unlawfully Mr. Beane, and trying to make sure he

10   didn't disappear or was killed.  Because there's no Jasper,

11   Colorado.

12        So that, for me, indicated that possibly at the

13   highest levels military was involved, which I know from my

14   experience, which is why I was in Texas dealing with the Bush

15   family.

16        So, excuse me, there was too much going on at the

17   time.  And I did give it to Whitney Bank, and said, please,

18   anything that you guys need, forward.  That was in the voice

19   mail as well.

20   Q    So you said during my -- I asked you exactly who

21   recruited you to do the cleanup and you said Commander Thoraks?

22   A    There are space programs.  I don't know if you recall

23   this, but Trump back in, I think it was October, November,

24   reinitiated the space council.  These are programs that our

25   military has been hiding for a long time.  There was

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    whistle-blowers inside.  I have been working with different

2    technologies, different scientists.  Banking doesn't have

3    borders.  So in my field of work over 20 years, I have had

4    experience with the medicine industry, education industry, all

5    of that.

6         Q    Okay.  I asked you, you said it was Commander

7    Thoraks.  Was he in the Navy?

8         A    No.  It's part of the space programs.

9         Q    Part of the space programs?

10         A    However, those contacts then put me in with different

11    U.S. military or militaries from different countries, so --

12              THE COURT:  Let me interrupt.  But let's just -- the

13    question was about Commander Thorak, so let's limit right now

14    the answer to that.

15    BY MS. DAVIDSON:

16         Q    Right.

17         A    He works with those militaries as well.

18         Q    Okay.  And do you play video games?

19         A    No.

20         Q    Are you familiar that there's a Commander Thoraks

21    with the World of Warcraft?

22         A    It's actually Thorak, not Thoraks.  No, I'm not

23    familiar with -- I could ask my kids, if you'd like, but I

24    wouldn't be able to have that answer for you right now.

25              MS. DAVIDSON:  Uh-huh.  May I have a moment?

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1          Thank you.

2          THE COURT:  Thank you.

3          Mr. Beane, any cross-examination?

4                    **CROSS-EXAMINATION**

5     BY MR. BEANE:

6          Q    Okay.  Ms. Tucci-Jarraf, how long would you say we've

7     known each other in your eyes?

8          A    Really, it was the first time that you had contacted

9     me in spring of 2017 was when I first became aware of you.  And

10    then we didn't have contact again until -- it was approximately

11    July 3rd when you were calling me from coming home, and that

12    was a brief conversation.  So, really, July 4th was when I

13    started to really get to know you.

14         Q    Did you ever receive any pay from myself or did we

15    arrange any type of pay for anything at any point that you may

16    have done work on my behalf?

17         A    I haven't received any money from you or anyone else

18    regarding these matters.

19         Q    I've heard you mention foreign actors on several

20    occasions.

21              Would you please clarify who a foreign actor might

22    be?

23         A    Okay.  So foreign actors, the ones I've worked with,

24    when I say foreign actors, it's anyone that is outside

25    physically the United States.  So you have Xi, president of

                    UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    China, I worked with General Wang, Guanzhong Wang, and I've

2    worked with -- so that would be one.

3            Then you have Putin, and every of the high level

4    cabinet officials who haven't been assassinated to date.

5            Then you end up having in Italy, it was basically

6    McKelly [phonetic], he's the Italian version of Jeff Sessions

7    here.  It wasn't him, but it was black nobility families that

8    are in Florence.  However, the communications was with he and I

9    regarding their wishes of trying to find out a solution.

10           Bill Gates, Sr., although he lives in Seattle, is a

11   part of those foreign actors as well.

12           The Rothchilds, obviously, and I've dealt with the

13   English as well as the Swiss and the French.  There are many --

14   there's a lot, so how far do you want me to go?

15       Q    I just wanted a definition kind of so we could

16   clarify who a foreign actor is in this since it's brought up

17   quite frequently.

18       A    Mainly in this particular case, China and Russia were

19   involved in giving the orders, because China has the most to

20   lose regarding TreasuryDirect deposit accounts.

21       Q    Could we bring up Exhibit 165, please.

22           Do you recall the warrants that you looked at

23   pertaining to my arrest?  And I don't remember what day you

24   said you saw the warrants, but does this warrant look familiar

25   to you?

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1      A     This one, no.

2      Q     And what warrants --

3      A     I've never seen this page until Ms. Davidson or maybe

4  it was Anne-Marie Svolto entered it into evidence.  I've

5  never -- I've never seen -- oh, excuse me, this is the state of

6  South Carolina.  I had seen it, but it was presented by someone

7  that had spoken with the FBI, but as far as this one being in

8  the system, when we checked the NCI -- national criminal

9  history for you, it was not showing at all, not active, not

10  even resolved.  It wasn't in the system.

11        So I've never seen this one until today, except for

12  that one time that I was shown, but I wasn't allowed to have

13  it, and it wasn't showing in the systems.

14      Q     You mentioned there were a couple of other warrants.

15  Do you recall what was on those warrants or --

16      A     Yeah.  Well, the ones that I saw that I received also

17  regarding the NCIC were two warrants.  If I recall right, one

18  was issued on July 12th.  One was issued on July 13th.  Not

19  duly issued.  There was no signature on them.  They were in the

20  clerk's records as well.  So when I received it from my intel

21  contact, I had gone to the clerk's office and verified that

22  they were the same ones.

23        But there was no signatures on them or anything else.

24  The ones presented by Ms. Davidson, I've never seen.  There was

25  never a stamp on it, there was no signature, no nothing.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    Q    This -- you said there was a warrant out of Jasper,

2  Colorado?

3    A    I believe.  Is there a second page to this one?

4         MS. DAVIDSON:  Not currently in evidence.

5         MS. TUCCI-JARRAF:  Oh, okay.  That was the one.

6         Jasper, Colorado doesn't even exist.

7  BY MR. BEANE:

8    Q    Right.

9    A    Which is what made me very concerned with who was

10 actually involved with having you taken.  Jasper, Colorado

11 doesn't exist.  That's what was stated, even in the courtroom

12 about Jasper, Colorado, that you were to be extradited there.

13 I even contacted the facility on July 13.

14        Because when I saw the -- excuse me, July 14th.

15 Because when I saw the facility's website and saw you listed

16 there on the 12th, it said an arraignment, a jail arraignment,

17 which means you would have been in the facility -- from my

18 experience, you would have been in the facility with a screen

19 and talking to someone over like a Skype thing.  Okay.  And

20 that you -- there had been an arraignment.

21        However, the July 12th warrant that I viewed that

22 wasn't signed at all, and neither was the affidavit on the

23 back, that was supposedly the one that was used for the

24 arraignment, but as of July 18th in the clerk's office, those

25 still weren't signed.

UNITED STATES DISTRICT COURT

1    So this one was signed after July 18th -- or excuse

2    me, the ones that I was presented for discovery were signed

3    after July 18th.  But on the day you were arrested, there were

4    no warrants, no active warrants per my intel.

5    Q    And you had mentioned an imminent threat on my life

6    because of this case.  Can you elaborate on that threat from

7    the information you gained, any more than what you already have

8    or --

9    A    I was contacted by an agent that I worked with for

10   years.  And then I also contacted Jonathan D. Betts, but didn't

11   get a contact back from him.  And between those two and myself,

12   we worked together for years.  They work with CIA, Mossad,

13   Chinese intelligence, Karl Langenstein is the other one that I

14   work with.

15         He's actually a director of finance for the state

16   owned Senotech, which is -- basically, it's the only company

17   and its two subsidiaries that can actually move money in and

18   out of China.

19         There was a lot of -- personally, there was -- he --

20   I had upset someone in Seattle, Bill Gates, Sr., and he

21   apparently, because I went in to ask questions, that's who

22   China, Russia in general, but it had to do with the AIIB --

23         MS. DAVIDSON:  Objection, Your Honor.  How is this

24   relevant?

25         MS. TUCCI-JARRAF:  He asked who was --

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1          THE COURT:  The question is the relevancy of what

2    you're talking about now.  You said something about Bill Gates,

3    and I don't know how that has to do with --

4          MS. TUCCI-JARRAF:  Because they were all involved in

5    making sure he gets arrested.

6          THE COURT:  Your testimony is Bill Gates in Seattle

7    was involved in --

8          MS. TUCCI-JARRAF:  They were part of --

9          THE COURT:  -- Mr. Beane getting arrested?

10         MS. TUCCI-JARRAF:  They were part of all the actors.

11         THE COURT:  That's based on your own personal

12   knowledge?

13         MS. TUCCI-JARRAF:  Yes.

14         THE COURT:  All right.  Go ahead.

15   BY MR. BEANE:

16      Q    Is that it?

17      A    AIIB, which is the Asian version of the World Bank,

18   they were dropping a whole bunch of U.S. Treasuries and

19   everything else, because that's what they were using as

20   collateral and monetary instruments, because of your case and

21   the Federal Reserve, and the fact that TreasuryDirect deposit

22   accounts, even if people were calling them TDAs, it was a short

23   time, in their estimation, that it would move to TreasuryDirect

24   deposit accounts and the exposure of them and the commandeered

25   value that the Federal Reserve was holding.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    So they were a big push for having you arrested, and

2    they did that through the Federal Reserve.  As far as I can

3    tell at this point, I received that information from

4    Mr. O'Malley during his testimony, as to the chain from Federal

5    Reserve to the Tennessee office here of the FBI.

6    Q    Right.  Do you remember a phone call between you and

7    I after my arrest in which you explained because of my actions

8    that I had exposed a lot of the deep state and the secret space

9    program and had upset a lot of people.

10   Would you explain the background to this information,

11   or is that something you've already done?

12   A    Well, this is -- no, it's not something I've

13   completely done.  These are programs and systems.  Basically,

14   you have the Federal Reserve, which acts as the facilitator for

15   foreign interests.  Okay.  Around that, it has different

16   security wrappers.

17   So the outer wrapper, the politicians, even schools,

18   corporations, to help manage the exposure.  Okay.  Then inside

19   of that, they have law enforcement.  And the main law

20   enforcement, traditionally in America at least, has been the

21   Federal Bureau of Investigation.  CIA never comes out of the

22   woodwork.  They always use, unfortunately, the Federal Bureau

23   of Investigation or local law enforcement, which was the

24   militarization of law enforcement.

25   Then inside of that, you have the judicial wrapper,

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    which is the final one in between that and -- so there's a

2    number of wrappers to help shield the Federal Reserve Bank and

3    that's the same for every country and their cental banks, same

4    template.

5        Q    So how would that have helped to expose the secret

6    space program and the ...

7        A    A lot of people that are working in different

8    offices, there's always good and bad --

9        Q    Right.

10       A    -- as it seems.  You have good agents, you have bad

11   agents.  And, really, usually, the foreign agents of the

12   foreign actors are always at the highest levels.

13       Q    Right.

14       A    Always.  And the way they use the foreign agents or

15   the network, because those foreign agents are responsible for

16   creating a network inside of their department, their agency, or

17   their branch.  Okay.  And so the lower levels don't know that's

18   where we call the system and a fraud inherent.  Okay.  It's

19   inherent in the system.

20           So like, for instance, the Federal Reserve will have

21   Congress, and they use a lot of different ways to pressure

22   certain members of Congress to introduce bills, pass bills, so

23   that they become law.  And it really just is a regulation of

24   commerce, but in favor of the foreign actors.

25       Q    Oh, wow.  Thank you.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   A   And the space program is all wrapped up into that,

2   involved in that.

3   Q   And as well as the deep state?  Is that --

4   A   People use deep state, shadow government, and all of

5   that.  I don't use that, so I don't know.

6   MS. DAVIDSON:  Objection, Your Honor.  Relevance to

7   the deep state and shadow government.

8   THE COURT:  I think we've gone -- I'll sustain the

9   objection.  Go ahead with your next question, Mr. Beane.

10  BY MR. BEANE:

11  Q   Would you please define the term "rebutted" for us in

12  the legal sense?

13  MS. DAVIDSON:  Objection, Your Honor.  This has all

14  been briefed and litigated, rebutted, the presumption,

15  unrebutted presumption.

16  THE COURT:  What is the relevancy of the question

17  today?

18  MR. BEANE:  She explained about the filings and the

19  fact they had never been rebutted.  I just wanted to get an

20  explanation on the rebuttal of -- and what the process was in

21  rebutting something.

22  THE COURT:  I think she's explained that already.

23  Let's go ahead and go on to the next question.

24  BY MR. BEANE:

25  Q   You seem to be very passionate about your work and

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    your effort behind the universal cleanup.

2              Can you help us to understand the ultimate goals of

3    this cleanup and what you're looking to be gained by that

4    cleanup and the ultimate benefits of it?

5              MS. DAVIDSON:  Objection, Your Honor.  Relevance.

6              MR. BEANE:  She keeps continuing to talk about the

7    universal cleanup, and it's not been defined really what that

8    is and what the ultimate goal of the cleanup is.

9              MS. DAVIDSON:  Or how it relates to this case.

10             MR. BEANE:  Evidently, it relates in a big way or she

11   wouldn't talk about it.

12             THE COURT:  Go ahead.

13             We've had some testimony about cleanup, so we'll

14   allow the question.

15   BY MR. BEANE:

16        Q    Would you mind explaining to us the ultimate goal of

17   the cleanup and --

18        A    Let's take -- you had three parts, I think --

19        Q    Okay.  Yeah.

20        A    -- to that, so I'll take what was the ultimate goal.

21             THE COURT:  Ask the question.  The question is,

22   what's the ultimate goal of the cleanup you've been describing.

23             Go ahead and answer that question.

24             MS. TUCCI-JARRAF:  The ultimate goal of the cleanup

25   is essentially that.  There's many, many code names for the

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1    cleanup.  I use just the word "cleanup."  Other people use the

2    word "war," depending on whose interests are being protected

3    and or a threat.

4         So the cleanup itself is basically through a series

5    of events, throughout history, systems have been presented to

6    the people or created by the people, and then slowly, through

7    deceptive practices and acts, have been converted and subverted

8    so that they don't serve the people.  And that part has been

9    hidden from everyone for centuries.

10        However, it's been coming out.  So for the last 30

11   decades, people know something is wrong.  People know that

12   stuff has been hidden.  People within their own agencies

13   experience the pressure and the bureaucracy and the corruption.

14        So that cleanup, there are people at the highest

15   levels in America as well as in the other governments in

16   corporations with -- on this planet who have been involved in

17   doing a cleanup and coordinating this cleanup so that every

18   single system that's supposed to serve the people serves the

19   people, as they were told it does, but it hasn't been working

20   that way.  That's really what it is.

21        So right now, we're handling the judicial, for

22   instance.  And, truly, it's to make it so that the people that

23   are in there who want to do their jobs can do their jobs.  So

24   identifying the foreign actors -- or excuse me, the foreign

25   agents and establishing the line between the foreign agents and

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  the foreign actors was a big one, and also freezing the money

2  so that it couldn't be fraudulently used for terrorism

3  activities and whatnot.

4        That was the biggest goal initially, one step, and

5  then go in and make everyone aware so they could change the

6  systems.

7        THE COURT:  All right.  Let's go on to the next

8  question.  Go ahead.

9  BY MR. BEANE:

10   Q    Okay.  Referring to the terrorist activity, is this a

11  situation where they could have traced it to someone who was a

12  potential terrorist to obtain these type of funds, or could

13  it -- was it something it could have just been exploited and

14  used by anyone?

15   A    In regards to the TDA?

16        MS. DAVIDSON:  Objection.  Relevance.

17        THE COURT:  Excuse me.  Let me hear the objection.

18        MS. DAVIDSON:  There's been no testimony regarding

19  terrorists.

20        THE COURT:  What's your response to the --

21        MR. BEANE:  She just mentioned terrorism.

22        THE COURT:  She mentioned it.  I'm dealing with the

23  question right now.  What's the relevance of that question?

24        MR. BEANE:  It was -- she mentioned it in her answer

25  about the cleanup, about terrorists.  And so I was alluding

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  to --

2          THE COURT:  I'll sustain the objection.

3          Go on to the next question.

4  BY MR. BEANE:

5      Q   Ms. Tucci-Jarraf, you say a lot of phrases that are

6  not common in most people's everyday vocabulary, such as

7  absolute sole authority, absolute transparency, and you seem to

8  say those phrases with a deep conviction.

9          Can you expound on your purpose and these phrases,

10 what they mean to you and why they're important?

11     A   The words.

12         MS. DAVIDSON:  Objection, Your Honor.  Relevance and

13 this is not proper cross.  This is an open-ended direct.

14         THE COURT:  I'll sustain the objection.

15 BY MR. BEANE:

16     Q   You said earlier in your testimony that you're a

17 truth seeker.  Is that a simple term, or do you feel it needs

18 to be expounded upon in order to understand what truth it is

19 you seek?

20         MS. DAVIDSON:  Objection, Your Honor.  Relevance and

21 it's not proper cross.

22         MR. BEANE:  It was in her testimony.

23         THE COURT:  Is that your response to the objection?

24         MR. BEANE:  Yes.

25         THE COURT:  All right.  I'll sustain the objection.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1  BY MR. BEANE:

2      Q    You often speak of exposing fraud in this universal

3  cleanup.  In your viewpoint, is there a lot of fraud yet to be

4  exposed?

5      A    Yes.

6      Q    What means are there to expose this fraud at your

7  disposal or available?

8      A    Awareness of the people.  That's the only way.  These

9  are supposed to be their systems, and not just here, but

10  everywhere.  So going in and cleaning up, which has been

11  happening since October 18th, and, for instance, there's now

12  13,216 indictments sitting sealed, waiting to be unsealed.

13     Q    How many?

14     A    I believe it's as of yesterday or as of 26th of

15  January, 13,260 indictments.  I could be wrong on that.  It's

16  over 13,000.  They haven't been unsealed yet.  A few have,

17  so -- by the Department of Justice, but not all of them.

18     Q    Can you describe the difference between a private

19  banking system for public use and a public banking system for

20  private use force?

21     A    Uh-huh.

22          MS. DAVIDSON:  Objection, Your Honor.  Relevance.

23          MR. BEANE:  It's in the paradigm report in the --

24  that she keeps using as a reference.  Have you read it?

25          THE COURT:  I'll overrule the objection.  You can

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Cross-Examination

1   limit your answer, but go ahead and answer.

2          Be brief, please.  Go ahead.

3          MS. TUCCI-JARRAF:  I'll answer the question

4   sufficiently.

5          Okay.  So a private -- or a public money system which

6   is where a treasury of the actual government would issue the

7   funds -- and typically there would be a collateral behind it,

8   something of value, and that way, they could collect on it.

9          Private system -- and that would benefit the people

10  that actually own the government and the government -- excuse

11  me, who the government actually serves.

12         In a private money system, it's owned by a few, and

13  it's their assets, and they loan them to everyone.  So, for

14  instance, O'Malley had testified that the U.S. funds itself by

15  borrowing and that's how a private system works.

16         So, essentially, the central bank is the Federal

17  Reserve, they say, which is nothing federal about it.  It's a

18  private bank.  And it loans money to the U.S. by receiving a

19  collateral called U.S. securities as well as other securities.

20  But it's for the benefit of the few.  It's just like a regular

21  private bank.

22         MR. BEANE:  Okay.  Well, I don't have any further

23  questions for you at this time.

24         THE COURT:  Thank you, Mr. Beane.

25         Ms. Tucci-Jarraf, we now move to redirect.  You have

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    the opportunity for -- to present in a factual narrative a

2    redirect examination based upon the cross-examination, limited

3    to the scope of the cross-examination.  So if you would like to

4    present any redirect, you can do so at this time.

5             MS. TUCCI-JARRAF:  Thank you.

6             May I have Mr. Lloyd bring up my notes from cross so

7    that I can make sure I stay within that scope, please?

8             THE COURT:  Yes.  Hand them to the courtroom deputy

9    will be fine.

10            MS. TUCCI-JARRAF:  Thank you.

11                      **REDIRECT EXAMINATION**

12            MS. TUCCI-JARRAF:  How I'll handle these questions is

13   the topics.

14            So one of the largest problems with the systems is

15   just the ignorance of those within actually operating and

16   employed in agencies that are supposed to serve the people in

17   public capacity, okay, as a public servant.

18            And when Ms. Davidson kept asking me about Black's

19   Law Dictionary, for instance, that's an example of sort of not

20   understanding how everything all works and that it's inner

21   related.  So saying that hypothecation is not in the Black's

22   Law Dictionary in the way I've described it, I'm describing it,

23   defining it as it's defined in banking.

24            Okay.  Law, like I said, is a shield around banking

25   so that it can say invisible as possible, that people don't

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1   have access to the inner operations of banks, how money is

2   created.  And not just money created.  I should say debt

3   instruments are created and how they can be monetized, which is

4   another way to say hypothecated, okay, so that you can actually

5   use an instrument and pay groceries, you know, from it.

6           So with the dictionary, this is an example of how

7   legal has its particular job, the judicial has its particular

8   job, law enforcement has its particular job.  Each one uses

9   their particular weapons.  Okay.  And in the case of law

10  enforcement, it's usually armaments.  In the case of judicial,

11  it's words.  So it's definitions and it's a play on words.

12          And that's just inherent in the system.  You have

13  to -- our system basically is based on the British system.

14  Okay.  So this is something that has been existing since before

15  America even did.  So there are -- there's an ignorance that's

16  built in, and it is literally managed so that that ignorance

17  stays there.

18          Now, I'm not saying the people that are doing their

19  jobs are ignorant.  I'm saying they're just trained so that

20  they don't ask questions.  And when they do, they receive

21  repercussions that basically tell them not to ask any more

22  questions.  Don't rebel against the policies and the rules, you

23  know, stick to those.

24          So in these systems, it's designed so that there is

25  no awareness or there's very little.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1          With law enforcement, for instance, it's sort of the

2     same thing.  They have -- even just at hiring, they change the

3     psychological evaluations overall for all of law enforcement to

4     bring in a different kind of --

5          MS. DAVIDSON:  Objection, Your Honor.  What is her

6     basis of any of this knowledge?  Foundation, relevance.

7          MS. TUCCI-JARRAF:  I was questioned regarding my

8     knowledge of the law, and I'm explaining my knowledge of the

9     law.

10         THE COURT:  Well, I think you've answered that, so

11    let's move onto the next subject matter.  I have to put in the

12    context, since you're giving a factual narrative, it's almost

13    like what was the question you're asking yourself and what's

14    the answer.  So I think from that standpoint, you've answered

15    the question, so let's move on.

16         MS. TUCCI-JARRAF:  Well, to assist, I can just --

17         THE COURT:  Let's just go on --

18         MS. TUCCI-JARRAF:  -- give a question and then an

19    answer.

20         THE COURT:  If that's your prerogative, if you'd like

21    to do it that way.

22         MS. TUCCI-JARRAF:  That way, there's no confusion.

23         Okay.  Who asked me to participate in the cleanup.

24         We've gone over a little bit about it.  The initial

25    contact was from Commander Thorak, and then from there, there

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    are a lot of individuals that I met over the time period

2    between 2000 and 2008, and it was always someone that was

3    significant for the area that I needed to go into.

4            So, for instance, in 2011, it was regarding D.C., and

5    the judicial, it was working with a supreme court justice from

6    Washington, D.C. who explained there needed to be a tipping

7    point as an example of which part I needed to go into.

8            So for each section of the work that I did, it was

9    always someone that would come in, and it would usually be in

10   the field related that needed to be incorporated into the

11   cleanup, and specifically, in my area of law and banking.

12           Okay.  There was a question as to why I was chosen.

13           Of course the things that I had said, but the main

14   thing was, it was about the belief systems, my belief systems,

15   and that I would let go of belief systems as I did my work and

16   had exposure and experience within each of the fields,

17   especially banking and law and government, was that it didn't

18   work the way we were told it worked, and then being going --

19   being able to go in and interconnect them to figure out exactly

20   how they did work so we knew where the solution -- how -- how

21   to create the solution to clean them up.

22           It was about not being susceptible to bribery.  That

23   was probably the biggest one, along with my ability to adjust

24   my belief systems through experience.  That and not having any

25   fear as far as being creative in the types of operations I

UNITED STATES DISTRICT COURT

1  would do in order to expose things, but also my compassion

2  regarding all the parties involved.

3           So, for instance, in this particular case, we have a

4  lot of parties involved.  And each one of them didn't know the

5  whole story.  When you don't know the whole story -- or excuse

6  me, you do know the whole story, when you do know all the

7  facts, it tends to assist someone in acting differently, having

8  more compassion and peacefulness in their approach to find out

9  what's going on as well as to stop anything that shouldn't be

10  going on as well as to create a solution, so ...

11          And just to be clear and to clarify regarding her --

12  the question that was asked about human capital, human capital

13  is you and you and you and you and you and all of us.  That's

14  human capital.

15          Again, the intelligence contacts that I may have been

16  working with for the last five years, there have been many

17  different ones that I've worked with throughout the years, and

18  through every single agency, intelligence agency, I really have

19  a respect, not just for intelligence agencies, but also the law

20  enforcement, as well as the militaries, these are ones that

21  I've worked with that truly want things to be cleaned up, they

22  just didn't know how to go about it.  And a lot of people died,

23  a lot of people disappeared, so we all worked together.

24          So by not being assigned or paid by any other agency,

25  I was able to work with all of them neutrally and not have bias

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1   against any of the others.  And so that's my reputation, and

2   that was another reason why -- not that I got asked to help,

3   but why I continued on and why I took a larger role in the

4   cleanup, was because of that, seeing everyone, not as a victim

5   but as if they had the awareness as a solution, as a leader.

6        Okay.  So the UCC, I got asked a lot of questions

7   about that.  Well, not asked a lot of questions.  It was you

8   believe that it doesn't exist.

9        Okay.  Here's the thing, in my work, it's

10  compartmental.  Everything is compartmentalized in life,

11  period, no matter where you are on this planet, it's always

12  compartmentalized.

13       Not -- for instance, DOJ doesn't know what goes on in

14  banking, other than what they're told.  Usually what they're

15  told is not the truth or it's a piece of the truth in order to

16  get them to act a certain way, okay, as an example.

17       So that has been the biggest problem is that nobody

18  knows actually what law has been the law of the land.  But I

19  can tell you in my experience and with the actual processes

20  that we use in banking, as well as in government, as you could

21  see in -- I believe it was Exhibit 3.

22       If you could bring up Exhibit 3, Francis, please --

23  or Mr. Lloyd.

24       THE COURT:  Defendants' Exhibit 3?

25       MS. TUCCI-JARRAF:  Defendants' Exhibit 3.  Thank you.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1       While he's doing that, the big question was, the UCC

2  has no relevance.  We've been dealing with that issue since I

3  got here in Tennessee.  It absolutely has relevance.

4       MS. DAVIDSON:  Objection, Your Honor.  You have held

5  that it has no relevance.

6       THE COURT:  Well, there was -- there was some

7  questions about the UCC, just in general in terms of the UCC in

8  its general applicability.  You can answer that.  So go

9  ahead --

10      MS. TUCCI-JARRAF:  I was just waiting for the exhibit

11 to show up where it actually states it, so it was the first

12 exhibit that we had put in yesterday from the Department of

13 Justice website regarding property.  Oh, I apologize.  It's

14 right here.  It doesn't have the sticker, though.

15      So it's utilized, but then every single agency,

16 branch, and department in the United States government, for

17 instance, so it's used even in the judicial -- this case

18 particularly was one where I had to go and make sure that the

19 monetizations didn't occur where the Federal Reserve could use

20 the monetizations and securities that get issued when there's a

21 defendant.  And especially when there's a conviction, the

22 monetary instruments get turned further into securities and

23 batched up and sold out.

24      So there were actions I had to take in this

25 particular case that we're in right now where I had to make

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    sure there were certain responses, rejections, et cetera, to

2    filings made -- and orders and stuff like that so that it

3    couldn't be monetized and fund the Federal Reserve to continue

4    any, let's just say, illegal activities rather than terrorism.

5         Did you get them?

6         So human capital is basically goods in transit,

7    because people are always moving, so that the Department of

8    Justice, Exhibit 3, that we looked at yesterday --

9         THE COURT:  Go ahead and put it on the screen.

10   Everybody agrees that's a copy of Defendants' Exhibit 3.  Go

11   ahead.

12        MS. TUCCI-JARRAF:  Okay.  This is Exhibit 3 that was

13   entered yesterday, and this is -- regards "Form 1649,

14   Protection of Government Property, Goods in Transit."

15        And in here it discusses that it's -- that the

16   application is determined by application of the Uniform

17   Commercial Code.  So most people don't know that.

18        And Department of Justice, such as Ms. Davidson, it's

19   not their job to know this stuff.  Their job is to do the

20   judicial part.  Okay.  But everything revolves in banking.

21   Everything is about commerce.  That was the issue with the UCC.

22        So, yes, it absolutely exists.  The Uniform

23   Commercial Code is what was used for the filings in this

24   particular instance.  There are offices you can go into, and

25   the state department has their own person that takes in the

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1   filings.  And a lot of times they have an online portal where

2   you can actually do the filings.  However, as of, I think,

3   early -- or late last year, they made it so you couldn't do

4   certain filings unless you took it in in person, so ...

5         Thank you, Mr. Lloyd.

6         Okay.  So I had been asked a question about praeterea

7   preterea and using Latin and all that stuff.  The way the

8   factualized trust is written, it's written for bankers, it's

9   written for attorneys that specify in or specialize in the UCC,

10   because we're talking about value.  That factualized trust

11   secures value.

12         Now, secures value means only you can use it.  If

13   it's only yours, only you can use it, and you have to give

14   authorization.  But it can't be the way that it was done before

15   where through deceptive acts and practices, you didn't realize

16   you were delegating authority for someone to use your value

17   without your knowledge.

18         That's what securing means was that it secured it to

19   each individual so only they have the authorization, and unless

20   they have all the material facts and awareness of the existence

21   of that value and its intended purpose, who it was being used

22   by, they had to have their -- what we call the finger on the

23   tail so that they had control over every aspect, because

24   they're responsible and accountable and liable for it.

25         Everyone is.  They just don't know it.  So it's --

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    sometimes actions occur where they don't understand why it's

2    occurring.  It's because there's a lot of stuff that's been

3    hidden behind the veil regarding this value.

4         All right.  So that's why I use those particular

5    words because they're used in banking.  And those are the ones

6    that would have to look at the factualized trust along with the

7    value and understand and know the anti-money laundering laws

8    and all the different regulations that would apply to value its

9    transportation or its transmission and its transfer.

10        So the words in that factualized trust are

11   specifically for the ones that would have to determine whether

12   there's title, ownership, and authority.

13        One People's Public Trust, there was some questions

14   about that and about frauds.  Is this the first fraud, I've

15   worked on other frauds?

16        I have worked on a lot of frauds, okay, Haiti,

17   Benghazi.  There have -- excuse me, the Bureau of Land

18   Management, so the Bundy case, for instance, I was in China in

19   December of 2008, and part of -- I was there to work on

20   cleaning up the corruption in Hong Kong with General Wang.

21        And during that, he received a call while we were

22   there, and it was basically offering a deal from our state

23   department for land -- gift of land, and that land happened to

24   be part of the land that the Bundys' issue was about.  That

25   case got dismissed on January 8th.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    MS. DAVIDSON:  Objection, Your Honor.  How are the

2  Bundys related to this?  Relevance.

3    MS. TUCCI-JARRAF:  I was questioned about the

4  different --

5    THE COURT:  Go ahead and talk about the One People's

6  Public Trust.

7    MS. TUCCI-JARRAF:  Thank you.

8    THE COURT:  I'll overrule the objection.

9    MS. TUCCI-JARRAF:  Okay.  Thank you.  Thank you.

10    So One People's Public Trust, that was just the name

11  of the trust.  As far as any activities or promotions or radio

12  shows that were done, campaigns, like opt in opt out, all that

13  stuff, I wasn't involved in any of that.

14    However, what was great about it was it really ended

15  up showing a lot of awareness, that there was opportunity for

16  awareness and then also that the people were choosing to be

17  aware, because you can't fix a problem unless you know exists,

18  number one, and then the level of awareness about the problem

19  allows for an informed decision on how to solve it.  So I did

20  not stop those particular people from doing those particular

21  activities.  However, I was not involved with them, and they

22  had nothing to do with the public trust tool that was used and

23  closed down.

24    In fact, I think some of those things went on after

25  the public trust had been closed down, like OPAL Tour which I

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1   was specifically asked about. OPAL Tour, I was in Morocco and

2   that was done in the U.S. You know, although I spoke to some

3   of the people while they were on it, because they are friends

4   of mine, I didn't have any involvement with that particular

5   tour, so I don't know too many particulars about that, about

6   that case.

7           But it wasn't -- people kind of just took off with

8   this One People's Public Trust and made it something else. And

9   that was fine, because at least in my eyes it made an awareness

10  and a reason for people to come and unify and ask questions.

11          That's the big goal is people to ask questions and

12  look for the information and make informed choices, which is

13  why I'm so big on transparency. There has to be transparency,

14  and there can be no transparency without complete context. So

15  why we might have transparency that banking exists, we do not

16  have complete context on how that banking actually works and

17  what they are actually using.

18          Because if they are using the commandeered value, it

19  might put you in a different state of mind or at least a mind

20  that would go and question's going on. Is this true? And

21  looking for the truth.

22          YouTube and all that, just to make it very, very

23  clear. I don't put anything out to the public for the purpose

24  of the public's awareness, so to speak. I'm more focused on

25  the cleanup of the financial system and the tools, so that --

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    and a lot of tools I create myself and then present over to the

2    different agent -- different agents that are currently using

3    the system, as well as the presidents of banks, the presidents

4    of corporations, the government itself, so that everyone can

5    come together and give their opinions, give their thoughts,

6    their concerns, and then it's refined.

7            So the mortgage scandal that I worked on, I've been

8    working on since 2009, and didn't get into a courtroom until

9    approximately the end of 2010, so there was a lot of

10   strategizing and a lot of working together with judges and

11   bankers and title companies and attorneys and whatnot, so --

12   real estate agents as well in order to go in and find a

13   solution without upsetting commerce and having it shut down

14   completely.

15           That's always a big issue.  That's a consideration we

16   take in completely.  So it's usually a long period of time

17   before you actually see changes.

18           In this particular instance, it wasn't a long time.

19   I just put in the first form, which you have now seen today,

20   and it was four pages -- or excuse me, three pages long when

21   formatted correctly.  Okay.  And it didn't have everything in

22   there.  It was just a starting point, and then additions go in

23   or refinements are made, but with everyone's -- everyone's

24   thoughts and concerns or suggestions.

25           So that was in June.  We hyperaccelerated.  I made

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1  the personal choice to hyperaccelerate this cleanup by

2  inserting myself into any case at this point -- or excuse me,

3  at that point, so even actions were taken so that I could make

4  sure, whether it was me entering into this case or me having a

5  case that was separate, either way, it all needed to come out.

6      So that was the intent behind -- the original intent

7  behind One People's Public Trust was making things visible and

8  at the same time securing everyone and their property so they

9  couldn't be used for terrorist acts or financial terrorism or

10 other illegal activity.

11     Ms. Davidson and Mr. Beane had asked specifically

12 about payments, had I received any payments.

13     No payment whatsoever.  That was truly a key issue.

14 We see that a lot happening right now, is that a lot of people

15 are getting in trouble for having received funds from

16 foundations or for campaigns and things like that, and it

17 taints whether or not they were serving a -- an outside

18 interest rather than the agency and the protocols and the

19 policies and the constitution that they signed up for.

20     So in order to make sure that there was no tainting

21 of any of the work that I specifically had done, that was a

22 protocol that I instituted myself, and I continued on.  I can

23 tell you, I never thought I'd be sitting here 20 years later

24 and it not being done by now.  So this is a big moment for

25 myself as far as the cleanup and it being made visible all

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    through D.C., but also around the world in countries like Saudi

2    Arabia and the United Kingdom.

3         Regarding Mr. Beane and directing him, I was asked

4    about if I had directed him.

5         Basically, I've always stated to Mr. Beane, as well

6    as anyone else who had come into contact with me, do what you

7    feel, do what you feel to do.

8         I will explain what I know from my own experience.

9    For instance, I had sat with Mr. Beane and -- or not sat with

10   him, but on the phone with him, and this was, I would say,

11   approximately on the 6th or the 7th, and explained to him that

12   this was not going to be easy, that there was so much more

13   involved, and at any point, it was his choice.

14        And I didn't mean as far as CDs and, you know, this

15   TDA account, which doesn't exist.  It's TreasuryDirect deposit

16   account.  But anything involving the Federal Reserve, I

17   expressed to him, brings a lot of heat down and a lot of very

18   extreme actions.

19        And I didn't know the details at the time, and I

20   explained that to him.  I didn't know all the details.  It

21   would make itself visible as we went, but he needed to only

22   move forward with what he felt good about, what he felt inside

23   to do.

24        And he -- I also explained that I would go, if there

25   was any heat that came down from anywhere and that I had had

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1  intel that there was heat coming down, that I would be with him

2  every step of the way, as you see me here today, sitting and

3  explaining all of this to you.

4          However, there was no conspiracy to hide money, to

5  even take money that wasn't Mr. Beane's.  I've actually worked

6  with these accounts and with this value.  I know it exists.

7          And whether or not Mr. Beane knew how the ACH system

8  worked or TreasuryDirect deposit accounts, he believed that the

9  value he was accessing was his.  I know the value that everyone

10  has the ability to access is theirs, but has been hidden and

11  has been commandeered, so ...

12          Okay.  At in no time was there conspiracy to hide

13  funds in an RV.  How do you find a 45-foot RV with a GPS,

14  tracking signal?  So you can find it anywhere.  For instance,

15  when I tried to find the RV to be able to know at least where

16  it was so that the proper steps could be taken to secure it, no

17  records were able to be found, other than at the sheriff's

18  office when I asked if they had impounded it, which was

19  information I had gotten while I was sitting in court listening

20  on July 18th.

21          There was no record of an RV, just that Mr. Beane had

22  turned himself in at headquarters, which, obviously, you've

23  heard here during the trial that wasn't the case.  So the RV, I

24  just said no problem, we'll grab it remotely through its GPS.

25          So these are things as far as no intent to hide

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    anything.  My intent was to expose everything, make it visible.

2    And there's a lot of information here that you've had to hear

3    that seemed -- might seem incredible, but it all is about

4    points of reference.  Not many people have a point of reference

5    with Federal Reserve other than it's a bank, and most people

6    think it's a federal bank.  It's not.  It's a private bank.

7           So that's one example of the data that's coming out,

8    and it's only going to continue, no matter what this case --

9    whatever happens to it.  Everything is coming out.  That was

10   the beauty of this case.

11          With USAA, Ms. Davidson had asked me regarding I

12   didn't give them any information.

13          I -- I did give them the information.  I didn't speak

14   of TreasuryDirect deposit accounts or any of that stuff while

15   we were on the phone.  That wasn't the information they were

16   seeking.  They were seeking whether or not it was a valid

17   transaction.

18          They were also seeking information whether the funds

19   were Randall Beane's, which they received the title, the

20   ownership as well as the origin of funds and history of funds,

21   which are the UCCs that were done from 2012 to 2013, inclusive

22   of the perpetuity that was done in May of 2000, which all the

23   bankers have, all the banking systems have, as well as the

24   highest levels of law enforcement and military, not just here

25   in the U.S., but around the world.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Redirect Examination

1    And we've been working consistently on creating a

2  solution to that private problem, called the Federal Reserve

3  and the Bank for International Settlements.

4    And that's why we were going to USAA.  Mr. Beane was

5  going to pick me up.  As long as the threat in Washington, D.C.

6  didn't turn imminent, I was going to San Antonio with Mr. Beane

7  to be able to speak with their president or their vice

8  president and their legal department.  They know exactly what

9  this stuff is.  They use UCCs all the time.

10    Regarding the Federal Reserve website, for me, the

11  Federal Reserve website is just a bunch of fluff.  There is

12  some things in there as far as what the -- the public is

13  supposed to be able to rely on it, if it's issued by the

14  Federal Reserve on their website.

15    So the information, I don't usually go to that

16  website.  I usually use our banking contacts directly or

17  intelligence contacts to be able to do the information, because

18  a lot of information they put out on their website is

19  incorrect.

20    Same with the Federal Bureau of Investigation, in my

21  experience, saying things are a fraud when they're not.

22  Especially like trading programs, those are not a fraud.  I've

23  worked on them.  I've actually prepared all the documents and

24  done all the transactions from A to Z regarding those, and yet

25  they are posted.

UNITED STATES DISTRICT COURT

1    I've never seen it on the Federal Reserve site.  They

2 don't talk about trading programs, but on the Federal Bureau of

3 Investigation, saying that it was a fraud, it was a scandal,

4 and it wasn't.  They just didn't want anyone to know unless

5 they were chosen to know.

6    I was asked about the warrants.

7    Again, South Carolina warrant wasn't in the NCIC.

8 When our people looked at it from July 11th forward, there was

9 no record of South Carolina, an active South Carolina warrant

10 out of South Carolina or anywhere else.  Until July 12th, there

11 were two -- there was one warrant on July 12th, one warrant on

12 July 13th.  But those weren't in the system.

13    My intelligence contacts pulled them from basically

14 every -- all the intelligence communities have access to every

15 single computerized program that's used in court systems,

16 education systems, medical offices.

17    I've actually worked with the gentleman, Michael

18 Short, who did all the consolidation for all the medical fields

19 in the United States.  They have access to be able to pull all

20 those.  They were the ones I had asked for whatever warrants

21 were in Randall Beane's name.

22    And I did another one on the 17th for that as well.

23 And when I got the paperwork, it was two warrants, one showing

24 for Jasper, Colorado, which doesn't even exist.  It wasn't

25 signed.  And then the other one, which was for South Carolina,

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Recross-Examination

1   which wasn't signed.  And since then, I've come to have

2   personal knowledge that they have been altered since July 18th.

3   But they have not been introduced into evidence.

4           Thank you.  That's all I have.

5           THE COURT:  Thank you.  That concludes redirect.

6           Mr. Beane, do you have any recross based on the

7   redirect?

8           MR. BEANE:  No.

9           THE COURT:  Ms. Davidson, recross?

10          MS. DAVIDSON:  Just briefly.

11                        **RECROSS-EXAMINATION**

12  BY MS. DAVIDSON:

13      Q    So the websites from the Federal Reserve and the FBI

14  are all fluff.  Right?  That's what you just testified to.

15          So if you had read that, you would have deliberately

16  ignored it, wouldn't you have, if you read that this whole

17  scheme was a fraud, you would have deliberately ignored it?

18      A    No.  I always take data in, but I do my own

19  assessments based on my personal knowledge as well as inquiries

20  that I make thereafter.  So, for me, most of the stuff that

21  they put on there, in my experience, has been fluff.  It's more

22  for the public so that they have a certain --

23      Q    Like you?

24      A    -- a certain reputation.  No.  I would not -- I mean,

25  yes, I'm part of the public.  However, my experience and my

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Recross-Examination

1    knowledge about the Federal Reserve or -- and with the Federal

2    Reserve is not consistent with the general public and their

3    experience with the Federal Reserve and their knowledge of the

4    Federal Reserve.

5        Q    And so you say you're knowledgeable about a hundred

6    sealed indictments at the Department of Justice.  That's just a

7    lie.  No one's knowledgeable about sealed indictments except

8    the grand jury.  Were you on the grand juries?

9        A    Actually, they're just showing sealed indictments.

10   So we're not able to see what they are, but they are showing on

11   PACER.

12       Q    Okay.  And you say that you have compassion for all

13   the people involved in this case, all the law enforcement and

14   the prosecutors, you have compassion for all of us.  But that's

15   not true.  You actually published all of Special Agent Parker

16   Still and his family and his parents, all that information on

17   the web, didn't you?

18       A    I don't know about Mr. Parker's family or his

19   parents.  As far as the discovery, which he had presented in

20   Washington, D.C., yes, I made sure that that particular

21   information was made public in our archives and --

22       Q    And his hometown and his parents and where he worked

23   and his family in Knoxville?

24       A    I didn't know there was -- I did not see information

25   that he gave me regarding his -- I had got FBI reports.  That

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Recross-Examination

1   was basically the gist of it as well as an identification,

2   thumbprint analysis that had been done regarding videos as well

3   that I -- video that I made so these -- that was the only

4   information they had.  I didn't have any information about his

5   hometown, where he was.

6           Are you talking about testimony, transcripts?

7       Q    No.  I'm talking about published information on the

8   web.

9       A    I don't know about his published information on the

10  web.  I just published the discovery, every piece of the

11  discovery that he had, and that was just to make sure that

12  things didn't -- basically that I made it from D.C. to

13  Tennessee.  That was it.

14          MS. DAVIDSON:  Thank you, Your Honor.  That's all I

15  have.

16          THE COURT:  Thank you.  That concludes the testimony.

17  You can return to --

18          MS. TUCCI-JARRAF:  Thank you.

19          THE COURT:  -- the table.  Let me ask you before you

20  leave, based on what you said yesterday, do you have additional

21  witnesses you wish to present?

22          MS. TUCCI-JARRAF:  At this time, I move to rest in my

23  case in chief.

24          THE COURT:  Okay.

25          MS. TUCCI-JARRAF:  Thank you.

UNITED STATES DISTRICT COURT

Heather Ann Tucci-Jarraf - Recross-Examination

1        THE COURT:  So Defendant Ms. Tucci-Jarraf rests on

2   her case in chief.

3        You can go ahead and return to the table,

4   Ms. Tucci-Jarraf.

5        MS. TUCCI-JARRAF:  Thank you.

6        THE COURT:  Does the government wish to call any

7   rebuttal witnesses?

8        MS. DAVIDSON:  Yes, Your Honor, we do.

9        THE COURT:  Go ahead.

10       MS. DAVIDSON:  Okay.  We recall to the stand,

11  Ms. Monica Alcala.

12       Your Honor, just for the record, she has not been

13  here during any of the defendants' case.  She left to go back

14  to USAA on Friday at lunch.

15       THE COURT:  Ms. Alcala, you've previously been sworn

16  in this case.

17       THE WITNESS:  Yes, sir.

18       THE COURT:  And that swearing in applies equally to

19  your testimony today, you understand?

20       THE WITNESS:  Yes, sir.

21       THE COURT:  Go ahead, Ms. Davidson.

22       MS. DAVIDSON:  Thank you, Your Honor.

23

24

25

UNITED STATES DISTRICT COURT

1    WHEREUPON,

2                        **MONICA ALCALA,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                        **DIRECT EXAMINATION**

6    BY MS. DAVIDSON:

7        Q    So we heard some -- during your direct testimony, we

8    heard some phone calls that were played.  Do you remember that?

9        A    Yes, I do.

10       Q    And you pulled those calls off the computer system?

11       A    Yes, I did.

12       Q    And we heard some calls from July 3rd, July 5th,

13   July 7th?

14       A    Yes.

15       Q    And when you were pulling those jail calls, did you

16   make -- I'm sorry, not jail calls -- USAA calls, did you make a

17   spreadsheet that reflected what information you got on the

18   computer system?

19       A    Yes, I did.

20       Q    Okay.  And would that spread -- was it based on the

21   computer records at USAA which were kept in the ordinary course

22   of business?

23       A    Yes, they were.

24       Q    And would that spreadsheet aid in your testimony here

25   today?

                    UNITED STATES DISTRICT COURT

1      A    Yes.

2           MS. DAVIDSON:  Okay.  And I'm going to show you

3  what's marked as Government's Exhibit 167.

4           Your Honor, at this time, I'd like to admit

5  Government's Exhibit 167.

6           THE COURT:  Any objection?

7           MS. TUCCI-JARRAF:  No.

8           MS. DAVIDSON:  May it be published to the jury?

9           THE COURT:  Is there any objection?  Mr. Beane, any

10  objection?

11          MR. BEANE:  No.

12          THE COURT:  Ms. Tucci-Jarraf?

13          MS. TUCCI-JARRAF:  She can go ahead.

14          THE COURT:  All right.  So admitted.

15      (Government's Exhibit 167 admitted into evidence.)

16  BY MS. DAVIDSON:

17      Q    This references the calls from the 5th through the

18  7th.  Right?

19      A    This is for all transactions for any time anybody

20  went into Mr. Beane's profile at USAA.

21      Q    Okay.  And when you say anyone went into his profile,

22  what does that mean?

23      A    Whether it was phone calls or if that representative

24  who took the phone call called our help desk to maybe help

25  clarify some questions that they might have.  The receiver, the

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    help line representative also goes into the profile so that

2    they can see all the information and know how to answer the

3    questions.  So those were also documented.  So any time anybody

4    opened up the profile for Mr. Beane, it was -- it records that

5    information.

6         Q    Okay.  And I'm going to show you -- so this has every

7    single call from -- and the employee number -- what's the

8    employee number?

9         A    The employee number is the number that USAA provides

10   us as employees.

11        Q    Okay.  And what is the green lines?

12        A    The green -- so USAA has multiple third-party

13   companies that assist us with phone calls, basic banking phone

14   calls.  So what I did is, I went in and looked at the employee

15   number to determine which location each employee worked at, and

16   the green was for USAA internal employees that worked in the

17   San Antonio office.

18        Q    Okay.  And what was the yellow?

19        A    Yellow is Teleperformance, which is one of our

20   third-party contract companies.

21        Q    Okay.  And what is TeleTech?

22        A    Yeah.  TeleTech and Sitel are also third-party

23   companies we utilize throughout the United States to take our

24   basic banking calls.

25        Q    Okay.  And the -- the call on 7/7/17 at 7:50 a.m.,

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1    which call is that, with Jeffrey Eichelberger?

2        A    That was the call we listened to, that was the wire

3    transfer for that large amount for the RV.

4        Q    Okay.  That was 7:50 a.m. Central Standard Time?

5        A    Yes.  All times on here are Central Standard Time.

6        Q    Okay.  And the call on 7/7 at 7:12 p.m. Central

7    Standard Time, who was that call by?

8        A    That was --

9        Q    Taken by?

10       A    That was Steven Dyer.  That would be Teleperformance

11   in Utah.

12       Q    Okay.  And I'm going to show you what's been marked

13   as Government's Exhibit 166.  Just for the witness.  They

14   haven't seen this yet.  I'm sorry, the witness and the

15   defendants.

16            Do you recognize 166?

17       A    Yes, I do.

18       Q    And is this a document that reflects the information

19   that you placed in this spreadsheet with regard to one

20   particular call?

21       A    Yes, it is.

22       Q    And where did you get this document?

23       A    This is actually the portal information that USAA

24   uses to recognize our customers, and it's held in our normal

25   course of business.

UNITED STATES DISTRICT COURT

1          MS. DAVIDSON:  Okay.  At this time, I'd like to admit

2    Government's Exhibit 166.

3          THE COURT:  Any objection, Mr. Beane?

4          MR. BEANE:  No.  No objection.

5          THE COURT:  Ms. Tucci-Jarraf?

6          MS. TUCCI-JARRAF:  No.

7          THE COURT:  So admitted.  Thank you.

8        (Government's Exhibit 166 admitted into evidence.)

9    BY MS. DAVIDSON:

10        Q    So this can be published.

11             Okay.  In the highlighted call, referenced there at

12   7:12 p.m., and that is -- who does it say took this call?

13        A    So when you click on that line, when you open up the

14   member's information, if you click on it, below that, it gives

15   you detailed information.  And that's what I pulled to put on

16   the spreadsheet.

17             So it says at 7/7/2017, at 7:12 p.m., Steven Dyer and

18   his employee number is who took the call.

19        Q    And this is 7:12 p.m. Central Standard Time.  Right?

20        A    Yes, ma'am.

21        Q    8:12 Eastern?

22        A    Correct.

23        Q    Okay.  Did Mr. -- did someone use Mr. Beane's member

24   number call on the 8th?

25        A    Yes.

UNITED STATES DISTRICT COURT

Monica Alcala - Direct Examination

1      Q      And who took that call?

2      A      If you could go back to the spreadsheet, I can tell

3   you.

4      Q      Okay.  I'm sorry.  Can you put it back up there?

5      A      So on 7/8, there was only one call that was done at

6   1:41 p.m. Central Standard Time.  That, when I pulled the

7   information, said unknown, because the employee no longer works

8   at USAA.  So at the time of the data pull, I didn't have the

9   information.

10     Q      Okay.  And let's go back to Government's Exhibit 79.

11            Do you recognize Government's Exhibit 79?

12     A      Yes, I do.

13     Q      And if you could go to the second page, David.  If

14   you would highlight the call at 1:41 on 7/8.

15            Okay.  And what is the phone number listed there?

16     A      So this is just telling you that on 7/8 what matches

17   the contact history.  It says it was taken by telephone for a

18   member service representative, and that phone number was (865)

19   693-7611.

20     Q      And did you research on your computer who made that

21   call?

22     A      I show that that is not Randall Beane's phone number,

23   that we have listed for him, and I believe it was -- it was a

24   dealership.  I don't remember offhand, the name.

25     Q      Okay.  And I'm going to show you what's been marked

UNITED STATES DISTRICT COURT

1    as Government's Exhibit 168.

2              And the defendants have not seen this.

3              Do you recognize this?

4    A    Yes, I do.

5    Q    And what is 168?

6    A    This is internal documentation that is stored by USAA

7    under the member profile.  Any time there's specific notes or

8    comments that need to be made, a bank representative will type

9    that in, and the system will capture the date, time, and who

10   submitted it.  Once it's entered, it can't be altered or

11   changed.

12   Q    Okay.  And --

13             THE COURT:  Is there any objection to 168?

14             MS. TUCCI-JARRAF:  If it could just be blown up, I

15   can't actually read it.

16             MS. DAVIDSON:  Here.

17             MS. TUCCI-JARRAF:  Oh, thank you.

18             I have no objection.

19             THE COURT:  Mr. Beane?

20             MR. BEANE:  No.

21             THE COURT:  Okay.  So admitted.

22        (Government's Exhibit 168 admitted into evidence.)

23   BY MS. DAVIDSON:

24   Q    Can we publish it to the jury?  It's very small.

25             Could you read what it says, and this is at 7/8/17 at

UNITED STATES DISTRICT COURT

1  1:44 p.m. Central Standard Time.

2      A    Right.  So at the time -- so the call happened, and

3  then the representative will have notated what the call was

4  about, anything out of the ordinary or unusual.  On this one,

5  it does say, "Dwayne, Ted Russell Ford," gave a phone number,

6  "(865) 384-6949, called in to verify a check.  Told him no it's

7  not going to go through.  I couldn't tell him it's credits

8  only."

9      Q    Okay.  And let's go back on -- to Government's

10 Exhibit 167.

11           So what are the dates of all of these calls?

12     A    7/8 of 2017.

13     Q    7/7, the times?

14     A    On -- the times for 7/7?

15     Q    Yes.  If you could highlight all the calls from 7/7

16 and the people that they spoke to.

17     A    So on 7/7, the phone calls were taken between

18 7:50 and eight -- 7:50 a.m. to 8:21 p.m., Central Standard

19 Time.

20     Q    Okay.  And -- the ones that say "internal," explain

21 to me what that is.

22     A    So each one, David Parker -- so not in green.  You

23 want just the green or just anything internal?

24     Q    Just anything -- it says "telephone, internal,

25 internal."  What does "internal" mean?

UNITED STATES DISTRICT COURT

1    A    Internal is going to reflect that there was not a

2  direct phone call to that representative.  So David Parker,

3  internal, because he was reviewing the wire.

4         The next three in green that say internal, those were

5  our consumer loan representatives that were actually calling

6  out to Mr. Beane, so they go internally to his profile, because

7  they didn't receive directly a phone call.

8    Q    And so these three calls at 10:39, 10:48, 10:51,

9  those are the people calling him regarding his consumer loans?

10   A    Yes.  Those are the ones who were calling to let him

11 know that his payments did not clear.

12   Q    Okay.  And then we discussed the 7/7 call to Steven

13 Dyer?

14   A    Correct.

15   Q    Okay.  Let's go back to the transactions that

16 happened on 7/3/2017.

17        Okay.  I'm going to show you what's been marked as

18 Government's Exhibit 169.

19        And what is Government's Exhibit 169?

20   A    This is the information that would have been added by

21 Randall Beane, providing us with a routing number and an

22 account number for an external bank account that he wanted to

23 utilize.

24   Q    Okay.  And where did you get this document?

25   A    This is also on the portal on the membership

1    information that USAA stores in its normal course of business.

2            MS. DAVIDSON:  Your Honor, at this time, I'd like to

3    admit Government's Exhibit 169.

4            THE COURT:  Any objections?

5            MS. TUCCI-JARRAF:  No.

6            MR. BEANE:  No.

7            THE COURT:  All right.  So admitted.

8        (Government's Exhibit 169 admitted into evidence.)

9    BY MS. DAVIDSON:

10       Q    Okay.  Explain what Government's Exhibit 169, now

11   that the jury can see it, is.

12       A    At the very -- starting from the bottom to the top,

13   it tells you when -- the ID tells you who added this

14   information, how it was done, and it says "Add" and the date

15   and time.

16           At the very top, it tells you what's provided to us

17   by the customer, so their account number, the routing number.

18   One of the questions that we asked when you add this is if

19   you're assigned authority, and that's what would determine the

20   to and from on it.  So this is what you would add when you pay

21   a bill or want to do a funds transfer, an ACH.

22       Q    Okay.  And what is the -- what is the last line here?

23       A    That last line is -- just indicates that the member,

24   Randall Beane, went on the Internet, the web, added the account

25   on 7/3 at 4:55 p.m. Central Standard Time.

                    UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1       Q    Okay.  If you could go back to the big screen,

2  please.  And can you blow up the account number and transit

3  routing number.  I'd like both of them, please.  Thank you.

4            And what account number is that?

5       A    That's Randall Beane's Social Security number.

6       Q    And that transit routing number, where does that

7  transit routing number go to?

8       A    The Federal Reserve Bank.

9            MS. DAVIDSON:  May I have a moment?

10           THE COURT:  Yes.

11           MS. DAVIDSON:  That's all I have of this witness.

12           THE COURT:  Any cross-examination by either

13  defendant?

14           MS. TUCCI-JARRAF:  I have a few questions.

15           THE COURT:  Go ahead.

16                      **CROSS-EXAMINATION**

17  BY MS. TUCCI-JARRAF:

18      Q    Without prejudice, a few questions.

19           David, do you mind putting Exhibit 169 back up for

20  me, please.

21           Good afternoon, Ms. Alcala.  Am I saying that right?

22      A    Yes.

23      Q    Okay.  Thank you.  So in Exhibit 169, I have a

24  question, is this produced by your wire room?

25      A    No, ma'am.

UNITED STATES DISTRICT COURT

1    Q    Okay.  I'm sorry if I missed it, but could you please

2    repeat who actually produces this report?

3    A    This is stored under Randall Beane's profile.

4    Q    Okay.

5    A    Based off of the information that -- on this one, he

6    provided it, the account number, routing number, so we just

7    pull that data from his membership profile.

8    Q    So like an activity log?

9    A    It's like that, but this is for account -- it's

10   account activity, account detail activity.

11   Q    So any details he wants to change about his account,

12   like settings, this is what this report would be?

13   A    No.  This is for USAA only.  So he would not -- he'll

14   see the account number and the routing number, but everything

15   underneath, the activity, that's for USAA only for us to

16   determine when an account was added, when it was verified, if

17   it's been restricted, who restricted it.  So this is what we

18   keep as our internal audit log.

19   Q    Okay.  At any time, did you -- at any time -- are you

20   aware of at any time any USAA employee actually going over this

21   log with Mr. Beane?

22   A    I don't know that anybody went over it with him.

23   Q    Okay.  I noticed that on Exhibit 168 -- David, if you

24   could help me with that, please.  Thank you.  On Exhibit 168,

25   and if you could help me blow that up so we could read that

UNITED STATES DISTRICT COURT

1    note, please.

2              So this was July 8th.  Correct?

3        A    Correct.

4        Q    2017.  And can you read that -- read that part -- is

5    this actually a note of what was said by a USAA employee?

6        A    Part of it is what was given to him.  So I can do it

7    with punctuation, because it doesn't look like they added any.

8        Q    Thank you.

9        A    So Dwayne from Ted Russell Ford called.  This is a

10   number that he provided, not necessarily the business phone,

11   but it could be his cell phone.

12       Q    Okay.

13       A    Said that that person called in to verify a check,

14   period.  The representative would have told him, no, it's not

15   going to go through, period.  And the rep is saying, personally

16   I can't tell him that the account is in credits only.

17             So the only thing he probably would have -- the rep

18   would have said is that the check is not going to go through.

19       Q    And what does it mean "credits only"?

20       A    "Credits only" means that USAA put it in a status to

21   where no funds could be depleted, but if money was coming into

22   the account, that that would still be allowed.

23       Q    Okay.  So not credits that you're waiting for from

24   the Federal Reserve?

25       A    Yes.  That would be included as a credits only,

                    UNITED STATES DISTRICT COURT

1    coming in.  So we were still allowing money to come in, but if

2    we were sending a wire transfer out, ATM withdrawals, or checks

3    to be debited, any debits from the account would not be

4    allowed.  Any incoming credits, including money from a funds

5    transfer, was allowed.

6         Q    Okay.  Was any of this explained to Mr. Beane

7    regarding the credits only versus if he put money in to

8    deposit?  Did anyone at USAA Bank attempt to speak with him

9    about the difference?

10        A    I don't know.

11        Q    Okay.  Did you attempt to speak with him about the

12   difference?

13        A    No.  At that point that the money was gone, I did not

14   contact him.

15        Q    And why was that?

16        A    At this point, the money had already left and it was

17   considered an investigation.  And I do not call out to somebody

18   until I've done enough gathering of information.

19        Q    At what point had you done enough gathering of

20   information, before he was arrested or after he was arrested?

21        A    Before he was arrested, I would have had --

22   everything would have been done on the 10th.  We had enough

23   information showing the routing number, the account number,

24   where the funds were pulled from, where the money went, so that

25   would have been on the 10th.

UNITED STATES DISTRICT COURT

1      Q     On the 10th.  Let me see if I have any other

2   questions for you.

3      A     Sure.

4      Q     On the call sheets, the worksheet was for, which was

5   Exhibit 167, which I don't need up, but that was just for

6   calls.  Did you have one for actual activity, a worksheet for

7   actual activity of Mr. Beane going in, showing September -- or

8   July 3rd through the 10th?

9      A     That's on the authentication log.  I don't remember

10  which exhibit.

11     Q     Oh, that was the authentication?

12     A     Yeah.  Just to clarify, this is all USAA employees

13  that contact -- that was opening Mr. Beane's profile.  So any

14  time we have to gather information, not just calls, so that

15  spreadsheet that I made was for any time somebody opened up

16  Mr. Beane's profile, whether it be to look for the fraud,

17  because of a call or answering a help line question.

18     Q     Okay.  Thank you for that clarification.

19     A     Uh-huh.

20           MS. TUCCI-JARRAF:  I don't have any further

21  questions.  Thank you.

22           THE COURT:  Thank you.

23           Mr. Beane, any questions?

24

25

UNITED STATES DISTRICT COURT

1          **CROSS-EXAMINATION**

2          MR. BEANE:  Could we pull up, I think it's

3   Exhibit 167.  The one you're holding there, what is that one?

4          MS. DAVIDSON:  167.

5   BY MR. BEANE:

6     Q    What's your last name, again?

7     A    Alcala.

8     Q    How do you spell that?

9     A    A-l-c-a-l-a.

10    Q    I just had USAA Monica on here.  I didn't write -- if

11  we go down to the last line here on the 10th, there was a call

12  made that morning at 8:45.  Correct?

13    A    That says that it was internal.

14    Q    It says it was internal?

15    A    Yes.

16    Q    Okay.  I do have a question about the recording that

17  was played for the Court concerning the conversation that took

18  place between two USAA employees while I was on hold.

19         I wanted to confirm with you for the jury that I was

20  on hold during that call, so I did not hear -- I was not privy

21  to the backside of that conversation which is recorded by USAA

22  and not recorded by me?

23    A    That's correct.

24    Q    All right.  Also, let's go to Exhibit 169, please.

25         I don't see any activity between the 3rd and the 6th.

                UNITED STATES DISTRICT COURT

Monica Alcala - Cross-Examination

1    Does that mean there was no activity on the 4th or the 5th?

2        A    For this account, we would have to look at the other

3    exhibits that were provided that showed the payments.  This is

4    just, again, for USAA's information to know whether -- when an

5    account was added or when it was verified, confirmed as

6    yours --

7        Q    Okay.

8        A    -- or whether it was restricted.  So that does not

9    track money movement or any transactions.  It's just --

10       Q    Just open an account is all it tracks?

11       A    It's documenting when you provided us with an

12   external bank.

13       Q    Okay.

14       A    If and when the external bank was confirmed.

15       Q    Okay.

16       A    And if and when we restrict a bank account.

17       Q    Okay.  Document 168, please.  According to your

18   testimony a few minutes ago, you said my account was set up for

19   credits only.  According to my -- what was shown on my phone,

20   it said I needed to sign a signature card.  Would that -- why

21   was that posted on my account instead of someone contacting me

22   and asking me what was going on here?

23       A    Right.  So I'm not sure why you got that message that

24   you needed a signature card.

25       Q    Is that a valid screen that would show up on my phone

UNITED STATES DISTRICT COURT

Steven Dyer - Direct Examination

1  with USAA?

2      A    Depending on if the credits only, so that could

3  trigger it to say -- because if we didn't have a signature

4  card, that could be another reason.

5      Q    Okay.  So as a customer, if I saw I needed a

6  signature card, all I would think is I needed a signature card?

7      A    Correct.

8          MR. BEANE:  Okay.  No further questions.

9          THE COURT:  Thank you.

10         Any redirect?

11         MS. DAVIDSON:  No, Your Honor.

12         THE COURT:  All right.  Thank you.  This witness may

13  be excused.

14         Any additional --

15         MS. DAVIDSON:  Mr. Steven Dyer.

16  WHEREUPON,

17                      **STEVEN DYER,**

18  was called as a witness and, after having been first duly

19  sworn, testified as follows:

20                   **DIRECT EXAMINATION**

21         THE COURTROOM DEPUTY:  Have a seat.  Scoot as close

22  as you can.  State and spell your name for the record.

23         THE WITNESS:  Steven Dyer.  S-t-e-v-e-n, D-y-e-r.

24  BY MS. DAVIDSON:

25     Q    And, Mr. Dyer, where do you work?

UNITED STATES DISTRICT COURT

Steven Dyer - Direct Examination

1    A    I work at a call center, Teleperformance.  It's --

2  our client is USAA.

3    Q    Okay.  And Teleperformance, you work at a call

4  center.  What does Teleperformance do?

5    A    We are just a basic company for different clients.

6    Q    Okay.  And you said a telecommunications company?

7    A    Yes.

8    Q    So you answer phone calls?

9    A    Correct.

10    Q    And how long have you done?

11    A    I've done that for a year and a half now.

12    Q    And what do you do -- do you only take phone calls

13  for USAA Bank?

14    A    Correct.

15    Q    And does your company take phone calls from other

16  banks?

17    A    No.

18    Q    Okay.  You personally, do you only take phone calls

19  from USAA Bank?

20    A    Yes.

21    Q    And how many calls do you take a day?

22    A    40 to 50 calls a day.

23    Q    Okay.  And does USAA make a recording of these calls

24  that you take?

25    A    Yes, we do.

UNITED STATES DISTRICT COURT

Steven Dyer - Direct Examination

1          MS. DAVIDSON:  If we could play Government's

2   Exhibit 86.

3          THE COURT:  It's already in evidence?

4          MS. DAVIDSON:  It is.

5          THE COURT:  Go ahead.

6       (Audio played in open court; not reported.)

7          MS. DAVIDSON:  Could you pause it?

8       (Audio paused in open court.)

9   BY MS. DAVIDSON:

10       Q    Do you recognize your voice?

11       A    Yes.

12       Q    Is that you?

13       A    Yes.

14       Q    Do you remember this call?

15       A    I do.

16          MS. DAVIDSON:  Okay.  Could you play a little bit

17   more of it?

18       (Audio played in open court; not reported.)

19          MS. DAVIDSON:  Okay.  Could you pause it?

20       (Audio paused in open court.)

21   BY MS. DAVIDSON:

22       Q    So what stood out about this call of all the calls

23   you take every day?

24       A    What stood out, the fact that when I asked him what

25   bank the trust came from, normal -- normally, you know,

UNITED STATES DISTRICT COURT

Steven Dyer - Cross-Examination

1    everybody knows where their trust is.

2         Q    And he didn't tell you?

3         A    He couldn't tell me.

4         Q    And he had millions of dollars at this bank,

5    according to him?

6         A    Correct.

7         Q    And did that seem odd to you?

8         A    That seemed very odd.

9         Q    And did -- if he had said, you know, my trust account

10   is at the Federal Reserve, would that have raised red flags to

11   you?

12        A    Absolutely.

13             MS. DAVIDSON:  That's all I have of this witness.

14             THE COURT:  Thank you.

15             Any cross-examination by either defendant?

16             Mr. Beane?

17             MS. TUCCI-JARRAF:  I just had a quick question.

18             THE COURT:  Ms. Tucci-Jarraf, go ahead.

19             MS. TUCCI-JARRAF:  Thank you.

20                        **CROSS-EXAMINATION**

21   BY MS. TUCCI-JARRAF:

22        Q    Without prejudice, I just have a couple of quick

23   clarifying questions.  And it's Mr. Dyer?

24        A    Yes.

25        Q    Mr. Dyer, you went in there, and, obviously, you read

                 UNITED STATES DISTRICT COURT

1  his profile -- or opened his profile, I should say.  Is that

2  correct?

3       A    Correct.

4       Q    Is that the same profile that's at USAA?  Is that

5  whose portal you accessed to be able to get that profile?

6       A    Correct.

7       Q    Okay.  And this call was on what date?

8       A    It was on July 7th.

9       Q    And you had stated that after you took some time to

10  read the notice, you had stated that the CD was showing as

11  returned?

12       A    Correct.

13       Q    Okay.  Was there any other notes that were there?

14       A    No.

15       Q    It didn't say anything about ACH credits -- or excuse

16  me, credits only or anything like that?

17       A    It said there were credits only, yes, but it did not

18  have any other notes.

19       Q    Can -- David, can you please pull up Exhibit 168,

20  please.  And if you could blow it up just so we could see the

21  notes, please.

22            MS. DAVIDSON:  Your Honor, I don't think this witness

23  has any personal knowledge of this note.

24            THE COURT:  Go ahead and ask the question, see if he

25  does.

Steven Dyer - Cross-Examination

BY MS. TUCCI-JARRAF:

 1    Q    Okay.  When you opened up the profile on July 7th, is

 2  there a window that looks similar to this one?

 3         Not the highlighted one, just the actual -- can you

 4  unhighlight that for me, please, David.  Thank you.

 5         Would it look similar to this window?

 6    A    Yes.

 7    Q    Okay.  And so the note would be there to the right so

 8  you'd be able to see it?

 9    A    The note on the right?

10    Q    Is this how it's formatted when you pull up the

11  window?

12    A    Yes.  Yes.

13    Q    So in that particular window of notes, in there is

14  where you say that it shows that it was ACH -- or excuse me,

15  credits only?

16    A    No.  Not in there, not in the comments, or the O docs

17  is what we call it.

18    Q    Where did you say -- where did you see --

19    A    Credits only will be right next to where the checking

20  account, each checking account is.

21    Q    Okay.

22    A    In a different section.

23    Q    Okay.  And it would say right next to it, "Credits

24  only"?

UNITED STATES DISTRICT COURT

Steven Dyer - Cross-Examination

1     A     Right next to each checking account.

2     Q     Okay.  And that's what you saw that day was, "Credits

3  only, credits only"?

4     A     Right.

5     Q     Where would the returns have been posted, to the

6  right of that?

7     A     Yes.  On the transaction report.

8     Q     Okay.  So next to each account, after each account,

9  it said, "Credits only," and then after that it said,

10  "Returned"?

11     A     Yes.

12     Q     Okay.  Did it say, "Account not found"?

13     A     No.

14     Q     Did it say, "Restricted"?

15     A     No.

16     Q     Okay.  So just "Returned," that was it?

17     A     Correct.

18     Q     And you didn't tell Mr. Beane that said credits only?

19     A     Yes.

20     Q     You did tell him that it said credits only?

21     A     Yes.

22     Q     Or did you tell him that it said returned?

23     A     I told him both.

24     Q     You told him both?

25     A     Yes.

UNITED STATES DISTRICT COURT

Steven Dyer - Cross-Examination

1    Q    Did you explain to him what credits only meant?

2    A    I don't remember.

3    Q    Do you know what credits only means?

4    A    Yes.  That only credits can go in and no debit.

5         MS. TUCCI-JARRAF:  No debits.  Okay.

6         Thank you.  I have no further questions, Mr. Dyer.

7         THE COURT:  Thank you.

8         Mr. Beane, any questions?

9                     **CROSS-EXAMINATION**

10   BY MR. BEANE:

11   Q    Hello, Mr. Dyer.

12        Do you recall asking me about the name of the bank

13   and I -- do you recall what my answer to you was?

14   A    Yes.

15   Q    What was that answer?

16   A    Your answer was, "I don't know."

17   Q    And that?

18   A    I don't remember the rest.

19   Q    Did I ask you -- did I say to you that I had written

20   it down on a Post-it Note and I left it in my briefcase and I

21   didn't have my briefcase with me?  Do you remember me saying

22   that statement?

23   A    I don't remember that.

24        MR. BEANE:  Okay.  Thank you very much.

25        THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

Steven Dyer - Cross-Examination

1          Any redirect?

2          MS. DAVIDSON:  No, Your Honor.

3          THE COURT:  All right.  Thank you, Mr. Dyer.  You may

4     be excused.

5          MS. DAVIDSON:  Want the next one?

6          THE COURT:  How many more with rebuttal?

7          MS. DAVIDSON:  We have three more, but they're all

8     short.

9          THE COURT:  I was hoping to let the jury go by the

10    afternoon break, but we may have to take a break and then come

11    back.  Why don't we take about a ten-minute -- try to limit it

12    to ten minutes, come in, and see what we can get done.

13         (Jury out at 3:33 p.m.)

14         THE COURTROOM DEPUTY:  This honorable court shall

15    stand in recess.

16         (Recess from 3:34 p.m. to 3:43 p.m.)

17         THE COURTROOM DEPUTY:  This honorable court is back

18    in session.

19         THE COURT:  Ready for the next witness?

20         MS. DAVIDSON:  Oh, I'm sorry.  Terry Wilshire.

21         MS. SVOLTO:  Yes.  We're ready for the next witness.

22    It's Terry Wilshire.  We're recalling Terry Wilshire.

23         THE COURT:  Let's bring our jury in.

24         (Jury in at 3:45 p.m.)

25         THE COURT:  Thank you.  Everyone may be seated.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1        The courtroom deputy will swear in the next witness,

2   please.

3        THE COURTROOM DEPUTY:  He's been sworn.

4        THE COURT:  Oh, excuse me.  This witness, you've

5   previously testified?

6        THE WITNESS:  I did, sir.

7        THE COURT:  That's right.  Thank you for the

8   reminder.  Remind you you're still under oath for purposes of

9   your trial testimony.

10       THE WITNESS:  Yes, Your Honor.

11       THE COURT:  Go ahead, Ms. Svolto.

12       MS. SVOLTO:  Thank you.

13  WHEREUPON,

14                        **TERRY WILSHIRE,**

15  was called as a witness and, after having been first duly

16  sworn, testified as follows:

17                    **DIRECT EXAMINATION**

18  BY MS. SVOLTO:

19     Q    Captain Wilshire, can you remind us where you work

20  again?

21     A    I work for Knox County Sheriff's Department,

22  currently assigned as assistant facility commander at the Roger

23  D. Wilson Detention Facility.

24     Q    And so what are some of the primary job

25  responsibilities that you have there?

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1      A      One of the main ones, I'm over the intake center

2  where everyone is booked and processed upon booking or release.

3  I'm over that, the sex offender registry for Knox County.  I'm

4  also over all the database systems that have to do with

5  anything with fingerprints or mug shot information that can be

6  used, over the phone system, also over the 287(g) program.

7      Q      You mentioned bookings and processing.  When you say

8  that, do you mean intake processing?

9      A      Yes.

10     Q      And what does that entail exactly?

11     A      When someone comes in, we identify them for who they

12 are by fingerprints and/or mug shot information.  We run

13 database searches to ensure we have the proper person in

14 custody for the charges that are going to be presented to the

15 courts.

16     Q      How are those folks typically brought into the

17 facility?

18     A      How are they brought in?  Usually by the arresting

19 officer and/or a paddy wagon.  They may bring in multiple

20 arrestees at once.

21     Q      In the course of that process, does the facility

22 maintain records for each of the inmates that it's processed?

23     A      Yes, we do.

24     Q      Would those records include forms and information

25 about the previous warrants and things like that?

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    A    Yeah.  We maintain a database that shows all prior

2  arrests by booking number.  And then all those have contained

3  any warrants or information that would -- each booking is

4  specific itself.  We maintain a hard copy and electronic copy.

5    Q    Are those records kept in the ordinary course of

6  business?

7    A    Yes.

8    Q    If I could show for the witness and defense only

9  what's been marked as Government Exhibit 170.

10         I'm just going to ask you if you recognize this.  Do

11  you recognize this document?

12    A    Yes.

13    Q    All right.

14    A    That's a mug shot taken with our data work system.

15    Q    Okay.

16         THE COURT:  Any objection?

17         MR. McGRATH:  I'm sorry.  We were --

18         THE COURT:  Any objection to this document?

19         MR. BEANE:  No.

20         THE COURT:  Ms. Heather Ann Tucci-Jarraf?

21         MS. TUCCI-JARRAF:  Oh, no, I do not.

22         THE COURT:  Thank you.  So admitted.

23      (Government's Exhibit 170 admitted into evidence.)

24  BY MS. SVOLTO:

25    Q    All right.  So I'm going to move on to Government

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1   Exhibit 171.

2           And do you recognize that document?

3       A   Yes.  That was in the inmate's file.  That's a copy

4   of the warrant that he was wanted for in South Carolina.

5       Q   All right.  And is this record also kept in the

6   ordinary course of business?

7       A   Yes, it is.

8           MS. SVOLTO:  I'd like to go ahead and move to admit

9   that.

10          THE COURT:  Any objection?

11          MS. TUCCI-JARRAF:  No objection.

12          THE COURT:  Mr. Beane?

13          MR. BEANE:  No.

14          MS. SVOLTO:  I'd like to --

15          THE COURT:  So admitted.

16          MS. SVOLTO:  Thank you.  Sorry.

17      (Government's Exhibit 171 admitted into evidence.)

18          THE COURT:  Show it to the jury now.

19          MS. SVOLTO:  I'm going to go through them

20  individually.  I'd like to go ahead and admit them.

21  BY MS. SVOLTO:

22      Q   Can we go to Exhibit 173.  Is there a second page to

23  that document?  All the way through.  That's the end.

24          Do you recognize that document as well?

25      A   Yes, I do.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    Q    And also kept in the ordinary course of business?

2    A    Yes, it's also kept electronically through our jail

3   management system.

4         MS. SVOLTO:  All right.  I'd like to move to admit.

5         Could you go back one page, David?

6         MS. TUCCI-JARRAF:  Thank you.  No objection.

7         THE COURT:  Mr. Beane, any objection?

8   Ms. Tucci-Jarraf --

9         MR. BEANE:  No.

10        THE COURT:  -- had no objection.  Do you have any

11  objection?

12        MR. BEANE:  No.

13        THE COURT:  Thank you.  So admitted.

14     (Government's Exhibit 173 admitted into evidence.)

15  BY MS. SVOLTO:

16    Q    All right.  Government's Exhibit 174.

17        Do you recognize this document?

18    A    Yes, I do.

19    Q    And I think there's a second page to this document,

20  too, David.

21        All right.  Also kept in the ordinary course of

22  business?

23    A    Yes, it is.

24        MS. SVOLTO:  All right.  Go ahead and move to admit

25  that exhibit now.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

 1          MS. TUCCI-JARRAF:  No objection.

 2          THE COURT:  No objection by Ms. Tucci-Jarraf.

 3          Any objection, Mr. Beane?

 4          MR. BEANE:  No.

 5          THE COURT:  Thank you.  So admitted.

 6      (Government's Exhibit 174 admitted into evidence.)

 7  BY MS. SVOLTO:

 8      Q    I'd like to show you now what's been marked for

 9  identification as Government's collective Exhibit 175.  This is

10  175A.

11          Do you recognize that document?

12      A    Yes, I do.

13      Q    What is this document?

14      A    That's a -- we call it a cover sheet.  It's actually

15  an initial booking sheet.  Whenever we house someone that's

16  newly brought in, it's starts the course of our process.  So it

17  shows the date and time we received the person, then when we

18  started our pat-down process, and all the way through the

19  release of the inmate.

20      Q    All right.  Could we go to 175B, please?

21          And you recognize this document as well?

22      A    I do.

23      Q    And 175C, do you recognize?

24      A    Yes.

25      Q    And 175D?

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1      A    Yes.

2      Q    And are all of these documents kept in the ordinary

3  course of business at the facility?

4      A    Yes, ma'am.

5      Q    And they're kept at or near the times that the events

6  occurred?

7      A    Yes.

8      Q    I'd like to move to admit Government's collective

9  Exhibit 175.

10          MS. TUCCI-JARRAF:  No objection.

11          THE COURT:  Mr. Beane, no objection?

12          MR. BEANE:  No objection.

13          THE COURT:  Thank you.  So admitted.

14      (Government's Exhibit 175 admitted into evidence.)

15  BY MS. SVOLTO:

16      Q    All right.  If we could go to 175A, please,

17  affidavit.

18          All right.  So you mentioned this document is inmate

19  processing form?

20      A    Yes, ma'am.

21      Q    Is that filled out the time the inmate arrives at the

22  facility?

23      A    It is.  It's completed as they go through the

24  processing.

25      Q    So that would be shortly after their arrest?

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    A    Uh-huh.

2    Q    And so if we could go to the intake date and time

3  there, and the inmate name right underneath it all the way to

4  the end of that page.

5         What's the intake date here?

6    A    It's July 11th, 2017.

7    Q    And the numbers next to it, does that indicate the

8  time?

9    A    Yeah.  By hours, military time, 16:55.

10   Q    Okay.

11   A    Or 16:35, I'm sorry.

12   Q    All right.  And so would that be 4:35?

13   A    4:35, yes, ma'am.

14   Q    In the afternoon.  So if we could highlight where it

15 says "Inmate Name," and the line.  Perfect.

16        So it looks like there's something crossed out there.

17 Could you read that for the jury?

18   A    Yeah, it's "Doe, comma, John," like John Doe.

19   Q    Why does it indicate John Doe there?

20   A    If we have a person who will not tell us who they are

21 when they first come to be arrested, we mark them as John Doe

22 until we find out who they are through fingerprinting and/or

23 any other methods we need to identify the person.

24   Q    Is that what happened here?

25   A    Yes.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    Q    And so how was the inmate in this case identified?

2    A    By fingerprint identification.  We actually took his

3  fingerprints and was waiting for a response from TBI and FBI,

4  and we actually went ahead and sent them off to the FBI

5  directly and asked them to do an online search for us -- or

6  offline search, if you will -- and they returned back a letter

7  to us telling what his true identity was.

8    Q    All right.  So is that when the form was completed?

9    A    Yes.

10    Q    Okay.  And so if we could go to 175B, please.

11         Is this another form that's filled out during the

12  intake processing?

13    A    It's filled out usually prior to processing, yes.

14  It's an arrest report.

15    Q    Okay.  And who fills this document out?

16    A    Normally, the arresting officer does.

17    Q    All right.  And if we could -- if we could highlight

18  on the "Personal Information" section.

19         And what does that say there?

20    A    John Doe referral to -- refused to give information.

21  Then city, state, ZIP Code, refused; home phone, refused; and

22  all the other information on the side, height, weight, eye

23  color, hair color, says refused.

24    Q    Indicating the inmate refused to answer any questions

25  about that?

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    A    Uh-huh.

2    Q    To the arresting officer or to which --

3    A    This is filled out by my staff upon entry.  They

4    brought him, and upon entry, talking to my staff, they informed

5    me that he wouldn't answer any questions, tell who he was, so

6    they filled out this report to start initial report for him.

7    Q    So this was done at the time of intake, and that is

8    when the inmate there refused to answer those questions?

9    A    Yes, ma'am.

10   Q    Does that delay the processing time?

11   A    It does, because we start pretty much from scratch.

12   Even if someone gives us a name, we still refer that as the

13   name referred to upon the arrest.  No matter what they would

14   tell an arresting officer, we still consider that name as not

15   being the completed name until we get fingerprint proof and

16   responses back from somewhere saying who the person is.

17   Q    Thank you.  Could we go ahead and go to 175C.

18        And what's this document?

19   A    That's a document we -- every inmate that comes in to

20   processing, we actually screen them for medical and mental

21   issues, any needs they may need initially upon entry, so we can

22   classify them and make sure they get any medical attention they

23   need upon entry.

24        On this one, this Officer Mobley that did the initial

25   screening, he put down refusal to sign.  He refused to sign

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

this.

2      Q    All right.  So then -- so there he refused to sign

it.  And there's a name and date of birth, so forth at the

bottom there.

5           Could you highlight?  Thanks.

6           And so how do we know -- if he refused to sign, how

do we know that it's an individual by this name?

8      A    Well, they could have done the screening, but he

refused to sign it.  This record is what we keep on file to

show that we gave them the opportunity to give us all

information, that they sign certain things saying they told us

the truth about their medical information.  Also some releases

so if something happened, when you get medical records from

another facility, they're signing for that as well.  That's

what you're signing on this part.

16     Q    And so by refusing to sign, did he -- and what's the

name on there?

18     A    Randall Keith Beane.

19     Q    And so did Beane then refuse the medical review?

20     A    I haven't reviewed the medical review on it.  I

couldn't tell you that part, but I can tell you he refused to

sign it.  That's all I can state on this one.

23     Q    Thank you.

24          So if we could go back to Government Exhibit 171.

25          All right.  And what is this document?

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    A    This is a faxed copy of the warrant from South

2  Carolina showing what they wanted -- he was wanted for, showing

3  the case numbers and the charges and the date issued.

4    Q    All right.  So is this document important when

5  processing an inmate that's been arrested?

6    A    It can be.  The biggest -- the biggest thing we use

7  for fugitives from justice is, of course, the teletype that

8  comes in from the agency.  If someone has a warrant on them,

9  when an officer runs it, they have to do what's called a

10 locate, which sends that agency, we have this person in

11 custody, and we'd like to know if we wish to extradite on them

12 or not.  And the response you get from that is what's most

13 important at that time, saying if they will or are not willing

14 to extradite.  Because without that, you can't do a fugitive

15 from justice warrant.

16   Q    Okay.  And --

17   A    Start the process.

18   Q    I'm sorry.  And so you need that information in order

19 to get a fugitive from justice warrant?

20   A    Yeah.

21   Q    Can you explain to us what a fugitive from justice

22 warrant is?

23   A    Sure.  Any time a subject is wanted from another

24 state outside of the state of Tennessee or any other state, the

25 state will enter the warrant into NCIC, which is National Crime

UNITED STATES DISTRICT COURT

1    Information Center.  It's what all law enforcement uses.  It's

2    a repository for criminal justice information, also for wants

3    data.

4           If you run someone's name, and they get a hit on

5    them, what's called a hit, it will show the warrant that's

6    outstanding for that agency.  The agency has so many minutes at

7    that point in time to actually respond back to that hit and let

8    that agency know, "Hey, we've got that person in custody.  And

9    would you like to either extradite them or place a hold?  What

10   do you want to do at this point in time?"

11          In fact, it works such intricately, that if you don't

12   do that response, if you fingerprint the person, the NCIC will

13   actually pick up on the fingerprints and will send you an

14   automated hit, saying this person is in custody and they're

15   wanted.  It's got backups.

16   Q    I have two questions really to your testimony just

17   now.

18          First, you mentioned extradition and having an

19   individual extradited.  Can you explain to us what that means?

20   A    Sure.  A state -- you can't just surrender someone's

21   person to another state without them giving consent initially.

22   Q    Who would have to give consent initially?

23   A    The person, the actual arrestee would have to.  The

24   person wanted would have to give consent.  It's called a waiver

25   of an extradition they sign.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1          So what we do is we do an FFJ warrant, which is

2     fugitive from justice.  We take it in front of our general

3     sessions court.

4          THE REPORTER:  Would you slow down?

5          THE WITNESS:  Sure.  Sorry.  Sure.  We take it in

6     front of general sessions court, and the sessions judge will

7     actually read the warrant to them, and tell them what they're

8     wanted for, and give them the option to either sign waiver of

9     extradition, saying they agree to go back willingly to that

10    state, or they can refuse to sign.

11         And at that point in time, if they refuse to sign,

12    they can seek what's called a governor's warrant.

13    Q    And when someone is extradited, does that mean

14    they're sent off to where the warrant was issued?

15    A    Yes.

16    Q    So if the warrant was issued in South Carolina, if

17    they were to be extradited, they would be extradited to South

18    Carolina?

19    A    Yes, ma'am.

20    Q    Okay.  Another question I had based on your testimony

21    was NCIC, what does that stand for again?

22    A    National Crime Information Center.

23    Q    And who has access to that?

24    A    Law enforcement mainly.

25    Q    Do members of the general public have access to NCIC?

UNITED STATES DISTRICT COURT

1    A    No, ma'am.

2    Q    And the information that's available through NCIC,

3    what -- excuse me, what information is available through NCIC?

4    A    Lots of things.  Your criminal histories are all

5    maintained there based off fingerprint submissions.  So any

6    time you're arrested, your fingerprints are submitted to them

7    electronically through TBI in the state of Tennessee, or

8    whatever state agency you are.  Your fingerprints actually get

9    submitted to FBI, and that's how they maintain the database of

10   what your charges are.

11        A lot of people think it's name, date of birth, and

12   demographics, but it's not.  It's mainly by fingerprints.  Of

13   course, they interact with INLETS, which stores driver's

14   license information, car information.  There's lots of systems

15   that are part of NCIC that law enforcement uses on a daily

16   basis.

17   Q    Thank you.  If we could go to Government's

18   Exhibit 173.

19        And now what is this?

20   A    That's a criminal complaint warrant.

21   Q    All right.  And what is the criminal complaint

22   warrant based on?

23   A    That's based on an affidavit from an affiant that

24   states that a crime has been committed and violation has been

25   done by TCA law -- yeah, TCA law in state of Tennessee.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1      Q    Okay.  Could we go to Page 2 of that document.

2           All right.  And is this the affidavit of complaint

3  that you referred to?

4      A    Yes.

5      Q    All right.  Could we highlight the all caps section.

6           And to be clear, this complaint is what forms the

7  basis for the warrant that the inmate is arrested on when he

8  comes to your facility?

9      A    Correct.

10     Q    So is this what is used for the fugitive from justice

11 warrant?

12     A    This is the fugitive from justice warrant, yes, it

13 is.

14     Q    All right.  So this is the information that is used

15 to -- to get an arrest of a fugitive?

16     A    Yes.

17     Q    Which would mean someone who's wanted perhaps in a

18 different -- from a different jurisdiction or who's wanted from

19 a different location?

20     A    Yes, ma'am.

21     Q    Okay.  And could we go -- could you read -- starting

22 at, I guess, right -- go ahead and read from the beginning, it

23 might be easier that way.

24     A    The defendant is a fugitive from justice --

25          THE REPORTER:  Whoa, whoa, whoa, whoa, whoa.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1          THE WITNESS:  Sorry.

2          "The defendant is a fugitive from justice,

3    Tenn. Code Ann. 40-9-103.  On Wednesday, July 12th, 2017 at

4    05:30 hours, the affiant came in contact with the defendant at

5    5001 Maloneyville Road.  The defendant did unlawfully,

6    knowingly, and willfully flee from Colorado to Knoxville,

7    Tennessee to avoid prosecution for failure to appear.  NCIC

8    confirmed the defendant is a wanted person.  ORI is Jasper,

9    Colorado Sheriff's Office, SC027000.  NIC" -- or NIC number --

10   "is W373601642.  Extradition confirmed."

11   BY MS. SVOLTO:

12        Q    That's good.  Thank you.

13        A    Okay.

14        Q    So here it says that the -- there is a -- that the

15   defendant is a fugitive from justice, failure to appear, and

16   then it says Jasper, Colorado.  So it is this -- is this a

17   fugitive from justice warrant that relates to Randall Keith

18   Beane?

19        A    The -- the bulk of this is.  There was one typo by

20   the commissioner's clerk that put the word "Colorado" in there.

21   This is actually South Carolina.  There's other identifiers in

22   this document that tell you what it is, that really makes the

23   sense of it.

24        First of all, there's -- I wish I could show you, but

25   right where it says Jasper County Sheriff's Office, the SC

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    number, that's an ORI, is what that's called.  That's an

2    originating agency number, and that's what's on the actual NCIC

3    wanted page, which shows the South Carolina 027, which that's

4    the county number for South Carolina, which shows that was the

5    area the person was wanted in.

6            And, of course, the NIC number is a great tool also.

7    The NIC number is the wanted number that's entered in NCIC

8    national.  And there's only one NIC number per want.  So that

9    number is kind of like a serial number for the want.

10   Q    So this particular affidavit contains -- it's

11   inaccurate as to Colorado?

12   A    Yes.  That was inaccurate.

13   Q    So what should it have said?

14   A    Should have said South Carolina.  The CO was meant to

15   be county.  And when the clerk -- apparently, what we can

16   figure out is, the clerk, when they saw "Jasper CO," they

17   thought it meant Jasper, Colorado.  So they typed it in

18   incorrectly.  And then we had a staff member that actually --

19   this was actually released and a new one was issued right

20   immediately after we found the problem.

21   Q    All right.  So could we go to Government Exhibit 174.

22        And so what is this document?

23   A    It's the secondary, the FFJ that was taken to correct

24   the first one's typo.

25   Q    All right.  Can we go to Page 2, David.  Thank you.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1        Could we highlight that all-caps area there.

2        I'm not going to make you read the whole thing, but

3   does this contain any corrections?

4   A    Yeah.  The Jasper part, the Jasper County, instead of

5   Jasper, Colorado, now it reads correctly.  ORI is Jasper County

6   Sheriff's Office.  Of course, it contains the same NIC number

7   and same South Carolina ORI number, identifying the county and

8   the state.

9   Q    All right.  Could we go to Page 1 of this document?

10  That's all right.  Actually, if you could go to the bottom.

11  There we go.  If you go to the middle sort of column there in

12  that document, all the way to the bottom.  All right.  And so

13  there we go.

14       This -- this notation down here, what does that

15  indicate?

16  A    It just means it was returned as Forrest Wallace was

17  a pro se attorney for the defendant.  Shows he was available

18  for court dates.

19  Q    So the notation there to the left of that line, ATTY

20  dot, does that mean attorney for defendant?

21  A    Attorney for defendant.

22  Q    And so then there's a name that's indicated there?

23  A    Uh-huh.  The Forrest Wallace?

24  Q    Uh-huh.  Okay.  All right.  So let me go ahead and

25  show you what has already been admitted as evidence in this

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1   case, Government's Exhibit 165.

2           And, in fact, what is this document?

3       A    That's a bench warrant from Jasper county, South

4   Carolina.

5       Q    And so with these documents, were you able to confirm

6   that there was a warrant out of Jasper County, South Carolina?

7       A    Yes.  This was just actually extra information.  A

8   lot of times, the agencies don't even send the copy of the

9   warrant.  We have the NCIC hit and the locate with their

10  indication they would extradite, and confirmation they have the

11  warrant on file was plenty.

12      Q    All right.  Thank you.  There was confirmation that

13  South Carolina would extradite here?

14      A    Yes, ma'am.

15      Q    All right.  Could we go to Government's Exhibit 175D.

16          All right.  And what is this document?

17      A    That is a waiver of extradition.

18      Q    Could we highlight the waiver of extradition

19  paragraph at the top there?

20          And so what does this paragraph indicate.

21      A    It's indicating just in short that the person in

22  charge of the FFJ is willing to return willingly back to the

23  area that's wanting him, the jurisdiction that's wanting him

24  for the outstanding warrant.

25      Q    And there's that signature of the defendant there?

UNITED STATES DISTRICT COURT

1       A      Uh-huh.

2       Q      So it's the defendant that's waiving that?

3       A      Yes.

4       Q      And is that the defendant that we've been discussing

5    here, Randall Beane?

6       A      It appears to be so, yes.

7       Q      All right.  Could you zoom back out?

8              And is there a date on this?

9       A      Yes, ma'am.

10      Q      And what date is that?

11      A      It's got -- it does have a date.  It's got July, but

12   it does have -- July of 2017.  It doesn't have that date on it

13   for some reason.  Didn't put the actual date of the day.

14      Q      But there he waived extradition.  Correct?

15      A      Uh-huh.

16      Q      All right.  Do you also take photographs of inmates

17   when they're being processed upon arrival?

18      A      We do.

19      Q      All right.  I have a -- I have an exhibit just for

20   the witness and defense only, please.

21             THE COURTROOM DEPUTY:  Want the camera?

22             MS. SVOLTO:  I want the Elmo.  Thank you.

23   BY MS. SVOLTO:

24      Q      I'd like to show you what's been marked as Government

25   Exhibit 176.  I think that's as far back as I can go.

                    UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1              Do you recognize this?

2        A    Yes.  It's a profile picture.  We take -- it's one of

3    two profiles we take left and right of every person who's

4    arrested.

5        Q    Okay.  I'd like to go ahead and show you Government

6    Exhibit 170.  And that's on the TrialDirector.

7              THE COURTROOM DEPUTY:  Thank you.

8              MS. SVOLTO:  Thank you.  Okay.  And this has already

9    been admitted as Government's Exhibit 170.

10             I would like to move to admit Government Exhibit 176.

11             THE COURT:  Without objection, so admitted.

12        (Government's Exhibit 176 admitted into evidence.)

13             MS. TUCCI-JARRAF:  I'm sorry.  170 and --

14             THE COURT:  176 is the side profile picture.

15             MS. SVOLTO:  I'm sorry.  That's my fault.  I also

16    have --

17             MS. TUCCI-JARRAF:  We didn't receive pictures.

18    That's why I'm asking.

19             MS. SVOLTO:  I'm showing them.

20             THE COURT:  We'll admit 176.

21             MS. TUCCI-JARRAF:  I don't have any objection.

22    BY MS. SVOLTO:

23        Q    All right.  I do want to show just for defense and

24    the witness only, and it's on the Elmo.  Thank you.

25             Government's Exhibit 177 -- what has been marked as

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1   Government's Exhibit 177.

2              And you recognize that?

3    A    Yes.  It's the second profile picture.

4              MS. SVOLTO:  All right.  Move to admit Government's

5   Exhibit 177.

6              THE COURT:  Without objection, so admitted.

7        (Government's Exhibit 177 admitted into evidence.)

8   BY MS. SVOLTO:

9    Q    All right.  So we'll go ahead and publish to the jury

10  Government's Exhibit 177.

11             And so this is -- what is this, for the jury, so they

12  know?

13   A    That would be a right profile picture.

14   Q    And is this a picture of the inmate that the

15  documents we've been discussing refer to?

16   A    Yes, it is.

17   Q    Is that Randall Beane?

18   A    Yes.

19   Q    And so this was taken at the time he was processed?

20   A    Yes.

21   Q    All right.  And same for Government Exhibit 176?

22   A    That's the left profile.

23   Q    Okay.  Also taken at the time of his processing?

24   A    Yes.

25   Q    All right.  And now Government Exhibit 170, and

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1   that's on TrialDirector.  I'm done with the Elmo.

2         And so this photograph, is this taken of every inmate

3   when they are processed?

4   A    Yes, ma'am.

5   Q    And is this a photograph of Randall Beane?

6   A    Yes, ma'am.

7   Q    And it's his front shot?

8   A    Yes.

9   Q    And this was taken when he was arrested.  Right?

10  A    Yes.

11        MS. SVOLTO:  That's all I have.

12        THE COURT:  Any cross-examination?

13        MS. TUCCI-JARRAF:  I'm going to, but it's -- I don't

14  know how much time you wanted to --

15        THE COURT:  How much cross do you have?

16        MS. TUCCI-JARRAF:  I have quite a few questions

17  regarding the worksheets and the forms that they have.

18        THE COURT:  Do you mind coming back in the morning,

19  Officer Wilshire, and completing your examination at nine

20  o'clock?

21        THE WITNESS:  Sure.

22        THE COURT:  I appreciate it.  We'll excuse you for

23  now.  So I'm going to let the jury go a little bit early today.

24        You can go ahead and step down while I'm talking to

25  the jury.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1      So I do believe -- I'm going to talk to counsel --

2 the only reason I'm going to stop a little early today -- about

3 some other matters.  One is the scheduling.  I'm anticipating

4 right now we'll probably get to closing arguments tomorrow,

5 so -- but you've not heard all the evidence in the case yet,

6 including rebuttal evidence.  So I caution you to continue to

7 keep an open mind as you hear all the evidence.

8      Keep in mind my reminders about not talking about the

9 case with anyone, including among yourselves and -- or anyone

10 else, and not reading anything that may be recorded on this

11 case.

12      With that being said, we'll see the jury back here at

13 9:00 a.m. tomorrow morning, which will be Wednesday,

14 January 31.

15      (Jury out at 4:13 p.m.)

16      THE COURT:  All right, Ms. Davidson -- everyone may

17 be seated.  Thank you.

18      You have two short, so to speak, rebuttal witness

19 after this witness?

20      MS. DAVIDSON:  Yes, Your Honor.

21      THE COURT:  Does either defendant, at least at this

22 point in time, anticipate any rebuttal testimony?

23      MR. McGRATH:  I was just -- I'm sorry.

24      MS. TUCCI-JARRAF:  No.  Go ahead.

25      MR. McGRATH:  I was discussing that with Mr. Beane.

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1  We would like the chance to go over that.  He was asking me

2  about that right now.

3           THE COURT:  Well, y'all discuss that.  Because as

4  soon as the government finishes, one or the other, I don't know

5  which order, but we'll ask you tomorrow morning, probably

6  pretty shortly after they finish, if there's any rebuttal

7  testimony to be presented by either defendant.

8           And after that's done, and after everybody rests on

9  their case in their entirety, we would give defendants the

10  opportunity to renew their Rule 29 motions, and the government

11  [sic] would rule on those motions before we went into closing

12  arguments to the jury.

13           Let me ask, start with the government, do you have

14  anticipation as to how long you want for closings?

15           MS. DAVIDSON:  Your Honor --

16           THE COURT:  In total, including rebuttal.

17           MS. DAVIDSON:  45 minutes.

18           THE COURT:  So roughly 30 and 15?

19           MS. DAVIDSON:  Yes, I'm doing both closings.

20           THE COURT:  Okay.  All right.  So that's 45 minutes.

21  So the defendants can divide up 45 minutes.  That's roughly 20,

22  to 22 minutes apiece.  So just keep that in mind after you

23  prepare your closings, because it looks like we will get to

24  closings tomorrow.

25           MS. DAVIDSON:  Your Honor, may I have -- I said 45

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    minutes.  Right?  Can I have 40 and --

2              THE COURT:  Want 50 minutes?

3              MS. DAVIDSON:  35 and 10, I think is how I want to

4    divide it.

5              THE COURT:  I'm going to give you 35 and 15, and then

6    I can divide it up a little easier.

7              MS. DAVIDSON:  I won't take that long, but I know

8    that the front part of my argument is way longer than my last.

9              THE COURT:  That's fine.  The math is a little easier

10   that way.  All right.  We'll give 50 minutes to the government

11   and 50 minutes divided equally to the defendants for their

12   closing arguments.

13             If you-all talk and, Mr. Beane, if you want -- since

14   there's more counts against you, if you want to divide that

15   more in your favor, you-all can talk about that before you

16   leave court today, but otherwise, we'll do 25 and 25.

17             I want the parties and counsel and their standby

18   counsel to meet with my law clerk just over here at side

19   counsel.  We'll adjourn court, so people in the audience know,

20   but sometimes I have, you know, what I call informal charge

21   conferences.

22             But just in follow-up to our formal charge conference

23   yesterday, we've got a few revisions we want to discuss with

24   you.  And then you-all were going to do some research on the

25   one charge about -- I guess the three methods of money

UNITED STATES DISTRICT COURT

Terry Wilshire - Direct Examination

1    laundering and the unanimity instruction.

2           So we've got some proposed language, but we want to

3    hear from you-all as well.  So if you'll meet with my law clerk

4    just over here at the side bench after we adjourn court, that

5    will allow us to take your input into consideration as we

6    finalize the jury charge.

7           Remind the defendants, if you -- you probably need to

8    think about this overnight and have prepared tomorrow, if you

9    want, and my law clerk will show -- remind you with the

10   particular jury charge page, if you want to submit a

11   defendant's theory as part of the jury charge, you'll need to

12   have that ready in the morning for the Court to review at the

13   conclusion of all the evidence.

14          I think that takes care of everything.

15          Main thing is, be prepared as soon as -- the main

16   thing, to reiterate, as soon as the government finishes with

17   its rebuttal testimony, we'll turn to the defendants

18   respectively, and your standby counsel can discuss with you,

19   they're very capable attorneys, what the scope of rebuttal

20   testimony is.

21          Mr. Lloyd and Mr. McGrath, I'd ask you to do that

22   with your -- with the respective parties, if you could, after

23   you finish the discussion with my law clerk.  Okay?

24          MS. DAVIDSON:  Okay.

25          THE COURT:  So otherwise, we'll see everybody back

UNITED STATES DISTRICT COURT

1    here at -- why don't we plan, just depending on what happens

2    with your discussion about the charge conference, why doesn't

3    everybody plan to be here at 8:45, in case we need to take up

4    anything before the jury comes back in.

5         All right.  We'll see everybody back -- we're

6    adjourned until 8:45 tomorrow morning.

7         (Proceedings recessed at 4:18 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1        **CERTIFICATE OF REPORTER**

2   STATE OF TENNESSEE

3   COUNTY OF KNOX

4           I, Rebekah M. Lockwood, RPR, CRR, do hereby certify

5   that I was authorized to and did stenographically report the

6   foregoing proceedings; and that the foregoing pages constitute

7   a true and complete computer-aided transcription of my original

8   stenographic notes to the best of my knowledge, skill, and

9   ability.

10      I further certify that I am not a relative, employee,

11  attorney, or counsel of any of the parties, nor am I a relative

12  or employee of any of the parties' attorneys or counsel

13  connected with the action, nor am I financially interested in

14  the action.

15      IN WITNESS WHEREOF, I have hereunto set my hand at

16  Knoxville, Knox County, Tennessee this 22nd day of April, 2018.

17

18

19

20                                    _____
                                       REBEKAH M. LOCKWOOD, RPR, CRR
21                                     Official Court Reporter
                                       United States District Court
22                                     Eastern District of Tennessee

23

24

25