1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TENNESSEE
2              AT KNOXVILLE, TENNESSEE
   _____
3  UNITED STATES OF AMERICA,        )
                                    )
4          Government,              )
                                    )
5  vs.                             ) Case No. 3:17-cr-82
                                    )
6  RANDALL KEITH BEANE,             )
   HEATHER ANN TUCCI-JARRAF,        )
7                                   )
           Defendants.              )
   _____
8
                    **TRIAL PROCEEDINGS**
9       **BEFORE THE HONORABLE THOMAS A. VARLAN**
                    **Volume V of VIII**
10
                 **Monday, January 29, 2018**
11               **9:03 a.m. to 5:38 p.m.**

12  **APPEARANCES:**

13          **ON BEHALF OF THE GOVERNMENT:**

14          CYNTHIA F. DAVIDSON, ESQ.
            ANNE-MARIE SVOLTO, ESQ.
15          U.S. DEPARTMENT OF JUSTICE
            OFFICE OF U.S. ATTORNEY
16          800 Market Street, Suite 211
            Knoxville, TN 37902
17
            **ON BEHALF OF THE DEFENDANT RANDALL KEITH**
18          **BEANE: (Appearing Pro Se)**

19          STEPHEN G. MC GRATH, ESQ. (Elbow Counsel)
            ATTORNEY AT LAW
20          9111 Cross Park Drive
            Building D, Suite 200
21          Knoxville, TN 37923

22

23  **REPORTED BY:**

24  Teresa S. Grandchamp, RPR, CRR
    P.O. Box 1362
25  Knoxville, Tennessee 37901
    (630) 842-0030

ON BEHALF OF THE DEFENDANT HEATHER ANN
TUCCI-JARRAF: (Appearing Pro Se)

FRANCIS L. LLOYD, JR., ESQ. (Elbow Counsel)
LAW OFFICE OF FRANCIS L. LLOYD, JR.
9111 Cross Park Drive
Building D, Suite 200
Knoxville, TN 37923

* * * * * * * *

1                          I-N-D-E-X

2      **WITNESS ON BEHALF OF THE DEFENDANT**
       **RANDALL KEITH BEANE:**
3
       **RANDALL KEITH BEANE**
4
       Continued Cross-Examination                   Page 5
5      By Ms. Svolto

6      Cross-Examination                             Page 16
       By Ms. Tucci-Jarraf
7
       Redirect Examination                          Page 126
8      By Mr. Beane

9      Recross-Examination                           Page 139
       By Ms. Tucci-Jarraf
10
       Recross-Examination                           Page 140
11     By Ms. Svolto

12
       **WITNESS ON BEHALF OF THE DEFENDANT**
13     **HEATHER ANN TUCCI-JARRAF:**

14     **HEATHER ANN TUCCI-JARRAF**

15     Direct Examination                            Page 154
       By Ms. Heather Ann Tucci-Jarraf
16

17
                  DEFENDANT TUCCI-JARRAF EXHIBITS
18
       **NO.:**                          **MARKED**      **IN EVID.**
19
       Exhibit No. 3                       214            217
20     Exhibit No. 4                       225

21                    * * * * * * * *

22

23

24

25

1          THE COURTROOM DEPUTY:  All rise.  The

2   United States District Court for the Eastern

3   District of Tennessee is again in session.  The

4   Honorable Thomas A. Varlan, Chief United States

5   District Judge, presiding.

6              Please come to order and be seated.

7          THE COURT:  All right.  Good morning,

8   everyone.

9          MS. DAVIDSON:  Good morning.

09:03AM 10          MR. LLOYD:  Good morning, Your Honor.

11          THE COURT:  It looks like we're ready to

12   continue with the cross-examination.  So we'll bring

13   our jury in.

14              (Jurors present in the courtroom.)

15          THE COURT:  Thank you.  Everyone may be

16   seated.

17              Good morning to our members of the

18   jury, and welcome back after what was hopefully a

19   pleasant weekend.

09:04AM 20              You'll recall the government was in the

21   midst or towards the end of its cross-examination of

22   this witness, the defendant, Mr. Beane.

23              So, Miss Svolto, you may continue with

24   cross-examination.

25          MS. SVOLTO:  Thank you, Your Honor.

1              **RANDALL KEITH BEANE**,

2   having been previously duly sworn, was examined and

3   testified further as follows:

4                   CONTINUED CROSS-EXAMINATION

5   BY MS. SVOLTO:

6        Q.   Good morning, Mr. Beane.

7        A.   Good morning.

8        Q.   I want to go back to something we spoke

9   about on Friday.

09:05AM 10        A.   Okay.

11        Q.   You talked about co-defendant Heather Ann

12  Tucci-Jarraf and --

13        A.   Excuse me?

14        Q.   I'm sorry.  You talked about Miss Heather

15  Ann Tucci-Jarraf, your co-defendant.

16        A.   Yes.

17        Q.   And she was with you every step of the way

18  during the financial transactions, wasn't she?

19        A.   What do you mean by "every step of the

09:05AM 20  way"?

21        Q.   So, she was with you on Skype while you

22  were conducting all the financial transactions on

23  USAA's website; correct?

24        A.   Most of them, but not all of them.

25        Q.   And so she was -- she was on Skype with you

          and consulting with you when you paid off your

          credit card bills?

               A.   No.

               Q.   So she wasn't with you on Skype when you

          were paying off your bills.

               A.   No.

               Q.   And was she with you when you were

          conducting the financial transactions in purchasing

          the CDs?

09:05AM        A.   Yes.

               Q.   And --

               A.   Part of them; not all of them.  Excuse me.

               Q.   And, in fact, you knew that there were

          folks that were keeping a list of all the attempts

          that were being made to take money from the Federal

          Reserve in this way; correct?

               A.   Excuse me?

               Q.   You were aware that there were folks who

          were making a list of all the attempts that were

09:06AM   being done to take money from the Federal Reserve.

               A.   What do you mean by "making a list"?

               Q.   A list of attempts.  Attempts

          where -- whether an attempt failed or was

          successful.  You were aware that a list like that

          existed, weren't you?

         A.    Not aware of a list, but I knew that people

were trying to keep up with what was going on, yes.

         Q.    Okay.  And so -- and Tucci-Jarraf used your

success as an advertisement for the success of this

whole scheme, didn't she?

         A.    That is beyond my knowledge.  I have no

idea of that.

         Q.    You were aware that Tucci-Jarraf, however,

used your success, your method, as a crutch, an

advertisement that this whole thing worked?

         A.    No, ma'am, I am not aware of that.

         Q.    You never said that on a jail call?

         A.    Not to my knowledge.

         Q.    You don't remember saying that on a jail

call?

         A.    After I got discovery, that's a different

story.  But beforehand, before I was put in jail,

no, ma'am, I did not know.

         Q.    So you looked at your Social Security

number to figure out what Federal Reserve you were

using to take money from this trust; correct?

         A.    Repeat the question, please.

         Q.    You looked at the back of your Social

Security card to determine which Federal Reserve

Bank you were to use to access your trust account.

1          A.   I looked at the back of my Social Security

2     card and saw that the letter was the same as the one

3     that Harvey Dent was using in the videos; so --

4          Q.   And you knew that was for the Federal

5     Reserve Bank; correct?

6          A.   From what was explained in the video,

7     correct.

8          Q.   And that was the Federal Reserve Bank of

9     New York; right?

09:07AM  10          A.   It popped up as being a clearinghouse

11     of -- I don't remember the exact name of the

12     clearinghouse.  I wrote it down on a sticky note.

13          Q.   All right.  And in the Harvey Dent video,

14     the speaker clearly talks about the Federal Reserve;

15     right?

16          A.   Yes, he does.

17          Q.   Okay.  When there is that call to USAA

18     Bank -- you said it was on July 8th; we disputed

19     that -- do you recall that part of your testimony?

09:08AM  20          A.   I do.  And I need to correct that.  I wrote

21     down everything this weekend in detail, and that

22     call was made on the night of the 7th.

23          Q.   All right.  And you said that --

24          A.   But I do need to clarify something about

25     that call.

1    Q.    You'll have a chance on redirect.

2    A.    Okay.

3    Q.    So you said you can't remember -- in that

4    call, you said you couldn't remember that the bank

5    where your trust was was the Federal Reserve Bank?

6    A.    Ma'am, it was not called the Federal

7    Reserve Bank.

8    Q.    But that's what you used in the Harvey Dent

9    video and that's how you identified which bank to

10   use on your Social Security card; correct?

11   A.    The bank had a specific name that I did not

12   recall.

13   Q.    When you and Heather are having the

14   conference call with Buddy Gregg and Whitney Bank on

15   July 10th, you never mentioned the Federal Reserve

16   Bank then, do you?

17   A.    No.

18   Q.    No.  You call it the originating bank; is

19   that the term you guys used?

20   A.    Yes.

21   Q.    But you never say "Federal Reserve Bank,"

22   do you?

23   A.    It's not called the Federal Reserve Bank

24   when you put the -- put the routing number in.

25   Q.    So you intentionally -- you intentionally

1    avoid using the term "Federal Reserve"?

2         A.    No, ma'am.

3         Q.    But you didn't say it?

4         A.    Not to -- not that I recall.

5         Q.    You recall presenting trust documents to

6    Buddy Gregg on July 11th; right?

7         A.    Yes.

8         Q.    And that's the factualized trust?

9         A.    Correct.

09:09AM  10         Q.    All right.  I think that's Exhibit 105 of

11    the government's case.

12                  And so on the factualized trust

13    documents, though, you do identify it as the Federal

14    Reserve; right?

15         A.    If it -- yes, it is -- it is identified as

16    the Federal Reserve in the factualized trust,

17    correct.

18         Q.    And you signed and reviewed that document,

19    didn't you?

09:09AM  20         A.    I sure did, yes.

21         Q.    And you affixed your biometric seal to

22    that?

23         A.    Correct.

24         Q.    And you signed it and everything?

25         A.    Correct.

         1          Q.   And you dated it?

         2          A.   Correct.

         3          Q.   And so on that factualized trust, it

         4    identifies the bank.  And here is the exhibit here,

         5    Government's Exhibit 105.

         6          MS. SVOLTO:  I'd ask you to blow up

         7    paragraph 5, please.

         8    BY MS. SVOLTO:

         9          Q.   All right.  And so if you could go to the

09:10AM 10    second line of that paragraph, it talks about the

        11    account of origin.  Could you read that out?

        12          A.   "Account of origin with Account No. 1135,

        13    Account name, Randall Keith Beane, and located at

        14    the Federal Reserve Bank of New York are lawfully

        15    and duly held an original factualized trust.

        16    Reference name, Randall Keith Beane."

        17          Q.   Thank you.  That's good.

        18               And that is the same factualized trust

        19    that you used to complete the transaction with Buddy

09:10AM 20    Gregg?

        21          A.   Correct.

        22          Q.   Okay.  Now, these documents, amongst the

        23    corrected purchase agreement and so forth, you

        24    intended to bring those documents to Buddy Gregg and

        25    then hit the road right after; correct?

1      A.   No, that is not correct.

2      Q.   So you weren't planning to get on the road

3  immediately after that purchase?

4      A.   No, I wouldn't say immediately, no.

5      Q.   So you weren't planning to go to Texas and

6  then go to Washington, D.C.?

7      A.   Never mentioned Washington, D.C., no.

8      Q.   So who was with you on the motor home on

9  July 11th?

09:11AM  10      A.   A couple of friends.

11      Q.   Was it Alex and Valerie Wegner?

12      A.   Yes, it was.

13      Q.   And did you not tell them that you were

14  going to Texas to pick up Heather Ann Tucci-Jarraf

15  and then go to D.C.?

16      A.   I sure did.

17      Q.   You did tell them that?

18      A.   I did.

19      Q.   Okay.  So you did tell them that you were

09:11AM  20  going to D.C.?

21      A.   No, I did not tell them that I was going to

22  D.C.

23      Q.   Okay.  So then after you told them that,

24  you never told them that the plan was, as I believe

25  you testified on Friday, to go talk to someone at

1   USAA, did you?

2        A.   Yes.

3        Q.   You told the Wegners that you were going to

4   talk to someone at USAA Bank in Texas?

5        A.   That was the only purpose to go to Texas.

6        Q.   And you told that to Alex and Valerie

7   Wegner?

8        A.   I did.

9        Q.   And so if they said otherwise, if they said

09:11AM 10  that you never mentioned going to USAA, would they

11  be lying?

12       A.   Yes, they would be lying.

13       Q.   All right.  So you're upset at the Wegners

14  right now, aren't you?

15       A.   Only at Alex.

16       Q.   Only at Alex.

17       A.   Yes.

18       Q.   Is that because he opened the door to the

19  RV when the FBI arrived?

09:12AM 20       A.   Yes.

21       Q.   And so you were mad at him for opening the

22  door to the RV?

23       A.   Yes.

24       Q.   Because you had told him not to open the

25  door; isn't that correct?

1    A.   I didn't say anything about opening the

2  door.

3    Q.   But you didn't think he should have opened

4  the door?

5    A.   Not without a warrant.

6    Q.   So you had mentioned going to USAA to talk

7  to -- excuse me -- to go to Texas to USAA to talk to

8  someone there, but you knew who to talk to at USAA

9  Bank, didn't you?

09:12AM 10    A.   No, ma'am.

11    Q.   You didn't know that you should -- that the

12  person who was asking questions about this

13  whole -- these -- all of these transactions was True

14  Brown?

15    A.   No.  No, at that point, he was identified

16  as an FBI agent.

17    Q.   You knew on the call with Buddy Gregg that

18  True Brown was with USAA, and Lauren Palmisano with

19  Whitney Bank gave you that information on that

09:13AM 20  conference call, didn't she?

21    A.   Mr. Brown was introduced as an FBI agent to

22  begin with.

23    Q.   And when Lauren Palmisano with Whitney Bank

24  discusses with you that she received a call from

25  True Brown while speaking with you and Heather, she

1  gave you the information that was from USAA, didn't

2  she?

3      A.   She gave me the information that -- that

4  that was True Brown, correct, but he was also

5  introduced as an FBI agent to begin with.

6      Q.   And Lauren Palmisano also gave the

7  information about True Brown's phone number and his

8  contact information, didn't she?

9      A.   As far as I remember.

09:13AM  10      Q.   And Jerry Byrne also gave you True Brown's

11  contact information, didn't he?

12      A.   I don't remember Mr. Byrne giving me that

13  information, no.

14      Q.   But you never called True Brown, did you,

15  during all of this?

16      A.   No.

17      Q.   And you knew what he would say, didn't you?

18      A.   No.

19      Q.   You didn't call because you knew it wasn't

09:13AM  20  your money; isn't that correct?

21      A.   I didn't call Mr. Brown because I didn't

22  know in actuality who he really was.

23      Q.   And you knew all along it wasn't your

24  money, didn't you?

25      A.   No, ma'am, I did not.

1      Q.   And you knew all along that there was a

2  very large possibility that that money didn't belong

3  to you, didn't you?

4      A.   No.  No, I did not.

5           MS. SVOLTO:  I have nothing further.  Thank

6  you.

7           THE COURT:  All right.  Thank you.

8                Let's take cross-examination,

9  Ms. Heather Tucci.

09:14AM  10       MS. TUCCI-JARRAF:  Jarraf.

11           THE COURT:  Ms. Heather Tucci-Jarraf.

12  Excuse me.

13           MS. TUCCI-JARRAF:  Just so there is no

14  confusion.

15                     CROSS-EXAMINATION

16  BY MS. TUCCI-JARRAF:

17      Q.   Good morning.

18      A.   Good morning.

19      Q.   Without prejudice, I have some questions

09:14AM  20  for you, Mr. Beane.  I just need to find you,

21  actually.  I apologize.

22                Okay.  So, Mr. Beane, you had stated

23  that you were in the military and the Air Force, and

24  I missed how many years you said you were -- how

25  many years were you in the military?

         A.    Approximately a little over three years.

         Q.    Okay.  And you also stated that you were
investigated by the FBI for top-secret clearance --

         A.    Correct.

         Q.    -- during that time?

         A.    Correct.

         Q.    Okay.  And you received that top-secret
clearance?

         A.    Yes, ma'am.

09:15AM  Q.    What was the top-secret clearance for?

         A.    Like I had described, at one point,
we -- when out in the field, we were actually
monitoring phone calls of American citizens with
keywords that would be mentioned on the call.

               Like I described at one point that, you
know, you could be giving your friend directions and
you might say, "Go down to the white house and turn
right."  Well, that would key your phone call to be
listened to just because you had said "white house."

09:16AM              It's similar -- similar keywords would
be brought up and your phone call would be
monitored.

         Q.    Okay.  So you guys were using external
equipment, monitoring equipment, for that?

         A.    We had satellites.  We set up what were

1    called TSQ-111 vans that we'd set up satellites in

2    different areas of the country and listen to phone

3    calls.

4         Q.   Okay.  You had mentioned that during the

5    '70s and '80s, you really got into computers and

6    computer programing.  Was that a basic computer

7    programing knowledge --

8         A.   Yes --

9         Q.   -- and training?

10        A.   -- it was the -- it's called the binary

11   hexadecimal-type programing.  It's the basic

12   computer programing of any -- language of any

13   computer.  Basically ones and zeros.  I know people

14   have heard that before, but when you get into the

15   ones and zeros, the language becomes very basic for

16   all computers.

17        Q.   Okay.  And during the work that you just

18   stated you were doing for the military, listening in

19   on conversations, were you doing any kind of

20   computer work or dealing with computers for that?

21        A.   Yes, we're repairing computers.  We're

22   taking circuits boards out, replacing circuit

23   boards, repairing circuit boards, that type of

24   computer repair.

25        Q.   So you were doing mainly repairing on the

1    technology, not actually running the programs?

2        A.    Right.

3        Q.    Okay.  Do you have any training in computer

4    programing or programs used in banking?

5        A.    No, none.

6        Q.    Okay.  Do you have any experience with

7    programs used in banking?

8        A.    No, ma'am.

9        Q.    And that includes no experience or training

09:18AM  10   with systems that are employed by banks?

11       A.    No, ma'am.

12       Q.    So is your experience with programs used in

13   banking, such as payment programs and things like

14   that, just related to what you have with USAA for

15   its services?

16       A.    Yeah, just what I learned -- I joined USAA

17   in May of 2016, and I -- you know, I immediately

18   went on to the -- logged on to the website and began

19   to learn through my iPhone how to log in and things

09:19AM  20   like that, you know, as I went along.

21              There is not -- there is not

22   really -- I think there is a tutorial when you

23   start, and that's about it.

24       Q.    Uh-huh.

25       A.    But, you know, once you get in, it's pretty

1    easy to, you know, navigate through the whole

2    operating system.

3        Q.    Okay.  And do you recall if that tutorial

4    gave you any information or explanation or process

5    to follow using ACH?

6        A.    No, I do not remember that.

7        Q.    Okay.  You had stated that after you or

8    while you were in the military and you had to do

9    that job of listening in on people that you started

09:19AM 10   to question things.  At that point, what was your

11   knowledge of banking, if any?

12       A.    Very minimal.  I had -- I had a checking

13   account, and basically at that time all it -- you

14   know, all you could do was write checks, as far as I

15   remember.

16       Q.    Okay.

17       A.    You know, and then I had a savings account.

18   So, I think our checks were automatically deposited.

19   Yeah, I'm pretty sure they were.  That was about all

09:20AM 20   I knew about the banking system.

21       Q.    Okay.  So through your employment

22   throughout the years, have you always had automatic

23   deposits for your checks?

24       A.    No, ma'am, not until this past -- this last

25   job that I had had I ever had automatic drafts or

1    automatic payments.

2        Q.   And when you say "not until this last job,"

3    which job was that?

4        A.   The Advantage Innovations, the company I

5    was working for before I got arrested.

6        Q.   And that's Advantage Innovations?

7        A.   Yes, ma'am.

8        Q.   When did you start working for them?

9        A.   January of 2016.

09:21AM 10   Q.   So, since January of 2016 is when you

11   started automatic deposits of your -- of your

12   paychecks?

13       A.   Yeah, when that -- in my job, I was on the

14   road all the time.  So we had to do it that way

15   because I could never get into the office to get

16   money, and it takes quite a bit of money to be out

17   on the road.  So --

18       Q.   And where is this company located?

19       A.   Here in Knoxville.

09:21AM 20   Q.   Is that why you relocated to Knoxville?

21       A.   Yes, ma'am.

22       Q.   And out of all the checks -- we saw many

23   statements throughout this -- this trial, bank

24   statements from USAA for you, and on them it shows a

25   significant amount of deposits as well as

1    transactions --

2          A.    Yes.

3          Q.    -- withdrawals or payments, debits,

4    credits.

5          A.    Yes.

6          Q.    Were those other credits to your account,

7    were those from other jobs that you were doing for

8    other places or --

9          A.    No, any credits on my account were -- would

09:22AM 10    come in from Advantage Innovations.  Sometimes they

11    might do a wire transfer.  Sometimes it might come

12    in as a -- I forgot what it was called, but it

13    wouldn't be listed as a wire transfer.

14                But it would come in -- it would depend

15    on how many days it would take for it to come in

16    what it was called on the statement.  I don't

17    understand why they have different names for the

18    same deposit, but --

19          Q.    So were the majority or all of them, of the

09:23AM 20    deposits each month from January of 2016, from

21    Advantage Innovations?

22          A.    Yes, any money that I've deposited from

23    January '16 until the day of the arrest was from

24    Advantage Innovations, correct.

25          Q.    Okay.  And then as far as the withdrawals

that were shown, or payments, debits, were those in
relation to your job, the majority of them?

    A.   Yes.  The -- every day I would travel
extensively all over the country and have to get a
hotel room.  Depending on -- you know, if I'm in
Atlanta and the boss calls and says, "You need to be
in D.C."  So I've got to travel.  So you're looking
at gas, food and lodging each day that I'm on the
highway.  So there is quite a few, you know, things
coming out of my account every day.

    Q.   Uh-huh.  Were you driving everywhere or --

    A.   Yes, ma'am --

    Q.   -- were they flying you?

    A.   -- I was driving everywhere.

    Q.   Were some of those deposits that Advantage
Innovations made, were they supposed to also cover
your expenses, as far as any material costs for the
job?

    A.   The -- the way I was getting paid was kind
of like a subcontractor to where he would price the
job to -- to pay me, and I'd take care of my
expenses.

    Q.   Okay.  So, like, an independent --

    A.   Yes, independent contractor.

    Q.   As far as function went.

1          A.   As far as function, yes.

2          Q.   Okay.  So, you did have, like, an

3     employment contract then with them or some kind of

4     contract for your services to them?

5          A.   Yes.

6          Q.   Okay.  You had stated that during -- after

7     you made that initial question about, "What are we

8     doing?" -- I believe were your question -- or your

9     statement on direct regarding your activities in the

09:25AM   10     military, you had stated something about birth

11     certificates and being printed on bank bond paper.

12     Do you remember around that -- around the year or

13     the month, even, of when you learned about that

14     stuff?

15          A.   That was sometime in the '90s.

16               In the military, you have a diverse

17     group of people put together, and you've got guys

18     that know things that can show you -- you know,

19     you're learning from everybody.

09:26AM   20               This one guy was showing me about birth

21     certificates, you know, and I had -- you know, I

22     really didn't understand what he was showing me, but

23     I began to look at it and realize that he was

24     correct in what he was saying.

25               But I never really thought about it

1    until some- -- sometime in the future when some

2    information came up about it.

3        Q.   Okay.  So you first learned about birth

4    certificates being printed on bank bond paper in the

5    military?

6        A.   Yes, I did.

7        Q.   From your fellow --

8        A.   From a fellow.  I don't remember his name.

9        Q.   Okay.  So was it in the military that you

09:26AM 10   also -- you had mentioned about a cestui que trust.

11   Did you also learn about that in the military?

12       A.   That was -- that was afterwards.  That was

13   after I got out of the military and started doing

14   some research on my own with other people.

15       Q.   Was that approximately in the '90s or

16   after -- or in the --

17       A.   I would say late --

18       Q.   -- 2000s?

19       A.   Late '90s.  Yes, late '90s.

09:27AM 20   Q.   Okay.  In the military, did you travel a

21   lot?

22       A.   No.

23       Q.   Were you stationed in different places?

24       A.   Well, we would -- we would go and set up

25   satellite systems, but -- for a couple weeks at a

1     time and then go back to home base.

2          Q.    When you say "set up satellite systems,"

3     is -- do you mean, like, a NOC, like a network

4     operating center, or --

5          A.    Yes, correct, like a miniature telephone

6     company.

7          Q.    A miniature telephone company owned by the

8     military?

9          A.    Yes.

09:28AM 10          Q.    Okay.  And you don't remember about how

11     many states that you ran during that time?

12          A.    Mainly Texas, Tennessee -- I mean, not

13     Tennessee.  Mississippi, Florida, Arizona, and

14     Louisiana.

15          Q.    Okay.  And for your job of -- sorry.  I

16     can't remember that name.  Advanced Innovations.

17          A.    Yes, Advantage Innovations.

18          Q.    Sorry.  I apologize.  Advantage

19     Innovations.  Did you travel -- or excuse me.

09:29AM 20     Approximately how many states did you travel in?

21          A.    Oh, wow.  It would be easier to tell you

22     how many I didn't.

23                    I basically traveled all over the East

24     Coast from Florida all the way up to Rhode Island,

25     Connecticut, Virginia, West Virginia, Ohio,

```
 1    Illinois, Rhode Island, Maryland --
 2         Q.    Was it --
 3         A.    -- North Carolina, South Carolina.
 4         Q.    -- mainly just East Coast then for --
 5         A.    From Midwest to East Coast.
 6         Q.    Midwest to East Coast?
 7         A.    Uh-huh.
 8         Q.    And I apologize.  So you had worked for
 9    them for how long?
10         A.    I started in January of 2016.  So a
11    year-and-a-half when I got arrested.  It would be
12    two years this January.
13         Q.    You were still employed by --
14         A.    Yes.
15         Q.    -- Ad- -- then when you got arrested in
16    July?
17         A.    Yes.
18         Q.    Do you still have that job --
19         A.    I don't know.
20         Q.    -- as far as you know?
21         A.    I've not talked to them.
22         Q.    So, going back to this trust account.  What
23    was your basic understanding about this -- I can
24    never pronounce it -- cestui que trust?
25         A.    Cestui que.  That there was a -- back
```

09:30AM (lines 10, 20)

1  during the Black Plague, there was a trust set up

2  because there was a lot of people that had died and

3  a lot of property was available that people didn't

4  know what to do with.  And so they set up this

5  trust.

6              And from my understanding, this trust

7  is where it had a lot to do with the birth

8  certificates because in 1913, when the Federal

9  Reserve system and the birth certificates came along

09:31AM  10  around the same time, as well as the IRS and the

11  Social Security system was all tied together.  So

12  it's my understanding it was all under this cestui

13  que trust.

14      Q.    Do you just know that it's all tied

15  together or do you know how it's tied together?

16      A.    I do not know how.  I just know that it's

17  tied together.

18      Q.    And did you glean that information from

19  your research with the other people or from actual

09:31AM  20  written materials?

21      A.    From a lot of research from other people,

22  books.  There is a lot of books that I've read.

23      Q.    Okay.

24      A.    Just a lot of -- you know, a lot of

25  research from a lot of friends.

         Q.   And you say -- you specifically said "they

set up this trust."  Who is "they"?

         A.   Well --

         Q.   To the best of your knowledge.

         A.   Well, being in the military, I guess we

learned that there was, like, a shadow government.

And so I was -- it was in the understanding to me

that this shadow government of the United States

would be the ones who would set up these trusts in

order to take a control over things.

         Q.   Okay.  And in your direct testimony on

Friday, you had stated that it was your

understanding that you were the value behind all the

money; that all the people were the value behind all

the money.

         A.   Correct.

         Q.   What -- well, what do you -- did you glean

that from research or did you read materials --

         A.   I actually --

         Q.   -- for that statement?

         A.   -- heard -- when you first started telling

us about all the documents you had filed for

the -- for the One People's Public Trust, I started

learning from the Blog Talk Radio shows that I had

started listening to where you would come on and

1    explain to us about these documents, and so that's

2    where I learned all that information.

3        Q.   Okay.  And that was approximately what

4    starting date --

5        A.   I'm going --

6        Q.   -- that you became aware of that

7    information of the --

8        A.   Around 2011, 2012.

9        Q.   So as far as value behind all the money,

09:34AM 10   anything related to that, that was specifically from

11   Blog Talk Radio shows and whatnot --

12       A.   Correct.

13       Q.   -- beginning somewhere around 2011, 2012?

14       A.   Correct.

15       Q.   Okay.  So all your research from the '90s

16   forward to that moment, basically just the birth

17   certificates is what you looked into and the cestui

18   que trust?  That's it?

19       A.   Well, that and learning about the legal

09:34AM 20   system through -- I don't know -- understanding that

21   the court system was under admiralty law, and that

22   was a big secret for the United States to hide the

23   judicial system under admiralty law and not share

24   that with the American --

25            MS. SVOLTO:  Your Honor, objection.  I

1  don't think that's a good-faith basis for what

2  Mr. Beane is testifying to here.  I'm not sure of

3  its relevance either.

4          THE COURT:  What's the relevance of this

5  line of questioning or these questions?

6          MS. TUCCI-JARRAF:  His personal knowledge

7  leading up to the July events regarding banking and

8  whether or not what he was doing -- if he had a

9  personal knowledge to even know if there might be an

09:35AM 10  issue is what we're determining here, and it is

11  relevant to the determination of the case.

12          MS. SVOLTO:  I think he's not testifying to

13  his personal knowledge; he's testifying to the

14  creation of some shadow government for which he

15  would have no personal knowledge.

16          THE COURT:  Well, I'll sustain the

17  objection in that regard.

18              Limit the answers to testifying on your

19  own personal knowledge.  Go ahead.

09:35AM 20  BY MS. TUCCI-JARRAF:

21      Q.   Okay.  I'm just going to ask you a question

22  as far as the date that you found out about that

23  information without going further into that

24  information.

25              Around what date did you learn about

1      that, about the legal system?

2          A.   I would say 2002, around about.

3          Q.   So approximately 2002.

4               Okay.  So when you had made the

5      statement that Heather Ann Tucci-Jarraf had told you

6      that you were the value behind all the money was the

7      quote, was that just from blogs or did we have

8      contact?

9          A.   No, we never had contact.  That was just

09:36AM 10     from blogs.

11         Q.   Okay.

12         A.   Or from the radio, from Blog Talk Radio.

13         Q.   Do you recall what month and year or date,

14     specific date, if you have it, that we actually

15     spoke the first time?

16         A.   I think it was the latter part of -- maybe

17     in the spring of 2017.

18         Q.   And you had stated that you had heard about

19     Heather Ann Tucci-Jarraf about 2012 December?

09:37AM 20     A.   Yes.  And I remember specifically in

21     December of that year, you came on and you told us

22     Merry Christmas; that you had all the paperwork done

23     and the documents filed; that all the accounts were

24     now -- the accounts now belonged to the people.

25         Q.   Spring of 2017.  In the spring of 2017, was

 1    there just one phone call or was there --

 2         A.   I don't think we had a phone call.  I think

 3    we did a Skype.

 4         Q.   Oh, where we wrote?

 5         A.   No, we actually -- yeah, we might have --

 6    at first we might have wrote back and forth, but we

 7    eventually got on camera and Skyped.

 8         Q.   Was it just one phone call or were there

 9    multiple in that spring?

09:38AM 10         A.   I don't remember multiple phone calls.  But

11    I remember just letting you know that I was pretty

12    much enamored to be able to talk to you for the

13    first time and felt like that -- you know, that I

14    could learn a lot from you.  So --

15         Q.   And when was the next time, to the best of

16    your recollection, you stated that -- excuse me.

17    Strike that.

18                   You stated that the next time that we

19    had spoken was in the summer of -- and then I

09:39AM 20    couldn't catch it -- about a situation in South

21    Carolina.

22         A.   Correct.  I had -- I had been illegally

23    detained in North Carolina, and when I got the

24    situ- -- when I got out of jail and got back home, I

25    decided that it was time to correct what I saw as

1    wrongs being done to a lot of people, and especially

2    myself, to where under the guise of law a lot of

3    agents can do things to your -- or put you in jail

4    for reasons that they feel like is justified when,

5    in essence, it's not true.

6              And so I wanted to contact you because

7    I knew you had experience in that field to where

8    maybe you could guide me in the direction to whether

9    it was a civil lawsuit just to get the information

09:40AM  10  out to the public of the wrongs that are being done

11   to citizens.

12        Q.   What -- and that was -- was that the summer

13   of 2017?

14        A.   That was actually July 4th of 2017.

15        Q.   So that was the next time that we had spoke

16   after that first call --

17        A.   Correct.

18        Q.   -- or that one call in the spring?

19        A.   Correct.

09:40AM  20   Q.   Okay.  I wrote it down as South Carolina,

21   but it was North Carolina?

22        A.   Well, there was two or three states that I

23   wanted to -- because I had been arrested and

24   assaulted on several occasions by, like I said, the

25   guise of agents from the government who had said

1    they were with the law, and I wanted to find out

2    some type of recourse to correct these wrongs.

3         Q.   Okay.  But during that particular call, we

4    didn't go into details about those particular

5    incidents, just that you wanted to correct those

6    things?

7         A.   You basically stated at that point that

8    that was negative energy.  They could not go back

9    and do that to me again.  That at this point we

09:41AM 10  could move forward in a creative new energy if I so

11   desired to do that.

12              And I said, "That feels better.  I

13   would rather do that, because if they can't touch me

14   again, I would certainly like to move forward in a

15   creative energy."

16        Q.   Okay.  Did we go over any kind of plan at

17   that point about what you were going to do to get

18   into the positive energies?

19        A.   No.

09:42AM 20       Q.   So it was a quick call?

21        A.   I would say it was roughly 10 minutes or

22   less.

23        Q.   And you said July 4th.  That was July 4th.

24   Where were you on July 4th of 2017?

25        A.   I was in Knoxville in my apartment.

Q.   And did you know where I was at that time?

A.   I think you told me on the phone call that you had just arrived in Houston, Texas.

Q.   Did I tell you why?

A.   No.

Q.   Okay.  And, actually, on July 4th, after we had -- or while we had spoken, you had said that you had sent to me a video to check out; do you recall that?

09:43AM

A.   I actually -- after I got off the phone with you is when I saw the video, and then I sent it to you --

Q.   Okay.

A.   -- and called you back to let you know that I had sent you this video.

Q.   So we had spoke in the morning?

A.   We spoke in the morning, correct.

Q.   And then you sent me the video right after you had seen it?

09:44AM

A.   Yes, as soon as I got off the phone with you, I went to my bedroom and got on my laptop, and this video popped up on my Facebook timeline.  And I watched it and immediately realized that this was the accounts that you had filed all the documentation for the One People for.  And so that's

why I wanted to verify with you and send you the

video and let you look at it and verify that that

was exactly what was -- he was talking about.

Q.   Okay.  When you said that that was posted

on your Facebook, did Harvey Dent post it on your

Facebook?

A.   I have no idea.  I searched to find out who

posted it on my timeline, but I couldn't find the

name.

09:44AM   Q.   Do you know a Harvey Dent?

A.   No.

Q.   Are you friends on Facebook with a Harvey

Dent, to the best of your knowledge?

A.   No, no.

Q.   Do you know whether or not Harvey Dent is

his real name?

A.   I do not.

Q.   I'll just keep referring to him as Harvey

Dent then --

09:45AM   A.   That's fine.

Q.   -- for the purpose of this cross.

Were you able to ever speak with

Harvey Dent?

A.   No.

Q.   So after you saw that video -- after you

saw that video, you had said -- you had testified on

your direct that you went to go check out this

process that you had seen on this video.

    A.    Well, no, I didn't do anything on the 4th.

I just watched the video and contemplated, "Is this

actually happening for the people?  Are we actually

getting access to our accounts?"

            And that night I went to see the

fireworks downtown Knoxville.  So the -- you know, I

had some friends coming over and stuff.  So not a

lot -- I didn't do anything that afternoon.

    Q.    What did you do on July 4th that would make

you believe that you didn't do anything on that day

with this information?

    A.    Because I didn't go in and check out

any -- whether these -- this was actually going to

work or anything.  I just knew it was there.  But

just thinking about it, you know, what -- what this

meant for us as the One People and our future.  Is

this actually real?

    Q.    And, in fact, I believe you -- did you go

do a celebration on July 4th that evening here in

Knoxville?

    A.    No, I just -- we just went to see the

fireworks, and then it started raining and we had to

1    run back home.

2         Q.   So, to the best of your recollection, you

3    started with this information or trying out this

4    information after the fireworks show; sometime

5    after, some day after the --

6         A.   The 5th, the next day.

7         Q.   Okay.  Did you talk to anybody about

8    this -- you know, the process that you saw on the

9    video or anything like that before you tested it

09:48AM  10   out, or did you just jump in to testing it out?

11        A.   I talked about it with some people that I

12   had close relationships with that knew about the

13   trust documents, and -- or the documents that had

14   been filed to claim our trust, and we had all

15   wondered, you know, how to link everything together

16   or if it was all linked together.

17        Q.   Okay.  Could you give me just one second so

18   I could --

19        A.   Sure.

09:48AM  20        Q.   So you were unsure whether the Harvey Dent

21   video and the process that he spoke about in that

22   video regarding the Federal Reserve Bank and the

23   routing numbers, whether that was -- excuse

24   me -- whether that was linked to any work that I

25   personally -- that Heather Ann Tucci-Jarraf had

1  done?

2      A.   Well, that's why I called you to find out

3  that this was actually linked to what you had filed,

4  and then you confirmed that.

5           So, yes, I did -- I still had my

6  doubts, but at the same time, I wanted to -- if it

7  was really true that this was linked to those

8  documents, then I was ready to spread the word.

9      Q.   When you say that I confirmed that they

09:49AM 10 were linked to the work that I, Heather Ann

11 Tucci-Jarraf, had done, did I say that about the

12 process itself or just the Federal Reserve in

13 general?

14     A.   Just the Federal Reserve in general.

15     Q.   So, on the 5th -- I'm going to go to

16 July 5th.

17          July 5th, you had informed me that you

18 had gone in and tested that process using your own

19 accounts; is that correct?

09:50AM 20    A.   That's correct.

21     Q.   And did I have questions for you as to what

22 the process was?

23     A.   Yes, you did.

24     Q.   And did you explain that process to me?

25     A.   I did, yes.

         Q.    Because I hadn't seen the video yet.

                    Okay.  And, in fact, on that day, you

had told me that you had actually gone in to apply

for a CD; is that correct?

         A.    No, not at that point.  The first thing I

did was paid my car insurance.

         Q.    Right.

         A.    My car insurance bill was, like, $4,800 all

total for all four vehicles.  So when I tried the

account out, I went in and paid the insurance bill,

and it cleared --

         Q.    Uh-huh.

         A.    -- for all $4800.

                    And at that point I was nervous

because it just seemed surreal.  And then later on

that afternoon, I decided to go in and pay my credit

cards and my car loans off, and they all cleared.

And that's -- I think we had a phone call after that

that I was excited to take care of all that through

this process that Harvey Dent had shown on the video

and that we had finally come to the time when we

could claim what was truly ours.

         Q.    Would you state that the -- during this

time period of July 1st through at least the 11th of

July was a pretty fast-paced moving time period for

1  you?

2     A.   Yes, it was.  There was a lot of people

3  that were excited and wanting a lot of information.

4  My phone was ringing off the hook from people,

5  really, all over the world calling me and contacting

6  me, literally from all over the world.

7     Q.   "All over the world."

8         Are these people that you are friends

9  with on Facebook or --

09:53AM  10     A.   Well --

11     Q.   Have you ever been overseas?

12     A.   No, I have not been overseas, but I seemed

13  to be pretty popular because of the radio shows.

14  Because at some point I would get involved in the

15  radio shows because I've had things I wanted to

16  share from my heart, and people would -- you know,

17  actually, we had a big meet-up one time where a lot

18  of people came and -- just to meet me from all the

19  radio shows.  So I had a pretty big -- I don't want

09:53AM  20  to call it a following, but I had a pretty big group

21  of followers who were watching my every move.

22     Q.   Okay.  And during this -- would you say

23  that if I had records that I was kind of watching

24  and following along what you were doing, and let's

25  say our dates are just maybe a day off or whatever,

1    is it a possibility that maybe you have gotten some

2    of the dates wrong just on the information that

3    we've gone over here in the trial?

4         A.    I feel sure about the 4th.

5         Q.    Okay.

6         A.    And I have -- I have written down over the

7    weekend every day after that that I'd like to share

8    later, but I -- I don't feel like I have missed

9    anything pretty much at all.

09:54AM 10        Q.    Okay.  And if it turns out that the data,

11   just the dates themselves, due to the fast-paced

12   time might be a little off, would that be an

13   intentional mistake of yours?

14        A.    No, ma'am, it would not be intentional, no.

15        Q.    Okay.  So you stated that you had

16   first -- just so we have the order correct here, you

17   first tested -- tested this process.  So I'm going

18   to focus for a second on this process without going

19   into, you know, detail about the video because it

09:55AM 20   hasn't been presented or in evidence.

21              The process, you went first and tried

22   it with credit cards and loans and what?

23        A.    Car insurance.

24        Q.    Car insurance?

25        A.    Correct.  Through USAA.

1      Q.   Okay.  Were all the accounts that you used

2  initially all through USAA?

3      A.   No.  Actually, I paid off all my credit

4  cards.  I have, like, 15 credit cards.

5      Q.   And the credit cards were preexisting to

6  July --

7      A.   Yes, ma'am.

8      Q.   Okay.  And are those for work that you use

9  those credit cards for for your costs?

09:56AM  10      A.   Yes, ma'am.  I also -- if I may add -- did

11  a purchase on Amazon that cleared.

12      Q.   Okay.  Well, let me get the order -- I want

13  to clarify what the order was --

14      A.   Okay.

15      Q.   -- as far as which product, banking

16  product, whether -- like a credit card is one

17  product.

18      A.   Okay.

19      Q.   I want to go through that.

09:56AM  20             So, USAA.  You did your car insurance

21  first.  Then you went and did which one?

22      A.   I think at that point I went and paid off

23  the four vehicle loans.

24      Q.   Four vehicle loans.

25             And did you do that through USAA's

1    website to pay those --

2         A.   Correct, yes.

3         Q.   -- or were those external?

4         A.   That was through the USAA website, correct.

5         Q.   Okay.  So at this point you were only on

6    one website using the payment system, using the

7    process on the payment system?

8         A.   At this point, yes.

9         Q.   Okay.  And then from there, which --

09:57AM  10   what -- what product did you do next?

11        A.   After the car loans?

12        Q.   Uh-huh.

13        A.   I paid off two credit -- two credit cards

14   with USAA.  I only had two credit cards with USAA.

15        Q.   Okay.  So you did two credit cards.  So

16   that's still all with USAA.

17        A.   Correct.

18        Q.   Okay.  And then which -- then what did you

19   do next?  What did you use the process next on?

09:57AM  20        A.   I don't know.  I've got -- I had -- I have

21   a Wal-Mart credit card, a Target credit card, a

22   Marshalls credit card, several other credit cards

23   that I use for different, like, gas or whatever on

24   the road.  I paid off all those credit cards.

25        Q.   Is that the same day that you did all of

1    these?

2         A.    Yes, ma'am.   That is the same day, yes.

3         Q.    And did you pay off every credit card that

4    you -- all 15 that you had?

5         A.    Yes, ma'am, every one of them.

6         Q.    All in that one day?

7         A.    Yes, ma'am.

8         Q.    And, to the best of your recollection, did

9    each of those -- let's see.   Two were with USAA.   So

09:58AM  10   that would be 13.   Were those other 13 credit cards,

11   were -- did they have their own portal that you had

12   to go through or were they all on the same portal?

13        A.    They would -- they had their own portal.

14        Q.    Okay.   Now, we were shown -- we were shown

15   an exhibit where it had --

16             MS. TUCCI-JARRAF:   Exhibit 91, David.

17   Would you mind helping me with that, please.

18                  Thank you.   Exhibit 91.   And I believe

19   there is multiple pages on that exhibit.   So, page

09:59AM  20   3, please.

21   BY MS. TUCCI-JARRAF:

22        Q.    I'm going to show you this statement.   I

23   guess maybe five.   It's the one that has supposedly

24   the account number and the routing number showing.

25   It was during the verify -- okay.   Well, we can

```
 1   start here (indicating).

 2                  So, is this showing your -- this is

 3   USAA --

 4        A.   Correct.

 5        Q.   -- is that correct?

 6                  Okay.  Is this -- to the best of your

 7   recollection, is this what the page looked like when

 8   you were actually filling it out?

 9        A.   Yes, it is.

10   Q.   Okay.  And you had to put your name -- this

11   is all your -- the information with USAA Bank that

12   has already on file prior to you doing anything with

13   this process from Harvey Dent; is that correct?

14        A.   Correct.

15        Q.   Okay.

16             MS. TUCCI-JARRAF:  Could I have the next

17   page, please.

18   BY MS. TUCCI-JARRAF:

19        Q.   Okay.  And are these -- just so that we

20   know, this is an actual Open a Bank Account and it

21   looks like those screen shots for each and every

22   action that has to be taken to open the account.

23   Did you -- did you provide these documents to the

24   Department of Justice or the FBI?

25        A.   No, ma'am, I did not.
```

1      Q.    So these aren't your documents?

2      A.    No, ma'am.

3      Q.    These aren't from the day that you actually

4  went in to do them, to the best of your knowledge?

5      A.    No, ma'am, they're not.

6      Q.    Okay.  To the best of your recollection, is

7  this -- is this an accurate screen shot of what you

8  experienced when you were on action number three of

9  opening a bank account?

10     A.    Yes, it is.

11     Q.    And this appears to be for a CD.

12     A.    Yes.

13     Q.    Okay.  Before I move further on this

14  particular exhibit then, on 91-6, because so far

15  you've only told me -- let's see.  You've told us

16  about the car insurance, the four car loans, two

17  credit cards from USAA, and then all the remaining

18  13 credit cards.  When was the CDs then?

19     A.    Later that evening.

20     Q.    Later that evening?

21     A.    Yes.  I had -- at some point that day, I

22  had to go out and do some errands, and at that point

23  was when I -- I was up towards Turkey Creek, and I

24  decided to go over and look at the RVs at Buddy

25  Gregg RV.

         Q.    Okay.  So that -- so "later that evening,"

that would be July 5th then?

         A.    Correct, yes.

         Q.    Okay.  And on that day, approximately, to

the best of your recollection, how many CDs did you

apply for?

         A.    That evening?

         Q.    Uh-huh.

         A.    I think there was 27, 28, somewhere around

in there.

         Q.    So approximately 27 or 28?

         A.    I think so.

         Q.    Okay.

         A.    It's been over six months since that night;

so it's hard to recall.

         Q.    Just to the best of your recollection.

Okay.

               Okay.  So we'll go back here.

               MS. TUCCI-JARRAF:  May I please have 91-7.

Thank you.

BY MS. TUCCI-JARRAF:

         Q.    Do you recall -- could you please look at

this exhibit here (indicating).  And, to the best of

your recollection, would this have been the next

step --

```
 1      A.    Yes.

 2      Q.    -- in the opening of an account?

 3      A.    Yes.

 4      Q.    Okay.  But this isn't from you --

 5      A.    No, ma'am.

 6      Q.    -- and your screen shot?

 7      A.    No, ma'am.

 8            MS. TUCCI-JARRAF:  Okay.  Could I please

 9      have 91-8.

10  BY MS. TUCCI-JARRAF:

11      Q.    Okay.  Can you see that?

12      A.    Yes.

13            MS. TUCCI-JARRAF:  Oh.  Thank you, David.

14  BY MS. TUCCI-JARRAF:

15      Q.    Okay.  So this would be Make Your Initial

16      Deposit.

17      A.    Yes.

18      Q.    Obviously this isn't your screen shot --

19      A.    No.

20      Q.    -- that you provided.

21                  So, does this page, though, look like

22      or look exactly like or similar to the one that you

23      had filled out --

24      A.    Yes.

25      Q.    -- with those 27-plus CDs?
```

 1          A.    It looks exactly like it, yes.

 2               MS. TUCCI-JARRAF:  Okay.  91-9, please.

 3     Thank you.

 4     BY MS. TUCCI-JARRAF:

 5          Q.    Can you see that exhibit, Mr. Beane?

 6          A.    Yes.

 7          Q.    This is -- which step is that?  That's

 8     the --

 9          A.    The Verify step?

10:04AM 10          Q.    Yeah, the Verify step.

11               Is this your actual screen shot that

12     you made while you were filling this out?

13          A.    No, it is not.

14          Q.    Okay.  This information here, does it look

15     similar to what you would have -- the fields,

16     account type, primary account holder, etcetera, are

17     these similar to the account fields that you

18     experienced on the night that you opened up the 27

19     CDs?

10:04AM 20          A.    Yes.

21               MS. TUCCI-JARRAF:  Could you please scroll

22     down on that one, please, David.

23     BY MS. TUCCI-JARRAF:

24          Q.    I'm going to have you look -- and there is

25     the bottom of it (indicating).

1              Can you take a look at those fields?

2      A.    Yes.

3              MS. TUCCI-JARRAF:  Okay.  91-10, please.

4  Oh, that's it (indicating).  Okay.  Thank you.

5  Thank you, David.

6  BY MS. TUCCI-JARRAF:

7      Q.    So we don't have any exhibits on -- regarding

8  6 and 7 of that particular process you would have

9  had to go through on that day in order to do

10 the -- to do the CDs, to complete them, and I

11 believe the last two steps show -- on 91-9, step 6

12 is Sign and step 7 is Confirm; is that --

13     A.    Correct.

14     Q.    -- what you read?  Is that correct?

15     A.    Correct.

16     Q.    And when you opened the CDs, were you able

17 to access step 6 to sign?

18     A.    Yes.

19     Q.    And were you able to access step 7 -- step

20 7 to sign or to confirm?

21     A.    Yes.

22     Q.    Okay.  And when you were -- obviously in

23 order to do all of this, you had to be able to add

24 an external account as a payment method; is that

25 correct?

1    A.   Right.

2    Q.   With USAA?

3    A.   Correct.

4    Q.   Did you also have to add an external

5  account to -- I think it's an additional payment

6  account; is that correct?

7    A.   Yes.

8    Q.   Did you also have to add an additional

9  payment account for the other 13 individual portals

10:06AM 10  that you had to do for the other 15 -- or the other

11  13 credit cards?

12    A.   Yes.

13    Q.   And does it remember the data?

14    A.   Yes.

15    Q.   Does it save or do you have to fill it in

16  each time?

17    A.   It saves it.

18    Q.   It saves it?

19    A.   You can label it.

10:07AM 20    Q.   And then are you able -- how do you

21  identify -- if you have multiple Payments From

22  options, how do you identify which one you're using,

23  whether it's a card or the new accounts?

24    A.   You do a drop-down.  There is, like, a

25  little drop-down, and it has all the accounts listed

 1    there to be able to use.

 2        Q.    Okay.  So you -- when you add an additional

 3    account, it will let you choose between prior

 4    payment methods that you've entered in to send

 5    the --

 6        A.    Correct, correct.

 7        Q.    When you enter in a new payment method,

 8    because this was a -- Open a CD that we just went

 9    over on Exhibit 91.

10:08AM 10            When you went in to set up your new

11    payment method, could you please clarify what the

12    actual screen looked like.

13        A.    Actually, it wasn't setting up a payment

14    method; it was setting up an account I wanted to

15    pull the funds from.

16        Q.    Uh-huh.

17        A.    And it was -- if you go back to the

18    previous screen --

19        Q.    To --

10:08AM 20        A.    To the deposit.

21        Q.    To 91?

22        A.    Yes, right there (indicating).

23        Q.    Okay.

24        A.    Can you enlarge that, please.

25            You see in that -- or right above Use

1  Other Account --
2      Q.   Uh-huh.
3      A.   -- there is a white box there with a little
4  arrow pointing down.
5      Q.   Right.
6      A.   You can click on that arrow and it gives
7  you a list of your accounts with USAA.
8      Q.   Okay.  So the other accounts or another
9  account, that's actually saved within the USAA
10  documents?
11      A.   Right.  Yes, correct.
12      Q.   And then did you assign, like, a nickname
13  to any of --
14      A.   Yes.
15      Q.   -- your other accounts?
16      A.   Yes.
17      Q.   Is that how you distinguish which one to
18  use?
19      A.   Correct, yes.
20      Q.   Okay.  Once you set up the other account,
21  do you ever go back in to change anything?
22      A.   No.
23      Q.   Okay.
24      A.   I'm -- I'm sure you could, but I didn't --
25  I didn't have a need to.

Q.   Okay.  And on the other portals, which we
don't have any exhibits for, on the other portals
for the other 13 credit cards, do they look exactly
the same as this or do they look different?

A.   Somewhat.  I mean, it's the same -- you
know, depending on what company it is.  They have
their -- the way it's set up is:  You go in and
enter, you know, your payment information; in this
case, an ACH payment, and pretty much the same --
the same type of format.

Q.   Okay.  And when you're setting up this
other account to be able to pay from or make initial
deposits from, what information does it require?

A.   Only the routing and account number.  The
name is used -- the name on the account is my name,
which, from my understanding, if the name didn't
match up, it wouldn't -- the account wouldn't even
be valid.  If I tried to use an account with your
name on it, per se, and tried to use your account
numbers, it wouldn't work is what I'm trying to say.

Q.   So the routing number and the account
number --

A.   Correct.

Q.   And the account name?

A.   The name is whatever name is on the USAA

1    account is the only name you can use.  You can't

2    change the name.

3         Q.   Okay.  Do you know if that's because of the

4    strict regulations they have as far as who can be

5    participants in the bank and --

6         A.   I guess they just want you to use your

7    accounts.  That's the only reason they do that.  If

8    it's not your accounts, you can't use it.

9         Q.   Right.  Okay.

10:11AM  10              So when you entered in the -- is there

11   any time in all the numbers -- numbers of accounts

12   that you say that you went to go pay off on that

13   day -- not even the CDs; I'm not even talking about

14   that.  But on the car insurance, four car loans and

15   two credit cards and the other 13 external portal

16   credit cards, did you enter the same routing number,

17   to the best of your recollection?

18        A.   Yes.

19        Q.   Did you enter the same account number --

10:11AM  20        A.   Yes.

21        Q.   -- to the best of your recollection?

22        A.   Yes, I did.

23        Q.   And did you enter the same account name for

24   the other 13 external credit cards that you did in

25   USAA --

           1      A.   I --

           2      Q.   -- or was it different?

           3      A.   I don't think they had -- a lot of those

    didn't have a place to label the account.  It was

           5   just entered -- enter the routing and account

           6   numbers.  And it used my name on the account as the

           7   name on the account.

           8      Q.   Okay.  So you always put in Randall Keith

           9   Beane --

10:12AM   10      A.   Correct.

          11      Q.   -- on each time?

          12           And your account number, you always

          13   put the same account number?

          14      A.   Yes, correct.

          15      Q.   Okay.  And the routing number; always the

          16   same routing number --

          17      A.   Correct.

          18      Q.   -- for those days?

          19           And when you enter in the routing

10:12AM   20   number, to the best of your recollection, did it

          21   actually just automatically pull up a name?

          22      A.   It did.  Yes, it did.

          23      Q.   At any time did it not automatically pull

          24   up the name?

          25      A.   No, every time I entered it, it pulled up

1    the bank name where the funds were being pulled

2    from.

3         Q.   And at any time did it say that the bank's

4    name was Federal Bank --

5         A.   No.

6         Q.   -- or Federal Reserve Bank of New York?

7         A.   Never.

8         Q.   Did it ever have Federal Reserve Bank in

9    the name that was shown at all?

10:13AM 10        A.   Not to my recollection.  It just was some

11   type of clearinghouse, payment clearinghouse.

12        Q.   Okay.  And when you entered in your account

13   number, did it show you all the numbers that you

14   were entering in or something else?

15        A.   I'm not sure I understand.  Yes.  Yes, I

16   got you.  Yeah, it did show me the numbers as I

17   typed them in, yes.

18        Q.   It showed you the numbers as you typed them

19   in?

10:13AM 20        A.   Yes.

21        Q.   Okay.  And then did you ever -- or excuse

22   me.

23              After you entered that information in,

24   what step would it have you take?

25        A.   Hit confirmation and make the payment.

1     Q.   And when -- did you -- did it show you --

2  on the confirmation, when you clicked on

3  confirmation, did it then give you a confirmation

4  page?

5     A.   Yes, ma'am, it sure did.  It would send me

6  a confirmation e-mail, actually.

7     Q.   Confirmation page.  On that confirmation

8  page, did it show all the numbers of the account?

9     A.   To the best of my recollection, it did,

10  yes.

11     Q.   Okay.  So, on the confirmation page, it

12  said something like it's successful or "Thank you

13  for your payment"?

14     A.   "Thank you for your payment.  Confirmation

15  number.  Keep this for your records."

16     Q.   Okay.  And on that it would state what

17  payments, account name and account number and all

18  that, that you had done it from?

19     A.   Correct, yes.

20     Q.   And it listed the complete name and the

21  complete account number on there?

22     A.   It depends on which payment it was.  I

23  would -- I don't remember if it did that on

24  every -- every one, but I remember some of them

25  having all the information available and the

1    confirmation number.

2        Q.    Okay.  Did you ever enter in a wrong

3    routing number where -- I mean, where it wouldn't

4    confirm -- you wouldn't get a confirmation page?

5    Did you ever have an experience where you resulted

6    in not getting a confirmation page?

7        A.    No.

8        Q.    Okay.  And on the 27 or 28 CDs that you did

9    later that evening, the same kind of process; did

10:16AM  10   you get a -- on the confirmation page, did it list

11   the account it was deposited from?

12       A.    Yes.  Well, it would -- at the time I had

13   labeled the -- when I put in the first one, I

14   labeled it Trust 2.  And so that's all I ever saw;

15   when I pulled up that account, it would be Trust 2.

16       Q.    So once you entered the routing number, the

17   account name, number and all that, you never saw it

18   again?  Once you entered it in, it would pull up the

19   nickname?

10:16AM  20   A.    Correct.

21       Q.    And that was Trust Account 2?

22       A.    Correct.

23       Q.    So, Trust Account 2, is that what was used

24   for the --

25       A.    CDs.

1    Q.   -- nickname that you would use just for the

2    CDs?

3    A.   Yes.

4    Q.   And you had another trust account that you

5    had entered in for the --

6    A.   Yes.

7    Q.   -- credit cards and loans?

8    A.   The ones that I -- the routing number that

9    I started with that day changed sometime during the

10:17AM  10   course of the day.  They changed the routing number

11   for the same bank.

12   Q.   How do you know they changed the routing

13   number?

14   A.   Because when I went in to purchase the CDs,

15   the routing number said it was not valid.

16   Q.   Okay.  So the routing number -- when you

17   went to -- did you figure that out as you were

18   filling out the CD Open a Bank Account --

19   A.   Correct.

10:17AM  20   Q.   -- process?

21   A.   Correct.

22   Q.   And you entered in your original trust

23   account info or the nickname.  You clicked on the

24   nickname for the original --

25   A.   Correct.

1      Q.   -- and then --

2      A.   It said that the account was not valid.

3      Q.   So account was not valid.

4      A.   The routing number.  Excuse me.  The

5 routing number was not valid.

6      Q.   Routing number was not valid.

7      A.   Yeah, it didn't say anything about the

8 account.  It said the routing number was not valid.

9      Q.   Okay.  And that was at the point that you

10:17AM  10 went and did the Trust Account 2?

11      A.   At that point, I went and located the new

12 account -- new routing number, and then -- and input

13 that routing number.

14          Because it -- I was on Skype, and we

15 were all discussing that the routing numbers were

16 being changed really quick.

17      Q.   In fact, I believe I was creating a

18 spreadsheet at that point just to figure out --

19      A.   Just -- right.

10:18AM  20      Q.   -- what was happening on the routing

21 numbers?

22      A.   Right.  And you made -- you had told me at

23 one point you had made a contact call to tell them

24 to stop changing routing numbers.

25      Q.   Okay.  So you located a new routing number.

1      Was that from the Federal Reserve --

2           A.   That --

3           Q.   -- Bank's website or --

4           A.   No, I actually Googled -- the bank that I

5      was -- the bank name that came up whenever I typed

6      in the first routing number, I typed in that bank

7      name in Google and it gave me the new routing number

8      immediately.

9           Q.   Okay.  So you Googled the bank --

10:19AM 10          A.   The bank name.

11          Q.   -- name that kept coming up?

12          A.   Right.  It was like the Clearinghouse of

13     New York or something like that.

14          Q.   And it gave you -- it listed a new routing

15     number for that bank?

16          A.   It listed a new routing number, correct.

17          Q.   But it was for the same bank?

18          A.   For the same bank, correct.

19          Q.   Did they -- how do you know it was the same

10:19AM 20     bank?  Did it have the address, or how do you know?

21          A.   I had the address.  I had everything.  It

22     was -- I don't remember the address or nothing, but

23     for some reason Peachtree Street comes up.  But --

24          Q.   Peachtree?

25          A.   -- I'm thinking that was the address.  It

1    was, like, Peachtree Street.

2              But I knew -- I confirmed the bank

3    name, the bank address and everything, and that's

4    how I Googled it, and that's how I found the new

5    routing number.

6        Q.   Okay.  So you didn't Google until after you

7    had already gotten through confirmation of the bank

8    and the bank address and all that?

9        A.   Well, I had been using the first routing

10:20AM  10   number that I found on the Harvey Dent video prior

11   to the -- when I went in to purchase the CDs, it

12   gave me -- when I used that -- that same routing

13   number, it said the routing number was not valid.

14             So I went to Google the bank and find

15   out what was going on, and it gave me a new routing

16   number right there on Google.

17       Q.   Okay.  So then after you got that, you went

18   in and did the same process to enter that as another

19   account?

10:20AM  20   A.   That was why I labeled that one Trust 2

21   because it was a different routing number.

22       Q.   Okay.  So, but you left the original --

23       A.   As trust -- as just trust.

24       Q.   And that has the original routing number --

25       A.   Correct.

1     Q.   -- that you had used for all the loan and

2  credit card --

3     A.   Correct.

4     Q.   -- payments?

5     So at that point is that the one -- is

6  that the only -- Trust Account 2, is that the only

7  one that was used to purchase those 27 or 28 CDs?

8     A.   Yes, yes.

9     Q.   And did you get a confirmation -- you went

10:21AM 10  through each and every step that I showed you here

11  in 91 --

12     A.   Right.

13     Q.   -- and its subparts?

14     A.   Right.

15     Q.   And at any time did you get a -- excuse me.

16     Each time did you get a confirmation

17  page?

18     A.   There was some times when I would be on the

19  phone and not realize that my session would time

10:21AM 20  out, and then I went back to work on it and it

21  would -- it would completely close out and go back

22  to the beginning and not let me finish out.  So it

23  did not confirm.  And I understand those are showing

24  up as invalid transactions or incomplete or

25  something like that.

1    Q.   Okay.  So it only gives you so much time to
2  complete them?
3    A.   Exactly.  You're timed out.  If you don't
4  do everything within a certain amount of time, it
5  times out on you.
6    Q.   Uh-huh.  Okay.  But the other, obviously,
7  27 or 28 times that you went in to go do this, there
8  was some kind of confirmation?
9    A.   There was, yes, for every one.
10    Q.   For every one?
11    A.   Correct.
12    Q.   You never got a no confirmation; not valid?
13    A.   No.  Not -- not as long as I did it within
14  the proper time frame that was allowed.
15         If I -- like I said, there was a time
16  period where when I'm on this -- this part of the
17  products, which is buying an initial -- making an
18  initial deposit or whatever, if any of these screens
19  time out --
20    Q.   Uh-huh.
21    A.   -- it closed out that whole buying process
22  for that CD.
23    Q.   Uh-huh.  In fact, you had called me after
24  you had done a number of them already --
25    A.   Correct, yes.

```
 1        Q.    -- to let me know?

 2        A.    I actually Skyped you.  No, I may have

 3   called you and then we got on Skype.  That may have

 4   been that way.

 5        Q.    Okay.  Somehow some way --

 6        A.    Yes.

 7        Q.    -- we talked after you had already done a

 8   number of them; is that correct?

 9        A.    Correct.  Yes, uh-huh.

10        Q.    And on that call, I had asked you to walk

11   me through what you were doing --

12        A.    Yes.

13        Q.    -- at that particular point?

14        A.    Correct.

15        Q.    Okay.  And you were walking me through --

16   actually, as you were filling out the information as

17   we've seen here in 91-8?

18        A.    That's correct.

19        Q.    And during that time it got sessioned out?

20        A.    Right.

21        Q.    And we ended the call at that point so you

22   could go back and do it?

23        A.    Well, no, we actually -- we stayed -- we

24   stayed on Skype.  That's why we put it on Skype.  So

25   I just -- I think I had my -- I had my phone and my
```

1  tablet and my -- I was on my Mac computer.

2      Q.    Right.

3      A.    And so I had my tablet set up with Skype

4  waiting for phone calls and doing the -- doing the

5  transactions actually on the Mac --

6      Q.    Okay.

7      A.    -- computer.

8      Q.    And we were -- that's right.  We were

9  videoing.

10:24AM 10      A.    Yes.

11      Q.    You had a hat on.

12      A.    Yes.

13      Q.    And during that video call, while you were

14  going through the process, I had asked you to

15  specifically tell me what steps you were doing --

16      A.    Yes.

17      Q.    -- in that particular --

18      A.    Yes.

19      Q.    Okay.  Similar to what I'm actually asking

10:24AM 20  you here during this --

21      A.    That's correct.

22      Q.    -- cross right now?

23      A.    Correct, exactly.

24      Q.    Okay.  And at that time I asked you to

25  please, if you could, take screen shots of each of

1    the process?

2         A.    And that was something I didn't know how to

3    do on the Mac.  I knew there was a way to do it; I

4    just didn't know how to do it.

5         Q.    Right.  I was actually trying to find you

6    some --

7         A.    I actually did not get any screen shots of

8    any of that.

9         Q.    Of how to do screen shots.

10:25AM  10   A.    Right.

11        Q.    So there were no screen shots that you were

12   able to take?

13        A.    No.

14        Q.    Okay.  Did we go over anything else at that

15   point after your session had timed out and we

16   had --

17        A.    No, I don't remember going over anything

18   else.

19        Q.    Okay.  And then what did you do after that,

10:25AM  20   after our phone call?

21        A.    After our phone call, my mouse had died for

22   my Mac, because it's a wireless mouse.  After -- I

23   made several clicks.  In the process of opening the

24   CD, after you go through all these seven different

25   steps, and once you get to the sign part, there is

1    several electronic signature steps that are

2    necessary in order to complete this process, and

3    then the confirmation is another step.  So there

4    were several clicks taking place, and my mouse was

5    almost dead, and when my mouse died, I just went to

6    bed.

7         Q.   So when you say it takes multiple clicks to

8    do the sign, are you talking about step 6, Sign?

9         A.   Yes, yes.

10:26AM 10         Q.   So within -- once you get to step 6, Sign,

11    there is a whole bunch of pages or a whole bunch of

12    clicks?

13         A.   There is a lot -- there was screens that

14    kept popping up asking about -- I don't remember

15    exactly what they were asking, but it was

16    confirmation.

17         Q.   Was there --

18         A.   Verification.  Excuse me.

19         Q.   I'm sorry.  I didn't mean to cut you off.

10:26AM 20               Verification, you say?

21         A.   Yeah, types of verifications and just

22    clicking on -- I don't remember, but it was a lot of

23    clicks.

24         Q.   So confirmation/verification.  Did it ever

25    ask you on that step 6 through all those clicks, did

1   it ever have an authorization thing you had to click

2   on?

3        A.   Yes.  And it was a -- it was like an

4   electronic signature-type.

5        Q.   What do you mean "an electronic" -- oh,

6   that you authorize for the --

7        A.   Yes.

8        Q.   Your electronic signature?

9        A.   Yes.

10:27AM  10        Q.   Is that an electronic signature that you

11  have already previously --

12        A.   Yes.

13        Q.   -- deposited with USAA?

14        A.   Yes.

15        Q.   How did you previously deposit an

16  electronic signature with USAA?

17        A.   By mail.

18        Q.   So it was an actual physical --

19        A.   Card.

10:27AM  20        Q.   -- card you had to sign?

21             Did it have a box and you just signed

22  in the box?

23        A.   Correct, yes.

24        Q.   Do you remember when the

25  previously-deposited signature card -- do you

```
 1    remember around what that -- what time of year

 2    or --

 3         A.    That would have been in May of 2016; around

 4    about May or June, because they mailed it to me and

 5    had me sign it and then I mailed it back.

 6         Q.    After you had opened your account or --

 7         A.    Correct, yes.

 8         Q.    -- before you had opened your account?

 9         A.    Correct.

10         Q.    Did you send all that kind of paperwork to

11    Texas?

12         A.    Yes.

13         Q.    San Antonio?

14         A.    Correct.  To the best of my knowledge,

15    there are no USAA offices in Tennessee at all.

16         Q.    Right.  In fact, I had asked you if there

17    were offices in Texas, and you had told me that it

18    was just the headquarters that you knew about?

19         A.    Correct.

20         Q.    Okay.  You spoke on your direct about USAA

21    security protocols were high.

22         A.    Yes.

23         Q.    Can you please explain to me what

24    you -- what you mean by that.

25         A.    Very often in my travels, I would get
```

10:28AM (line 10)
10:29AM (line 20)

1    a -- I kept my phone right here (indicating) when I

2    was driving, and I'd often get a call from USAA, and

3    oftentimes it would be the fraud department telling

4    me that there was a transaction taking place on my

5    credit card.  I might be in Washington, D.C., but

6    there is a gas charge in Pennsylvania.

7                    And so they would confirm that that was

8    an actual fraud charge and cancel it and cancel that

9    credit card and send me a new card immediately, and

10:30AM 10   that would be -- I mean, the transaction might have

11   taken place 10, 15 minutes prior to the call.

12        Q.   So when you say the USAA protocols are

13   high, that's just based on your experience dealing

14   with them?

15        A.   Off of my experience with banking with

16   them, correct.

17        Q.   Have you ever banked with anybody else?

18        A.   Yes.

19        Q.   Approximately how many institutions have

10:30AM 20   you banked with other than USAA?

21        A.   Oh, wow.

22        Q.   I mean, if you can recall.

23        A.   Do you want me to give you the institutions

24   or just the --

25        Q.   No, I just -- how many -- like, how many

1    other?  Just a number.

2        A.    20 or so, maybe.

3        Q.    Throughout your -- your life?

4        A.    Throughout my life, yes.

5        Q.    And out of those 20 or so, have you ever

6    done online banking through them?

7        A.    No.

8        Q.    So USAA was your first time doing online --

9        A.    Yes.

10:31AM 10        Q.    -- banking?

11        A.    Yes, first time.

12        Q.    Now, I don't want to go into the details of

13    any acts or things like that, legislation or

14    anything, but you had made mention that when you had

15    stated that the USAA protocols were high, you were

16    talking about the Patriot Act.  Was that something

17    that the bank had told you from the fraud department

18    or --

19        A.    No, I had been keeping up with different

10:32AM 20    things that were taking out -- taking place from the

21    LIBOR scandal, the mortgage -- the housing bubble.

22            I mean, there was different things.

23    And one thing I remember after 911 was the protocols

24    for banking were significantly increased because of

25    terrorism threats.

1    Q.   Okay.   Thank you.   I just wanted to clarify

2    if that was something USAA had told you.

3    A.   No.

4    Q.   You said LIBOR scandal, mortgage scandal,

5    and what else?

6    A.   The bailouts.   That's what it was, the

7    bailouts.

8    Q.   Oh, the bailouts.   Like TARP?

9    A.   Yeah.   Well, you know, the bank bailouts

10:32AM   10   that -- you know, the General Motors and Chrysler

11   and all those bailouts that happened all during that

12   time with all the banks.

13   Q.   Oh, the too-big-to-fail bailouts.

14   A.   Yes, the too big to fail; correct.

15   Q.   They're separate from TARP.

16   A.   Okay.

17   Q.   Just so we understand.

18        Oh, you had also stated that when you

19   had been questioned on July 5th -- excuse me.   Not

10:33AM   20   when you're being questioned.

21        You had stated that on July 5th when

22   you went to go and -- I believe you had said you

23   were looking for a line of credit to use against the

24   CDs.

25   A.   Yes, I -- that morning when I woke -- no,

         that was on the 6th, actually.

             Q.    Okay.

             A.    That morning when I woke up, I called USAA

    to inquire about how to obtain a line of credit

    against the CDs in order to be able to make a

    purchase.

             Q.    Have you ever owned CDs before?

             A.    Yes, I have.

             Q.    You have owned CDs.

                   And in the past with those CDs, have

    you gotten lines of credit against them or --

             A.    Yes, I have, yes.

             Q.    So that's how you knew --

             A.    I could do that, yes.

             Q.    -- you could do that?

             A.    I actually had a CD at the time with a line

    of credit against it with USAA.

             Q.    Oh, you had an existing one with them?

             A.    Yes, $5,000.

             Q.    Had you had CDs and used them as collateral

    at any of the other 20 institutions or so that

    you've had in your lifetime?

             A.    Yes, ma'am.

             Q.    So it sounds like prior to banking with

    USAA, did you have loans and things like that with

```
 1    those other 20 institutions as well?
 2         A.   Yes, ma'am.
 3         Q.   Do you still have those loans?
 4         A.   No, no.
 5         Q.   They're satisfied?
 6         A.   Yes, they're all satisfied, correct.
 7         Q.   Okay.  Okay.  And was it the USAA who told
 8    you you could cash those CDs?
 9         A.   Yes, ma'am.
10         Q.   I believe we heard that on video.
11         A.   When I asked about opening a line of
12    credit, when she -- when she inquired how much and I
13    told her I'd just like to just maybe get a
14    half-a-million-dollar line of credit against one of
15    the smaller CDs, and so she said, "Well, if you're
16    going to do that, why don't you just cash in the
17    CD."
18              And I said, "Can you do that without
19    letting it" -- you know -- "mature?"  She said, "Of
20    course you can."
21              Well, I said, "How much is that going
22    to cost?"  And when she told me the cost, it was
23    relatively low for the amount of CDs.  So we decided
24    to go ahead and cash it in.
25         Q.   I remember that call.  I don't remember
```

          which exhibit that was, but that was when you were

          discussing, like, a 99,000 --

               A.    It was actually a half-a-million-dollar CD,

          and she told me it was going to be $47 to cash it

          in.

               Q.    Right.  But before that, you were asking

          for a line of credit and there was a whole

          conversation on that?

               A.    Oh, no, no.  That was about my debit card.

10:36AM   Q.    Oh, that was about your debit card?

               A.    Yeah, raising the debit card limit,

          spending limit.

               Q.    It was very hard for me to hear this audio.

               A.    Yeah, it's hard.

               Q.    So excuse the confusion.

               A.    That's okay.

               Q.    Okay.  And you had just purchased those,

          like --

               A.    The night before.

10:36AM   Q.    -- hours before?

               A.    The night before, yes.

               Q.    And she told you you could cash them?

               A.    She did, yes.

               Q.    And you had actually -- I believe on

          that -- on that call, we heard you state that you

believed you had to wait 30 days before you could

cash any of them?

    A.    Actually, they didn't play that call.  They

played the one that afternoon.  They never played

that call of that morning when I first talked to the

USAA Bank about cashing in the CD.  But I was

shocked.

    Q.    I'm just quoting from the notes that I have

regarding that audio.  So -- so it was immediately

cashed within hours of you purchasing it?

    A.    Oh, within a couple of minutes.  Oh.  Oh,

no.  Within hours of me purchasing?  Yes.

    Q.    Within hours of you creating the CD?

    A.    Yes.  I agree, yes.  I thought you meant

when she cashed it in.  Sorry.

    Q.    Yeah.  How long did that process take?

    A.    Just a couple of minutes.

    Q.    Okay.  And how long did it take for you to

actually open the CD?

    A.    Oh, it took longer to open it than it did

to cash it in.  I would say the whole process of

clicking through all these pages, it took at

least -- I don't know -- a good four, five minutes

per page waiting on things to open and close and

verify.

```
 1      Q.   Okay.  Excuse me.

 2              Do you remember how long it would take

 3   before it would end your -- or your session would

 4   time out, like how long it gave you before it timed

 5   out?

 6      A.   I don't know.  If I started something and

 7   got up and went to the bathroom, when I came back,

 8   it would be timed out.  It depends on if you're not

 9   making movement on that page, I think.  If you're
```

10:38AM  10   not moving your mouse or anything.

```
11              And I think that's part of USAA's

12   security protocol to keep someone from being able to

13   access your account while you're not at your

14   computer or something.

15      Q.   But you don't actually know what their --

16      A.   I do not.

17      Q.   -- security protocols are, do you?

18      A.   I have no idea.

19      Q.   Did you ever talk to USAA about their
```

10:39AM  20   security protocols?

```
21      A.   No, every time I talked to them, I told

22   them how excited I was that they took care of me the

23   way they did.

24      Q.   Okay.

25      A.   That was the only thing I had ever
```

 1    mentioned about their security.

 2        Q.    And out of all the published material or on

 3    their website or their pamphlets, they don't

 4    describe what their security protocols are?

 5        A.    Not to my knowledge.  I've not seen

 6    anything.

 7        Q.    Okay.  Have you ever seen any written

 8    material on either their web- -- USAA's website or

 9    in written form regarding the ACH payment system?

10:39AM  10        A.    No.

11            MS. TUCCI-JARRAF:  Let me just check to see

12    if I have any more questions.

13            THE WITNESS:  Okay.

14    BY MS. TUCCI-JARRAF:

15        Q.    Actually, regarding this -- the factualized

16    trust, the document --

17            MS. TUCCI-JARRAF:  It's not 105.  That's

18    the -- pull up 105, please, David, if you would.

19    BY MS. TUCCI-JARRAF:

10:40AM  20        Q.    Okay.  Is this an actual -- is this the

21    actual factualized trust or is this a document

22    issued from the factualized trust?

23        A.    This is a document issued from the

24    factualized trust.  This is when I purchased the

25    coach, the documentation to put the coach in the

1    trust.

2        Q.   This is the -- to the best of your

3    knowledge, is this the sale validation that

4    Miss Palmisano asked for?

5        A.   Yes.

6             MS. TUCCI-JARRAF:  Thanks.  Excuse me.

7    BY MS. TUCCI-JARRAF:

8        Q.   And, in fact, I created that document,

9    didn't I?

10:40AM  10       A.   Yes, you did, yes.

11       Q.   And I e-mailed it to you --

12       A.   Yes.

13       Q.   -- for your signature?

14            And I e-mailed it to you on

15    the morning of July 11th?

16       A.   That's right, on the morning of the 11th,

17    correct.

18            MS. TUCCI-JARRAF:  Pardon me.  Something is

19    stuck in my throat.

10:41AM  20   BY MS. TUCCI-JARRAF:

21       Q.   And along with this particular document,

22    that is your thumbprint and your --

23       A.   Initials.

24       Q.   -- initials?

25            MS. TUCCI-JARRAF:  Pardon me.

BY MS. TUCCI-JARRAF:

Q.   And along with this document, did you receive another document in your e-mail to also give to --

A.   Yes.

Q.   -- Buddy Gregg?

A.   Yes.

Q.   And that was the actual factualized trust document?

10:41AM   A.   Correct.  Which is six pages all total, I think, not counting these.

Q.   Not -- okay.

And, in fact, I created that document, didn't I?

A.   Yes, ma'am, you did.

Q.   And I e-mailed that to you again the morning of July 11th?

A.   Yes, ma'am.

Q.   And what did you do with those two
10:42AM   documents?

A.   I went to -- I think it was either Staples or Office Depot and had all that printed out, did my signature and the thumbprint and had them notarized.

Q.   And did you read those documents --

A.   I did, yes.

Q.   -- before signing and notarizing?

A.   Yes.

Q.   Now, a big question:  Did you understand those documents?

A.   For the biggest part, yes, I did.  A lot of the legwork that went into the documents I do not understand that are listed on the factualized trust, but I understand exactly what the trust represents.

Q.   When you say not the legwork, can you please clarify what you mean.

A.   All the effort that was put into the legwork behind the power behind these documents.

Q.   Are you referring to the UCCs that are cited in that?

A.   Correct.  I am, yes.

Q.   In fact -- in fact, those UCCs were preexisting --

A.   Yes.

Q.   -- to your factualized trust; correct?

A.   That is correct.  From my understanding, those are the documents that you told us Merry Christmas.  I'm pretty sure that was 2012.  You told us you had -- you came on the radio and you said, "Merry Christmas.  I've obtained the funds for the One People."  Something to that effect anyway.

1    Sorry.

2         Q.   That's fine.

3              Do you know anyone who understands

4    those UCC documents?

5         A.   You.

6         Q.   Am I the only one that understands those

7    UCC documents in your life?

8         A.   I don't know these people personally, but I

9    know that on the Blog Talk Radio shows, there are

10:44AM 10   several people who understood those documents.

11        Q.   But you state that you understood

12   the -- I'm sorry.  Could you repeat what you did

13   understand about that factualized trust.

14        A.   I understand the power behind and what it

15   represents for us.

16        Q.   Okay.  But you never received information

17   from me explaining how to use those UCCs at all?

18        A.   No.

19        Q.   Uh-huh.  And, in fact, did you receive any

10:45AM 20   information from me of how to use a factualized

21   trust?

22        A.   No.

23        Q.   And you did deliver those to -- the

24   factualized trust and this document, Exhibit 105,

25   you did deliver those to Buddy Gregg?

1  A.    I did.

2  Q.    What day was that?

3  A.    The 11th.

4  Q.    The 11th.  Okay.

5       And were you alone when you went to

6  deliver them?

7  A.    Actually, Alex and Val Wegner were with me

8  at that point.

9  Q.    Okay.  And who are Alex and Val Wegner?

10:46AM  10  A.    They're friends of mine who were involved

11  with the Blog Talk Radio shows as well and became

12  part of a tour that went across the United States

13  known as the Opal Tour.  And he was -- Alex was

14  actually the mechanic for a lot of the RVs on that

15  tour.  And we became good friends, and I went and

16  visited them in Wisconsin on one of my business

17  trips.

18  Q.    Do you remember what year that Opal Tour

19  was?

10:46AM  20  A.    I would say around 2014 -- 2013, 2014.

21  Q.    2013, 2014.  So you had been friends with

22  them since around approximately 2013, 2014?

23  A.    No, I wasn't friends with them at that

24  point.  I didn't become friends with them until

25  2015.

                    We met in North Carolina.  They were

coming -- they wanted to meet me, and so they

came -- they actually came to North Carolina, and we

ended up renting a home together, living together

for a while.

    Q.    Were you working in North Carolina at the

time?

    A.    At that time, no.  I had just left -- I had

just left a farm job that I had been on for 11 years

at that point.

    Q.    How many years?

    A.    11 years.

    Q.    Okay.  And you stated that Alex had been a

mechanic on the RVs on that tour from 2013, 2014?

    A.    Correct.

    Q.    Okay.  Is that why you had called him

specifically to come --

    A.    No.

    Q.    -- to Knoxville?

    A.    No.  The reason I -- we had been discussing

getting together here in Knoxville, because I told

him -- I was excited when I moved to Knoxville

because I just loved it here and I told everybody I

had moved to heaven.  So everybody wanted to come to

heaven and see me.

1    And Alex and Val were some of those

2 people who wanted to come to Knoxville, and we had

3 planned on a week during the summer to get together,

4 especially since I was on the road a lot, and I was

5 going to be off for the week of the 4th.  And so we

6 had planned on getting together.

7    Q.  Okay.  So, in fact, they had come in July

8 of 2017 -- during all of this, they had come

9 here --

10:49AM 10    A.  Yes.

11    Q.  -- to see you?

12    A.  Yes.

13    Q.  What day?  Do you remember what day they

14 showed up?

15    A.  I think they ended up showing up on either

16 the 9th or the 10th.  I'm not sure exactly what day.

17    Q.  So July 9th or 10th --

18    A.  Approximately.

19    Q.  -- of 2017?

10:49AM 20    A.  Correct.

21    Q.  So, like, a day or two before going to

22 Buddy Gregg?

23    A.  Yes.

24    Q.  Okay.  And had you -- had you given them

25 any cash to help them?

```
 1          A.    I wired them a thousand dollars to help
 2   them with gas and food and whatever they needed to
 3   get here.
 4          Q.    And what were they coming for?
 5          A.    They were going to go with me to Texas to
 6   pick you up and go to USAA Bank.
 7          Q.    Uh-huh.
 8          A.    And keep me company.
 9          Q.    So support?
10          A.    Yeah.
11          Q.    In fact, we were going to USAA Bank to
12   handle a lot of the situations that were presented
13   in court into evidence; is that correct?
14          A.    Correct, correct.
15          THE COURT:  We're going to take a break.
16   It sounds like you're about to end, but let's go
17   ahead and take a break anyway.
18          MS. TUCCI-JARRAF:  Okay.  Thank you.
19          THE COURT:  The jury is excused.
20          MS. TUCCI-JARRAF:  Thank you.
21               (Jurors excused.)
22          THE COURT:  Let me just double-check.  And
23   be seated just a moment.  You have a couple minutes
24   left from what you said a few minutes ago.
25          MS. TUCCI-JARRAF:  I still need to cover
```

the incident with the FBI that day.

THE COURT:  Right.  So how much time do you anticipate?

MS. TUCCI-JARRAF:  The FBI and then just the arrest of that day.  Probably about another 20 minutes.

THE COURT:  All right.  So, after that, Mr. Beane, that would finish the cross-examination.  You've seen during this trial after cross-examination --

THE WITNESS:  Redirect.

THE COURT:  -- there is the opportunity for redirect.

In your case, it would be the same factual narrative.  So I'll ask you at the end of the cross-examination, "Do you have any redirect examination?"  Do you think you do at this time?

MR. BEANE:  Yes, I do.

THE COURT:  So, again, that would be limited to the matters discussed on cross-examination and --

MR. BEANE:  Correct.

THE COURT:  -- you would need to do it in the same fashion that you did your direct examination.

1          MR. BEANE:  Yes, sir.

2          THE COURT:  And then the parties would have

3    the opportunity for recross-examination based on

4    your redirect.

5          MR. BEANE:  Okay.

6          THE COURT:  And then after that -- again,

7    you can change your mind, but based on what you told

8    me Friday, you don't have any other witnesses.

9          MR. BEANE:  No, sir.

10:52AM  10          THE COURT:  All right.  So I'll ask you if

11    you rest on your case, like the government rested on

12    its case.

13              And then after that, Ms. Tucci-Jarraf,

14    it would be your opportunity to make opening

15    statement.  Do you plan to make an opening

16    statement?

17          MS. TUCCI-JARRAF:  Yes, I do.

18          THE COURT:  Then that will be how we will

19    progress forward.

10:52AM  20          MS. SVOLTO:  Your Honor, I have a quick

21    question.

22              After Mr. Beane finishes his redirect,

23    you said the parties would be afforded an

24    opportunity to recross on the redirect.  Will I be

25    able to ask Mr. Beane questions that came out on the

1    cross between him and Ms. Tucci-Jarraf?

2               THE COURT:  Yes.

3               MS. SVOLTO:  Okay.  Thank you.

4               THE COURT:  We'll probably go in reverse

5    order on recross, if there is any.  We'll have

6    Ms. Tucci-Jarraf and then finish with the government

7    on recross.

8               MS. SVOLTO:  Okay.  Thank you.

9               THE COURT:  We'll stand in recess.

10:53AM 10               THE COURTROOM DEPUTY:  This honorable court

11    shall stand in recess until 11:05.

12                    (A brief recess was taken.)

13               THE COURTROOM DEPUTY:  Remain seated and

14    come to order.

15               THE COURT:  All right.  We'll bring the

16    jury in in just a moment and continue.

17                    (Jurors present in courtroom.)

18               THE COURT:  Thank you.  Everyone may be

19    seated.

11:24AM 20               Miss Tucci-Jarraf, you may continue.

21               MS. TUCCI-JARRAF:  Thank you.

22    BY MS. TUCCI-JARRAF:

23    Q.    Without prejudice, I have a few other

24    questions to clarify your direct testimony, as well

25    as testimony we've heard here during this trial.

1          On July 7th, there was paperwork that

2     was supposedly done at Buddy Gregg --

3          A.    Right.

4          Q.    -- when you said that you had purchased the

5     RV and there was paperwork done.  To the best of

6     your recollection, when was the -- was there more

7     than one set of paperwork done?

8          A.    Yes.

9          Q.    Okay.  When was the first set of paperwork

11:25AM 10    done?

11         A.    Evidently that morning after they had

12    called me and said they had received the wire and it

13    was clear on the 7th; before I ever got to the

14    dealership.

15         Q.    Okay.  And there was a second set of

16    paperwork done?

17         A.    Yes.  When I walked into the -- and met the

18    finance manager or officer there in the dealership,

19    he turned the folder around with all the paperwork

11:25AM 20    and it had Randy Beane on it.  And I looked at him

21    and I said, "This is not" -- I said, "Randy is a

22    nickname for me."  I said, "We need to do this in my

23    full name."  He said, "Oh, no problem."  So he

24    proceeded to print out, according to my driver's

25    license, my full name.

         Q.    Okay.  And, in fact, you had sent me over

the e-mail, the first set of paperwork; is that

correct?

         A.    That is correct, yes.

         Q.    And that was after you had gotten home to

scan it in to send to me?

         A.    No, we did that there at the dealership.

         Q.    You scanned it and then e-mailed it to me?

         A.    Yes.

11:26AM  Q.    And then, in fact, we had gotten on the

phone with -- with Daron Walker --

         A.    Yes.

         Q.    -- to go over that paperwork.

         A.    Yes, we did that there in Daron's office.

         Q.    And I explained to him that I would have to

finish up the paperwork for the actual public trust

for their documents.

         A.    Yes.

         Q.    And that paperwork for their documents was

11:26AM  done on the 11th of July?

         A.    No, we actually did a -- a trust document

that I went and had printed out for him to use that

day, went out right before lunch and had that

printed and brought it back to him, and he did the

third set of paperwork with the factualized trust

1    name.

2         Q.    Uh-huh.    And where did you get that?

3         A.    E-mail; e-mail.

4         Q.    Okay.    And that example of the factualized

5    trust document, not the eventual one that you did on

6    the 11th, but the other one, did you pull that from

7    a particular website or had --

8         A.    You had e-mailed it.

9         Q.    I had e-mailed it to you?

11:27AM 10    A.    You had e-mailed it to me.

11         Q.    Okay.    It was not the same, though, as the

12    final one that you submitted to them?

13         A.    I never compared the two to see what the

14    difference was, because on the 11th, I went -- you

15    know, I received that e-mail, went to the office

16    supply store and had that printed out and notarized.

17    So I never had a chance to compare the two different

18    pieces of paper and see what the difference might

19    be.

11:28AM 20    Q.    But they looked pretty much the same?

21         A.    Yeah, they looked exactly alike to me.

22         Q.    Okay.    And, in fact, on that same phone

23    call with you, Walker and myself, we went over the

24    MSO?

25         A.    Correct.

     Q.    And he confirmed that he would have to find

it on-site or off-site?

     A.    No.  He said that that was something they

did all the time in the RV business and that the MCO

was downstairs and they would get that and bring it

up and fill it out.

     Q.    The MCO or the MSO?  Are you --

     A.    I understand it's an MCO, Manufacturer's

Certificate of Origin.

11:28AM   Q.    Okay.  MCO.  I think he called it the birth

certificate of the --

     A.    He called it the birth certificate.  That's

exactly right.

     Q.    Okay.  On July 10th, I just had a few

clarification questions.  There was -- obviously you

saw the video --

     A.    Yes.

     Q.    -- that DOJ played here during this trial.

     A.    Yes.

11:29AM   Q.    Okay.  And did you make that -- did you

make a video recording?

     A.    No, I did not.  I had a friend with me who

did that.

     Q.    You did a video recording or --

     A.    No, not a video; just an audio recording.

```
 1        Q.   Did you -- did you make that or a friend

 2   made that?

 3        A.   My friend made that on her phone.

 4        Q.   Okay.  Did you notify myself or the others

 5   that you guys were recording before the recording?

 6        A.   I don't remember.

 7        Q.   To the best of your recollection.

 8        A.   I think we did, but I don't remember

 9   exactly if that was -- I'm --

10        Q.   Okay.

11        A.   I do not remember.

12        Q.   And then during that particular call, you

13   and I both had used the word "attorney" to describe

14   myself, didn't --

15        A.   Yes.

16        Q.   And I didn't correct you, did I?

17        A.   No, you did not.

18             When you first -- when we first talked

19   about -- in Mr. Walker's office, you had corrected

20   me in Mr. Walker's office that you're not an

21   attorney, you're my lawyer, and I just kept saying

22   attorney off the top of my head.  So --

23        Q.   I see.  Yeah.

24             And that, in fact, I had clarified

25   that I was the lawyer for the factualized trust --
```

         1        A.    Exactly.

         2        Q.    -- and not Mr. Beane, except for you --

         3        A.    Exactly.

         4        Q.    -- as trustee?

         5        A.    Exactly.

         6        Q.    So in your capacity as the trustee of the

         7   factualized trust --

         8        A.    Yes.

         9        Q.    -- that I was assisting and representing?

11:31AM 10        A.    Correct.

        11        Q.    Okay.  On -- now, a few clarification

        12   questions for July 11th, and then I will be --

        13        A.    Okay.

        14        Q.    -- done.  I think I'll have all my

        15   questions answered.

        16              The -- on July 11th, you had arrived

        17   with the paperwork, the factualized trust and the

        18   Declaration of Valid Sale, after you had

        19   stated -- after you had notarized it, or signed it

11:31AM 20   and notarized it; is that correct?

        21        A.    That is correct.

        22        Q.    Okay.  Just to make sure I got that

        23   correct.

        24              And then you went back to Buddy Gregg

        25   with that particular paperwork.  Do you recall

1    around what time that was?

2         A.    I'm going to say somewhere around 11:00.

3         Q.    Okay.

4         A.    It may have been -- it's somewhere between

5    11:00 and 1 o'clock because we had just

6    had -- between -- it was not really breakfast and

7    lunch; it was like a brunch, but it was on

8    Monday -- or Tuesday.

9         Q.    Okay.  And that was -- who -- who was with

11:32AM  10   you on that day?

11        A.    That was my friend Angie, Alex and Val,

12   Angie's son, and Angie's grandson and myself.

13        Q.    Angie's grandson.  Okay.  They were all

14   with you at the RV place?

15        A.    No, we were all together at the restaurant.

16        Q.    Oh, I'm sorry.  I should have clarified.

17                  Who went with you to Buddy Gregg?

18        A.    Oh, Alex and Val.

19        Q.    Alex and Val.  And did all three of you go

11:32AM  20   into the dealership?

21        A.    I think me and Alex did.  I'm thinking,

22   yeah, it may have been all three of us went in.  I

23   can't remember exactly, but I know they -- yeah, I'm

24   pretty sure they did.

25        Q.    Okay.  And at that time that you went in to

1    Buddy Gregg, did anyone notify you that there was a

2    problem, a continued problem with the sale?

3       A.    No.    As a matter of fact, when I walked

4    into the office and handed him the paperwork, he

5    thanked me, and he said, "Your coach is up on the

6    hill."   He said, "I'll go up and start it up for

7    you."

8       Q.    Who did -- who was that?

9       A.    One of the guys there in the office

11:33AM   10    sitting -- there was -- Mr. Byrnes (*sic*) was sitting

11    behind his desk, and then Mr. Forbes and then

12    another guy was sitting there, and I don't remember

13    the other guy's name, but he stood up and he said,

14    "I'll go get your keys and start it up for you."

15    Because it was hot outside.   Of course, it's

16    July 11th.   It was -- the humidity, I think, was

17    pretty high that day and the temperature was close

18    to 100.

19       Q.    Okay.   While he was getting it started,

11:33AM   20    did -- were you following him out or were you still

21    in there?

22       A.    No, he got -- he went on the golf cart on

23    up to the coach and met us up there.   I actually

24    parked the truck in the parking lot and was taking

25    Alex and Val up to show them the coach.

1          We couldn't find it.  There was

2    a -- there was a couple there that were identical in

3    color and everything to mine that I saw one in the

4    shop that I thought was mine.

5          But mine was parked back in the corner,

6    kind of between a bunch of other coaches back in the

7    corner of the fence there in the lot.

8          And so when we found it -- well,

9    actually, the guy that brought the key up showed me

11:34AM  10   where it was, and I took Alex and Val up there and

11   was showing them the coach.

12        Q.   Had you seen it the day before?

13        A.   The day before, no.

14        Q.   When you were there for the conference?

15        A.   No.  I was told it was up in the shop

16   getting some of the things that needed to be done.

17        Q.   Okay.  And on -- so on July 11th, after you

18   had gone in, before the guy went out to go get your

19   car, had -- did you speak with Mr. Byrnes (*sic*) or

11:35AM  20   Mr. Forbes?

21        A.   Mr. Byrnes (*sic*) was sitting at his desk,

22   and I went in and handed him the documents because

23   he's the one that requested them.

24        Q.   Did you get a conformed copy -- I mean, get

25   a stamp from them saying that they had them, that

1    they had received them?

2        A.   No, I didn't get anything other than just

3    they were tickled to have them, and, you know, he

4    said my keys -- he'd take my keys up there and get

5    my coach.

6        Q.   And was your understanding of my actions

7    was to provide the -- the UCCs, the underwriting for

8    that document to Palmisano or Palmisano -- excuse

9    me -- Mrs. Palmisano?

11:36AM  10        A.   Yes, I understood you were going to e-mail

11    all the documents that supported the factualized

12    trust and everything that was needed in order to

13    verify where the money fund -- the funds originated.

14        Q.   So you didn't produce any of that --

15        A.   No.

16        Q.   -- underwriting to them that day?

17        A.   No.

18        Q.   Okay.  So you left and went out to go into

19    the motor home.  And what happened?  The FBI showed

11:36AM  20    up?

21        A.   No, not at that point.  At that point,

22    Al -- Val was -- she felt like she was getting a

23    heatstroke.  So we got the RV started and she got

24    inside to where she could cool off.

25                  Alex and I were walking around the

outside, but one of the guys from Buddy Gregg came

out there and was just chitchatting with me about,

you know, where was I planning on going.  I said,

"Well, I'm headed to Texas."

And he said, "Well" -- you know, he

kept pointing things out.  "Let me take care of this

before you leave.  Let me take care of this before

you leave.  How about" -- "As a matter of fact, come

in the office over here."

So I said, "Well, I'll

just" -- "Whoever needs to talk to me, just have

them come out here.  I've got some friends out here

and I don't want to leave them.  Just have them come

out here and talk to me."

So at that point he went to the office,

came back with some tools, and there was a -- where

the TV is on the outside of the coach, I lifted it

up, and around the rubber rim, there was a wire

sticking out that would cut someone, and I asked him

if he would please cut that wire off because it was

dangerous.  And he looked at me and he said, "Yeah,

you're right."

So he cut that wire off.  He said,

"Hey, come on to the office with me."  And I

thought, "Well, what's he trying to keep getting me

1    to the office for?"

2              And so I walked with him to the office.

3    When I walked in, everybody in the office was

4    looking at me.  And I just stood there and looked at

5    them.  I didn't feel very comfortable.

6              He said, "Have a seat right here."  And

7    I said, "Who am I here to see?"  He said, "The boss.

8    He's out to lunch."  I said, "Well, when he comes

9    back, I'll be in the coach.  Have him to come out

11:38AM 10   there and get me."

11             So I walked out.  And as soon as I

12   walked out the door, there was a car pulled up with

13   a couple of these agents in.  I didn't know they

14   were agents, but I could tell with -- by the suits

15   and ties they had on, they were not customers.

16             So I walked -- I proceeded to go on to

17   the coach, and at that time I was on the telephone

18   with you.

19             So I sat down in the coach and was

11:38AM 20   waiting for it to cool off, and here comes this car

21   pull up in front of the coach blocking it in.  And

22   all these fellows get out and run -- come to the

23   door telling me to open the door.

24             And then Alex opens the door and let's

25   them in, and they're coming in telling me I'm under

1   arrest; I'm a fugitive out of Colorado, and I'm

2   trying to tell them I've never been to Colorado.

3             Well, they grab me and pulled me

4   outside the coach and start beating me and throwing

5   me on the ground.  One of them has got his foot on

6   my head and telling me to -- I'm telling him, "I

7   can't breathe."  And he's saying, "You're going to

8   have to breathe."

9             Well, when I did breathe, my mouth was

11:39AM 10   stuck full of dirt and grass because he had my head

11  so far down in the grass, I couldn't do anything.

12       Q.   If you can -- is that officer here in this

13  room right now?

14       A.   I didn't -- at that point, I think -- I

15  don't see him now.  He was in here.

16             This gentleman here known as Mr. Pack

17  who I've pointed to several times, and then

18  Mr. Parker Still.

19       Q.   Uh-huh.

11:39AM 20       A.   There was a lady who was pregnant and then

21  the bald-headed guy.  I don't remember his name.

22  Jimmy Duran or something like that.

23       Q.   Okay.

24       A.   I think Mr. Duran was the one that was

25  manhandling me the most.

         1      Q.    Okay.  In fact, you and I were on the phone

         2   prior to someone showing up, and you had said

         3   that --

         4      A.    Yes.

         5      Q.    -- there were guys in suits?

         6      A.    Yes.

         7      Q.    And I had asked if they had approached you.

         8      A.    Yes.

         9      Q.    And you said no.

11:40AM 10      A.    Right.

        11      Q.    And you were already in the coach as we --

        12      A.    I was sitting --

        13      Q.    -- were talking?

        14      A.    Yes, I was sitting in the driver's seat

        15   trying to cool off because it was so hot outside.

        16      Q.    Uh-huh.  In fact, I told you just to remain

        17   calm --

        18      A.    Yes.

        19      Q.    -- and if they want to contact you, just

11:40AM 20   hand them the phone so I can figure out who they

        21   are?

        22      A.    Exactly; exactly.

        23      Q.    In fact, I kept repeating, "Stay calm."

        24      A.    Right.

        25      Q.    "Just speak with them"?

1     A.   Right.

2     Q.   Uh-huh.  But to let me speak with them to

3 at least figure their identification --

4     A.   Right.

5     Q.   -- and their purpose?

6     A.   Right.

7     Q.   Okay.  And then so you could talk to them?

8     A.   Exactly.

9     Q.   Figure out what's going on?

11:41AM 10     A.   Right.

11     Q.   Because at that time I told you perhaps it

12 was part of trying to figure out the identity of who

13 was messing around with the accounts?

14     A.   Exactly.

15     Q.   Uh-huh.

16     A.   Exactly.

17     Q.   It appears they weren't calm that day?

18     A.   They were not calm.

19     Q.   They didn't ask to talk to you?

11:41AM 20     A.   No, they wouldn't let me talk.  They

21 wanted -- they wanted -- it was obvious that they

22 wanted me -- they wanted to manhandle me and they

23 wanted me down.

24     Q.   Okay.  And you received an injury that day?

25     A.   On the back of my head.  Of course, you

1   know, I'm in handcuffs; so I can't feel it, but I

2   can feel blood trickling.

3       Q.   You had stated that and we had heard

4   testimony that it was facedown on the ground.

5       A.   Yes, it was facedown.

6       Q.   So how did you receive an injury to the

7   back of your head?

8       A.   They manhandled me pretty good.  They

9   twisted this arm up pretty good (indicating).  But I

11:42AM 10  don't remember.  There was so much activity going

11  on.  Things were flying by.  So I don't remember

12  exactly how the back of the head got hurt, but I was

13  hurting all over.  I had a black eye and --

14      Q.   Okay.

15      A.   -- several bruises all over my body after a

16  couple days.

17      Q.   Did they offer you medical attention?

18      A.   They -- they amazingly had an ambulance

19  pull up and ask me to -- if I wanted to be looked

11:42AM 20  at, and I told them no.

21      Q.   So an ambulance was already present

22  before --

23      A.   I mean, the ambulance --

24      Q.   -- you came out of the RV?

25      A.   -- pulled up during the arrest.

```
 1        Q.   Oh, okay.  I see what you're saying.

 2                  The ambulance arrived while you were

 3   being arrested?

 4        A.   Yes.

 5        Q.   And -- I'm sorry -- I didn't hear your

 6   answer.  Did you get medical attention?

 7        A.   No.

 8        Q.   Did you refuse the medical attention?

 9        A.   Yes, I did.

10        Q.   Okay.  After that, did they put you into a

11   patrol car?

12        A.   No, at that point, they -- they pulled my

13   pants down around my waist and made me stand there

14   in handcuffs.  And there were people everywhere,

15   just everywhere watching, but I was standing there

16   in my underwear, basically, with my shorts down

17   around my thighs with my handcuffs on with a bandage

18   wrapped tight around my head.

19        Q.   But you said you had refused medical

20   attention.  Who did the bandage around your head?

21        A.   Mr. Pack did.

22        Q.   Mr. Pack?

23        A.   Yes.

24        Q.   Mr. Pack.

25        A.   The gentleman with the glasses there.
```

The timestamps `11:43AM` appear at lines 10 and 20.

1    Q.    Okay.

2    A.    And he put it on really tight.

3    Q.    And you were in your underwear?

4    A.    They had pulled my pants down so that I was

5    standing there with my underwear showing with my

6    hands cuffed.

7    Q.    And there were people around?

8    A.    There were people everywhere.

9    Q.    Okay.  Did they say -- were you told why

11:44AM  10    your pants were pulled down?

11    A.    I was told nothing.  I was just told there

12    was a warrant for my arrest out of Colorado, and I

13    kept trying to tell them, "I've never been to

14    Colorado."

15    Q.    You told them that?

16    A.    Yes.  They said they didn't care.

17    Q.    Did you ask to see the warrant?

18    A.    Yes.

19    Q.    Did they produce a warrant --

11:44AM  20    A.    No.

21    Q.    -- that day?

22    A.    No.

23    Q.    Did they identify themselves?

24    A.    No.

25    Q.    Did they say what agency they worked for?

1    A.   No, nothing.

2    Q.   Did they give you -- nothing?

3    A.   Nothing.

4    Q.   Did they at least tell you why you were

5    arrested?

6    A.   No, nothing; nothing.  They didn't say

7    anything to me.  Other than the fact that

8    Colorado -- I was a fugitive of Colorado.

9    Q.   Okay.  So they did tell you --

11:45AM  10    A.   They told me I was a fugitive out of

11   Colorado.

12   Q.   "Fugitive out of Colorado."

13        So the first time you had ever heard

14   that was from the F- -- from whoever was present,

15   Mr. Parker Still, Mr. Pack, and Mr. --

16   A.   Yes, that's correct.

17   Q.   -- Duran, I think.

18        Was Mr. Patter- -- or Officer

19   Patterson there as well?  He was the one that

11:45AM  20   testified about cyber -- he does cyber stuff

21   from --

22   A.   I never saw him.

23   Q.   -- the University of Tennessee Police

24   Department.

25   A.   There were several officers walking around.

1    I don't recall who they were or know who they were.

2          Q.   Were any of them in uniforms?

3          A.   Only one.   There was a Knox County Sheriff

4    there with a dog.   When they had me on the ground,

5    they had the dog with his -- he was wanting to bite

6    me.   He had -- he was growling at my head.

7          Q.   So approximately -- just -- I know your

8    recall may be a little different just because of the

9    events, but, if you recall, approximately how many

11:46AM 10   office -- officers were present in that moment?

11         A.   There -- there was -- I know there was

12   four -- I'd say around nine.

13         Q.   So approximately --

14         A.   That I could see.   I could see other

15   officers off in the distance, like what

16   they're -- like Mr. Byrnes (*sic*) was talking about

17   at the gates and stuff.   But they weren't up there

18   close to where I was.

19         Q.   Okay.   So at the RV where you were, there

11:47AM 20   was approximately nine officers and only one was in

21   uniform?

22         A.   Only one.

23         Q.   Were the others dressed with, like, field

24   jackets on that --

25         A.   They had on --

1        Q.    -- said anything?

2        A.    -- suits just like they're wearing today;

3   just suits.

4        Q.    So out of the approximately nine officers,

5   eight of them had business suits on?

6        A.    Yes, ma'am.

7        Q.    Okay.  At that point, you said that they

8   had pulled your pants down and you were in your

9   underwear.  Were you just standing there or were

11:47AM 10  they taking you to the car?

11       A.    No, I stood there for -- I bet I stood

12  there for a good 45 minutes to an hour before they

13  ever put me in the car.

14       Q.    In your underwear?

15       A.    In my underwear.

16       Q.    Okay.  Do you recall the kind of squad

17  car -- or did they put you in a squad car --

18       A.    Eventually they did.

19       Q.    -- with lights?

11:48AM 20  A.    They put me in a Knox County Sheriff's car.

21       Q.    Knox Sheriff.

22             Is that the one officer that was in

23  uniform that was there?

24       A.    Yes, that was the one officer that was

25  there, yes.

1       Q.    Okay.  And did you immediately leave the

2   site once you got put into the car?

3       A.    No, no.

4       Q.    How long did you stay on-site?

5       A.    Probably another 30 minutes.

6       Q.    Was the officer in the car with you?

7       A.    No.

8       Q.    Was he talking to the other officers that

9   were there?

11:49AM 10      A.    Yeah, they were all walking around

11  discussing things outside the car.

12      Q.    You couldn't -- could you hear them --

13      A.    No.

14      Q.    -- discussing -- you could just see them?

15      A.    Yeah.

16      Q.    Were they within your visual the whole

17  time?

18      A.    No.

19      Q.    Okay.  So approximately 30 minutes after

11:49AM 20  you get put into the car -- were your pants at least

21  pulled up before you got put into the car?

22      A.    I think at that point they did pull my

23  pant -- I don't think they buttoned them, but I

24  think they pulled them up.

25      Q.    So 30 minutes on-site waiting for the

1    officer to get back in.  At that point, did the

2    officer drive you back or drive you anywhere?

3         A.   He took me to a Weigel's store and swapped

4    me in another sheriff's car.

5         Q.   Sorry.  A Knox Sheriff, that you originally

6    got placed into his car, drove you to where?

7         A.   To Weigel's.  It's a -- it's a convenient

8    store on Lovell Road and met another officer and

9    swapped me and put me in his car.

11:50AM  10         Q.   So Weigel's, W-y-g-e-l?

11         A.   No, it's Weigel's.  W-i-e-g-e-l-s-e (*sic*).

12    G- -- W-i-e- -- Weigel's, W-i-e- --

13              THE COURT:  W-e-i-g-e-l-'-s.

14              MR. BEANE:  There you go.  Thank you,

15    Judge.

16              MS. TUCCI-JARRAF:  Thank you.  Sorry.  I'm

17    not from here; so I don't know all these names.

18    BY MS. TUCCI-JARRAF:

19         Q.   Okay.  So you went into this other Knox

11:50AM  20    Sheriff car?

21         A.   Yes.

22         Q.   Did they swap out the handcuffs when

23    you --

24         A.   No.

25         Q.   -- went from one car to the next?

1          A.    No.  And the officer that was in that car,

2     I know his name was Officer Blaine.

3          Q.    Officer Blaine?

4          A.    B-l-a-i-n-e.

5          Q.    Okay.  Swapped to -- were you -- were you

6     shackled at this -- during --

7          A.    Just handcuffed; just handcuffed.

8          Q.    In the front or the back?

9          A.    In the back.

11:51AM  10     Q.    In the back.

11               Okay.  So Officer Blaine from Knox

12    Sheriff, did he -- did he then drive you somewhere?

13    Did he drive you to the precinct?

14         A.    We then proceeded towards Knox County Jail

15    via I-40 east.

16         Q.    I apologize because I'm not familiar

17    with --

18         A.    Right.

19         Q.    -- this whole area.

11:51AM  20               There is a Knox County Sheriff's

21    Office here downtown, isn't there?

22         A.    I -- I don't know.

23         Q.    Or is this the Wilson D. -- the detention

24    facility they were driving you to?

25         A.    The detention facility.

```
 1      Q.   Oh, okay.  So it was -- he was taking you

 2  out of --

 3      A.   We were leaving Lovell Road headed on 40

 4  east to Knox County Detention Facility.

 5      Q.   Okay.  So they took you straight to the

 6  detention facility; no more stops?

 7      A.   Right.  That was -- while we were on the

 8  way is when I passed -- we came up behind the coach,

 9  and I said to Officer Blaine, I said, "That looks
```
11:52AM  10  like my coach."  And as we drove by, that's when
```
11  Mr. Pack and Mr. Still were laughing and -- pointing

12  at me and laughing.

13      Q.   They were driving your RV?

14      A.   Yes, they were driving the RV.

15      Q.   Who was driving?  Mr. Parker?

16      A.   Mr. Pack was driving and Mr. Parker was

17  sitting in the passenger seat.

18      Q.   And you now know Mr. Pack and Mr. Still and

19  Mr. Duran to be with the Federal Bureau of
```
11:52AM  20  Investigations?
```
21      A.   Yes.

22      Q.   Knox County, or in Knox?

23      A.   From the discovery that I've read, yes.  I

24  don't know that other than through discovery that

25  I've read.
```

```
 1        Q.    But at that time you didn't know?
 2        A.    I had no idea.
 3        Q.    Okay.  And then when you get to the
 4   facility --
 5        A.    Uh-huh.
 6        Q.    -- where -- are you immediately taken in?
 7        A.    No.  We pull up in the sally port, they
 8   call it.  It's an area where there is a garage door,
 9   you pull in, and then the garage door comes down and
10   you wait until --
11        Q.    Oh, yeah.
12        A.    -- to go into the jail.
13        Q.    So you're in this -- how long were you in
14   the sally port?
15        A.    Three hours.
16        Q.    Did they have the -- both doors down?
17        A.    Yes, ma'am.  And I sat in the back of the
18   patrol car for three hours.
19        Q.    Was an officer with you in the car?
20        A.    Actually, he was sitting outside the car on
21   his phone.  And I asked him why it was taking so
22   long.  And he said, "We can't find a reason to put
23   you in jail."  He said, "The jail will not accept
24   you."  And he said, "I can't take you in that jail
25   without" --
```

1          MS. SVOLTO:  Your Honor, I'm going to

2    object to the hearsay of the officer.

3          THE COURT:  Sustained.

4               You can't testify about what someone

5    else told you unless there is an exception to the

6    hearsay rule, which I don't hear being offered.  So

7    let's move on to the next question.

8          MS. TUCCI-JARRAF:  I'm not supposed to do

9    his --

11:54AM  10          THE COURT:  Well, I'm sustaining the

11   objection --

12          MS. TUCCI-JARRAF:  -- objections.

13          THE COURT:  -- to that question.

14               Well, it's your question; so you can

15   respond.  But I've sustained the objection.  So just

16   go on to the question.

17          MS. TUCCI-JARRAF:  But may I respond to her

18   objection --

19          THE COURT:  No, just go on.

11:54AM  20          MS. TUCCI-JARRAF:  -- in the future?

21          THE COURT:  Yes.  Go ahead.

22   BY MS. TUCCI-JARRAF:

23     Q.   Were you -- that whole three hours you were

24   just sitting there, were you offered any water?

25     A.   No.

1      Q.   Food?

2      A.   No.

3      Q.   Bathroom?

4      A.   No.  He kept saying he could not take me in

5  the jail.  I was begging for water because it was so

6  hot outside.

7      Q.   Okay.  So, to the best of your knowledge,

8  the jail wouldn't let you in?

9      A.   Right, the --

11:55AM 10   Q.   Okay.

11     A.   -- jail would not let me in.

12     Q.   Thank you.

13              Okay.  So, eventually, three hours

14  later, you're let into the facility?

15     A.   Yes.

16     Q.   Okay.

17     A.   The officer made the comment that --

18              THE COURT:  Well, let's just answer the

19  question as to whether you were led into the

11:56AM 20  facility.  And the answer is yes.  So go on to the

21  next question.

22              MS. TUCCI-JARRAF:  Thank you.

23  BY MS. TUCCI-JARRAF:

24     Q.   I have one clarifying question.  During

25  that three hours you were in the sally port waiting

1    for someone to take you into the jail, were there

2    any other vehicles coming and going in that sally

3    port --

4        A.    Yes.

5        Q.    -- or people getting -- going into the jail

6    for processing?

7        A.    Yes.

8        Q.    So it was just you --

9        A.    Yes.

11:56AM 10        Q.    -- being held out there?

11        A.    Yes.

12        Q.    You saw other people with handcuffs being

13    walked in?

14        A.    Yes.

15        Q.    Okay.  So you were taken inside.  And were

16    you immediately processed?

17        A.    No.

18        Q.    Okay.  Approximately from the moment that

19    you were taken into the -- from the car and brought

11:56AM 20    into the facility, how much time expired before you

21    were actually being processed?

22        A.    Well, the first thing they do when they get

23    you there is they dress you out.  They take off your

24    civilian clothes and put jail clothes on you.  They

25    did that immediately.  But the paperwork didn't

1    happen until later that night.  It was like -- I

2    think it was like 1:00 or 2:00 in the morning.

3         Q.   So if the arrest happened at approximately

4    11:00 -- or the RV/Buddy Gregg situation happened

5    approximately around 11:30 in the morning, it wasn't

6    until the next morning that you -- around 1:00 or

7    2:00?

8         A.   Yes.

9         Q.   So on the 12th?

11:57AM 10         A.   Correct.

11         Q.   Did you have access to a phone at that

12    time --

13         A.   Yes.

14         Q.   -- to call anyone?

15         A.   Yes.

16         Q.   Did you make phone calls?

17         A.   Yes, I called out.  I think I called Alex.

18    Maybe my friend Patricia.

19         Q.   Okay.  So they knew where you were?

11:58AM 20         A.   Yes.

21         Q.   Okay.  And after you were processed,

22    were -- you were taken up to classification?

23         A.   It was, like, 4 o'clock in the morning

24    before they ever took me to classification.

25         Q.   Okay.  And did you ever have a visit -- did

1  you ever figure out the Colorado thing, as far as

2  were you asked if you had ever been to Colorado?

3      A.  Yeah, a lady showed up and asked me if I

4  had ever been to Colorado, and I said no, and she

5  said (witness made a nonverbal sound) and turned

6  around and walked out.  That was all that was --

7      Q.  That was after you had been classified?

8      A.  Yes, that was.

9      Q.  So was that on the 12th?  Do you recall

11:59AM  10  what day?

11      A.  That was on the 12th.  And it was around --

12  I think it was, like, 9:00 or 10 o'clock in the

13  morning.

14          MS. TUCCI-JARRAF:  I have no further

15  questions.  Thank you.

16          THE COURT:  All right.  Thank you.

17          MR. TUCCI-JARRAF:  Thank you, Mr. Beane.

18          THE COURT:  That concludes the respective

19  cross-examination.

11:59AM  20              As has been discussed with Mr. Beane,

21  you now have the opportunity for redirect, and you

22  indicated you'd like to do redirect --

23          MR. BEANE:  Yes.

24          THE COURT:  -- which would be given in the

25  narrative fashion that you testified to earlier.  So

1    go ahead with your redirect --

2            MR. BEANE:  Okay.

3            THE COURT:  -- at this time.

4            MR. BEANE:  Okay.  I wrote down a lot of

5    stuff.  So is it okay if I use my notes?

6            THE COURT:  Yes.

7                    REDIRECT EXAMINATION

8            MR. BEANE:  Okay.  One of the things I

9    wanted to clarify is:  There was a phone call that

12:00PM 10   was played for the Court in which two USAA employees

11   are discussing something.  I want you to understand

12   that I was not privy to that discussion because I

13   was on hold listening to music.  So a lot of that

14   information in that phone call I didn't hear until

15   you guys heard it.  The lady in the background, I

16   never heard her say anything.  So that information

17   was new to me.

18            I've discussed what happened on the 4th

19   already.  And on the 5th, I discussed about paying

12:00PM 20   the credit cards and the vehicles off.

21            On the 5th, I also went to Buddy Gregg

22   and spent time with Dan Settler, I believe is his

23   last name, and I proved that through the

24   documentation that I asked Mr. Byrnes (*sic*) about

25   that was dated for the 5th, and he denied it, but I

was actually there on the 5th talking with

Mr. Settler for quite a while.

We looked at several coaches and

discussed why I needed a coach; how long he had been

in the business, and we spent quite a bit of time

together that day. And then I came back home. And

that's the night that I purchased the CDs.

The next morning when I got up, I

called USAA about the credit line, toward -- about

getting a credit line on the CDs. And that's when

she discussed with me that I might be best just to

go ahead and cash -- cash one in if I wanted to.

And in the conversation with her, I was surprised

that you could cash one in. I thought you had to

let one mature out before you could cash it in.

And so we discussed that. And she

explained to me that I didn't have to. And when I

asked her how much and she told me it was only $47,

I said, "Well, if I can do that, then that's what

I'm going to do." So we did that. And in a matter

of a few minutes, she put it into my checking

account.

I went to breakfast, and after

breakfast, I stopped by Ted Russell Ford. I was

driving my Lincoln Navigator, and the running board

1  wasn't working properly on my Navigator.  So I

2  wanted to stop in and find out what it was going to

3  cost me to get a new motor put on my running board

4  because they're electric.  When you open the door,

5  the running board goes down; when you close the

6  door, the running board comes back up.

7          Well, the motor had burned out, and so

8  the running board was staying down.  And so after

9  breakfast, I stopped into Ted Russell Ford to

12:02PM 10  inquire about getting a motor for my running board.

11         While there and waiting for them to

12  price it, I decided to walk out and look at trucks.

13  Well, this spunky little sales lady came out and

14  started talking to me, and she said, "Do you see

15  anything you like?"  And I said, "Yeah, that one

16  right there has got my name all over it."

17          So we started talking, and the next

18  thing I know, I'm driving it.  And she tells me

19  that -- her story about how she just started; her

12:03PM 20  mother has been with the dealership for 20-some

21  years, and she had just started and this would be

22  her first sale.  And I thought, well, today is your

23  lucky day.  I felt like I could help her out and

24  boost her morale by purchasing the truck.  So we

25  went in the dealership, made the deal, and I drove

1   the truck off the lot.

2                I came back home and picked up my car,

3   took it to Christian Brothers to drop it off.  At

4   that point Christian Brothers drove me back downtown

5   to pick up my Excursion and bring it back for

6   repairs.  So at that point I had three vehicles in

7   the shop for repairs that day and I was driving the

8   new truck.

9                After I came back home that evening

12:03PM 10   after being dropped back off by Christian Brothers,

11   I got to thinking about the coach and how

12   much -- how much did that thing cost.  I didn't

13   remember.

14                So I called the salesman at Buddy

15   Gregg, and I said, "Dan, how much was that coach?"

16   He said, "It was $750,000."  He said, "Do you think

17   you want it?"  I said, "Well, that's a lot of

18   money."  And he said, "Well, let me get a price

19   together and I'll call you back."

12:04PM 20                So he called me back in about

21   15 minutes, and he said, "We're going to cut that

22   price on that thing about $250,000."  I said, "Wow,

23   that's a huge markdown."

24                He said, "Well, the story behind it is,

25   we can't get any 2018s until we sell that coach."

1  And I said, "Well" -- he said, "If you'll help us

2  out, we're going to help you out."  I said, "Okay."

3  I said, "Well, what do you need from me if we go

4  ahead and do the purchase?"  He said, "Well, if

5  you'll do a $10,000 payment" -- "down payment over

6  the phone, I'll hold this coach for you."  He said,

7  "I'll need the rest in a wire."  I said, Well, I've

8  never done a wire.  How do you do that?"  He said,

9  "Well, all you need from me is my bank information."

12:05PM  10  He said, "Call your bank and set up the wire

11  transfer."  I said, "Well, can I do that in the

12  morning?"  He said, "That will be fine."

13         So I did the $10,000 deposit over the

14  phone that afternoon.  The next morning on the 7th,

15  I got up early, went to breakfast, and while I'm

16  eating breakfast, I decided to call USAA and do this

17  wire transfer.  Got on the phone with a really nice

18  guy at USAA and he explained the wire transfer

19  process to me.

12:05PM  20         I realized I didn't have my briefcase

21  with me at breakfast.  So I went out to the truck,

22  and I think during the audio recording, you can hear

23  the wind blowing of me walking out to the truck.  So

24  I went out into the truck and got the information he

25  needed for their end of the wire transfer.  He

proceeded to get the wire transfer, and within a few
minutes, he was done.

Within 10 to 15 minutes, I got a call
from Buddy Gregg.  He said, "We got your wire
transfer."  And I said, "Wow, that was quick."  He
said, "If you want to come and sign the paperwork,
we'll have it ready when you decide you want to come
and do it."  I said, "Well, I'm at breakfast and
I've got a few errands to run, but I'll come on down
and sign it when I get done with all that."  He
said, "Well, we'll look forward to seeing you when
you get here."

So when I get to the Buddy Gregg
dealership, Dan is sitting out on the golf cart, and
we converse a little bit.  He said, "Come on
inside."  He takes me inside and he introduces me to
Mr. Walker, who is the finance manager.

So we go in Mr. Walker's office, and I
sat down at his desk and he pulls out this folder of
paperwork, and I noticed that it's -- it all has
Randy Beane on it.

So I looked at him and I said, "I can't
do this paperwork with Randy Beane on it."  He said,
"Why not?"  I said, "Because my full name is Randall
Beane."  And I pulled out my driver's license and

showed him. And I said, "I'd prefer to be under

Randall Beane." He said, "That ain't no problem."

So he proceeded to print out the paperwork according

to my driver's license at that point.

Well, sometime in the process of all

that, I was on the phone with Heather and we were

discussing the deal, and she said, "Do you" -- "did

you get the MCO for the vehicle?" And I said, "No."

She said, "Well, you'd really need to get the MCO

and do it in the trust name." And I said -- she

explained to me the benefits of having the MCO

versus the title, and especially doing it into a

trust.

So I went back to the dealership and

discussed with Mr. Walker the situation, and we got

on the phone with Heather at that point. And he

said, "This is no big issue." He said, "We do this

all the time." He said, "We'll just redo the

paperwork. You bring me the trust documents."

So I went and got those ready and came

back, and at that point we redid the paperwork a

third time under the trust -- with all the trust

documents at that point.

After getting the paperwork signed,

the -- Dan said, "We're going to put your vehicle up

1    there in the shop."  And he said, "We're going to go

2    through and wax it, do everything to it."  He said,

3    "It might be ready tomorrow; it might be ready this

4    afternoon."  He said, "But I'll call you and let you

5    know when you can come back and pick it up."  I

6    said, "Okay.  No rush."

7              So I left Buddy Gregg at that point,

8    and because we had done the title work or the

9    paperwork and gotten the MCO, I thought, well, I

10   better get that on the truck, too.

11             So I went by Buddy -- Ted Russell on

12   the way back home, which I lived downtown at that

13   time, and I'm on -- I'm at Turkey Creek.  So I'm

14   headed back toward downtown Knoxville, and I

15   thought, well, I'll just run by Ted Russell on my

16   way home and tell them that we need to get the MCO

17   for the truck just like we did for the RV.  Showed

18   him the paperwork; showed him exactly what we had

19   done.  And he said, "Okay.  We can do that.

20   Shouldn't be any problem."

21             And at that point I left the Ted

22   Russell dealership and went back home.  Excuse me

23   while I read this just to recollect my thoughts

24   here.

25             THE COURT:  Does he want some water, Julie?

MR. BEANE:  Oh, okay.  That afternoon when I was at -- when I had gotten back home, I got a call from Dan.  He said, "I pushed these guys and I got your coach ready.  Do you want to come and do the walk-thru?"  I said, "Yeah, sure.  That sounds exciting."

He said, "Well, I've got a guy that's ready to do it for you."  He said, "How soon can you be here?"  I said, "Well, I think I can be there in 20 minutes."  He said, "Well, come on."

So I got in my truck, headed to Buddy Gregg, and they had the coach backed into what's called the camping area at Buddy Gregg, and he took me up there on the golf cart.  I met a guy named Eric.  Eric proceeded to show me -- we spent an hour-and-a-half going through all the controls.

There was a control panel in the coach that's like a screen that you control all the -- all the shades, everything on the coach through.  So he was teaching me all about that; the generator, the water, the power, all the hookups.

It has four slides on it.  He taught me how to operate all that.  He showed me how to -- he just showed me a lot of stuff.  There was a huge owner's manual.  It looked like a big briefcase.  He

1   showed me all that.

2           So we did go through the coach.  This

3   is getting on later in the afternoon.  Now, they

4   were at closing time.  So this had to be 6 o'clock

5   or after.  He stayed after closing to go over the

6   coach with me.  So it was probably going on around

7   towards 7:00.

8           At that point I got a call from a

9   girlfriend of mine who was coming to see me and we

12:10PM 10  were going to go have dinner that evening and hang

11  out.

12          So we -- at that point she came on up

13  to Buddy Gregg, parked her car there at the coach,

14  and we left in my truck and went and did a little

15  bit of shopping and went and had dinner.

16          Well, while we were at dinner, I looked

17  at my phone and I'm checking my balances and I

18  noticed on my checking account it said that I needed

19  to sign a signature card, but it would not let me

12:11PM 20  access that signature card, and at that point is

21  when I made the phone call to USAA from the parking

22  lot at the restaurant we were eating.  And that's

23  when the phone call that was recorded was played.

24          While I was out in the parking lot,

25  this conversation is taking place between these two

1  employees at USAA that I'm not privy to because I'm

2  listening to music. So I don't hear what's going on

3  on the USAA side of the conversation.

4  And at the end of the phone call, I'm

5  no more informed of why I need to sign a signature

6  card than I was when I called. The guy seemed very

7  confused about what was going on and offered an

8  apology, that we would get this straightened out.

9  So, at that point, I went back

12:11PM  10  to -- went back inside the restaurant, finished

11  dinner, and we proceeded back to my apartment at

12  that point and waited for my brother to come into

13  town that night. He always came in on the weekends.

14  And when he got there, we took off back

15  to Buddy Gregg, and he and I spent the night in the

16  coach there on the property at Buddy Gregg and got

17  up the next morning, Saturday, had breakfast.

18  At that point I think I had talked to

19  Heather, and we were discussing about the truck and

12:12PM  20  maybe it was best if I just take the truck back to

21  Ted Russell until we got the correct -- until we got

22  the MCO done and put it in the factualized trust.

23  So I went back to Ted Russell with my

24  brother in tow. He was going to pick me up. I went

25  in and talked to the manager and told him that I

1   felt like it might be best at this point to leave

2   the truck with him until we got this deal completely

3   like it ought to be.  He said, "No, just come in

4   next week.  Keep the truck with you.  It ain't no

5   problem.  Keep the truck with you.  We'll get this

6   straightened out.  No big deal."

7               So I left Ted Russell.  We left and

8   hung out with my friend's grandson and son and did a

9   little clothes shopping and shoe shopping.  We all

10  went to dinner that evening.

11              And I think at that point I had some

12  friends come in from Florida.  We had planned on

13  having dinner.  And my brother and those two friends

14  went to dinner and my friend Angie stayed in my

15  apartment.

16              And after we had dinner, we went back

17  to the coach and hung out for a while and my brother

18  and I spent the second night in the coach.

19              And then Sunday we came back to the

20  apartment.  We had brunch.  I think Angie and I had

21  brunch.  And then we went to the pool, hung out at

22  the pool all day.  And then I stayed at the

23  apartment that night and had -- Alex and Val arrived

24  at that point and we were going to hang out some.

25              And then I think my brother left, and

1    then Monday morning when we got up, we all went to

2    breakfast.

3              After that, I got a call from

4    Mr. Byrnes (*sic*), which is the first time I had ever

5    heard his name.  He said, "Mr. Beane, I just got a

6    phone call."  He said, "Somebody is calling here

7    saying that they're you and they want to reverse

8    this wire transfer."  He said, "Are you requesting

9    this wire transfer be reversed?"  I said, "No, I've

12:14PM  10    not called you."  And I said, "I don't know anything

11    about a wire transfer being reversed."  He said,

12    "Well, can you come to the office?"  I said, "I'll

13    be there in a few minutes."

14              So I left the restaurant where we were,

15    went to Buddy Gregg, and then that's when -- no,

16    actually, Angie was with me, and we went into the

17    office and I met Mr. Byrnes (*sic*) for the first

18    time, as well as Mr. Forbes.  We went over the phone

19    calls that he had received and what was going on and

12:14PM  20    what could possibly be happening.

21              We had a conference call at that point

22    with Whitney Bank out of Louisiana and Mr. Cohen,

23    who was the president of Buddy Gregg RV, and also in

24    that phone call were included Mr. Cohen's attorney,

25    an accountant.  Several other people that were not

1    mentioned were included on this phone call.

2              By the conclusion of the phone call,

3    Heather had gotten e-mails from everyone and told

4    them that she would send them the correct

5    documentation, the origin of the funds, and have it

6    all taken care of, to which everyone agreed to.

7              So -- let's see.  Actually, that -- on

8    Monday evening is when my friends arrived from

9    Florida.  Alex and Val arrived from Florida.  And we

12:15PM  10   just hung out that afternoon.

11             Got up on the 11th, which is a Tuesday,

12   and went and had breakfast, and at that point

13   Heather had e-mailed me the fact- -- the completed

14   factualized trust documentation and told me how to

15   get it notarized with my thumbprint and signature.

16   So I went and took care of that.

17             And once we finished with all that,

18   Alex and Val were with me, and we proceeded to go to

19   Buddy Gregg RV and hand this documentation over to

12:16PM  20   Jerry Byrnes (*sic*), because he was the one that

21   asked for it, and like I said earlier, the gentleman

22   was sitting there, and he said, "I've got your keys.

23   We'll go up and get your coach for you.  And then

24   the next thing I know, I'm being arrested.

25             So, at this point, I don't know of

1    anything else to share with you.  I didn't write

2    down -- there was some other things that I had in

3    mind, but I didn't write them down.  So that's all I

4    have to share at this point.

5              THE COURT:  All right.  Thank you,

6    Mr. Beane, for that redirect.

7                   Miss Tucci-Jarraf, do you have any

8    additional questions based on that redirect?

9              MS. TUCCI-JARRAF:  Yes, I just have a few.

12:17PM 10                   RECROSS-EXAMINATION

11   BY MS. TUCCI-JARRAF:

12        Q.   Without prejudice, I have a few questions

13   just based off of what you just said.

14        A.   Yes.

15        Q.   Did you believe the funds you used to buy

16   the RV were your funds?

17        A.   Yes, ma'am.

18        Q.   Did you believe that the funds you used to

19   open the 28 CDs were your funds?

12:17PM 20        A.   Yes, ma'am.

21        Q.   Did you believe that the funds that you

22   used to pay off all your debt, your car loans, your

23   auto insurance and your two credit cards -- all your

24   credit cards were your funds?

25        A.   Yes, ma'am.

```
 1       Q.   Did you intend to commit any crimes --
 2       A.   No, ma'am.
 3       Q.   -- during that period?
 4       A.   Never have I ever intended to commit a
 5  crime.
 6       Q.   Okay.  Did you believe that you were
 7  committing a crime by doing what you did in July?
 8       A.   No, ma'am.
 9       Q.   Did you and I at any time plan, organize or
10  otherwise conspire to commit a crime?
11       A.   No, ma'am.
12            MS. TUCCI-JARRAF:  Thank you.  I have no
13  further questions.
14            THE COURT:  Thank you.
15              Recross by the government.
16            MS. SVOLTO:  Yes, Your Honor.  Thank you.
17                  RECROSS-EXAMINATION
18  BY MS. SVOLTO:
19       Q.   All right.  Mr. Beane, you stated that you
20  had done some banking with various banks before
21  USAA; right?
22       A.   Yes.
23       Q.   And you also stated that Advantage
24  Innovations' paychecks to you came to your bank
25  account electronically; correct?
```

                    A.    That's correct.

                    Q.    And you understood that the money that went

into your bank account from Advantage Innovations

was from money you earned from your job there;

right?

                    A.    That is correct.

                    Q.    You understood that deposits into your

account were for money you worked for and earned?

                    A.    Yes.

12:19PM    Q.    Okay.  You discussed the UCC documents.

Let me just ask you:  The UCC documents that you've

referred to several times are hundreds of pages of

documents?

                    A.    That is correct.

                    Q.    Does about 435 pages sound right to you?

                    A.    That is correct.

                    Q.    And those documents are just full of legal

jargon; correct?

                    A.    They are.

12:19PM    Q.    And you don't understand that jargon, do

you?

                    A.    I understand the process that

Mrs. Tucci-Jarraf explains in obtaining those

documents and what they mean.

                    Q.    All right.

1    A.   The steps taken to achieve those documents.

2    Q.   But you couldn't explain those documents.

3    A.   Not in legal jargon, no.  I'm not an

4  attorney.

5    Q.   All right.  And when you went to Buddy

6  Gregg on July 10th that day, you knew there was

7  something wrong with your account; correct?

8    A.   At that point, the only thing showing on my

9  phone was that there was a signature card needed.

12:20PM 10    Q.   And but at that point you knew that there

11  was an issue because you had asked Miss Tucci-Jarraf

12  to be on the call; correct?

13    A.   The issue -- call was about the wire being

14  requested to be returned.

15    Q.   And there is discussion in the phone call

16  about what exactly was going on; correct?

17    A.   Yes.

18    Q.   And so you had two friends with you at

19  Buddy Gregg on that day?

12:20PM 20    A.   On the 10th?

21    Q.   On the 10th.

22    A.   No, just one.

23    Q.   Just one.  Was that Valerie Wegner?

24    A.   No.

25    Q.   So it was not Valerie Wegner there?

1    A.    No.

2    Q.    So who was it that recorded that call?

3    A.    Angie Lensley.

4    Q.    And one of the things you spoke about in

5    your cross-examination with Miss Tucci-Jarraf was

6    something you called the Opal Tour.

7    A.    Yes.

8    Q.    All right.  So was the Opal Tour based on

9    information from the One People's Public Trust?

12:21PM  10    A.    Correct.

11    Q.    And that's something very similar to the

12    information you've shared with us regarding these

13    trust accounts and individual worth and all of that;

14    correct?

15    A.    That is correct, yes.

16    Q.    All right.  And the Opal Tour utilized RVs,

17    didn't they?

18    A.    Yes.

19    Q.    And so those RVs were used to spread the

12:21PM  20    message of all of the individual worth we have?

21    A.    Yes.

22    Q.    And so that was around the country that

23    that toured?

24    A.    That's correct.

25    Q.    And that's where you met Alex and Valerie

1    Wegner or where you --

2         A.   Through the Opal Tour.  I didn't meet on

3    the tour, but the tour ended up at a place I was

4    living in North Carolina.

5         Q.   And let me make sure I understand your

6    testimony.

7              Did you -- is it your testimony that

8    you paid off your credit card bills and your car

9    loans on July 5th?

12:22PM 10        A.   That is my testimony.

11        Q.   That's your testimony?

12        A.   Yes, ma'am.

13        Q.   And so is it also your testimony that

14   that's the same day that you opened the certificates

15   of deposit?

16        A.   That is my testimony, correct.

17        Q.   So the previous exhibits we've discussed in

18   this case regarding the payment of your debts on

19   July 3rd are not true?

12:22PM 20        A.   They are not true.

21        Q.   They're not true.  So that would be

22   Government's Exhibit 44?

23        A.   I have no idea which ones they are.

24        Q.   45?

25             How about your Facebook posts, Government's

1    Exhibit 140?

2         A.    That is not true.

3         Q.    So the Facebook post that said, "I paid off

4    all my debts, ask me how."

5         A.    I did do that post, but not on the 3rd.

6         Q.    Not on July 3rd?

7         A.    No, ma'am.

8         Q.    So that's incorrect?

9         A.    Yes, ma'am, that is incorrect.

12:22PM 10        Q.    All right.  And documents from USAA

11   indicating the payment of those bills on July 3rd

12   are also incorrect?

13        A.    Yes, ma'am.

14        Q.    Okay.  And you discussed that you changed

15   the routing number when you were opening the

16   certificates of deposit; is that correct?

17        A.    The bank changed the routing number.

18        Q.    So the bank changed the routing number.

19             And then so you put in a new routing

12:23PM 20   number?

21        A.    Correct.

22        Q.    And that new routing number was also for

23   the Federal Reserve?

24        A.    It was not titled the Federal Reserve.  It

25   was titled a clearinghouse something -- clearing

1    payment center or something to that effect.

2         Q.   And you got that number from where exactly?

3         A.   Google.

4         Q.   So you Googled, and you Googled what?

5         A.   I Googled the address of the bank which

6    came up when I first used -- when I put in the first

7    routing number, any time you type it in, it shows

8    the bank name automatically when you type in the

9    routing number.

12:24PM 10             I wrote down that bank name and the

11   address, and that's what I Googled whenever I found

12   the second routing number.

13             I had the discussion with

14   Miss Tucci-Jarraf about the routing number, and she

15   said --

16        Q.   Was that at the same time that you were

17   researching the routing number you wanted to use?

18        A.   Correct; correct.

19        Q.   But you do know that the routing number you

12:24PM 20   used, the second routing number you used, was for

21   the Federal Reserve; right?

22        A.   It was for this clearinghouse bank,

23   whatever the --

24        Q.   A clearinghouse through the Federal

25   Reserve, as you understood it; correct?

1      A.   Yes, I understand it to be the Federal

2   Reserve, but the title of the bank was not Federal

3   Reserve.   It was some type of clearinghouse, payment

4   clearinghouse.

5      Q.   Okay.   But you did understand the routing

6   number was to a Federal Reserve Bank?

7      A.   That's what I understood, yes.

8           MS. SVOLTO:   That's all I have.

9           THE COURT:   All right.   Thank you.

12:25PM  10           Why don't we do this:   Well, let me ask

11   you, Mr. Beane -- I'll just ask you from the witness

12   stand just to verify a conversation we had while the

13   jury was out.

14           That concludes your testimony.   Do you

15   have any other witnesses that you wish to present in

16   your case-in-chief?

17           MR. BEANE:   No, sir, I do not.

18           THE COURT:   So do you rest on your case at

19   this time?

12:25PM  20           MR. BEANE:   I sure do.

21           THE COURT:   All right.   Thank you then.

22           And we'll go ahead and take our lunch

23   break.   We'll go ahead and break until 1:45.   I've

24   got a few other matters to address.   So we'll give

25   the jury plenty of time for lunch.   And so the jury

1    is excused at this time.

2                        (Jurors excused.)

3              THE COURT:  We'll stand in recess until

4    1:45, at which time, Miss Tucci-Jarraf, you'll be

5    prepared for your opening statement up to

6    20 minutes.

7                    I remind you, as you've heard me say,

8    your opening statement is not closing argument or

9    argument about the sufficiency or weight of the

10   evidence.  It's your opportunity to present an

11   opening statement about what you expect the evidence

12   to show during your case-in-chief, and then we'll go

13   into testimony after that.

14                   So we'll see everybody at 1:45.

15             MR. LLOYD:  Your Honor --

16             THE COURT:  Yes, sir.

17             MR. LLOYD:  -- do we need to clear the

18   tables for your other matters?

19             THE COURT:  No, it's being handled in

20   chambers.

21             THE COURTROOM DEPUTY:  This honorable court

22   should stand in recess until 1:45.

23

24

25

1          (Whereupon, a lunch recess was

2          had, after which the Report of

3          Proceedings was resumed at the

4          hour of 1:54 p.m. as follows:)

5     THE COURTROOM DEPUTY:  All rise.

6     THE COURT:  All right.  Thank you.  We'll

7 bring in our jury.

8          (Jurors present in the courtroom.)

9     THE COURT:  All right.  Thank you.

01:54PM 10 Everyone may be seated.

11          You heard right before lunch the

12 defendant, Mr. Beane, rested on his case, and now

13 Ms. Tucci-Jarraf has the opportunity -- as you

14 recall, she deferred making an opening statement at

15 the start of this case.  So she now has the

16 opportunity to make an opening statement.

17          And, again, I remind you that opening

18 statements are not evidence, but they are designed

19 to present in this case the party the opportunity to

01:54PM 20 discuss with you what they believe the evidence in

21 this case will show going forward.

22          So, Miss Tucci-Jarraf, you may begin

23 with opening statement on your own behalf.

24     MS. TUCCI-JARRAF:  Thank you.

25          Okay.  Good afternoon.  This case is so

much bigger than what anyone knows.  You're going to

hear evidence that's presented to give you an

insight to what some have called a war.  I

personally call it a cleanup.  And you're going to

hear that testimony about things that have been

going on behind the scenes, and there have been

reasons why it's been going on behind the scenes.

Only until recently, until October of

last year, you're going to hear that in October of

last year, everything changed.

And you're going to hear testimony

about not just one man, Randall Keith Beane, but of

hundreds of thousands of people; not just here in

America, but also people all over the world who were

put out to be human fodder within this secret war or

cleanup that has been going on since before I was

born.

You're also going to be hearing

testimony about the actions that were taken in July

to be able to mitigate, if not terminate, that

particular threat against the people in America, as

well as around the world.  And it was in connection

with a threat that was being made against the

president of the United States, Donald Trump.

MS. DAVIDSON:  Objection, Your Honor.  I

know these are her opening statements, but there

is -- there is no basis in fact to this.

MS. TUCCI-JARRAF:  I believe it's my

opening.  I haven't even gotten to testify yet and

present the evidence.

THE COURT:  Well, it's your opening, but

you're testifying -- your opening is related to

matters that -- I mean --

MS. TUCCI-JARRAF:  It's relevant, and if

the Court would give some leeway --

THE COURT:  Keep in mind this is an opening

statement, and, Ms. Tucci-Jarraf, you should be, I

guess, on notice that you might state in your

opening what you believe the evidence will show, but

then if you attempt to introduce evidence that the

Court deems irrelevant, that evidence will not be

shown or demonstrated.

MS. TUCCI-JARRAF:  I am fully aware --

THE COURT:  Go ahead.

MS. TUCCI-JARRAF:  -- of court procedures.

Thank you.

You're going to hear about testimony

through testimony the events of not just July 11th,

but the events that led up to July 11th.

You're going to hear testimony about

why I took specific actions and what those actions were based on and that those actions were done with full responsibility, accountability and liability in order to protect anyone from getting harmed.

There is very much a pixilated picture that is very unclear, and only until October of 2017 did it start to become visible.

The evidence that will be presented today and through the close of my particular case-in-chief will hopefully give you those pieces for your own determinations and your own choices that you will need to make on this particular case.

Thank you.

THE COURT: All right. Thank you.

You may call your first witness.

MS. TUCCI-JARRAF: Without prejudice, I call Heather Ann Tucci-Jarraf to the stand.

THE COURT: If you'll please take -- you can go on up to the witness stand. We'll give the courtroom deputy a moment to move the podium, or you can just leave it there if you want, Julie. Whatever you want to do.

(The witness was thereupon

duly sworn.)

THE COURT: Ms. Tucci-Jarraf, as you've

1    seen and as you saw with the defendant, Mr. Beane,

2    this is your opportunity to present testimony.

3                    Since you are representing yourself,

4    you may provide a factual narrative to the jury, and

5    it's subject to any objection that may be made by

6    the government or by Mr. Beane, and if an objection

7    is made, if you'll pause and give me an opportunity

8    to respond.  But, otherwise, you may proceed forward

9    with your factual narrative at this time.

02:00PM   10                    HEATHER ANN TUCCI-JARRAF,

11    having been first duly sworn, was examined and

12    testified as follows:

13                    DIRECT EXAMINATION

14              MS. TUCCI-JARRAF:  Thank you.

15                    Okay.  My name is Heather Ann

16    Tucci-Jarraf.

17                    Should I spell that?

18              THE COURT:  No, that's okay.

19              MS. TUCCI-JARRAF:  I grew up in Tacoma,

02:00PM   20    Washington, Pierce County, Washington State.  I

21    graduated from Bellarmine Preparatory High School.

22    It's a Jesuit high school.

23                    My family is very prominent in the

24    area.  They helped build a lot of -- a lot of the

25    county, if not the state and surrounding states.

1    And I have worked for them since the age of 10.

2    That was my first life was in construction.

3                    It was also my first experience in

4    business practices which today are called

5    white-collar crime; however, they were just known as

6    business practices back in the day.

7                    My family has a multi-state,

8    multi-million-dollar construction company; plus, we

9    do developments throughout Washington State,

02:01PM  10  high- -- I've worked on large highway projects,

11   freeways, overpasses, bridges, and I did that from

12   the age of 10 until I graduated from law school.

13                   And while there, I also did accounting.

14   I went to University of Puget Sound, received my

15   bachelor's degree in accounting with emphasis in

16   tax.

17                   And during that time I interned for our

18   company in the accounting firm, our in-house

19   accounting, and learned about accounting procedures,

02:02PM  20  different programing, forensics auditing.

21                   A lot of times we had to prepare things

22   for bids because we worked with the -- with the

23   state of Washington, and so I would have to do all

24   of the accounting procedures and the accounting

25   forensics for not just the bid, but also if there

 1    was litigation after a project for any instance.

 2              We never went to litigation due to

 3    failed projects or anything like that.  So I didn't

 4    do those for our particular company, but we also had

 5    a number of different subsidiaries that would also

 6    be -- that were owned by my family and run by my

 7    family that would be involved in the projects.  So I

 8    did work on those.  And we have a development

 9    company that would manage basically all the projects

02:03PM 10    that our construction company would build.

11              MR. MC GRATH:  Your Honor, I apologize.

12    I'm sorry to interrupt.  Mr. Beane is having trouble

13    hearing.  If I could mention that to --

14              THE COURT:  If you'll try to speak up.  The

15    microphone is the bar in front of you and it just

16    picks up -- it's voice activated.

17              MS. TUCCI-JARRAF:  Maybe if I sit back.

18    Can you hear now?

19              MR. BEANE:  Yes.

02:03PM 20              MS. TUCCI-JARRAF:  Sorry.

21              Okay.  In that development company,

22    that part of the arm was run by my uncle whose

23    grandfather was the vice-president of StarKist®

24    Tuna, and he had a very strict policy as far as

25    making sure there was a paper trail, paper trail,

1    paper trail, and that's when I learned the benefit

2    of having paper trails.

3                So I would do all the paperwork, all

4    the filing, and if there was anything missing --

5    this was about the age of 12 to 15 that I worked in

6    that particular -- that particular area with the

7    finance company.

8                My family also would start and own

9    banks.  They currently to this day own a bank.

02:04PM 10   However, I've never worked inside of our banks at

11   all since I was young.

12               However, they were a big part of our

13   development and our construction projects,

14   obviously, as they would do a lot of the financing.

15               So I would have to get familiar with

16   that particular paperwork, and it just made for a

17   very interesting experience as far as learning how

18   everything is interconnected, even if it doesn't

19   look like it.

02:04PM 20   Also, during that time I -- from 12 to

21   approximately 21, I also learned about the

22   Securities and Exchange Commission.  First, a lot of

23   the private companies that we had to do a lot of

24   work with.  We had to do compliance and things like

25   that.

1          We had an in-house counsel named Chris

2    Huss, and I also worked with him.  He actually was

3    the one who prompted me -- or let's just say advised

4    me that I should go to law school and how to go

5    about it, what to expect, that kind of a thing.

6          And the reason that I even went to him

7    was because while I was in my graduating year from

8    college, I was studying for the CPA exam.  I was

9    also studying the -- studying for my finals to

02:05PM  10   graduate, and I was studying for the law entrance

11   exam, which was required to be able to go to law

12   school.

13          At that time I was also interning at a

14   pension consulting firm which my family had helped a

15   friend from Greece start up, which has been up and

16   running, I think, around the date that I was born.

17   So, 1972.

18          And, of course, that particular

19   company, which was called Spectrum Pension

02:06PM  20   Consulting Firm, who I interned for, did all of the

21   pension work for all of my family's companies,

22   whether it was the development, construction, or the

23   banking.

24          It was during that time that I

25   experienced the inner workings of a general manager

and the corrupt practices that were done in the
pension consulting industry, and a lot of it was
very shady.

I wouldn't say it was -- at the time I
didn't know whether it was legal or illegal. I just
knew that I didn't feel good about it. It was
hiding things from the clients. It was shifting
things around in the pension consulting -- in the
pension accounts that they had for use by other
third parties, whether it was to fund monetary
instruments, hypothecate them is what we say in
banking, to hypothecate a loan -- or excuse me --
use it as an insurance wrap or a collateral to be
able to hypothecate a loan not through normal
business standards or banking standards or going
through a bank necessarily, but it seemed shady.

So that's why I had gone to Chris Huss
in the first place. And my general manager had been
telling me to do many things that I questioned. And
I would always put notes on everything that I did.

This goes to expand on my uncle's -- my
Uncle John's practices of paperwork, paper trail,
paper trail, paper trail, as I would put notes all
over it saying "Per my GM" -- my general manager --
"I'm told to do this."

1          And I explained to Chris Huss, who is

2     our in-house attorney, "This is what I do."  And he

3     just said, "If you know something to be illegal, it

4     doesn't matter whether someone told you to do it or

5     not, you're responsible."

6          So at that point I also learned about

7     the fact that general managers, president, anyone

8     who is running a company who doesn't know what's

9     going on in their own house doesn't like to be

02:08PM 10     confronted or presented, even, with information that

11     perhaps their company might be doing something not

12     completely legal.

13          So at that time I had a job with them

14     for after when I graduated.  I made the choice to go

15     to law school, to go to law school and figure out

16     what the laws were, and I went in to law school at

17     Gonzaga University School of Law, and that was in

18     1996.  I almost didn't get in, but I did get in, and

19     it was a fascinating experience.

02:08PM 20          It was one where I had professors from

21     all over.  One of my professors was the Vatican's

22     United Nations representative.  The other one was a

23     constitutional advisor to the White House.

24          During the time that I was in school,

25     there was another one who was doing -- basically

setting up programs in countries like Libya, Sierra

Leone in order to stop human rights abuses.  And he

was my trial coach, and his wife, Judy Clark, who

also trained me.  They trained me in evidence.  They

also trained me in litigation and evidence as far

as, you know, using it in a trial court and rules.

And I was on the national trial team

where for a year, solid six days a week, that's all

we did was train and train and train.  So I learned

not only about paper trails since I was younger, but

I kind of saw how -- why they were so important.

They were so important to lay out what

was missing, who did what and whatnot, but now I got

to see how that actually is applied in a whole

'nother arena, similar to the one that we're sitting

in here today.

So at Gonzaga -- we called it GU Law.

At GU Law, I worked as a city prosecutor, as an

intern for the city prosecutor's office underneath

another attorney.  I got to have the experience of

seeing how the city prosecutor -- how a prosecutor's

office actually even works.  That was my first

experience.

Within that there was charging that

needed to be done.  So I got to see actually how

1    they would even start a case from a charging

2    document on.

3              And it's -- it later became so

4    important.  I didn't understand at the time, but

5    later it was crucial to the work that I would do for

6    the next 20 years after graduating from law school

7    to date.

8              And so with these -- within that

9    office, I found the same kind of problem with, let's

02:11PM  10   just say, questionable activities, questionable

11   practices.

12             Of course, I still quite did not

13   understand exactly what all the pieces were, and any

14   time that you would ask behind what happens or

15   what's the reason behind just taking a case to court

16   and trying it, the answers were never given.

17             At that point I went to intern for a

18   judge, Superior Court Judge Gregory Sypolt, and I

19   was with -- as his intern for approximately a

02:11PM  20   year-and-a-half through my law school career where I

21   learned basically from the judicial side.

22             I got to sit with him in court, listen

23   to everything, similar to this young man over there,

24   and hear cases, and then at the -- during the cases,

25   he and I would sit in his office before we would

1   finish for the day and he would ask me what my

2   thoughts were, what did I think about, you know, the

3   presentations of the case, and we had everything

4   from Department of Justice attorneys in there, U.S.

5   attorneys, as well as Canadian -- the Canadian

6   equivalent with their wigs and their gowns.

7           So we've -- I've had a lot of

8   experience as well as with private and -- private

9   attorneys in that office as well.

02:12PM   10           So at that time what he did was he

11  trained me on how to actually dissect a case, go

12  through all of the materials presented on -- on the

13  plaintiff's side, as well as on the defense side,

14  whether it was a civil case or a criminal case.

15          And we had everything in there

16  from -- well, we had many cases.  I think over the

17  time I worked on about 50 cases; some of them are

18  very significant in civil litigation.

19  Interrogatories.  I got exposed to every single tool

02:13PM   20  in the legal field that they use for discovery as

21  well as for motions, hearings and trial.

22          And then what the Judge had trained me

23  to do was to go in and actually write an opinion.

24  And so he would have me run a parallel opinion while

25  he was doing his and then compare them and taught me

how to be neutral; taught me how to evaluate from a
neutral stance, and by the time I graduated, I was
writing the opinions where there would be nothing
really to correct, and he would sign them after
going through every aspect and making me explain why
I chose certain things.  So that was for about a
year, the last year that I was in law school that
that was happening.

I did have a brief experience with a
private firm who actually asked me to be their
intern only because I had sat and done all that work
I just described to you on a litigate -- on a case
that was litigated that was similar to one they had,
which wasn't disclosed until I got in there.

However, we had won nationals -- or
excuse me -- regionals; so we were going national.
So I stopped.

I bring all this up because it is what
helped me develop habits that has saved my life and
also were a part of what happened in July.

So after that time I graduated from law
school, it was my last week, my graduating week of
law school when I was contacted and asked if I
wanted to be a part of a cleanup.

Now, I had -- I had grown up with

individuals such as General Major Timothy Lundberg

who was head of the U.S. Air National Guard for all

of Washington State and worked with Homeland

Security, as well as advised on the governor's

association and advised individuals at the White

House.

I grew up with that family. They're

good family friends, as well as Congressman Norm

Dicks. So, being around politics and all that

02:15PM actually helped, also, to be able to prepare me for

what I would end up doing for the next 20 years and

the folks that usually people in America, as well as

the planet, don't usually see and don't see the

operations that literally affect every day of your

life. And it was going to be necessary to be able

to establish a solution for some very serious

problems which were not made public until now.

So another part of it was good family

friends of ours were the Weyerhaeusers or George

02:15PM Russell. I grew up in basically a field -- or

basically around people who had multinational

corporations. So I got the international side of

things as well growing up, as well as after I had

graduated law school, worked with, especially during

investigations that I would end up doing with

Mr. Lundberg or General Major Lundberg and George

Russell, as far as monetary instruments.

The job that I was to take or that I

would end up taking 10 months after being asked to

do it, after serious consideration regarding whether

I even had what it took to do it, I ended up taking

the position, and it was involving a cleanup of the

core issue.  It was presented as the core issue of

everything on this planet that wasn't working, and

02:16PM  that was banking.

Now, because banking did not have

borders, I actually had to go overseas and stay in

France and Italy, Spain and China.  I started off

with Italy.  My family is Italian.  I took four

years.  Of course, didn't learn anything.  So I had

to start all over by the time I got to Italy.  And I

lived in Italy from essentially 2000 to 2000 and --

just -- December of 2002.  So I spent almost three

years there.

02:17PM  During that time I met with more U.S.

politicians in Taormina.  I was stationed in

Taormina where I studied the language at levels for

a professional application, both in the legal

industry, as well as the banking industry.

Sigonella, which is a naval base

station close by; plus, we had Naples above.  So I

also had Navy around me, Navy officials, and a lot

of things were explained to me while I was in

Taormina that assisted in me being able to

understand what all the problems were in banking, as

well as how banking was utilized to maneuver and

manage and manipulate different areas, not just in

America, but in all government entities especially.

          So during that time a part of what I

was asked to do was to help with funding for a world

trade center in Sicily, and Sicily and Italy had a

big problem.  Those in Sicily and Italy wanted to

separate.

          So as far as a lot of the information

we've seen in the last year where a lot of people

are trying to secede from different parts of the

whole that they have been in, such as in Spain with

Catalonia.  We've heard some rumors about states in

the United States wanting to secede or split apart,

such as California wanting to split into different

sections.  This is not a new problem.  It has been

going on since even before I went into things in

2000.

          This is all information that was

critical to me and experience that was critical to

me. I was also there during the time when Mafia was attacking attorneys and judges. And speaking with some of the judges that were there, I never met with the attorneys, but with the judges, it was a matter of -- it went beyond politics. I got to see a whole 'nother side of humanity that involved systems that we use every day, such as our judicial, such as our banking; usually just ATMs, but, I mean, it went even further.

02:19PM      There were a lot of shadow games that I became aware of but never a part of. I was still in the process of going in and learning my own abilities, learning my own capacities, as well as being able to identify different factors that were wrong in the systems globally.

So a lot of meetings were held while I was in Taormina, Sicily, in 2000 to be able to give me that data and then let me do my own research and validation.

02:20PM      That was one thing about doing this -- this -- I use the term cleanup -- was I had full autonomy as well and discretion over how I chose to do my part. However, transparency was the number-one protocol as well as paper trail. And in this case, inclusive of digital trail so that there

1    was always a trail from A to Z.  So very important.

2              But first I had to see how to create

3    that through the examples that I was given and

4    allowed to do my own research on.

5              So I had pretty much access to a number

6    of different officials and their offices and to be

7    able to learn.  Almost like a international

8    internship, but, really, for nobody other than to be

9    able to gain the experience and the knowledge, the

02:21PM  10   personal knowledge I would need to be able to do my

11   part in the cleanup.

12             So at that point I got married and had

13   two kids in Italy, and then we moved back to the

14   United States so that I could begin prep work.

15             And that prep work included setting

16   foundations that would later be used in the cleanup.

17   I had worked in the city prosecutor's office in

18   Spokane, Washington when I was in law school.  This

19   time for the -- setting the foundation.

02:21PM  20             I went to Pierce County, Washington's

21   prosecutor's office, applied.  They didn't know

22   where I had been for the last, you know, two to

23   three years and wanted to know what I was doing, and

24   I gave them a general statement -- nothing to what I

25   gave you guys here today -- and I got rejected.

1    So then I went into the defender's
2 office and said, "Here I am ready to do the work,"
3 and I was given a position.  And it was a temporary
4 position because they were trying to seek funding.
5 So I also got exposed to the inner process that they
6 have to do for applications and grants from state
7 and federal.  That was another part of it.
8    So I did go in there, and I was a
9 public defender from approximately December 2000
10 and -- let's see.  That would be 2002 until
11 approximately May 20th of 2003, which at that point
12 I had been -- because of the job that I had done at
13 the defender's office, I was recruited from the
14 prosecutor's office that had rejected me before.
15    Now, I'll disclose that at this
16 particular point, Pierce County, Washington, like I
17 said, my family is pretty prominent there.  It's
18 just under a million people.  It's like 758,000
19 people, I think, at the time that this was going on,
20 and the judges had all gone to school -- the
21 attorneys that had come in had either been attorneys
22 with my great uncle or my father.  They had gone to
23 school together.  So there is a lot of people that
24 just know each other.  It's a pretty tight
25 community, but there is also a lot of multinational

business that comes in there because they have a
huge port that's run by another family friend,
Commissioner Clare Petrich, and she gave me the
insight regarding the international side of things,
as far as shipping and all that went.

And this is all being run
simultaneously.  So, really, the job that I took at
the prosecutor's office was to figure out the inner
workings, and the big question that there was was
the funding of prosecutors and the judicial system
and whatnot.

So I did get to learn all that and
where the records are kept; where they're sent.  It
was
a -- it is a long process, and it wasn't all --
necessarily all that knowledge gained while I was at
the prose- -- employed by the prosecutor's office.
It was also later while I was doing an investigation
and test cases inside of Pierce County court
systems.

So while I was at the prosecutor's
office, there was a lot of -- I got to see the inner
turmoils that occurred there.

I was very good friends with the
judicial assistants, as well as the judges, private

attorneys, and including my colleagues, whether they

were for the public defender's office or the

prosecutor's office, and, really, the big decision

for me to move from the defenders to the prosecutors

occurred when someone's rights had gotten abused.

So I got to see how the reactions were.

And, basically, you know, what it ended up being

was:  Your defenders and your prosecutors work for

the same people and they get paid by the same

entity.

So that launched me into scheduling to

go in and look at the auditor's offices and the tax

assessor's offices, which I ended up doing at a

later day.

So once the foundation was set, I

worked from -- at the prosecutor's office from 2003,

May 26th of 2003 until February of 2006, which is

when I left, and there -- from there, I went to the

international -- back to the banking so that I could

go in and get everything ready for the final test to

go in and grab all the data that we needed for final

implementations of solutions.

So while I was working overseas, I went

back into the bank trade and finance and worked with

authorities from all over the world, intelligence

agencies and whatnot, and I was taking approximately
90 monetary assets and projects a week and having to
do the compliance on them; everything from the
background check of the individual that was
presenting their project, as well as going in and
doing all of the auditing, making sure all the
pieces were there for the project so that it would
meet whichever international and local laws that
were required where the projects would be built out.

02:26PM  I also worked with the bankers from
different banks all around the world in order to
make sure all the funding was set up correctly, all
reporting was going to be complied with at that time
for anti-money-laundering laws, tax laws, local tax
laws.

A lot of projects that were -- that I
worked on also had to get a United Nations number
because they were multinational or included
basically an immigration program.

02:27PM  China was usually the one that had the
immigration program. So that was another aspect
that later would become vital to the work that I did
was how people are shuffled around. And it's -- in
banking, it's known as human capital, and you'll see
a lot of companies that have a human capital section

1    or director or someone assigned to -- in regards to
2    human capital.

3              And what that in my experience and my
4    personal knowledge became was that in certain
5    projects, a project would not be allowed to go,
6    especially at the -- what we call at the UN number
7    level, the United Nations level was that they would
8    not go unless the local -- they would look for a
9    local individual.  So, let's say Knoxville.  You
02:27PM 10    would have a local individual that they would look
11    for that had strong contacts, political sway, as
12    well as contacts with the local banks that were
13    here.

14              They would also have to have some kind
15    of pull with political figures in order to get visas
16    or some kind of approval for Chinese nationals to be
17    able to come over here and do the work.  It was a
18    requirement that 51 percent of all labor that was
19    applied would be done by Chinese nationals.

02:28PM 20              Later there would be found to be a
21    problem is that a lot of the Chinese nationals would
22    never come back.  Whether they would skip out on
23    their visas; whether they would just have another
24    type of visa that they would be given.

25              A lot of it was through a lottery

program that they were -- if someone paid a million

dollars, they wouldn't have to do the lottery

program.  They could go under a whole 'nother type

of program where they would just be given permanent

residency or citizenship in order to stay.  So,

China was, at the time, paying a lot of -- millions

of dollars for different individuals to stay.

So that was my first experience with

China, and later I became the one that they would

call when China was involved in any kind of project

because of the experiences and the exposure that I

had to its practices.

The other thing was I worked a lot with

Switzerland and with a gentleman named Chris Alfray

(phonetic) who runs LEOTRADE (phonetic), which is

basically the largest shell company, holds the

largest amount of shell companies, and those

companies, those shell companies, were used a lot at

the highest levels of bank trade and finance in

order to set up schemes from all over the world for

these projects.

And it really just was a matter of you

would try to get anyone that had a monetary

instrument to come to hypothecate that through or

within a bubble called a shell company.

1          So each shell company would have its

2     own costs, and that shell company would be used for

3     the duration of that project and then the shell

4     company would be sold off.

5          These are the types of business

6     practices that have been used.  Some of them -- some

7     of the business practices, such as learning about

8     people that have assets and that want to make a

9     steady income, you know, for seven years to

02:30PM 10   20 years, the banks, you know, prior to the year

11    2000, would go in and try to get someone to come and

12    bring their value, their money into the bank,

13    deposit it there, and then they wouldn't touch it

14    for seven years, 20 years, depending on the private

15    agreement.  Okay?

16         And, meanwhile, the bank would say,

17    "We'll give you lines of credit."  Okay?  "We'll

18    give you lines of credit in the form of S-" -- what

19    they call standby letters of credit.

02:30PM 20        So they get a standby letter of credit

21    for a hundred million, and then they would go and

22    say to some other third party, "We'll let you borrow

23    this and we'll confirm that it's good through our

24    bankers and then you can get a line of credit."

25         It was -- it was essentially a long

line of hypothecation. And after 2000, it became
illegal to have those kinds of contracts.

So I was the one that would be called
in to do research on those and give -- you know, at
the time I was an attorney, give legal opinions, as
well as identify all of the different problems and
any solutions.

And the solutions could be industry
practices that are already involved, but maybe not
at all the levels, or create a new solution
that -- so there was a lot of policy work that I
ended up doing just through how I ran my own -- my
own product, my own quality of work.

So security protocols became very, very
important in my work to make sure that every party
to a transaction was completely protected.

I always liked to have 100 percent
transparency, but in banking that was never
available to every single party involved. There was
a lot of hiding of information, especially of how
banking worked. That is one of the most guarded
secrets on the planet, maybe next to Antarctica.

So there is a lot of information that I
was exposed to and had to cover while I was working,
again, at the highest levels of bank finance

overseas.

I did move and worked -- I had moved
back to Washington State, and by that time I had
four children, and I was working on -- the last
project that I worked on was in Zambia, and I had --
through these projects, we worked a lot with U.S.
Treasury, all the big banks, the four here in the
United States which they call -- we call the Big
Four, Bank of America, JPMorgan, Citibank, and
Chase, of course, and then Wells Fargo came in much
later, and there was a lot of experience and
exposure in the -- not just shady, but illegal
operations and activities that go on in banking
because nobody knows how it works in the public.

They might know the general concepts of
things, but they do not know the actualities of how
it all works. So my goal was to bring a lot more
transparency. I felt it would make the deals a lot
more secure and more successful. They had a greater
potential to be successful.

A lot of these programs -- or excuse
me -- projects were built so that it could provide
for jobs, job creation. It could provide better
services to local communities.

There were a lot of -- because of the

immigrants aspects to these projects, especially
with China -- Russia was another one.  We had some
from Italy as well.  But it was mainly China was the
big one, and it became a matter of how these people
don't know what's going on, and so housing became
important.

So I worked with different world
organizations that deal with housing and
providing -- providing food, job, in case they don't
have the job start up right away was to make sure
that they had everything they needed to provide for
their family, because a lot of the times the family
would be included in that person coming over.

So what they ended up doing in most of
these is:  We started to notice in approximately
around 2008 that there -- well, 2006, there was the
big financial crisis, which was completely
contrived.  There was -- you know, it was just a
bunch of practices that basically got caught up and
bottlenecked and, you know, it affected everybody on
this planet, not just here in America.

And we ended up having the Wall
Street -- Occupy Wall Street in that particular
instance, and that was -- in 2008 to 2011, I saw
the -- I got to see the buildup that eventually led

1   to Occupy Wall Street; what it was truly about; who

2   it was truly started by, and the actual effects on

3   the people in America, as well as overseas, because

4   they ended up expanding that particular -- that

5   particular program overseas.

6           And during -- from 2008 and onward, I

7   worked a lot with different intelligent agencies,

8   including my husband who I'm married to was born in

9   Morocco and basically grew up in Florence, Italy,

02:36PM 10  which is where we met.  He speaks a number of

11  different languages, six languages, primary

12  languages, and then 14 different dialects on top of

13  that.

14          So a lot of military intelligence and

15  different intelligence agencies from different

16  countries, including our own, were coming in and

17  trying to recruit him because of his language

18  skills, but also the work that he and I did.

19          We started a company -- or he started a

02:36PM 20  company.  I was doing the law practice.  I had left

21  the prosecutor's office to open up my own practice;

22  was doing global projects and integrating local.

23          There was a real problem with artisans

24  and products at the time.  You had farmers from

25  Columbia not getting their money from the

1    multinationals here.

2              We had products from Morocco, for

3    instance.  That's probably where my greatest

4    knowledge base is that led into the cleanups that

5    we've been doing here.

6              So I spent a number of years there to

7    not only learn what the problems were with different

8    organizations, such as U.S. Aid and what their true

9    purpose was and how they work with the state

02:37PM 10   department, especially their program called Sister

11   Cities which the state department runs and connects

12   with other countries to make a sister city between a

13   city in the United States and a city somewhere else.

14   It was sort of an unofficial way for communications

15   to be spread, as well as a way to organize things

16   unofficially.

17             That was my experience, and I did go in

18   to start the sister city between Tacoma in

19   Washington State and Morocco, El Jadida, in Morocco

02:37PM 20   near Casablanca.

21             So I got to work with the founder of

22   that who is Bixler Mazeus (phonetic) who works for

23   the U.S. State Department, and he is very good

24   friends and started -- he, with the mayor of

25   Chicago, started a Sister Cities program between

Chicago and Casablanca.

So my first experience with the state department at that level and programs they were using to unofficially communicate with foreign governments and foreign agents, that was where it had started for me.

So I got to see a lot of Bixler Mazeus (phonetic). And one thing that was really great about Morocco is: They still have a paper trail. They don't have things digitized. I mean, they barely have computers in their offices. So they have everyone walk everything around.

They say, "Okay. Bring" -- "You need to bring something stamped here." They tell you what it is. Then they say, "Go to so-and-so office." So the people walk. And I actually got to do that, to see what it was like.

I had two children in Italy. I had two children in America. We went to register their birth certificates in Morocco in what they call a family book.

My -- so that was really where I learned about the birth certificate and getting into that level. And the Moroccan government was very good about explaining it and how they needed it so

1    they could stamp it and send it to the IMF; so that

2    when we're there, they get to be able to collect

3    funding.  When the kids are in the states, of

4    course, the children have dual citizenship until

5    they're 18 according to the laws at that time.

6                    So it was really a process.  It was

7    something that I learned from my own personal life

8    that we had to do for our own family, not part of my

9    work.

02:39PM  10                    But it actually ended up becoming part

11   of my work, because when I was working with banks,

12   such as Santander, they do monetize the birth

13   certificates, and it's a very elite field.

14                    There is very few people that actually

15   have the knowledge about that particular monetary

16   instrument.  And I didn't exactly at that time,

17   especially when I was registering -- this would have

18   been 2006 -- I didn't know how any of it worked.  I

19   didn't even look at it.  It wasn't a part of the

02:40PM  20   bank trade and financing that I was working on with

21   Switzerland, and so I asked Christoff Ray about

22   that, who is a Swiss authority and does all the

23   security for Davos and the forms that they do there,

24   and it was basically no need to know.

25                    So a lot of the -- even in bank and

trade and finance, there are a lot of levels and
there is a lot of shields.

So I essentially for the first 11 years
after my graduation week at law school spent a lot
of time really seeing how compartmentalized,
seemingly not interconnected agencies and systems,
both in a particular country or between countries,
actually work. And the common denominator was
always banking. There is no borders.

During that time I also worked with
different law enforcements from all over the world,
whether it was -- and a lot of the work that I did,
they didn't start coming out of the woodwork until I
did a particular investigation.

And basically what ended up happening,
as I stated earlier, around 2008, even those in the
mid levels of banking had problems monetizing,
hypothecating monetary instruments because there was
so much fraud going on at the lower levels and the
highest levels.

So I did an investigation in those
particular -- I was asked to do an investigation
within the industry to go in and figure out,
identify who were the individuals, how were they
doing, the fraudulent paper, because it was to

saturate the entire financial system, global

financial systems, and a lot of people were getting

harmed in the banking industry, but also innocent

folks who don't have any knowledge typically about

high-level monetary instruments, such as standby

letters of credit, bank guarantees, how to do

insurance wraps and things like that, and were

getting involved in -- into what we call high-level

trade programs, which, for the most part, FBI is the

02:42PM  law -- in my experience is the law enforcement

agency that is used to make sure that everyone

believes that it's a scam, and that way it helps us

control who actually comes in; that they're a more

sophisticated investor, but not too sophisticated so

they won't ask too many questions or demand too many

things.

So part of that investigation that I

did -- oh.  I apologize.

May I grab my paperwork?  It got left

02:43PM  on the desk.

Thank you.  Excuse me.

Okay.  Can you all hear me okay?

THE COURT:  Yes.

MS. TUCCI-JARRAF:  Thank you.

So, can you all see Exhibit 155-A?

During my time in bank trade and finance doing compliance, as well as investigations for audits for projects, preparation and whatnot, I would be asked to give what they call white papers, which would be my reports on a specific -- I'd be given a topic, and I would be asked to go in and specifically research that topic.

If I found anything that was inner connected with or influencing that particular topic, I was then to expand the white paper and give that data as well.

So how they would do it is:  I would give what we call a bullet report, which would be more like a field report, just saying, "Here is what I've got so far.  This is where I think that I need to look into more," and give a status report at that moment.  So like a snapshot.  But it's a bullet report.  It's not in full -- it wouldn't be presentable to an agency or for publishing to the public or anything like that.  It would just be, "Here is where we are at right this moment and this is what I suspect.  This is what I found so far."

So that's what this particular report was, and it was issued on 3/6/2011, because I was going to be exiting the bank trade and finance field

1    at that point, as far as working on projects and

2    working on financing, working on the banking side of

3    things to go in and for the cleanup to basically use

4    one area that was so prevalent with fraud, which was

5    the mortgage industry.

6                    During that time the reason why I got

7    involved in that was because I was working on

8    Panama -- or in Panama on a project where the

9    presidents -- the president of Panama and many other

02:45PM 10    presidents around the world, after they leave

11    office, they would get a monetary instrument that

12    they could use for one to two to five years,

13    depending on what they negotiated with the families

14    in Asia, and they would use that for whatever they

15    wanted to.  Okay?

16                    A lot of them would set up some kind of

17    operation where it would kind of fund their

18    lifestyle for the rest of their lives.  Some of them

19    had very humanitarian objectives.

02:46PM 20                    This particular one in Panama, it was

21    the former president of Panama who wanted to go in

22    and create a trail -- or excuse me -- a rail system

23    that went from Columbia all the way up to the U.S.

24    border.  And he wanted to be able to have it go

25    straight up so that they could bring in all these

         1    different projects, because in Panama, you have the

         2    port there which was very strategic and very

         3    important to the United States for many years until

         4    Carter signed it back over.

         5              So that's what I was working on at that

         6    particular time, and that's when I got presented

         7    with basically -- I would work on assets that were

         8    anywhere from one million to 100 billion.

         9              And the 100 -- usually the higher ones

02:47PM  10    that were 50 billion or above are what we call

        11    batch, a batch instrument.

        12              So in this particular case, I was given

        13    a batch instrument in hundred billion-dollar

        14    tranches, and they all had essentially Fannie Mae

        15    and Freddie Mac securities.  And as I was doing my

        16    investigation, there were questions as to the

        17    monetary instruments and the collateral and the

        18    underwriting.

        19              In that particular instance, we found

02:47PM  20    that there was a lot of fraudulent paper issued and

        21    sold on the NASDAQ, and I was told not to go -- not

        22    to go what we call behind the NASDAQ and look inside

        23    the files, you know, go all the way back to the

        24    underwriting, go through the underwriting, go all

        25    the way back to the collateral to look at it.

But we did.  We went through.  And the
reason why I chose to do that was because at the
time the U.S. Secretary of Transportation showed up
in Panama, and I had received a call from my
intelligence contacts to get out of that project and
to do it very quickly.  And within a week, FBI was
down in Panama, and I'm not sure as to the results
of it or even the purpose.  All I know is the
project for the train stopped completely.

The president of Panama all of a sudden
was under investigation locally by the local
Panamanian authorities for fraud and whatnot.  And
so I was asked to do essentially a white paper
regarding this particular monetary instrument that
he had planned on using and to discover what I
could, and I did.  I gave all that particular data
over to the Panamanian then president of Panama.
And it involved everyone from Russia to China, and
there was a lot of collusion, and HSBC specifically
in Panama, who was essentially stealing
clients -- the tribal.  They would go out and say,
"Do you want a loan for your farms?"  Because in
Panama, there is a lot of farmers, the banana.  So
we had Pelosi involved.  We had the Dole family
involved because the banana industry is very big

 1    there.  It was just this huge scandal.

 2              So I had to go in and do the

 3    investigations for this and put that information in.

 4    It got buried.  Some of it came out in the Panama

 5    papers later, but essentially I was more interested

 6    in mortgages and the fraud that was being done

 7    there.

 8              I had a house.  I have four kids.  My

 9    family has a house.  Anyone that I know, it

02:49PM  10    affected.  And so what we did was we still had the

11    data from the mone- -- from the money-laundering

12    operations from the Fannie and Freddie Mac, and

13    during this time, that's when Congress and Timothy

14    Geithner in particular from the U.S. Secretary of

15    Treasury, who was formerly with the Federal Reserve

16    Bank, had introduced what was called TARP, and it

17    was supposed to be a mortgage relief program.  So I

18    had to know the ins and outs of that particular

19    program as well.

02:50PM  20              And so this report here is the summary,

21    the exiting -- my exiting report regarding all of

22    that, and regarding the investigations that I did in

23    more detail, as well as the ones that were running

24    at the time.

25              And the particular conclusion,

everything came back to the heart of not just the
Federal Reserve Bank, but also Bank for
International Settlements, which is in Switzerland.

These are things people -- most people
at the time from 2010 onwards didn't even know who
Bank for International Settlements was. That it was
-- they tout themselves as the central bank for
central banks.

It was even more secretive and more
dirty and, in my personal experience, dealing with
BIS than Federal Reserve.

And so during this time, of course, my
whole goal was that things got cleaned up. I really
didn't care who was committing what, who was using
what. What mattered was that things were cleaned up
so that there wouldn't be any problems.

So this is really the start of me just
sort of going in and saying everything needed to be
transparent. And I changed my own protocols with
this job that I took back in 2000 to do the
universal cleanup with a number of teams from around
the world, and it was the first time I made myself
public. But I did it in, I guess, not such a
transparent way.

I would not work with anyone. My

greatest concern was people getting hurt. So what I
did was I put up my own home for this particular
part of discovering the mechanics that went all the
way through the court systems to -- through the
banking systems and then back out on the stock
exchanges.

So that house was used, and there were
four people involved in deciding which house would
be used.

In order for me to control the whole
thing -- because I was an attorney at the time, in
order to control every aspect as much as possible
because there was no way we could decide or even
determine what the emotional, the spiritual, or the
pressure, because, mind you, when you do a lot of
work in the actual field where this fraud is coming
from, in my experience, growing up and working was
that people are not too happy when they're presented
with a fraud within their own organizations, but
especially if the public knows what's going on.

Now, the only other instance that
I've -- that I was around and experienced was the
savings and loan scandals from the '80s. Bernard
congressman -- or excuse me -- Congressman Bernard
in doing the hearings and the cleanup, I mean, that

1   resulted in Arthur Andersen having closed down, as

2   well as the IRS for the first time ever in history

3   having to get audited or being more transparent, I

4   should say, and having to answer to someone, because

5   before that, they didn't.

6               And it was so -- the particular scandal

7   affected a lot of Americans' lives, but also those

8   overseas who were buying these particular securities

9   that were based off of these savings and loan

10  scandals.

11              So a lot of the people doing this

12  investigation that I did in 2010 -- I started in

13  2010 -- were the people that worked on the savings

14  and loan scandals.

15              Brenda Steely, who was basically

16  formerly with one of the senators in Washington,

17  D.C., as well as DOJ, Department of Justice, before

18  they -- and she was older; so she gave me a history

19  of how they never had licensed bar attorneys in

20  there.  They were just always lawyers, and explained

21  to me the difference between bar attorneys and

22  lawyers.

23              That was not really my focus.  So I

24  just sort of left that information dangling.  But

25  she helped assist me in guiding me based on sharing

information of how they did the savings and loan

scandal cleanups, which she thought was cleaned up

completely, and she noticed in 2000 and started

tracking.  So that's how she actually came to find

me.

When I register anything in a database,

whether it's a court database, whether it's a state

database such as the Uniform Commercial Registry,

whether I'm traveling just with my passport or my

credit card, it's tracked.  It's -- I'm able to be

found.

I worked with Egide Thein, who is the

founder of Truth Technologies, and Egide does all of

the background checks for the banks.  And he was the

former chief of counsel for Luxemburg Bank U.S.A.,

as well as high up in the mili- -- in the Luxemburg

Royal Military.

With that particular case, I was

actually approaching him to go in because MERS®

database -- and I'm giving you this particular

history so you know exactly my habits when I am

going in to look at every aspect.

The goal is always to figure out how

everyone can stay safe, how to clean it up with no

defaults, no judgements, really.  It's just, "Stop

1    it.  Clean it up."

2              So with Egide, because of his status,

3    as well as the services he provides worldwide, he

4    consulted with governments inclusive of France and

5    U.S.A. and UK was that to have him go into MERS® and

6    actually see the system because MERS® was

7    essentially a trading platform, but the question had

8    to do with systems and how to actually -- how data

9    was being changed in there by the bankers.

02:56PM  10          There was no protocols, no security

11    protocols, but it was designed that way so that

12    later, if there was a mortgage bubble, that they

13    could actually change the data inside and make it

14    very difficult for litigations.

15              That was the suspicion, and that was

16    later confirmed throughout the years up to date,

17    that there was a lot of corruption, collusion, as

18    well as falsification of mortgage documents.

19              That is what this paradigm and its

02:57PM  20    ultimate findings and conclusions were, the

21    bulletproof, paradigm bulletproof reports, and

22    involved -- I also in this particular report put in

23    there regarding the case, because we also ended up

24    having a lot of judicial corruption.

25              And I wouldn't say judicial, meaning

the judges or the lawyers, the attorneys themselves.

We found it to be within the system structure

itself.   And that's -- again, led all the way back

to the Federal Reserve.

So, you know, I had to go in and

investigate the FBI and its creation and how

Hoover's relationship and his Swiss connections and

his German connections and how Andrew Mellon, who is

the United States Secretary of Treasury at the time

worked with Hoover to be able to implement

something, a law enforcement agency that would be

able to enforce the Federal Reserves and the banking

objectives and manage the human capital from

becoming too aware.

So I ran essentially four primary

cases, test cases, to be able to go in, and it was

never about, "Show me the notes."  It was about,

"Show me the loan."  Because they're -- and we were

trying to figure out how to make the public aware,

more aware so they become more vigilant, ask more

questions.

So it was a top-down, as well as a

bottom-up approach to solving basically a lack of

transparency and a lack of accountability within the

banking system utilizing the government agencies and

departments and branches in order to make sure the

fraud was either never caught, or if it was caught

that it would be the least amount possible, which

was the federal -- the FDIC.

You know, the FDIC was actually within

the Federal Reserve until they decided to move it

into the United States government and incorporate it

as a U.S. corporation that would insure the banks,

which doesn't -- or excuse me -- insure the

depositors, which doesn't really insure the

depositors.  It just makes sure that the bank's

liability will never be over a certain amount.

So if it's an individual -- I don't

even know what the amounts are now, but at the time

it was 100 and -- 100,000, and 200,000, I believe --

I could be wrong -- if you were married.  It could

be 200,000.

So it was really an insurance coverage

program to make sure that the banks never had to go

over that amount.  Anything over that amount was

good.

So that ended up becoming any kind

of -- any time they got caught, it ended up becoming

just a cost of business.  You know, count up however

many individuals may get caught up in the scheme and

1   times it by 200,000.  That is now factored into a

2   cost of business for any kind of scheme that they

3   were doing.

4               The SEC was very important in making

5   sure that different distributions would happen.  So

6   essentially you never had actual litigations that

7   would come to a trial and a judgment.  There was

8   always, always, always dealings.

9               So JPMorgan, who got caught in 2011,

03:00PM 10  you had the OCC, the Office of Comptroller Currency,

11  go in and basically issue orders against every bank,

12  a warning.  "Change your ways.  We're going to have

13  to set up some kind of protocol where you need to go

14  in and change your actual practices or we're going

15  to fine you."  And they would have a certain period

16  of time to change those practices.

17              Well, they didn't.  And during this

18  time period, I was running -- one of the test cases

19  was a deceptive acts and practices test case within

03:01PM 20  the mortgages.

21              That particular deceptive acts and

22  practices brief was -- in fact, it was a judge that

23  helped me, multiple judges at the federal level and

24  state level that helped me refine that, including

25  the judge who the test case was in front of.

1          It was entertaining and yet at the same

2     time very distressing that -- how do you -- how do

3     you overcome and create a solution to an industry

4     that is worldwide.  That was basically essentially

5     what was happening.

6          So during that time the deceptive acts

7     and practices brief then got used by 49 out of the

8     50 states by the attorney generals.

9          And basically what I do is:  Any time I

03:02PM 10    do an investigation, I always find -- I always

11    utilize public databases because all of the agencies

12    involved in the cleanup and intelligence agencies

13    that are watching, they can access -- they always

14    have access to those databases.

15         So all I have to do is enter, like, the

16    cases that could listen in to court, realtime while

17    we were doing hearings.  They could -- they had

18    access to all the filings.  So they -- we were able

19    to watch everything as it went along.  And since law

03:02PM 20    enforcement was involved, we got to see the -- how

21    our law enforcement is actually utilized by the

22    banking industry and by the banking facilities.

23         One of the test cases, the one that I

24    was explaining to you, ended up going through -- it

25    started in 2010 when I decided to -- actually, in

2009 when it was my house that was going to be used

for this test case, I stopped -- deliberately

stopped paying for the mortgage.  The only way I

could get -- because if you applied for TARP and you

didn't get it, you were supposed to get to see the

formula that they used to determine whether

you -- or excuse me -- to determine -- the formula

that they used to determine why you didn't qualify.

Because that was kept a secret.  And even in

the -- in the banking industry, I couldn't get it

through my contacts.  And so the only way I could do

it was through, in part, going in, applying for it

and getting rejected.

However, when I got rejected and then

did the proper procedure to get that formula, I was

denied, and there was no explanation that was

officially given for it, because what our suspicions

were after the Freddie Mac -- or excuse me -- the

Fannie/Freddie securities paper that was fraudulent,

most of that paper was sold to China.  So China was

very upset with it.

And what we ended up finding was China

demanded all of their money back and to basically

have the United States Treasury cut up or shred up

all of the fraudulent paper.

1    And so our suspicion at that time was

2  that TARP was actually there to be able to get

3  authorization, appropriation and allocation of a

4  certain amount of funds, and I believe it was 700

5  billion was the amount for TARP.

6    There may have been other amendments to

7  it, and it increased.  I don't know.  But at the

8  time that I worked on it, it was 700 billion.

9    And, in fact, that ended up being a

03:04PM 10  problem that came out later through all of the

11  members of this -- the universal cleanup was that,

12  in fact, very few families actually even got

13  approved and received funding from this TARP

14  program, this mortgage relief program.  And the

15  money disappeared.  You ended up having the Federal

16  Reserve Board -- excuse me -- the Federal Reserve

17  testifying that they didn't know where 16 billion

18  dollars went.  That was during that time period as

19  well.

03:05PM 20    So at this -- during this particular

21  case in March -- another aspect of this case was to

22  figure out how our law enforcement and judicial were

23  at risk, as well as the -- just the community

24  itself, individuals who had mortgages.

25    So I had to assess what risks there

1   were to each and every party in this particular

2   mortgage scandal, and then what steps could be taken

3   in order to protect them.

4           One of the things with the judicial

5   was, that we found the risk of, was that the

6   sheriffs were completely at risk because they have

7   oaths and bonds.  Each -- everyone in the judicial

8   is supposed to give an oath and a bond.  Okay?  And

9   they're supposed to be on file.

03:06PM  10          When I worked for the judge, for Judge

11  Sypolt in Spokane as an intern, he had his oath and

12  he had his bond sitting with him up at the desk.

13  That was the first time --

14          MS. DAVIDSON:  Objection, Your Honor.  I

15  think that she is getting a little far afield here,

16  and this was part of a Motion in Limine which we

17  brought before the Court.

18          THE COURT:  And what is the relevance of

19  this particular testimony?

03:06PM  20          MS. TUCCI-JARRAF:  The relevance shows how

21  law enforcement was at risk at the time to -- for a

22  habit of how I handled the risk that happened in

23  July with Mr. Beane, as well as with the law

24  enforcement that were involved.

25          THE COURT:  I'm not sure about testimony

1       about a prior employer's placement of an oath and

2       bond -- I'm not seeing how that relates.  So why

3       don't we move on.

4               MS. TUCCI-JARRAF:  Okay.

5               THE COURT:  I'll sustain the objection.

6               MS. TUCCI-JARRAF:  So at that time there

7       were certain aspects that were found to be at risk

8       for judicial -- excuse me -- law enforcement,

9       specifically in that case the sheriff, and then also

03:07PM 10      for the judicial.

11                  It all goes back to the funding, the

12      banking and to the Federal Reserve banks and the

13      systems, as well as the International Monetary Fund

14      which is a special agency of the United Nations.

15                  All this is significant because all of

16      these -- all this data helped to refine my own

17      skills and abilities as well as to be able to

18      identify when there are threats, whether they're

19      imminent or not.

03:07PM 20                  And in this particular instance on

21      March 23rd -- excuse me -- March 24th of 2011,

22      because continually while I was working all this

23      time from 2000 to even today, I have contact with

24      those intelligence agencies, as well as insiders in

25      the banking, as well as insiders in the government

in order to be able to make sure that everything is
as smooth and gentle as possible and as safe as
possible for everyone involved; also to ferret out
who foreign agents are and which foreign actors they
are working for; who is the one that is actually
issuing the threat and implementing the threat so
that they -- and I don't deal with any kind of
enforcements on that, just helping in the
identification of who they are, and then that is
handled by proper authorities or exposed as we have
going on right now in the United States.

So on the 24th, I was told -- I was
still an attorney on March 24th, 2011 and was told
that my bar license -- so I got to see how an
attorney would be at risk as well. And that by
using my bar license, somehow by using my bar
license, because it wasn't given in details, that I
would be arrested that day.

So it really made me kind of think what
-- the systems that we have, how are they being used
against us when we're told that they're there to
protect us and help us. What kind of solution can
we implement to make sure that everyone is safe and
that -- the systems they're serving.

So on that particular night, I figured

1    out how that bar license was going to be used, and I

2    actually cancelled my bar license on that particular

3    day.  And the same thing to the notification.  I

4    faxed it in so that it was ready because I had court

5    on the 25th, that next morning, and at -- that

6    particular case was going to show or be presented

7    and filed evidence of how -- by me going in and

8    doing it against the sheriffs or against the county

9    to show them how they would be at risk, their

03:10PM  10    insurance policies for the county and all of that, a

11    good friend of my father's was the actual risk

12    manager for Pierce County during this entire time,

13    and was to make sure that everything was documented

14    so they could see how it would be done and then

15    never use that particular instrument or amounts.

16                A lot of people would do liens.  That

17    was another thing, because you have people who were

18    trying -- people in the community, individuals who

19    were trying to find solutions to things they felt

03:10PM  20    were a problem in their own systems and being used

21    against them.

22                And so you had a lot of individuals

23    trying to lien judges, lien sheriffs, lien

24    everybody, and that puts everybody at risk.  But so

25    does the behavior that led to people going in and

1   trying to lien people, to lien the judicial and law

2   enforcement.

3              So, in this particular instance, that's

4   what happened.  And, yes, they did try, but it

5   didn't -- it was just me explaining to them, "This

6   is what was going on.  There is no harm here, no

7   foul."

8              Now, I had grown up with most of the

9   law enforcement that was there or was present or I

03:11PM  10  had worked with them when I was at the prosecutor's

11  office.  So they already knew my demeanor, my work

12  quality, my character.  So I didn't get arrested.

13             And, in fact, they stopped from coming

14  to the actual courtroom, which was putting them into

15  harm's way until we could figure out a way to defuse

16  all of this.

17             So these are the kinds of actions that

18  I take when I am especially in a situation that

19  starts to escalate to what we call imminent.

03:11PM  20             In the past, at least with other people

21  that work in the universal cleanup around the world,

22  human life -- I mean, I guess you could say I felt

23  that people felt bad about the fact that someone

24  would get lost.  And what I mean by that is either

25  killed or disappeared or whatnot.  I've never had

that instance happen to me before, and I definitely

didn't want to experience that. And for me it was

very personal, because it could be someone I know;

it could be someone I loved, and I -- that was one

of the reasons why I wanted to be in Pierce County

when I did this particular investigation and refine

things and also prepped for this moment here today.

So that in those particular cases, I

made sure I was the defendant and up to a certain

point I was the attorney, the licensed bar attorney

as well on those cases.

So there were a lot of precautions. I

worked with people that were in DOJ, FBI, CIA, the

federal judges and state judges and district judges

during that time period so that I could have the

information that was necessary in order to show the

risk, as well as in order to work with them to

create a solution. Okay?

And the biggest solution throughout

every single investigation I've done is lack of

awareness, and that's because there was not

transparency in those situations to begin with; so

how can awareness be applied. Okay?

At that particular point I -- on --

after March 24th, 2011, I was assisted by one

of -- well, let's just say in the intelligence arena

and banking arena, there are ways that they are able

to utilize other people's e-mails, their phones, so

it looks like something is coming from someone maybe

that you know, for instance, but it's really from

one of them, and there is a certain language and

certain codes that you establish through your

relationship and your experiences with these

intelligence officers and bankers in order to know

03:14PM 10 that the message is from them.

And on the 28th of March, due to the

risk that was shown in that particular court

appearance, one of them who manages the

Rothschild fam- -- or the -- it's a family called

the Rothschilds, and they're in France.  They're in

London.  They're kind of all over.  And they have

also in Chicago -- here in Chicago in the United

States have their operations as well, and

their -- their trustee was the one that contacted me

03:14PM 20 in order to show me how I could just get a case

thrown out.

Because in this particular test case,

an unexpected event happened where I was arrested

after I had been bumped by an officer; this officer

who I later found out had been paid off by the

1    bankers to move things along.

2             This particular trustee from the

3    Rothschilds had sent me over information of how to

4    certify -- like if someone gets charged with a

5    particular violation of a particular statute, all

6    you have to do is get the attorney generals to

7    certify that that is lawful -- constitutional --

8    excuse me.

9             When someone does that, 99 percent of

03:15PM 10   the time the cases get thrown out or dismissed.  In

11   this particular instance, I decided that it was a --

12   there was a reason why this unexpected event

13   happened where I was -- now had a criminal case

14   inside of all the test cases that was related to all

15   of the test cases for this house.

16            And I decided not to do that part, but

17   I did research it to make sure, you know, is that

18   how it goes, and what were the results.  How

19   many -- what are the stats on it; how many cases got

03:15PM 20   removed.  And I chose not to in order to help -- we

21   had expanded the investigations into judicial

22   corruption.  Not judicial corruption of individuals

23   within the judicial but the structure itself and how

24   certain legislation either from Congress or what we

25   call legislation from the bench, which would be

judicial rulings, how the structure was actually set
up to aid the banking industry, specifically the
Federal Reserve Bank, which is the central -- it's
known as the Central Bank of the United States of
America, how that was being used.

So I stayed on in that particular case
until they -- because, mind you, at the lower levels
there in the county, they didn't know what was going
on. This was all done at the higher levels but
using me to go in and kind of test things out very
quietly.

Only, it wasn't quiet. What I found
was people -- ordinary people, everyday lives were
literally looking for their own personal solutions
for their own personal problems, and a lot them had
mortgage issues or loan issues, credit card issues,
that kind of a thing, and would literally go into a
clerk's office, a court's clerk's office, and scan
what cases got filed that day. And they would look
for the facts and the patterns, and they would have
to go into the courthouse to do that unless they
paid for an online system, like PACER, and at a
state level, in Pierce County, they had LINX. So
they would have to pay for that.

So they would physically go in. So a

1    lot of them found me.  And that was the first time,

2    because, mind you, all that I had done had never

3    involved other people.  I didn't want to have

4    to -- have to deal with that, that element, as well

5    as a whole bunch of personalities.

6              Only that's what ended up happening.

7    They ended up being such great investigators.  But a

8    lot them worked for the state.  They worked -- one

9    of them worked for the state capital.

03:18PM  10              So what ended up happening was:  I

11   learned the value of marrying, I guess you could

12   say, the abilities or learning how to recognize,

13   identify and apply the abilities, and as well as the

14   positions of everyone else, but in a transparent way

15   where they only had so much detail.

16              They didn't know the whole big picture

17   or even who I was or where I worked or who I had

18   worked for.  What they knew was -- is I was working

19   on an issue that was important to them, too.  So

03:18PM  20   they helped me figure out all the mechanics and the

21   pressures that were coming in.

22              At a certain point I was offered a job

23   to be a director of a bank in Spain in order to stop

24   everything that I was doing because people started

25   to really figure out the bigger picture, and that

job was over in Spain in Madrid for Bandenia, Banca

Bandenia Privada, and they wanted to run the U.S.

operations.

So at this point what was very

upsetting was a project that I had been working on.

It was the only one I retained from my bank training

and finance days was Zambia.

The U.S. Secretary of Treasury,

Geithner, Timothy Geithner at the time had basically

stolen a whole bunch of gold vines in order to find

essentially a unification and new programs within

the European union. And in February 2011, that's

what happened.

So the Zambia project closed, and I was

asked to expand this investigation of the banking

fraud that I had been doing up until 2011 to

actually go in and help find solutions even at the

mid levels to high levels of bank trade and finance,

which is what I've been doing from essentially 2011

to to date, and part of that was a public trust that

had been -- it's always existed, and the actual

corruption and premeditation that's gone into

setting up foreign agents within all governments on

this planet.

In America, it started before 1871, and

1    you can actually see where it was modeled off of the

2    Bank of England.

3              So I've had experience with a lot of

4    the allies, as well as the non-allies throughout my

5    bank trade and finance days, and a lot of what I do,

6    it always involves security protocols for myself as

7    well as anyone else involved.

8              But I try never to have anyone else

9    involved because then it becomes more of a risk as

03:21PM  10    far as losing control of whatever scenario I'm

11    working on or investigation and whatnot.  So that's

12    essentially the history of that.

13              On 2011, I began going in to help

14    implement that particular solution.  And if I am

15    going to --

16         THE COURT:  Let's take an afternoon break

17    at this time.

18         MS. TUCCI-JARRAF:  Okay.

19                   (Jurors excused.)

03:22PM  20                   (The following report of

21                    proceedings was had outside

22                    the presence and hearing of

23                    the jury:)

24         THE COURT:  All right.  Before we break,

25    maybe, just, we'll -- the Court's observed,

1    Ms. Tucci-Jarraf, we've certainly heard a lot --

2    about almost an hour-and-a-half of what I would term

3    background testimony information, and, again, you're

4    representing yourself and I want to give you

5    specific leeway, but at some point during the course

6    of the trial, we do need to relate your testimony to

7    the personal knowledge as it relates to the

8    allegations of Count 7 of the Indictment against

9    you.  So --

03:22PM  10          MS. TUCCI-JARRAF:  That's where I was

11    beginning to go --

12          THE COURT:  Okay.

13          MS. TUCCI-JARRAF:  -- before the break.

14    Thank you.

15          THE COURT:  Let's stand in recess.

16          THE COURTROOM DEPUTY:  This honorable court

17    shall stand in recess until 3:40.

18                    (A brief recess was taken.)

19          THE COURTROOM DEPUTY:  This honorable court

03:43PM  20    is again in session.

21          THE COURT:  Let's bring our jury in.

22                    (Whereupon the following

23                     report of proceedings was had

24                     within the presence and

25                     hearing of the jury:)

1    THE COURT:  Thank you.  Everyone may be

2  seated.

3         Ms. Tucci-Jarraf, you may continue with

4  direct examination.

5                    (Defendant Tucci-Jarraf's

6                    Exhibit 3 was marked for

7                    identification.)

8    MS. TUCCI-JARRAF:  Okay.  At this point,

9  I'm going to ask Mr. Lloyd to assist me with the

03:44PM  10  exhibit.  It's a proposed exhibit that's not in

11  evidence yet.

12    MR. LLOYD:  Your Honor, I've explained to

13  Ms. Tucci-Jarraf that my wife finding me near

14  digital equipment, it would be found to be quite

15  humorous.

16    THE COURT:  Go ahead.

17    MS. DAVIDSON:  At this point, Your Honor, I

18  object to relevance.  She hasn't laid a proper

19  foundation to this document.  I'm not sure where

03:46PM  20  it's from, and I also object on the relevance

21  grounds.

22    MR. LLOYD:  Your Honor, maybe I should ask

23  a few questions.

24    THE COURT:  Go ahead.  With that objection

25  in mind, go ahead and ask a few questions.

1          MR. LLOYD:  Ms. Tucci-Jarraf, you have in

2     front of you a single-page document?

3          MS. TUCCI-JARRAF:  Yes, I do.

4          MR. LLOYD:  You do.  And is it entitled at

5     or near the top Offices of the United States

6     Attorneys?

7          MS. TUCCI-JARRAF:  Yes.

8          MR. LLOYD:  And do you recognize this

9     document?

03:46PM 10          MS. TUCCI-JARRAF:  Yes, I do.

11          MR. LLOYD:  And I suppose with a relevance

12     objection pending, Your Honor --

13          THE COURT:  What is the relevance, either

14     Ms. Tucci-Jarraf or your standby counsel; what is

15     the relevance of this document?

16          MS. TUCCI-JARRAF:  It goes to -- this fact

17     is of consequence as to the UCC filings which were

18     the actual insight of the factualized trust that

19     they have already presented and entered into

03:47PM 20     evidence, and it is the basis for my intent as to

21     the specific events that happened on July -- July

22     2017 as to there was no intent to commit a crime.

23          THE COURT:  Maybe this might be appropriate

24     for a jury charge conference, but is this a document

25     that you've seen or utilized --

1          MS. TUCCI-JARRAF:  Uh-huh.

2          THE COURT:  -- at or around the time?

3          MS. TUCCI-JARRAF:  It is the very reason

4    why I actually did the UCC filings and was asked to

5    protect the property of not just the United States

6    but to find -- so it is relevant.  It goes to my

7    intent of not committing a crime.

8          THE COURT:  I understand the position.

9          MS. TUCCI-JARRAF:  Thank you.

03:47PM 10          MS. DAVIDSON:  Your Honor, I don't

11   recognize this.  I mean, I've never -- Office of the

12   United States --

13          THE COURT:  I don't see the top.  When you

14   mentioned the -- when she said -- I don't -- okay.

15          MS. DAVIDSON:  Offices of the United States

16   Attorneys?  I've never seen anything like that.  All

17   the U.S. Attorney's offices are individual, like

18   U.S. -- United States Attorneys of the Eastern

19   District of Tennessee.

03:48PM 20          THE COURT:  Where are you saying you got

21   this document from and when?

22          MS. TUCCI-JARRAF:  This is actually from

23   the Department of Justice website, and it's

24   directly -- the link is actually at the bottom.

25          THE COURT:  When did you get this document?

1    I mean, yesterday or --

2              MS. TUCCI-JARRAF:  Oh, I've always

3    had -- I've always had knowledge of this particular

4    form.

5              THE COURT:  I didn't ask you if you had

6    knowledge.  I said, When did you get this document?

7              MS. TUCCI-JARRAF:  I printed it just

8    directly from their website for 1649, but it's

9    always been in their books, Protection of Government

03:48PM  10    Property and Goods.

11              THE COURT:  Go ahead.

12              MS. DAVIDSON:  When did she print this?

13              THE COURT:  I'll overrule the objection.

14    Just go ahead.

15                   What's the next defendant's exhibit

16    number?

17              MR. LLOYD:  I believe it's -- is it 4?  3.

18              MS. TUCCI-JARRAF:  If you'll --

19              THE COURT:  This is being admitted as

03:49PM  20    Defendant's Exhibit 3.  So go ahead with your direct

21    examination.

22                             (Defendant Tucci-Jarraf's

23                              Exhibit 3 was received into

24                              evidence.)

25              THE COURT:  Do you want to talk about this

 1    document now?

 2              MS. TUCCI-JARRAF:  Just a brief --

 3              THE COURT:  Go ahead.

 4              MS. TUCCI-JARRAF:  Thank you.

 5              THE COURT:  It's on the screen being shown

 6    to the jury.

 7              MS. TUCCI-JARRAF:  Okay.

 8              THE COURT:  You might want to move it

 9    around.  There you go.

03:49PM 10              Thank you, Ms. Davidson.

11              MS. TUCCI-JARRAF:  Thank you.

12              MR. LLOYD:  Move that it be published, Your

13    Honor.

14              THE COURT:  It is.  Thank you.

15              And, again, if you want to talk about

16    it in your direct examination, it needs to be

17    fact-based, not a summary of any argument.

18              Go ahead.

19              MS. TUCCI-JARRAF:  Okay.  So in -- in

03:49PM 20    relation to the testimony in this particular trial

21    regarding a factualized trust, there are certain

22    documents inside of that factualized trust which are

23    what we call the underwriting, and it was part of

24    the solution in the universal cleanup, and

25    specifically it started with the solution for

1    America and for the property of the United States of

2    America and the people in America.

3              Each country has their own, but this

4    was the specific one.  And each country has its own

5    registry that they utilize.

6              In America, it's a Uniform Commercial

7    Registry, and each state will have its own portal of

8    registry.

9              So, in Tennessee, for instance,

03:50PM  10    Knoxville has its -- or Tennessee will have its own

11    particular portal to be able to enter all property

12    that's registered as property of the United States.

13              And in this particular one, it's --

14    specifically the status of the property in transit

15    is determined by the contract and the application of

16    the Uniform Commercial Code.

17              So, essentially, in my experience and

18    training, I thought that the Constitution and the

19    statutes and the codes were the law of the land,

03:50PM  20    especially the Constitution was the law of the land,

21    when, in actuality, through my last 20 years of

22    work, it was actually the Uniform Commercial

23    Registry, and --

24              MS. DAVIDSON:  Objection, Your Honor.

25    Relevance.

1    MS. TUCCI-JARRAF: I'm speaking of personal

2 knowledge.

3    THE COURT: Let me hear the objection.

4    MS. TUCCI-JARRAF: I apologize.

5    MS. DAVIDSON: Relevance and it's

6 completely not true.

7    THE COURT: Well, we'll leave that for

8 cross-examination.

9    Go ahead.

03:51PM 10    MS. TUCCI-JARRAF: Thank you.

11    So every piece of property that is

12 registered in the United States is registered

13 through the Commercial -- the Uniform Commercial

14 Registry. Okay?

15    So as part of the solution, there was a

16 perpetuity registration of property that had been

17 filed in the United States, and it was done through

18 the Washington, District of Columbia portal, which

19 is particularly -- Washington, D.C., you have the 50

03:51PM 20 states and the District of Columbia; Washington,

21 District of Columbia. So it's not actually part of

22 the states, of the 50 states.

23    It has -- that is the main portal.

24 However, every state of the United States feeds into

25 that D.C. portal. Okay? It's what we would call in

1    banking an international portal.

2              And every country has their own

3    international portal and their states feed into that

4    international portal.  Okay?

5              And this registry, what it does is:

6    It's basically where anyone internationally can go

7    in and check that particular registry if they're

8    given either the UCC number, registration number for

9    that particular filing of property, a registry, and

03:52PM 10   you can -- what is registered is claims of property

11   with the identifications of that property, whatever

12   content they want in there, the laws that will apply

13   to that property, conditions.

14             There is many -- once a piece of

15   property is filed, then there is amendments that

16   they can make as far as transfers, even, about that

17   property, what rules may apply to change

18   jurisdictions and whatnot.  So everything is within

19   the Universal Commercial Code within the United

03:53PM 20   States for that.  Okay?

21             So there was one filed on May 4th,

22   2000, which would have been the year that I actually

23   started in the cleanup in Taormina, Sicily.

24             And I had no awareness of this

25   particular perpetuity.  And this perpetuity

basically covers all the systems here in the United

States and the people themselves inside the UCC

system.   Okay?

            And this perpetuity is -- my

understanding is that the perpetuity, and after I

had to do significant research on it in order -- and

verification and validation of this particular

perpetuity is because I was asked to go in and get

this perpetuity back from a private individual that

was holding it, and actually trying to negotiate his

own -- for his own personal benefit basically all

the Americans and all the property that were inside

the United States.

            This perpetuity back in 2000 had been

written and actually filed by a gentleman named

Charles C. Miller with the assistance of the U.S.

Treasury, Federal Reserve, and Chinese.   Okay?

            Now, the Chinese are the other ones.

The Chinese families overseas are the other ones

that have significant holdings in the United States,

and all of that is recorded because of what happened

with the perpetuity filing in 2000, which basically

secured all of the property in the United States

into the hands of one individual.   Basically other

departments and systems were created which still

1    feed into the UCC, but they keep all the records.

2    Okay?

3                In my review back in the -- in 2011, it

4    was near impossible for anyone -- in my experience,

5    for anyone to figure out how the UCC even worked at

6    that level without having someone inside who had

7    told them.

8                So, based on that research, review,

9    also the verification and validation of that

03:55PM  10    particular perpetuity filing, I made a decision to

11    go ahead and go in and get that particular filing,

12    and that filing was actually offered by this

13    individual as a gift to the people because he felt

14    he was in the middle of negotiations for some kind

15    of property in Hawaii and operations regarding the

16    kingdom and -- of Hawaii and all of that.

17                And he was trying to negotiate a loan,

18    and that's why he brought the gift out in the first

19    place was because of my contacts with the actual

03:56PM  20    families and the intelligence agencies and different

21    governments was that he wanted me to assist him with

22    this negotiation and with also the notice.

23                He basically -- this tool was a public

24    trust tool that was -- it's created -- every single

25    government was created from a trust, and basically

1    it's the people coming together and saying, "We want
2    to have a better community."

3            That's how America was actually, you
4    know, really started was everyone was fleeing from
5    not just America but other places for more religious
6    freedom, economic freedom, to be able to live their
7    lives the way they felt they wanted to live, and
8    then you had governments start to form in the form
9    of local municipalities and whatnot which ended up
03:56PM  10   becoming to the day that we have where we have the
11   United States government.  Okay?

12           So this perpetuity, when I was asked in
13   December of 2000 and -- excuse me.

14           In December of 2011, because I was
15   going to Switzerland to meet with Christopher Ray
16   and the Swiss authorities regarding another
17   operation that was going on was to stop off at NM
18   Rothschild's in London, as well as Rothschild's in
19   Zurich, and which I did, and this gentleman, this
03:57PM  20   individual that was holding this, the property of
21   the Uniform Commercial Code and everything that was
22   inside of it had -- was going to -- his intent was
23   to gift it to the people but yet be part of the
24   management of that property.  Instead, he actually
25   gifted it.

```
 1              And so, Mr. Lloyd, if you could -- this
 2    is the particular perpetuity which was written and
 3    that I had to secure back for the United States'
 4    government and the people of America, and this was
 5    done in December of 2012, and then actually gifted.
 6              So this would be a proposed exhibit.
 7                        (Defendant Tucci-Jarraf's
 8                         Exhibit 4 was marked for
 9                         identification.)
10         MR. LLOYD:  This is proposed Exhibit --
11    Defense Exhibit 4.
12              And do you have it on your screen,
13    Ms. Tucci-Jarraf?
14         MS. TUCCI-JARRAF:  Part of it, yeah.
15         MR. LLOYD:  I'm sorry?
16         MS. TUCCI-JARRAF:  I also have it in front
17    of me, but I can see it.
18         MS. DAVIDSON:  Your Honor, none of these
19    documents say what she says they say, and we've had
20    many court hearings and rulings regarding these
21    alleged UCC filings, Your Honor, and this Court
22    ruled that they were inadmissible at that time, and
23    we continue to believe that they're inadmissible and
24    irrelevant.  They don't say --
25         THE COURT:  What is the relevancy of this
```

particular document?  Who is Charles Miller?

MS. TUCCI-JARRAF:  Charles Miller was part of the universal cleanup, and he worked with U.S. Marshals, as well as the U.S. Treasury and the Federal Reserve.

THE COURT:  Has he been involved in this case at all?

MS. TUCCI-JARRAF:  This is -- the filing itself is consequential -- is of absolute consequence in determining the actions that occurred and whether the funds were actually Mr. Beane's or not and whether I conspired to have something stolen or to continue to protect it.  And this was my beginning of the protection of all of those funds.

THE COURT:  Well, I've allowed testimony as background in this particular area, but I believe that this particular document does fall within the ambient of the Court's pretrial ruling.

And, furthermore, for the reasons therein, I don't believe it's relevant evidence under Rule 401.

And, furthermore, even if it somehow were, which the Court has not heard that it is, it would -- any probative value would be substantially outweighed by confusing the issues under Rule 403.

1           So the Court will sustain an objection

2    to introduction of this document.

3           MR. LLOYD:  Your Honor, for the record,

4    Ms. Tucci-Jarraf has provided copies of this

5    document, both to counsel for the United States, as

6    well as to the co-defendant, and this document

7    consists of 12 pages.

8           THE COURT:  We'll mark it for

9    identification as Defendant's Exhibit 4, noting the

04:00PM 10   Court's ruling is sustaining the government's

11   objection to introduction of Defendant's Exhibit 4.

12          MR. LLOYD:  Thank you, Your Honor.  I'll

13   mark it accordingly.

14          THE COURT:  All right.  Go ahead,

15   Ms. Tucci-Jarraf, with your testimony.

16          MS. TUCCI-JARRAF:  Okay.  So this

17   particular document was in the factualized trust,

18   and these are listed -- David, could you pull up the

19   factualized trust, please?

04:00PM 20          MS. DAVIDSON:  What exhibit?

21          MS. TUCCI-JARRAF:  My notes are up there.

22   This is the -- the --

23          THE COURT:  Documents pertaining to the --

24          MS. TUCCI-JARRAF:  The actual factualized

25   trust.

1          THE COURT:  -- motor home sale?

2          MS. TUCCI-JARRAF:  Yeah.

3          THE COURT:  I'm just trying to figure out

4   what the number is.  I don't know if anyone recalls.

5          MS. DAVIDSON:  Is it 105?  Is that it?

6          MS. TUCCI-JARRAF:  No, that's the

7   Declaration of Valid Sale.  I think it was the one

8   behind that one.  This one (indicating).

9          THE COURT:  All right.  Go ahead with your

04:01PM  10   testimony.

11          MS. TUCCI-JARRAF:  Thank you.

12              And this is Exhibit -- David?

13          THE COURT:  105?  Government's 10- --

14          MS. DAVIDSON:  It's 105, page 3.

15          MS. TUCCI-JARRAF:  Thank you.

16              Okay.  So, Exhibit 105, page 3.

17              If you would please go to the next

18   page, David.  One more page, please.

19              Okay.  So in -- at the top in article

04:02PM  20   2, you see the UCC record number, which is -- thank

21   you, David -- 2000043135.

22              That is the perpetuity number on the

23   UCC registration system regarding this perpetuity

24   that was secured.

25              And the original intent of actually

even filing this particular document was that it was
intended to be used for the financial benefit and
interest of only a few and not for the American
people.

So it was able to be obtained and
properly gifted and duly accepted for the benefit of
every person, not just in America and its systems,
but also for the people and their systems all over
the world. And that was done on -- in December of
2012.

And underneath all of that in each of
these articles, this -- it lists the due gift in
article No. 4 where the perpetuity -- it actually
has the other record numbers for the gifting that
was actually done in order to protect you, your
property, your neighbor, your neighbor's property,
the law enforcement agencies, the systems, the
actual -- anything that is considered U.S., so that
the U.S., when it was being utilized as a piggy bank
for foreign actors could then be returned back to
the people. That was the whole purpose of obtaining
back the perpetuity and having it gifted properly.

Underneath those gifts as well are the
bond numbers of the -- of the three agents that were
involved in doing that, including myself.

                    And then, of course, there were a lot

of agencies and intelligence agencies and

departments from America especially, but later when

it was expanded to include protecting the property

and the people in each of the individual countries,

it expanded into what's called the factualized

trust.

                    So that there is a uniformity amongst

commerce available where the only issue then would

be fraudulent actors inside, having to identify them

and clean them out so that the fraud itself and

application could be stopped.  This was solving a

structural issue of fraud.  Okay?

                    If you could please go down to 5 so I

could see the whole thing, please.

                    Thank you, David.

                    And it seems really dry, all of these

documents.  Even for me, it just felt that way

except for when you realize how it affects your

everyday life.  It all of a sudden becomes

important.  And that's what's happening in the

cleanup right now and starting in October;

specifically after October 18th of 2017.

                    So, in this, No. 5 was the declaration

of commercial claim.  This is where basically to

give notice to foreign agents that had been imbedded
into the United States' government branches, its
departments, its agencies.

There was a commercial claim that was
done, and essentially you have the Federal Reserve
Bank who holds all this commandeered value of the
American people. But not just the American people,
it also holds commandeered value from people in
other countries which are used in order for those
countries to have their currencies.

So, for instance, a euro. In order to
actually have a euro, they would have to have a
Federal Reserve dollar inside of their bank in order
for a euro. And that's where your currency
fluctuations are different. It's based solely on a
private banking system that benefits a few. Okay?

So this commercial claim went in, and
the Federal Reserve Bank is -- along with the Bank
for International Settlements and all of the
international equivalence are basically your
facilitators of all the value that goes back and
forth of the property that's held in -- in custody.
Okay?

So Federal Reserve Bank is actually the
one that's holding in custody all of this property,

this value -- excuse me -- and the collateral is

actually held -- so all the collateral is recorded

and registered and it goes through the U.S.

Treasury.

Then the U.S. Treasury submits its --

or creates its U.S. securities, and then the Federal

Reserve basically goes out and sells it or they can

sell it directly.  The U.S. Treasury can sell it

directly.

04:07PM    So there has been a lot of strategic

placing of who is particularly the U.S. Secretary of

Treasury, as well as the who is -- works inside of

the treasury.  Okay?

So, for instance, the one that I'm

familiar with the most was Timothy Geithner who was

Federal Reserve Bank and then later afterwards was

your U.S. Secretary of Treasurer -- of Treasury.

Let's see here.

And those particular UCC records, I was

04:08PM    the one who did the security of the actual

individuals, because before it was done through

birth certificates and whatnot.

So in this particular instance, there

were two filings that were done; one for the

individual being and then two was the actual

treasurers or banks that are in the Federal Reserve

system as members share -- how did he say it?

They're owners by holding shares. Okay?

All of these banks, in order to clean

them up, had to first be put into a position where

they weren't able to commandeer the property of

America and the American people.

So that's those particular filings

which have a UCC record number 2012079290. That was

04:08PM   the one that secured you as an individual, you as a

being. Okay?

And in this particular one, which would

be 2012079322, was to secure your property that may

be held -- okay? -- in other banks, no matter where

they were on the planet. Okay?

You are considered the original

depositories, and then the secondary depositories

would be Federal Reserve Bank. And then you have

your -- all the other depositories that fall under

04:09PM   that would be in their membership.

So every single depository on the

planet was secured -- or excuse me -- your property

was secured in any depository that's on the planet.

So that way they would be able -- they wouldn't be

able to use it for their own purposes without

1    telling you or without seeking proper approval.

2    Okay?

3              And throughout, since the time of this

4    being filed, they have tried to utilize all of that

5    property to utilize any kind of fraudulent funding

6    that they could create, but they weren't able to

7    move it around.

8              And, in fact, an executive order was

9    just issued on December 20th, 2017 by the president

04:10PM  10    for particular human rights abuses, which this is

11    what it falls under.

12              If we go down to No. 6, please.

13              Okay.  So, in No. 6 -- and this is the

14    factualized trust document that was presented on

15    July 11th, which we all heard testimony about.

16              So going through and knowing what each

17    of these are is very important to understand what my

18    intent was in this particular -- or the intent of

19    everyone, even, including the Whitney Bank.

04:10PM  20              Let's see here.

21              Okay.  So super custodian.  You have a

22    lot of property titles.  I told you that we had done

23    the mortgage investigations; correct?  Because

24    another part of all of this United Nations, which is

25    basically just like a big organization, like a

1  members- -- a members-only organization.  Okay?

2  However, it's not just governments that belong to

3  it.  You also have members that are General

4  Electric.  So multinational corporations which are

5  also members of the United Nations.  Not many people

6  know that.

7  The Vatican was another one.  I had

8  mentioned one of my professors who was the UN

9  Vatican -- or the Vatican's UN representative.

04:11PM  10  This particular one here, they had tons

11  of mortgage titles that were stolen and fraudulently

12  transferred through the Federal Reserve systems, as

13  well as all of the international equivalents.

14  In this particular instance what was

15  done was that the perpetuity was amended again to

16  include protection of every single property until we

17  could clean it all up and figure out titles and a

18  proper way to do it.

19  And there was just no way inside the

04:12PM  20  databases of the banks at that time in order to

21  clean it up because there was collusion between the

22  title companies, the banks themselves, as well as

23  politicians, and, of course, judicial.

24  There was a lot of rubber stamping.

25  Mainly Florida got hammered for that for rubber

stamping foreclosures.  That was the big foreclosure

scandal, which is what in 2011, I was working on was

the cleaning up the foreclosure scandal or exposing

it and then cleaning it up.  Okay?

So that No. 6 actually secured under

that perpetuity the property of the United States,

meaning all of the properties that -- I mean, where

you're sitting; what building you're sitting on;

what land you're sitting on; what home you have and

what land your home sits on.  All of it.  Okay?

Also included in that filing, which was

UCC No. 2012094308, would also be any kind of titles

whatsoever.  So, like, cars, which had to do

with -- you have state conversions.  Okay?  You even

have state conversions of homes.  It's just harder

to steal a home because you can't physically take

it.  You steal it via monetary instruments.

So, with a car, it's easier to have a

theft.  But in this particular instance, the theft

is very elegant.  It's very quiet.  It involves what

we call birth -- or what's been referred to as a

birth certificate of the vehicle.

So when it's born, a birth certificate

is submitted and then -- or is created, and then

when someone purchases a vehicle, not many people

1   buy a car and pay cash all on one front.  Usually

2   it's mortgaged out.  Okay?

3                When you do pay cash for that car, then

4   you're able to get that birth certificate.  And what

5   ends up happening is:  There were a lot of groups,

6   because during the investigations I had to look at a

7   lot of schemes that people were doing, and even

8   charging money to figure out that -- these groups

9   were charging money to teach people how to figure it

04:14PM 10   out.  Okay?  Which can be a real risk to the public

11   when they don't know all the facts and they don't

12   understand how important it is to the banking

13   industry and to the families behind it that own it

14   that the people don't know about this stuff.

15                You know, because, really, the American

16   government is supposed to be serving the people, and

17   there are so many people at the highest levels and

18   the middle levels and the lower levels.  Let's just

19   say levels that do want to serve and -- and have

04:14PM 20   done everything they can to serve to the best of

21   their abilities in very toxic environments.  Okay?

22                So this particular one here was

23   regarding anything including vehicle titles.

24                So at that point, Mr. Beane and I did

25   have knowledge about that.  I didn't exactly go over

1  all of it with him because I had a whole 'nother

2  matter that I was -- and another imminent threat

3  that I was actually -- or escalating to imminent

4  threat that I was actually monitoring and having to

5  handle in Washington, D.C. and I'm part of it.

6  That's why I was in Texas was handling part of the

7  foreign actors and their agents that were doing that

8  threat.

9              So when I heard about the particular

04:15PM  10  problem with USAA Bank and found out they were

11  headquartered in San Antonio, as long as the threat

12  in D.C. did not become imminent, I had the ability

13  to go to USAA's headquarters and walk through all

14  this stuff, because USAA -- the top bankers, they

15  know about the UCC.  They know about these filings

16  in particular because everyone was notified back in

17  2012.

18              And that included Department of

19  Justice, especially the public integrity, as well as

04:15PM  20  every Federal Reserve Bank president of the 12

21  branches, as well as the Federal Reserve Bank

22  governor, as well as U.S. Secretary of Treasury,

23  Secretary of State, which was Clinton at the time,

24  as well as Secretary of Commerce, which was Gary

25  Locke, who was our former -- in Seattle, Washington,

1    he was our former mayor.

2                So the MSO -- that's how I became aware

3    of the MSOs and all the car titles and whatnot and

4    that when they're mortgaged out, the banks just send

5    the titles over to IMF.  Because IMF is basically

6    everything from the United States, when it's

7    fraudulently commandeered, and then played around

8    with between all the banks in the banking systems.

9                Everything for law enforcement, the

04:16PM  10    judicial branch.  Every branch -- every branch,

11    department and agency, everything gets recorded and

12    basically goes from our U.S. Secretary of Treasurer

13    through the Federal Reserve Bank and then over to

14    IMF.

15                You have payments for -- for salaries,

16    for instance.  I was a prosecutor as well as a

17    public defender.  My check would come from the

18    county auditor.  But when you track it all back, it

19    all comes from IMF, for instance, that manages all

04:17PM  20    the accounts.  So you have a master account sitting

21    at Federal Reserve.  Okay?

22                So we heard testimony regarding

23    commandeered value not being held -- of the American

24    people not being held in the Federal Reserve.

25                From my experience, my work with the

Federal Reserve, as well as U.S. Treasury, and, mind
you, with the Federal Reserve, my work has never
been direct because of the work that I was doing and
the cleanup.  I've never been inside of the Federal
Reserve Bank.  I've been inside of BIS, yes, Bank
for International Settlements, which the Federal
Reserve Bank here is a member of.  And they actually
have two people sit on the board.  Okay?

          Could I have 7, please?  Thank you.

          So, in Article 7, you know, we're
talking about the depositories.  Basically what
happens is that the people, the individuals, even
though it's been registered -- you've been
registered, when you go to get a loan, for instance,
you're the original depository.  You're the only one
that can issue value.  This is a banking term for
original -- it's also in the IRS.  They have a form.
It's called the 1099-OID, which is 1099 original
issue discount.

          So when you do a loan, whoever is the
bank, they actually have to fill out a 1099-OID
form.  Who was the original issue and who is the
discounter?

          So when you want to go get a loan, you
fill out all the promissory note.  You fill out the

securitization -- or the -- excuse me -- the

security agreement for a mortgage, for instance.

Okay?  And you agree to pay back in lawful money of

the United States, which money and funding are not

one and the same.  Your money that you have in your

pocket is not really money.  It's -- they're debt

instruments.  Okay?

Money in America by the Constitution is

gold and silver.  That's it.

Okay.  So what happens here is these --

in No. 7, you see the actual UCC filings which

secured everyone as an original depository, as well

as anything that you create or that you work for

that you exchange, you are an original depository.

It's already been recognized in

banking, but that part's been hidden.  Most people

don't know about 1099-OIDs, the original issue

discount.  So when you send all that paperwork, that

paperwork, basically they get a verification from

the bankers that are involved.  Okay?  And the title

company.  And then the Federal Reserve would send

money for that amount.

After the 1099-OID is filled out, they

would actually send money to -- for instance, if I

filled it out and I'm doing the loan, it would be

1    Federal Reserve sends it -- that amount of money --

2    or excuse me -- that amount of debt instrument over

3    to the bank that's in the deal and -- but it's in an

4    account name, Heather Ann Tucci-Jarraf.

5              And there is a paper trail.  There is a

6    significant paper trail of everything I am speaking

7    about.  IRS has to have their paper trail.  Federal

8    Reserve has to have their paper trail.  The bank,

9    Federal Reserve Bank sending to, let's say, bank

04:20PM  10   A -- okay? -- with the money -- with the debt

11   instrument that I've now asked for for that loan,

12   which I think the bank is actually loaning me.

13   Well, it doesn't.  It goes into an account, and that

14   says Heather Ann Tucci-Jarraf.  I'm the only signer

15   on it.

16             Except for in the loan agreements and

17   the promissory notes, I usually -- typically because

18   it's Fannie Mae and Freddie Mac, there are uniform

19   forms they use in mortgages, car purchases; anything

04:21PM  20   that's purchased there are forms that they have to

21   use.  Okay?

22             In those particular forms will be the

23   language where -- because they're boring forms --

24   will be the language where I've unknowingly

25   appointed the bank as my agent.

1        So then the agent then goes in and
2   moves the money from Heather Ann Tucci-Jarraf, an
3   account I don't know exists at their bank to receive
4   that money, and then moves it to a numbered account
5   or some kind of other account, and that then becomes
6   the -- where they say they're loaning me money from.
7        That whole process that I've just
8   discussed from the loan account behind the loan
9   account all the way to the Federal Reserve to my
04:21PM 10  hand, my signature, those are the kinds of monetary
11  instruments that I worked with at the highest levels
12  of bank trade and finance.
13       In order to figure out how to protect
14  all of that, this is the factualized trust.  It was
15  work of many, not just me.  I had put in 20 years,
16  but there were people that had put in 60 years, such
17  as those ones that I discussed with the savings loan
18  scandal.  This is something that they were -- they
19  worked on, too, to help secure everyone.
04:22PM 20       So that was -- UCC record for the
21  original depositories, that is 2012113593.  That was
22  the UCC record for that.  It was an amendment made
23  to the perpetuity.
24       I guess what is important for everyone
25  to understand is:  What does perpetuity mean?

Typically a UCC filing has an expiration date. But
because we had some great guys from the U.S.
Treasury and Federal Reserve, of course they
intended to use it for their own interest, but what
was great about it is they helped in the solution.
They made it a perpetuity, which means it never
terminates. It never expires. It's forever more.

That's what was so significant about
that document and why I spent so much time to go and
get it and get it gifted properly.

So on this particular No. 8, we had a
lot of -- in America, America is one of the largest
debtors to China. China holds -- they're our
biggest creditor. Okay? They hold a lot. And they
stand to lose a lot in this cleanup. And yet at the
same time, if they run things clean and not with
fraud, they stand to be as great as everyone else.
Okay? There is no better than, less than, and it
truly is a transparent system that can serve its
people as well, you know, working together then,
possibly, instead of war. Okay?

So in this particular one, I got asked
by basically your Italian version -- your Italian
version of Jeff Sessions in 2000 -- the end of 2013
because Italy and all the other countries weren't

1    able -- once you -- once every individual on this

2    planet was secured, they couldn't print any money.

3    Not the Federal Reserve.  Nothing was working.  They

4    could not generate money for operations.

5            And so they asked for, you know, a

6    solution; what could we do.  And it was due to the

7    fact that a declaration of facts had been entered.

8    Essentially a foreclosure had occurred on the

9    fraudulent system only.  Okay?

04:24PM  10           The fraudulent system is what the

11   banking systems had done and taken over.  So, in

12   America, it was 1871 when there was a

13   reincorporation, the Constitution, and the way that

14   they did it, because, you know, back then, people

15   were still very fresh from the whole British thing.

16   Okay?  So they wouldn't allow too much.  So it was

17   actually the clause of the Constitution where

18   Congress was granted unfettered power to regulate

19   commerce.

04:25PM  20           So through Congress is where the

21   subversion and the takeover was allowed to happen,

22   but it happened very slowly because people were

23   still raw, and there were two factors that the

24   Federal Reserve, those behind the Federal Reserve

25   had to do was dumb down the judicial and dumb down

1    the people.  Excuse me.  Compromise the judicial and

2    dumb down the public because the Federal Reserve

3    that we know today is not the first try that -- it's

4    not the first existing.  It's not the only one.

5    There were two prior forms, and each one was

6    terminated.

7              In fact, right here by one of your own

8    from Tennessee, Andrew Jackson.  Okay?  They

9    terminated the first two versions of the Federal

04:26PM  10    Reserve for collusion, extortion, theft.

11              There is a book, *If You Want to Rob a*

12    *Bank, Own One,* which probably doesn't say much about

13    my family since they do.

14              But if you go to No. 8, Declaration of

15    Facts, you'll see the record numbers, which at the

16    time -- at the time the UCC allowed me to do a whole

17    bunch of -- or, like, a filing that was really long.

18              Well, there was concerted effort, and,

19    mind you, I'm talking to intelligence agencies all

04:26PM  20    the way through, similar to the day of in July of

21    2017.  I was talking to intelligence agents and law

22    enforcement that -- relationships that I've had for

23    many, many years in order to keep it from someone

24    being hurt.  Okay?  Anyone being hurt.

25              We'll get into that.  But this

declaration of facts, a lot of foreign actors who

were actually benefitting from the way things have

been tried to stop this and actually have the UCC

parameters changed.  So we were playing a game all

the way through, and I had to break it down.

So unfortunately there is four UCC

documents -- or excuse me -- three UCC documents in

order to get one declaration of facts in, and this

declaration of facts shut down the fraudulent system

which was owned by a few, and using our own systems,

our own law enforcement, our only branches and

departments and agencies.

And there were so many good people

inside of those branches, departments and agencies

that have known about all this.  There have been

times when they have come out to try to say

something, and it was just a matter of it never

worked.  Okay?  Until now.  That's all the changes

that you guys -- that everyone can see now visibly

since October.

And those particular agents

and -- excuse me.  Those particular branches and

departments and agencies, no matter what badness it

looks like they have done, there is really good

people that are in there, which is why there is a

focus of just getting the foreign agents out. Okay?

There has also been a culture that has existed and grown like a fungus where those inside branches, departments and agencies aren't accountable to the people. And that's what's being cleaned up as well. Okay?

That's from these particular documents that are listed in this factualized trust. And we've been working quietly since 2012 to do this and to clean everything out and then announce to the public. It got hyper-accelerated due to that threat that was becoming imminent in D.C. that we were trying to deescalate and terminate the threat itself.

Article D, please.

So it may be boring. At least we're not going through the UCC themselves, but they are listed in here. It's part of the underwriting. They are very important, important documents, only for now, because at some point when it comes down to a much more peaceful environment globally, if not locally, it's going to be about the beings again and trusting each other and being transparent with each other.

But until then, this is what was being

created.  It wasn't ready in July.  Things got
hyper-accelerated, again, because of that threat in
D.C.

So, D here, there is some language in
there, and it really is just legal jargon.  Same
with the inside of these UCCs.  It had to be legal
jargon because that is the jargon that was used in
order to commandeer all the value.

So the actual audience of these UCCs
and all of this were the lawyers and the bankers.
We were hoping to have everything cleaned up without
the people having to see all of these.  But due to
this war or this cleanup that's been going on behind
the scenes not being visible, it would bleed out
every once in a while.  Okay?

We were also testing on how -- how do
we -- how do we tell the American people that they
have been lied to all this time?  How do you tell
all the people in every place on this planet,
"You've been lied to all this time."  How do you do
that?

And a lot of it was just testing the
awareness and how to raise the awareness without
shutting down the systems completely so that there
could still be service and working together.

1         So a lot of the test cases I did from

2   2011 onwards was really kind of going in to

3   incorporate with the people directly so that we

4   could better understand, as well as the people could

5   better understand, hey, a lot of bad things have

6   happened.

7         Everyone's intent is to change it now

8   together.  That was kind of the point.  But there

9   was a lot of fear.  A lot of fear of pitchforks and

04:31PM 10  hanging ropes, and unfortunately on July 2017 -- in

11  July of 2017, that inner war, that war that's been

12  in the shadows bled out and we've gotten some more

13  facts on this.

14        My particular whole purpose was to

15  protect not just Randall Keith Beane, but every

16  single person in America that -- because only

17  America was at risk with that information, that

18  process that was in that video.

19        And I'll get more into that, but I

04:32PM 20  wanted to import the significance of this

21  factualized trust, the actual underwriting of this

22  factualized trust, the UCCs that are in there.

23  There is a significance.  Every one at the top

24  levels of banking knows what that is.  Government as

25  well.

                        There has been a transparent cleanup

that's going on, and personally in -- my part of the

cleanup has been to maintain the communication and

the transparency at all levels, even though most

people on this planet, to go and talk to them about

this stuff, there would be no point of reference

except for Hollywood and whatnot.

                        So that's why it was so important to

have some of the cleanup come out and be visible

04:32PM   prior to the moments of this case.  And the setup of

what this case truly was about was so that those

would come out.  Okay?

                        So I'm not going to go through the rest

of them, but these particular documents that you

have gotten, this is -- this is -- the significant

part is that this factualized trust, everything is

energetic.  We moved everything from biometric

securities to energetic securities during the

cleanup in 2012.

04:33PM   Actually, March 18th of 2013 is when it

was all completely finished.  So everything is by

energetic signature or moving into that.

                        And, in fact, you had Bank of America.

Many of the banks are going in and doing patents on,

for instance, like a iPad where you can put your

handprint on it and push out the confirmation for

the amount just through your magnetic field.

So all of these patents are actually

inside of the -- registered in the patent offices.

You'll have American Express.  You have Bank of

America, Citibank.  You have all these different

technologies that they're trying to bring out in

order to use the magnetic fields, the energetic

fields of the actual individuals, because there is a

lot of information that's been hidden that's coming

out and has been coming out in bits and pieces, but

it's all going to be coming out.

So they have tried to get ahead of the

line because this technology that I just mentioned

to you about the readers, so no cards, no nothing.

It's just by energetic signature now is -- according

to these patents, you know, to have this technology.

Those were filed, I believe, if I

remember correctly, in 2011.  And here we are in

2018.  This is something that's been prepped for for

a very long time.  Okay?

So that gives you some more information

regarding the declaration of factualized trust.  It

was a document, because I was called -- we were

actually in preparation for all of this, and it was

basically kind of like a scenario where you would
present it to all of the parties that are engaged.
And in this case, we're talking global.  Okay?
Because every place on this planet has a financial
system that's connected to the global financial
system.  So we're talking a security issue here as
well.

So typically all the work that I've
done in the cleanup and my focus has been the
financial system and the legal system.  Those
are -- that and the -- what we call i-tech,
i-technology, which is any technology that uses any
of the magnetic fields or the energetic fields of
the actual body.

Those have been my specialities in
making sure that the fraud is stopped and that there
is no more bearing of the inventions and whatnot.

So I've worked a lot with Darpa
scientists and had to -- because the Darpa
scientists ended up not getting -- the funding got
cut in so many areas because of everything that was
happening here.

So they came to me because they
knew -- knew what I -- what fields I was in.  Okay?
And would look for additional funding.

1          So we even had a problem which involved

2    inventions through Darpa and Darpa scientists and

3    whatnot.  So it became even more of a national

4    security issue.

5          So between financial, the legal, and

6    then now you have the technology, you have real

7    security issues that might be there which led to

8    this greater threat that was escalating to imminent

9    in Washington, D.C., which is where I was headed

04:36PM  10   from Houston after dealing with part of the foreign

11   agents that were part of -- that were doing this

12   threat against the president, or in Texas, Houston,

13   Texas.

14          So when I got a call from Randy on the

15   1st -- okay? -- or excuse me.  Not on the 1st.

16   On -- and I'm just going to go by my notes.  It was

17   July 3rd.

18          Okay.  On July 3rd, I had gotten a call

19   from him saying that he was coming home.  That

04:37PM  20   was it.  But I didn't have the communication from

21   him.  I had just arrived -- or excuse me.  I had

22   just arrived, and so I didn't have a long

23   conversation with him in Houston, and I was just

24   settling in the house.

25          And so I talked with him, and he -- his

statement about what I had said was accurate. I

did. I said, "If it's" -- you know, "Do you want to

continue in old energies or do you want to create

something new?"

And as you guys have all heard, at

least some testimony, I'm very much about creating

something new. I don't believe in judgment. I

don't believe in retribution and all that. I

believe in creating something new, but making sure

none of that happens again.

So on July 4th, I did receive a notice

of him of this video. Okay? And all this video was

was some guy, and it said Harvey Dent at the bottom.

Other than the contents of the video

itself, I didn't have any information as far as

metadata or who made it, who put it out, because

Harvey Dent wasn't the real name, and that was known

just by the contents of the video.

I could tell somebody in the banking

level or someone high up in the financial system or

familiar with the highest level of the financial

system would know those processes.

So somebody put together this video.

That was -- after watching that video, I became

concerned with the fact that it's out in the public

already.  There was nothing that could be done about

it, and people were clicking on it.  You could tell

that people were clicking.

So I made a call to my contacts in the

intelligence, and it's the same contacts I was

working with regarding the threat that was

escalating to imminent in July of 2017, which is why

I left my home in Boston to go on the road and start

deescalating that.

It appeared that it was -- at least one

of the foreign actors involved in that threat was

involved in making sure this information came out.

Possibly.  I don't know.

I do know Harvey Dent's real identity

at this point, for me, that's irrelevant, because,

in my experience, the person that would put out this

video is not the person that's behind it, and that's

my experience with Occupy Wall Street and other

investigations that I've done.

Typically someone is used that we call

a casualty.  In banking, it's cattle or human

fodder.  Okay?  And they will put them out and they

don't care if they're burned.

So with this video and the

process -- now, I'm not familiar with the ACH

1    system.  I am not focused on the ACH system.  I'm

2    more focused on the policies and the applications at

3    the top, or let's just say the greater levels of

4    which your ACH system flows in.

5              So as far as the details and the

6    technicalities of ACH and how it works, I don't

7    know.  I only know from -- because I conducted a

8    side investigation just to see, What is this ACH?

9              All I know is that when someone is able

04:40PM  10   to go in and do $30 million -- over $30 million in

11   CDs -- right? -- using their Social Security number

12   and their name and a routing number from the

13   Fed's -- because the Fed's routing system, with all

14   the routing numbers for every bank, it's out on the

15   Internet.  It's always been out on the Internet.

16             The Feds have had their stuff, their

17   particular Federal Reserve routing numbers out for

18   anyone to get.  Okay?

19             What was concerning is:  I was familiar

04:40PM  20   with not a part of but familiar with incidents that

21   had happened before everything was digitized

22   regarding the Social Security numbers and the

23   treasury direct deposit accounts.  Okay?

24             And essentially what you had going on

25   with the ACH system starting in July of 2017 was the

same thing that had happened, you know, two decades

before, just in paper form.

At least in paper form, they were able

to manually catch it and not let it go through.  A

few got through.  Actually, more than a few got

through, which is why they had to train their

employees differently.  Okay?  To be able to look

for those particular things, the paperwork.  So they

could recognize the paperwork and then manually put

it aside and a supervisor would grab it, go through

it.

And then FBI, typically in every

instance of fraud, it was FBI that was utilized.

However, I have had instances where it wasn't.  It

was CIA that actually came in using FBI badges or

other foreign agents, such as MI6, MI5.  I've worked

with MI6 and MI5 on a lot of banking stuff because

of the UK sensor nodule in London City.

So, at this point, I didn't know who

had put this video out, who had authorized it.  All

I knew is that the information that was in there

would not be information that anyone who isn't in

banking or who isn't at the higher levels, there is

no way they would know it.

So at this particular point when

1    Randy -- and basically what I saw was on July 4th, I

2    woke up and I was supposed to do a -- I was supposed

3    to do just a real quiet day, no celebration, no

4    nothing, but just a quiet day, and I saw the message

5    regarding all payments have been paid off.

6              And I received the message immediately,

7    and it was July 4th that it was dated.  Now, as far

8    as July 3rd, I don't know, but I do know that

9    Facebook, especially Facebook and Google, those

04:43PM 10   systems are backdoored.  You can change the

11   information.  I believe that even an individual,

12   like if I have a Facebook account, I can change the

13   date showing

14   that -- of anything that I posted, for instance.  I

15   don't know.

16              But as far as the actual systems, I

17   have worked with Sue Harper Todd.  Her husband --

18   ex-husband is Henry Todd who actually worked with

19   the VP of Google and all the other social media

04:43PM 20   programs.  And they were on Mount Everest in April

21   of 2015 when the big avalanche -- in fact, the VP of

22   Google privacy died in that particular operation.

23   And they were going through private e-mails of

24   myself, as well as this particular -- my associate

25   to read through those kinds of e-mails.

1    So is it possible that someone backed

2 it up?  I don't know.  I mean, at that level, I

3 would be questioning why they would spend so much

4 time.  Why so much effort?

5    So my question for -- with Randy and

6 then to see the 30 million in CDs, plus the whole

7 debt thing that was paid off.  So I just sat and

8 watched.

9    When I first got notice on July 4th, I

04:44PM 10 sat and watched what everyone on the universal teams

11 know that there might be a possible issue, and I

12 also -- the way that I work is:  We're able to -- I

13 mean, we communicate anyways, but I use Facebook, or

14 I've created two websites in the past during

15 investigations, as well as solutions, and I usually

16 will post there.  Nobody knows that they're there

17 until they do, or until I let them know.

18    And basically that's how we -- I post

19 things and then I get feedback on what I'm working

04:45PM 20 on.  But that's so that every single agency on the

21 planet here can actually see what it is I'm working

22 on, where my focus is, and it -- and that's all

23 tracked.  Okay?

24    So as far as July 4th, I put out a

25 Facebook post with the video and all on.  And all on

1  was our code for anything having to do with the

2  universal cleanup.  But it's specifically with the

3  terminating the threat that was escalating to

4  imminent against the president of the United States.

5           So I gave them the -- I posted that

6  video so that everyone could see that, and at that

7  point with the 30 million, I already knew that

8  Randall was going to be a target, but possibly a

9  whole bunch of others.

04:45PM  10           It's human fodder.  And I worked on the

11  Haiti -- on different -- on the Haiti scenario where

12  the Clinton -- President Clinton at the time and his

13  foundations, there was tons of money.  All these

14  wires went in before the tsunami.

15           I was involved in all of that

16  particular data after the tsunami happened with

17  cleanups and whatnot, and it was a big coverup.  But

18  it was a money theft laundering operation.  There

19  was similar things where certain groups and certain

04:46PM  20  persons were put out.

21           You could call it culling, a culling

22  data or a culling piece where you try to get people

23  to come to you to join in in the effort so people

24  will donate.  They will -- they will put together

25  organizations to -- for human effort to be able to

1  get more donations.

2              So mainly any time some kind of scheme

3  is there for money, I'm called in to be able to just

4  determine who is involved, where is the identity so

5  that we can figure out who put this out, what

6  purpose, etcetera, etcetera.

7              I already know what the Federal Reserve

8  does in scenarios like this, and basically they go

9  in -- if they aren't the ones that actually put it

04:47PM  10  out, you know, to put it out, they will go in and

11  immediately FBI is involved.  Okay?

12              In this particular instance, that was

13  my concern because there were $30 million in CDs.

14  And since I didn't know the ACH system, I went in

15  and tested the ACH system to see what we could find

16  and how you actually bill pay, because I don't

17  have -- I don't have any debt.  Okay?  So I don't

18  have bill pay.  I don't have any of that stuff.  I

19  do have a bank account, and I can do online stuff,

04:47PM  20  but that's as far as I'm familiar with the actual

21  apps.  Okay?

22              So the ACH -- ACH system, I had to go

23  in, and I did tests -- testing from July 5th all the

24  way through July 8th, and then that -- the threats

25  in D.C. became imminent; so I had to go there.

But as far as the 23rd of July, I did
my last one, but I did that one -- I opened a credit
card in order to be able to see how the credit
card -- because that's the only thing that I hadn't
tested was a credit card.

So I did open it, tested it, and I
wasn't able to finish up with JPMorgan Chase until
after -- obviously I went on a 30-day tour as part
of this case, and that stuff -- a lot of data
regarding ACH came out in this trial.  You know, a
lot of it.

So my experience with banking, with
particular bank systems themselves, each
bank -- I've worked with coders and programmers that
have done things for the banks themselves because
they will have their own programs.  They will have,
like, certain APIs where they connect up to the
Federal Reserve system.  So they have their -- kind
of their own in-house, but it has to meet certain
parameters to be able to communicate with the
Federal Reserve.

I'm not technical on any of that stuff.
So I actually contacted those particular coders that
I know that have worked with the banks to explain to
me that API and how if the account doesn't exist on

1    the other end there would never be any movement

2    whatsoever of any funds.

3            I had to make certain determinations of

4    whether -- human fodder works on both sides; not

5    just the ones that are creating the problems but

6    also the universal cleanups, the teams.  It's been

7    the main issue for everything is how life is valued.

8    Okay?

9            So in this particular instance, I see

04:49PM 10    this video go out.  I already know how many people

11    are going to just jump on this because so much

12    discontent has occurred, not just in America but all

13    over the world.

14            It's visible.  If you open your eyes,

15    you can see it.  And that has also been the thing

16    that I have been discussing with the different

17    branches, agencies and departments and governments

18    themselves and the families and the banking is,

19    listen to the people.  Everyone is discontent.

04:50PM 20            I was concerned for another -- of

21    course, the details would be different, but the

22    significance and the impact and the intensity would

23    be similar to that which happened in Spain, you

24    know, with the protests and trying to leave the

25    Spanish government.

1          These are things we're trying to work

2     to a solution where everyone comes together and

3     there is no more fraud; there is no more crime;

4     there is no more stealing and theft, and there is

5     just peace.

6          So this went against anything and

7     everything.  I started to check who put the video

8     out, because if it was part of the universal cleanup

9     to hyper-accelerate for some reason this existing

04:50PM 10     threat that was escalating to imminent in D.C., I

11     wanted to know about it because this is something --

12     for me, I would never put people in danger.

13          And so I had to make a choice, and I

14     made a personal choice in July, and it was on

15     July 7th to go in and insert myself into a case.

16          We've been building and waiting for a

17     scenario with the Federal Reserve and to be able to

18     calmly and collectively do this final part of the

19     cleanup and make things visible with everyone.  That

04:51PM 20     includes a lot of the governments that are in -- on

21     this planet, but not all of them.  And the two big

22     ones which were involved with D.C. were Russia and

23     China.

24          So my question was:  Who was pushing

25     this out?  Who was pushing out this video?  And I

know it seems like, oh, it's just some accounts,

ACH, but it was actually a move that affected

something much bigger that's been going on.

And, of course, anything that's visible

now, from October to now wasn't visible back then.

So nobody would have thought twice.

Even today to think that this case was

connected to something much bigger seems

implausible, almost.

I'm telling you: This is the moment

where it starts and it begins, and that was what's

been communicated through the different governments

and the banking families who we have been in contact

the entire time throughout this case.

I've even spoke about reports I had

received from Parker Still and Department of Justice

and where certain flaws, how I would handle it and

everything else, as far as, like, the FBI reports

that I had received.

So this has been a collective effort

for this particular case. I already knew what the

end result would be, but I had to make a decision.

Basically what I was concerned about was the

immediate risk to the people because at that point

on July -- after July 4th and when -- especially

1 when Randall went public with certain things.

2         Now, he -- I monitored everything. At

3 no time did he go into a process, at least where it

4 was written out. But I did see things where "Call

5 me" or statements like that that were posted, but

6 never once did he post out the processes.

7         People were watching videos and then

8 making new videos, which was a concern, because the

9 more -- each person has their network. Okay. Then

04:53PM 10 you get a friend. You make a friend, and now you

11 have their network. You know, and as you go

12 through, especially Facebook was a concern. Twitter

13 was a concern. YouTube was another concern. And no

14 attention was being given to it, at least in my

15 contact, trying to determine where this came from.

16         At the same time, I knew that we had

17 to -- I had to make a personal decision regarding

18 whether if this comes to a case, do I put myself in.

19 That wasn't even in question.

04:54PM 20         We've been preparing for some kind of

21 case for -- me personally for over 20 years to be

22 able to put things into the public light. So that

23 wasn't an issue.

24         My issue was personal security, because

25 depending on what level this was released at or by

1    who determined how much pressure was going to be put

2    on.

3              Federal Reserve is one thing.  Okay?

4    FBI, that's another.  I have -- I have enough

5    history with those particular ones.  It was at the

6    higher levels, which ended up -- my concern was

7    military.

8              As soon as I saw or heard -- I should

9    say heard that Randall was -- that they were

04:54PM 10   attempting to ship Randall off to Colorado, that

11   confirmed a suspicion that I had had some time

12   during, I would say, 7/10, 7/9, July 9th, July 10th,

13   because, like I said, the factualized trust

14   document, even that Declaration of Valid Sale

15   wasn't -- didn't even exist.  And I was truly trying

16   to figure out who was being used, who was

17   responsible, and a lot of times you just have to

18   reverse engineer all the way back to Federal Reserve

19   or whoever else may be involved.

04:55PM 20             Hence, the communication, initial

21   communication with -- on the phone with Mr. Walker,

22   and I think it was -- I believe it was Mr. Walker.

23   Mr. Walker for the Ford F-150.

24             And I never once corrected Randall as

25   far as him saying I was his attorney, because nobody

can -- everything that I do is paper trailed, and I
have relationships within all the different
agencies, branches and departments, not just here in
the United States but everywhere else.  So it's not
that it would be a problem at all.  The question
was:  How far do we take this to ferret out the
foreign agents?  Okay?

Get the foreign actors and their
foreign agents to make a trail all the way from the
top down to a bottom level in one sitting or one
unexpected event.

Similar as to what happened to me
during the investigations with the mortgage.  There
was an unexpected event.  I was arrested, and -- by
those that I worked with and have been explaining
things to you for two weeks.  I wanted to create
something that would be similar if we needed it.
Okay?

Unfortunately it was created for me
through July events.  I was looking to create
something much later and more prepared.

But at the same time, because of the
potential human fodder that would occur from this
particular video and the possibility of humans were
becoming so discontent with everything, they were

looking for solutions anywhere, and there is a very

large perception, especially in America, but also

overseas, that, you know, there is commandeered

value.

There are groups that have been around

for longer than I've been born promoting those kinds

of concepts and literature that's been written and

testimony, congressional testimony that's been

given.

So it's not like all of a sudden this

year or last year there were these -- like, for

instance, you ended up having groups that were

created.

Hoover -- J. Edgar Hoover was very

great about creating programs or, like, a box; what

we call a box.  We call it a box.  Throw them in the

box so that our attorneys can handle it easier.

Human management.  Okay.  Human management programs

are key for -- in the banking world and in the

finance world.

So in this particular box you'll have

certain classifications.  Okay?  And that's what was

wearing is because videos that were coming off of

this Harvey Dent video that were being re-posted

with certain language on top or on bottom or videos

that were made about this video that had been made
by Harvey Dent or had been put out by Harvey Dent
were following some of those boxes, and we were
trying to discover who -- who let this data out.
Okay?

On July -- by July 8th, there was no
doubt in my mind that Randall would definitely be
arrested, but there was also a high possibility, a
high probability that Federal Reserve, if they had
the proper incentive, would show up in that
particular court case, if possible.

So when Randy introduced me -- there is
nothing else that they can touch me on as far as to
create the illusion for arrest or anything.  So give
them something.

The one thing, when he had stated
attorney, because many people don't know the
difference between lawyer and attorney, or the
application.  All I know is what I've received from
a member of DOJ and a ghostwriter for SCOTUS.
Anyways, that came in that day.

I didn't correct him.  I let him say
that.  I even said it on a video.  There was a video
that you watched.  I believe it's Exhibit 94.  Is
that correct?

1       Exhibit 94.  I made the visual.  I hate

2  photos.  I hate video.  I don't do it.  That

3  particular day, I did, and the only recording that I

4  made was of me talking on my end.

5       I don't record people, period.  I don't

6  -- I make them -- I call them supplemental

7  recordings, because, actually, everything is

8  recorded whether you think it is or not.  I don't

9  care if you put your phones or you walk into a

05:00PM  10  ferreted cage.  It is all recorded.  If there is a

11  human body in there, it is known.  Okay?

12       So I made a supplemental video but only

13  of me speaking on that end.  That was the only

14  thing.  But it was -- so it took a little bit more

15  prodding.  And I did have assistance and did myself

16  in order to prod.

17       On July 11th -- or excuse me -- on

18  July 10th when I did the phone call with Mr. Byrne

19  and Mr. Forbes and then later on we had

05:00PM  20  Ms. Palmisano come in, as well as Mr. Cohen, who was

21  the owner of Buddy Gregg, it was obvious that there

22  were so many that were going to be affected just by

23  this one incident with Randall Keith Beane and this

24  Harvey Dent video.

25       Well, by July 7th, I had already

received over 300,000 -- over 300,000 people had

sent me data of them trying the process as well.

I asked everyone to keep screen shots

and to make sure everything was recorded on our

teams that were testing everything. But these

individuals, these 300 thought -- I didn't respond

to any of them, but I had them.

So on July 7th, going into July 7th,

certain universal teams were used to be able to go

in and put the word out because there was a concern

for human fodder and to eliminate that risk.

So there was a radio show, and I

explained to everyone, "If you are doing it, you

know, at this point you don't do anything that you

don't feel comfortable -- or that you don't know

about. If you are doing it, keep screen shots of

everything so that everything can be handed over to

the authorities."

Because at that point, I had not tested

-- except for maybe two tests, and the -- I didn't

keep all the screen shots. I wish I had, because on

July 5th, I believe it was -- I tested it twice.

One was a CD application to see how that worked, and

it didn't work. So I'm not sure how USAA -- I was

not sure at the time how Randall was able to do 30

1    of them.

2                    Now, during this trial, I see how it

3    was done.  Because of the fact that it was cashed

4    out within two hours -- excuse me.  They didn't do

5    the hold.

6                    As USAA -- I can't remember.

7    Alisha -- the witness from USAA had stated that they

8    were supposed to have a 10-day hold on it.

9    Apparently so that they can get the communication

05:03PM  10    back from the Federal Reserve or from the

11    originating bank.  Because that's what it's called.

12    When you have a transaction that originates from

13    somewhere, it's called originating bank.  Okay?

14                    So from that originating bank, they do

15    this 10-day hold or up to a 10-day hold.  Obviously

16    there was no hold, because within less than -- less

17    than a day, he goes in and -- to get a line of

18    credit and he's told he can cash it.  So that became

19    even more of a concern for us because if it's one

05:03PM  20    institution, maybe it's possible in others.

21                    And you're talking about an institution

22    that's been around as long as -- you know, almost as

23    long as the Federal Reserve.

24                    So through this, I did a number of

25    different accounts to go in and try them out to see,

What did it look like? Did each one have the same
system? And, meanwhile, while I was doing that, the
intelligence guys and the tech guys were actually
tracking everything to see from -- let's just say
what we call behind the screens. Okay?

So inside of the banking facilities
themselves, they have their own programs. Me
sitting at a computer, I can't look at it. I can't
see what's going on on their end, but I can see
what's going on in front of me.

So we were able to track that part, to
field that part, and then the guys, the other part
of the universal teams that were working on the
cleanup, were able to see the other parts. I have
not seen the other parts.

Since I started with this particular
instance, I ended up here and haven't been able to
follow through, other than to give the data of what
I had been able to experience by my own tests, and
then my sole focus was to keep Randall Keith Beane
alive, not disappeared, and to also give incentive
to have the Federal Reserve show up so that we could
have a final closure on data that needed to come out
that many have been waiting a lot longer than the
20 years I have to have that data come out.

1    I'm going to have some documents to

2  enter into evidence.  Do you want me to do that now

3  or do you want to break?

4        THE COURT:  I think we'll break for the day

5  at this point.

6        MS. TUCCI-JARRAF:  Okay.

7        THE COURT:  I thank the jury for --

8        MS. TUCCI-JARRAF:  Thank you.

9        THE COURT:  -- your attention today.  We're

05:05PM 10  obviously going a little bit beyond what maybe we

11  estimated, and I appreciate the jury's cooperation

12  and patience in that regard.  So we'll stand in

13  recess.

14        I have one brief matter in the

15  morning.  So I'm going to ask you to be here at 9:15

16  a.m.  So we'll try to start tomorrow, which would be

17  Tuesday, January 30, at 9:15 a.m.  So thanks to the

18  members of the jury, and we'll see you in the

19  morning.

05:06PM 20        (Jurors excused for the day.)

21        THE COURT:  Let me ask you:  How much more

22  time do you anticipate on your direct examination?

23        MS. TUCCI-JARRAF:  I'm not sure.  I have

24  the documents to show, the -- I have some documents

25  that I want to enter into evidence, as well as

1    testimony.  But it's just me as the witness.  I'm

2    not doing another witness.

3            THE COURT:  Okay.  So I'm not going to hold

4    you to it, but roughly, in terms of introducing the

5    documents and your additional direct exam, I just --

6            MS. TUCCI-JARRAF:  I'm not sure.  I'm not

7    going to make the assumption of moderate cross

8    or --

9            THE COURT:  I'm not -- I'm not asking how

05:07PM  10    long they will take.  I'm just saying from -- for

11    you to finish your direct examination, about how

12    long would you anticipate?

13            MS. TUCCI-JARRAF:  I told Ms. Davidson I

14    expect to probably go through or at least after

15    lunch through the afternoon.  Possibly the end of

16    the day.  I don't know.

17            THE COURT:  Well, we're up to the events in

18    July.  So, let's do this:  Let's take a 5-minute

19    recess.  I want to come back and discuss the jury

05:07PM  20    charges because those will guide, you know, any

21    rulings I may have to make on introduction of

22    evidence or introduction of documents.

23                    So we're going to take a 5-minute

24    recess.  I think everybody got the jury -- draft

25    jury charge Friday and actually looked at it over

1    the weekend, and we'll come back in and have our

2    charge conference in five minutes.  Thank you.

3                    We'll stand in recess, let's say,

4    until 5:15.

5                    (A brief recess was taken.)

6            THE COURTROOM DEPUTY:  Please come to order

7    and be seated.

8            THE COURT:  All right.  I do want to go

9    ahead and talk about the jury charges.  I know we're

05:17PM 10   not at the end of the case, but I think we can go

11   ahead and discuss the jury charge and have our jury

12   conference.

13                   Before we do that, the Court notes that

14   the Indictment in this case contains forfeiture

15   allegations, and it appears to the Court that these

16   forfeiture allegations are directed only as to the

17   defendant Mr. Beane, as they concern the motor home

18   Mr. Beane allegedly attempted to purchase, as well

19   as a requested personal money judgment against him.

05:17PM 20                   Let me turn to the government.  Is that

21   the government's understanding of the forfeiture

22   allegations it is pursuing in this case?

23           MS. SVOLTO:  Yes, it is, Your Honor.

24           THE COURT:  With that in mind, Federal Rule

25   of Criminal Procedure 32.2(b)(5)(A) provides that in

1    any case tried before a jury, if the Indictment

2    states the government is seeking forfeiture, the

3    Court must determine before the jury begins

4    deliberating whether either party requests that the

5    jury be retained to determine the forfeitability of

6    specific property if it returns a guilty verdict.

7              In other words, the way the Court reads

8    Rule 32.2(b)(5)(A), and this is directed to the

9    government and Mr. Beane because the forfeiture

05:18PM  10    allegations do not involve Ms. Tucci-Jarraf, but if

11    either party requests, then if, and only if, there

12    were a guilty verdict as to Mr. Beane, then at the

13    request of either party, the jury would then have to

14    deliberate as to whether forfeiture is appropriate.

15    If the parties don't request that, then the Court

16    would determine the issue of forfeiture.  Again,

17    that's dependent on a guilty verdict in this case.

18              So, with that in mind, the question

19    then becomes:  Does either party seek a jury

05:19PM  20    determination as to whether the motor home -- since

21    we're talking about specific property under Rule

22    32.2.  So I would not interpret that to include the

23    requested money judgment.  That would be determined

24    by the Court; again, if there were a guilty verdict

25    at the time of sentencing.

1          So we're only talking about the motor

2    home, and the question becomes whether either party,

3    that being the government and Mr. Beane, seeks a

4    jury determination as to -- opposed to a Court

5    determination as to whether the motor home is

6    subject to criminal forfeiture if there were to be a

7    guilty verdict returned in this case as to

8    Mr. Beane.

9          So let me ask the government first.

05:19PM  10          MS. SVOLTO:  The government does not seek a

11   jury determination of the forfeiture of the motor

12   home.

13          THE COURT:  Mr. Beane.  Mr. McGrath, you

14   can --

15          MR. MC GRATH:  I'm sorry, Your Honor.  I'm

16   speaking for Mr. Beane.

17          THE COURT:  That's fine.

18          MR. MC GRATH:  Mr. Beane would prefer the

19   jury determination.

05:20PM  20          THE COURT:  He would request a jury

21   determination?

22          MR. MC GRATH:  He does, Your Honor.

23          THE COURT:  All right.  So you know what

24   that means.  If the jury comes in and decides guilty

25   on any of the relevant counts --

```
 1              MR. BEANE:  Right.

 2              THE COURT:  -- then we would have to have

 3    the jury -- to charge the jury again on whether

 4    forfeiture was appropriate.  That's what you would

 5    request?

 6              MR. BEANE:  Sure.  Yeah.

 7              THE COURT:  All right.  Then in light of

 8    that request for a jury determination on forfeiture,

 9    Rule 32.2(b)(5)(B) provides that the government is
```
05:20PM 10    to submit a proposed special verdict form listing
```
11    each property subject to forfeiture and asking the

12    jury to determine whether the government has

13    established the requisite nexus between the property

14    and the offense committed by the defendant.

15              So, I would ask, in light of that

16    request by Mr. Beane, that the government submit a

17    proposed special verdict form as to the

18    forfeitability of the motor home at some point

19    tomorrow, or at least --
```
05:21PM 20              MS. SVOLTO:  Yes.
```
21              THE COURT:  -- by -- well, by -- if

22    we -- let's say by tomorrow afternoon.

23              MS. SVOLTO:  Okay.  Yes, Your Honor, we

24    will.

25              THE COURT:  All right.  Thank you.
```

        1              Let's now look at the draft jury

        2    charge.  Typically at a charge conference, I'll look

        3    at the government first and see if they have any

        4    objections or questions or comments about the draft

        5    jury charge and then I'll go to each defendant.

        6              So let me start with the government.

        7    Ms. Svolto, are you handling that or Ms. Davidson or

        8    both?

        9              MS. DAVIDSON:  I think I'm prepared to

05:21PM 10    handle it.

       11              THE COURT:  Okay.

       12              MS. DAVIDSON:  If -- there are just some

       13    form -- at this point, I don't think the Court has

       14    made any judicially-noticed facts, and that's page

       15    7.  And, Your Honor, we object to the good-faith

       16    defense.  The defendant has not asked for it.  I'm

       17    not sure that it's applicable in this case.

       18              THE COURT:  All right.  What page -- what

       19    page is that?

05:22PM 20              MS. DAVIDSON:  That's on page 34.

       21              And then I think page 49 is not

       22    applicable.

       23              And then I don't think we had a witness

       24    that testified to both facts and opinions, and

       25    that's 52.  I think that should be taken out.

THE COURT:  All right.

MS. DAVIDSON:  And page 53, I don't think
we had any summaries that were not admitted into
evidence.

THE COURT:  Is that all the government's
comments?

MS. DAVIDSON:  Yes, Your Honor.

THE COURT:  I would tend to agree with you
on pages 49, 52 and 53.  Again, as we draft these at
05:22PM the beginning of the trial or toward the beginning
of the trial and some may or may not be applicable.

For example, page 52 is defendant's
election not to testify or present evidence.  I'm
sorry.  Page 49.  So we would take that out and
instead give the defendant's testimony charge on
page 50, i.e., defendants' testimony, since both
defendants did decide to testify, and I would tend
to agree with the government that we did not have --
looking at page 52 -- a witness testifying as to
05:23PM both facts and opinions and we have did not have
summaries or other materials not admitted into
evidence.  That's at page 53.

So let's go back to page 34, which in
the draft -- again, we know these jury charges must
conform to the evidence or are dependent on the

1    evidence submitted at trial.

2                Mr. Beane, I'll ask you if you have any

3    comment to the jury's -- I'm sorry -- to the

4    government's request not to include the good-faith

5    defense.  This only relates to the fraud, which is

6    only the counts directed to you in the Indictment.

7                So looking at page 34, do you have a

8    response to the government's request or objection

9    not to include the good-faith defense charge?

05:24PM  10           MR. MC GRATH:  May I have just a moment

11   with Mr. Beane?

12           THE COURT:  Yes.

13           MR. MC GRATH:  Thank you, Judge.

14                     (A discussion was had off the

15                      record between Defendant Beane

16                      and his counsel.)

17           MR. MC GRATH:  I appreciate the Court's and

18   everyone's patience.

19                Looking over it, we'll have a chance to

05:24PM  20   go over this again to see if he wants to change his

21   mind about any additions, changes or comments.

22           THE COURT:  All right.  So, I guess, you

23   mean to the charge -- right now I'm only asking

24   about page 34.

25           MR. MC GRATH:  Oh, yeah, yeah.  I just

1  wanted to look that over real quick.

2          THE COURT:  While he's looking that over,

3  we'll hold the government's objection in abeyance.

4              Ms. Tucci-Jarraf, do you have any

5  objections to the charge as drafted?

6          MR. LLOYD:  Your Honor, I have a -- I

7  guess, a combination question or suggestion being in

8  sort of a --

9          THE COURT:  That's fine.

05:25PM  10         MR. LLOYD:  -- twilight role in this case

11  or ambient role.

12          THE COURT:  Go ahead.

13          MR. LLOYD:  I might suggest to both

14  Ms. Tucci-Jarraf and to the Court that if you have,

15  beginning on page 41, three definitions of possible

16  money laundering that -- that in the absence of the

17  jury being called upon to specify what money

18  laundering, if any, occurred, the jury could be

19  confused enough to reach an inconsistent verdict

05:25PM  20  without knowing it if -- if the jury believes one

21  co-defendant conspired to commit money laundering

22  form A or type A, but the other co-defendant

23  conspired to commit money laundering type C.

24          THE COURT:  What are you suggesting or

25  requesting or proposing?

        1           MR. LLOYD:  Well, I might -- if I could
        2   have a little time, maybe I could propose some
        3   alternative language in the -- tomorrow before the
        4   middle of the day which might affect the verdict
        5   form.
        6           THE COURT:  All right.  Ms. Davidson.
        7           MS. DAVIDSON:  Your Honor, to be perfectly
        8   honest, I have not researched this issue and I would
        9   like some time to research what Mr. Lloyd brings up.
05:26PM  10   I really don't know the answer.
       11           THE COURT:  All right.  Well, that's good
       12   we're talking about this today then.
       13           MS. DAVIDSON:  Uh-huh.
       14           THE COURT:  All right.  We'll reserve
       15   Mr. Lloyd's comments, or both parties look at and
       16   consider in more detail Mr. Lloyd's comments
       17   regarding page 40, Object Offenses:   Money
       18   Laundering.
       19               All right.  Excuse me just a second.
05:27PM  20               And look -- as you're considering that,
       21   I'm jumping ahead to page 45, which is part of this
       22   same charge, which, I guess, I would style as a
       23   unanimity instruction.  So look at page 45 as you
       24   being the parties or counsel for the parties.  Also
       25   consider the issue raised by Mr. Lloyd.

                    MR. LLOYD:  Your Honor, my page 45 is

definitions pertaining to money laundering.

                    THE COURT:  Well, let me -- on this

particular charge, I'm looking at the last paragraph

7.  It's on my page 45, and it may have been copied

different.  If you look at the last paragraph --

                    MR. LLOYD:  Yes, sir.  Yes, Your Honor.

46.

                    THE COURT:  Paragraph 7 talks about the

government need only prove an agreement to commit at

least one of them, i.e., the three forms of money

laundering, but they must be unanimous agreement,

etcetera.

                    So take a look at that as we're also

considering the first part of that charge.

                    MS. DAVIDSON:  So if I understand it

correctly, Mr. Lloyd wants a verdict form that lists

all three for -- three separate times?  I mean,

three separate kinds?

                    MR. LLOYD:  Counsel is giving me more

credit for coherent thought than I deserve, but --

                    THE COURT:  I think he's questioning or

pondering whether -- based on this, whether the

verdict form would need to be changed.

                    MR. LLOYD:  Right.  Because I'm not sure if

1    the jury found whether the -- and as it stands now,

2    the jury is not required to disclose it, but if the

3    jury were to find that one co-defendant did launder

4    money but laundered money in the sense of hiding its

5    source and then came to the conclusion that the

6    other co-defendant laundered money in a different

7    way, I'm not sure that conspiracy conviction could

8    stand because there wouldn't have been agreement.

9            THE COURT:  Any comment at this point or do

05:29PM  10    you want to look at it?

11            MS. DAVIDSON:  Well, like I said, I would

12    like to research it more, but it seems like the one

13    that you -- on page 45, the instruction that you

14    give on page 45 takes care of that, because you do

15    tell the jury that they must agree that both parties

16    engaged in that one.

17            THE COURT:  Well, take a look at it.  It

18    says, "You must be in unanimous agreement as to

19    which offense a particular defendant conspired to

05:30PM  20    commit."

21                Maybe -- maybe it needs to say that the

22    defendants together -- I mean, the first question is

23    would they have to -- as Mr. Lloyd seems to be

24    stating, would they have to -- would the jury

25    have -- there are three separate methods that could

1    lead to money laundering.

2              Does the jury in their deliberations

3    have to conclude that both defendants conspired as

4    to the same one?

5              MS. DAVIDSON:  Yes.

6              THE COURT:  If that's the case, maybe we

7    need to look at the language, the unanimity

8    language, too, because it does say a particular

9    defendant.

05:30PM   10              But -- and that may -- that may take

11   care of Mr. Lloyd's, you know, comment that he

12   raised.  Perhaps.  I don't know.  You all take a

13   look at that.  That's fine.

14              MR. LLOYD:  Yes, Your Honor.

15              THE COURT:  All right.  And, Mr. Lloyd, on

16   Ms. Tucci-Jarraf's behalf, or, Ms. Tucci-Jarraf,

17   besides the Object Offenses:  Money Laundering

18   charge, are there any other charges to which there

19   are objection or comment?

05:31PM   20              MR. LLOYD:  Do you have any other

21   objections to the draft charge?

22              MS. TUCCI-JARRAF:  Without prejudice, I

23   have no further comments or objections or any kind

24   of -- just with the exception of what Mr. Lloyd

25   brought up.

```
 1              THE COURT:  Mr. Beane, subject to
 2   any -- subject to your response to the government's
 3   objection as to including a good-faith defense, are
 4   there any other objections or comments from you as a
 5   defendant to any other aspects of the jury charge?
 6              MR. BEANE:  No.
 7              THE COURT:  All right.  Mr. McGrath?
 8              MR. MC GRATH:  Yes.  And, sorry.  He got it
 9   out a little bit early.
10              THE COURT:  That's okay.
11              MR. MC GRATH:  Yes.  Page 34 and 35, the
12   fraud and the good-faith defense, there would be an
13   objection.  I think that's -- my client believes
14   that is needed in there.  He's spoken to his intent
15   as a possible defense and discusses that as an
16   element that's been a factor that we've been
17   discussing or that Mr. Beane, I should say, has been
18   discussing throughout this trial.  I believe that
19   the good-faith defense of fraud is something that
20   needs to stay in to the jury instructions.
21              THE COURT:  What would be the government's
22   response to that, to the defendant's argument that
23   it is one of his defenses that he's been raising
24   through his testimony and the evidence?
25              MS. DAVIDSON:  I guess I would say that I
```

1    don't understand that theory then.  But, I mean, he

2    certainly -- he testified, I think, that because the

3    bank put the money in his account initially that he

4    believed it was his; is that what I understood his

5    testimony to be?  And so, what, is it good faith

6    that the money is actually his?

7                    I mean, my initial objection was that

8    he didn't ask for it.  Most of the time the

9    good-faith defense is asked for by defense counsel.

05:32PM  10    But, I mean, if it's their theory that he did use

11    good faith, perhaps it's appropriate.

12              THE COURT:  All right.  Anything else on

13    Mr. Beane's behalf, Mr. McGrath?

14              MR. MC GRATH:  If we're leaving that in

15    there, no.  If not, I can respond and go into

16    further detail about the good-faith defense.

17                    Like I said before, I just think that

18    he's spent a lot of time leading up to that.  I

19    understand the government's position in this matter.

05:33PM  20    However, I think it should be left up to the jury to

21    decide about his intent.  And there has certainly

22    been enough put forth by the government, by both

23    co-defendants, where the jury can make a decision, I

24    believe, about a good-faith defense and what his

25    intentions are.  I believe that 12 people in our

```
 1    community can make that decision, and if you take

 2    that away from Mr. Beane, I think it undercuts a

 3    large part of his defense that he's testified to and

 4    that he's kind of, for lack of a better word, hung a

 5    portion of his case on, Your Honor.

 6              THE COURT:  All right.  Thank you.  I'll

 7    take that objection and the response under

 8    advisement.

 9              Now, other than the issue raised -- so

10    anything else by any of the parties on the jury

11    charge itself?

12              MR. LLOYD:  No, Your Honor.

13              THE COURT:  Hearing none then, going to the

14    verdict form.

15              Other than the issue raised by

16    Mr. Lloyd on Ms. Tucci-Jarraf's behalf as to

17    the -- I guess the three methods of money

18    laundering, are there any additional issues or

19    comments to the verdict form?

20              MS. DAVIDSON:  No, Your Honor, we had no

21    objections.

22              THE COURT:  Ms. Tucci-Jarraf or Mr. Lloyd?

23              MR. LLOYD:  Just -- you can go ahead.

24              Just that one issue, Your Honor, that

25    we're going to do some research on might affect
```

1   reshaping the verdict form.  But being charged with

2   only that one offense, I don't think there is any

3   other objection --

4           THE COURT:  All right.

5           MR. LLOYD:  -- to the verdict form that

6   this defendant could have.

7           THE COURT:  Do you concur in that?

8               Actually, there is only one

9   para- -- one section that even applies to you,

05:35PM  10   Ms. Tucci-Jarraf, obviously.

11           MS. TUCCI-JARRAF:  Without prejudice, I

12   find it to be just fine as written.

13           THE COURT:  Thank you.

14               Mr. Beane, any objections to the

15   verdict form?

16           MR. BEANE:  No, no objection.

17           THE COURT:  All right.  Anything else then?

18               I don't think there is anything else.

19   For charge conference purposes, we will give -- the

05:35PM  20   Court will consider the arguments related to the

21   good-faith defense charge.

22               Oh, there is one other thing.  What

23   page is the -- I'm looking at my page 47, but it's

24   the title Defendants' Theories 6.01.  Look around

25   page 47, 48 or 49.

1          MR. MC GRATH:  It's on 47, Your Honor.

2          MS. DAVIDSON:  47.

3          THE COURT:  47?  Does everybody see that

4    one?

5          MS. TUCCI-JARRAF:  Our says separately

6    tried co-conspirators.

7          THE COURT:  No, this is page 47.

8          MS. TUCCI-JARRAF:  Oh, here it is.  Here we

9    go.

05:36PM 10          THE COURT:  Defendant's Theory 6.01.  That

11    is a standard charge.  I will not ask you if you

12    want that included yet.  I will ask you at the

13    conclusion of all the evidence; "you" being each

14    defendant individually.

15          This gives you an opportunity, as you

16    see, after explaining the elements of the charged

17    offenses.  Next I'll explain the defendant's

18    positions.  Defendant, you know, Tucci-Jarraf says;

19    Defendant Beane says.  Okay?

05:36PM 20          Now, in criminal cases, and I urge you

21    to consult with Mr. Lloyd and Mr. McGrath, they can

22    tell you sometimes defendants insert a position or

23    theory; sometimes they don't.

24          If you do, this is not a closing

25    argument.  That's why we reference the Sixth Circuit

1    1999 case.  These theories are not meant to be the
2    defendant's views of the facts of the case.  It's
3    just legal theories or theories that find some
4    support in the evidence and the law.  So it's not a
5    two- or three-page recitation of your view of the
6    facts.  It's usually just a succinct, you know,
7    short, here is our position.
8              I mean, sometimes the defendant's
9    position has simply been, "We don't believe the
05:37PM  10   government has met its burden of proof in this
11   case."  Or, as I said, sometimes defendants don't
12   want this included at all and just wait until
13   closing argument to discuss their positions and
14   theories.
15             But sometimes they want something in
16   there, again, related to their theories that are
17   supported by the evidence and the law, but, again,
18   are not a recitation of what in effect would be a
19   closing argument.
05:37PM  20             So, just keep in mind that at the close
21   of all the evidence, the Court will ask each
22   defendant individually whether you want to include
23   any proposed language under Defendant's Theories.
24             Everybody understand that?
25             MS. TUCCI-JARRAF:  Uh-huh.

1          MR. MC GRATH:  And one more brief thing:

2    With that in mind, if Mr. Beane were to put forward

3    what it seems like he had testified to, going back

4    to pages 34 and 35, he would certainly need that to

5    then add to his -- to my defendant's theory.  Even

6    in a very succinct statement, he would certainly

7    need that aspect of his good faith.

8          THE COURT:  All right.  Okay.  Anything

9    else?

05:38PM 10          MS. DAVIDSON:  No, Your Honor.

11          THE COURT:  All right.  We'll see

12    everybody -- the proceeding I have, I'm having it in

13    another courtroom.  Hopefully it will only last

14    about 20 minutes or so.  So I'm not utilizing this

15    courtroom in the morning to make it easier for you

16    all to be here and be ready to go at 9:15.

17          MR. LLOYD:  And we can leave things

18    overnight?

19          THE COURT:  Yes, like you've been doing.

05:38PM 20          MR. LLOYD:  Thank you.

21          THE COURTROOM DEPUTY:  All rise.  This

22    honorable court stands in recess until January 30th.

23                      (Which were all the proceedings

24                       had and herein transcribed.)

25                    * * * * * * *

1                   C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4            I, Teresa S. Grandchamp, RPR, CRR, do hereby

5    certify that I reported in machine shorthand the

6    above proceedings, that the said witness(es)

7    was/were duly sworn; that the foregoing pages were

8    transcribed under my personal supervision and

9    constitute a true and accurate record of the

10   proceedings.

11           I further certify that I am not an attorney

12   or counsel of any of the parties, nor an employee or

13   relative of any attorney or counsel connected with

14   the action, nor financially interested in the

15   action.

16           Transcript completed and signed on Friday,

17   March 30, 2018.

18

19

20           _____
             TERESA S. GRANDCHAMP, RPR, CRR
21           Official Court Reporter

22

23

24

25